UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------ x
ALAN BROWN,                                      :    Case No. 05 Civ. 11178 (NG)
                                                 :
                    Plaintiff,                   :
                                                 :
         -against-                               :
                                                 :
STATE STREET CORPORATION                         :
and STATE STREET GLOBAL                          :
ADVISORS,                                        :
                                                 :
                    Defendants.                  :
------------------------------------------------ x
```

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS PURSUANT TO FED. R. CIV. P. 37(a)

Defendants State Street Corporation (the "Corporation") and State Street Global Advisors ("SSgA") (collectively "State Street") respectfully submit this memorandum of law in support of their Motion pursuant to Fed. R. Civ. P. 37(a) to compel plaintiff Alan Brown to produce documents in response to Requests Nos. 1, 2, 9, 10 and 11 of Defendants' Second Request for the Production of Documents, dated May 27, 2006.

### Preliminary Statement

In his Amended Complaint, plaintiff Alan Brown alleges that State Street terminated his employment to avoid paying him pension benefits that its former CEO, David Spina, had orally promised him. To explore Brown's allegations, State Street requested the production of (i) his communications with headhunters; (ii) his communications with Schroder Investment Management Limited, his current employer, through May 17, 2005 -- the day he stopped receiving a salary from State Street; and (iii) notes he took of discussions he had with current and former employees of State Street. Additionally, to investigate Brown's potential

damages, State Street requested the production of documents concerning the prior pension arrangements he had while employed at State Street. Brown, however, has refused to provide these documents and, accordingly, the Court should compel their production.

### Statement of Facts

By letter, dated March 11, 2005, Brown resigned from State Street, asserting that his position with the company was "no longer tenable." On March 17, 2005, State Street accepted Brown's resignation and placed him on leave, during which Brown did not work but received pay for 60 days, through May 17, 2005. At the end of March or in the beginning of April 2005, Brown began negotiating an employment agreement with Schroder Investment Management Limited ("Schroders"). On May 10, 2005, he completed a medical examination for Schroders and, on May 17, 2005 -- the last day of his leave and salary continuation from State Street -- Brown signed an employment agreement with Schroders. Three weeks later he brought this action claiming that State Street breached an oral agreement he had for benefits under State Street's Supplemental Executive Retirement Plan (or "SERP"). CPLT ¶ 34.

During discovery, Brown produced handwritten notes that either he or his wife took of conversations he had prior to March 11, 2005. At deposition, Brown testified that, starting in late 2004, he routinely took handwritten notes of conversations he had with people with whom he worked. Brown Dep. at 67:11-15 (excerpts from Brown's deposition are attached as Exhibit A). Brown also admitted that, since March 11, 2005, he has recorded at least one conversation with a former State Street employee concerning events that occurred before he left State Street. *Id.* at 61:8-63:12.

Brown also testified that he had a private pension arrangement with SSgA U.K. Limited, the State Street division that employed him. *Id.* at 143:19-144:6. Rather than

participate in any State Street U.K. pension plan, Brown received supplemental payments added to his salary. *Id.* He was also a member of a statutory pension plan in the United Kingdom *Id.* at 49:23-50:2. He acknowledged that, according to its terms, any pension benefit he received under the SERP would have to be reduced by benefits he received from his alternative pension arrangements. *Id.* at 143:20-144:6. Finally, he testified that he had documents showing the current value of these alternative arrangements. *Id.* at 50:6-20.

To explore these issues, State Street requested the following documents:

**Request No. 1**
All communications through May 17, 2005, between you and Schroders.

**Request No. 2**
All communications between you and any headhunter, recruiter, executive search firm or employment consultant.

**Request No. 9**
All notes, reports or transcripts of any conversation or communication between you and any of the following individuals: Timothy Harbert, John Snow, John Serhant, David Spina, Ronald Logue, Robert Weissman, Mitchell Shames, William Hunt, John Marrs, Luis de Ocejo, Boon Ooi, Peter Leahy, Trevor Lukes, John Towers, Thomas McCrossan, Charles Cutrell, Shawn Johnson, Nicholas Lopardo, any employee or agent of Spencer Stuart, and any employee or agent of The Hay Group or Hay Acquisition Company I, Inc.[1]

**Request No. 10**
All documents concerning any benefit plan, pension plan or retirement plan of which you are a participant or have been a participant.

**Request No. 11**
All documents concerning any benefit or compensation you receive or have received in lieu of participating in any benefit plan, pension plan or retirement plan.

State Street made these requests, among others, as part of its Second Request for the Production of Documents, dated May 27, 2006. On July 6, 2006, State Street received Brown's responses

---

[1] With the exception of Spencer Stuart, The Hay Group and Hay Acquisition Company I, Inc., the individuals listed in Request No. 9 are all current or former employees of State Street.

and objections to its Second Request. There, he objected to and withheld documents in response to Requests Nos. 1, 2, 9, 10 and 11 that were created after March 11, 2005.

By letter, dated July 26, 2006, counsel for State Street requested a discovery conference pursuant to Fed. R. Civ. P. 37 and LR 37.1. The parties' attorneys participated in discovery conference calls on August 1 and 7, 2006. Brown's counsel indicated that Brown would not produce any documents in response to Requests Nos. 1, 2, 9, 10 and 11 that were created after March 11, 2005.

Neither Brown nor his counsel, however, have offered any justification permitting Brown to withhold documents created after March 11, 2005. His counsel provided no explanation during the parties' conference call. And in his responses to State Street's discovery requests, Brown did not assert any attorney-client or work product privilege. Nor did he object on the grounds that it would be unduly burdensome for him to produce these documents. Rather, he has simply decided to produce some documents created after March 11, 2005, while withholding others.[2] State Street thus has no choice but to seek the Court's assistance.

## Argument

In his Amended Complaint (D.E. 35), Brown brings a claim for breach of the implied covenant of good faith, alleging that "State Street discharged [him] in an attempt to avoid paying him the VSP benefits Mr. Spina promised would be paid." CPLT ¶ 45. To prove this claim, Brown must first show that State Street terminated his employment in bad faith. *See*

---

[2] Though Brown asserted that he was not obligated to produce documents in response to Requests Nos. 1, 2, 9, 10 and 11 that were created after March 11, 2005, he responded to State Street's other requests seeking documents created after this date. For example, Brown indicated that he produced documents in response to State Street's Request No. 7, which sought:

> All communications between you, on the one hand, and John Snow, Peter Leahy, John Serhant, Shawn Johnson or John Marrs, on the other hand, concerning why your employment as an executive vice president for State Street and Chief Investment Officer for SSgA ended.

*Fortune v. National Cash Register Co.*, 373 Mass. 96, 104-05 (1977) (a claim for breach of the implied covenant is available only if an employer discharges an employee in bad faith). Despite giving notice of his resignation by letter, dated March 11, 2005, Brown asserts that he was not resigning but rather notifying State Street that he was entitled to certain benefits. CPLT ¶ 33.

Brown's communications with headhunters and with Schroders, his current employer, are certainly relevant to this issue. Brown has withheld these documents, claiming that he does not have to produce documents created between March 11, 2005 -- the date of his notice of resignation -- and May 17, 2005 -- the last day he received a salary from State Street. Yet, his correspondence with headhunters and with Schroders during this time period are a likely source of admissions by Brown as to how he viewed his departure from State Street and his intent in preparing his March 11, 2005 letter. Indeed, these communications will explain why Brown, if he believed he was fired, did not sign an employment agreement with Schroders until May 17, 2005 -- the last day of his leave and salary continuation from State Street.[3] Such evidence is plainly relevant to the merits of Brown's claims and, to prepare its defense, State Street is entitled to see it. It is not for Brown to pick and choose what relevant evidence State Street may or may not see.

His handwritten notes are unquestionably relevant to his remaining claims. Brown bases these claims -- breach of contract, ratification and promissory estoppel -- on an oral "commitment" that he alleges he entered into with State Street's former CEO. CPLT ¶¶ 35-43. To defend against these claims, State Street is entitled to know whether Brown knew that the Executive Compensation Committee had to first approve this oral "commitment" and that, in

---

[3]  To be clear, State Street is not seeking Brown's communications with Schroders after May 17, 2005. And it is willing to limit its Request No. 2 for his communications with headhunters to those created before he signed an employment agreement with Schroders.

fact, it did not. The notes of his conversations with current and former State Street employees, including those that took place after March 11, 2005, are likely to reveal what he knew before he left State Street and thus answer these questions.

There is no magic to March 11, 2005. This is so because, in his post-March 2005 conversations with State Street employees, Brown discussed events that occurred prior to his departure from the company. Brown Dep. at 61:8-63:12. Indeed, at least one conversation concerned events during "the fourth quarter of '04" -- when the Executive Compensation Committee rejected his oral "commitment" -- while another concerned "the summer of '03" -- when Brown alleges this "commitment" was made. *Id.* at 60:1-5. Because these conversations relate to events directly at issue in this case, State Street is entitled to discover the substance of these conversations, regardless of when they took place. And his notes, rather than his testimony, are the most reliable source for this information.

Finally, the valuations of his alternative pension arrangements are highly relevant to assessing the amount of his potential damages. Brown admitted at deposition that any pension benefit he received under the SERP would have to be reduced by benefits he received from his alternative pension arrangements. *Id.* at 143:20-144:6. Moreover, he testified that just before his deposition he had obtained current valuations of these arrangements. *Id.* at 50:14-20 ("I've just converted all of my pension arrangements into a new one, so I happen to know its current value."). These admissions make clear that the information in these valuations, regardless of when they were created, will impact the amount of State Street's potential liability and that, as a result, State Street is entitled to their production.

To defend against Brown's lawsuit, State Street is entitled to investigate fully all events relevant to his claims. *See, e.g., Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("Mutual

knowledge of all the relevant facts gathered by both parties is essential to proper litigation."). Federal Rule of Civil Procedure 26(b)(1) plainly indicates that parties "may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party...." Fed. R. Civ. P. 26(b)(1). Moreover, the standard of relevance is broad and encompasses more than that which is "admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

Even Brown has acknowledged that documents created after March 11, 2005, are relevant to his claims. He did not object to producing his communications with certain individuals after March 11, 2005, in response to State Street's other requests. Yet, the Federal Rules of Civil Procedure do not permit Brown to unilaterally pick and choose which discovery requests he believes are relevant to his claims and which are not.

### **Conclusion**

For the foregoing reasons, State Street respectfully requests that the Court grant this Motion in its entirety and issue an Order (attached as Exhibit 1 to State Street's Motion) compelling Brown to produce documents in response to Requests Nos. 1, 2, 9, 10 and 11 of its Second Request for the Production of Documents, dated May 27, 2006. Pursuant to Fed. R. Civ. P. 37(a)(4)(A), State Street also respectfully requests that the Court award State Street the fees and costs it incurred in preparing this Motion and the supporting papers.

Dated: New York, New York
August 14, 2006

Respectfully submitted,

QUINN EMANUEL URQUHART
  OLIVER & HEDGES, LLP

By: ___/s/ Peter Calamari_____
    Peter E. Calamari (*Pro Hac Vice*)
    Rex Lee (*Pro Hac Vice*)

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

HARE & CHAFFIN

By: ___/s/ David B. Chaffin_____
    David B. Chaffin
    BBO No. 549245

160 Federal Street
Boston, MA 02110
(610) 330-5000

*Attorneys for Defendants*
  *State Street Corporation*
  *and State Street Global Advisors*

# CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 14, 2006.

_____/s/ Rex Lee_____

# EXHIBIT A

# Transcript of the Testimony of Alan Brown

Taken: April 24, 2006

Volume: 1

In the Matter of:

Alan Brown,
                Plaintiff,

v.

State Street Corp, Et Al,
                Defendants.

Reported By Cynthia Stutz

O'CONNOR POLLARD REPORTING, INC.
Phone: 508-528-2950
Fax: 508-528-3927
Email: Mycourtreporter@comcast.net

Page 1

```
 1                                          Volume:   I
                                            Pages:  190
 2                                          Exhibits:  25

 3              UNITED STATES DISTRICT COURT

 4                 DISTRICT OF MASSACHUSETTS

 5

 6
     ALAN BROWN,
 7                          Plaintiff
                                            Docket No.
 8              vs.                         05 CIV 1178(NG)

 9   STATE STREET CORPORATION and
     STATE STREET GLOBAL ADVISORS,
10                          Defendant

11

12

13              VIDEOTAPED DEPOSITION of ALAN BROWN, a
     witness called by and on behalf of the Defendant, taken
14   pursuant to the Federal Rules of Civil Procedure,
     videotaped by Craig Newman of Valed Videography
15   Services, before Cynthia F. Stutz, Certified Shorthand
     Reporter and Notary Public in and for the Commonwealth
16   of Massachusetts, at the offices of Hare & Chaffin, 160
     Federal Street, Boston, Massachusetts, on Monday, April
17   24, 2006, commencing at 10:31 a.m.

18

19

20

21

22

23

24
```

Page 46

1   A. Right from the start.
2   Q. Okay. And can you describe the function of a
3   chief investment officer?
4   A. It's the most senior investment person within
5   that unit to whom typically all investment
6   professionals under them report to them and they take
7   ultimate responsibility for the investment activities
8   of the firm underneath them.
9   Q. And did your role change at any time during
10  the time you were at State Street?
11  A. Yes.
12  Q. And how did it change?
13  A. Changed several times. First, in 1996 my role
14  was extended to be chief investment officer for the
15  non-U.S. offices of State Street Global Advisors in
16  partnership with an individual called Peter Sternberg,
17  who is the U.S. CIO.
18  Q. And then, how did it change again?
19  A. Then a year later I became group chief
20  investment officer for all of State Street Global
21  Advisors activities in 1997.
22  Q. Okay. And when you became group chief
23  investment officer did you enter into a new employment
24  agreement?

Page 47

1   A. I did not.
2   Q. Was there anything in your arrangements with
3   State Street Global Advisors U.K. that guaranteed that
4   you would keep that position?
5       MR. SCHWARTZ: Which position?
6   Q. The position of group chief investment
7   officer.
8   A. Did it guarantee that I would keep that
9   position?
10  Q. Yes.
11  A. No.
12  Q. Then how did your role change after that?
13  A. In 2000 I was made an executive vice president
14  of State Street Corporation.
15  Q. Did that change your functional role?
16  A. No.
17  Q. What did that provide you?
18  A. Greater compensation, change of control
19  agreements, those kinds of benefits.
20  Q. And how was the change of control agreement
21  reflected?
22  A. I can't recall the detail of it, but I can't
23  recall -- And also that made me eligible for the, after
24  I'd done enough service, the senior executive

Page 48

1   retirement plan.
2   Q. So-called SERP?
3   A. So-called SERP.
4   Q. In terms of the change of control agreements,
5   were there specific agreements?
6   A. I can't recall the detail of it right now.
7   Q. How would a change of control impact you as an
8   employee?
9   A. The principal way in which that happened was
10  through the vesting, immediate vesting of equity
11  awards.
12  Q. And was that provided for in the equity award
13  agreements?
14  A. It was provided for in an agreement. I don't
15  recall which agreement.
16  Q. And that was really my question. In other
17  words, there was a specific agreement?
18  A. I think there was.
19  Q. That you were a party to?
20  A. Yes.
21  Q. It wasn't just some oral understanding?
22  A. No.
23  Q. Okay. Now, you also became eligible for the
24  SERP. What is the SERP?

Page 49

1   A. It's Senior Executive Retirement Plan.
2   Q. How did it work?
3   A. You had to have fulfilled certain service
4   criteria in that role and then after you'd reached the
5   age of 55, it provided additional pension benefits to
6   you, valuable pension benefits.
7   Q. And that was, when you say additional pension
8   benefits, in addition to what?
9   A. In addition to such other pension rights as
10  you might have accrued in your schemes within State
11  Street or outside of it.
12  Q. And what pension rights had you accrued other
13  than the SERP? In other words, what would it be in
14  addition to for you?
15  A. My private pension plan arrangements.
16  Q. And in addition to that, were you the
17  beneficiary of pensions from prior employment?
18  A. No.
19  Q. You had no pensions from any prior employment?
20  A. No.
21  Q. In the U.K. don't they have a state funded
22  pension plan, or had you always opted out of it?
23  A. No, there's a statutory state pension plan, as
24  well.

13 (Pages 46 to 49)

Page 50

```
1    Q. And you had been a member of that?
2    A. Since the first day I worked.
3    Q. Right. And you're still a member of that, I
4  trust?
5    A. I am still, yes, thank you.
6    Q. Where can we get documents that would
7  establish the value of your various pension rights from
8  either prior employment, State Street -- I'm sorry,
9  from the U.K. national pension plan or from your
10 private plan?
11   A. The question was where could you get it from?
12   Q. Yeah.
13   A. The answer would be me.
14   Q. Okay. Do you have such documents?
15   A. Yes.
16   Q. And it would be -- Do those documents show
17 valuation? Do you have periodic reports on valuation?
18   A. I've just converted all of my pension
19 arrangements into a new one, so I happen to know its
20 current value.
21   Q. Okay, good. So you said in 2000 your
22 situation changed. When did it next change?
23   A. After the departure of Nick Lopardo.
24   Q. And who was Nick Lopardo?
```

Page 51

```
1    A. He was the chief executive prior to Tim
2  Harbert of SSgA.
3    Q. And when did he depart?
4    A. If I remember right, it was 2001.
5    Q. And how did your role change after that?
6    A. Next role was replaced by something which
7  became known as the G4, which was a quasi-partnership
8  arrangement of four individuals who took over the
9  running of the firm.
10   Q. And how did your role change as a result of
11 that?
12   A. Well, the G4 now assumed all of the executive
13 arrangements. So instead of being purely concerned
14 with CIO activities, I was now, within the context of
15 that quasi-partnership, involved in all of the
16 executive functions of SSgA.
17   Q. And again, was this a role that was guaranteed
18 to you in some fashion?
19   A. No.
20   Q. Okay. And did your role change after that?
21   A. It did.
22   Q. When was that?
23   A. 2003.
24   Q. Okay. And what happened then?
```

Page 52

```
1    A. As a result of the voluntary severance program
2  two members of the G4, John Serhant and John Snow left.
3  So the G4 became a G2 with Tim Harbert and myself.
4    Q. Okay. And how did that change your role?
5    A. There were now two of us undertaking the work
6  that previously four had been doing.
7    Q. So your job became bigger?
8    A. Bigger, yeah.
9    Q. More important?
10   A. More important.
11   Q. Okay. And did the role change after that?
12   A. It did.
13   Q. And what happened next?
14   A. Tim Harbert died in August of 2005.
15   Q. Okay.
16   A. Sorry, correction. August of 2004.
17       MR. SCHWARTZ: Right.
18   Q. And then what happened?
19   A. The G2 became a G1 and I became acting head of
20 SSgA and worked with Peter Leahy to manage SSgA during
21 the succession planning arrangements.
22   Q. Who was Peter Leahy?
23   A. Peter Leahy was the chief operating officer.
24   Q. And how long did that continue?
```

Page 53

```
1    A. Until the end of January 2005.
2    Q. And then what happened?
3    A. And then Bill Hunt was appointed as the new
4  chief executive of SSgA.
5    Q. And how did you view that?
6    A. It changed my role to going back to being the
7  group chief investment officer.
8    Q. Which was the role you had occupied in, well,
9  for the bulk of your career at State Street Global
10 Advisors U.K.?
11   A. For the period 1997 to 2001.
12   Q. And was there anything wrong with that?
13       MR. SCHWARTZ: Objection.
14   A. Can you explain the question more?
15   Q. Were you upset by that?
16   A. I was not pleased with the way that the
17 succession plan, the succession, the succession
18 decision, no.
19   Q. Were you unhappy about not becoming the
20 permanent head of SSgA as opposed to the acting head?
21   A. I would have liked to have been appointed the
22 chairman and group chief investment officer of SSgA.
23   Q. Which would have been the Number 1 position?
24   A. Which would have been the Number 1 position.
```

Page 58

1  producing it before I arrived.
2  Q. Have you been working on it since you have
3  arrived?
4  A. I take an enthusiastic interest in it, yes.
5  Q. Did you think that you might be, in doing
6  that, disclosing trade secrets that belong to State
7  Street?
8  A. Not at all. The nature of the product is
9  rather different.
10 Q. And how is it different?
11 A. The State Street product, in line with State
12 Street's heritage, is very much geared to providing a
13 matching, almost semi-passive type solution. The
14 Schroeder product, in line with Schroeder's heritage,
15 is much more active. Reflecting that, there are only
16 five, five buckets, not eight. The -- There are no
17 option programs incorporated in it. The cash
18 collateral is managed aggressively in a number of
19 enhanced strategies and it is coupled with a growth
20 portfolio, which includes all sorts of things from
21 equities to private equities to hedge funds to
22 commodities, all sorts of things which are not included
23 in the SSgA solution.
24 Q. Okay. Did you prepare for the deposition

Page 59

1  today?
2  A. I met with my counsel over the weekend and
3  obviously, I refreshed my memory by rereading things
4  like the pleadings and stuff like that.
5  Q. Can you tell me if you met with anyone else
6  besides your counsel?
7  A. And my wife in her role as counsel, as well.
8  Q. In her role as counsel?
9  A. In preparation for this?
10 Q. Yes.
11 A. No.
12 Q. Did you speak to any present or former
13 employees of State Street in connection with your
14 preparation for this deposition?
15 A. Yes, I have spoken to two former employees of
16 State Street.
17 Q. And who were they?
18 A. John Marrs and John Snow.
19 Q. And when did you speak to them?
20 A. During the course of the weekend.
21 Q. This weekend?
22 A. This weekend.
23 Q. And can you tell me what you said to them and
24 what they said to you?

Page 60

1  A. I asked them to clarify one or two issues in
2  relation to conversations that may have happened
3  particularly during the, in the context of John Marrs,
4  the fourth quarter of '04 and in John Snow, the summer
5  of '03.
6  Q. Can you tell me -- Let's start with John
7  Marrs, what conversation maybe -- Strike that. With
8  regard to the conversation with John Marrs, what did
9  you, how did you start it, what did you say?
10 A. I asked him whether he was well and enjoying
11 life at Fidelity.
12 Q. And what did he say?
13 A. He said he was both well and enjoying life at
14 Fidelity.
15 Q. And then what?
16 A. And then I asked him if he would be prepared
17 to talk to my attorney.
18 Q. And what did he say?
19 A. He said he would.
20 Q. And to your knowledge, has he done so?
21 MR. SCHWARTZ: Objection. His knowledge
22 would only be based on communications from me, so --
23 MR. CALAMARI: Not necessarily. It
24 could be based on communications with John Marrs.

Page 61

1  MR. SCHWARTZ: Well, why don't you see
2  then?
3  Q. I don't want any information that you may have
4  gotten from your attorney. If you have knowledge other
5  than what you may have gathered from your attorney --
6  A. I don't.
7  Q. Okay. And then what did you say?
8  A. I asked him about his recollection as to
9  whether any conversations had taken place with him and
10 a number of individuals in SSgA, in particular, Ron
11 Logue.
12 Q. And what did he say?
13 A. And Lou de Ocejo.
14 Q. I'm sorry.
15 A. And Lou de Ocejo.
16 Q. And what did he say?
17 A. He said that he had not had a conversation
18 with Ron Logue, but that he had had a conversation with
19 Boon Oui.
20 Q. And what did he say about that conversation?
21 A. He said -- Try and remember it. He said that
22 Boon Oui had inquired as to whether I had any U.K.
23 pension benefits. I think that was it.
24 Q. And what was his answer?

16 (Pages 58 to 61)

Page 62

1   A. I don't know.
2   Q. I'm sorry. What did you say in response to
3   that?
4   A. I think I said -- No, I mustn't speculate. I
5   said I don't have any U.K. pension benefits from the
6   corporation.
7   Q. Not counting the increase in salary?
8   A. Correct.
9   Q. You received as a result of --
10  A. Correct, correct.
11  Q. And did he have anything else to say in this
12  conversation?
13  A. He said that Tim Harbert had said to him just
14  before he died that Ron Logue had had a conversation
15  with Tim.
16  Q. And what did he say about that conversation?
17  A. Only that it had happened just before Tim's
18  death.
19  Q. Did you ask him what the substance of the
20  conversation was?
21  A. The substance of it was simply in relation to
22  the agreement that Tim and I had with David Spina.
23  Q. What were the words? Did he use words to
24  describe what was said or did he just tell you what the

Page 63

1   subject was?
2   A. He just told me what the subject was.
3   Q. How did this conversation take place, by
4   telephone?
5   A. By telephone.
6   Q. Were there e-mails that were used to set up
7   the conversation?
8   A. No.
9   Q. Did you take notes of the conversation?
10  A. Yes.
11  Q. Do you have those notes with you?
12  A. No.
13          MR. CALAMARI: We'll call for the
14  production of the notes.
15  Q. Is that all you can remember about the
16  conversation?
17  A. Yes. It wasn't a long conversation.
18  Q. And is that the only time you have spoken to
19  him over the past year?
20  A. No.
21  Q. When was the last time you spoke to him before
22  this?
23  A. The week before.
24  Q. And what was the nature of that conversation?

Page 64

1   A. He called me.
2   Q. What was the purpose of that call?
3   A. To inform me that he'd been contacted by your,
4   your associates in relation to the fact that he was
5   going to be called for deposition.
6   Q. And did you have any substantive discussion
7   with him about this matter?
8   A. No.
9   Q. Did you ask him any questions at that time?
10  A. Only social ones, how are you, that kind of a
11  question.
12  Q. And that was also by telephone?
13  A. Yes.
14  Q. Where were you, were you in the U.K. when that
15  occurred?
16  A. I was.
17  Q. And he was?
18  A. In the U.S., I think.
19  Q. Have you seen him recently?
20  A. No.
21  Q. What was the last time you spoke to him before
22  the call one week ago?
23  A. I don't recall. I don't recall. Not in 2006,
24  for sure.

Page 65

1   Q. Do you recall ever speaking to him on any
2   other occasion about the matters that we're here for?
3   A. No.
4           MR. SCHWARTZ: Let me clarify. You mean
5   since he left State Street or while he was at State
6   Street?
7           MR. CALAMARI: Since he left State
8   Street.
9   A. Sorry, that's how I took it. No.
10  Q. Okay. Now, you also said you also had a
11  conversation with John Snow?
12  A. I did.
13  Q. Who is John Snow?
14  A. John Snow was a member of what I previously
15  referred to as the G4. He was another previously
16  executive vice president and he elected to take the
17  EVSP in 2003.
18  Q. And what was the nature of that conversation?
19  A. Whether he'd be happy to speak to my attorney.
20  Q. And what did he say?
21  A. He would.
22  Q. And did you talk about anything else with him?
23  A. Yes.
24  Q. What did you talk about?

17 (Pages 62 to 65)

Page 66
1  A. Whether we might have time to meet for a drink
2  tonight.
3  Q. And did he?
4  A. Depends how long you keep me here.
5  Q. And other than that, was that the sum and
6  substance of the entire conversation?
7  A. It was.
8  Q. You did not talk about any information that is
9  related to this case?
10 A. No.
11 Q. Did you get any documents from either John
12 Marrs or John Snow?
13 A. From John Marrs, no. From John Snow, a copy
14 of the EVSP plan.
15 Q. And you got a copy of the EVSP plan from him
16 why?
17 A. So that I could refresh my knowledge of its
18 terms.
19 Q. Didn't you have your own copy?
20 A. No.
21 Q. Why not?
22 A. Because I wasn't given one.
23 Q. Now, you also said in preparing for the
24 deposition you reviewed documents. Can you tell me

Page 67
1  what documents you reviewed?
2  A. I reread the pleadings. I reread my
3  handwritten notes and I skimmed a small portion of the
4  many documents you have sent to us.
5  Q. Speaking of your handwritten notes, was it
6  your practice to take notes of conversations with
7  people that you worked with?
8  A. Routinely?
9  Q. Yes.
10 A. No.
11 Q. Did you develop a practice in that respect at
12 some point in time?
13 A. Yes.
14 Q. And when did that happen?
15 A. In the fourth quarter of 2004.
16 Q. And was there a reason that you developed a
17 practice to take notes at that time?
18 A. Yes.
19 Q. And what was that reason?
20 A. I was advised to.
21 Q. And I trust that's by counsel, which we don't
22 want to go into?
23 A. Correct.
24 Q. Did you also make tapes of conversations you

Page 68
1  had with people?
2  A. No.
3  Q. Now, when you made notes did you sit there
4  while people were talking and jot down the notes?
5  A. It depended.
6  Q. What did it depend on?
7  A. It depends on whether I was able to do that or
8  not. In other words, if I was sitting on the end of a
9  phone and I could write on a pad, yes. If I was eating
10 lunch and had other things in my hand, then I would
11 make the note afterwards.
12 Q. Okay. So if you had an in-person meeting and
13 you made notes of an in-person meeting, you would make
14 your notes after the meeting was over?
15 A. Either after or at the same time, depending.
16 Q. Well, would people see you jotting down notes
17 as they spoke to you?
18 A. They might do if they were looking, yes.
19 Q. Okay. And would you show them copies of notes
20 when they were finished?
21 A. I was never asked to.
22 Q. Well, did you ever offer to?
23 A. No.
24 Q. Wouldn't it be important to you to make sure

Page 69
1  you recorded things the way people thought they should
2  be recorded?
3  A. I saw no reason to give copies of those notes.
4  Q. So you could write whatever you want on the
5  notes, there'd be no way to tell if it was correct or
6  not correct?
7      MR. SCHWARTZ: Objection.
8  A. I could write whatever I wanted on the notes,
9  but that doesn't mean there wouldn't be a way to tell
10 whether it was right or not.
11 Q. Okay. During your -- Now -- I'm sorry.
12 Anybody else you talked to in terms of preparation for
13 this deposition other than your attorney, your
14 attorneys, to broaden that?
15 A. Other than what people we've already talked
16 about?
17 Q. Yes.
18 A. No.
19 Q. And since you left SSgA have you talked to any
20 employees or former employees of SSgA about the claims
21 you're asserting in this case?
22 A. Yes.
23 Q. Who was that?
24 A. John Serhant.

18 (Pages 66 to 69)

Page 142

1  A. Effectively, yes. As you might imagine, we
2  had many conversations on the succession process that
3  we were going through.
4  Q. What did this have to do with the succession
5  process?
6  A. Well, Peter Leahy was very concerned about the
7  succession process that we were going through. And by
8  his nature, you know, he's fairly tense individual and
9  he was very anxious that he and I stick together in
10 terms of the proper succession proposition that we had
11 put forward to Ron Logue, which was that the two of us
12 take over the leadership of the firm.
13 Q. And why did you think that you should advise
14 him about this agreement?
15 A. Well, in the spirit of full disclosure to a
16 close colleague, I thought that he ought to know that I
17 had what I regarded as a secure back stopper
18 arrangement, an option.
19 Q. And what was his comment in response to this?
20 A. Nothing specific. Just acknowledged it.
21 Q. Did he say, I'm surprised, or?
22 A. No.
23 Q. Or that's good for you?
24 A. I can't speculate on what he said.

Page 143

1  Q. So you just talked to him about the agreement
2  and he had no particular response that you can recall?
3  A. No special noteworthy response.
4  Q. And what about John Marrs?
5  A. John Marrs was already aware, that I believe,
6  I had this agreement, that I had this arrangement with
7  David Spina, but --
8  Q. How did he become aware?
9  A. I believe I must have told him sometime quite
10 a while ago. His role, as you may know, was head of
11 HR, so it's not exactly surprising that would know that
12 kind of thing. I can't recall how he became aware of
13 it, whether it was from me or Tim or both or when.
14 Q. And what was the nature of that conversation?
15 A. The nature of that conversation was that there
16 was one element of the benefit under the agreement with
17 David Spina that in particular I wanted to get more
18 closely defined.
19 Q. Which was that?
20 A. The provisions of the SERP include a deduction
21 from the benefit equal to accrued pension rights under
22 alternative arrangements, DB and DC type arrangements.
23 In the strict interpretation of that, I had no DB or DC
24 style benefits of the type contemplated by the plan,

Page 144

1  but as we've already discussed, State Street had been
2  paying to me a top up on my salary in lieu of
3  contributions to a recognized State Street plan. And
4  so there was the question of what allowance should be
5  made in terms of a deduction from the SERP benefit for
6  the monies that State Street had been paying to me.
7  Q. Was this something you discussed with David
8  Spina?
9  A. Yes. I had talked about the fact that I
10 didn't fit quite within the standard VSP formula
11 because of the fact that my benefits were outside of
12 the DB and DC arrangements contemplated in the
13 documentation, but obviously, in all equity and
14 fairness to State Street, they had been making a
15 contribution to me in lieu and they ought to get some
16 benefit from that in relation to a reduced SERP
17 liability.
18 Q. And what did David say about that?
19 A. No more at the time. No more. We didn't get
20 into any more detail on that.
21 Q. You didn't talked about any detail, you talked
22 about this is an issue?
23 A. Yes. And that was noted in his letter when he
24 was putting it on record to the compensation committee.

Page 145

1  Q. So getting back to what did John Marrs say
2  about that issue?
3  A. The result of that was to arrange for a
4  meeting with Lou de Ocejo at which we would go through
5  the specifics of what this agreement would mean for me
6  in the event that I elected to call it.
7  Q. Did John say anything else or was that the sum
8  total of what he said, I'll set up a meeting with Lou?
9  A. That's pretty much the sum total of it, as I
10 recall. Nothing else of note.
11 Q. Express anything about the agreement itself?
12 A. No.
13 Q. Say anything about the compensation committee?
14 A. Not at all.
15 Q. When did the meeting with Lou take place?
16 A. In the absence of my calendar, I can't give
17 you a precise date, but I think it was in November or
18 possibly December of '04.
19 Q. And what was the nature of that meeting? Was
20 it a meeting or was it a telephone call?
21 A. It was a meeting in my office at 1 Lincoln
22 Street.
23 Q. And what was the nature of the meeting?
24 A. To discuss a sensible approach to the pension

37 (Pages 142 to 145)