UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------- x
ALAN BROWN,                             :
                                        :
                    Plaintiff,          :
                                        :        Case No. 05 Civ. 11178 (NG)
        -against-                       :
                                        :
STATE STREET CORPORATION                :
and STATE STREET GLOBAL                 :
ADVISORS,                               :
                                        :
                    Defendants.         :
------------------------------------------------------- x


**DEFENDANTS' STATEMENT OF UNDISPUTED
FACTS PURSUANT TO LOCAL CIVIL RULE 56.1
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**


QUINN EMANUEL URQUHART
    OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

HARE & CHAFFIN
160 Federal Street, 23rd Floor
Boston, MA 02110
(617) 330-5000

Pursuant to Local Rule 56.1 of the United States District Court for the District of Massachusetts, defendants State Street Corporation and State Street Global Advisors respectfully submit this statement of material facts as to which there is no genuine issue to be tried in support of their motion for summary judgment.

## Undisputed Facts

### The Parties

1.      Co-defendant State Street Global Advisors ("SSgA") is a global business unit of State Street Bank and Trust Company, a wholly-owned subsidiary of co-defendant State Street Corporation (the "Corporation") (collectively, "State Street").

2.      Plaintiff Alan Brown ("Brown") is the former Chief Investment Officer of SSgA and a former executive vice president for the Corporation.

### State Street's Board Of Directors

3.      State Street's business is overseen by the Corporation's Board of Directors (the "Board") as well as the Board's various committees.  Declaration of Rex Lee dated September 25, 2006 ("Lee Decl.") ¶ 2, Ex. 1 (Proxy Statement at Plaintiff 312-16).  The Board's committee on executive compensation matters is the Executive Compensation Committee (the "ECC").  Lee Decl. ¶ 2, Ex. 1 (Proxy Statement at Plaintiff 315).

4.      The ECC, as set forth in its charter, is the final authority within State Street on granting or modifying equity or compensation awards, severance arrangements and any special or supplemental benefits for senior executives.  Lee Decl. ¶ 2, Ex. 1 (Proxy Statement at Plaintiff 315); Lee Decl. ¶ 3, Ex. 2 (the ECC Charter); Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 35:3-7; 74:12-18).

The Voluntary Separation Program

5.    In 2003, as part of an effort to reduce its overall costs, State Street conceived and developed the Voluntary Separation Program ("VSP") for its U.S. employees as well as a corresponding plan, the Executive Voluntary Separation Program ("EVSP"), for U.S. employees who were executive vice presidents or higher.  (We refer to both plans collectively as the "VSP.")  Lee Decl. ¶ 5, Ex. 4 (Apr. 10, 2003 email to employees from de Ocejo); Lee Decl. ¶ 6, Ex. 5 (de Ocejo Tr. 5:18-7:1).

6.    Through the VSP, State Street offered certain U.S. employees, among other things: (i) enhanced severance benefits; (ii) continued vesting of stock options and exercise deadlines; and (iii) enhanced retirement benefits, which for eligible executive vice presidents were paid pursuant to State Street's Supplemental Defined Benefit Pension Plan (the "Executive SERP").  Lee Decl. ¶ 7, Ex. 6 (VSP Decision Guide at 7-8, 15, 16); Lee Decl. ¶ 8, Ex. 7 (May 1, 2003 letter to eligible employees from Ooi).

7.    To implement these enhanced benefits within the context of the Executive SERP and State Street's existing stock option plans, State Street had to take action to modify the terms of these plans.  Lee Decl. ¶ 9, Ex. 8 (June 18, 2003 ECC minutes at 5-6).  The plan providing the severance payment did not require a formal vote to modify its terms.  Lee Decl. ¶ 11, Ex. 10 (Severance Plan at ¶ 3.2).

8.    Such modifications required the formal approval of the ECC, which it granted on June 18, 2003.  Lee Decl. ¶ 9, Ex. 8 (June 18, 2003 ECC minutes at 5-6).

9.    Participation in the VSP was limited to certain employees who were on State Street's U.S. payroll, participated in State Street's U.S.-based benefit plans and had

satisfied certain service requirements and other eligibility criteria.  Lee Decl. ¶ 7, Ex. 6 (VSP
Decision Guide at 3); Lee Decl. ¶ 6, Ex. 5 (de Ocejo Tr. 11:5-12:11).

      10.    On or about May 1, 2003, employees eligible for the VSP received letters
and detailed handbooks (collectively, the "VSP Decision Guide") summarizing the
enhancements to their stock option, severance and retirement benefits that State Street was
offering.  Lee Decl. ¶ 7, Ex. 6 (VSP Decision Guide); Lee Decl. ¶ 8, Ex. 7 (May 1, 2003 letter to
eligible employees from Ooi).

      11.    To obtain these benefits, eligible employees had to sign and submit written
election forms and releases by June 16, 2003 and agree to voluntarily terminate their
employment by a predetermined date.  Lee Decl. ¶ 7, Ex. 6 (VSP Decision Guide at 4-6); Lee
Decl. ¶ 8, Ex. 7 (May 1, 2003 letter to eligible employees from Ooi); Lee Decl. ¶ 12, Ex. 11
(Election Form); Lee Decl. ¶ 13, Ex. 12 (Release Agreement).

      12.    State Street reserved its right to exclude otherwise eligible employees
from participating in the VSP based on its business needs or to condition such participation upon
their agreement to remain with State Street for a specified and definite period of time before
resigning and/or to enter a non-compete agreement applicable in the post-resignation period.  Lee
Decl. ¶ 7, Ex. 6 (VSP Decision Guide at 3, 6); Lee Decl. ¶ 8, Ex. 7 (May 1, 2003 letter to eligible
employees from Ooi).

<u>The Severance And Retirement Plans Underlying The VSP</u>

      13.    For the two versions of the VSP applicable to executive vice presidents,
the enhanced severance payment was paid pursuant to State Street's U.S. severance pay plan (the
"Severance Plan").  Lee Decl. ¶ 11, Ex. 10 (Severance Plan); Lee Decl. ¶ 7, Ex. 6 (VSP Decision
Guide at 22); Lee Decl. ¶ 15, Ex. 14 (June 18, 2003 ECC Information Binder at SSC 05879-80);

Lee Decl. ¶ 16, Ex. 15 (June 19, 2003 Board Presentation at 5, 6, 8); Lee Decl. ¶ 6, Ex. 5 (de

Ocejo Tr. 12:6-11).

        14.     The benefits provided under the Severance Plan include, among others, a

cash payment based on tenure and salary and continuation of medical and life insurance through

the severance period. Lee Decl. ¶ 11, Ex. 10 (Severance Plan at Schedule A). Ordinarily, these

benefits are only available to State Street's U.S. employees and only if State Street terminates

their employment under one of three circumstances: (i) "[a] reduction in staff or layoff;" (ii)

"[a]n employee returning from leave and the original or comparable position is no longer

available, and/or;" (iii) "[a] determination that an employees' work performance is the result of

factors that may be beyond the employees' control." *Id.* (Severance Plan at 2; Schedule A).

        15.     The Executive SERP provides a select group of State Street's senior

executives with deferred compensation benefits based on a formula using tenure and salary. Lee

Decl. ¶ 18, Ex. 17 (Executive SERP Plan Document, ¶¶ 3.1, 3.2, 4.1, 4.2).

        16.     Under the express terms of the Executive SERP, employees' total benefits

are reduced by the amount of any retirement income these employees have earned from State

Street or from prior employers. Lee Decl. ¶ 18, Ex. 17 (Executive SERP Plan Document, ¶¶

2.21, 4.1, 4.2); Lee Decl. ¶ 19, Ex. 18 (Ooi Tr. 14:3-11); Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 143:20-

144:6). The Executive SERP also requires that any designation of participation be set forth in

writing. Lee Decl. ¶ 18, Ex. 17 (Executive SERP Plan Document, ¶ 3.2(iv)).

        17.     The VSP enhanced the Executive SERP by waiving its minimum age and

service requirements for eligibility and, for certain employees, by crediting them with additional

age and service years. Lee Decl. ¶ 7, Ex. 6 (VSP Decision Guide at 7-8).

Alan Brown

18.    On January 16, 1995, Brown commenced his employment with SSgA's United Kingdom affiliate, State Street Global Advisors U.K. Limited.  Lee Decl. ¶ 20, Ex. 19 (Brown's Employment Agreement); Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 14:3-10).

19.    In 1997, Brown became the Group Chief Investment Officer for SSgA, and, in 2000, he became an executive vice president of the Corporation.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 46:9-47:14); Lee Decl. ¶ 21, Ex. 20 (Aug. 18, 2000 letter to Brown from Spina).

20.    During all relevant periods, Brown was a British citizen and a resident of London, England.  Lee Decl. ¶ 22, Ex. 21 (Amended Complaint, ¶ 2); Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 87:13-88:1).

21.    Brown's primary office was State Street Global Advisors U.K. Limited's office in London, England.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 92:18-24).

22.    Throughout the entirety of his employment, Brown received his salary from State Street Global Advisors U.K. Limited, and he only participated in U.K.-based benefit plans.  Lee Decl. ¶ 23, Ex. 22 (Aug. 11, 1995 letter to Brown from Mossop); Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 17:8-17; 43:15-44:16).

23.    In 2003, Brown was a member of SSgA's "G4," a senior management group responsible for the overall direction of SSgA.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 51:5-16).

24.    Brown earned over $2.5 million in 2003.  Lee Decl. ¶ 24, Ex. 23 (2003 Compensation Summary at Plaintiff 78).

25.    Brown entered into numerous agreements with State Street regarding compensation matters.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 13:2-17; 14:1-10; 17:18-18:15; 23:8-15; 27:5-13; 29:13-30:23).

26.    Among these were:

- his employment agreement dated December 7, 1994;

- his Supplemental Life Assurance Arrangement dated August 11, 1995;

- a stock option agreement (pursuant to the 1994 Stock Option and Performance Unit Plan) dated July 11, 1996;

- an award agreement (pursuant to State Street's 1997 Equity Incentive Plan) dated November 16, 2001;

- a stock option agreement (granted under State Street's Executive Annual Incentive Plan) dated March 19, 2002;

- an award agreement (pursuant to the SSgA Equity Compensation Plan) dated September 19, 2002;

- and a performance award agreement (granted under State Street's 1997 Equity Incentive Plan) dated June 30, 2003.

Lee Decl. ¶ 20, Ex. 19 (Brown's Employment Agreement, ¶ 18.1); Lee Decl. 25, Ex. 24 (July 11, 1996 Agreement); Lee Dec. ¶ 26, Ex. 25 (Sept. 19, 2002 Agreement); Lee Decl. ¶ 27, Ex. 26 (Nov. 16, 2001 Agreement); Lee Decl. ¶ 28, Ex. 27 (Mar. 19, 2002 Agreement); Lee Decl. ¶ 34, Ex. 33 (June 30, 2003 Performance Award); Lee Decl. ¶ 23, Ex. 22 (Aug. 11, 1995 letter to Brown from Mossop at SSC 02010); Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 13:2-17; 14:1-10; 17:18-18:15; 23:8-15; 27:5-13; 29:13-30:23).

27.    Each of these agreements were in writing, duly authorized and executed. Lee Decl. ¶ 20, Ex. 19 (Brown's Employment Agreement); Lee Decl. 25, Ex. 24 (July 11, 1996 Agreement); Lee Dec. ¶ 26, Ex. 25 (Sept. 19, 2002 Agreement); Lee Decl. ¶ 27, Ex. 26 (Nov. 16, 2001 Agreement); Lee Decl. ¶ 28, Ex. 27 (Mar. 19, 2002 Agreement); Lee Decl. ¶ 34, Ex. 33 (June 30, 2003 Performance Award); Lee Decl. ¶ 23, Ex. 22 (Aug. 11, 1995 letter to Brown from Mossop at SSC 02010); Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 29:13-30:23; 108:15-18).

28.    Brown understood that all agreements concerning State Street executive compensation, bonuses, equity, severance and/or benefits had to be approved by the ECC.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 33:15-34:14; 35:3-7; 38:9-39:10; 74:12-18; 75:9-15; 79:15-80:7); Lee Decl. ¶ 21, Ex. 20 (Aug. 18, 2000 letter to Brown from Spina at 1); Lee Decl. ¶ 29, Ex. 28 (Dec. 7, 2000 letter to Brown from Lukes); Lee Decl. ¶ 30, Ex. 29 (1994 Prospectus at 5, 6); Lee Decl. ¶ 31, Ex. 30 (1997 Prospectus at Plaintiff 130); Lee Decl. ¶ 32, Ex. 31 (SSgA Equity Plan at Plaintiff 263); Lee Decl. ¶ 33, Ex. 32 (2002 Annual Incentive Plan at Plaintiff 70, 72); Lee Decl. ¶ 3, Ex. 2 (ECC Charter).

29.    Brown was familiar with the ECC's charter.  Lee Decl. ¶ 3, Ex. 2 (ECC Charter); Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 75:9-15).

30.    Brown was represented by an employment lawyer throughout his employment.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 13:12-17; 108:1-3; 138:10-19).

31.    Brown was ineligible for the VSP because he was not on State Street's U.S. payroll and did not participate in State Street's U.S.-based benefit plans.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 17:8-17; 43:15-44:16; 87:13-88:1); Lee Decl. ¶ 23, Ex. 22 (Aug. 11, 1995 letter to Brown from Mossop); Lee Decl. ¶ 7, Ex. 6 (VSP Decision Guide at 3).

32.    Brown was never invited to participate in the VSP, and he did not see the VSP Decision Guide until after he left State Street.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 66:11-22; 87:13-14; 88:9-15; 161:6-13).

33.    Brown understood the business reasons why State Street did not offer the VSP to all of its employees generally.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 71:3-72:13).

34.    In 2003, Brown was not yet eligible to be considered for participation in the Executive SERP. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 44:13-16); Lee Decl. ¶ 29, Ex. 28 (Dec. 7, 2000 letter to Brown from Lukes).

<u>Brown's Conversation With David Spina</u>

35.    In or about May 2003, Brown learned that two of the four members of the G4, John Snow and John Serhant, were eligible for the VSP and intended to participate. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 96:24-97:13).

36.    Though Brown did not intend to retire, he approached David Spina, then State Street's Chief Executive Officer, and suggested that he receive a severance arrangement similar to what others had received under the VSP. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 97:2-98:4; 98:13-24; 99:8-10; 99:18-100:11); Lee Decl. ¶ 35, Ex. 34 (Spina Tr. 12:6-13:1; 20:6-21). Tim Harbert, then head of SSgA, was also present and participated in this conversation. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 97:2-98:4).

37.    Spina and Brown discussed Brown's request, but the discussion did not include any detail as to specific terms or obligations. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 112:7-13; 143:14-144:20); Lee Decl. ¶ 35, Ex. 34 (Spina Tr. 26:1-4; 28:6-10; 32:18-33:7); Lee Decl. ¶ 36, Ex. 35 (June 10, 2004 email to Spina from Brown); Lee Decl. ¶ 37, Ex. 36 (June 3, 2004 email to Harbert from Brown).

38.    Among the issues that were not discussed or were left open for future discussion were the nature and extent of the benefits that Brown would receive, how these benefits would be calculated, how long Brown was required to stay with SSgA to receive them and what circumstances would trigger their payment. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 112:7-13; 143:19-144:20); Lee Decl. ¶ 35, Ex. 34 (Spina Tr. 26:1-4; 28:6-10; 32:18-33:7); Lee Decl. ¶ 36,

Ex. 35 (June 10, 2004 email to Spina from Brown); Lee Decl. ¶ 38, Ex. 37 (June 30, 2004 letter to Weissman from Spina).

39. Brown and Spina agreed that any agreement they might reach would need to be set out in writing. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 104:20-23; 106:11-13; 138:10-19); Lee Decl. ¶ 35, Ex. 34 (Spina Tr. 22:21-23:7; 32:18-33:7).

40. Spina told Brown that there were significant components to what they had discussed that "were beyond his control." Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 103:2-7).

41. Spina also told Brown that he would need to bring the proposal to the attention of the ECC. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 103:2-7); Lee Decl. ¶ 39, Ex. 38 (June 15, 2004 email to Brown from Spina).

42. Following this discussion, Brown interacted frequently with Spina but never spoke to him again, in person, about his request during their time at State Street. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 97:23-98:4; 106:5-10).

<u>Brown Renewed His Proposal Over A Year Later.</u>

43. In or about June 2004, there were rumors that Spina would be leaving State Street. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 117:14-18).

44. On June 10, 2004, Brown sent Spina an email to clarify the status of his proposal. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 125:4-127:1); Lee Decl. ¶ 36, Ex. 35 (June 10, 2004 email to Spina from Brown); Lee Decl. ¶ 37, Ex. 36 (June 3, 2004 email to Harbert from Brown).

45. The June 10, 2004 email was not intended to be and did not provide a complete summary of what Brown and Spina had discussed in May 2003. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 120:13-121:14)

46.    On June 15, 2004, Spina responded to Brown's email, informing him that he would raise what they had discussed with the ECC at its next meeting and that he would have "[m]ore after [this] meeting." Lee Decl. ¶ 39, Ex. 38 (June 15, 2004 email to Brown from Spina). Brown did not reply. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 106:5-10).

<u>The ECC Never Approved Brown's Proposal.</u>

47.    At the ECC's June 16, 2004 meeting, Spina informed the ECC of his discussions with Brown, Harbert and another senior executive John Towers. Lee Decl. ¶ 35, Ex. 34 (Spina Tr. 39:15-40:14).

48.    At the June 16, 2004 meeting, the ECC instructed Spina to provide more information about his discussions with Brown and the other employees. Lee Decl. ¶ 35, Ex. 34 (Spina Tr. 39:15-40:14).

49.    The ECC did not approve Brown's request at the June 16, 2004 meeting. Lee Decl. ¶ 40, Ex. 39 (June 16, 2004 ECC Minutes); Lee Decl. ¶ 45, Ex. 44 (Hill Tr. 16:5-9).

50.    Brown knew that the ECC did not approve his proposal at the June 16, 2004 meeting. Lee Decl. ¶ 38, Ex. 37 (June 30, 2004 letter to Weissman from Spina); Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 153:8-21); Lee Decl. ¶ 39, Ex. 38 (June 15, 2004 email to Brown from Spina); Lee Decl. ¶ 6, Ex. 5 (de Ocejo Tr. 39:21-40:17).

51.    On the day of his retirement, Spina provided a letter dated June 30, 2004, to Robert Weissman, the chairman of the ECC, in which he outlined the discussion he had with Brown. Lee Decl. ¶ 38, Ex. 37 (June 30, 2004 letter to Weissman from Spina); Lee Decl. ¶ 35, Ex. 34 (Spina Tr. 40:15-18).

52.    Brown received a copy of Spina's June 30, 2004 letter. Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 153:8-21); Lee Decl. ¶ 35, Ex. 34 (Spina Tr. 45:15-46:4).

53.    In the June 30, 2004 letter, Spina requested that the ECC approve a severance arrangement for Brown.  Lee Decl. ¶ 38, Ex. 37 (June 30, 2004 letter to Weissman from Spina); Lee Decl. ¶ 35, Ex. 34 (Spina Tr. 25:8-26:4).

54.    Spina did not intend his June 30, 2004 letter to be a complete summary of his discussion with Brown.  Lee Decl. ¶ 35, Ex. 34 (Spina Tr. 25:8-26:4; 27:14-28:15).

55.    In response to the June 30, 2004 letter, Weissman asked Luis de Ocejo, then head of Human Resources and one of the architects of the VSP, to review Spina's June 30th letter and prepare cost estimates for the proposal set forth in the letter.  Lee Decl. ¶ 6, Ex. 5 (de Ocejo Tr. 7:11-19; 46:21-47:24).

56.    In preparing the estimates requested by Weissman, de Ocejo and Boon Ooi, then head of Compensation and Benefits, made assumptions based on their interpretation of statements contained in Spina's June 30th letter.  Lee Decl. ¶ 19, Ex. 18 (Ooi Tr. 7:17-8:5; 10:4-14; 11:24-12:10); Lee Decl. ¶ 41, Ex. 40 (July 12, 2004 letter to Weissman from de Ocejo); Lee Decl. ¶ 42, Ex. 41 (Sept. 15, 2004 ECC Presentation).

57.    At its next meeting, on September 15, 2004, the ECC discussed a potential severance arrangement for Brown but again did not vote to approve one.  Lee Decl. ¶ 43, Ex. 42 (Sept. 15, 2004 ECC Agenda); Lee Decl. ¶ 44, Ex. 43 (Sept. 15, 2004 ECC Minutes); Lee Decl. ¶ 45, Ex. 44 (Hill Tr. 23:5-24:1); Lee Decl. ¶ 46, Ex. 45 (Sergel Tr. 42:22-43:2); Lee Decl. ¶ 6, Ex. 5 (de Ocejo Tr. 78:1-79:2); Lee Decl. ¶ 19, Ex. 18 (Ooi Tr. 46:10-17).

Brown Was Aware That The ECC Did Not Approve His Proposal.

58.    Brown knew that the ECC had not approved his proposal.  Lee Decl. ¶ 6, Ex. 5 (de Ocejo Tr. 39:21-40:17); Lee Decl. ¶ 38, Ex. 37 (June 30, 2004 letter to Weissman from Spina); Lee Decl. ¶ 39, Ex. 38 (June 15, 2004 email to Brown from Spina); Lee Decl. ¶ 4, Ex. 3

(Brown Tr. 103:2-7; 137:16-22; 140:13-15); Lee Decl. ¶ 45, Ex. 44 (Hill Tr. 25:17-27:5); Lee Decl. ¶ 47, Ex. 46 (Weissman Tr. 44:16-45:5).

59.    After the September 16, 2004 ECC meeting, de Ocejo told Brown the ECC was unwilling to grant him the type of severance package he had raised with Spina.  Lee Decl. ¶ 6, Ex. 5 (de Ocejo Tr. 39:21-40:17).

60.    Beginning in the fourth quarter of 2004, on the advice of counsel, Brown began taking notes of his discussions with State Street employees.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 67:11-20; 153:8-15).

61.    de Ocejo also testified that he spoke with Harbert on this subject and that Harbert informed him he knew that the ECC would never approve an individual VSP-type arrangement.  Lee Decl. ¶ 6, Ex. 5 (de Ocejo Tr. 26:3-22; 38:13-39:20).

62.    No written agreement was ever negotiated or entered into between Brown and State Street regarding what Brown had raised with Spina in May 2003.  Lee Decl. ¶ 44, Ex. 43 (Sept. 15, 2004 ECC Minutes); Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 137:16-22); Lee Decl. ¶ 45, Ex. 44 (Hill Tr. 23:5-24:1; 24:24-25:6; 25:17-27:5); Lee Decl. ¶ 46, Ex. 45 (Sergel Tr. 42:22-43:2); Lee Decl. ¶ 6, Ex. 5 (de Ocejo Tr. 78:1-79:2); Lee Decl. ¶ 19, Ex. 18 (Ooi Tr. 46:10-17); Lee Decl. ¶ 47, Ex. 46 (Weissman Tr. 44:16-45:5).

## Brown Resigned From State Street.

63.    After Harbert died in August 2004, Brown began vying to succeed him as head of SSgA.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 162:7-163:24).  State Street offered the position to another individual in late January of 2005.  *Id.*

64.     On March 11, 2005, Brown gave notice of his resignation from State Street.  Lee Decl. ¶ 4, Ex. 3 (Brown Tr. 166:15-18; 175:23-176:9; 180:10-13); Lee Decl. ¶ 48, Ex. 47 (Mar. 11, 2005 letter to Logue from Brown).

65.     State Street accepted Brown's resignation and placed him on "garden leave" until May 17, 2005, under which he continued to receive salary but did not work.  Lee Decl. ¶ 49, Ex. 48 (Mar. 17, 2005 email to Brown from Hunt); Lee Decl. ¶ 20, Ex. 19 (Brown's Employment Agreement, ¶ 29).

66.     On May 17, 2005, Brown signed an employment agreement with Schroder Investment Management Limited.  Lee Decl. ¶ 10, Ex. 9 (Schroders Employment Agreement).

Dated:    New York, New York
          September 26, 2006

                                        Respectfully submitted,

                                        QUINN EMANUEL URQUHART
                                          OLIVER & HEDGES, LLP


                                        By:  ___/s/ Peter Calamari_____
                                              Peter E. Calamari (*Pro Hac Vice*)
                                              Rex Lee (*Pro Hac Vice*)

                                        51 Madison Avenue, 22nd Floor
                                        New York, New York 10010
                                        (212) 849-7000

                                        HARE & CHAFFIN


                                        By:  ___/s/ David B. Chaffin_____
                                              David B. Chaffin
                                              BBO No. 549245

                                        160 Federal Street
                                        Boston, MA  02110
                                        (610) 330-5000

                                        *Attorneys for Defendants*
                                          *State Street Corporation*
                                          *and State Street Global Advisors*


## CERTIFICATE OF SERVICE

        I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 26, 2006.

                                        _____/s/ Rex Lee_____