UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------- x

ALAN BROWN,                              :     Case No. 05 Civ. 11178 (NG)
                                         :
                    Plaintiff,           :
                                         :     **DECLARATION OF REX LEE**
        -against-                        :     **IN SUPPORT OF DEFENDANTS'**
                                         :     **MOTION FOR SUMMARY**
STATE STREET CORPORATION                 :     **JUDGMENT**
and STATE STREET GLOBAL                  :
ADVISORS,                                :
                                         :
                    Defendants.          :
---------------------------------------------------------- x

        I, REX LEE, under penalty of perjury, do declare:

        1.      I am an associate with the firm of Quinn Emanuel Urquhart Oliver &

Hedges, LLP and a member of the bar of the State of New York. I have also been admitted *pro*

*hac vice* before this Court. I submit this declaration in support of defendants State Street

Corporation's (the "Corporation") and State Street Global Advisors' ("SSgA") (collectively,

"State Street") motion for summary judgment, dated September 26, 2006, to place before the

Court the documents and materials relied upon by State Street.

        2.      Attached as Exhibit 1 is a true and correct copy of select pages from the

Corporation's Proxy Statement dated March 4, 2005, which bears the Bates numbers Plaintiff

305 through Plaintiff 328.

        3.      Attached as Exhibit 2 is a true and correct copy of the charter of the

Executive Compensation Committee of State Street's Board of Directors, which bears the Bates

numbers SSC 04705 through SSC 04706.

        4.      Attached as Exhibit 3 are true and correct copies of select pages from the

transcript of the deposition of plaintiff Alan J. Brown taken April 24, 2006.

5.      Attached as Exhibit 4 is a true and correct copy of an email to State Street's U.S. employees from Luis de Ocejo dated April 10, 2003, which bears the Bates numbers SSC 04876 through SSC 04877.

6.      Attached as Exhibit 5 are true and correct copies of select pages from the transcript of the deposition of Luis de Ocejo taken May 23, 2006.

7.      Attached as Exhibit 6 is a true and correct copy of a document entitled "Executive Voluntary Separation Program Decision Guide," which bears the Bates numbers Plaintiff 4 through Plaintiff 28.

8.      Attached as Exhibit 7 is a true and correct copy of a letter to eligible U.S. employees from Boon S. Ooi dated May 1, 2003, which bears the Bates numbers Plaintiff 1 through Plaintiff 2.

9.      Attached as Exhibit 8 is a true and correct copy of the Executive Compensation Committee minutes taken June 18, 2003, which bears the Bates numbers SSC 04642 through SSC 04648.

10.      Attached as Exhibit 9 is a true and correct (redacted) copy of an employment agreement between Alan Brown and Schroder Investment Management Limited dated May 17, 2006, which bears the Bates numbers Plaintiff 442 through Plaintiff 449.

11.      Attached as Exhibit 10 is a true and correct copy of the plan document to State Street Corporation's U.S. Severance Plan (unsigned), effective January 1, 2000, which bears the Bates numbers SSC 06103 through SSC 06117.

12.      Attached as Exhibit 11 is a true and correct copy of an Election Form for the Executive Voluntary Separation Program, which bears the Bates number SSC 05332.

13.    Attached as Exhibit 12 is a true and correct copy of a Release Agreement for the Executive Voluntary Separation Program, which bears the Bates number SSC 05334 through SSC 05337.

14.    Attached as Exhibit 13 are true and correct copies of select pages from Plaintiff's Responses to State Street's First Set of Interrogatories dated February 26, 2006.

15.    Attached as Exhibit 14 are true and correct copies of select pages from a presentation concerning the Voluntary Separation Program made to the Executive Compensation Committee of State Street's Board of Directors on June 18, 2003, which bears the Bates numbers SSC 05877 through SSC 05881.

16.    Attached as Exhibit 15 is a true and correct copy of a document entitled "Cost Reduction Initiative" dated June 19, 2003, which bears the Bates numbers SSC 01420 through SSC 01430.

17.    Attached as Exhibit 16 is a true and correct copy of Plaintiff's Responses to State Street's Second Set of Interrogatories, which is undated.

18.    Attached as Exhibit 17 is a true and correct copy of the plan document to State Street's Supplemental Defined Benefit Pension Plan (without schedules) (unsigned), which bears the Bates numbers SSC 01106 through SSC 01127.

19.    Attached as Exhibit 18 are true and correct copies of select pages from the transcript of the deposition of Boon S. Ooi taken June 20, 2006.

20.    Attached as Exhibit 19 is a true and correct copy of an employment agreement (including schedules) between Alan Brown and State Street Global Advisors U.K. Limited dated December 7, 1994, which bears the Bates numbers SSC 01982 through SSC 02007.

21.    Attached as Exhibit 20 is a true and correct copy of a letter to Alan Brown from Nicholas Lopardo dated August 18, 2000, which bears the Bates numbers Plaintiff 300 through Plaintiff 302.

22.    Attached as Exhibit 21 is a true and correct copy of the Amended Complaint filed in the above-captioned action.

23.    Attached as Exhibit 22 is a true and correct copy of a letter to Alan Brown from Christopher J. Mossop dated August 11, 1995, which bears the Bates numbers SSC 02008 through SSC 02010.

24.    Attached as Exhibit 23 is a true and correct copy of a document entitled "State Street Global Advisors 2003 Annual Total Compensation Summary -- Alan Brown" dated October 10, 2003, which bears the Bates numbers Plaintiff 78 through Plaintiff 80.

25.    Attached as Exhibit 24 is a true and correct copy of a letter agreement between Alan Brown and State Street dated July 11, 1996, which bears the Bates numbers Plaintiff 106 through Plaintiff 112.

26.    Attached as Exhibit 25 is a true and correct copy of an award agreement between Alan Brown and State Street Bank and Trust Company dated September 19, 2002, which bears the Bates numbers Plaintiff 260 through Plaintiff 262.

27.    Attached as Exhibit 26 is a true and correct copy of an award agreement between Alan Brown and State Street dated November 16, 2001, which bears the Bastes numbers Plaintiff 213 through Plaintiff 214.

28.    Attached as Exhibit 27 is a true and correct copy of an award agreement between Alan Brown and State Street dated March 19, 2002, which bears the Bates numbers Plaintiff 250 through Plaintiff 257.

29.     Attached as Exhibit 28 is a true and correct copy of a letter to Alan Brown from Trevor Lukes dated December 7, 2000, bearing the Bates number Plaintiff 303 through Plaintiff 304.

30.     Attached as Exhibit 29 is a true and correct copy of a prospectus for State Street's 1994 Stock Option and Performance Unit Plan dated January 19, 1995, which bears the Bates numbers Plaintiff 113 through Plaintiff 126.

31.     Attached as Exhibit 30 is a true and correct copy of a prospectus for State Street's 1997 Equity Incentive Plan dated October 1, 2001, which bears the Bates numbers Plaintiff 127 through Plaintiff 139.

32.     Attached as Exhibit 31 is a true and correct copy of the plan document for SSgA's Equity Compensation Plan, which bears the Bates numbers Plaintiff 263 through Plaintiff 268.

33.     Attached as Exhibit 32 is a true and correct copy of the plan document for State Street's 2002 Executive Annual Incentive Plan, which bears the Bates numbers Plaintiff 69 through Plaintiff 73.

34.     Attached as Exhibit 33 is a true and correct copy of a performance award agreement between Alan Brown and State Street dated June 30, 2003, which bears the Bates numbers Plaintiff 280 through Plaintiff 283.

35.     Attached as Exhibit 34 are true and correct copies of select pages from the transcript of the deposition of David A. Spina taken May 31, 2006.

36.     Attached as Exhibit 35 is a true and correct copy of an email to David Spina from Alan Brown dated June 10, 2004, which bears the Bates number SSC 01306.

37.     Attached as Exhibit 36 is a true and correct copy of an email to Tim Harbert from Alan Brown dated June 3, 2004, which bears the Bates number Plaintiff 31.

38.     Attached as Exhibit 37 is a true and correct copy of a letter to Robert E. Weissman from David Spina dated June 30, 2004, which bears the Bates numbers Plaintiff 29 through Plaintiff 30.

39.     Attached as Exhibit 38 is a true and correct copy of an email to Alan Brown from David Spina dated June 15, 2004, which bears the Bates number SSC 01207.

40.     Attached as Exhibit 39 is a true and correct (redacted) copy of the Executive Compensation Committee minutes taken June 16, 2004, which bears the Bates numbers SSC 04668 through SSC 04671.

41.     Attached as Exhibit 40 is a true and correct copy of a letter to Robert E. Weissman from Luis de Ocejo, copying Boon Ooi, dated July 12, 2004, which bears the Bates numbers SSC 05477 through SSC 05479.

42.     Attached as Exhibit 41 is a true and correct copy a presentation concerning Alan Brown made to the Executive Compensation Committee of State Street's Board of Directors on September 15, 2004, which bears the Bates numbers SSC 05475 through SSC 05476.

43.     Attached as Exhibit 42 is a true and correct copy of the agenda of the September 15, 2004 meeting of the Executive Compensation Committee of State Street's Board of Directors, which bears the Bates number SSC 05610.

44.     Attached as Exhibit 43 is a true and correct (redacted) copy of the Executive Compensation Committee minutes taken September 15, 2004, which bears the Bates numbers SSC 04672 through SSC 04676.

45.    Attached as Exhibit 44 are true and correct copies of select pages from the transcript of the deposition of Linda Hill taken May 23, 2006.

46.    Attached as Exhibit 45 are true and correct copies of select pages from the transcript of the deposition of Richard P. Sergel taken May 26, 2006.

47.    Attached as Exhibit 46 are true and correct copies of select pages from the transcript of the deposition of Robert Weissman taken July 13, 2006.

48.    Attached as Exhibit 47 is a true and correct copy of an email to Ronald Logue and Luis de Ocejo from Alan Brown dated March 11, 2005, which bears the Bates number SSC 02123 through SSC 02124.

49.    Attached as Exhibit 48 is a true and correct copy of an email to Alan Brown from William Hunt dated March 17, 2005, which bears the Bates numbers SSC 01151 through SSC 01152.

Dated: New York, New York
    September 26, 2006

_____/s/ Rex Lee_____
Rex Lee

### CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 26, 2006.

_____/s/ Rex Lee_____

# EXHIBIT 1

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-EXOBOS venkp0dc VENKP00E | 04-Mar-2005 02:53 EST | 10243 SCH14A 1 | 2* |
| NOTICE & PROXY STATE | | BOS | | HTM Che | 1C |
| | | | | Page 1 of 2 | |

## SCHEDULE 14A INFORMATION
Proxy Statement Pursuant To Section 14(a) of the
Securities Exchange Act Of 1934
(Amendment No.    )

Filed by the Registrant    ☒

Filed by a Party other than the Registrant    ☐

Check the appropriate box:

☐  Preliminary Proxy Statement      ☐  Confidential, for Use of the Commission Only (as permitted
                    by Rule 14a-6(e)(2))

☒  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material Pursuant to Section 240.14a-11(c) or
  Section 240.14a-12

## STATE STREET CORPORATION

### (Name of Registrant as Specified in its Charter)

### (Name of Person(s) Filing Proxy Statement if Other Than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

  (1) Title of each class of securities to which transaction applies:

  (2) Aggregate number of securities to which transaction applies:

  (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth
    the amount on which the filing fee is calculated and state how it was determined):

  (4) Proposed maximum aggregate value of transaction:

  (5) Total fee paid:

☐ Fee paid previously with preliminary materials:

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the
  offsetting fee was paid. Identify the previous filing by registration statement number, or the form or schedule and the date
  of its filing.

  (1) Amount Previously Paid:

  (2) Form, Schedule or Registration Statement No.:

  (3) Filing Party:

Plaintiff 305

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CXR VENKPODC | BOS venkp0dc | 04-Mar-2005 02:53 EST | 10243 SCH14A 1 | 2* |
|---|---|---|---|---|---|---|
| NOTICE & PROXY STATE | | | BOS | | HTM Che | 1C |
| | | | | | Page 2 of 2 | |

(4)   Date Filed:

Plaintiff 306

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-EX0 8.8.12 | BOS venkp0dc | 04-Mar-2005 04:04 EST | | 10243 LTR 1 | 3* |
| NOTICE & PROXY STATE | | | BOS | | CLN g44o27-1.0 600w41-2.0 | PS PMT | 2C |

# STATE STREET.

Ronald E. Logue
Chairman and Chief Executive Officer

March 16, 2005

DEAR STOCKHOLDER:

We cordially invite you to attend the 2005 Annual Meeting of Stockholders of State Street Corporation. The meeting will be held in the Global Room, 7th floor, at One Lincoln Street, Boston, Massachusetts, on Wednesday, April 20, 2005, at 10:00 a.m.

Details regarding admission to the meeting and the business to be conducted are more fully described in the accompanying Notice of Annual Meeting and Proxy Statement.

Your vote is very important. Whether or not you plan to attend the meeting, please carefully review the enclosed proxy statement and then cast your vote, regardless of the number of shares you hold. Please complete, sign, date and mail promptly the accompanying proxy card, or for shares held in street name, the voting instruction form, in the return envelope. As a registered stockholder, you may also vote electronically by telephone or over the Internet by following the instructions included with your proxy card. If your shares are held in street name, as an alternative to returning the voting instruction form you receive, you will have the option to cast your vote by telephone or over the Internet if your voting instruction form includes instructions and a toll-free telephone number or Internet website to do so. In any event, to be sure that your vote will be received in time, please cast your vote by your choice of available means at your earliest convenience.

We look forward to seeing you at the Annual Meeting so that we can update you on our progress. Your continuing interest is very much appreciated.

Sincerely,

*Ronald C. Logue*

PLEASE NOTE: Stockholders should be aware of the increased security at public facilities in Boston. If you plan to attend the meeting, please allow additional time for registration and security clearance. You will be asked to present a valid, picture identification such as a driver's license or passport. If you own your shares through a bank or brokerage account, or through some other nominee, you must also bring proof of ownership (for details, see *Meeting Admission* in the *Notice of 2005 Annual Meeting of Stockholders*). Public parking is available at State Street's headquarters at One Lincoln Street (entrance from Kingston Street). Other public parking facilities available nearby include the LaFayette Corporate Center and the Hyatt Hotel (entrances from Rue de LaFayette).

State Street Corporation
One Lincoln Street
Boston, MA 02111-2900

Plaintiff 307

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX0 8.8.12 | BOS venkp0dc | 04-Mar-2005 03:54 EST | | | 10243 NOT 1 | 2* |
| NOTICE & PROXY STATE | | | BOS | | CLN | g44o22-3.0 | PS PMT | 2C |



# STATE STREET.

## NOTICE OF 2005 ANNUAL MEETING OF STOCKHOLDERS

**Time**            10:00 a.m., Eastern Time

**Date**            Wednesday, April 20, 2005

**Place**           One Lincoln Street, Seventh Floor, Boston, Massachusetts

**Purpose**
1. To elect fourteen directors;

2. To ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the year ending December 31, 2005; and

3. To act upon such other business as may properly come before the meeting and any adjournments thereof. We have been informed that stockholders intend to submit to the meeting additional proposals outlined under Other Matters in the Proxy Statement, including a proposal to amend the by-laws relating to the composition of the audit committee and selection of independent auditors, disclosure of self-dealing transactions of the directors, and prohibition of interlocking directorships.

**Record Date**     The directors have fixed the close of business on February 25, 2005 as the record date for determining stockholders entitled to notice of and to vote at the meeting.

**Meeting Admission**   For security clearance purposes, you will be asked to present a valid, picture identification such as a driver's license or passport. If your State Street stock is held in a brokerage account or by a bank or other nominee, your name does not appear on our list of stockholders, and these proxy materials are being forwarded to you by your broker or nominee. For street-name holders, in addition to a picture identification, you should also bring with you a letter or account statement showing that you were the beneficial owner of the stock on the record date, in order to be admitted to the meeting.

**Voting by Proxy**    Please submit a proxy card or, for shares held in street name, voting instruction form, as soon as possible so your shares can be voted at the meeting. You may submit your proxy card or voting instruction form by mail. As a registered stockholder, you may also vote electronically by telephone or over the Internet by following the instructions included with your proxy card. If your stock is held in street name, you may have the choice of instructing the record holder as to the voting of your shares over the Internet or by telephone. Follow the instructions on the voting instruction form you receive from your broker, bank, or other nominee.

By Order of the Board of Directors,

Charles C. Cutrell, III
*Secretary*

March 16, 2005

Plaintiff 308

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CXR&8 BOS venkp0dc | 04-Mar-2005 02:53 EST | 10243 TX 1 | 1* |
| NOTICE & PROXY STATE | | BOS | CLN | PS IFV | 1C |

# STATE STREET CORPORATION

One Lincoln Street, Boston, Massachusetts 02111

## PROXY STATEMENT

### GENERAL INFORMATION

*When are this proxy statement and the accompanying material scheduled to be sent to stockholders?*

This proxy statement and accompanying proxy card or, for shares held in street name, voting instruction form, are scheduled to be sent to stockholders beginning on March 16, 2005.

*Who is soliciting my vote?*

The Board of Directors of State Street Corporation ("State Street" or the "Company") is soliciting your vote for the 2005 Annual Meeting of Stockholders.

*What is the record date for the Annual Meeting?*

The Company's Board of Directors has fixed the record date for the Annual Meeting as of the close of business on February 25, 2005.

*How many votes can be cast by all stockholders?*

331,470,832 shares of common stock of State Street are outstanding and entitled to be voted at the meeting. Each share of common stock is entitled to one vote on each matter.

*How do I vote?*

If you are a registered stockholder, you may vote in person at the Annual Meeting or by proxy without attending the meeting. To vote by proxy, please mark, date, sign, and return the proxy card you received from management with this proxy statement in the return envelope. As a registered stockholder, you may also vote electronically by telephone or over the Internet by following the instructions included with your proxy card. If you vote by the proxy card you received from management with this proxy statement (or electronically by following the instructions included with the proxy card), your shares will be voted at the meeting in accordance with your instructions. If you sign and return the proxy card or vote electronically but do not give any instructions, your shares will be voted by the persons named in the proxy card in accordance with the recommendations of the Board of Directors given below.

If your stock is held in the name of a broker, bank or other nominee, please mark, date, sign, and return the voting instruction form you received from your broker or nominee with this proxy statement. As indicated on the form, you may have the choice of voting your shares over the Internet or by telephone. To do so, follow the instructions on the form you received from your broker or nominee.

If you are a registered stockholder and wish to vote in person at the meeting, be sure to bring a form of personal picture identification with you. If your stock is held by a broker, bank or other nominee and you wish to vote in person at the meeting, in addition to picture identification you should both bring an account statement or a letter from the record holder indicating that you owned the shares as of the record date, *and* obtain from the record holder and bring with you a proxy from the record holder issued in your name.

Plaintiff 309

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX08 BOS venkp0dc | 04-Mar-2005 02:53 EST | 10243 TX 2 | 1* |
| NOTICE & PROXY STATE | | ■ BOS | CLN | PS IFV | 1C |

Participants in State Street's Salary Savings Program will receive a voting direction form separately. State Street Bank and Trust Company, as trustee, will vote in accordance with written instructions from the participant and, where no instructions are received, the shares will be voted as directed by State Street.

### What are the Board's recommendations on how to vote my shares?

The Board of Directors recommends a vote:

- FOR election of the fourteen directors (page    )
- FOR ratification of the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for 2005 (page    )

### Who pays the cost for soliciting proxies by State Street?

State Street will pay the cost for the solicitation of proxies by the Board. That solicitation of proxies will be made primarily by mail. State Street has retained Georgeson Shareholder Communications, Inc. to aid in the solicitation of proxies for a fee of $17,500, plus expenses. Proxies may also be solicited for management by employees of State Street and its subsidiaries personally, or by telephone, fax or e-mail, without any remuneration to such employees other than their regular compensation. State Street will also reimburse brokers, banks, custodians, other nominees and fiduciaries for forwarding these materials to their principals to obtain authorization for the execution of proxies.

### Can I change my vote?

You may revoke or change your proxy at any time before it is voted by notifying the Secretary in writing, by returning a signed proxy with a later date or submitting an electronic proxy as of a later date, or by attending the meeting and voting in person. If your stock is held in street name, you must contact your broker or nominee for instructions as to how to change your vote.

### What vote is required to approve each item?

The fourteen nominees for election as directors who receive a plurality of the shares voted for election of directors shall be elected directors (Item 1). The affirmative vote of a majority of all shares present in person or represented by proxy at the meeting and entitled to vote is necessary to ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for 2005 (Item 2).

### How is the vote counted?

Votes cast by proxy or in person at the Annual Meeting will be counted by the persons appointed by State Street to act as tellers for the meeting. A majority of the shares entitled to vote at the Annual Meeting constitutes a quorum. The tellers will count shares represented by proxies that withhold authority to vote for a nominee for election as a director only as shares that are present and entitled to vote for purposes of determining the presence of a quorum. None of the withheld votes will be counted as votes "for" a director. Shares properly voted to "abstain" on Item 2 are considered as shares that are present and entitled to vote for the purpose of determining a quorum, but will be treated as having voted *against* approval of Item 2.

2

Plaintiff 310

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX01 B.8 BOS venkp0dc | 04-Mar-2005 02:54 EST | 10243 TX 3 | 1* |
| NOTICE & PROXY STATE | | BOS | CLN | PS | IFV | 1C |

If you hold shares through a broker, bank or other nominee, generally the nominee may vote the shares for you in accordance with your instructions. Stock exchange and NASD rules permit a broker to vote shares held in a brokerage account on some proposals if the broker does not receive voting instructions from you. Under these rules, a broker may vote in its discretion on Items 1 and 2.

*Could other matters be decided at the Annual Meeting?*

We do not know of any matters that may be properly presented for action at the meeting other than Items 1 and 2 and the stockholders' proposals intended to be submitted as outlined in Other Matters on page    . Should any other business come before the meeting, the persons named on the enclosed proxy will have discretionary authority to vote the shares represented by such proxies in accordance with their best judgment.

*What happens if the meeting is postponed or adjourned?*

Your proxy may be voted at the postponed or adjourned meeting. You will still be able to change your proxy until it is voted.

3

Plaintiff 311

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX02 BOS venkp0dc | 04-Mar-2005 02:54 EST | 10243 TX 4 | 1* |
| NOTICE & PROXY STATE | START PAGE | ■ BOS | CLN | PS IFV | 1C |

## CORPORATE GOVERNANCE AT STATE STREET

State Street has implemented the corporate governance initiatives under the Sarbanes-Oxley Act of 2002, the related rules of the Securities and Exchange Commission, and listing standards of the New York Stock Exchange, thereby strengthening the Company's governance and director independence standards already in place. We are intent on maintaining the Company's reputation for quality, integrity and the highest ethical standards that has been established over many years.

State Street is a financial holding company whose principal subsidiary is State Street Bank and Trust Company (the "Bank"). Each of State Street and the Bank is incorporated under the laws of Massachusetts. In accordance with Massachusetts law and State Street's By-laws, the Board of Directors has responsibility for overseeing the conduct of our business. Members of the Board are kept informed about our business by participating in meetings of the Board and committees of the Board, through regular discussions with the Chief Executive Officer, the President and other key members of management, and by reviewing materials provided to them.

State Street has also built upon its long-standing Standard of Conduct for officers and employees, promoting honest and ethical conduct and the avoidance of conflicts of interest, by adopting a Standard of Conduct for Directors. In addition, we adopted a Code of Ethics for Financial Officers (including the Chief Executive Officer and senior financial officers), consistent with the Sarbanes-Oxley Act, to promote honest and ethical conduct, full, fair, accurate, understandable and timely public disclosure, and avoidance of conflicts of interest.

Each of the Executive Committee, the Examining and Audit Committee, the Executive Compensation Committee, and the Nominating and Corporate Governance Committee has approved a charter that establishes its roles and responsibilities and governs its procedures, and each charter has been adopted by the Board. The Examining and Audit Committee charter, which was previously adopted by the Board, was recently amended by the Board to reflect changes to the New York Stock Exchange listing standards.

State Street's Board of Directors, in its role of overseeing the conduct of our business, is guided by our Corporate Governance Guidelines. The Guidelines have been recently updated to reflect changes to the New York Stock Exchange listing standards. Among other things, the Guidelines contain categorical standards for determining director independence in accordance with the New York Stock Exchange listing standards. In general, these categorical standards would prohibit a director from qualifying as an independent director if the director (and in certain circumstances, a member of the director's immediate family) has, or in the past three years had, certain relationships or affiliations with State Street, its external or internal auditors, or other companies that do business with State Street (including employment by State Street, receipt of a specified level of direct compensation from State Street other than director fees, and compensation committee interlocks). The categorical standards also provide specified relationships that by themselves, would not be considered to impair independence, including being an executive officer of an entity that has annual payments to, or payments from, State Street equal to or less than the greater of $1 million, or two percent of the gross annual revenue of the other entity. The portion of the Guidelines addressing director independence is attached as Appendix A to this proxy statement. The full Guidelines are available on State Street's website at www.statestreet.com and will be made available without charge by State Street to any stockholder who requests them.

Pursuant to the Guidelines, the Board undertook its annual review of Director independence in February, 2005. As part of this review, the Board considered transactions and relationships between each non-management

4

Plaintiff 312

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX8 8.8 | BOS venkp0dc | 04-Mar-2005 02:54 EST | | 10243 TX 5 | 1* |
| NOTICE & PROXY STATE | | | BOS | | CLN | PS IFV | IC |

Director or any member of his or her immediate family and the Company, including those reported under Related Transactions below. As provided in the Guidelines, the purpose of this review was to determine whether any relationship or transaction was inconsistent with a determination that the Director was independent. As a result of this review, the Board has determined that each of the 13 non-management directors (Mss. Albright, Hill, and Walsh and Messrs. Burnes, Casner, Darehshori, Goldstein, Gruber, LaMantia, Sergel, Skates, Summe, and Weissman) meet the categorical standards for independence under the Guidelines, has no material relationship with the Company, and satisfies the qualifications for independence under the Securities Exchange Act of 1934 (the "Exchange Act"). In determining that each of the 13 non-management directors is independent, the Board considered that the Company and its subsidiaries in the ordinary course of business makes loans or commitments to or sells services to, or purchases services or products from, entities in which certain directors serve as an executive officer or in the case of one director, Mr. Casner, an entity of which he is a former partner and is currently Of Counsel. In the case of loans and commitments made in the ordinary course of the Bank's business, the transactions were made on substantially the same terms, including interest rate and collateral, as those prevailing at the time for comparable transactions with unrelated persons with no more than normal risk of collection and which are made in compliance with applicable law, including Regulation O and Regulation W of the Board of Governors of the Federal Reserve System and Section 13(k) of the Exchange Act. In the case of Mr. Casner, the amounts paid to the law firm of which he is Of Counsel in each of the past three years was less than the 2% of total revenue threshold in the Guidelines. In the case of Dr. Walsh, the State Street Foundation has made discretionary contributions in each of the past three years to Wellesley College, of which she is President, in amounts which were less than the 2% of total revenue threshold in the Guidelines. The Board has determined that these transactions were not otherwise material to the other entity or to State Street, and that none of the Directors had a material interest in the transactions with these entities. The Board therefore determined that none of these relationships impaired the independence of the Directors.

In addition to the Guidelines, the charters for the Executive Committee, Executive Compensation Committee, Nominating and Corporate Governance Committee, and Examining and Audit Committee; the Standard of Conduct for officers and employees; the Standard of Conduct for Directors; and the Code of Ethics for Financial Officers are also available on State Street's website at www.statestreet.com and will be made available without charge by State Street to any stockholder who requests them.

The non-management directors meet in executive session at least quarterly. Robert E. Weissman is the Presiding Director of the non-management directors. State Street has established a procedure for communicating directly with the Presiding Director regarding concerns about State Street or its conduct, including complaints about accounting, internal accounting controls, or auditing matters. The contact information is available on State Street's website at www.statestreet.com. The Presiding Director may forward to the Examining and Audit Committee, or other group, any concerns the Presiding Director receives for appropriate review, and will report periodically to the non-management directors as a group regarding concerns received.

State Street has a regularly scheduled Board of Directors meeting that follows the annual stockholders' meeting, and all directors who are available to attend the Board meeting are expected to attend the stockholders' meeting that precedes it. In 2004, of the 15 individuals who were nominees at the annual meeting or whose terms extended past the annual meeting, 12 were present at the stockholders' meeting.

State Street has established and maintains internal controls and procedures for financial reporting designed to ensure the integrity and accuracy of the financial statements and control of its assets, and has established and maintains disclosure controls and procedures designed to ensure that State Street is able to timely record, process

5

Plaintiff 313

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX BOS venkp0dc | 04-Mar-2005 02:54 EST | 10243 TX 6 | 1* |
| NOTICE & PROXY STATE | | BOS | CLN | PS  IFV | 1C |

and report the information required for public disclosure. State Street is dedicated to maintaining the high standards of financial accounting and reporting that we have established over many years of service to stockholders, employees, and clients.

## Meetings of the Board

During 2004 the Board of Directors held 10 meetings and each of the directors attended 75% or more of the total of all meetings of the Board and of the committees of the Board on which each director served during the year. Each member of the Board is also a member of the Board of Directors of the Bank. The Board of Directors of the Bank held 10 meetings during 2004. Each member of State Street's Executive Committee and Examining and Audit Committee is also a member of the corresponding committee of the Bank, and members customarily hold joint meetings of both committees.

## Committees of the Board of Directors

The Board of Directors has the following committees to assist it in carrying out its responsibilities:

EXECUTIVE COMMITTEE. The Executive Committee is authorized to exercise all the powers of the Board of Directors that may be legally delegated to it by the Board in the management and direction of the business and affairs of State Street during the intervals between meetings of the Board, including the review of policies for the extension of credit and management of risk, investment of assets and financial management, and monitoring activities under these policies. The Committee reports periodically to the Board. Its members are Truman S. Casner, Chair; David P. Gruber; Charles R. LaMantia; Kennett F. Burnes and Ronald E. Logue. During 2004, the Committee held 13 meetings.

The Committee has a written charter, which is available on the Company's website, at www.statestreet.com.

EXAMINING AND AUDIT COMMITTEE. The Examining and Audit Committee has direct responsibility for the appointment, compensation, retention, and oversight of the independent auditors for State Street, and sole authority to establish pre-approval policies and procedures for audit and non-audit engagements with the independent auditors. The Committee also oversees the operation of a comprehensive system of internal controls designed to ensure the integrity of State Street's financial statements and reports and compliance with laws, regulations and corporate policies; oversees the independent auditor's qualifications, performance and independence, and monitors communications with the independent auditor and bank regulatory authorities; and monitors the performance of the internal audit function at State Street. Specific functions and responsibilities of the Committee are set forth in the revised charter of the Committee, adopted by the Board, which is attached as Appendix B to this proxy statement. The Committee's members are Charles R. LaMantia, Chair; Tenley E. Albright; David P. Gruber; and Ronald L. Skates. During 2004, the Committee held 12 meetings.

The Board of Directors has determined that the Committee consists entirely of directors who meet the independence requirements of the New York Stock Exchange listing standards and the rules and regulations under the Exchange Act. Further, all of the members of the Committee are financially literate, based upon their education and experience, as such qualification under the New York Stock Exchange listing standards is interpreted by the Board. The Board has determined, based upon education and experience as a principal accounting or financial officer or public accountant, or experience actively supervising a principal accounting or financial officer or public accountant, that three members of the Committee, Messrs. Gruber, LaMantia, and

6

Plaintiff 314

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX0 8.8 BOS venkp0dc | 04-Mar-2005 02:54 EST | | 10243 TX 7 | 1* |
| NOTICE & PROXY STATE | | BOS | | CLN | PS IFV | 1C |

Skates, satisfy the definition of "audit committee financial expert" as set out in the rules and regulations under the Exchange Act, and have accounting or related financial management expertise as such qualification under the New York Stock Exchange listing standards is interpreted by the Board. None of the members of the Committee serves on more than two other audit committees of public companies.

The Committee has a written charter, which, as recently amended, is attached as Appendix B and is also available on the Company's website, at www.statestreet.com.

EXECUTIVE COMPENSATION COMMITTEE. The Executive Compensation Committee reviews, evaluates and administers policies that relate to the compensation system for State Street's executive officers and other incentive programs of State Street and reviews and approves, together with the other independent directors, the Chief Executive Officer's compensation in light of approved corporate goals and objectives. Its members are Robert E. Weissman, Chair; Nader F. Darehshori; Linda A. Hill; and Richard P. Sergel. None of these individuals is or has been an officer or employee of State Street or the Bank. The Board of Directors has determined that the Committee consists entirely of directors who meet the independence requirements of the New York Stock Exchange listing standards and the rules and regulations under the Exchange Act. During 2004, the Committee held 5 meetings.

The Committee has a written charter, which is available on the Company's website, at www.statestreet.com.

NOMINATING AND CORPORATE GOVERNANCE COMMITTEE. The Nominating and Corporate Governance Committee's principal responsibilities are to assist the Board in identifying and recommending nominees for directors of State Street, and to provide leadership in shaping the corporate governance of the Company, including the Corporate Governance Guidelines applicable to the Company. Its members are Arthur L. Goldstein, Chair; Nader F. Darehshori; Gregory L. Summe; and Diana Chapman Walsh. The Board of Directors has determined that the Committee consists entirely of directors who meet the independence requirements of the New York Stock Exchange listing standards and the rules and regulations under the Exchange Act. During 2004, the Committee held 5 meetings.

The Committee has a written charter, which is available on the Company's website, at www.statestreet.com.

In carrying out its responsibilities of finding the best qualified candidates for directors, the Committee will consider proposals from a number of sources, including recommendations for nominees from stockholders submitted upon written notice to the Chair of the Nominating and Corporate Governance Committee, c/o the Office of the Secretary of State Street Corporation, One Lincoln Street, Boston, Massachusetts 02111 (facsimile number (617) 664-4747). The Committee seeks to identify individuals qualified to become directors, consistent with the Board's criteria for director candidates. That criteria covers those individuals who have substantial achievement in their personal and professional pursuits and whose talents, experience, and integrity would be expected to contribute to the best interests of the Company and to long-term stockholder value. Without limitation, the Committee considers those individuals who have a general management focus, preferably serve as CEOs of public companies, have a specialization in technology or finance, have global or international business experience, and contribute to the diversity of the Board.

The Committee's process for identifying and evaluating candidates includes actively seeking to identify qualified individuals by reviewing lists of possible candidates, such as CEOs of public companies, leaders of technology, finance, or other industries, or leaders of academia; and considering proposals from a number of

7

Plaintiff 315

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX02BOS venkp0dc | 04-Mar-2005 02:54 EST | 10243 TX 8 | 1* |
| NOTICE & PROXY STATE | | BOS | | CLN | PS IFV 1C |

sources, such as from members of the Board, members of management, employees, stockholders, and industry contacts. While the Committee has not typically used outside third-party search firms, its charter grants it authority to retain such a firm to assist it. Upon identifying a possible candidate, from whatever source, the Committee makes an initial evaluation as to whether the individual would be expected to qualify under the Board's general criteria for directors. A possible candidate who the Committee feels is an individual who could qualify under the general criteria is then further evaluated through a process which may include obtaining and examining the individual's resume, speaking with the person who has recommended the individual, speaking with others who may be familiar with the individual, interviews by members of the Committee with the individual, discussion at the Committee level of the individual's possible contribution to the Company, and, if appropriate, voting on the individual as a candidate. There are no differences in the manner in which the Committee evaluates possible nominees for directors based on whether an individual is recommended by a stockholder or otherwise.

### Compensation of Directors

Directors who are also employees of State Street or the Bank do not receive any compensation for serving as directors or as members of committees. The compensation for the non-management directors of State Street is reviewed and determined annually by the Executive Compensation Committee of the Board of Directors. For the period April 2004 through March 2005, directors who are not employees of State Street or the Bank received the following compensation:

- annual retainer – $50,000, payable at their option in shares of common stock of State Street or in cash,
- meeting fees – $1,500 for each Board and committee meeting, and
- an award of 2,067 shares of deferred stock, payable (together with additional stock amounts to reflect dividend and distribution amounts paid during deferral) after the director leaves the Board.

For this period, one outside director elected to receive his annual retainer in cash, and all other outside directors elected to receive their annual retainer in shares of common stock. The directors may elect to defer either 50% or 100% of fees and compensation payable during any calendar year pursuant to State Street's Deferred Compensation Plan for Directors, until after the director leaves the board or attains a specified age. Under the plan, deferred cash amounts accrue interest during deferral at a rate equal to the effective yield on 360-day Treasury bills, and deferred stock amounts are adjusted to reflect dividend and distribution amounts paid during deferral. Three directors have elected to defer compensation under the plan.

Directors receive travel accident insurance and are entitled to receive reimbursement for travel expenses or to be provided transportation in attending Board meetings and functions, and complimentary parking at State Street's headquarters building in Boston.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires State Street's directors and certain of its officers to send reports of their ownership and of changes in ownership of the common stock to the Securities and Exchange Commission and the New York Stock Exchange. Due to an administrative error on the part of the Company, one officer, Mr. Gavell, did not report on a timely basis one transaction, consisting of shares withheld to satisfy the tax-withholding consequences of the vesting of restricted stock. Based on State Street's review of the reports it

8

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CDBBOS venkp0dc | 04-Mar-2005 02:54 EST | | 10243 TX 9 | 1* |
| NOTICE & PROXY STATE | | BOS | | CLN | PS  IFV | 1C |

has received, State Street believes that all of its directors and officers otherwise complied with all reporting requirements applicable to them with respect to transactions in 2004.

Related Transactions

During 2004 certain executive officers of State Street, and corporations and other entities associated with certain directors of State Street, were customers of the Bank and its affiliates and had ordinary business transactions with the Bank and its affiliates. There are no personal loans or extensions of credit by the Bank to any directors or executive officers. From time to time, the law firm of Ropes & Gray LLP provides legal services to State Street. The Company paid Ropes & Gray LLP $5.775 million in 2004 for legal services rendered by the firm to State Street and its subsidiaries. Mr. Casner, a director of State Street, is Of Counsel to that firm, but the Company believes that Mr. Casner did not have a material direct or indirect interest in the transactions with Ropes & Gray. It is anticipated that the firm will continue to provide legal services to the Company in the current year. In 2004, the State Street Foundation made a discretionary contribution of $20,000 to Wellesley College, of which Dr. Walsh is President, completing a three-year pledge of $60,000.

## ELECTION OF DIRECTORS

**The Board of Directors unanimously recommends that you vote**
**FOR**
**each of the nominees for director. (Item 1 on your proxy card)**

Consistent with Massachusetts law and State Street's By-laws, the Board had previously been divided into three classes of directors, with each class having a term of three years. On December 21, 2004 the Board elected to exempt the Company from the provision of Massachusetts law which classified the Board, effective as of the date of the 2005 Annual Meeting, thereby declassifying the Board. Concurrently, the Board voted to amend the Company's By-Laws to provide for the annual election of directors (see "By-Laws of the Company" for additional information on the By-Law amendments). Accordingly, each director elected at the 2005 annual meeting serves until the next annual meeting of shareholders or as otherwise provided in the By-Laws.

The State Street Board currently consists of 14 members. Of the 14 directors currently in office, 13 are non-management directors and one is an executive officer of State Street. Each of the non-management directors is an independent director, as determined by the Board in its opinion, under the definition of the New York Stock Exchange listing standards. The Board determines the number of directors.

Pursuant to the By-laws, at a meeting on December 16, 2004 the Board of Directors fixed the number of directors at 14, effective at the time of the 2005 Annual Meeting. Fourteen directors are to be elected at the meeting. Each of the nominees for election as director is currently a director.

9

Plaintiff 317

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CXRBOS venkp0dc | 04-Mar-2005 02:53 EST | 10243 TX 10 | 1* |
| NOTICE & PROXY STATE | | BOS | CLN | PS  IFV | 1C |

Unless contrary instructions are given, shares represented by proxies solicited by the Board of Directors will be voted for the election of the fourteen nominees listed below as directors. We have no reason to believe that any nominee will be unavailable for election at the Annual Meeting. In the event that one or more nominees is unexpectedly not available to serve, proxies may be voted for another person nominated as a substitute by the Board, or the Board may reduce the number of directors to be elected at the Annual Meeting. Information relating to each nominee for election as director, including his or her period of service as a director of State Street, principal occupation, and other biographical material is described below.

**TENLEY E. ALBRIGHT, M.D.**                    Director since 1993

Physician and surgeon. Dr. Albright, age 69, is Chairman of Western Resources, Inc., a real estate holding company. Dr. Albright's concentration in medicine and health services stems from her specialty of general surgery over 23 years. She is a faculty member and lecturer at Harvard Medical School and is on the surgical staff of New England Baptist Hospital. Dr. Albright is consultant to and formerly chairman of the Board of Regents of the National Library of Medicine at National Institutes of Health. She is a director of West Pharmaceutical Services, Inc. and the Whitehead Institute for Biomedical Research, and a member of the corporation of Woods Hole Oceanographic Institution. Dr. Albright graduated from Harvard Medical School after attending Radcliffe College, and has received eight honorary degrees.

**KENNETT F. BURNES**                    Director since 2003

Chairman, President and Chief Executive Officer of Cabot Corporation, a global specialty chemicals company. He has been Chief Executive Officer of Cabot Corporation since 2001 and President since 1995. Prior to joining Cabot Corporation in 1987, Mr. Burnes, age 62, was a partner at the Boston-based law firm of Choate, Hall & Stewart, where he specialized in corporate and business law for nearly 20 years. He is a director of Cabot Corporation and J. K. Adams Co., Inc., and is a member of the Dana Farber Cancer Institute's Board of Trustees. Mr. Burnes is also Chairman of the Board of Trustees of the Schepens Eye Research Institute. Mr. Burnes holds both an LL.B. and B.A. degree from Harvard University.

**TRUMAN S. CASNER**                    Director since 1990

Of counsel to the law firm of Ropes & Gray LLP. Mr. Casner, age 71, received an A.B. degree from Princeton University in 1955 and an LL.B. from Harvard Law School in 1958. He served as law clerk to Chief Justice Wilkins of the Massachusetts Supreme Judicial Court and joined Ropes & Gray in 1959, becoming a partner in 1968 and of counsel in 2002. Mr. Casner is a trustee *emeritus* of the Museum of Science, Boston, a trustee of the New Bedford Whaling Museum, and a corporation member and past president of Belmont Hill School. He is a member of the American Law Institute.

**NADER F. DAREHSHORI**                    Director since 1990

Chief Executive Officer and Chairman of Cambium Learning, Inc., an educational publishing company. Mr. Darehshori, age 68, was Chairman, President and Chief Executive Officer of Houghton Mifflin Company, a publishing company, from 1990 to 2000. Mr. Darehshori is a director of Aviva USA Corporation and the Boston Public Library Foundation. He is a trustee of Wellesley College and the Dana-Farber Cancer Institute, and a director of the Tanenbaum Center for Interreligious Understanding. Mr. Darehshori received a B.A. degree from the University of Wisconsin.

10

Plaintiff 318

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX BOS venkp0dc | 04-Mar-2005 02:53 EST | 10243 TX 11 | 1* |
| NOTICE & PROXY STATE | | BOS | CLN | PS IFV | 1C |

**ARTHUR L. GOLDSTEIN**                                             Director since 1995

Retired Chairman and Chief Executive Officer of Ionics, Incorporated, an international company involved in the purification and treatment of water. He was Chief Executive Officer of Ionics, Incorporated from 1971 to 2003 and was Chairman from 1991 to 2004. Mr. Goldstein, age 69, is a director of Cabot Corporation. He is a member of the National Academy of Engineering. He is a trustee of the California Institute of Technology, the Massachusetts General Physicians' Organization, Inc., where he serves as chairman of its compensation committee, and a director of Partners HealthCare System, Inc., where he serves as Vice Chairman of its finance committee. Mr. Goldstein received a B.S. degree in chemical engineering from Rensselaer Polytechnic Institute, an M.S. in chemical engineering from the University of Delaware, and an M.B.A. from Harvard Business School.

**DAVID P. GRUBER**                                                 Director since 1997

Retired Chairman, Chief Executive Officer and Director of Wyman-Gordon Company, a manufacturer of forging, investment casting and composite airframe structures for the commercial aviation, commercial power and defense industries. Mr. Gruber, age 63, joined Wyman-Gordon in 1991 and retired in 1999. He is a Distinguished Life Member of the Materials Information Society (ASM), chairman of the Worcester Polytechnic Institute Mechanical Engineering Advisory Committee, and a member of the boards of directors of Novelos Therapeutics Inc. and Worcester Municipal Research Bureau. He has a B.S. degree from Ohio State University.

**LINDA A. HILL**                                                   Director since 2000

Wallace Brett Donham Professor of Business Administration at Harvard University. Dr. Hill, age 48, is unit head, Organizational Behavior Unit, and faculty chair, Leadership Initiative. She is a member of the board of directors of Cooper Industries, the boards of trustees of Bryn Mawr College and the Children's Museum, Boston, and the board of overseers of the Beth Israel Deaconess Medical Center. Dr. Hill received an A.B. degree in psychology from Bryn Mawr College, an M.A. in educational psychology from the University of Chicago, and a Ph.D. in behavioral sciences from the University of Chicago.

**CHARLES R. LAMANTIA**                                             Director since 1993

Retired Chairman and Chief Executive Officer of Arthur D. Little, Inc., management consultants. He served as Chief Executive Officer of Arthur D. Little, Inc. from 1988 to 1999. Dr. LaMantia, age 65, is a member of the board of directors of NeuroMetrix, Inc., the advisory board of the Carroll School of Management of Boston College, and is a member of the Corporation of the Woods Hole Oceanographic Institution. Dr. LaMantia received B.A., B.S., M.S. and Sc.D. degrees from Columbia University, and attended the Advanced Management Program at Harvard Business School. He served on active duty as an officer in the United States Navy.

**RONALD E. LOGUE**                                                 Director since 2000

Chairman and Chief Executive Officer of State Street since June 30, 2004. Mr. Logue, age 59, joined the Company in 1990 as senior vice president and head of the investment servicing for U.S. mutual funds. He was elected Vice Chairman in 1999, chief operating officer in 2000 and president in 2001. As president and chief operating officer, he was responsible for overseeing State Street's investment servicing, securities finance and investment research and trading activities, as well as information technology. Mr. Logue is a director of The Federal Reserve Bank of Boston, Boston Financial Data Services, and the Metropolitan Boston Housing Partnership. He received his B.S. and M.B.A. degrees from Boston College.

Plaintiff 319

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX05 | BOS venkp0dc | 04-Mar-2005 02:53 EST | 10243 TX 12 | 1* |
| NOTICE & PROXY STATE | | | BOS | | CLN | PS | IFV | 1C |

### RICHARD P. SERGEL
**Director since 1999**

Retired Chairman, Chief Executive Officer and Director of National Grid U.S.A., an electric and gas utility and the successor to New England Electric System (NEES). Mr. Sergel, age 55, joined NEES in 1978 and retired in 2004. He is a trustee of the Worcester Art Museum. Mr. Sergel received a B.S. degree from Florida State University, an M.S. from North Carolina University, and an M.B.A. from the University of Miami. He served in the United States Air Force.

### RONALD L. SKATES
**Director since 2002**

Private investor. Mr. Skates, age 63, joined Data General Corporation, a computer and storage manufacturing company, in 1986 as senior vice president of finance and administration. He also served as chief financial officer for a portion of 1987. He was elected a director, executive vice president and chief operating officer in 1988. He was elected president and chief executive officer in 1989. He remained in those posts until EMC acquired the company in 1999, when he retired. Mr. Skates began his career at Price Waterhouse as a certified public accountant and was an audit partner for 10 years. He is a director of Courier Corporation, Gilbane Corporation, and Raytheon Company. Mr. Skates is a trustee of The Massachusetts General Hospital, Massachusetts General Physicians' Organization, Inc., and Peabody Essex Museum. Mr. Skates holds bachelor and M.B.A. degrees from Harvard University.

### GREGORY L. SUMME
**Director since 2001**

Chairman, Chief Executive Officer and President of PerkinElmer, Inc., a global technology company focused in the businesses of life and analytical sciences, optoelectronics and fluid sciences. Prior to joining PerkinElmer in 1998, Mr. Summe, age 48, was with AlliedSignal, serving successively as the president of general aviation avionics, aerospace engines, and the automotive products group. Prior to that he was general manager of commercial motors at General Electric and a partner at McKinsey & Co. Mr. Summe holds B.S. and M.S. degrees in electrical engineering from the University of Kentucky and the University of Cincinnati, and an M.B.A. from the Wharton School of the University of Pennsylvania.

### DIANA CHAPMAN WALSH
**Director since 1997**

President of Wellesley College. Prior to becoming President of Wellesley College in 1993, Dr. Walsh, age 60, was Professor and Chairman, Department of Health and Social Behavior, at the Harvard School of Public Health. She is the chair of the board of directors of the Consortium on Financing Higher Education and is a trustee of Amherst College. Dr. Walsh received a B.A. degree from Wellesley College, M.S. and Ph.D. degrees from Boston University, and honorary doctoral degrees from Boston University, American College of Greece, and Northeastern University.

### ROBERT E. WEISSMAN
**Director since 1989**

Chairman, Shelburne Investments, a private investment company that works with emerging companies in the United States and Europe. Mr. Weissman, age 64, was Chairman and Chief Executive Officer of IMS Health Incorporated, a provider of information to the pharmaceutical and healthcare industries, from 1997 to 2000 and prior to that was Chairman and Chief Executive Officer of Cognizant Corporation. He is a director of Pitney Bowes, Inc. and Cognizant Technology Solutions Corporation, and a member of the advisory boards of Broadview Capital and Affinnova, Inc. He is Vice Chairman of the board of trustees of Babson College. Mr. Weissman received a degree in Business Administration and an honorary Doctor of Laws degree from Babson College.

Plaintiff 320

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX0 BOS venkp0dc | 04-Mar-2005 02:53 EST | | 10243 TX 13 | 1* |
| NOTICE & PROXY STATE | START PAGE | BOS | | CLN | PS IFV | 1C |

## BENEFICIAL OWNERSHIP OF SHARES

As of February 1, 2005, there were 333,540,266 shares of Common Stock of the Company outstanding. We know of no person who may be deemed to own beneficially more than five percent of the outstanding Common Stock, except as follows:

| Title of Class | Name and Address of Beneficial Owner | Amount Beneficially Owned | Percent of Class |
|---|---|---|---|
| Common Stock | Wellington Management Company, LLP<br>75 State Street<br>Boston, MA 02109 | 17,733,129(1) | 5.3% |

(1) Wellington Management Company, LLP, a registered investment adviser and a holding company with affiliates including Wellington Trust Company, NA, a bank, has informed the Company, by a report dated February 14, 2005 on Schedule 13G, that it holds beneficial interest in 17,733,129 of such shares as a result of acting as investment adviser to clients of Wellington Management Company, LLP (with shared power to dispose of such shares, and shared power to vote 13,282,280 of such shares). Wellington Management Company, LLP states in the Schedule 13G that no client is known to have the right or power to receive or direct the receipt of dividends from or proceeds of sale of more than 5% of the class outstanding.

13

Plaintiff 321



| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX8 BB | BOS venkp0dc | 04-Mar-2005 02:53 EST | | 10243 TX 14 | 1* |
| NOTICE & PROXY STATE | | | BOS | | CLN | PS IFV | 1C |

## Management

The table below sets forth the number of shares of common stock of State Street beneficially owned (as determined under the rules of the Securities and Exchange Commission) as of the close of business on February 1, 2005 by each director, the current chairman and chief executive officer, the former chairman and chief executive officer, the four other most highly compensated executive officers in office at the end of 2004, a deceased executive officer, and the group consisting of current directors and executive officers, based on information furnished by representatives of each person. Neither the persons listed below individually, nor the current executive officers and directors as a group, owned beneficially as much as 1% of the outstanding shares of common stock.

| Name | Amount and Nature of Beneficial Ownership(1) |
|---|---|
| Tenley E. Albright, M.D. | 57,411(2)(9) |
| Allen John Brown | 215,068(3) |
| Kennett F. Burnes | 7,471(9) |
| Truman S. Casner | 49,487(4)(9) |
| Nader F. Darehshori | 29,380(9) |
| Arthur L. Goldstein | 24,671(9) |
| David P. Gruber | 24,227(9) |
| Timothy B. Harbert | 638,939(3)(5) |
| Linda A. Hill | 12,094(9) |
| Charles R. LaMantia | 32,198(6)(9) |
| Peter G. Leahy | 33,348(3) |
| Ronald E. Logue | 889,988(3)(9) |
| Edward Resch | 49,666(3) |
| Richard P. Sergel | 15,197(9) |
| Ronald L. Skates | 10,898(9) |
| David A. Spina | 1,438,039(3)(7)(8) |
| Gregory L. Summe | 11,410(9) |
| John R. Towers | 594,022(3)(9) |
| Diana Chapman Walsh | 19,598(9) |
| Robert E. Weissman | 47,486(9) |
| All current directors and executive officers, as a group (25 persons) | 2,865,181(3)(9)(10)(11) |

(1) Information in this table does not include options to acquire common stock, but does include shares of common stock which have not been issued but which are subject to options, which either are currently exercisable or will become exercisable within 60 days of February 28, 2005. Information in this table also does not include deferred cash rights measured by stock on 18,432 shares, which represents the right to receive cash in an amount equal to the fair market value of the underlying common stock and which are held under Company benefit plans.

(2) Includes 13,417 shares held in trust for a family member pursuant to a trust of which Dr. Albright is a co-trustee and 8,550 shares owned by a family member, with respect to all of which shares she disclaims beneficial ownership.

14

Plaintiff 322

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX0BOS venkp0dc | 04-Mar-2005 02:53 EST | 10243 TX 15 | 1* |
| NOTICE & PROXY STATE | | BOS | | CLN | PS IFV 1C |

(3) Includes shares which the individual or his representative has the right to acquire ownership through the exercise of those stock options which are exercisable within 60 days of February 28, 2005, as follows: Mr. Brown, 117,017; Mr. Harbert, 426,700; Mr. Leahy, 9,334; Mr. Logue, 788,333; Mr. Resch, 35,666; Mr. Spina, 1,241,353; Mr. Towers, 565,299; and the group, 2,167,961.

(4) Includes 8,000 shares as to which Mr. Casner has sole investment power and shared voting power.

(5) Mr. Harbert died in August 2004.

(6) Includes 4,000 shares as to which Dr. LaMantia has shared voting power and investment power.

(7) Includes 44,000 shares owned by members of Mr. Spina's family, with respect to all of which shares he disclaims beneficial ownership.

(8) Mr. Spina retired on June 30, 2004.

(9) Includes the right to receive the following shares upon retirement or other specified events: Dr. Albright, 13,443; Mr. Burnes, 2,961; Mr. Casner, 14,695; Mr. Darehshori, 14,695; Mr. Goldstein, 12,350; Mr. Gruber, 12,458; Dr. Hill, 7,493; Dr. LaMantia, 13,443; Mr. Logue, 37,750; Mr. Sergel, 14,415; Mr. Skates, 5,769; Mr. Summe, 10,595; Mr. Towers, 3,524; Dr. Walsh, 10,595; Mr. Weissman, 21,678; and the group, 198,751.

(10) Includes 7,500 shares as to which current executive officers not individually named share investment and voting power, and 1,000 shares owned by a family member of one current executive officer not individually named.

(11) One current executive officer not individually named owns 8 units of the Company's SPACES, less than 1% of the number of units outstanding.

## REPORT OF THE EXECUTIVE COMPENSATION COMMITTEE

The Executive Compensation Committee of the Board of Directors (the "Committee") furnishes the following report on Executive Compensation.

**Policy**

State Street combines information technology with financial expertise to provide sophisticated investors with an integrated range of products and services spanning the investment cycle. Our goal is to be the leading company serving sophisticated investors worldwide. The executive compensation program, by providing competitive pay and aligning executive compensation with our business strategy, is designed to attract and retain superior executives, to focus these individuals on achieving State Street's objectives, and to reward executives for meeting specific short-term and long-term performance targets. The executive compensation program places emphasis on challenging performance goals, business growth, and sustainable real growth in earnings per share. By including stock-based compensation plans as a major part of the compensation strategy, we link closely the goals of stockholders and executives. Thirty-five executives participated in the executive compensation program in 2004. For 2004, the Chairman and Chief Executive Officer, the Vice-Chairman, and the Executive Vice Presidents were considered executives for this purpose, as well as the former Chairman and Chief Executive Officer and a deceased executive.

The principles of the executive compensation strategy are applied throughout State Street. Because executives have the greatest opportunity to influence long-term performance, a greater proportion of their compensation is linked to the achievement of long-term strategic and financial goals. Other individuals who manage business units or have corporate functional or staff responsibilities have a significant opportunity to

15

Plaintiff 323

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX08 8.8 | BOS venkp0dc | 04-Mar-2005 02:53 EST | | 10243 TX 16 | |
| NOTICE & PROXY STATE | | | BOS | | CLN | PS IFV | 1C |

influence State Street's results, and a sizable portion of their compensation is related to the achievement of financial goals of both the respective business unit and State Street as a whole. In addition to executives, officers and managers who are expected to make significant contributions participate in the equity incentive programs, and all employees participate in a variety of annual incentive plans.

The Committee is composed entirely of independent, non-employee directors, each of whom also qualifies as an "outside director" for purposes of Section 162(m) of the Internal Revenue Code. The Committee is responsible for setting and administering policies that relate to executive compensation, equity incentive programs, and other incentive programs. The Committee, on an annual basis, reviews and evaluates the executive compensation program.

The Committee met 4 times in 2004 and provided reports to the Board of Directors about its activities at each of these meetings. In conjunction with its annual review and evaluation of the executive compensation program, the Committee engaged its own independent compensation consultant. The consultant worked for the Committee in reviewing the executive compensation program, in reviewing a reference group of public companies against which State Street's executive compensation and financial performance were compared, and in considering modifications to existing plans. The Committee, with assistance from its independent consultant, determined that this group of companies was appropriate to be used as a reference group against which to compare compensation practices and competitive levels of compensation. This group includes large U.S. bank holding companies and U.S.-based financial services companies.

The Committee believes that State Street's most direct competitors for executives are not necessarily the same companies that would be included in a peer group established to compare stockholder returns. Therefore, the reference companies used for comparative compensation purposes contain some overlap with, but are not identical to, the companies in the S&P Financial Index used for performance comparison under "Stockholder Return Performance Presentation" in this proxy statement.

The elements of the executive compensation program currently consist of base salary, annual bonus, performance awards, stock options, deferred stock awards and restricted stock awards. These are integrated components where salary and bonus reflect one-year results, performance awards reflect two-year results, and stock options, deferred stock awards and restricted stock awards reflect long-term stock price appreciation. Each September the Committee reviews competitive compensation data from the reference group as well as other market data with its consultant. The study includes the reference group's base salary levels, annual incentive payments, the value of long-term incentive compensation, and the annual value of benefits including executive retirement benefits. Based on this information, the Committee targets the executives' base salaries at market median, bonus opportunities at market median, long-term incentive opportunities between the 60th and 75th percentile of the reference group, and annual value of benefits at market median. As a result of its 2004 review, the Committee has determined that the fundamental elements of the current compensation plans are appropriate for a program that is intended to support State Street's business strategy, provide competitive compensation, and create value for stockholders. The Committee's policies with respect to each of these elements, including the basis for the compensation reported for 2004 to Mr. Logue, are discussed below.

**Base Salaries**

The Committee recommended to the Board of Directors the base salary of Mr. Logue, as President and COO in March 2004, and subsequently in September 2004 after his promotion to Chairman and CEO. The Committee

16

Plaintiff 324

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CXR BOS venkp0dc | 04-Mar-2005 02:53 EST | | 10243 TX 17 | 1* |
| NOTICE & PROXY STATE | | BOS | | CLN | PS IFV | 1C |

also reviewed the salaries of the other executives. Base salaries for executives are determined by subjectively evaluating the responsibilities of the position, the strategic value of the position to State Street, and the experience and performance of the individual as well as market data from the reference group of companies. No specific formula is used to set base salaries. The Committee has determined, however, that to be competitive it is appropriate for State Street's executive salary levels to be near the median of the reference group. Annual adjustments, if any, to base salary levels are determined by reviewing market compensation data and subjectively considering the overall scope of each position and its strategic importance, the performance of State Street, an evaluation of the individual's performance, and the length of time since the individual's last salary adjustment.

With respect to the base salary granted to Mr. Logue for 2004, the Committee reviewed all of the factors noted above, including data supplied by the compensation consultant on market levels of pay for the chief executive officer at companies in the reference group. No particular weight was applied to any single factor in making the Committee's determination. As compared to salaries paid to the chief executive officer position in the reference group, Mr. Logue's salary was at median.

Management has recommended, and the Committee agreed, not to award any salary increases in 2005 for the population of employees with a bank title of vice president or above, including Mr. Logue, with the exception of selective market adjustments and promotional increases.

**Annual Bonuses**

Six executives are eligible for annual cash bonuses under the provisions of the Senior Executive Annual Incentive Plan, which was approved at the 2001 annual meeting of stockholders. Each year the Committee assigns to each executive a minimum, target, and maximum bonus award opportunity, stated as a percent of salary. The levels of bonus opportunity assigned to each executive are determined by reviewing competitive compensation data supplied by the compensation consultant, the level of responsibility of each executive, and the strategic importance of the executive's position. The actual level of bonus earned is based upon achievement of specific predetermined performance targets established by the Committee.

In establishing performance targets for the annual incentive plan, the Committee considers earnings per share growth along with State Street's long-term financial goals, the specific financial goals for the following year, and the business environment in which State Street is operating. The Committee then establishes the measures that will be used (based on the measures available under the Senior Executive Annual Incentive Plan) and the specific performance targets at which various levels of bonus will be earned. At its December 2003 meeting, the Committee assigned a range of bonus opportunity for Mr. Logue for 2004 at a minimum award of $0, and a maximum award of $2,500,000.

The 2004 performance targets established by the Committee were based on reported earnings per share. The Committee established a performance/payout schedule, which identified various earnings per share levels at which specific awards would be earned.

At its meeting in March 2005, the Committee certified that an earnings per share level of $2.34 (excluding gains from SPACES), which are collateralized, forward purchase contract units for additional shares of State Street common stock, had been achieved for the Senior Executive Annual Incentive Plan performance goals and approved a total bonus payment for 2004 of $1,300,000 for Mr. Logue. The award represented 52% of the maximum award of $2,500,000. Bonuses for three other participants in the plan receiving bonuses totaled $1,410,000 for the year. Two of the participants did not receive awards under the plan.

17

Plaintiff 325

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX8 BOS venkp0dc | 04-Mar-2005 02:53 EST | 10243 TX 18 | 1* |
| NOTICE & PROXY STATE | | BOS | CLN | PS IFV | 1C |

Pursuant to the provisions of the 2004 Senior Executive AIP, one-third of the bonus award to Mr. Logue and the other plan participants were paid in the form of deferred stock awards, each scheduled to vest (based on continued service) in two equal annual installments starting at the first anniversary of the award date. All other manager-level employees also received one-third of their bonus under the same terms.

Federal law and regulations provide that in order to qualify for a tax deduction (See Tax Law at the end of this report), compensation in excess of $1,000,000 to top executive officers of a public corporation must qualify as performance-based compensation. In order to qualify as exempt performance-based compensation, bonuses must be earned under a plan, the material terms of which have been approved by stockholders. In general, the performance measures under such a plan must be re-approved by stockholders every five years. The Senior Executive Annual Incentive Plan was last approved by stockholders at the 2001 Annual Meeting.

### Performance Awards/Equity Awards

Longer term compensation is provided to executives in the form of both performance awards and equity awards under the terms approved in the 1997 Equity Incentive Plan.

*Performance Awards.* Performance awards represent a contingent right to a cash payment, based upon the price of State Street's stock, in the event State Street meets specified performance goals over a two-year time period following the grant. Performance awards are granted to executives every year. Performance award payments, if any, are made after the completion of the two-year performance cycle associated with each grant.

The Committee granted performance awards totaling 549,800 units under the 1997 Equity Incentive Plan to the executive group in March 2005, including three additional executives promoted in March 2005. This grant included an award of 131,400 units to Mr. Logue. All of these grants have a two-year performance period covering the years 2005 and 2006. The Committee established performance targets for the 2005-2006 performance period for these grants, tied to a combination of financial measures, based upon return on equity and earnings per share.

After the end of the two-year performance period ending December 31, 2006, and subject to review and certification of performance results by the Committee, a cash payment will be calculated based upon the number of performance awards earned, if any, multiplied by the average market value of State Street's common stock over the last ten trading days at the end of the performance period. In this way, the final cash value of the performance awards relates directly to both corporate financial performance in determining how many awards are earned and stock price appreciation in determining the cash value of the units earned.

In March 2005, following Committee certification of results, payments were made pursuant to performance awards granted in December 2002 for the 2003-2004 performance period. Based on cumulative earnings per share results of $4.45 and average return on equity of 13.45% achieved during the period, the Committee certified an achievement level of 26% and approved payment of $2,244,369 to Mr. Logue and $10,017,613 to the rest of the executives.

*Stock Options.* Stock options are granted to executives annually, although the Committee has the authority to grant options at any time and has in the past made additional grants in conjunction with the assumption of new responsibilities by members of the executive group. The Committee selects the executives to receive options and sets the size of option awards based on Black-Scholes valuation and relying upon a number of factors, including: the perceived importance of the executive's contribution to the success of State Street, similar to the subjective

18

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX6 5.8 | BOS venkp0dc | 04-Mar-2005 02:53 EST | | 10243 TX 19 | 1* |
| NOTICE & PROXY STATE | | | BOS | | CLN | PS  IFV | 1C |

factors considered in setting base salary; the target level of long-term incentive opportunity with respect to the reference group, other market data supplied by the compensation consultant; and the amount of and annual value of the two-year performance awards which were granted to the respective executive in that year. The exercise price of options is equal to the market price of the shares at the time of the grant. The options have a maximum ten-year life and generally become exercisable in four equal annual installments starting at the first anniversary of the grant date. Because stock options are granted at market price, the value of the stock options is dependent upon an increase in the price of State Street stock. The Committee views stock option grants as a part of the executive's annual total compensation package. The amount of stock options outstanding at the time of a new grant or granted in prior years does not serve to increase or decrease the size of the new grant.

At its meeting in March 2005 the Committee granted Mr. Logue options to purchase 292,000 shares, based upon a review of all of the factors noted above.

*Deferred and Restricted Stock.* Deferred and restricted stock awards are used to recruit, motivate, and retain high-potential individuals. Typically, deferred and restricted stock awards are made to individuals who are not members of the executive group. However, the Committee may grant deferred and restricted stock to members of the executive group as part of a recruitment package or based upon subjective factors to reward what is considered to be exceptional performance or for retention purposes. Two members of the executive group other than Mr. Logue received deferred stock under the 1997 Equity Incentive Plan in 2004. The awards were made without payment from the recipients.

**Total Annual and Cumulative Compensation Review**

The Committee in March 2005 also reviewed historical total compensation levels for the senior executive group for the previous five years encompassing base salary history, bonus awards, stock option grants based on economic value awarded and cumulative intrinsic value based on current stock price, cumulative value of restricted or deferred stock awards and payouts from performance awards during this period. In addition, accrued retirement benefits from the qualified and supplemental executive plans and 401(k) plan and deferred compensation plan balances were reviewed.

**Tax Law**

Section 162(m) of the Internal Revenue Code generally precludes State Street from taking federal income tax deductions for compensation in excess of $1,000,000 per year for the chief executive officer and any of its four other highest paid executive officers, if those individuals are employed as officers on the last day of the tax year. Generally, however, performance-based compensation that satisfies the requirements of Section 162(m) is not subject to the deduction limit. The Committee reviewed all elements of the executive compensation program against the standards for qualifying for the tax deduction. Stock option and performance awards under the 1997 Equity Incentive Plan and awards under the Senior Executive Annual Incentive Plan have been designed to qualify as performance-based compensation, with the intended result that the deduction of compensation under these plans, including compensation from the exercise of options or from performance awards, would not be affected by the Section 162(m) deduction limits.

Deferred and restricted stock awards are not intended to qualify for exemption from the Section 162(m) limits.

19

Plaintiff 327

| STATE STREET CORPORA | RR Donnelley ProFile | LANFBU-MWS-CX0 8.8 | BOS venkp0dc | 04-Mar-2005 02:53 EST | 10243 TX 20 | 1* |
| NOTICE & PROXY STATE | | ■ BOS | | CLN | PS  IFV | 1C |

In administering the executive compensation program, the Committee will continue to consider whether the deductibility of compensation may be limited under Section 162(m) and, in appropriate cases, may structure such compensation so as to minimize or avoid the effect of those limitations.

Conclusion

Through the program described above, executive compensation is linked directly to State Street's performance, growth in stockholder value, and each executive's contribution to those results. As State Street's business changes, particularly in light of our global expansion, and with the increasingly competitive and complex business and regulatory environment, the continuing assessment of the compensation structure and goals is required to assure that compensation incentives remain competitive, consistent with stockholder interest, and closely tied to continuing growth in stockholder value.

Submitted by,

Robert E. Weissman, Chair
Nader F. Darehshori
Linda A. Hill
Richard P. Sergel

20

Plaintiff 328

# EXHIBIT 2

## STATE STREET CORPORATION
## EXECUTIVE COMPENSATION
## COMMITTEE CHARTER

### Purpose

The Executive Compensation Committee (the "Committee") is appointed by the Board of Directors to have direct responsibility, as described in this charter, for the director and officer compensation plans, policies and programs of the Corporation.

The Committee is also responsible for producing an annual report on executive officer compensation for inclusion in the Corporation's proxy statement.

### Committee Membership and Qualifications

The Committee shall consist of no fewer than three members. The members of the Committee shall meet the independence requirements of the New York Stock Exchange.

The members of the Committee shall be appointed by the Board on the recommendation of the Nominating and Corporate Governance Committee. Committee members may be replaced by the Board.

### Committee Authority and Responsibilities

1.  The Committee shall have sole authority to retain and terminate a compensation consultant to be used to assist it in the evaluation of director, CEO or senior executive compensation and shall have sole authority to approve the consultant's fees and other retention terms. The Committee shall also have authority to obtain advice and assistance from internal or external legal, accounting or other advisors.

2.  The Committee shall annually, in consultation with other sources, including but not limited to the Board of Directors, review and approve corporate goals and objectives relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and together with the other independent directors, determine and approve the CEO's compensation level based in part on this evaluation. In determining the long-term incentive component of CEO compensation, the Committee, together with the other independent directors, shall consider the Company's performance and relative stockholder returns, the value of similar incentive awards to CEOs at comparable companies, and the awards given to the Company's CEO.

3.  The Committee shall annually review, evaluate and advise the Board with respect to an assessment of management's performance and the total compensation of all senior executives (Executive Vice President level and above), including under

incentive-compensation plans which are subject to Board approval and equity-based plans.

- The Committee shall annually review, evaluate and advise the Board with respect to, for the CEO and the senior executives of the Corporation, (a) the annual base salary level, (b) the annual incentive opportunity level, (c) the long-term incentive opportunity level, (d) employment agreements, severance arrangements, and change in control agreements/provisions, in each case as, when and if appropriate, and (e) any special or supplemental benefits.

4. The Committee shall annually, in consultation with other sources, including but not limited to the Board of Directors, review the form and amount of director compensation, and shall recommend such compensation for the succeeding year to the Board of Directors. In recommending directors' compensation, the Committee shall consider, among other things, the appropriateness of the payment of directors' compensation in whole or in part in stock, the Company's performance and relative stockholder returns, compensation of directors at comparable companies, and the compensation paid to directors in past years.

5. The Committee shall review, evaluate and approve annual incentive plans which are subject to Board approval and equity-based plans and awards made thereunder.

6. The Committee may form and delegate authority to subcommittees when appropriate.

7. The Committee shall make regular reports to the Board.

8. The Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval. The Committee shall perform an annual evaluation of the Committee's performance.

SSC 04706

# EXHIBIT 3

ALAN BROWN
4-24-06

Page 1

1                                    Volume:  I
                                     Pages: 190
2                                    Exhibits: 25

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5

6
     ALAN BROWN,
7                        Plaintiff
                                     Docket No.
8              vs.                   05 CIV 1178(NG)

9    STATE STREET CORPORATION and
     STATE STREET GLOBAL ADVISORS,
10                       Defendant

11

12

13             VIDEOTAPED DEPOSITION of ALAN BROWN, a
     witness called by and on behalf of the Defendant, taken
14   pursuant to the Federal Rules of Civil Procedure,
     videotaped by Craig Newman of Valed Videography
15   Services, before Cynthia F. Stutz, Certified Shorthand
     Reporter and Notary Public in and for the Commonwealth
16   of Massachusetts, at the offices of Hare & Chaffin, 160
     Federal Street, Boston, Massachusetts, on Monday, April
17   24, 2006, commencing at 10:31 a.m.

18

19

20

21

22

23

24

ALAN BROWN
4-24-06

Page 13

1    A.    No.

2    Q.    Okay.  How did you come to join State Street?

3    A.    I was approached by State Street.

4    Q.    And did they approach you directly or through

5    a headhunter?

6    A.    They approached me directly.

7    Q.    And who approached you?

8    A.    An individual called Tony Ryan.

9    Q.    And did you negotiate an employment

10   arrangement with State Street?

11   A.    I did.

12   Q.    How did you negotiate that employment

13   arrangement?

14   A.    I had legal advice, the presence of my wife.

15   Q.    Was it a -- Did you negotiate a formal

16   employment contract?

17   A.    Yes.

18              (Brown Exhibit No. 1 marked

19              for identification.)

20   Q.    I show you, let me show you a document that's

21   marked as Brown Exhibit 1 and Brown Exhibit 1 consists

22   of a series of documents that are stapled together, I

23   believe, is that correct?

24   A.    Yes.

ALAN BROWN
4-24-06

Page 14

1       Q.    And can you identify the first of these

2    documents?

3       A.    Yes, it's the agreement that I entered into

4    with State Street Global Advisors U.K. Limited.

5       Q.    Now, this agreement was entered into when?

6       A.    The 7th of December 1994.

7       Q.    And this provided for the terms of your

8    employment at State Street?

9       A.    It provided for the terms of my employment at

10   that time.

11      Q.    And were there any terms of your employment

12   that this did not provide for?

13      A.    Can you explain which employment, employment

14   at what time?

15      Q.    At that time.

16      A.    This was the full provision of terms of my

17   employment at that time.

18      Q.    You will notice on Page 3, the number SSC

19   01270, Paragraph 6, Secondment?

20      A.    Yes.

21      Q.    Can you read that paragraph quickly?

22      A.    The company may, subject to the appointee's

23   consent, second to the employee by any company within

24   the group without prejudice to his rights under this

ALAN BROWN
4-24-06

Page 17

1      Q.    The company being State Street U.K.?

2      A.    State Street Global Advisors U.K.

3      Q.    I'm sorry, State Street Global Advisors U.K.,

4  I apologize.. If you turn back one page to Pay,

5  Paragraph 17, that paragraph provides for your base

6  salary?

7      A.    It does.

8      Q.    And was that base salary paid by State Street

9  Global Advisors U.K.?

10     A.    It was.

11     Q.    And was that true for the entire time that you

12  were an employee of State Street Global Advisors?

13              MR. SCHWARTZ:  Object to the form.

14     A.    Yes, subject to revisions of the rate.

15     Q.    But it was always paid by State Street Global

16  Advisors U.K.?

17     A.    Yes.

18     Q.    You see, coming back to Paragraph 18,

19  Paragraph 18, 1, Pension?

20     A.    Yes.

21     Q.    Can you read that?

22     A.    In lieu of participating in the State Street

23  U.K. Pension and Life Assurance scheme, the company

24  shall make a supplementary payment of such amount as to

ALAN BROWN
4-24-06

Page 18

1    leave after tax a net payment equivalent to 13% of base

2    salary, such payment to be paid monthly in arrears.   As

3    a result of opting out of the State Street scheme, life

4    cover is to be based on two times basic salary.

5        Q.   Can you explain the meaning of that provision

6    and especially the first paragraph of it?

7        A.   Yes.   I had my own pension arrangements, and

8    therefore did not wish to participate in the group

9    arrangements provided by State Street U.K. and in lieu

10   of that, the company paid additional salary to me,

11   which salary was open for me then to pay into my own

12   arrangements.

13       Q.   And did the company in fact pay that salary,

14   that additional salary to you?

15       A.   Yes.

16       Q.   And did you in fact use that additional salary

17   to invest in your own pension arrangements?

18       A.   I did and then subsequently I stopped.

19       Q.   And when you say you stopped, you stopped

20   using the additional salary for investment in your

21   pension arrangements?

22       A.   Correct.

23       Q.   And when did that happen?

24       A.   I can't recall precisely.   I stopped paying

ALAN BROWN
4-24-06

Page 23

1    Q.    So you used to read documents before you

2    signed them, but then you at some later date got into

3    the habit of signing documents without reading them?

4    A.    If lawyers of the employee have reviewed the

5    documents and it's a fat, fat wad of documents and

6    particularly if it's written in Japanese, I'm not able

7    to read it.

8    Q.    Okay, I see.  What about documents that affect

9    you personally?

10    A.    I read them.

11    Q.    Before you sign them?

12    A.    Correct.

13    Q.    And if you don't understand them, do you try

14    to get clarity on them?

15    A.    I do.

16    Q.    Okay.  Now, if you keep turning in the exhibit

17    but to a different document, it's Document Number SSC

18    01290.  The date on that is December 7th, 1994, is that

19    correct?

20    A.    It is.

21    Q.    And can you describe what this document is?

22    A.    It's a letter to me from State Street Global

23    Advisors U.K. Limited setting out terms of an

24    indemnity.

ALAN BROWN
4-24-06

Page 27

1    Q.   Right.  This was just for U.K. company -- U.K.

2    employees?  I'm sorry.

3    A.   It have State Street group companies, U.K.

4    group companies, correct.

5    Q.   Okay.  Now, can you tell me over the years how

6    were you compensated at State Street?  What forms of

7    compensation did you receive?

8    A.   Cash as salary, cash as benefits in lieu of

9    things like pension, cash as bonus, sometimes deferred,

10   sometimes not, stock units in various forms, options in

11   various forms and compensation as a result of my role

12   as an executive vice president of State Street

13   Corporation.  I think that's all.

14   Q.   And was this compensation, if you will,

15   pursuant to your agreement?

16              MR. SCHWARTZ:  Object to the form.

17   A.   It was pursuant to the work that I undertook

18   for all companies in SSgA.

19   Q.   Well, what I'm driving at was was the

20   compensation that you received over the years

21   compensation that was provided for in your agreement?

22   A.   I don't believe it was.

23   Q.   Okay.  Was it compensation that was provided

24   for in various plans and programs of the company?

ALAN BROWN
4-24-06

Page 29

1    where whoever was the chief executive for the day would

2    take ultimate responsibility for allocating a share of

3    the plan to me, along with all others, of course, and

4    then again under the EVP plans, I imagine it was the

5    chief executive of the company who took the decision,

6    in effect.

7        Q.    And what was the role of the compensation

8    committee of the board in awarding, in awarding equity?

9        A.    It was their role to approve the general

10   structure of plans and, on behalf of the board, to

11   insure that those plans were aligning the interests of

12   the employees with the stockholders.

13       Q.    Now, was each award the subject of an award

14   agreement?

15       A.    I believe it was.

16       Q.    And did you sign those award agreements?

17       A.    I did.

18       Q.    And what did the award agreements say about

19   the awards?  Do you recall what kinds of provisions

20   there were in the agreement?

21       A.    Yes, there were quite extensive provisions in

22   relation to things like confidentiality, not poaching

23   clients should you leave, not poaching staff should you

24   leave.  Various employment-related constraints under

ALAN BROWN
4-24-06

Page 30

1    those agreements.

2      Q.    And did the award agreements annex a copy of

3    the plans under which the award agreements were

4    generated?

5      A.    A full copy of the plans?  Is that the

6    question, a full copy of the plans?

7      Q.    Yes.

8      A.    I don't believe it always did, no.

9      Q.    Did it annex a copy of a plan summary?

10     A.    Yes.

11     Q.    And for every award that you received, you

12   would have received an award agreement with a copy of

13   the plan summary, is that right?

14     A.    Correct.

15     Q.    And you would have signed the award agreement,

16   right?

17     A.    Correct.

18     Q.    And you would be bound by the terms of what

19   you signed?

20     A.    I would.

21     Q.    And you agree that -- And you read those

22   agreements before you signed them?

23     A.    I did.

24                    (Brown Exhibit No. 2 marked

ALAN BROWN
4-24-06

Page 33

1    record?

2        A.    Governing Law Construction.    This agreement

3    shall be construed under and governed by the laws of

4    the Commonwealth of Massachusetts.    Executive hereby

5    expressly acknowledges that the executive compensation

6    committee of the board of directors of the corporation

7    has full discretionary power and authority to construe

8    the terms of the plan and of this agreement.

9        Q.    So does that give, in your view, the executive

10   compensation committee the authority to make changes in

11   this agreement?

12       A.    I'm not sure that that's what I understand by

13   the word construe.    I think I understand by the word

14   construe, interpret.

15       Q.    Could you turn to Page 263, and read Paragraph

16   2?  And I don't want you to read the whole paragraph

17   into the record, because it's long, but if you would

18   read the first sentence?

19       A.    The plan will be administered by the executive

20   compensation committee ("the committee") of the board

21   of directors of the corporation.

22       Q.    And then if you will go to the next sentence

23   and read until the colon?

24       A.    The committee shall have complete authority,

ALAN BROWN
4-24-06

Page 34

1    subject to the terms of the plan, to do any of the

2    following in its discretion.

3        Q.    And then if you read little Item 3?

4        A.    Amend or cancel an existing award in whole or

5    in part (and if an award is cancelled grant another

6    award in accordance with 3 below, with the same or

7    different terms, in its place).

8        Q.    And then can you read the last sentence in

9    the?

10       A.    Determinations and actions by the committee

11   shall be conclusive and shall bind all parties.

12       Q.    Now, when you got this award agreement and the

13   and accompanying plan, did you read these documents?

14       A.    Yes.

15       Q.    Okay.  And what did that mean to you, the

16   language you just read about the responsibilities of

17   the executive committee?

18       A.    As I said, that the executive compensation

19   committee would be responsible for making sure that

20   the, agreeing the nature and scope of the plan, make

21   sure it was aligning employees and stockholders'

22   interests and that they would be responsible for its

23   administration, albeit they might delegate it to staff

24   of the company.

Page 35

1      Q.    Did you see the word delegate anywhere here?

2      A.    No, no.

3      Q.    Is there any doubt in your mind that the

4   compensation committee had ultimate authority to make

5   decisions with regard to stock awards?

6      A.    No.  I think the compensation committee has

7   the ultimate authority.

8      Q.    And do you see anything in here that allows

9   someone else to make decisions of this sort without the

10   consent of the executive compensation committee?

11      A.    No.

12            MR. SCHWARTZ:  Object to the form.

13      Q.    Could you go to Plaintiff 264?  And that's

14   Item C, Vesting, do you see that?

15      A.    I do.

16      Q.    And Item Number 1 provides for the vesting,

17   for vesting of the award?

18      A.    Yes, but I think Items 3, as well, and 3 do

19   also in certain respects, don't they?

20      Q.    Yes, they do.

21      A.    So I wouldn't say that Item 1 --

22      Q.    In general, then.

23      A.    -- was the total expression of the vesting and

24   distribution.

ALAN BROWN
4-24-06

Page 38

1    by paragraph in this agreement, I would find language

2    respecting the executive compensation committee

3    substantially identical to the language I read to you

4    with regard to Exhibit 2?

5        A.   Without rereading the whole thing, I think

6    that would be correct.

7                    (Brown Exhibit No. 4 marked

8                     for identification.)

9        Q.   I show you what's marked as Defendant's

10   Exhibit 4, Pages Plaintiff 127 to 139.

11                   (Document handed to the witness.)

12       Q.   Ask you if you have seen that document before?

13       A.   Yes, I have.

14       Q.   I refer to Page Plaintiff 130, Administration

15   of the Plan, and can I ask you to read the first

16   sentence?

17       A.   The 1997 plan is administered by the committee

18   of the board of directors (which currently is an

19   executive compensation committee) consisting of at

20   least two directors.

21       Q.   And then can you read the second paragraph?

22       A.   The committee has full power, subject to the

23   1997 plan, to grant awards at such times as it chooses,

24   determine the size, type and terms of any award, waive

ALAN BROWN
4-24-06

Page 39

1    compliance with award terms, amend and cancel awards

2    and interpret the 1997 plan and decide any questions

3    that may arise in connection with the 1997 plan.

4       Q.    And did you read this at the time you received

5    this?

6       A.    I did.

7       Q.    And again, is there any doubt in your mind

8    that it was the committee that had the authority to, as

9    you just read, waive compliance with award terms?

10      A.    That's what it says.

11                    (Brown Exhibit No. 5 marked

12                    for identification.)

13      Q.    I show you what's marked as Exhibit 5.

14                    (Document handed to the witness.)

15      Q.    Can you tell me what Exhibit 5 is?

16      A.    It's prospectus for State Street Global

17   Advisors Equity Compensation Plan.

18      Q.    And for -- Is there a year on this?

19      A.    Well, the date of the prospectus is October

20   the 2nd, 1998.

21      Q.    And can I direct your attention to what's

22   Plaintiff 207, Page 5 under Administration of the Plan?

23   You got that?  Could you read that?

24      A.    Yes.  It says, The plan is administered by the

ALAN BROWN
4-24-06

Page 43

1      A.    I do.

2      Q.    And can you tell me what that is?

3      A.    It's the terms and conditions for stock option

4    grants on or after February the 21st, 2002.

5      Q.    Okay.  That's it.  I just want to -- I'm

6    sorry.  Let me just identify, it's marked as Plaintiff

7    254 through 257, is that correct?

8      A.    It is.

9      Q.    Now, what -- Now, you received equity awards,

10   options pursuant to these various agreements and plans

11   and I'm not sure this was an exhaustive group of them.

12   You may have gotten others.  Did you also receive

13   medical benefits?

14     A.    I did.

15     Q.    And what was the nature of the medical

16   benefits you received?

17     A.    Private medical cover under, I think it was a

18   BUPA scheme in the U.K.

19     Q.    And that was for the duration of your

20   employment?

21     A.    It was.

22     Q.    And did you also receive life insurance?

23     A.    Yes.

24     Q.    And can you describe what you received in the

ALAN BROWN
4-24-06

Page 44

1    way of life insurance?

2        A.    Well, in my case, because I didn't participate

3    in the U.K. pension plan, if I recollect, instead of

4    having four times death and service benefit, my death

5    and service benefit was two times.

6        Q.    And that was provided from State Street

7    Advisors U.K. Limited?

8        A.    I can't be sure as to which legal entity, but

9    associated with that employment.

10       Q.    But it was provided out of the U.K., is that

11   correct?

12       A.    Correct.

13       Q.    And did you also -- And you have testified

14   about pension.  Now, were you a member of any U.S.

15   pension plan?

16       A.    None.

17       Q.    Okay.  And in other words, everything that you

18   received during the time you were employed by State

19   Street Advisors U.K. Limited with the exception of

20   equity awards came under U.K. plans, programs or

21   pursuant to your agreements in the U.K.?

22       A.    I don't think so.

23       Q.    Okay.  What else did you receive?

24       A.    They were called things like Cycle K, Cycle L

ALAN BROWN
4-24-06

Page 46

1     A.    Right from the start.

2     Q.    Okay.  And can you describe the function of a

3   chief investment officer?

4     A.    It's the most senior investment person within

5   that unit to whom typically all investment

6   professionals under them report to them and they take

7   ultimate responsibility for the investment activities

8   of the firm underneath them.

9     Q.    And did your role change at any time during

10   the time you were at State Street?

11     A.    Yes.

12     Q.    And how did it change?

13     A.    Changed several times.  First, in 1996 my role

14   was extended to be chief investment officer for the

15   non-U.S. offices of State Street Global Advisors in

16   partnership with an individual called Peter Sternberg,

17   who is the U.S. CIO.

18     Q.    And then how did it change again?

19     A.    Then a year later I became group chief

20   investment officer for all of State Street Global

21   Advisors activities in 1997.

22     Q.    Okay.  And when you became group chief

23   investment officer did you enter into a new employment

24   agreement?

ALAN BROWN
4-24-06

Page 47

1      A.   I did not.

2      Q.   Was there anything in your arrangements with

3   State Street Global Advisors U.K. that guaranteed that

4   you would keep that position?

5           MR. SCHWARTZ:  Which position?

6      Q.   The position of group chief investment

7   officer.

8      A.   Did it guarantee that I would keep that

9   position?

10     Q.   Yes.

11     A.   No.

12     Q.   Then how did your role change after that?

13     A.   In 2000 I was made an executive vice president

14   of State Street Corporation.

15     Q.   Did that change your functional role?

16     A.   No.

17     Q.   What did that provide you?

18     A.   Greater compensation, change of control

19   agreements, those kinds of benefits.

20     Q.   And how was the change of control agreement

21   reflected?

22     A.   I can't recall the detail of it, but I can't

23   recall -- And also that made me eligible for the, after

24   I'd done enough service, the senior executive

ALAN BROWN
4-24-06

Page 51

1      A.    He was the chief executive prior to Tim

2   Harbert of SSgA.

3      Q.    And when did he depart?

4      A.    If I remember right, it was 2001.

5      Q.    And how did your role change after that?

6      A.    Next role was replaced by something which

7   became known as the G4, which was a quasi-partnership

8   arrangement of four individuals who took over the

9   running of the firm.

10      Q.    And how did your role change as a result of

11   that?

12      A.    Well, the G4 now assumed all of the executive

13   arrangements.  So instead of being purely concerned

14   with CIO activities, I was now, within the context of

15   that quasi-partnership, involved in all of the

16   executive functions of SSgA.

17      Q.    And again, was this a role that was guaranteed

18   to you in some fashion?

19      A.    No.

20      Q.    Okay.  And did your role change after that?

21      A.    It did.

22      Q.    When was that?

23      A.    2003.

24      Q.    Okay.  And what happened then?

Page 66

1    A.    Whether we might have time to meet for a drink

2    tonight.

3    Q.    And did he?

4    A.    Depends how long you keep me here.

5    Q.    And other than that, was that the sum and

6    substance of the entire conversation?

7    A.    It was.

8    Q.    You did not talk about any information that is

9    related to this case?

10    A.    No.

11    Q.    Did you get any documents from either John

12    Marrs or John Snow?

13    A.    From John Marrs, no.  From John Snow, a copy

14    of the EVSP plan.

15    Q.    And you got a copy of the EVSP plan from him

16    why?

17    A.    So that I could refresh my knowledge of its

18    terms.

19    Q.    Didn't you have your own copy?

20    A.    No.

21    Q.    Why not?

22    A.    Because I wasn't given one.

23    Q.    Now, you also said in preparing for the

24    deposition you reviewed documents.  Can you tell me

ALAN BROWN
4-24-06

Page 67

1    what documents you reviewed?

2        A.    I reread the pleadings.  I reread my

3    handwritten notes and I skimmed a small portion of the

4    many documents you have sent to us.

5        Q.    Speaking of your handwritten notes, was it

6    your practice to take notes of conversations with

7    people that you worked with?

8        A.    Routinely?

9        Q.    Yes.

10       A.    No.

11       Q.    Did you develop a practice in that respect at

12   some point in time?

13       A.    Yes.

14       Q.    And when did that happen?

15       A.    In the fourth quarter of 2004.

16       Q.    And was there a reason that you developed a

17   practice to take notes at that time?

18       A.    Yes.

19       Q.    And what was that reason?

20       A.    I was advised to.

21       Q.    And I trust that's by counsel, which we don't

22   want to go into?

23       A.    Correct.

24       Q.    Did you also make tapes of conversations you

ALAN BROWN
4-24-06

Page 72

1     and to deprive staff of a benefit that their colleagues

2     across the street were enjoying would not necessarily

3     lead them to be motivated.  Point 2 was that our turn-

4     over, staff turnover rate at that time had got down

5     extremely low and a VSP -- not without risk, but a VSP

6     could provide some room to move people on in their

7     careers.  And Point 3 was that it would potentially at

8     a stroke restore our profitability ratios to pre-bear

9     market levels.

10         Q.    So this was a plan you were in favor of?

11         A.    I was in favor of SSgA participating in any

12    such program that the corporation was bringing out,

13    yes.

14         Q.    And your position was based on what was good

15    for SSgA?

16         A.    Yes.

17         Q.    How did the VSP get adopted?

18         A.    By whom?

19         Q.    By the company.

20         A.    I don't know.

21         Q.    Let me try something different.  In your

22    experience as chief investment officer were you in a

23    position to recommend compensation for people that

24    worked for you?

ALAN BROWN
4-24-06

Page 73

1      A.    To recommend it, yes.

2      Q.    Yes.  And was there a formal bonus process

3   that occurred at the end of each year?

4      A.    There was.

5      Q.    And how did that bonus process work?

6      A.    At the end of the year the size of the bonus

7   pool would be determined.

8      Q.    Who would determine that?

9      A.    It was based, in most years, but not 2001, on

10  a formula related to the profitability of SSgA.  Based

11  on its profitability, an incentive pool would be

12  created.  The G4 would then allocate at the highest

13  level those pools out to the main units of SSgA and

14  they in turn would allocate them down and through the

15  levels of the organization.  And once those pools had

16  been allocated down, the managers would make their

17  target allocations to the individual staff.  And that

18  would then rise back up through the levels of the

19  organization and would then be reviewed by the G4 and

20  the SSgA's head of HR.

21     Q.    And then what would happen?

22     A.    And then once that process had run its, you

23  know, whatever number of iterations was necessary to

24  reach a conclusion, then that would be the bonus

ALAN BROWN
4-24-06

Page 74

1    arrangements, which would then be discussed with David

2    Spina or such other COO's of the day.

3        Q.    And then what would David Spina do with it?

4        A.    David Spina, in my experience, accepted it

5    without alteration.

6        Q.    Would he present it to the executive

7    compensation committee for approval?

8        A.    I doubt it.  I don't know.  I'd be surprised

9    if he showed the bonuses of every member of staff down

10    to the lowest level to David Thick of the compensation

11    committee.

12        Q.    Was there a specific day upon which bonuses

13    were actually paid?

14        A.    Each year there would be a date upon which

15    bonuses would be paid.

16        Q.    And was that a date that followed the

17    executive compensation committee approving the bonuses?

18        A.    Yes.

19        Q.    And so the executive compensation committee

20    did in fact approve the bonuses?

21        A.    Not necessarily at the individual level.  I

22    mean, that would be a daunting task with over 20,000

23    employees.

24        Q.    Would the executive compensation committee

ALAN BROWN
4-24-06

Page 75

1    approve the bonuses for the senior level people?

2        A.    I don't know how far down the organization

3    they would go, so I couldn't speculate on that.

4        Q.    Would it go as far down as you?

5        A.    Again, I don't know.  I know, because it says

6    so under its remit, that it includes David Spina's

7    compensation.  I don't know how much further down the

8    organization it goes.

9        Q.    Do you have a copy of the executive

10   compensation's remit, as you put it?

11       A.    Only such as is displayed on the Website.

12       Q.    And you have seen that?

13       A.    Yes.

14       Q.    And you know what it says?

15       A.    Yes.

16            Not wanting to break your flow, could I

17   request a top off of this jug of water?

18            MR. CALAMARI:  Yeah.  We could even take

19   a break at some point.  I don't know what everybody's

20   preference is on lunch.  I want to cut it quick,

21   because we're low on time because of the late start,

22   but I don't mind taking a break at some point.

23            MR. SCHWARTZ:  Yeah, let's -- Obviously

24   we'll take a lunch break.  We could shoot for a half

ALAN BROWN
4-24-06

Page 79

1    talks about what their total comp. is, isn't that

2    correct?

3         A.    They do.

4         Q.    Okay.  So that brings me back to my question

5    about the VSP, which is how did the VSP go about

6    getting approved?  Maybe I'm still not --

7         A.    I was not a party to the process of the VSP

8    plan being approved by the compensation committee, so I

9    can't speak to how that happened.

10        Q.    Do you know in fact that it was approved by

11   the compensation committee?

12        A.    It's implied by the fact that the program went

13   ahead, but I have no documentary or other evidence of,

14   that it has.

15        Q.    Okay, but -- And maybe you're answering my

16   question.  I don't mean to be argumentative, but when

17   you say it's implied by virtue of the fact that the

18   program went ahead, that's because it's your knowledge

19   that it could not have gone ahead without the executive

20   compensation committee's approval?

21        A.    Correct, correct.

22        Q.    And so you assume that the executive

23   compensation committee approved it?

24        A.    I assumed.

ALAN BROWN
1-24-06

Page 80

1    Q.    And you've seen the charter of the executive

2    compensation committee, which puts something like that

3    squarely in its remit?

4    A.    Um-hum.

5    Q.    Not to mention all of the other documents we

6    marked before?

7    A.    Correct.

8                MR. CALAMARI:  Okay.  Maybe this is as

9    good a time as any.  I got five minutes remaining on

10   the tape notice and why don't we try to take a break?

11   We've been running probably a little over two hours or

12   maybe right on two hours.  So if we're going to do

13   seven, we have five left.  You have to leave at what

14   time?

15               THE WITNESS:  6:45.

16               MR. CALAMARI:  We don't need this on the

17   record.

18               THE WITNESS:  6:45.

19               MR. CALAMARI:  So if we got back at

20   1:15, even 1:30, we could still make it.

21               We can go off the record.

22               THE VIDEOGRAPHER:  The time is 12:27,

23   going off the video record, end of Tape Number 1.

24               MR. CALAMARI:  Off the record.

ALAN BROWN
4-24-06

Page 86

1    employment with State Street.

2        Q.    Could they get the benefits if they did not

3    terminate their employment with State Street?

4        A.    A consequence of receiving the benefits was

5    that your employment would terminate.  So I think -- Is

6    that clear?

7        Q.    Well, is that your answer?

8        A.    Yes.

9        Q.    In other words, you had to resign your

10   employment in order to get the benefits?

11       A.    Yes.  The two were indivisible.

12       Q.    And do you remember the specific benefits that

13   would be offered?

14       A.    In broad terms, yes.  Not down to the level of

15   the formulae.

16       Q.    Could you describe them?

17       A.    Yes.  In terms of the EVSP program, one

18   received a credit of an additional five years for the

19   purposes of the SERP.  So that if you were an employee

20   who had satisfied service criteria and whose age lay

21   between 50 and 55, you then became eligible for the

22   SERP, which otherwise you would not be eligible for

23   until you reached the age of 55.

24                    On top of that, there was a severance

ALAN BROWN
4-24-06

Page 87

1    payment under a formula of, related to your length of

2    time with SSgA, there was a vesting of all equity and

3    there was the ability to hold your options until their

4    natural expiration dates, as opposed to having to

5    dispose of those in the ordinary course within

6    12 months. And then there were certain medical and

7    other benefits.

8        Q.    Speaking of the options, was there a standard

9    term for the options?

10       A.    I think most of them were ten-year options.

11       Q.    Okay. Now, were you eligible for the SERP?

12   I'm sorry, strike that.

13                Were you eligible for the VSP?

14       A.    I was not offered the VSP.

15       Q.    Do you know why you were not offered?

16       A.    The VSP was offered to U.K. citizens employed

17   in the United States, U.S. citizens employed in the

18   United States and U.S. citizens on certain ex-pat

19   arrangements outside of the United States provided they

20   hadn't gone local. It was not offered to U.K. or other

21   foreign national citizens if they received their

22   compensation through, if you like, the U.K. payroll or

23   other such countries.

24       Q.    Which was you?

Page 88

1      A.    Which was me.

2      Q.    And was there also a provision in the VSP that

3   permitted the company to designate people as ineligible

4   on a so-called discretionary basis?

5      A.    I believe that a couple of individuals within

6   State, the wider State Street were made ineligible, but

7   I'm not aware of anyone in SSgA being made ineligible

8   who otherwise would have been eligible.

9      Q.    Did you get VSP program materials at the time

10  the VSP was offered?

11     A.    I reviewed general materials, but none

12  obviously specific to myself, because, along with other

13  senior management at SSgA, we had to be ready to

14  explain these programs both to staff and clients and

15  consultants.

16     Q.    And you were also part of the process that

17  resulted in the VSP, as I recall?

18     A.    The VSP was not created by people in SSgA, but

19  we had to apply it within SSgA once we decided not to

20  ask for an exemption, yes.

21     Q.    Right.  And you equally -- Strike that.

22            Now, of the underlying plans that the

23  VSP applied to, which were you a member of?  Which plan

24  did you, plans did you participate in?

ALAN BROWN
4-24-06

Page 92

1    job was a truly global one and therefore could have

2    been considered to be eligible for the program.

3         Q.    You had no U.K. role?

4         A.    Other than being the chairman of the U.K.

5    company, no.

6         Q.    You don't regard that as a U.K. role?

7         A.    The principal executive function that was

8    carried out by the managing director, Nigel Wightman.

9         Q.    I thought before you described the chairman

10   role as the Number 1 spot?

11        A.    That was the chairman of SSgA.

12        Q.    The same would not hold true for the chairman

13   of the U.K. entity?

14        A.    No, it wouldn't, because the chairman role in

15   SSgA was very much an executive role.  The executive,

16   senior executive carrying out the day-to-day management

17   of the U.K. company was the managing director.

18        Q.    Okay.  So you don't think the chairman role

19   was a role in the U.K. company.  How many weeks a month

20   did you stay in the U.K.?

21        A.    At what point in time?

22        Q.    At this point in time.

23        A.    Okay.  I was in the U.K. somewhere around

24   about between seven and eight months of the year.

ALAN BROWN
4-24-06

Page 96

1    considered to be entirely similar to the other members

2    of the G4 other than in the respect of the payroll.

3        Q.    Who was the managing director of the U.K.

4    company?

5        A.    Nigel Wightman.

6        Q.    Was he included in the, in the VSP?

7        A.    Nigel's role was a local role and he was not

8    recharged to Boston and he was not offered the VSP.

9        Q.    You pay no taxes in the U.S., is that correct?

10       A.    Other than withholding taxes on investments.

11       Q.    On dividends?

12       A.    On investments, yeah.

13       Q.    And yet, if you, using your line of reasoning,

14   wouldn't you have been obligated to pay taxes in the

15   U.S. on your income?

16       A.    The advice from the State Street personnel

17   finance people was no.

18       Q.    And that's because you were considered a U.K.

19   employee, right?

20       A.    That's because I was paying taxes in the U.K.

21   and they did not believe that I met whatever the

22   criteria there are in your country for paying taxes

23   over here.

24       Q.    Okay.  You went to -- You were upset about not

ALAN BROWN
4-24-06

Page 97

1    being included and what happened?

2        A.    I discussed this with people like John Snow

3    and Tim Harbert, John Serhant, my close colleagues

4    there.  I was also concerned that we knew that the two

5    Johns, John Serhant and John Snow were going to elect

6    to take the package and, of course, if Tim Harbert were

7    to take the package, as well, then I would have been

8    left entirely on my own at that point.  And vice versa,

9    if Tim didn't take the package, then he too would be

10   foregoing an extremely valuable benefit.  So I asked

11   him if he -- I said I wanted to go and speak to David

12   Spina and I asked him if he would like to come with me

13   or whether he'd like to stay on his own.

14       Q.    And what did he say?

15       A.    And he asked me what I was proposing and I

16   told him.

17       Q.    And when did this occur?

18       A.    Around about the second half of May.

19       Q.    And what did he say?

20       A.    And he said that he would like to come with

21   me.

22       Q.    And then what happened?

23       A.    We went to meet with David Spina, which was a

24   routine event for us, either in person or if I was in

ALAN BROWN
4-24-06

Page 98

1    London, by phone.  We would meet roughly every

2    two weeks.  And we put on to the agenda that we wanted

3    to talk about the VSP arrangements as it related to the

4    two of us.

5        Q.    Why did you want to talk about them as they

6    related to you?

7        A.    Because I wanted, rather than going to a

8    lawyer, I wanted to talk about what I felt was an

9    equitable position with David.  And I was also

10   concerned about continuity of management in SSgA and I

11   believed I had a proposal which would be fair to all

12   sides.

13       Q.    Did you want to leave SSgA at that time?

14       A.    Not if my proposal was accepted.

15       Q.    So you were going there to threaten to quit

16   unless you received a benefit?

17       A.    I never threatened to quit and I never have

18   threatened.

19       Q.    Okay.  Well, then tell me what your state of

20   mind was.  Were you intending to leave State Street at

21   that time?

22       A.    No.  I was intending to find out what David's

23   reaction to my proposal was.  That's what I was

24   intending to do at that point.

ALAN BROWN
4-24-06

Page 99

1    Q.   You had a meeting with David Spina.  Did you

2  sit down and talk to him?

3    A.   Yes, we did.

4    Q.   Was it in person?

5    A.   Yes, it was.

6    Q.   Where did the meeting occur?

7    A.   In his office.

8    Q.   And about how long did it last?

9    A.   Entire meeting, which we covered a number of

10  agenda items, not more than an hour.

11    Q.   Did you take any notes of the meeting?

12    A.   No.

13    Q.   Did you make any notes after the meeting to

14  record the substance of the meeting?

15    A.   No.

16    Q.   Did you make a tape recording of the meeting?

17    A.   No.

18    Q.   Tell me what transpired at the meeting, what

19  you said and what he said?

20    A.   The conversation went like this.  I told him

21  that I regarded my job as being a global one and that

22  it was but a technicality that I had not been included

23  in the program.  I also said that the value of the

24  benefits to those who took it was so great that it was

ALAN BROWN
4-24-06

Page 100

1    really very difficult for an individual not to take

2    those benefits for the sake of themselves and their

3    families.  And I said that we knew that the two Johns

4    were going to elect to take the VSP and that therefore

5    half of the G4 was definitely leaving.

6                    And I said to David Spina that I didn't

7    think he would want, you know, any more departures, any

8    more departures, and that I had a proposal which I

9    thought would be equitable both to myself and Tim if we

10   stayed to continue to support SSgA and could

11   potentially cost the company nothing.

12       Q.   What did you mean by he didn't want any more

13   departures?

14       A.   Well, I found it difficult to believe that he

15   would want all four of the top managers of SSgA to

16   leave at one go.

17       Q.   Why would you leave if you weren't going to

18   get the VSP?

19       A.   If I hadn't got the VSP and if I was the only

20   person left standing on the deck, so to speak, I would

21   have taken headhunter calls, which come regularly, and

22   listened to them, because the position would have been

23   pretty impossible.  And I might have gone potentially

24   further.  I made no decision to do so, but I might have

ALAN BROWN
4-24-06

Page 103

1     A.    Correct.

2     Q.    What was David's response?

3     A.    Well, David made it clear that there were

4     certain things which were beyond his control.  So

5     things like the equity plans he wasn't in a position to

6     be amending any equity plans.  But otherwise, he

7     accepted the basis of the proposal.

8             Now, David never makes an instant

9     decision.  It's not in his character.  But he said he

10    would think about it and subsequently he confirmed that

11    he thought the proposals were fair and equitable and I

12    accepted them -- accepted his word on that.

13    Q.    Okay.  Let's go slowly.  At that meeting he

14    said he would think about it.  And was that the end of

15    that meeting.

16    A.    Yes.

17    Q.    And nothing else was said about?

18    A.    Not about the EVSP.

19    Q.    Now, let me just come back to some of the

20    specifics.

21    A.    Can I apply for a break in a minute, just to

22    take a pit stop?  But carry on with your question until

23    we can get to a break.

24    Q.    Do you want to do that now, if that's --

ALAN BROWN
4-24-06

Page 104

1      A.    If that's all right.

2                  THE VIDEOGRAPHER:   The time is 1:50,

3     going off the record.

4                  (Brief recess.)

5                  THE VIDEOGRAPHER:   The time is 1:55,

6     back on the record.

7      Q.    Okay.  After you broke off on that meeting you

8     said that David Spina got back to you?

9      A.    Yes.

10     Q.    And when did that occur?

11     A.    Our next meeting.

12     Q.    How long?

13     A.    Within two weeks.  We always met every couple

14    of weeks.

15     Q.    And what did he say?

16     A.    He said that he'd considered my proposal and

17    with the exception of the piece that he couldn't deal

18    with, such as equity plans, he thought it was a fair

19    one and he was happy with it and I accepted it.

20     Q.    Is that all he said?

21     A.    No.  And we then agreed that we would need to

22    reflect this in writing and he said that he would do

23    that.

24     Q.    Now, did he talk to you about seeking approval

ALAN BROWN
4-24-06

Page 106

1          Let me go on to what David was agreeing

2     to.  You mentioned -- Was that the whole of your

3     conversation, the second conversation?

4          A.   As it related to this.

5          Q.   Right, okay.  Did you have occasion to talk to

6     David again about it?

7          A.   Not to talk, no.

8          Q.   So that was the last conversation you had with

9     David about this arrangement?

10         A.   Until the 28th of February 2005.

11         Q.   Right, okay, sorry.  And you said David -- I'm

12    sorry.  Did you say that it has to be put in writing?

13         A.   Yes.

14         Q.   Okay.  And did you attempt to put it in

15    writing?

16         A.   I did, after a gap of some time, in 2004.

17         Q.   But you didn't attempt to do anything at that

18    point in time?

19         A.   No, because David had said he would get back

20    to me with something in writing.

21         Q.   Well, he didn't get back to you a week,

22    two weeks later?

23         A.   He didn't.  David suffered a heart condition

24    and had to go into hospital and, I think the technical

ALAN BROWN
4-24-06

Page 108

1    Q.   Now, you were advised by legal counsel

2  throughout this entire period, is that correct?

3    A.   Yes.

4    Q.   And you were careful about getting everything

5  else that you could conceivably get in writing in

6  documents signed by you?

7          MR. SCHWARTZ:  Objection.  Sorry.

8    Q.   Is there some reason that you were so relaxed

9  about this particular agreement, which had such a big

10  impact?

11          MR. SCHWARTZ:  Objection.

12    A.   I've never been careful about registering

13  agreements in writing.  It's probably a weak spot of

14  mine.

15    Q.   Well, I introduced dozens of agreements.  Is

16  it State Street that was careful about getting

17  agreements in writing?

18    A.   Yes.

19    Q.   I see.  And as a general matter, that's a good

20  business practice, I would think you would agree, to

21  get agreements in writing?

22    A.   I particularly agree that now.

23    Q.   And you were advised by counsel at this period

24  as well as every other period of your employment there?

ALAN BROWN
4-24-06

Page 109

1    A.    My wife is an employment lawyer and advises me

2    whenever there is anything to be advised on.

3    Q.    And I think I'm not invading a privilege, but

4    I'll leave that to you to decide, to ask if you at the

5    time of these discussions consulted with your wife

6    regarding the substance of the discussions.  You can't

7    tell me what was said, but I think you can tell me if

8    you had conversations about it?

9    A.    We did.

10    Q.    Now, how long were you required to stay with

11    State Street in return for this supposed agreement?

12    A.    Except in the event of unforeseeable

13    circumstances like health, for example, the expectation

14    was that we would fully see the transition of SSgA post

15    the VSP through to stability again, with whatever

16    changes that needed to be made to the management team

17    and whatever changes that, whatever reaction we had to

18    come up with as a result of any client or consultant

19    reaction to the VSP.

20    Q.    Now, was that ever put in writing anywhere?

21    A.    No.

22    Q.    And what did that mean?  How long would that

23    be?

24    A.    Well, I think our collective understanding was

ALAN BROWN
4-24-06

Page 112

1    be required to stay for the full five-year period?

2        A.    No.

3        Q.    So David had an expectation that you would

4    resign under this agreement at some point in the near

5    future?

6        A.    Not that I would, but that I might.  The --

7        Q.    So we have a situation where you're not

8    eligible for any benefits under this plan and you make

9    a proposal that you might stay for an additional period

10   in return for benefits under the plan?

11       A.    Correct.

12       Q.    But that period is unstated?

13       A.    The period is unstated.

14       Q.    Now, are you contending, as we sit here today,

15   that you were made -- I'm sorry, strike that.

16            Are you contending, as we sit here

17   today, that you became eligible to participate in the

18   VSP as a consequence of this discussion with David

19   Spina?

20       A.    I believe that I became eligible to a modified

21   EVSP along the lines that we had discussed, exactly.

22       Q.    Okay.  And that's the question you put in an

23   extra word in your answer.  You said modified.  What

24   did it mean that it was a modified EVSP?

ALAN BROWN
4-24-06

Page 116

1     Q.   Let's go to this.

2               (Brown Exhibit No. 12 marked

3               for identification.)

4     Q.   I show you a copy of Exhibit 12 and ask you if

5     you recognize that?

6               (Document handed to the witness.)

7     Q.   Do you see that?

8     A.   I do.

9     Q.   Okay.  Now, was this your attempt to make a

10    written record of this arrangement?

11    A.   It was.

12    Q.   And you waited a year from when the

13    conversations took place before you attempted to do

14    that?

15    A.   Yeah.

16    Q.   And what was going on in your mind about this

17    particular arrangement all throughout that year?

18    A.   Well, I was getting increasing advice that I

19    should really move to get this written down for the

20    record, which as I said, I have not been diligent about

21    before, and certainly did not at the beginning want to

22    chase David with health problems, and finally responded

23    to that advice and this is the result.

24    Q.   Did anything else happen at about that time to

Page 117

1    trigger your desire to put something like this down on

2    a piece of paper?

3        A.    Not that I can link directly with this time.

4        Q.    What was David Spina's status at about this

5    time?

6        A.    Exactly.  I'm not sure whether I became aware

7    of the rumors of that before or after this.  I mean, it

8    was clearly around about that time, but I cannot with

9    confidence say which side of it.

10                MR. SCHWARTZ:  Why don't the two of you

11    stop hinting and be a little bit more explicit by what

12    you mean by that?

13       ·A.    Shall I go first?

14        Q.    I just asked you what his status was.  You can

15    answer.

16        A.    He was the chief executive of State Street,

17    but there was increasing rumor that he was likely to

18    depart fairly soon.

19        Q.    Okay.  And in this period of time did you

20    expect that David was going to seek compensation

21    committee approval for your arrangement?

22        A.    I didn't think that he needed any compensation

23    committee approval.  His response to this e-mail simply

24    said that he was going to put it on record with them.

ALAN BROWN
4-24-06

Page 120

1      Q.    And that's it, similar to?

2      A.    Similar to.

3      Q.    Okay.  And then going on, reading this, the

4   next sentence says -- You can read it.

5      A.    Specifically, you agreed that Tim and I would

6   get the VSP package amortized over five years save in

7   one regard, that vesting of equity would be limited to

8   equity granted before June 30th of 2003.

9                MR. SCHWARTZ:  Slow down a little bit.

10               MR. CALAMARI:  Were you able to get

11   that?

12               THE COURT REPORTER:  Yes.

13     Q.    Now, I come back to it.  Before you said it

14   was the SERP that was going to be amortized, but this

15   says the VSP package, the entire package is going to be

16   amortized, is that correct?

17     A.    It says I would get the VSP package amortized

18   over five years.  Aspects of that are not capable of

19   being amortized.  And the example that I subsequently

20   give relates specifically to the EVP top up pension

21   plan.

22     Q.    Wouldn't severance, a severance arrangement be

23   capable of being amortized?

24     A.    It would be capable of it.

ALAN BROWN
4-24-06

Page 121

1     Q.    Doesn't this say VSP package amortized?

2     A.    It says a severance package similar to that of

3     the VSP.  This is, as you will appreciate, a rather

4     short form to go through all of the detail concerned.

5     It's my clear understanding that the amortization

6     related to the EVP top up pension plan, the SERP.

7     Q.    But you wrote this document?

8     A.    I did.

9     Q.    With advice of counsel?

10    A.    Yes.

11    Q.    But it wasn't complete?

12    A.    I don't think one could describe three

13    paragraphs as being a complete, detailed agreement of

14    something which is relatively complex.

15    Q.    It's fair to say that there were many more

16    terms and conditions to your agreement than are in this

17    document?

18    A.    There is quite a lot which is implied by the

19    VSP package itself, which is not just within these

20    three paragraphs.  The agreement was very

21    straightforward.  It was very straightforward in that

22    we would, to the extent possible, receive the same

23    benefits that we would be have been entitled to under

24    the EVSP program, save for the fact that the additional

Page 125

1    introduce it before you answer that question.

2                    (Brown Exhibit No. 13 marked

3                    for identification.)

4        Q.    This is Exhibit 13.  That's an e-mail chain,

5    actually, with the top e-mail being an e-mail to Tim

6    Harbert dated 3/6/2004 at 9:15 a.m. and it's numbered

7    Plaintiffs 31, is that correct?

8        A.    That's correct.

9        Q.    Okay.  And you were saying that Tim responded

10   to this e-mail?

11       A.    He did.  I sent the draft to him when I was in

12   London.  Weekend, I flew over to Boston.  I saw Tim on

13   the 10th and asked him if he'd seen this note and

14   whether he agreed with it.  He said that he did, so I

15   then forwarded it, as you see, to David Spina.

16       Q.    How did he say that he agreed with it?

17       A.    Verbally.  I was standing in his office and he

18   said verbally.

19       Q.    So if you e-mailed him, why couldn't you have

20   just handed it to him if you were standing in his

21   office?

22       A.    I beg your pardon?

23       Q.    I was confused.  Maybe I'm missing something

24   here.  You sent Tim an e-mail asking him if he had any

ALAN BROWN
4-24-06

Page 126

1    comments on this?

2        A.    Correct.  That was on the 3rd of June.

3        Q.    That's correct.

4        A.    Right.

5        Q.    At 9:15 a.m.

6        A.    London time.

7        Q.    Right.  And you said he got back to you?

8        A.    I flew over to the United States following

9    that and in a conversation in his office, I asked him

10   if he had seen this e-mail and whether he had any

11   comments to make on it or whether he was happy with it.

12   He said he was happy with it, it reflected his

13   understanding of the agreement, and so I sent it on.

14       Q.    Okay.  That's what I missed, I'm sorry.  Now,

15   one question for you.  Do you have a severance

16   agreement already agreed.  What did he say?

17       A.    I don't actually recall what he said to that.

18       Q.    And you also say here, If not, would you like

19   me to change the language to "we" instead of "I"?

20       A.    Right.

21       Q.    What did he say to that?

22       A.    Again, I don't recall.

23       Q.    Did you change the language to we instead of

24   I?

ALAN BROWN
4-24-06

Page 127

1      A.    Let me have a look.  No.

2      Q.    So did that reflect some disagreement with Tim

3  over what this was?

4      A.    No.

5      Q.    Is there a reason Tim did not want you to --

6      A.    Well, I can't speculate, but obviously, if

7  he'd said yes to already having a severance agreement

8  in place, then he wouldn't have needed we to turn into

9  I.  But I'm not going to speculate as to the reason.

10  What is clear from this is that I did not change we --

11  I'm sorry, I to we.  I left it at I.

12      Q.    All right.  Eventually David Spina got back to

13  you, is that correct?

14      A.    Yes, it is.

15      Q.    And how did he get back to you?

16      A.    By e-mail.

17      Q.    What did he say, what did he say?

18      A.    I'll be happy to read it.

19      Q.    You don't recall what the e-mail said?

20      A.    Not word by word, no.

21      Q.    Do you have an idea of what the substance of

22  the e-mail was?

23      A.    The substance of the e-mail was that he

24  thanked me for getting back to him, that he wasn't

ALAN BROWN
4-24-06

Page 137

1      Q.    Then this statement is not correct?

2      A.    There are elements of the package which are

3  necessarily effectively binary and incapable of being

4  amortized.  For example, equity vested before 2003.  It

5  either vests or it doesn't vest, right?

6      Q.    No, not necessarily.

7      A.    Well, it could proportionately vest, I

8  suppose.

9      Q.    Correct, it could.

10     A.    It could, but that was not the intent of the

11  agreement entered into between myself and David Spina.

12     Q.    The only question I have for you is why didn't

13  you write that here?

14     A.    For no reason.  I think I now rather wish I

15  had.

16     Q.    Okay.  What happened after the June 30th, 2004

17  letter as far as your agreement is concerned?

18     A.    After I'd received a copy of the letter that

19  was copied to Tim Harbert, that was it.

20     Q.    You no longer cared about getting a written

21  agreement?

22     A.    I believed that that was sufficient.

23     Q.    Why did you believe that that was sufficient?

24     A.    I can't speculate as to why.  I mean, it

ALAN BROWN
4-24-06

Page 138

1    seemed to me evidence of a commitment from David Spina

2    which I believed he'd entered into in good faith and I

3    believe he's a man of integrity and I believed the

4    corporation would honor it.  I believe there was

5    sufficient there.

6         Q.   Even though this was not a letter addressed to

7    you?

8         A.   Even though it wasn't a letter addressed to

9    me.

10        Q.   And yet you had a specific employment

11   agreement with the company and dozens of award

12   agreements with the company and multiple letters from

13   the company to you setting forth terms of compensation,

14   yet something as valuable as this, you were sufficient,

15   you felt was sufficiently clear that you could rely on

16   it?

17        A.   I very much regret that I didn't take the

18   advice of my counsel to get it down in more concrete

19   form.

20        Q.   So you did receive advice that you should have

21   a written agreement if it were to be an enforceable

22   agreement?

23        A.   No.  No.  Not if it were to be an enforceable

24   agreement.  I got advice of my counsel that matters of

ALAN BROWN
4-24-06

Page 140

1    Q.    What were the circumstances surrounding that

2  discussion?

3    A.    They were discussions that I had with Peter

4  Leahy and John Marrs and the discussions were in the

5  context of the succession process that SSgA was going

6  through at the time.

7    Q.    Did there come a point where someone advised

8  you that the compensation committee had rejected this

9  agreement?

10    A.    No.

11    Q.    And no one ever told you that?

12    A.    No.

13    Q.    Did anybody ever tell you that the

14  compensation committee had approved it?

15    A.    No.  May I add to my reply to your previous

16  question?

17    Q.    Of course.

18    A.    I also, during the fourth quarter, discussed

19  it with Lou de Ocejo and in January 2005 I mentioned it

20  in a meeting with Ron Logue.

21    Q.    Now, in terms of these four conversations,

22  I'll call them for the moment, Peter Leahy, John Marrs,

23  Lou de Ocejo and Ron Logue, which would have come

24  first, can you recall?

ALAN BROWN
4-24-06

Page 143

1      Q.   So you just talked to him about the agreement

2   and he had no particular response that you can recall?

3      A.   No special noteworthy response.

4      Q.   And what about John Marrs?

5      A.   John Marrs was already aware, that I believe,

6   I had this agreement, that I had this arrangement with

7   David Spina, but --

8      Q.   How did he become aware?

9      A.   I believe I must have told him sometime quite

10   a while ago.  His role, as you may know, was head of

11   HR, so it's not exactly surprising that would know that

12   kind of thing.  I can't recall how he became aware of

13   it, whether it was from me or Tim or both or when.

14      Q.   And what was the nature of that conversation?

15      A.   The nature of that conversation was that there

16   was one element of the benefit under the agreement with

17   David Spina that in particular I wanted to get more

18   closely defined.

19      Q.   Which was that?

20      A.   The provisions of the SERP include a deduction

21   from the benefit equal to accrued pension rights under

22   alternative arrangements, DB and DC type arrangements.

23   In the strict interpretation of that, I had no DB or DC

24   style benefits of the type contemplated by the plan,

ALAN BROWN
4-24-06

Page 144

1    but as we've already discussed; State Street had been

2    paying to me a top up on my salary in lieu of

3    contributions to a recognized State Street plan.  And

4    so there was the question of what allowance should be

5    made in terms of a deduction from the SERP benefit for

6    the monies that State Street had been paying to me.

7        Q.    Was this something you discussed with David

8    Spina?

9        A.    Yes.  I had talked about the fact that I

10   didn't fit quite within the standard VSP formula

11   because of the fact that my benefits were outside of

12   the DB and DC arrangements contemplated in the

13   documentation, but obviously, in all equity and

14   fairness to State Street, they had been making a

15   contribution to me in lieu and they ought to get some

16   benefit from that in relation to a reduced SERP

17   liability.

18       Q.    And what did David say about that?

19       A.    No more at the time.  No more.  We didn't get

20   into any more detail on that.

21       Q.    You didn't talked about any detail, you talked

22   about this is an issue?

23       A.    Yes.  And that was noted in his letter when he

24   was putting it on record to the compensation committee.

ALAN BROWN
4-24-06

Page 153

1    with various people that you had not recorded up until

2    that point in time?

3        A.    It's clear that we're going through

4    potentially, we're going through a succession process

5    the outcome of which could potentially be quite

6    uncertain in relation to my future career at SSgA,

7    depending upon the outcome.

8        Q.    Why would that matter, though?  What was so

9    important about the succession process discussions that

10   required you to suddenly start taking notes?

11       A.    Because I believe that there could be

12   circumstances under which I might find that I wanted to

13   exercise this option and I wanted to document, so I

14   didn't have to rely too much on my memory, as to what

15   people were saying as we went through that process.

16       Q.    I thought before you told me you were

17   satisfied once you got a copy of the letter to Robert

18   Weissman that Tim Harbert gave you that you were

19   satisfied with the status of your situation with regard

20   to that agreement?

21       A.    I was.

22       Q.    So then why would you need to take notes?

23       A.    The only note that I made in relation to that

24   was when I double checked on the 28th of May with David

ALAN BROWN
4-24-06

Page 161

1    required to enter into a non-competition agreement,

2    your election pursuant to the EVSP will not be

3    effective unless you execute such an agreement in

4    addition to the other terms and conditions as set forth

5    in the EVSP materials.

6        Q.   So in theory, if the company were to want to,

7    were to have wanted to, as a condition for your

8    exercising whatever rights you might have had under the

9    VSP or the EVSP, they could have asked you to sit out

10   of work for a period of time?

11       A.   Possibly.  I have no idea of the nature of the

12   agreements that they may have entered into with people.

13   And I didn't receive this document until after I left.

14       Q.   I understand that.  But you have alleged that

15   you were entitled to a VSP arrangement?

16       A.   Uh-hum.

17       Q.   This would be an element of a VSP arrangement

18   if the company were to choose to exercise it?

19       A.   Possibly.

20       Q.   And if the company were to choose to exercise

21   it, it might have prevented you from earning any future

22   income for a period of time?

23       A.   Possibly.

24            MR. CALAMARI:  Tape's out?  Tape's out.

ALAN BROWN
4-24-06

Page 162

1    Did you get the last?

2                    THE VIDEOGRAPHER:   The time is now 3:27,

3    going off the record.   End of Tape Number 3.

4                    (Brief recess.)

5                    THE VIDEOGRAPHER:   3:32, back on the

6    record with Tape Number 3.

7        Q.   You've talked about a succession period and I

8    trust that succession period runs from the time you and

9    Peter Leahy became co-heads of SSgA, interim co-heads

10   of SSgA until the time Bill Hunt was named as head?

11       A.   I think I probably have the starting point as

12   being Tim's death, but --

13       Q.   How long before Tim's -- How long after Tim's

14   death was it that --

15       A.   About a week or thereabouts.   I'm not quite

16   sure, but about a week.

17       Q.   And were Tim's files given to you when you

18   became interim co-head?   Do you know who took

19   possession of Tim's files?

20       A.   No.

21       Q.   What was your position during the succession

22   period with regard to seeking the top job?

23       A.   After Tim's death the executive management

24   group met to see if we had a common position on a

ALAN BROWN
4-24-06

Page 163

1    succession plan.  And with the help of John Marrs, we

2    put together a succession proposition.  And the essence

3    of it was that I'd be moved to the position of chairman

4    and CIO and Peter Leahy to the position of vice

5    chairman and CEO and that the two of us would then, if

6    you like, carry on from where Tim and I had previously

7    been, but with the chairmanship moving from the CEO to

8    the CIO spot.

9        Q.   And how did the succession planning play out?

10   What were the major steps over the course of time?

11       A.   Well, it was a process that we were kept

12   fairly distant from because we were candidates, but

13   it's a process which took a lot longer than I think any

14   of us on all sides really would have liked.  So

15   originally we'd hoped that it would all be done in

16   30 days, then by Thanksgiving, then by the end of the

17   year and ultimately to the 1st of January -- I'm sorry,

18   the 31st of January.

19       Q.   And was it clear that you wanted the Number 1

20   job?

21       A.   I believe it was.

22       Q.   And there came a point in time where you

23   didn't get it?

24       A.   Correct.

ALAN BROWN
4-24-06

Page 166

1       A.   That's correct.

2       Q.   Was your best earnings year since you had been

3  with SSgA?

4       A.   Yes.

5       Q.   And that was $2.5 million?

6       A.   Or thereabouts.

7       Q.   Thereabouts, okay.  So what was your response

8  to the changes you discussed?

9       A.   My response was to reach the conclusion in

10  early March, when I came back from my trip to the

11  United States, the notes of which you have in front of

12  you, that my position was becoming untenable and that

13  therefore I should exercise my agreement that I had

14  concluded with David Spina.

15      Q.   In other words, you were going to resign and

16  in your view elect the, is it modified VSP or is

17  similar VSP, which?

18      A.   Whichever.

19      Q.   Whichever.

20      A.   That I was going to elect for the benefits,

21  and that in so doing, that would lead to my employment

22  terminating.

23      Q.   And if you did not have those benefits, would

24  you have stayed on?

ALAN BROWN
4-24-06

Page 175

1    made by my counsel and that Mitch was appraised of the

2    fact that she was listening to the conversation.

3        Q.   And is your counsel going to testify in this

4    case?

5        A.   You tell me.

6        Q.   In any event, why don't you tell me what you

7    remember as being said?

8        A.   Well, one of the things that I do remember is

9    repeating to Mitch that my letter was not intended and

10   could not be construed as a resignation.  There was

11   then discussions about a number of matters on which we

12   see here, such as NAPF, going on holiday, whether I'd

13   be able to go into the office to access my speech

14   notes, what we were going to do with certain

15   forthcoming meetings between, meeting with Mr. Paulson

16   from Goldman Sachs and a variety of other matters of

17   that nature.

18              And I think back from Mitch was an

19   indication that Mitch and SSgA needed time to consider

20   things and to reflect on it and said that while it

21   couldn't draw on forever, that they needed some time to

22   consider things and get back to me.

23       Q.   Some in that conversation did you say to

24   Mitch, Look, if you guys don't agree with my election

ALAN BROWN
4-24-06

Page 176

1    of the VSP type benefits, I'm going back to work, I'm

2    not resigning?

3       A.    I said that this is not a letter of

4    resignation, this is a letter of election.

5       Q.    Well, but as a practical matter, you were

6    doing two things. You were electing what you thought

7    might be a benefit, but you were also telling them you

8    didn't want to work there any more, isn't that correct?

9       A.    As far as I'm concerned they're indivisible.

10       Q.    Okay. Let's go to the next exhibit. By the

11   way, was that the entire substance of the conversation,

12   as best you remember it?

13       A.    Without the benefit of the notes, it is.

14              (Brown Exhibit No. 23 marked

15              for identification.)

16       Q.    That is Exhibit 23, which is an e-mail from

17   you to Mitch Shames dated Friday, March 11th, 2005?

18       A.    Correct.

19       Q.    Okay. And what was the point of this letter?

20       A.    It was to acknowledge receipt of his e-mail,

21   the one that we've just been discussing, and then to

22   register the fact that I did not, don't believe that

23   the answers properly explain the basis upon which I

24   would be asked not to go to work, and references the

ALAN BROWN
4-24-06

Page 180

1  response to that letter?

2      A.  It was.

3      Q.  Now, after this letter, what did you do?

4          MR. SCHWARTZ:  Object to the form.

5      A.  What did I do?

6      Q.  I'll strike the letter.  In relationship to

7  the subject of this letter, what was the next thing you

8  did?

9      A.  Consult with my lawyers.

10     Q.  Did you ever go back to State Street and say,

11 If you're not going to give me the EVSP, I'm coming

12 back to work, I don't want to leave work right now?

13     A.  No, I didn't.

14     Q.  Did you ever make any clear offer to return to

15 work?

16     A.  Pretty much the day following this, I believe

17 I'm right in saying, that State Street had publicly

18 announced my departure.  So I'm afraid it seemed to be

19 rather difficult at that point.

20     Q.  Why would it have been difficult?  You could

21 have come back in.

22     A.  I think you can appreciate that once a public

23 announcement has gone out from State Street, that it

24 would be difficult.

# EXHIBIT 4

Employee-Communicat    To: All US StateStreet
) ion                   cc:
04/10/2003 07:01 PM     Subject: Expense Reduction Plans

To:    All U.S. Employees
From:  Lou de Ocejo, EVP, Human Resources & Organizational Performance

As David Spina indicated in his communication earlier today, we will be reducing our staff levels by up to 1,800 employees by June 30. We hope to achieve a significant number of these reductions through the offering of a one-time Voluntary Separation Program. This plan will be offered to eligible employees as discussed below (see also Important Notice below).

If the number of voluntary terminations is insufficient at the conclusion of the Voluntary Separation Program, an involuntary reduction in staff will be implemented to achieve our cost reduction goals.

Our priority is to achieve these overall cost reductions in a balanced fashion, ensuring that employees are treated with respect and have the necessary information to make informed decisions, while appropriately addressing the interests and concerns of our stockholders and clients. Therefore, I ask for your patience during the coming days.

Now, let me provide you with a broad outline and timeframe of how the programs will work.

## Voluntary Separation Program

- The election period will begin in the first week of May and conclude in mid-June. This allows eligible employees at least 45 days to make an informed decision.

- The formal and official offering of this program will be mailed to your home. The package will contain a full and detailed description of the program and a personal statement showing which program benefits and components are available to you. **To ensure that you receive this important information, please review and update your home address immediately through employee-business at http://employeebusiness.statestr.com**

- Generally, employees who have completed one year of service (based on most recent hire date) as of April 1, 2003, and remain employed until June 27, 2003, will be eligible.

- Employees or former employees who have already entered into a separation agreement with the company are not eligible for the Voluntary Separation Program.

- Employees who are in an extended notice period who were part of a previously announced staff reduction or divestiture also are ineligible for the Voluntary Separation Program.

- The company reserves the right and discretion to exclude or include employees for eligibility in the Voluntary Separation Program on the basis of business needs and other considerations.

- The program benefits are a combination of enhanced retirement benefits, severance, continued vesting of stock, outplacement and other benefits. **The benefits or combination of**

SSC 04876

benefits that apply will vary by employee and may be based on certain other conditions. Please refer to the attached summaries to determine the Voluntary Separation benefits that may apply to you.

• **At the conclusion of the offering period, all enhanced benefits under the Voluntary Separation Program will cease.**

<u>Reductions In Staff</u>

• In the event insufficient terminations occur under the Voluntary Separation Program, involuntary staff reductions will be implemented.

• **Involuntary staff reduction benefits will be limited to standard retirement and severance benefits. None of the enhanced benefits of the Voluntary Separation Program will apply.**

<u>Other Important Information</u>

• Beginning July 1, 2003, benefit accrual for employees hired prior to 1990 under the pre-1990 formula of the retirement plan (i.e. the "grandfathered" formula) will be frozen. That means that if an employee remains employed after June 30, 2003, no pay or service earned after that date will be considered in the calculation of the grandfathered benefit. The cash balance account will not be affected by this change and the account will continue to pay interest credits.

• Please note that all managers will receive a general information package concerning the Voluntary Separation Program and Reductions In Staff. This will enable them to respond to questions. **Please understand they will not be able to discuss, explain, or counsel employees on program details.**

• In the near future, HR&OP will set up an electronic mailbox to respond to general employee questions. We will inform you when this service is available.

The smooth implementation of these programs will require much patience and collaboration from all of us. Our goal is to provide you with individual and accurate information so that you can make an informed decision.

IMPORTANT NOTICE

State Street reserves the right, in its sole discretion, to exclude one or more individuals, groups of employees, and/or employees of an entire business unit from participation in the Voluntary Separation Program even if such employees would otherwise meet the program's eligibility criteria, or to vary the terms of the Program for any such groups. Employees who are affected will be notified. All of the terms and conditions of the Program have not been finalized, and State Street reserves the right and discretion to modify the Program in any respect.



Plan detailfinal.xls

# EXHIBIT 5

Louis de Ocejo
5/23/2006

1

1

**COPY**

Volume:
Pages:  1 - 102
Exhibits:  1 -  7

2

3      UNITED STATES DISTRICT COURT
       DISTRICT OF MASSACHUSETTS

4

5  ALAN BROWN,

6                    Plaintiff
                                      C.A.
7  Vs.                                No. 05-11178-NG

8
   STATE STREET CORPORATION and
9  STATE STREET GLOBAL ADVISORS,

10                 Defendants

11

12      Deposition of LOUIS de OCEJO, a witness

13  called on behalf of the Plaintiff, pursuant

14  to the Federal Rules of Civil Procedure,

15  before Rosamond K. Marcy, a Certified

16  Shorthand/Registered Professional Reporter

17  and Notary Public in and for the Commonwealth

18  of Massachusetts, at the Offices of Rodgers,

19  Powers & Schwartz, LLP, 18 Tremont Street,

20  Boston, Massachusetts 02108, commencing at

21  10 A.M. on Tuesday, May 23, 2006.

22

23
24

SHEA COURT REPORTING SERVICES
(617) 227-3097

Louis de Ocejo
5/23/2006

5

| 1 | A. | No one.  I'm retired. |
| 2 | Q. | Who were you last employed by? |
| 3 | A. | State Street Corporation. |
| 4 | Q. | What was your last position? |
| 5 | A. | Executive Vice President of Human |
| 6 | | Resources. |
| 7 | Q. | Can you run through for me your career |
| 8 | | at State Street? |
| 9 | A. | I joined the company in September of |
| 10 | | 2001 in the same position and I was |
| 11 | | there until the end of March 2005. |
| 12 | Q. | I take it you are familiar with the |
| 13 | | program called VSP. |
| 14 | A. | Yes. |
| 15 | Q. | Were you involved in the design of the |
| 16 | | VSP? |
| 17 | A. | Yes. |
| 18 | Q. | Can you summarize for me what the |
| 19 | | purpose of the VSP program was? |
| 20 | A. | A cost-reduction program that offered |
| 21 | | employees the option to leave the |
| 22 | | corporation with enhanced severances and |
| 23 | | in some cases pension benefits. |
| 24 | Q. | Why did State Street implement the VSP? |

SHEA COURT REPORTING SERVICES
(617) 227-3097

Louis de Ocejo
5/23/2006

6

1    A.    The goal was simply reduction in cost,

2          reducing the number of employees and

3          therefore the cost which employees

4          represented the majority of the

5          operating cost of the business.

6    Q.    I understand there was a VSP and there

7          was a subset under that called the EVSP.

8    A.    Yes.

9    Q.    What was the EVSP?

10   A.    That was pretty much a mirror of the VSP

11         program.  It was directed at executive

12         vice presidents.

13   Q.    How were the VSP and the EVSP programs

14         designed?  What was the process in

15         deciding what the parameters should be?

16   A.    The parameters were initially stated as

17         goals in terms of overall reductions in

18         staff and subsequently we worked with

19         our outside consultants and actuaries

20         that we used in developing the program,

21         the people that did all the work for us

22         on pensions in particular to design a

23         program that would provide enhanced

24         benefits and therefore encourage people

Louis de Ocejo
5/23/2006

7

1     to accept.

2  Q.  Was there a committee formed or some

3      sort of group put together to design the

4      VSP?

5  A.  No.  It was done pretty much in the

6      normal ordinary course of business,

7      folks that were primarily involved in

8      design work and discussion of

9      preparation for submission to my direct

10     staff.

11 Q.  Who were the managers responsible for

12     designing the VSP?

13 A.  Myself, Boon Ooi, the head of

14     compensation, Datz worked with us as the

15     lawyer.  We kind of got input from

16     various generalists as to the function

17     but the bulk of the work was done by the

18     three of us with our outside

19     consultants.

20 Q.  Did you report to anybody above you in

21     the chain of command about the design of

22     the VSP?

23 A.  Yes.  The normal reporting was expected

24     at State Street.  I reported to the vice

Louis de Ocejo
5/23/2006

11

1      being presented to them and David Spina

2      subsequently had the discussion with

3      them since it was a plan.  I wasn't

4      present for that discussion.

5    Q.    Who were the State Street employees who

6      were eligible for the VSP?

7    A.    U.S. State employees and it was defined

8      as at least one year of service is my

9      recollection and as long as they were on

10      the U.S. payroll and covered by U.S.

11      plans they were eligible.

12    Q.    What about ex-Pats?

13    A.    Americans that were out of the state but

14      on the U.S. payroll and covered by the

15      U.S. plans were technically eligible.

16    Q.    What about foreign citizens working in

17      the U.S.?

18    A.    If they were on the U.S. payroll and

19      covered under the U.S. plans they would

20      have been eligible.  If they were

21      British ex-Pats on assignment here for a

22      year they would have not.

23    Q.    Were there a number of employees as to

24      who decisions had to be made as to

Louis de Ocejo
5/23/2006

12

```
 1          whether they would be eligible because

 2          of their citizenship or residency?

 3   A.     I don't recall many of those, if any.

 4          It was pretty straightforward as to

 5          eligibility.

 6   Q.     What do you mean by covered under the

 7          U.S. plans?

 8   A.     Meaning they were paid out of the U.S.,

 9          had U.S. benefits, were eligible under

10          the pension plan, the cash back plan or

11          the health and welfare plan.

12   Q.     What was the SERP?

13   A.     The SERP was the executive retirement

14          plan, a supplemental plan for

15          non-qualifieds.

16   Q.     Was that a U.S. plan?

17   A.     Yes.

18   Q.     Was Alan Brown covered by the SERP?

19   A.     I think Alan was eligible at the time,

20          is my recollection.

21   Q.     Do you know one way or the other?

22   A.     I don't.  I don't believe he was covered

23          by the SERP.  He had his own

24          arrangements.
```

Louis de Ocejo
5/23/2006

26

1        such benefits were provided sometime in

2        the future.

3   Q.  Can you place that conversation with

4        Mr. Harbert in time?

5   A.  My recollection is that it was late that

6        summer but I can't remember.

7   Q.  The summer of the VSP?

8   A.  Right, of 2003.

9   Q.  How did the topic come up?

10  A.  I don't recall.

11  Q.  I'm going to ask you to exhaust your

12       memory about that conversation with Mr.

13       Harbert. Tell me as best you can recall

14       what he said.

15  A.  Pretty much what I have said is what I

16       recall. Both of us were joking about

17       the fact that it was highly unlikely

18       that it was ever going to happen for a

19       number of reasons, and Tim, frankly, was

20       very dismissive of this whole thing ever

21       seeing the light of day. That was the

22       end of the conversation.

23  Q.  He has been described to me as a

24       long-term State Street employee. Is

Louis de Ocejo
5/23/2006

38

```
 1            his own."  It was a very similar
 2            discussion to what I had with Tim in
 3            August before he passed away where he
 4            was aware that this issue had been
 5            raised by Alan in June and I had this
 6            very similar discussion about this will
 7            never get approved.
 8     Q.     Is that the discussion you had with Tim
 9            that you told us about earlier?
10     A.     No.  This was in August of 2004 right
11            before he passed away.  You asked me if
12            I had discussed it with Alan.
13     Q.     No.  I asked you whether you discussed
14            it with Tim again after the June 2003
15            conversation.
16     A.     I stand corrected.  We had an office in
17            Quincy where he and I stepped outside
18            for a cigarette and this issue came up.
19            He was aware that Alan had raised it.  I
20            said, "We discussed it a year ago.  It
21            will never happen."
22     Q.     So you had two discussions with Tim, one
23            in the summer of 2003 and one in the
24            summer of 2004.
```

Louis de Ocejo
5/23/2006

39

```
 1   A.   In August.  I'm pretty sure about that
 2        one because it was just before he passed
 3        away.
 4   Q.   Tell me about that discussion with Tim
 5        in August of 2004.
 6   A.   It was brief on this topic.
 7   Q.   How did the topic come up?
 8   A.   I think he raised it by saying, "I
 9        understand that Alan raised this issue
10        with David and wrote letters to that
11        effect," and I said, "Yes, he did, but
12        my view is that David did not possess
13        the authority to grant this and in the
14        mood of the Board and particularly the
15        Compensation Committee that it was very
16        unlikely that anybody would ever agree
17        to such terms."
18   Q.   What was Tim's reaction to that?
19   A.   He was very much of the same view that
20        anybody would ever agree to those terms.
21   Q.   Let's go back to the conversation you
22        had with Alan Brown about his
23        conversation with Mr. Spina.  When was
24        the conversation with Alan?
```

Louis de Ocejo
5/23/2006

40

1                    MR. CALAMARI:  Objection.

2     A.    He and I spoke either at the end of

3           September or sometime in October of '04

4           and the discussion was very limited in

5           this respect that it was mostly about

6           the question of the job search to

7           replace Tim and whether Alan was going

8           to be a candidate so that was the bulk

9           of the discussion, but I recall Alan

10          making a comment about, "I had a

11          discussion with David and certain

12          arrangements about the VSP," and I said,

13          "Alan, it will never see the light of

14          day.  The Committee will never agree to

15          something like this and I know they have

16          looked at it and this letter that David

17          wrote and nothing is going to happen."

18    Q.    You told Alan that the Executive

19          Compensation Committee had looked at it?

20    A.    My recollection is that that's what I

21          shared with him, that it has been

22          reviewed and they are never going to

23          approve something like this.  Alan's

24          view at that point in time was very

SHEA COURT REPORTING SERVICES
(617) 227-3097

Louis de Ocejo
5/23/2006

41

```
 1          committed to, "I want the job," and

 2          that's what he spent most of the time

 3          talking about.

 4   Q.     Are you sure you are not confusing this

 5          conversation about Mr. Spina's

 6          commitment with a different conversation

 7          with Alan Brown later on?

 8                    MR. CALAMARI:  Objection as

 9          to form.

10   A.     I'm pretty sure.  I subsequently spoke

11          to Alan again on a number of topics at

12          different locations.  I know he was

13          particularly concerned the search was

14          taking so long and where he ended up

15          following up with me on that and I

16          remember giving him an update on where

17          things were.  That's not the same

18          conversation.

19   Q.     Did you have any other conversations

20          after the one in September of '04 with

21          Alan Brown about the subject of

22          Mr. Spina having made some sort of

23          commitment to him?

24   A.     No.
```

Louis de Ocejo
5/23/2006

46

1          Committee is reflected in the minutes?

2    A.    Yes, that's our practice.

3    Q.    You said you spoke with Mr. Weissman

4          about Mr. Spina's letter, Exhibit 5.

5    A.    Yes.

6    Q.    When was that conversation?

7    A.    It was either that day or the day after

8          is my recollection, very soon after I

9          received this letter.

10   Q.    Before you received this letter on June

11         30 did you know that on June 16

12         Mr. Spina had spoken with the

13         Compensation Committee about Mr. Brown?

14   A.    If he did, I didn't know it, no.

15   Q.    So nobody from the Compensation

16         Committee contacted you to ask about

17         Mr. Spina's commitment to Mr. Brown.

18              MR. CALAMARI:  Objection to

19         form.

20   A.    No.

21   Q.    Tell me about your conversation with

22         Mr. Weissman about Mr. Spina's letter.

23   A.    It was very matter of fact in terms of

24         reading through the letter and giving

Louis de Ocejo
5/23/2006
47

```
 1          him what he asked me for was my
 2          perspective and I shared that with him.
 3   Q.     What did you tell him?
 4   A.     I told him that as far as I was
 5          concerned it was something that David in
 6          no way, shape or form was authorized to
 7          approve and agree to on behalf of the
 8          company because it's a level of the
 9          individuals that were involved and there
10          was no compelling business reason to do
11          this and that has always been the
12          rationale and that's what I shared with
13          him.
14   Q.     What did he say?
15   A.     He said, "Fine.  Thank you for your
16          input.  We will discuss this at an
17          upcoming meeting.  What I want you to do
18          is to also make certain assumptions
19          about, "Okay if you're going to quantify
20          what this is about what does it mean,"
21          and that's what I did myself and my
22          staff to figure out what does that mean,
23          how many weeks of severance can a person
24          get if that were to happen.
```

Louis de Ocejo
5/23/2006

78

```
 1   Q.   Why couldn't they receive the
 2        information and vote on it?
 3   A.   They received the information but there
 4        was no vote because no one had proposed
 5        any vote.  There was no vote proposed.
 6   Q.   Were there votes proposed on these other
 7        items?
 8   A.   Yes.
 9   Q.   Who proposed them?
10   A.   My recollection is that Joseph Chow's
11        and Tom McCrossan's votes were items
12        that came from Ron Logue and the one on
13        David Spina I raised it as an issue that
14        was left over from his leaving the
15        company so the technical issues are the
16        calculations.
17   Q.   Before the September 15 meeting did
18        Mr. Weissman tell you that there would
19        be no vote about Alan Brown?
20   A.   He didn't say there would be no vote.
21        He said that we would be discussing it
22        and that's all that was planned.
23   Q.   And you interpreted that to mean there
24        would be no vote?
```

Louis de Ocejo
5/23/2006

79

1    A.    Right.  There was no one affirmatively

2          proposing any kind of vote.

3    Q.    Do you know whether at any meeting after

4          the September 15, 2004 meeting the topic

5          of Alan Brown receiving some sort of

6          benefits was ever proposed?

7    A.    After this meeting?

8    Q.    Yes.  Was it ever discussed?

9    A.    By the Committee?

10   Q.    Yes.

11   A.    Not to my recollection.

12   Q.    Did you prepare a package of information

13         for the September 15 meeting about

14         Mr. Brown?

15   A.    Yes.  I don't have that here.

16                    [Document entitled SSgA

17                    Executive Vice President,

18                    Verbal Commitment by David

19                    Spina marked de Ocejo

20                    Exhibit No. 10 for

21                    Identification.]

22   Q.    I show you what we have marked as

23         Exhibit 10, SSC 05475 and 76.  In the

24         lower left-hand corner it says Tab 4B,

SHEA COURT REPORTING SERVICES
(617) 227-3097

Louis de Ocejo
5/23/2006

80

1      September 15, 2004.  What does that

2      mean?

3   A.  That's the binder that's prepared for

4      the Compensation Committee meeting.

5   Q.  Who prepared that binder?

6   A.  Boon Ooi and his staff with my review

7      and approval.

8   Q.  So this Exhibit 10 then was prepared by

9      your staff for the Executive

10     Compensation Committee for their

11     September 15 meeting?

12  A.  Right.

13  Q.  Did you review this before it was

14     presented to the Committee members?

15  A.  Yes, I looked it over.

16  Q.  Do you know who wrote it?

17  A.  The actual drafting of the words was

18     probably done by Boon Ooi.

19  Q.  Did you approve it?

20  A.  I passed it on, yes.

21  Q.  Let's go through it.  The first heading

22     says Background.  The first bullet says,

23     "Certain verbal commitments were made

24     to Alan Brown during EVSP period."  Did

SHEA COURT REPORTING SERVICES
(617) 227-3097

# EXHIBIT 6

# Executive Voluntary Separation Program Decision Guide

## *Election Period: May 1–June 16, 2003*

*For Employees Eligible for Retirement
(Age 50 or older with five or more years of service)*

## What's Inside

About the Executive Voluntary Separation Program ........................................................3

Retirement Plan Benefits ...............................................................................................7

Salary Savings Program—401(k) .................................................................................13

Summary of Tax Considerations ..................................................................................14

Enhanced Severance Payments ...................................................................................15

Equity-based Awards ..................................................................................................16

Medical Coverage .......................................................................................................17

Dental and Vision Coverage .........................................................................................18

Life Insurance ............................................................................................................19

Flexible Spending Accounts (FSAs) ..............................................................................20

Employee Assistance Plan (EAP) .................................................................................20

Vacation ....................................................................................................................20

Outplacement Benefits ...............................................................................................20

Social Security ...........................................................................................................21

Benefits at a Glance ...................................................................................................21

Future Changes ..........................................................................................................22

ERISA Rights .............................................................................................................22

Questions and Answers ...............................................................................................22

---

**Important Note**

This guide and the accompanying documents describe the benefits available to you through the Executive Voluntary Separation Program. If there is any discrepancy between the information in this guide and the plan documents, the plan documents will govern. State Street reserves the right in its sole discretion to amend, modify or terminate any plan for active or former employees at any time and for any reason, subject to applicable laws. If a change is made, you will be notified.

State Street has made its best efforts to determine that those employees who receive the Executive Voluntary Separation Program package of materials are eligible to participate. However, if you are not eligible, having received this package will not entitle you to participate. Similarly, if you are eligible but relevant data in State Street's recordkeeping system is incorrect, State Street reserves the right to correct the data.

State Street also reserves the right in its sole discretion to exclude one or more individuals, groups of employees and/or employees of an entire business unit from participation in the Executive Voluntary Separation Program, even if such employees would otherwise meet the eligibility criteria. Alternatively, State Street may vary the terms of the Program for any groups of employees.

---

Plaintiff 4

# Calendar of Important Dates for the
# Executive Voluntary Separation Program (EVSP)

| May 2003 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**May 1:** EVSP election period begins.

| June 2003 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

**June 16:** Election period closes. Your Election Form and Release Agreement must be received by HR & OP Benefits (see *Returning Your Forms* on page 4). However, in no event will you have less than 45 calendar days to review and consider the Release Agreement.

**June 27:** Last day of employment for employees who elect the EVSP (unless your termination date is extended by State Street). Equity-based awards will be adjusted to reflect the EVSP vesting and exercisability enhancements.

| July 2003 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

**July:** Severance payments are made. Retirement Plan payment election packages will be distributed to employees who elect the EVSP.

| August 2003 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**August 31:** The date as of which your Retirement Plan benefits have been calculated and your service has been projected for severance and retiree medical eligibility. You may elect that your Retirement Plan payments begin as soon as practicable after your termination (but not earlier than September 1, 2003), or you may defer payments to a future date.

Plaintiff 5

# About the Executive Voluntary Separation Program

## What Is the Executive Voluntary Separation Program?

The Executive Voluntary Separation Program (EVSP) is a one-time election to terminate your employment with State Street voluntarily on June 27, 2003 (unless your termination date is extended by State Street). The EVSP provides retirement and severance payments, retiree medical and life insurance, and other benefits and services based on your projected age and State Street service as of **August 31, 2003**. The rate of pay for severance and certain retirement calculations will be your base pay rate as of April 1, 2003.

## Eligibility

You are eligible to elect the EVSP if you meet the following criteria:

- You are employed on April 1, 2003 by State Street Bank and Trust Company or an affiliated company that is a participating employer under the State Street Retirement Plan, and you are on the U.S. payroll.

- You have at least one year of service with State Street as of April 1, 2003. For this purpose, your service is measured from your most recent hire or rehire date.

- You hold the title of Executive Vice President or a superior position.

- You have not been designated as ineligible for the Program.

## Entitlement to Executive Voluntary Separation Program Benefits

If you are eligible, you will be entitled to receive the benefits provided under the EVSP if:

- Your signed Election Form and Release Agreement are returned to HR & OP Benefits by June 16, 2003 (see *Returning Your Forms* on page 4), and you do not revoke them, and

- You remain employed by State Street in a satisfactory manner until June 27, 2003 (or your extended termination date, if later).

Plaintiff 6

## What You Need to Do

The EVSP is entirely voluntary. The checklist below identifies the steps you should take to decide whether to elect the EVSP.

*All employees eligible for the EVSP should:*

☐ Become familiar with the benefits offered under the EVSP (read this guide and review your Personalized Statement).

☐ Review your financial status and your personal situation.

☐ Seek legal advice and consult a tax and/or financial advisor.

☐ Decide whether you want to terminate your employment under the EVSP or continue working until you leave State Street voluntarily or become subject to an involuntary staff reduction.

*If you decide to elect the EVSP, you must:*

☐ Complete and sign the Election Form.

☐ Sign the Release Agreement.

☐ Return the Election Form and Release Agreement. Your Election Form and Release Agreement must be received by **HR & OP Benefits no later than June 16, 2003** (see *Returning Your Forms* below).

*If you do not want to elect the EVSP, no action is required. Remember, the EVSP is a one-time offer.*

---

## Returning Your Forms

You must return your Election Form and Release Agreement by one of the following methods:

| By Mail | In Person |
|---|---|
| Mail your forms to the address below. Forms must be received by June 16, 2003. You are encouraged to use a method that provides you with a receipt of delivery (for example, U.S. Express Mail® next-day delivery). | Deliver your forms **by 5:00 PM Eastern Time on June 16, 2003** to: |
| | Boon S. Ooi<br>HR & OP Compensation & Benefits<br>John Adams Building, 1st Floor North<br>Quincy, MA |
| Boon S. Ooi<br>Senior Vice President, HR&OP<br>State Street Bank and Trust Company<br>JAB 4N<br>PO Box 5118<br>Boston, MA 02206-5118 | |

Remember: You do not have to sign the Release Agreement before you have had 45 calendar days to review and consider it. However, you may sign it sooner.

Plaintiff 7

## Termination Date

If you elect the EVSP, you agree that your employment with State Street will end on June 27, 2003, unless it is extended by State Street. By electing the EVSP, you agree to any such extension.

## Re-employment

If you elect the EVSP, you will not be eligible to be hired or rehired by State Street or any affiliate before September 1, 2005. In addition, you will not be permitted to work at, or provide services to, State Street or any affiliate in any capacity through Adecco or any other temporary or contract agency, or as a consultant or independent contractor, before September 1, 2005.

## Non-competition Agreement

As a further term and condition of the EVSP, if you elect the EVSP, you may be required by State Street to enter into a Non-competition Agreement, in addition to the Release Agreement, that would be specifically limited as to its length and nature of the restricted activity.  The terms of such an agreement will be communicated to you as soon as practicable after your valid election for EVSP is received.

RE
Plaintiff 9

# Retirement Plan Benefits

This section describes how your Retirement Plan benefits may be enhanced if you elect the EVSP. In summary, the EVSP provides the following enhancements to employees who have reached age 50 and completed five years of projected service as of August 31, 2003:

- You will become eligible for participation in the State Street Corporation Supplemental Defined Benefit Pension Plan ("Executive SERP") if you have not held the title of Executive Vice President for at least four years.

- Your benefit will be calculated according to the applicable Executive SERP formula assuming that you are five years older and have five additional years of service.

- The Executive SERP benefit will be offset by the sum of your actual accrued benefit from the tax-qualified State Street Retirement Plan and the State Street Corporation Supplemental Executive Retirement Plan ("SERP") as described below.

## Cash Balance Benefits

Normally, if you were to terminate employment (regardless of the reason), your Cash Balance Account would not be credited with pay credits after your termination date. If you elect the EVSP, your cash balance pay credits will be calculated as if your pay (base pay rate as of April 1, 2003) and service continued to August 31, 2003, rather than June 27, 2003.

## Grandfathered Benefits if Employed Before December 31, 1989

If you were employed by State Street on December 31, 1989 and have been continuously employed since that date, you may be eligible for a grandfathered benefit calculation under the former final average salary formula ("grandfathered benefits").

Currently, you are eligible for this grandfathered benefit calculation only if you are age 55 or older when you leave State Street. Under the EVSP, the "age 55" requirement is being waived for employees who have not reached age 55. This means that you will be eligible to receive the greater of your Cash Balance Account or your grandfathered benefit, even if you are under age 55. If you do not elect the EVSP and subsequently leave State Street before age 55, you will be eligible for your Cash Balance Account only.

## Supplemental Executive Retirement Plan (SERP)

The SERP provides benefit under the cash balance or the grandfathered benefits formula (whichever is applicable) without regard to the IRS limits on compensation, offset by the benefit accrued under the Retirement Plan (which is affected by those IRS limits).

Plaintiff 10

# Supplemental Defined Benefit Pension Plan (Executive SERP)

The EVSP offers the following enhancements to the Executive SERP:

1.  You are eligible for participation in the Executive SERP after you have held the title of Executive Vice President for four years. This four-year requirement for participation in the Executive SERP is being waived for anyone who was appointed an Executive Vice President after August 31, 1999.

2.  Ordinarily, you must be age 55 and have completed 10 years of State Street service to vest in your accrued benefit under the Executive SERP. Under the EVSP, you will be treated as if you are five years older and have completed five more years of service for purposes of calculating your benefit under the Executive SERP. Therefore, you will also be 100% vested in your benefit even if you have completed fewer than 10 years of service.

If you elected the EVSP, your benefit under the Executive SERP would be calculated based on one of the following formulas, whichever is applicable, as enhanced by EVSP:

- Appointed as an Executive Vice President before February 2000:

    50% of final average pay (based on the average of the highest five consecutive years of base pay and State Street annual incentive plan bonus), reduced by the retirement income payable from other State Street qualified and non-qualified plans (Retirement Plan and SERP)

- Appointed as an Executive Vice-President February 2000 or later:

    2.5% of final average pay (based on the average of the highest five consecutive years of base pay and State Street annual incentive plan bonus) times years of service (up to a maximum of 20) reduced by retirement income from other State Street qualified and non-qualified plans (Retirement Plan and SERP)

With respect to either formula, the amount payable to you under the Executive SERP would be reduced by the respective amounts payable to you as your accrued benefit under the Retirement Plan and the SERP, each calculated without regard to any EVSP enhancements in your age or service.

Plaintiff 11

*Grandfathered Benefits Will Be Frozen*

Grandfathered benefits will be frozen as of August 31, 2003. This means that, if you continue working at State Street, your grandfathered benefit will be calculated using your final average salary and benefit service as of August 31, 2003. As a result, the grandfathered annuity benefit payable to you at age 65 will not increase with future pay or benefit service. Your future age and service will continue to count for purposes of early retirement eligibility and early retirement reductions. Your Cash Balance Account is not affected by this freeze.

If you do not elect EVSP, you will not be eligible for any grandfathered benefit calculation if you leave State Street before age 55.

A separate notice about the effect of freezing the grandfathered benefit will be provided in mid-July to affected participants who do not elect the EVSP.

Plaintiff 12

# Payment Options

If you elect the EVSP, you may elect to begin receiving payment as soon as practicable after you leave State Street, but not before September 1, 2003. Or, you may choose to defer payment to a later date, but not beyond age 65. If you are already age 65 or older, you may not defer payment.

The available payment options vary depending on the value of your Retirement Plan benefit when you leave State Street. It's important to note that the **lump-sum option will not be available** if the present value of your enhanced Retirement Plan benefit is $25,000 or more. Instead, you may elect the 5-year Level Installment Payment, described below. The 5-year Level Installment Payment is available only if you elect the EVSP.

After your Election Form and Release Agreement are processed, you will receive a package containing information about the Retirement Plan payment options available to you, as well as the Retirement Plan forms you will need to complete. *Keep in mind that HR & OP Benefits will be processing a large volume of Retirement Plan benefits in a short period of time. Your package will be sent to you as soon as administratively practicable after your termination date.*

| Present Value of Your Retirement Plan Benefit as Shown on Your Personalized Statement | Payment Options |
|---|---|
| $25,000 or more | • 5-year Level Installment Payments <br> • Annuity payments |
| More than $5,000 but less than $25,000 | • Lump-sum payment <br> • Annuity payments |
| $5,000 or less | • Automatic lump-sum payment |

## *The 5-year Level Installment Payments*

The 5-year Level Installment Payment option is available to you if you elect the EVSP and the present value of your Retirement Plan benefit is $25,000 or more. To determine the amount of your installment payments, State Street will convert the value of your benefit into five equal annual payments (that is, one payment per year for five years) using a federally-mandated interest rate (4.76% for 2003; in effect, your benefit will be credited with 4.76% interest during the installment period). If you are eligible for 5-year Level Installment Payments, your estimated annual payment amount is shown on the enclosed Personalized Statement.

If you are married and elect 5-year Level Installment Payments, you will need your spouse's notarized, written consent.

If you die before receiving five years of installment payments, your remaining annual payments will be paid to your beneficiary.

**SERP and Executive SERP**

The payment option and date of commencement that you elect under the Retirement Plan will determine the form of payment and date of commencement of your benefits under the SERP and Executive SERP.

**Taxation**

For a brief summary of the taxes that may apply to Retirement Plan distributions, see page 14.

Plaintiff 13

*More About the Payment Options*

Following is a summary of the Retirement Plan payment options. If you elect the EVSP, you will receive detailed information about the amount payable to you and your beneficiary (if applicable) under each form of payment and how the forms of payment work.

If you are married, be sure to include your spouse's name and date of birth on the Election Form. If you plan to choose someone other than your spouse as beneficiary, also include your beneficiary's name and date of birth. If you select a beneficiary other than your spouse, you will need your spouse's notarized, written consent on the Retirement Plan forms that will be sent to you if you elect the EVSP. (You do not need your spouse's consent to submit the EVSP Election Form.)

If you're not married and you want to consider one of the payment options that continues payments to a beneficiary after your death, include your beneficiary's name and date of birth on the Election Form.

| Payment Option | Description |
|---|---|
| **5-year Level Installment Payments** | • Total benefit amount paid over five equal annual installments if the present value of your benefit is $25,000 or more.<br><br>• If you die before five years of payments are completed, the remaining annual installments are paid to your beneficiary. |
| **Annuity Payments**<br><br>    Single Life Annuity | • Monthly payments made during your lifetime.<br><br>• No payments made after your death. |
| Joint & Survivor Annuity | • Reduced monthly payments during your lifetime (in addition to any reduction for early retirement).<br><br>• After your death, your beneficiary will receive 50%, 66 2/3%, 75% or 100%, as elected by you, of your monthly benefit for the rest of his or her life.<br><br>• If you're married, the 50% Joint & Survivor annuity with your spouse as beneficiary is the normal form of payment, unless you elect a different payment option. **(You will need your spouse's notarized, written consent to elect a form of payment other than a Joint & Survivor Annuity with your spouse as the beneficiary.)** |
| Certain & Continuous Annuity | • Monthly payments during your lifetime.<br><br>• If you die before receiving at least 60 or 120 payments, as elected by you, your beneficiary receives payments until the end of the period. |
| **Lump Sum** | • Total benefit amount paid to you if present value of benefit is less than $25,000.<br><br>• Paid automatically if present value of benefit is $5,000 or less.<br><br>• No payments made after your death. |

For more information about these options, please refer to your Retirement Plan summary plan description. To request a copy of the summary plan description, please send an e-mail to US-Voluntary-Separation-Program.

Plaintiff 14

## If You Defer Payment

If you elect the EVSP, you may elect to begin payment of your Retirement Plan benefits as early as September 1, 2003, or you may defer payment to a date no later than age 65. If you are already age 65 or older, you may not defer payment.

If you defer payment of your Retirement Plan benefit to a later date and you are eligible for the grandfathered benefit calculation, a comparison will again be made of your Cash Balance Account benefit and your grandfathered benefit at the time you elect to commence payment. You will be entitled to the larger of the two benefit amounts. The calculations will be based on your age and the actuarial factors in effect under the terms of the Plan at that time. The amount of your grandfathered annuity benefit will take into account your age and your actual service projected to August 31, 2003.

Your ability to receive a lump-sum payment versus 5-year Level Installment Payments will be determined based on the value of the estimated Retirement Plan benefit shown on your Personalized Statement. See page 7 for more information about which option is available to you.

Plaintiff 15

# Salary Savings Program—401(k)

## Payment Options

The table below summarizes your payment options under the Salary Saving Program (SSP), the 401(k) plan. The SSP Web site at http://ssp.csplans.com also contains information about "Distribution Options When Leaving the Company" in the Plan Information tab under the Plan Highlights section. Under the Forms tab of the Web site, you'll find a copy of the SSP Termination Distribution Package that contains the Termination Distribution Request Form and the Special Tax Notice Regarding Plan Payments. The Termination Distribution Request Form has special instructions concerning your distribution options if you are invested in the State Street ESOP Fund and/or the Self-Managed Brokerage Account. You can also find information about your SSP payment options in your summary plan description or by calling 800-985-FUND (3863) and speaking with a Participant Service Representative. To request a copy of the summary plan description, please send an e-mail to US-Voluntary-Separation-Program.

| Payment Option | Description |
| --- | --- |
| Leave your account balance in the Plan (if your account balance is more than $5,000) | • Leave your account balance in the plan (you must begin receiving payment by April 1 following the year in which you reach age 70 ½)<br>• Tax deferral continues until you take a distribution |
| Roll over your account balance* | • Take a total distribution and roll over all or a portion of your account balance into a traditional individual retirement account (IRA) or another employer's tax-qualified plan (if that plan accepts rollovers)<br>• Tax deferral continues for the rollover until you take a distribution from the IRA or tax-qualified plan |
| Have your account balance paid directly to you* | • Total benefit amount paid directly to you (subject to the 20% tax withholding described on page 14)<br>• Taxation is not deferred unless you roll over your distribution, plus the amount of tax withholding, within 60 days of receipt |
| Receive periodic installment payments | • Receive your account balance in installment payments paid over the number of years and the pay frequency you select<br>• Available only to employees who are age 55 or older with 10 or more years of service, or age 65 or older (and employees age 50 and older with five or more years of service who elect the EVSP) |

*If you choose to take a total distribution, you may also choose to roll over a portion of your account balance and have a portion paid directly to you.

Remember: You are always 100% vested in your SSP account, whether or not you leave State Street under the EVSP.

Plaintiff 16

## If You Have an Outstanding SSP Loan

If you have an outstanding loan, you may continue to make loan payments via money order or cashier's check. Information about loan repayment after termination of employment will be sent to you by CitiStreet (State Street's SSP recordkeeper). For more information, go to http://ssp.csplans.com or call 800-985-FUND (3863).

# Summary of Tax Considerations

This tax summary applies to distributions from the Retirement Plan and the Salary Savings Program.

| Forms of Payment | Summary |
|---|---|
| • **Lump-sum Payment**<br><br>• **Installment Payments of Fewer than 10 Years (including the 5-year Level Installment Payment for the Retirement Plan)** | Subject to federal income tax and, if applicable, state and local income tax.<br><br>If you leave State Street and take a distribution before you reach age 55 (your actual age), the IRS assesses a 10% early withdrawal penalty on the taxable portion of the distribution. This penalty is *in addition to* ordinary income taxes that apply to your distribution.<br><br>You may defer current taxes and penalties if you roll over your distribution to a traditional IRA or to another employer's tax-qualified retirement plan (if that plan accepts rollovers).<br><br>If your distribution is paid to you (rather than rolled over directly), the taxable portion of your distribution will be subject to mandatory 20% federal tax withholding. You could still roll over part or all of your distribution into an IRA or another retirement plan within 60 days of receipt of your distribution. However, if you decide to roll over the full amount, you will have to find other money to replace the 20% that was withheld. |
| • **Annuity Payments (Retirement Plan only)**<br><br>• **Installment Payments of 10 or More Years (SSP only)** | Subject to federal income tax and, if applicable, state and local income tax each year in which they are paid to you. These payments are not subject to the 10% early withdrawal penalty described above nor can they be rolled over. |

*Note:* The present value of your SERP and Executive SERP benefit is subject to FICA (Social Security and Medicare) taxes in 2003, regardless of when the benefits are actually paid and what form of payment you elect. SERP benefits cannot be rolled over.

The tax considerations involved in Retirement Plan and 401(k) plan payments—at any time, not just under the EVSP—can be quite complicated. **You should consult a tax and/or financial advisor for information about payment options and tax implications.** In addition, if you elect the EVSP, you'll receive a Special Tax Notice Regarding Plan Payments that contains more details about the tax consequences of receiving payments and distributions from the Retirement Plan and 401(k) plans.

Plaintiff 17

# Severance Payments

## Amount of Severance Payments

If you elect the EVSP, you will be eligible for severance payments. Severance payments are based on your weekly base pay rate multiplied by the number of weeks. Service is equal to your completed years of service from your hire date (or your adjusted service date, if applicable) through August 31, 2003.

Your severance pay is based on 50 weeks of base pay plus 4 weeks per year of completed service with an overall maximum severance pay of 104 weeks.

The enclosed Personalized Statement shows your salary grade and the severance payments payable under the EVSP.

## How Severance Is Paid

Under the EVSP only, severance will be paid in a single lump-sum payment as soon as practicable after your termination date. No retiree medical, SSP or other benefit contributions will be withheld from this payment.

Your lump-sum severance payment will be subject to federal tax withholding at a supplemental tax rate of 27%, as required by the IRS. State and local taxes, if applicable, will also be withheld. If you had elected direct deposit of your regular paychecks, the same direct deposit election(s) will apply to this payment.

Plaintiff 18

# Equity-based Awards

## Stock Options

If you elect the EVSP, your vested stock options will continue to be exercisable under the original terms of the grant(s), as if you continued your employment. In addition, any unvested stock options will continue to vest under the original terms of the grant(s), as if you continued your employment. Normally, retirees have up to one year from their retirement date to exercise options for grants that are fully vested at the time of retirement, and they have up to one year from the last vesting date within the grant to exercise options for grants that are not fully vested at the time of retirement. By electing the EVSP, you will have the full period stated in the award to exercise your options.

If you have Incentive Stock Options (ISOs), your election to participate in the EVSP will result in conversion of those options to non-qualified stock options. You should consult a financial advisor concerning additional details. State Street will treat any vested ISOs that are exercised prior to your termination date as ISOs for tax-withholding and reporting purposes, and any options exercised on or after that date as non-qualified options, with the result that any gain upon exercise of any of your options occurring on or after your termination date will be taxed as ordinary income subject to tax withholding.

## RSAs and DSAs

If you elect the EVSP, you will become 100% vested on your termination date in any Restricted Stock Award (RSA) or Deferred Stock Award (DSA) that you may have received, regardless of the terms of the grant. In addition, your DSA shares will become deliverable to you on your termination date, subject to your prior satisfaction of tax-withholding obligations. Normally, any unvested RSAs or DSAs held by you immediately prior to your termination date would be forfeited upon termination. When your RSAs or DSAs vest, you will recognize ordinary income equal to the Fair Market Value of the shares on that day, and tax withholding will be required (provided that you have not previously recognized income for tax purposes). Prior to that time, you will be able to elect how you would like to satisfy the required withholding. If you elect the EVSP, any shares granted under a DSA will be delivered as soon as practicable after your termination date.

## Performance Awards

You will continue to be eligible to participate in Cycle L of the performance award grants that are based on State Street's 2003 and 2004 financial performance under the original terms of the grant as if you continued your employment for the remainder of the term. Payment of the award (if any) will be made in March 2005.

## How to Exercise Your Equity Awards

To exercise your equity awards, you may logon to www.benefitaccess.com or call Smith Barney at 617-570-9545. If you have any questions about navigating this site, please send an e-mail to US-Voluntary-Separation-Program.

Plaintiff 19

# Medical Coverage

To be eligible for retiree medical coverage, you normally must:

- Have reached age 55 and completed 10 or more years of service when you leave State Street, *or*

- Have reached age 65 and completed five or more years of service when you leave State Street.

If you elect the EVSP, you will be eligible for retiree medical coverage if you are age 50 or older and have five or more years of service as of August 31, 2003. If you do not elect the EVSP and subsequently terminate employment for any reason before meeting the above criteria, you will not be eligible for retiree medical coverage.

You may also continue coverage for your eligible family members. Generally, eligible family members include your spouse or domestic partner, your dependent children and other adult dependents. See the Medical Plan summary plan description for more information. To request a copy of the summary plan description, please send an e-mail to US-Voluntary-Separation-Program.

If you elect the EVSP, you are eligible for a one-time right to elect retiree medical coverage for yourself and your eligible dependents, even if you are not currently covered by a State Street medical plan, provided you enroll before age 65.

## Retiree Medical Plan Options

The medical plan options available to you and your eligible family members depend on your age:

- **Under age 65**—You and your under-age-65 eligible dependents have the same medical plan options as active employees.

- **Age 65 or older**—State Street credits an account on your behalf that helps you pay for eligible medical expenses (e.g., medical plan premiums, Medicare premiums, deductibles or coinsurance). The credit depends on your coverage level when you reach age 65 (or your termination date, if later): $5,000 if you have no medical coverage at State Street; $10,000 if you cover just yourself; and $15,000 if you cover yourself and a spouse or domestic partner. *This is a one-time credit, not an annual credit.* In addition, you have the option to continue medical coverage for yourself for up to 18 months through COBRA. You will receive detailed information about your rights under COBRA if you elect the EVSP.

  If you are age 65 or older and your spouse or domestic partner is under age 65, he or she may remain in an under-age-65 medical plan, but you must pay 100% of the cost of coverage. Dependent children's coverage will end, but they may be eligible to continue coverage through COBRA for up to 36 months.

## Cost Sharing for Coverage Before Age 65

You pay the same medical plan costs as active employees pay. You pay your share of the cost in one of two ways:

- **Deducted from Retirement Plan annuity payments**—If you are receiving Retirement Plan annuity payments, you may elect to have your share of the cost of medical coverage deducted from your monthly payments, provided your annuity payments are sufficient to cover the cost of medical coverage.

- **Direct bill**—You can be billed for the cost of your medical coverage on a monthly basis.

Once you reach age 65, you will no longer have medical coverage through State Street. You will, however, be eligible to submit eligible expenses for reimbursement from the account described above.

RE
Plaintiff 20

### Opt-out Credits

If you have opted out of medical coverage and are currently receiving the opt-out payment of $140 per month, this payment will cease on your termination date. Remember: if you elect the EVSP, you are eligible to elect retiree medical coverage for yourself and your eligible dependents even if you are not currently covered by a State Street medical plan, provided you enroll before age 65. If you are age 65 or older, you may enroll your under-age-65 spouse or domestic partner and you will be eligible for the reimbursement account described on page 17.

### Deferring or Canceling Retiree Medical Coverage

If you do not enroll in State Street retiree medical coverage effective June 27, 2003 (or your termination date under the EVSP, if later), you may defer coverage and enroll at a later date (subject to the benefits and cost sharing in effect at that time). You must enroll before you reach age 65. Once you enroll, you may drop coverage at any time but you will not be able to re-enroll in the future.

If you continue your State Street medical coverage after June 27, 2003 (or your termination date under the EVSP, if later), you will have one opportunity to drop coverage in the future and re-enroll at a later date (subject to the benefits and cost sharing in effect at that time). You must re-enroll before you reach age 65. Once you re-enroll, you may drop coverage at any time but you will not be able to re-enroll in the future.

If you defer or cancel medical coverage for yourself, your dependents will not be eligible for coverage, except as required under COBRA.

> While State Street intends to continue retiree medical coverage indefinitely, State Street reserves the right to terminate, modify or amend retiree medical coverage, and change the cost charged for such coverage, at any time for any reason.

# Dental and Vision Coverage

Your dental and vision coverage will continue until June 30 (or the end of the month in which your employment terminates, if later). You and your covered family members may be eligible to continue your dental and/or vision coverage through COBRA for up to 18 months, provided you pay 102% of the cost of coverage. You will receive detailed information about your rights under COBRA if you elect the EVSP.

### 2003 COBRA Costs

This table shows your monthly cost for COBRA coverage under the dental and vision plans for 2003. These costs are subject to changes each year.

| Plan | Employee Only | Employee Plus One | Family |
|------|---------------|-------------------|--------|
| Delta Premier | $30.10 | $61.70 | $106.51 |
| Delta Premier—Kansas City | $19.52 | $49.41 | $65.24 |
| DeltaCare | $20.59 | $39.44 | $59.27 |
| EyeMed Vision Plan | $5.08 | $9.18 | $13.26 |

RE
Plaintiff 21

# Life Insurance

## Basic Life Insurance

State Street continues a portion of company-paid Basic Life Insurance for eligible retirees. This coverage, known as Retiree Life Insurance, is equal to $5,000 for employees eligible for full-time benefits (scheduled to work 29 or more hours per week) and $2,500 for employees eligible for part-time benefits (scheduled to work at least 20 but less than 29 hours per week).

To be eligible for Retiree Life Insurance coverage, you normally must:

- Have reached age 55 and completed 10 or more years of service when you leave State Street, *or*
- Have reached age 65 and completed five or more years of service when you leave State Street.

If you elect the EVSP, you will be eligible for Retiree Life Insurance coverage if you have reached age 50 and completed five or more years of service as of August 31, 2003. If you do not elect the EVSP and subsequently terminate employment for any reason before meeting the above criteria, you will not be eligible for Retiree Life Insurance.

You may be eligible to convert your remaining Basic Life Insurance (pre-retirement coverage amount minus your Retiree Life Insurance) to an individual policy. MetLife will send information about converting coverage to your home after your coverage ends.

No flex credits will be paid after your termination date.

## Optional Life Insurance and Family Life Insurance

Optional Life Insurance and Family Life Insurance end on June 27, 2003 (or your termination date, if later). However, you may take advantage of the "portability feature," which means you can continue coverage by paying premiums at group rates directly to MetLife. Your premiums will be higher than they were when you were actively employed. Your age for determining premiums will be based on your actual age, not an enhanced age. More information will be provided by MetLife if you elect the EVSP.

## Accidental Death & Dismemberment Insurance

Accidental Death & Dismemberment coverage (for you or your family) ends on your termination date and cannot be converted or continued.

RE
Plaintiff 22

# Flexible Spending Accounts (FSAs)

- **Health Care FSA**—Contributions will end on your termination date. You may continue to submit claims for eligible expenses incurred before your termination date. In addition, you may be eligible to continue contributions on an after-tax basis under COBRA through December 31, 2003. You'll receive a separate notice explaining your right to COBRA continuation of coverage.

- **Dependent Care FSA**—Contributions will end on your termination date. You may not continue your Dependent Care FSA contributions under COBRA. You can, however, submit claims for any eligible expenses you incur in 2003, up to the amount you had contributed to the account as of your termination date.

- **Transportation FSA**—Contributions will end on your termination date. You may not continue your Transportation FSA contributions under COBRA. You can, however, submit any eligible expenses you incurred as of your termination date, up to the amount you had contributed to the account as of your termination date.

Claims for reimbursement of eligible 2003 health care and dependent care expenses must be submitted to the claims administrator no later than March 31, 2004. Claims for reimbursement of eligible 2003 transportation expenses must be submitted to the claims administrator no later than January 31, 2004.

# Employee Assistance Plan (EAP)

Your EAP coverage will end on your termination date. After your termination date, EAP coverage may be continued under COBRA for up to 18 months, provided you pay 102% of the cost of coverage. The 2003 COBRA rate for the EAP is $23.50 for 18 months. You'll receive a separate notice explaining your right to COBRA continuation of coverage if you elect the EVSP.

# Vacation

If you elect the EVSP, you will receive your full 2003 vacation entitlement, minus any vacation time that you have used. Normally, employees under age 55 receive only the prorated vacation they would have earned as of their termination date, minus any time used.

If you bought vacation days and did not use them before your termination date, you will be reimbursed for the cost of your unused days.

If you sold vacation days and the amount you have been reimbursed is greater than the value of the days you have earned, the value of your unaccrued days will be deducted from your severance payment.

# Outplacement Benefits

If you elect the EVSP, you will be eligible for outplacement benefits at no cost to you. You will receive more information about outplacement services after you elect the EVSP.

Plaintiff 23

# Social Security

You may begin to receive Social Security benefits as early as age 62 and Medicare benefits as early as age 65. You are responsible for filing an application with the Social Security Administration to begin receiving benefits. To confirm the timeframe for applying for benefits or for more information, contact your local Social Security office, visit its Web site at www.socialsecurity.gov or call 1-800-772-1213.

# Benefits at a Glance

Following is a summary of how your benefits are affected if you elect the EVSP. As you review this chart, keep in mind that **your termination date is June 27, 2003** (or a later date if your employment is extended by State Street).

| *Review of Benefits Discussed on Previous Pages* | |
|---|---|
| **Medical Coverage** | Retiree medical benefits are available. (See page 17.) |
| **Dental, Vision and EAP Coverage** | Coverage ends on your termination date but may be continued for an additional 18 months under COBRA. (See pages 18 and 20.) |
| **Life Insurance** | Retiree life insurance is available. Other coverages end on termination date. (See page 19.) |
| **Health Care Flexible Spending Account** | Contributions end on your termination date but may be continued through December 31, 2003 under COBRA. (See page 20.) |
| **Dependent Care Flexible Spending Account** | Contributions end on your termination date, but you may continue to submit any eligible expenses incurred in 2003, up to the amount you had contributed to your account. (See page 20.) |
| **Transportation Flexible Spending Account** | Contributions end on your termination date, but you may continue to submit eligible expenses incurred as of your termination date, up to the amount you had contributed to your account. (See page 20.) |
| *Summary of Other Benefits* | |
| **Short-term Disability** | Coverage ends on your termination date. |
| **Long-term Disability** | Coverage ends at the end of the month in which your active employment ends. |
| **Business Travel Accident Insurance** | Coverage ends on your termination date. |
| **Adoption Assistance Plan** | Coverage ends on your termination date. |
| **Tuition Assistance Benefits** | Coverage ends on your termination date. You will be reimbursed for any courses that were approved before May 1, 2003, subject to the same reimbursement provisions that apply to active employees. |
| **Citizens Checking** | You may retain free checking (subject to changes made by Citizens Bank). |
| **Auto and Home Owner Insurance** | You may retain insurance at discounted rates (subject to changes made by MetLife). |

Plaintiff 24

# Future Changes

State Street reserves the right to amend, modify or terminate any or all employee benefit plans, programs and arrangements (including the cost sharing for such benefits) with respect to all active, inactive, retired and former employees and their dependents and beneficiaries, irrespective of whether you elect the EVSP.

# ERISA Rights

References to "EVSP" and "Executive Voluntary Separation Program" are used for communication purposes only. The Executive Voluntary Separation Program is not a separate plan. To the extent that the benefits and services described in this booklet are provided through an employee benefit plan covered under the Employee Retirement Income Security Act (ERISA), please refer to the applicable summary plan description for more details and information about your rights under ERISA.

# Questions and Answers

## Executive Voluntary Separation Program Basics

| | |
|---|---|
| *Why is State Street offering the EVSP?* | The EVSP is part of State Street's effort to meet our cost reduction goals, which require us to reduce staff by up to 1,800 employees. By offering the EVSP, we hope to reduce the number of involuntary reductions. |
| *What happens if the EVSP does not generate sufficient savings?* | State Street will have an involuntary staff reduction if the EVSP does not bring about sufficient savings. |
| *If I'm laid off after the EVSP, will I receive enhanced benefits?* | No. If you do not elect the EVSP and are subsequently laid off, you will not receive any enhanced Executive SERP benefits or any of the other enhanced benefits provided under the EVSP. |
| *What are the main benefits of accepting the EVSP?* | The EVSP offers enhanced benefits that are not normally available to State Street employees. These benefits include:<br><br>▪ Executive SERP benefit enhancements<br><br>▪ Severance payments for all employees<br><br>▪ Retiree medical and life insurance coverage for employees age 50 and older with five or more years of service<br><br>▪ Continued vesting in equity plan<br><br>The enhancements are available only to eligible employees who elect the EVSP during the May 1–June 16, 2003 election period. |
| *Will there be another EVSP at State Street in the future?* | At this time, we do not plan to offer the EVSP in the future. |

| | |
|---|---|
| *How long do I have to decide whether to elect the EVSP?* | You have until June 16, 2003, to return the signed Election Form and Release Agreement to indicate your acceptance of the EVSP. The completed paperwork must be *received by* HR & OP Benefits by June 16, 2003. (See *Returning Your Forms* on page 4.) If your paperwork is received after June 16, your election for the EVSP will not be valid and you will not be eligible for any enhanced benefits.

**Keep in mind, however, that in no event will you have less than 45 calendar days to review and consider the Release Agreement.** |
| *What if I return my paperwork to elect the EVSP and later change my mind?* | You have seven calendar days from the date you sign the Election Form to submit a Revocation of Election Form, even if it's after June 16, 2003. Once the seven-calendar-day period ends, however, the election is irrevocable, provided you sign the Release Agreement.

In no event, however, will you have less than 45 calendar days to review and consider the Release Agreement. You have seven calendar days after signing the Release Agreement to revoke it. If you do not sign the Release Agreement or if you revoke it during the seven-calendar-day period, your election of the EVSP will not be effective, and you will be treated as though you never elected the EVSP. |
| *If I choose to elect the EVSP, what will be my last working day at State Street?* | Your last day at work will be June 27, 2003, unless your termination date is extended by State Street. Only executive management or its delegate can extend an employee's termination date beyond June 27, 2003. |
| *Should I elect the EVSP?* | Only you can answer this question. Please take the time to read through the materials you've received, discuss your options with your family and friends, and consult a financial advisor before you decide whether the EVSP makes sense for you. You are advised to seek advice from an attorney before you sign the Release Agreement. |
| *Am I eligible for unemployment if I elect the EVSP?* | We can't answer that question. You'll need to check with your state's local unemployment insurance office to determine if you would be eligible for unemployment insurance benefits if you elect the EVSP and to determine how severance and Retirement Plan benefits may affect unemployment insurance benefits. |
| *What if I elect to participate in the EVSP but die before I terminate employment?* | If you elect the EVSP and die before June 27, 2003, State Street will honor your election. |

RE

Plaintiff 26

## About the Retirement Plan

| | |
|---|---|
| *When will I receive my Retirement Plan payment?* | Payment will commence as soon as administratively practicable after you leave State Street and after you return the appropriate forms, but not before September 1, 2003. Or, you may defer payment to a later date. |
| *If I elect the EVSP, can I defer my pension?* | You may defer payment of your Retirement Plan benefits under the EVSP, but not beyond age 65. If you are already age 65 or older, you may not defer payment. If, however, the present value of your Retirement Plan benefit is $5,000 or less, it will automatically be paid to you as a lump sum as soon as administratively practicable after you leave State Street. |
| *What happens to my Retirement Plan payments if I accept a job with a different company?* | Your Retirement Plan payments are not affected if you begin working at another company. |
| *Will all of the Retirement Plan payment options apply if I elect the EVSP?* | Yes, with one exception: if the present value of your Retirement Plan benefit is $25,000 or more, you cannot elect a lump-sum payment. Instead, you may elect the special payment option of 5-year Level Installments. |

## Retiree Medical Coverage

| | |
|---|---|
| *Who is eligible for retiree medical coverage?* | You are normally eligible for retiree medical coverage if you terminate employment from State Street at age 55 or older with 10 or more years of service, or at age 65 or older with five or more years of service. Under the EVSP, you are eligible if you terminate employment at *age 50* or older with five or more years of service. |
| *If I have access to other medical coverage now, can I decline retiree medical coverage and enroll at a later date?* | Yes. You have one opportunity to defer State Street retiree medical coverage now and to enroll at a later date, provided you enroll before age 65 and you were eligible for retiree medical coverage when you left State Street. |
| *I've currently opted out of medical coverage as an active State Street employee. Can I elect retiree medical coverage under the EVSP?* | Yes. You have one opportunity to elect State Street retiree medical coverage now or to enroll at a later date, provided you enroll before you reach age 65. However, any opt-out payment that you are receiving will end on your termination date. |
| *If I elect to defer my pension, does that mean I won't have retiree medical and life insurance benefits right away?* | Your retiree medical and life insurance benefits can begin as soon as you terminate. They do not depend upon when your pension begins. |
| *Is retiree medical coverage guaranteed?* | No. While State Street intends to continue retiree medical coverage indefinitely, State Street reserves the right to discontinue or amend retiree medical and life insurance coverage, and to change the costs charged to retirees for that coverage, at any time. |
| *If I'm age 65 or older, do I have to enroll in Medicare?* | Yes. Medicare offers a "special enrollment period" in Medicare Part B for those who terminate employment. For more information, contact your local Social Security office, go to www.socialsecurity.gov, or call 1-800-772-1213. |

RE
Plaintiff 27

| *Does dental and vision coverage continue during retirement?* | No. However, you may be eligible to continue dental and/or vision coverage for up to 18 months through COBRA. In general, this means you are required to pay 102% of the cost of coverage. You'll receive a separate notice explaining your right to COBRA continuation of coverage if you elect the EVSP. |

**Important Reminder!** If you want to elect the Executive Voluntary Separation Program, your Election Form and Release Agreement must be received no later than June 16, 2003 (see *Returning Your Forms* on page 4). After you sign your Election Form and Release Agreement, you have seven calendar days to revoke your decision.

**Remember, you will have at least 45 calendar days to sign your Release Agreement.**

RE

Plaintiff 28

# EXHIBIT 7



**STATE STREET.**
*For Everything You Invest In™*

Boon S. Ooi
Senior Vice President
Human Resources &
Organizational Performance

State Street Bank and Trust Company
P. O. Box 351
Boston, MA 02101-0351

Telephone:    617 985 6348
Facsimile:    617 537 1667

May 1, 2003

Re:    Executive Voluntary Separation Program

You will find enclosed the program materials that describe the terms and conditions of the Executive Voluntary Separation Program (the "EVSP") under which you are eligible to participate. Your Personalized Statement shows the amount of your retirement and severance benefits and the respective forms of payments that you would be entitled to if you make a valid election under the EVSP. The following is a summary of the key features of the EVSP:

**Retirement Benefit**

Because you are at least age 50 and have completed at least five years of service with State Street (as of August 31, 2003), the retirement benefit under the State Street Corporation Supplemental Defined Benefit Pension Plan (the "Executive SERP") will be enhanced by applying the applicable formula in calculating your benefit as if you were five years older and had completed five additional years of service, reduced by any amounts actually payable from the State Street Retirement Plan (the "Retirement Plan") and its corresponding non-qualified plan, the State Street Corporation Supplemental Executive Retirement Plan (the "SERP"). This benefit will be payable as either a life annuity (in a variety of options) or in five equal annual installments. The benefit will be calculated taking into account your April 1, 2003 rate of base pay and the amount of your March 2003 annual incentive payment.

**Retiree Medical and Other Benefits**

Because you will be deemed to be retirement eligible under the Retirement Plan, you will be eligible for retiree medical coverage. All other active benefit coverage will cease, unless permitted by the terms of the plan or policy. Details of benefit coverage are found in the accompanying Decision Guide.

**Severance Benefit**

Your severance benefit will be calculated as the sum of 50 weeks of base pay plus four weeks for each year of completed service on August 31, 2003, up to a maximum of 104 weeks of base pay. This benefit will be paid in a single lump sum as soon as practicable following your termination date.

**Equity Awards**

Your stock option awards will continue to vest and to be exercisable under the original terms of the grants as if you continued your employment throughout the respective terms. See the Decision Guide about the tax effect of your election to participate in the EVSP on any outstanding Incentive Stock Option awards.



Plaintiff 1

RE

Any outstanding Restricted Stock Awards and Deferred Stock Awards will become fully vested regardless of the terms of the awards. In addition, any DSA shares will become deliverable to you on your termination date, subject to your prior satisfaction of tax-withholding obligations.

With respect to the Cycle L Performance Awards, you will continue to be eligible to participate under this Award as if your employment continued throughout the remainder of the term. Payment, if any, will be made in March 2005.

**Outplacement**
You would be provided with executive level outplacement assistance from a vendor approved by State Street.

**Non-Competition Agreement**
You may be required to enter into a non-competition agreement that would be specifically limited as to the length and nature of the restricted activity. The terms of such an agreement would be communicated to you separately as soon as practicable after you submit your EVSP Election. If you are required to enter into a non-competition agreement, your election pursuant to the EVSP will not be effective unless you execute such an agreement, in addition to the other terms and conditions as set forth in the EVSP materials.

**Termination Date**
Your employment with State Street would terminate on June 27, 2003, unless required by State Street to be extended to a later date.

**Election Process**

If you decide to elect the EVSP, you must deliver to State Street the Election Form and the Release Agreement by the deadline. Please follow the directions that are set out on the Election Form and Release Agreement in returning the documents to me. If you elect the EVSP and then change your decision, you have seven days from the date you sign your Election Form and Release Agreement to execute and deliver a Revocation of Election Form to me, according to the instructions on the form.

If you have any questions about the details of the EVSP, please call me directly at 617-985-6348.

Sincerely,

Boon S. Ooi
Senior Vice President
Compensation and U.S. Benefits

Plaintiff 2

RE

# EXHIBIT 8

<u>CONFIDENTIAL</u>

A meeting of the <u>Executive Compensation Committee</u> of <u>State Street Corporation</u> was held on <u>Wednesday, June 18, 2003</u>, at 225 Franklin Street, Boston, Massachusetts.

Mr. Weissman, the Chairman, presided. Committee members Ms. Hill and Messrs. Darehshori, Sergel and Summe were present. Also present were Messrs. Logue, Resch, de Ocejo, and Ooi, and Ms. Bateman, the Secretary, who kept the minutes of the meeting.

Mr. Weissman called the meeting to order noting the presence of a quorum.

Mr. de Ocejo presented and reviewed a summary of actions taken at the Committee's March 21, 2003, meeting following which Ms. Bateman presented minutes of that meeting, which had been distributed previously. Upon motion duly made and seconded, it was unanimously

<u>VOTED</u>:     That the minutes of the Executive Compensation Committee held on March 21, 2003, having been provided to the members, be and hereby are approved.

Mr. de Ocejo presented and reviewed information on the Voluntary Separation Program, the early retirement and enhanced severance offers made available to employees. He noted that the program was part of the Company's effort to cut costs in order to better align expenses with revenues. He reviewed the goal of the program to reduce operating expenses by $125 million for the remainder of the year by reducing headcount by 1800 to 2000 through the voluntary program with possible involuntary reductions to follow. He reviewed the terms of the program for employees below the level of Executive Vice President. He stated that eligible employees are grouped into five categories based on retirement plan eligibility. He reviewed the eligibility criteria as well as the enhanced benefits available for each group. He also reviewed details of the Executive Voluntary Separation Program. He reviewed statistical data for the employees groups including the number of eligible employees that elected the Voluntary Separation Program and the annualized savings to the Company. Discussion followed.

Mr. de Ocejo reviewed recommended modifications of equity grants that would be necessary to effectuate the voluntary separation program. He noted that under the voluntary separation program options will continue to vest and be exercisable under the original terms of the grant, restricted stock awards and deferred stock awards, including those granted under the SSgA Equity Program will vest on June 30, 2003, and performance awards granted to Executive Vice Presidents under Cycle L will continue to be payable under the original terms and performance criteria. He reviewed information specific to employees in Private Asset Management, and employees of the International Depositary Services. Following discussion, and upon motion duly made and seconded, it was unanimously

<u>Votes Relating to Stock-based Awards – Non-PAM/IDS Employees</u>

<u>VOTED</u>:     That in the case of each stock option (a "general-rule VSP-affected option") awarded under the Corporation's 1994 Stock Option and Performance Unit Plan or the 1997 Equity Incentive Plan that is outstanding and held, immediately prior to the applicable termination event, by a VSP participant (excluding, for the avoidance of doubt, anyone employed by the Private Asset Management ("PAM") business unit or the International Deposit Services ("IDS") business unit), the following vesting and exercise rules shall apply:

SSC 04642

(i) the general-rule VSP-affected option, if not already fully exercisable, shall continue to become exercisable on the same basis as if the VSP participant had continued to be employed by the Corporation and its subsidiaries, subject to clause (iii) below;

(ii) the general-rule VSP-affected option shall continue to be exercisable in accordance with its terms, as modified by clause (i) above and subject to clause (iii) below, until the date on which it would have expired by its terms if the VSP participant had continued to be employed by the Corporation and its subsidiaries; and

(iii) notwithstanding clauses (i) and (ii) above, the special option-related vesting and exercise rules described therein shall apply only if the VSP participant satisfies all applicable Program requirements.

<u>VOTED:</u>    That each deferred stock award made under the SSgA Equity Compensation Plan or the Corporation's 1997 Equity Compensation Plan, (a "general-rule VSP-affected deferred stock award") and each restricted stock award made under the 1997 Equity Compensation Plan, in each case that is held immediately prior to the applicable termination event by a VSP participant (excluding, for the avoidance of doubt, anyone employed by the PAM business unit or the IDS business unit), shall be fully vested on June 30, 2003, subject to the VSP participant's satisfaction of all applicable tax withholding requirements and all applicable Program requirements; and that the shares of stock subject to each general-rule VSP-affected deferred stock award that is vested or that vests in accordance with the foregoing shall be delivered, subject to the VSP participant's satisfaction of all applicable tax withholding requirements and all applicable Program requirements, at or as soon as practicable after June 30, 2003.

<u>VOTED:</u>    That each Cycle L Performance Award made under the Corporation's 1997 Equity Compensation Plan that is held immediately prior to the applicable termination event by a VSP participant (excluding, for the avoidance of doubt, anyone who is employed by the PAM business unit or the IDS business unit) shall continue to be outstanding (and shall be payable, if at all, following completion of the 2003-2004 performance period), subject to the VSP participant's satisfaction of all applicable Program requirements, on the same basis as if the VSP participant had continued to be employed by the Corporation and its subsidiaries.

## <u>Votes Relating to Stock-based Awards – PAM Employees</u>          SSC 04643

<u>VOTED:</u>    That in the case of each stock option (a "PAM option") awarded under the Corporation's 1994 Stock Option and Performance Unit Plan or the 1997 Equity Incentive Plan to an individual who is currently employed by the PAM business unit (a "PAM participant"), who remains employed by the PAM business unit until the closing of the contemplated transaction (the "Transaction") to sell the PAM business (the "Closing"), and who is either not offered employment by the purchaser of the PAM business unit or an affiliate thereof (the "Purchaser") in connection with the Transaction or is offered and accepts such employment, the following vesting and exercise rules shall apply:

(i) if the PAM participant (A) is not offered employment by the Purchaser and ceases to be employed by the Corporation and its subsidiaries, or (B) is offered and accepts employment by the Purchaser and continues in the employment of the Purchaser (or is jointly employed by the Purchaser and the Corporation or its subsidiaries) for at least nine months following the Closing, or is involuntarily terminated by the Purchaser (other than for cause) prior to the expiration of such nine-month period,

2

the PAM option, if not then already fully exercisable, shall continue to be exercisable on the same basis as if the PAM participant had continued to be employed by the Corporation and its subsidiaries; *provided*, that in the circumstances described in sub-clause (B) above, no portion of the PAM option that could not have been exercised after the Closing and prior to the expiration of such nine-month period (or involuntary termination, if earlier) without regard to this clause (i) shall be exercisable prior to the expiration of such nine-month period (or involuntary termination, if earlier) by reason of the application of this clause (i);

(ii) if the PAM participant is offered and accepts employment by the Purchaser and his or her employment by the Purchaser thereafter terminates for any reason (other than involuntary termination by the Purchaser as described in clause (i)) prior to the expiration of the nine-month period following the Closing, that portion of the PAM option that was exercisable immediately prior to the Closing shall be exercisable for three months following termination of the PAM participant's employment by the Purchaser (or until the final expiration date of such option, if earlier), and thereupon shall expire, and the remainder of the PAM option shall expire immediately upon the termination of the PAM participant's employment by the Purchaser; *provided*, that in the event of a termination for cause the entire option shall immediately expire;

(iii) notwithstanding clauses (i) and (ii) above, the special option-related vesting and exercise rules described therein shall apply only if the PAM participant satisfies all applicable requirements (similar to the requirements applicable under the 2003 Program) applied by the Corporation to benefits available to employees affected by the sale of the PAM business unit; and

(iv) notwithstanding clauses (i), (ii) and (iii) above, if the PAM participant would have been eligible to retire (as that term is used under the applicable plan in determining rights to continued vesting of options) from the Corporation and its subsidiaries at or prior to the Closing, the rules set forth in clauses (i), (ii) and (iii) shall not operate to reduce the rights the PAM participant would have had with respect to the PAM option had he or she retired at the Closing.

**VOTED:**    That each deferred stock award made under the SSgA Equity Compensation Plan or the Corporation's 1997 Equity Compensation Plan (a "PAM deferred stock award") and each restricted stock award made under the 1997 Equity Compensation Plan (a "PAM restricted stock award") (PAM restricted stock awards and PAM deferred stock awards being herein referred to as "PAM stock awards"), in each case to a PAM participant who remains employed by the PAM business unit until the Closing and who is either not offered employment by the Purchaser in connection with the Transaction or is offered and accepts employment by the Purchaser in connection with the Transaction, shall be subject to the following special rules:

(i) if the PAM participant (A) is not offered employment by the Purchaser and ceases to be employed by the Corporation and its subsidiaries, or (B) is offered and accepts employment by the Purchaser and continues in the employment of the Purchaser (or is jointly employed by the Purchaser and the Corporation or its subsidiaries) for at least nine months following the Closing, or is involuntarily terminated by the Purchaser (other than for cause) prior to the expiration of such nine-month period, the PAM stock award shall vest fully at the expiration of such nine-month period (or immediately prior to such cessation or termination of employment, if earlier), subject to the PAM participant's satisfaction of all applicable tax withholding requirements; and the shares of stock subject to each PAM deferred award that is

3

SSC 04644

vested or that vests in accordance with the foregoing shall be delivered, subject to the PAM participant's satisfaction of all applicable tax withholding requirements, at or as soon as practicable after vesting of such award;

(ii) if the PAM participant is offered and accepts employment by the Purchaser and his or her employment by the Purchaser thereafter terminates for any reason (other than involuntary termination by the Purchaser as described in clause (i)) prior to the expiration of the nine-month period following the Closing, any then unvested PAM stock award shall be immediately forfeited; and

(iii) notwithstanding clauses (i) and (ii) above, the special rules described therein shall apply only if the PAM participant satisfies all applicable requirements (similar to the requirements applicable under the 2003 Program) applied by the Corporation to benefits available to employees affected by the sale of the PAM business unit.

## Votes Relating to Stock-based Awards – IDS Employees

**VOTED:**    That in the case of each stock option (an "IDS option") awarded under the Corporation's 1994 Stock Option and Performance Unit Plan or the 1997 Equity Incentive Plan to an individual who is employed by the IDS business unit (a "IDS participant"), who remains employed by the IDS business unit until his or her role completion date (provided he or she does not transfer to another position within the Corporation and its subsidiaries prior to signing his or her release agreement), the following vesting and exercise rules shall apply:

(i) the IDS option, if not already fully exercisable, shall continue to become exercisable on the same basis as if the IDS participant had continued to be employed by the Corporation and its subsidiaries, subject to clause (iii) below;

(ii) the IDS option shall continue to be exercisable in accordance with its terms, as modified by clause (i) above and subject to clause (iii) below, until the date on which it would have expired by its terms if the IDS participant had continued to be employed by the Corporation and its subsidiaries; and

(iii) notwithstanding clauses (i) and (ii) above, the special option-related vesting and exercise rules described therein shall apply only if the IDS participant satisfies all applicable requirements (similar to the requirements applicable under the 2003 Program) applied by the Corporation to benefits available to employees affected by the transfer of the IDS business unit.

**VOTED:**    That each deferred stock award made under the Corporation's 1997 Equity Compensation Plan (an "IDS deferred stock award") and each restricted stock award made under the 1997 Equity Compensation Plan (an "IDS restricted stock award") (IDS restricted stock awards and IDS deferred stock awards being herein referred to as "IDS stock awards"), in each case to an IDS participant who remains employed by the IDS business unit until his or her role completion date or the date he or she signs an applicable release, if later, shall be fully vested upon the later of such date or the satisfaction of all applicable requirements (similar to the requirements applicable under the 2003 Program) applied by the Corporation to benefits available to employees affected by the transfer of the IDS business unit, subject to the IDS participant's satisfaction of all applicable tax withholding requirements; and that the shares of stock subject to each IDS deferred stock award that is vested or that vests in accordance with the foregoing shall be delivered, subject to the IDS participant's satisfaction of all applicable tax withholding requirements and all

4

SSC 04645

other applicable requirements as described above, as soon as practicable after the vesting hereinabove described.

Mr. Ooi presented and reviewed proposed amendments to the Retirement Program, the Senior Executive Retirement Program (SERP) and the Executive SERP. He stated that the purpose of the amendments is to accommodate the enhanced benefits available under the voluntary separation program, which had been discussed earlier. He requested that the Committee recommend the amendments to the Retirement Plan and to the SERP for approval by the Board, and that the Committee approve the amendments to the Executive SERP as presented. Following discussion, and upon motion duly made and seconded, it was unanimously

### Vote Relating to Retirement Plan

**RESOLVED:** To recommend to the Board of this Corporation that the amendment of the State Street Corporation Retirement Plan providing for (1) benefit enhancements pursuant to the 2003 Voluntary Separation Program and (2) the freezing of the grandfathered early retirement subsidies as of August 31, 2003, presented to the meeting and filed with the records of the meeting, be and hereby is approved and adopted substantially in the form presented.

### Vote Relating to SERP

**VOTED:** That it be the recommendation of this Committee to the Board that the Board amend the Corporation's Supplemental Executive Retirement Plan (the "SERP") to provide that any VSP participant who is a participant in the SERP, other than any such VSP participant who holds the title of Executive Vice President or a superior position, be deemed fully vested in his or her SERP benefit without regard to whether he or she has at least five years of "Vesting Service" (as that term is defined in the SERP), subject to the VSP participant's satisfaction of all applicable Program requirements.

### Vote Relating to Executive SERP

**VOTED:** That the amendment to the Corporation's Supplemental Defined Benefit Pension Plan (the "Executive SERP") presented to this Committee, relating to enhanced Executive SERP benefits for certain persons participating in the Corporation's 2003 Executive Voluntary Separation Program, be and it hereby is approved and adopted substantially in the form presented, but with such changes, not substantially at variance with said form, as the Chairman and Chief Executive Officer, the Vice-Chairman or the Executive Vice President, Human Resources and Organizational Performance, may determine; and that, subject to any such changes as may be so determined, the officers of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to execute such documents and take such other measures as such officer or officers deem necessary or appropriate to effectuate the foregoing, the execution of any such document and the taking of any such other measure by such officer or officer so acting to be conclusive evidence that the same has been approved by this Committee.

5

SSC 04646

## Definitions

**VOTED:** That for purposes of the foregoing votes, the following terms shall have the meanings set forth below:

(i) "Applicable Program requirement": the giving of an effective release or any other procedural requirement or contractual obligation described in the 2003 Program and applicable to a VSP participant, if the VSP participant's participation in or benefits under such Program are contingent upon the giving of such release or the satisfaction of such requirement or obligation;

(ii) "Applicable termination event": in the case of any VSP participant, the termination under the 2003 Program of such VSP participant's employment with the Corporation and its subsidiaries;

(iii) "2003 Program": the Corporation's 2003 Voluntary Separation Program (including the 2003 Executive Voluntary Separation Program); and

(iv) "VSP participant": any individual who is eligible to and does elect to participate in the 2003 Program.

## General Authorization

**VOTED:** That the officers of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing votes; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. Ooi reported that the UK Save-As-You-Earn (SAYE) Scheme approved by the Committee in June 2001 will be replaced by a new all-employee Share Incentive Plan (SIP), scheduled for launch in September 2003. He stated that a similar plan has been promised to former Deutsche Bank employees which required a replication of employment rules, terms, and conditions of employment provided by Deutsche Bank. He noted that the plan has received preliminary approval by UK Inland Revenue, and that State Street Brokerage would be used as the broker to purchase shares each month. He noted that the Plan may have an unapproved sub-plan to allow State Street to extend the Plan to employees in Jersey, but that favorable tax treatment would not apply. He reviewed the key terms of the plan, which were listed in the materials provided to the meeting. He reviewed background data on the number of employees eligible, expected share contribution cost, and expected number of shares to be purchased each month. He also reviewed summary information on UK tax provisions. Following discussion, and upon motion duly made and seconded, it was unanimously

## Approval of UK Share Incentive Plan                SSC 04647

**VOTED:** To adopt the Employee UK Share Incentive Plan as presented to this meeting for employees of State Street Bank and Trust Company, London Branch and other participating employers.

**VOTED FURTHER:** That the General Counsel, Executive Vice President and Secretary, the Executive Vice President for Human Resources & Organizational Performance, and the Senior Vice President for Compensation and US Benefits of this Corporation and each of their respective delegates, be and each is hereby authorized to execute such documents and to take such actions as such officer deems necessary or appropriate

to implement and administer the preceding vote approved and adopted by the Committee.

Mr. de Ocejo presented and reviewed a summary of actions expected to be taken at the Committee's meeting in September 2003.  Discussion followed.

There being no further business, the meeting adjourned.

Dissolved.

A true record.

Attest:

_Maureen Scannell Bateman_

Maureen Scannell Bateman

7

SSC 04648

# EXHIBIT 9

**Schroder Investment Management Limited**
31 Gresham Street, London EC2V 7QA

Schroders

Tel: 020 7658 6000  Fax: 020 7658 6965
www.schroders.com

Human Resources/PB/NG

17 May 2005

**PRIVATE & CONFIDENTIAL**

Mr Alan Brown
21 Sutherland Place
London
W2 5BZ

Dear Alan

We are pleased to make you an offer of employment with Schroder Investment Management Limited ("the Company"). This offer is subject to your being free to join the Company and satisfactory references. Your employment will start on 5 July 2005. The main terms and conditions of this offer will be as follows:-

**Appointment:**    You will be employed by Schroder Investment Management Limited as Head of Investment. Initially you will be responsible for our Global Equities, Fixed Income, Property and Alternatives activities. As we have discussed with you, in the event of the Company making an acquisition in the Fixed Income or Alternatives areas, such business would, in all probability, report to the Chief Executive at least for an initial period although you would be closely involved in such acquisition and in the integration planning and process. Your grade on joining will be Band 1 Executive Director. In this capacity you would be a member of the Group Management Committee and a member of the Board of Schroders plc, reporting to Michael Dobson as Chief Executive. In view of the fact that this is a Board position, your appointment would require formal approval of the Board and this offer is subject to that approval. We have a Board meeting scheduled for 25 May 2005 and I would hope that you will have met all of the non-executive directors on or before that date so that we can formally table your appointment at that meeting.

In addition to or instead of your normal duties you may be required to undertake other duties from time to time at a similar level consistent with your skills, experience and status within the Company or any Associated Company.

We will work with you to assist you to comply with any restrictions to which you continue to be subject as a result of your employment by State Street. The existence of the restrictions of which you have made us aware will not be grounds for the summary termination of your employment. You will co-operate with us (not least by providing us with all relevant information so as to enable both us and you to minimise the risk of breach of such restrictions) and use all reasonable efforts to avoid any breach of such restrictions. If nonetheless there is an allegation that the restrictions have been breached and as a consequence State Street withhold or seek to claw back remuneration due to you or bring a claim against you for damages we would, provided the Company is reasonably satisfied that you have acted properly, assist you in contesting this with State Street including with respect to defending or bringing any legal action and we would compensate you for any damages awarded, the loss of such remuneration and legal costs, up to a maximum of $███████.

In your position you are required to sign and return the enclosed documents relating to the Code of Ethics (including Insider Trading) and Drug Free Workplace policies. You should ensure you familiarise yourself with the policies prior to joining the Company. If you have any queries about the policies please contact me.

Registered Office at the above address. Registered number 1893220 England
Authorised and regulated by the Financial Services Authority. For your security, communications may be taped or monitored.



EXHIBIT

Brown #
4/24/06  11  cs

Plaintiff 442

Alan Brown

2

**Location:**

Your normal place of work will be the Company's offices at 31 Gresham Street, London EC2V 7QA.

However, the Company reserves the right to change your permanent place of work to any place within London. You will be given notice of such change and where appropriate the Company will provide you with financial or other relocation assistance under any relocation policy which it may operate from time to time.

**Salary:**

£▮▮▮▮▮ per annum, payable by credit transfer on the 26th day of each month, unless this falls at a weekend or a Bank Holiday, in which case salary will be paid on the preceding working day. Your salary will be reviewed, subject to performance, from 1 March 2006 and subsequently in March each year.

**Company Car Allowance:**

You will be entitled to receive a non-pensionable allowance of £▮▮▮▮ gross per annum which will be paid monthly and to the use of car parking facilities at 31 Gresham Street or such other office you may be employed at from time to time.

**Deductions:**

The Company reserves the right in its absolute discretion to deduct from the payment of any money owing or due to be paid to you any money owing or due to be paid by you to it under your employment to which you hereby expressly agree.

**Hours of Work:**

Normal office hours are 9.00 a.m. to 5.00 p.m., Monday to Friday, with a one-hour lunch break. However, in view of the nature of your role you will be required to work whatever hours are reasonably necessary for the effective performance of your duties.

Due to the specific nature of the professional activities in your role you are exempted from the Working Time Directive.

The Company reserves the right to extend or amend normal hours of work where necessary to meet reasonable operational requirements.

**Bonus:**

You will be eligible to be considered for payment of a non-pensionable bonus. The amount, if any, that you may receive is at the absolute discretion of the Company, having regard to its view of its business requirements and those of the Group at that time. Your performance and the performance of the business in which you work will be considered. The Company's requirements to retain and/or reward its staff as it feels appropriate in its absolute discretion will also be a consideration. The fact that a bonus may be paid in one year will not be any indication of a likelihood of a bonus in any subsequent year, regardless of equivalent performance and/or circumstances.

Bonus payments are annual and are normally paid in the first quarter in respect of the previous performance year. However, you will not be paid a bonus if your employment has ended or you have given notice of termination at the payment date. The amount and mode of delivery of any bonus award will be at the sole discretion of the Company. However, in relation to the mode and timing of delivery of any bonus award, you will be treated no less favourably than any other Band 1 Executive Director would normally be treated.

Provided that your performance and the performance of the Company is satisfactory, it would not be unreasonable, in this role, to expect to receive an annual bonus in the region of £▮▮▮, split between cash and an award under the Equity Compensation Plan for 2005, had you been working for the full year. Our expectation would be that your annualised bonus for 2005 would be at or around this level. Any bonus received in 2005 will reflect your actual length of service in 2005.

The Company undertakes that any Equity Compensation Plan and any cash bonus awards for the 2006 performance year shall be assessed in good faith reflecting its and your own performance and the other factors referred to in the first paragraph of this bonus section and by taking into account comparability with the annualised equivalent of the amounts of any such awards made to you in respect of the 2005 performance year.

*Plaintiff 443*

The proportion of any bonus that is delivered via the Equity Compensation Plan will be in accordance with the standard deferral approach used at the time for Band 1 Executive Directors. Vesting of awards made under the Equity Compensation Plan shall be in accordance with the rules of the Equity Compensation Plan from to time to time. This includes the provision that there shall be no vesting where you have given notice of resignation or have been dismissed for reason of gross misconduct, at the time of vesting.

A copy of the Schroders Equity Compensation Plan 2000 guidance note is attached. You should note that the plan is subject to review and details may be amended at a future date. Your participation in the Plan is subject to changes to the rules from time to time.

**Share ownership Target:** As a member of the GMC you are required over time to acquire and maintain a shareholding of shares in Schroders plc equal to 300% of your annual base salary. The latest version of the guidelines for GMC members is attached.

**Pension Scheme:** You will be eligible immediately on joining the Company to become a member of the non-contributory Defined Contribution section of the main pension scheme, the Schroders Retirement Benefits Scheme ('the Scheme'), subject to the rules governing the Scheme from time to time. Contributions based on "Salary" (basic annual salary subject to a maximum of the Earnings Cap) will commence on the 1st of the month following receipt of your completed application form. You will only be entitled to vested benefits on completing two years membership of the Scheme.

The Earnings Cap is the ceiling imposed by the Government on the earnings that can count towards benefits from a tax-approved scheme and is currently £████ for the 2005/6 tax year.

The Company reserves the right however, on reasonable notice, to amend or alter the rates of accrual, level of Company contribution and provision of future benefits under the Scheme.

An explanatory booklet and details of the investment options open to you are enclosed. If you decide to join the Defined Contribution section of the Scheme, the necessary forms will be provided to you on joining the Company.

Life assurance cover of 4 x Salary (basic annual salary subject to a maximum of the Earnings Cap), together with a spouse's and children's pensions, is also provided on death in service, subject to the rules governing the Scheme from time to time.

If you decide not to join the Scheme, the Company will pay you £████ per annum and will provide you with life assurance cover.

**Private Medical Care Scheme:** You will be eligible for membership of the Company's non-contributory private medical scheme, as amended from time to time. The premium we pay on your behalf is a taxable benefit-in-kind and the tax will be deducted on a monthly basis through the payroll. Details of the medical scheme have been enclosed for your reference.

**Holidays:** You will be entitled to 30 days' holiday per calendar year (exclusive of statutory and Bank holidays) to be taken at such time as shall be mutually agreed between us, having regard to the requirements of the Company's business.

It is an audit requirement that at some stage during the year two weeks of your entitlement must be taken consecutively. Full details are given in the Handbook.

In the year you join the Company your holiday entitlement will be calculated on a pro rata basis.

Plaintiff 444

Alan Brown

4

| | |
|---|---|
| References: | The employment offer contained in this letter is subject to the receipt by the Company of references which we consider to be satisfactory. Please complete the names and addresses of your referees (including a business and HR contact for the previous 5 years of employment) on the enclosed Confirmation of Information form and confirm on the form that we may approach all for references once you have formally accepted our offer. |
| No Smoking: | The Schroder Group has a No Smoking policy on its premises to which your employment is subject. |
| FSA: | The Company is regulated in the conduct of its investment business by the Financial Services Authority (FSA). The rules of the FSA impose an obligation on all employees to comply with such rules. Details of these FSA obligations will be given to you in your pre-joining letter and you will be given compliance induction training shortly after joining. |
| | The offer of employment contained in this letter is subject to the granting to you by the FSA of Approved Person status. |
| | As you have told us that you are currently registered with the FSA, you should complete the enclosed Form A (but only in the relevant sections as per the instructions on the form). |
| | The relevant forms should be completed and returned to me as a priority. |
| | As an employee and Approved Person, you will be subject to the relevant statement of principles. You should familiarise yourself with these and adhere to those applicable to you. You will be under an obligation not to act or omit to act in any way which causes the Company to be in breach of the FSA rules or the Financial Services & Markets Act 2000. |
| | The appointment to which this contract relates requires that you satisfy the conditions of the FSA's Training & Competence rules. You have told us that you were formally assessed as threshold competent in a comparable role at your previous employer and we require confirmation of this before your start date. |
| Medical Examination: | You will be required to undergo a medical examination and I should appreciate it if you would arrange this immediately with the Tower Hill Medical Centre, First Floor, 10 Lloyds Avenue, London, EC3N 3AX (Tel: 020 7709 7171) quoting cost code C0176. Please ensure you complete the enclosed pre employment questionnaire and take it with you. Would you please let me know the date on which your medical will take place. |
| Other Employment: | You are expected to devote the whole of your working time, attention and abilities to your duties for the Company and/or any Associated Company. You may not, whether directly or indirectly undertake any other duties, of whatever kind, during your hours of work for the Company and/or Associated Companies save where the Company consents by receiving Board approval, which will be sought in the Board meeting on 25 May 2005, in relation to your activities with the CERGE-EI Foundation, the Advisory Council for the CFA Centre for Financial Market Integrity and the Amphora Fine Wine Fund. |
| | You may not without the prior written consent of the Company take up any other appointment whilst you are employed by the Company. Without such consent you may also not be directly or indirectly engaged in, concerned with or financially interested in any other business, except through holding for investment purposes only of not more than three per cent in any class of shares or securities in any company listed or dealt in on any recognised stock exchange. |
| Confidentiality: | During your employment you will have access to and will be entrusted with confidential information and trade secrets relating to the business of the Company and its Associated Companies. You must not disclose any trade secrets or other information of a confidential nature relating to the Company or any Associated Companies or their business or in respect of which the Company or any Associated Company owes an |

obligation of confidence to any third party during or after your employment except in the proper course of your employment or as required by law.

**Intellectual Property Rights:**

Any trademark, design, procedure or other copyright work created by you during your employment with the Company (and whether or not in conjunction with a third party) in connection with, affecting or relating to the business of the Company or any Associated Company or capable of being used or adapted for use in it must immediately be disclosed to the Company and will belong to the Company and/or Associated Company. You will not infringe any rights in such works and will notify the Company immediately of any circumstances where such rights may have been infringed.

You agree that you will at the Company's expense and upon request (whether during or after the termination of your employment) execute such documents as may be necessary to implement the provisions of this clause and vest all rights titles and interest in such property in the Company and/or Associated Company.

**Restrictive Covenants:**

During your employment and for 6 months after its termination you will not directly or indirectly do or attempt to:

a) entice induce or encourage a Client to transfer or remove custom from the Company or any Associated Company;

b) solicit or accept business from a Client for the supply of Relevant Services ;

c) employ engage or work with an Employee of the Company or any Associated Company for the purpose of the supply of Relevant Services or a business which competes or which plans to compete with the Company and/or any Associated Company or

d) do anything to encourage an Employee to terminate their contract of employment with the Company and/or Associated Company (whether or not such termination is in breach of their contract).

For the purpose of this paragraph 'Client' means a person or company:

(i) who at any time during the period of 12 months ending on the last day of your employment or the period of your employment if shorter than 12 months was a client of the Company or any Associated Company or to whom the Company or any Associated Company was actively and directly seeking to supply goods or services; and

(ii) with whom you had material dealings at any time during the 12 months prior to the termination of your employment or were in possession of confidential information about such clients in the performance of duties to the Company or any Associated Company.

'Relevant Services' means goods or services identical or similar to or competitive with those you were materially involved with at the expiry of 12 months prior to the termination of your employment and which the Company or any Associated Company was supplying or negotiating or actively and directly seeking to supply to a client.

'Employee' means an employee of Assistant Manager (or equivalent status) or above with whom you have had any significant personal or business contact at any time in the 12 months prior to the termination of your employment or the period of your employment if shorter than 12 months.

The periods specified in this clause shall each be reduced by the duration of any period immediately prior to the date of termination of your employment during which you are required not to attend work.

Each of the obligations in this section constitutes an entire, separate and independent restriction on you, despite the fact that the obligation may be contained in the same phrase, and if any part is found to be unenforceable the remainder will remain valid and enforceable.

Alan Brown

6

| | |
|---|---|
| **Notice Arrangements:** | The notice required to be given by either party to the other is not less than six months in writing. |
| | Whilst observing the notice period, at the discretion of the Company you may be required not to attend work during some or all of this period ("Garden leave"). This will not affect your contractual pay and benefits during the period. |
| | You are liable to summary dismissal without notice for fraud, dishonesty, or other gross misconduct or for breach of the Company's Compliance and Security Regulations. Further details are contained in the Handbook. |
| | On the termination of your employment or upon the Company exercising its rights above in this clause you will at the request of the Company resign from all directorships held by you in the Company or any Associated Company. If you fail to do so, the Company and/or Associated Company may nominate someone on your behalf to sign such documents and to take such other steps as are necessary to give effect to such resignations. |
| | If the Company terminates your employment without there being gross misconduct on your part or without exercising its right to place you on Garden leave, it reserves the right to pay salary plus a sum equal to the benefits, but excluding bonus, you would have received in lieu of all or any part of the unexpired period of notice and will pay you such sum unless it elects to continue your employment through your notice period. |
| **Disciplinary and Grievance Procedures:** | Details of the Company's disciplinary and grievance procedures are set out in the Staff Handbook. |
| **Confirmation of Information Form:** | Please complete the enclosed form as confirmation of the information on which this offer of employment is based. The verification of your references and the information provided on the Confirmation of Information Form, will be carried out by an independent pre-employment screening agent acting on behalf of Schroders. On signing the Confirmation of Information Form, you will be authorising this agent to carry out a credit review, verification of educational qualifications, verification of employment history, including references and salary details and an address trace. |
| **Definitions:** | In this letter: |
| | "Associated Company" means, in respect of the Company, an undertaking which is its subsidiary undertaking or parent undertaking, or an undertaking which is a subsidiary undertaking of that parent undertaking. |
| | "Group" means the Company and any Associated Company and "Group Company" shall be construed accordingly. |
| **Starting Date:** | This employment will start on the 5 July 2005. |

The other terms and conditions of your employment are set out in the enclosed Handbook.

The details set out in this letter, together with the Handbook, satisfy statutory requirements for the provision of written information to you relating to your contract of employment with Schroder Investment Management Limited.

Your contract of employment shall be governed by, and construed in accordance with, English law. In relation to any legal action or proceedings arising out of or in connection with your contract, you and the Company irrevocably submits to the exclusive jurisdiction of the English courts.

The offer of employment contained in this letter will remain open until 31 May 2005. If you are unable to reply by this date please telephone to let me know.

**Plaintiff 447**

Alan Brown

7

We hope that you will decide to join this Company and look forward to receiving a signed copy of this letter confirming your acceptance of our offer. This should be sent to me, together with your completed Confirmation of Information Form, Code of Ethics Memorandum/Drugfree Workplace Memorandum, Bank Details Form and FSA Form A. Once signed by you these terms and conditions will become contractually binding upon you and the Company. It replaces any previous agreements between us.

Yours sincerely

Paul Barry
Group Human Resources Director

Encs:    Schroders Handbook
         Confirmation of Information Form
         Medical Booklet
         Defined Contribution Pension Scheme Booklet
         "Your Investment Choices" Booklet
         Schroders Equity Compensation Plan 2000 guidance note
         Bank Details Form
         Code of Ethics
         Drug Free Workplace
         Medical Questionnaire
         FSA Form A
         FSA Form A Guidance Notes
         FSA Statements of Principle
         FSA Code of Practice for Approved Persons: General

Plaintiff 448

Alan Brown

8

I have read and understood this letter and the accompanying Handbook and agree to accept the position offered to me on the terms and conditions contained herein. I confirm I have made the Company aware of any potential conflicts of interest and/or obligations to current or former employers that could prevent or restrict me from carrying out my duties.

I understand that I will be unable to take up this appointment until after verification of academic achievement, providing acceptable documentary evidence of the right to work in the UK and receipt of both medical evidence and references which the Company finds satisfactory.

I agree by signing this contract that the Company may hold computer records and HR files relating to me. These may include, but are not limited to, my employment application, references, bank details, performance appraisals, holiday and sickness records, salary reviews and remuneration details and other records (which may where necessary, include sensitive data relating to your health and data held for ethnic monitoring purposes.) The Company requires such personal data for HR administration and management purposes and to comply with its obligations regarding the keeping of employee / worker records. Your right of access to this data is as prescribed by law.

I agree that the Company may process personal data relating to me for HR administration and management purposes, and may, when necessary for those purposes, make such data available to its advisors, to parties providing products and / or services to the Company (such as IT systems suppliers, pension, benefits and payroll administrators), to regulatory authorities (including the Inland Revenue) and as required by law.

Anticipated Start Date:          .........5 July 2005...................

Date of Medical Examination:............10 May 2005.................

Signed:          ...................................

Date:          ...................................

Plaintiff 449

# EXHIBIT 10

STATE STREET CORPORATION
SEVERANCE PLAN

(Plan #508)


Amended and Restated

Effective January 1, 2000

SSC 06103

# TABLE OF CONTENTS

**ARTICLE**                                                                 **PAGE**

Article 1.  Introduction. .................................................................................2
   1.1.  Purpose of Plan ................................................................................2

Article 2.  Definitions. ...................................................................................2
   2.1.  "Administrator" ...............................................................................2
   2.2.  "Benefit Eligible Employee" .........................................................2
   2.3.  "Code" ..............................................................................................3
   2.4.  "Corporation" .................................................................................3
   2.5.  "Effective Date" .............................................................................3
   2.6.  "Employee" ......................................................................................3
   2.7.  "Employer" .......................................................................................3
   2.8.  "ERISA" ...........................................................................................3
   2.9.  "Participant" ....................................................................................3
   2.10.  "Plan" .............................................................................................3
   2.11.  "Plan Year" ....................................................................................3
   2.12.  "Qualifying Termination" ............................................................3

Article 3.  Participation; Benefits Under the Plan. ....................................4
   3.1.  Participation ....................................................................................4
   3.2.  Benefits ............................................................................................4
   3.3.  Integration With Other Benefits, Arrangements and Agreements ......4

Article 4.  Administration of Plan. .............................................................5
   4.1.  Plan Administrator .........................................................................5
   4.2.  Reliance on Tables, Etc .................................................................5
   4.3.  Claims Procedure ...........................................................................6
   4.4.  Indemnification of Administrator ..................................................7

Article 5.  Amendment and Termination of Plan. ......................................7
   5.1.  Amendment and Termination of Plan ...........................................7
   5.2.  Termination of Plan .......................................................................7

Article 6.  Miscellaneous Provisions. .........................................................8
   6.1.  Information to be Furnished ...........................................................8
   6.2.  Limitation of Rights ......................................................................8
   6.3.  Employment Not Guaranteed ........................................................8
   6.4.  Exclusive Benefit ...........................................................................8
   6.5.  No Vested Rights ............................................................................8
   6.6.  Benefits Solely From General Assets ............................................8
   6.7.  Requirement of Release ..................................................................8
   6.8.  ERISA Welfare Plan Status ...........................................................9
   6.9.  Actions On Behalf Of Employers ..................................................9
   6.10.  Governing Law .............................................................................9

Article 1.  Introduction.

1.1.    Purpose of Plan.  This Plan document amends, restates and continues the State Street Corporation Severance Plan, effective January 1, 2000. The purpose of this Plan is to provide severance benefits to Participants whose employment with an Employer ceases due to a Qualifying Termination.

1.2.  Plan Status.  This written Plan document is intended to comply with all relevant provisions of the Code and ERISA and is to be interpreted in a manner consistent with the requirements of such laws.  The Plan shall consist of this document and the severance-related provisions of Schedule A, which is incorporated by reference into this document.

Article 2.  Definitions.

Whenever used herein, the following terms have the following meanings unless a different meaning is clearly required by the context:

2.1.    "Administrator" means the Corporation or such other person or committee as may be appointed from time to time by the Corporation to supervise the administration of the Plan.

"Benefit Eligible Employee" means a regular Employee who is working at least 20 hours per week and has at least six months continuous service with an Employer. The term Benefit Eligible Employee does not include Employees not on the United States payroll, and any other individuals who are in a division, department, unit, or job classification designated by an Employer as not benefits eligible, regardless of the individual's work schedule or number of hours worked.

SSC 06105

2.2.    "Code" means the Internal Revenue Code of 1986, as amended from time to time. Reference to any section or subsection of the Code includes reference to any comparable or succeeding provisions of any legislation which amends, supplements or replaces such section or subsection.

2.3.    "Corporation" means State Street Corporation and any successor to all or a major portion of its assets or business that assumes the obligations of State Street Corporation under the Plan.

2.4.    "Effective Date" means January 1, 1988.

2.5.    "Employee" means an individual who is employed by a Employer.

2.6.    "Employer" means the Corporation and each affiliated employer which adopts the Plan with the approval of the Corporation. An affiliated employer will become an Employer as of the date agreed upon pursuant to such adoption and approval.

2.7.    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time. Reference to any section or subsection of ERISA includes reference to any comparable or succeeding provisions of any legislation which amends, supplements or replaces such section or subsection.

2.8.    "Participant" means an Benefit Eligible Employee who participates in this Plan in accordance with Article 3.

2.9.    "Plan" means State Street Corporation Severance Plan (Plan number 508) as set forth herein, together with any and all Schedules, Exhibits, amendments and supplements hereto.

2.10.    "Plan Year" means the calendar year.

2.11.    "Qualifying Termination" means the termination of an Benefit Eligible Employee's employment with an Employer in accordance with the Corporation's severance program, which is attached hereto as Schedule A and incorporated by this reference, as may be amended from time to time in the sole and absolute discretion of the Corporation.

SSC 06106

Article 3.  Participation; Benefits Under the Plan.

3.1.    Participation.  A Benefit Eligible Employee will become a Participant on the date he or she becomes a Benefit Eligible Employee.

3.2.    Benefits.  Severance benefits under the Plan, to the extent available and subject to the terms herein (including but not limited to Section 6.7), will be payable to a Participant in the event he or she has a Qualifying Termination.  The amount of severance benefits paid to a Participant under the Plan, as well as the form and manner in which such benefits are paid, are set forth in Schedule A, and in such other procedures as may be established by the Administrator from time to time. In exceptional cases (as determined by the Administrator), an Employer may, in its sole and absolute discretion, provide additional severance benefits to one or more individuals under the Plan from time to time.

3.3.    Integration With Other Benefits, Arrangements and Agreements.  The benefits provided for in the Plan are the maximum benefits that the Employers will pay, subject to the following provisions.

(a)    To the extent that any federal, state or local law (to the extent not preempted by ERISA), including, without limitation, so-called "plant closing" laws (e.g. the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101 et seq.), requires an Employer to make a payment (e.g ., payment in lieu of notice) of any kind to a Participant because of that Participant's involuntary termination due to a layoff, reduction in force, plant or facility closing, sale of business, or similar event, the benefits provided under this Plan shall be reduced by an amount equivalent to any money the Participant receives pursuant to, or in satisfaction of, the aforementioned plant closing laws.  Notwithstanding this reduction, all Participants who are otherwise eligible for pay and benefits under the Plan shall receive at least one week's salary under the Plan. The Administrator shall so construe and implement the terms of the Plan accordingly.

(b)    The benefits provided under this Plan shall be reduced by an amount equivalent to any money the Participant receives pursuant to, or in satisfaction of, any

SSC 06107

employment, severance or change in control agreement between the Participant and an Employer that pertains in whole or in part to the subject matter hereof (whether or not such other agreement or arrangement makes explicit reference to this Plan). Notwithstanding this reduction, all Participants who are otherwise eligible for benefits under the Plan shall receive at least one week's salary under the Plan. The Administrator shall so construe and implement the terms of the Plan accordingly.

Article 4.  <u>Administration of Plan.</u>

4.1.    Plan Administrator.  The administration of the Plan shall be under the supervision of the Administrator.  The Administrator shall be the named fiduciary of the Plan for purposes of ERISA with the discretionary authority to interpret the Plan and to control and manage the operation and administration of the Plan in all of its details.  For this purpose, the Administrator's discretionary powers will include, but will not be limited to, the following discretionary authority, in addition to all other powers provided by this Plan:

(a)     To make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan, including the establishment of any claims procedures that may be required by applicable provisions of law;

(b)     To decide all questions concerning the Plan and all matters relating to eligibility, coverage or benefits under the Plan; and

(c)     To delegate its responsibilities under the Plan and to designate other persons to carry out any of its responsibilities under the Plan, any such delegation or designation to be in writing and in accordance with applicable requirements of law.

Any determination by the Administrator shall be final and binding, in the absence of clear and convincing evidence that the Administrator acted arbitrarily and capriciously.

4.2.    Reliance on Tables, Etc.  In administering the Plan the Administrator will be entitled to the extent permitted by law to rely conclusively on all tables, valuations, certificates, opinions and reports which are furnished by, or in accordance with the instructions or

fn Sev Doc No 508 eff 1-1-2000.DOC                    -5-

SSC 06108

recommendations of accountants, counsel, actuaries, consultants or other experts employed or engaged by the Administrator.

4.3.    Claims Procedure.  If any person believes he or she is being denied any rights or benefits under the Plan, such person may file a claim in writing with the Administrator.  If any such claim under the Plan is wholly or partially denied, the Administrator will provide the claimant with a written explanation which will include (i) the specific reasons for the denial, (ii) reference to the pertinent plan provisions upon which the denial is based, (iii) a description of any additional information the claimant might be required to provide with an explanation of why it is needed, and (iv) an explanation of the Plan's claim review procedure.

A written claim denial will be sent within 90 days after receipt of the claim by the Plan. The 90 days may be extended for up to another 90 days if special circumstances warrant an extension of time.  If such an extension is needed, the claimant will be notified in writing prior to the beginning of the extension period.  The extension notice will indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render a decision.

The claimant or a duly authorized representative may appeal any denial of a claim for benefits by filing a written request for a full and fair review to the Plan Administrator.  In connection with such a request, documents pertinent to the administration of the Plan may be reviewed, and comments and issues outlining the basis of the appeal may be submitted in writing.  The claimant may have representation throughout the review procedure.

A request for a review must be filed within 60 days of the claimant's receipt of the written notice of denial of a claim.  The full and fair review will be held and a decision rendered by the Administrator no longer than 60 days after receipt of the request for review.

If there are special circumstances, the decision will be made as soon as possible, but not later than 120 days after receipt of the request for review.  If such an extension of time is needed, the claimant will be notified in writing prior to the beginning of the time extension period.  The decision after the review will be in writing and will include specific reasons for the decision as well as specific references to the pertinent plan provisions on which the decision is based.

4.4.   Indemnification of Administrator.  The Employers agree to indemnify and to defend to the fullest extent permitted by law any Employees serving as the Administrator or as a member of a committee designated as Administrator or who assists the Administrator as part of his or her duties (including any such Employee or former Employee who formerly served as Administrator or as a member of such committee) against all liabilities, damages, costs and expenses (including attorney's fees and amounts paid in settlement of any claims approved by an Employer) occasioned by any act or omission to act in connection with the Plan, if such act or omission is in good faith.

Article 5.  Amendment and Termination of Plan.

5.1.   Amendment and Termination of Plan.  The power to amend the Plan, in whole or in part, shall be vested in the Corporation, which shall have the sole discretion to make all amendments to the Plan or any of its provisions.  Such amendment shall be effected by a written instrument signed by an officer of the Corporation, or his or her authorized delegate, and delivered to the Administrator. Unless otherwise provided, any such amendment will be effective for all Participants, whether or not employed by the Corporation or any other Employer.

5.2.   Termination of Plan.  The Corporation has established the Plan with the bona fide intention and expectation that it will be continued indefinitely, but the Corporation will have no obligation whatsoever to maintain the Plan for any given length of time and may discontinue or terminate the Plan at any time, without liability, by a written instrument signed by an officer of the Corporation, or his or her authorized delegate, and delivered to the Administrator.

SSC 06110

Article 6.  <u>Miscellaneous Provisions.</u>

6.1.    Information to be Furnished.  Benefit Eligible Employees shall provide the Administrator with such information and evidence, and shall sign such documents, as may be requested by the Administrator from time to time for the purpose of administration of the Plan.

6.2.    Limitation of Rights.  Neither the establishment of the Plan nor any amendment thereof will be construed as giving to any Benefit Eligible Employee or other person any legal or equitable right against the Administrator or the Corporation, and in no event will the terms of employment or service of any Benefit Eligible Employee be modified or in any way affected hereby.

6.3.    Employment Not Guaranteed.  Nothing contained in the Plan nor any action taken hereunder shall be construed as a contract of employment or as giving any Benefit Eligible Employee any right to be retained in the employ of an Employer.

6.4.    Exclusive Benefit.  The Plan is maintained for the exclusive benefit of Benefit Eligible Employees.

6.5.    No Vested Rights.  No Employee, whether or not a Participant in, or eligible to participate in, the Plan, shall at any time have any vested rights to benefits provided under the Plan.

6.6.    Benefits Solely From General Assets.  Except as may otherwise be required by law, the benefits provided hereunder will be paid solely from the general assets of the Employers. Nothing herein will be construed to require the Employers or the Administrator to maintain any fund or segregate any amount for the benefit of any Participant, and no Participant or other person shall have any claim against, right to, or security or other interest in, any fund, account or asset of the Employers from which any payment under the Plan may be made.

6.7.    Requirement of Release.  As a condition of receipt of severance benefits for a Qualifying Termination, a Participant shall execute such documents (including, but not limited to, a release) as the Administrator, in its sole and absolute discretion, may require.

SSC 06111

6.8.    ERISA Welfare Plan Status.  No severance benefit shall be paid under the Plan to the extent the payment of such severance benefit would cause the Plan to be deemed to constitute an "employee pension benefit plan" or "pension plan" under Section 3(2)(A) of ERISA and 29 C.F.R. §2510.3-2(b).

6.9.    Actions On Behalf Of Employers.  The Corporation shall act for and on behalf of any and all Employers in all matters pertaining to the Plan, and every act done by, agreement made with, or notice given to the Corporation shall be binding on all such Employers.

6.10.    Governing Law.  To the extent not preempted by ERISA or any other federal statutes or regulations, this Plan shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

IN WITNESS WHEREOF, The Corporation has caused this amended and restated Plan to be executed in its name and on its behalf by an officer or a duly authorized delegate this _____ day of ___ ____, 2000.

STATE STREET CORPORATION

By:_____ _____

Title: _____ _____

SSC 06113

SCHEDULE A

State Street Corporation
Severance Plan
(Effective January 1, 2000)


(See attached)

**STATE STREET CORPORATION - USA**

### Severance Pay and Benefits

State Street employees are currently eligible to receive severance when terminated due to one of the following circumstances:

- A reduction in staff or layoff
- An employee returning from leave and the original or comparable position is no longer available, and/or
- A determination that an employees' work performance is the result of factors that may be beyond the employees' control

**Notice Period:**     All employees will receive 2 weeks' pay in lieu of notice.  In addition, employees will receive pay in the following amounts:

**Employees in Grades 32 and below (non-officers)**
- Bridging period of 8 weeks  base salary
- Severance pay of 1 week per completed year of service
- Maximum pay of 52 weeks (including notice period)

**Employees in Grades 33 through 36 (officers/AVPs)**
- Bridging period of 8 weeks  base salary
- Severance pay of 2 weeks per completed year of service
- Maximum pay of 52 weeks (including notice period)

**Employees in Grades 37 through 39 (AVPs/VPs)**
- Bridging period of 12 weeks base salary.
- Severance pay of 2 weeks per completed year of service
- Maximum pay of 52 weeks (including notice period)
- Stock options and restricted stock awards continue to vest during notice and bridging period; no continued vesting of equity after bridging period

**Employees in Grades 40 through 43 (VPs/SVPs)**
- Bridging period of 24 weeks base salary
- Severance pay of 3 weeks per completed year of service
- Maximum pay of 78 weeks (including notice period)
- Stock options and restricted stock awards continue to vest during notice and bridging period; no continued vesting of equity after bridging period

**SSC 06115**

<u>**Definitions:**</u>

**STATE STREET CORPORATION - USA**

- Notice period starts from last day of active employment (last day worked)
- Termination date is defined as the last day of bridging period
- Separation from service is defined as the date that the severance period ends

**Benefits:** Continued eligibility as shown below

*Medical, Dental, and Vision.* Continued for entire notice, bridging and severance period. Changes in coverage can be made if the entire period extends into the next calendar year. Benefits can be continued through COBRA for an additional 18 months after separation from service.

*Short Term Disability and Long Term Disability.* Short-term disability coverage ends as of the last day of active employment. Long-term disability coverage ends at the end of the month in which your active employment ends.

*Employee and Dependent Life Insurance.* Coverage continues through entire notice, bridging and severance period (can convert life coverage under State Street's group life plan to an individual policy at employee cost)

*Accidental Death and Dismemberment Insurance.* Coverage continues through entire notice, bridging and severance period (cannot be converted to an individual policy)

*Business Travel Accident.* Coverage ends as of the last day of active employment.

*Salary Savings Program.* Participation in the SSP ends no later than the end of 8 weeks of bridging.

*Retirement Plan.* Participation in the Retirement Plan continues during the notice and bridging period.

- Vacation Pay – Stops accruing on last day of active employment. Payment made for vacation time accrued but not used as of the last day of active employment. Employees eligible for retirement will receive full annual vacation accrual.

- Confidential Information - Comply with State Street's policies and procedures regarding Confidential Information

- Release of Claims - Salary and benefit continuation is conditioned upon signing a release, which releases State Street, its affiliates and all those connected with them from any and all causes of action or claims in any way related to or arising out of or in connection with employment and termination

- New Employment – Accepting employment with State Street stops severance at the date of re-employment. Accepting employment outside of State Street during severance period results in stoppage of severance pay upon the date of new employment. Remaining severance will be paid in a lump sum, and all benefits will cease upon acceptance of employment outside of State Street

**SSC 06116**

**STATE STREET CORPORATION - USA**

- Outplacement – Employees who have signed the release agreement will be eligible to receive, upon request, outplacement benefits at State Street's expense at a level, for a duration, and by an outplacement firm selected by State Street

- Severance Payment Offsets – Severance payments will be reduced to take into account any outstanding financial obligations that the employee may have to State Street. This can include employee loans, relocation allowances, educational assistance, expense account balances, company credit card balances, and employee advances. Severance payments will also be reduced for any misappropriation of company property

- Confidentiality Agreement - conditions of severance agreement are to be held in strict confidence

- ERISA – Entitled to rights and protections under the Employee Retirement Income Security Act of 1974

- Exceptions to policy to be approved by EVP, Human Resources or his designate

**SSC 06117**

# EXHIBIT 11

# State Street
## Executive Voluntary Separation Program
# Election Form

**To elect the Executive Voluntary Separation Program, you must complete this Election Form and return it by the deadline. The form must be <u>received</u> by HR & OP Benefits no later than June 16, 2003. (See instructions at the bottom of this form.) If you elect the Executive Voluntary Separation Program, you will receive a Retirement Plan Election Package with more information about your retirement benefits. This package will be sent to you as soon as administratively practicable after your Election Form has been processed.**

## Section 1: Personal Information (please print)

First Name_____ Middle Initial _____ Last Name _____

Mailing Address _____

City _____ State _____ ZIP _____

Work Phone Number _____ Home Phone Number _____ Marital Status _____

Social Security Number _____ — _____ — _____    Employee ID Number _____

**For Retirement Plan (This information will be used to calculate Retirement Plan payment options.):**

Spouse's Name _____ Spouse's Date of Birth _____ *(Required if you are married)*

Beneficiary's Name (if other than your spouse) _____ Date of Birth _____ *(If you are not married, you may name anyone you wish as beneficiary. If you are married, spousal consent will be required if you elect a different beneficiary. Regardless of your beneficiary election, if you are married you must also list your spouse's date of birth on this form.)*

## Section 2: Election & Acknowledgment

By signing this Election Form, I hereby state my decision, made voluntarily and of my own free will, to elect to participate in the State Street Executive Voluntary Separation Program ("EVSP") and terminate employment as of June 27, 2003 (or a later date if required by State Street). I have carefully read and considered the EVSP, and I understand the information provided about the EVSP. I have had the opportunity, and have been advised, to discuss it with my family and professional advisors, including an attorney.

- I understand that if I wish to receive benefits under the EVSP, I must also execute (and not revoke) the Release Agreement and return it with this Election Form. However, in no event will I have less than 45 calendar days to review the Release Agreement and consider whether to sign it.

- I also understand that I may cancel or revoke my election to participate in the EVSP within seven calendar days after the date I sign this Election Form and the Release Agreement. To change my initial election, I understand that HR & OP Benefits must receive my signed Revocation of Election Form within that seven-calendar-day period.

- I also understand that after seven calendar days following the date I sign this Election Form and the Release Agreement, I may not cancel or revoke my election to participate in the EVSP.

_____                    _____
Your Signature                                         Date

### Returning Your Election Form

| By Mail | In Person |
|---|---|
| Mail your form to the address below. It must be received by June 16, 2003. You are encouraged to use a method that provides you with a receipt of delivery (for example, U.S. Express Mail® next-day delivery). | Deliver your form by 5:00 PM Eastern Time on June 16, 2003 to: |

**By Mail**
Mail your form to the address below. It must be received by June 16, 2003. You are encouraged to use a method that provides you with a receipt of delivery (for example, U.S. Express Mail® next-day delivery).

Boon S. Ooi, Senior Vice President
HR & OP Compensation and Benefits
State Street Bank and Trust Company
JAB 4N
PO Box 5118
Boston, MA 02206-5118

**In Person**
Deliver your form by 5:00 PM Eastern Time on June 16, 2003 to:

Boon S. Ooi
HR & OP Compensation and Benefits
John Adams Building
1st Floor North
Quincy, MA

**SSC 05332**

VSP Election Form

# EXHIBIT 12

# State Street
## Executive Voluntary Separation Program
## Release Agreement

1.  I acknowledge that I have received the Executive Voluntary Separation Program material available to all State Street employees who are eligible to participate in the Program. This material includes the Election Form and this Release Agreement (which provides for a release of all claims), and other associated documents. I also acknowledge that I have been informed that I must submit the Election Form and this Release Agreement to HR & OP Benefits by person or mail no later than June 16, 2003. (See the directions on returning the form at the end of this document.) I understand that I have at least 45 calendar days to review this Agreement before I must sign it. If I do not sign this Release Agreement within the 45-calendar-day period, my Executive Voluntary Separation Program election will not be effective.

2.  I wish to participate in the Executive Voluntary Separation Program. In consideration for the Executive Voluntary Separation Program benefits provided by State Street as set forth in the Decision Guide ("the Guide"), which I acknowledge I would not otherwise be entitled to receive, I hereby agree to voluntarily terminate my employment relationship and all of my employment rights with State Street effective no later than June 27, 2003 (or such later date as may be required by State Street), and by signing this Release Agreement, I hereby resign my officer title(s) with State Street.

3.  I hereby certify that my election to participate in the Executive Voluntary Separation Program is completely knowing and voluntary. I further certify that I have received a full and adequate explanation of the benefits made available to me if I voluntarily elect to participate in the Executive Voluntary Separation Program; that I have been provided with all of the data and information required under Section 7(f)(1)(H)(ii) of the Age Discrimination in Employment Act; that, prior to signing the Release Agreement, I have been advised to review my legal rights with an attorney of my choice, and I have had reasonable time of at least 45 calendar days to think over my options and to consult with legal counsel; and that no coercion or undue influence of any kind has been exerted on or over me to obtain my election to participate in the Executive Voluntary Separation Program and voluntarily terminate my employment with State Street. I understand that if I sign this Release Agreement before the end of the 45-calendar-day period, I forfeit my right to consider the general release incorporated in this Release Agreement for the full 45 calendar days.

4.  In consideration of the Executive Voluntary Separation Program benefits provided by State Street as set forth in the Guide, I, for myself and for my heirs, executors, administrators, trustees, legal representatives and assigns (hereinafter collectively referred to as the "Releasor"), hereby forever release and discharge State Street Corporation, State Street Bank and Trust Company, and any and all of their affiliated and related entities (collectively, "State Street"), employee benefit and/or pension plans or funds, successors and assigns, and any and all of its or their past, present or future officers, directors, agents, trustees, fiduciaries, employees or assigns (whether acting as agents for State Street or in their individual capacities) (hereinafter collectively referred to as "Releasees"), from any and all claims, demands, causes of action, and liabilities of any kind whatsoever (based upon any legal or equitable theory, whether contractual, common-law, statutory, federal, state,

SSC 05334

local or otherwise), whether known or unknown, by reason of any act, omission, transaction or occurrence, including but not limited to claims or actions under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Civil Rights Act of 1991, the Family and Medical Leave Act of 1993, the Worker Adjustment and Retraining Notification Act, the Employee Retirement Income Security Act, the Americans with Disabilities Act all as they may have been amended, and any federal, state or local statute or regulation regarding employment, discrimination in employment, the termination of employment or claims for severance under any policy, plan procedure and/or collective bargaining agreement or for attorneys' fees, costs and the like, which the Releasors ever had, now have or hereafter can, shall or may have against the Releasees for, upon or by reason of any act, omission, transaction or occurrence up to and including the date on which I sign this Release Agreement. Notwithstanding the foregoing, this Release of claims shall not extinguish any rights I may have to vested benefits under the terms of any State Street retirement or pension plan, and shall not bar claims arising under or seeking to enforce the terms of this Agreement. To the extent that I live or work or have lived and/or worked in California, except as provided above, no claim, demand, action, or cause of action is reserved, and I hereby waive any and all rights that I have or may have under Section 1542 of the California Civil Code, which provides as follows:

*A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him might have materially affected his settlement with the debtor.*

5. I further acknowledge that this Release Agreement is part of an agreement between State Street and myself that is written in a manner that I understand and that State Street is giving me money and other things of value that I acknowledge I would not otherwise be entitled to receive. By signing this Release Agreement, including the incorporated release, I acknowledge that I understand that I am waiving any rights or claims for discrimination arising under the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act and other similar laws.

6. I represent and warrant that I will not, to the maximum extent permitted by law, commence, maintain, prosecute or participate as a party or member of a class in any action, or proceeding of any kind (judicial or administrative), against any of the Releasees, arising out of any act, omission, transaction or occurrence occurring up to and including the date on which I sign this Release Agreement and have not done so as of the date on which I sign this Release Agreement, provided, however, that the foregoing shall not preclude my participation as a Charging Party before any equal employment opportunity agency, it being understood that I am releasing any right I might otherwise have to economic remedies in connection with same.

7. I agree to cooperate with State Street with respect to all matters arising during or related to my employment, including but not limited to all matters (formal and informal) in connection with any governmental investigation, internal State Street investigation, litigation (potential or ongoing), regulatory, or other proceeding which may have arisen prior to or which may arise following the signing of this Release Agreement. I understand that State Street agrees to reimburse me for my out-of-pocket expenses (not including attorney's fees, legal costs, or my lost time or opportunity), and to provide me with appropriate legal representation in a manner to be determined by State Street.

SSC 05335        Release Agreement – O

8. I will use my best efforts and exercise due diligence to protect, to not disclose, and to keep as confidential all confidential and proprietary information, and will never use it for my benefit or the benefit of others, nor use the knowledge of activities or positions in clients' securities portfolio accounts or cash accounts for my own personal gain or for the gain of others after the termination of my employment. Proprietary or confidential information shall mean information the unauthorized disclosure or use of which would reduce the value of such information to State Street, and includes, without limitation, State Street's customer and client lists, its trade secrets, trade knowledge, any confidential information about (or provided by) any client or customer or prospective or former client or customer of State Street, information concerning State Street's business or financial affairs, systems, data documentation, files and other information relating to the operations of State Street and to its clients and customers, as well as cash and securities account transactions and position records of clients or customers, whether such information is stamped "confidential." I agree to return to State Street and will retain no copies of any written materials, records, and documents, in any medium, made by me or that have come into my possession during my employment with State Street that contain or refer to any such confidential or proprietary information. I further agree that I will return all property and equipment of State Street on or before my termination date including, without limitation, badge, credit cards, laptop computers, cell phones, pagers, and other electronic devices.

9. I acknowledge and agree that this Release Agreement shall be governed by Massachusetts law. If any case or controversy arises under this Release Agreement, I agree that any action will be brought in a court of the Commonwealth of Massachusetts or the United States District Court of Massachusetts, and I agree to submit to each such court's jurisdiction. Notwithstanding the provisions of Massachusetts law, and for the purpose of implementing a full and complete release and discharge of State Street, I expressly acknowledge that this Release Agreement is intended to include in its effect, without limitations, all claims which I do not know or suspect to exist in my favor against State Street at the time of execution thereof, and that the Release Agreement contemplates the extinguishment of any and all such claims.

10. I understand that I have the right to revoke this Release Agreement within seven calendar days of signing it ("Revocation Period"). To do so, I understand that the revocation must be in writing on the Revocation of Election Form and received by HR & OP Benefits no later than the seventh day following the date I sign this Release Agreement. (See the directions on returning the form at the end of this document.) The Release Agreement will become effective and enforceable on the eighth day following my signing, provided I have not revoked my acceptance in a timely manner prior to that date. I understand this revocation may be delivered in person or mailed. After the revocation period has elapsed and if I have not revoked this Release Agreement during the Revocation Period, I understand that it will be irrevocable and binding upon me and my heirs, executors, administrators, legal representatives, successors, and assigns. In the event that I either do not accept the Release Agreement as set forth above no later than June 16, 2003, or revoke the Release Agreement during the Revocation Period, this Release Agreement, including the obligation to provide benefits as set forth in the Guide, shall automatically be deemed null and void.

11. If, at any time after the date of the execution of this Release Agreement, any provision of this Release Agreement shall be held by any court of competent jurisdiction to be illegal, void, or unenforceable, such provision shall be of no force and effect. The illegality or unenforceability of such provision, however, shall have no effect upon, and shall not impair

SSC 05336                                    Release Agreement – O

the enforceability of any other provision of this Release Agreement, provided that upon a finding by a court of competent jurisdiction that the general release given by me in paragraph "4" or any other term or provision hereof is illegal and/or unenforceable, such general release or other term or provision shall be automatically reformed so that it is legal and enforceable to the maximum extent allowed by law. I agree that in the event State Street breaches any of the provisions of this Release Agreement, my sole remedy shall be the enforcement of the terms of this Release Agreement. In the event this Release Agreement is revoked or challenged by me, I agree to return to State Street all consideration and benefits to which I would not otherwise be entitled.

12. This Release Agreement constitutes the complete understanding between State Street and me. No other promises or agreement shall be binding unless in writing and signed by State Street and me. This Release Agreement and all attendant rights and obligations of either party described in the Guide will be binding upon and will inure to my benefit and to State Street's benefit and to my respective heirs, successors, and assigns and to those of State Street.

**My signature below acknowledges that I have read the above and the materials furnished me with respect to the Executive Voluntary Separation Program, that I fully understand the terms and conditions of the Executive Voluntary Separation Program and this Release Agreement, and that I am acting of my own free will. I further acknowledge that State Street has advised me to consult an attorney and any other advisors of my choice prior to signing this Release Agreement and that I have had a reasonable opportunity to do so.**

| | |
|---|---|
| Your Signature | Date |
| Your Name (Printed) | Employee ID Number |
| Social Security Number | |

| Returning This Release Agreement | |
|---|---|
| **By Mail**<br>Mail this form to the address below. It must be **received by June 16, 2003.** You are encouraged to use a method that provides you with a receipt of delivery (for example, U.S. Express Mail® next-day delivery).<br><br>Boon S. Ooi, Senior Vice President<br>HR&OP Compensation and Benefits<br>State Street Bank and Trust Company<br>JAB 4N<br>PO Box 5118<br>Boston, MA 02206-5118 | **In Person**<br>Deliver this form by **5:00 PM Eastern Time on June 16, 2003** to the following location:<br><br>Boon S. Ooi<br>HR & OP Compensation and Benefits<br>John Adams Building<br>1st Floor North<br>Quincy, MA |

**SSC 05337**

# EXHIBIT 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN BROWN, <br>     Plaintiff, <br><br> v. <br><br> STATE STREET CORPORATION, and <br> STATE STREET GLOBAL <br> ADVISORS, <br>     Defendants. | ) <br> ) <br> ) <br> ) <br> )    C.A. No. 05-11178-NG <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff, by his attorneys, objects generally to the defendants' first set of interrogatories to the plaintiff on the grounds and to the extent that they are vague, ambiguous, overly broad, unduly burdensome, seek information that is not relevant to the claims or issues raised in this lawsuit, violate the privacy rights of the plaintiff or third parties, are not reasonably calculated to lead to the discovery of admissible evidence, seek information that is protected by the work product doctrine or attorney/client privilege, or any other privilege, or are otherwise not properly discoverable under Fed. R. Civ. P. 26(b). Subject to and without waiving these objections, the plaintiff responds to each interrogatory below, and reserves the right to supplement his responses as appropriate.

## INTERROGATORY NO. 8

*State the basis for your allegation in paragraph 15 of the complaint that the "value to Mr Brown of the VSP benefits is several million dollars."*

Answer:
The benefits afforded by the VSP as applied in my case amounted to several million dollars as can be seen by the key elements below.

- My base pay was £391,038.

- EVP Pension benefit as if aged 55 would be 2.5% of final average pay (based on the average of the highest five consecutive years of base pay and State Street annual incentive plan bonus) times years of service (up to a maximum of 20) reduced by retirement income from other State Street qualified and non-qualified plans (Retirement Plan and SERP) as applied to other SSgA EVPs.

- Severance entitlement is 50 weeks + 4 weeks base pay per year of completed service.

- Immediate vesting of all equity awarded prior to June 30, 2003. Unvested equity awarded to me prior to June 30, 2003 amounted to 23,033 shares.

- In addition, I had 16,133 of unvested options, 21,000 of out of the-money options, and 28,991 options that I was forced to sell.

## INTERROGATORY NO. 9

*State the basis for your allegation in paragraph 26 of the complaint that "Mr Spina had actual authority to commit State Street to the modified VSP benefits."*

Answer:
In his role as Chief Executive Officer of the Corporation, Mr. Spina was the most senior executive and had very extensive authority to speak for the Corporation and commit it. There was no suggestion from Mr. Spina that he was not able to enter into this agreement, although I understood that the Compensation Committee would be informed. As far as I understood, the Board had agreed to the principle of the VSP, and it was within the normal scope of operation for Mr. Spina to have the authority to modify individual arrangements. Additionally, Mr. Spina's June 30, 2004 letter states, "I made oral commitments to . . . Alan Brown . . .." This evidences Mr. Spina's authority to bind the corporation. …"

## INTERROGATORY NO. 10

*State the basis for your allegation in paragraph 27 of the complaint that "Mr Spina had apparent authority to commit State Street to the modified VSP benefits."*

6

Answer:

I believed based on his position that he had authority to make the offer and enter into the agreement as he did. He was an honourable person and I do not believe he would have entered into an agreement that he was not authorized to enter into. I believed and it appeared that the Compensation Committee had approved of the VSP in principle and that Mr. Spina had authority to make modifications and exceptions to portions of the general plan. I was unaware of any instance in which State Street had refused to put into effect any employment-related decision made by Mr. Spina. It was my belief that Mr. Spina made numerous significant decisions on behalf of State Street, including decisions concerning employment matters, which State Street accepted and implemented, without him having to obtain approval. Further, neither Mr. Spina nor any other representative of State Street ever informed me that State Street had repudiated the agreement I entered into with Mr. Spina.

## INTERROGATORY NO. 11

*Describe those acts you took, or failed to take, in reliance on the offer for the modified VSP or the offer to extend your eligibility for the VSP.*

Answer:

As a leading CIO while I was with SSgA, I regularly received calls from head hunters or others trying to interest me in alternative employment opportunities. After reaching an agreement with Spina in June 2003 and in reliance on that agreement, I consistently turned down these overtures without discussion or enquiry. Indeed, I had no conversations with other asset management companies during my employment with SSgA. Further, I did not challenge the fact that the original VSP was not offered to me, despite the fact that it was only by way of a technicality that it was not offered to me. The reason for that was that I understood that I had an agreement with Spina whereby he had extended in all material ways the VSP to me.

## INTERROGATORY NO. 12

*Describe how State Street or SSgA discharged you or terminated your employment with SSgA.*

Answer:

By an e-mail dated March 17, 2005, Hunt informed me that "tomorrow, Friday, March 18, 2005, will be the date on which your voluntary resignation from employment with State Street will take effect." He then notified me of arrangements to collect State Street property in my possession. I had not, however, resigned voluntarily. I had merely requested the VSP which Spina had previously extended to me. Furthermore, I replied immediately to Hunt's e-mail message and stated that it was totally incorrect to refer to my e-mail letter of March 11, 2005 (in which I requested the VSP) as a "voluntary resignation." Not withstanding, I believe the Bank issued a press release stating that I had left.

## INTERROGATORY NO. 13

*Identify any current or former client of a) State Street, b) State Street Bank or c) SSgA with whom you have had contact on or after March 11, 2005.*

Objection:

The plaintiff objects to this interrogatory as beyond the scope of discovery. The interrogatory does not seek relevant information nor is it reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 14

*Identify any current or former employee, officer or director of a) State Street, b) State Street Bank or c) SSgA with whom you have had contact on or after March 11, 2005.*

Objection:
The plaintiff objects to this interrogatory as beyond the scope of discovery. The interrogatory does not seek relevant information nor is it reasonably calculated to lead to the discovery of admissible evidence.

Answer:
Without waiver of the foregoing objection, please see my answer to Interrogatory No. 12 for explanation of post-March 11, 2005 communications with Hunt. Additionally, I communicated with Shames on March 11 and March 12, 2005.

Signed under the pains and penalties of perjury this 26th day of February 2006.

ALAN BROWN

As to objections only:

HARVEY A. SCHWARTZ

I certify that on February 27, 2006, I served a copy of the attached document on defendants counsel by overnight delivery.

HARVEY A. SCHWARTZ

8

# EXHIBIT 14

<u>CONFIDENTIAL</u>

<u>Voluntary Separation Program (VSP)</u>

## <u>Background</u>

- In April 2003, aggressive cost-cutting measures commenced in an effort to bring State Street's expenses down to a level that is better aligned with current revenues

- The goal of this cost cutting program is to reduce operating expenses by $125.0 million for the remainder of 2003:

    - Efforts have been made to monitor direct controllable expenses

    - Adjustments will be made to incentive compensation accruals

    - A workforce reduction of 1,800 to 2,000 employees will be made by June 30, 2003, with the plan of achieving most of the reductions through voluntary retirement and severance programs (VSP)

    - If the number of voluntary terminations is insufficient, involuntary reductions in staff will be made

## <u>VSP</u>

- The offering period for the VSP will be from May 1, 2003 through June 16, 2003

- The target staff reduction savings is $69.0 million for the balance of 2003, with an annualized ongoing reduction of $138.0 million

- Employees who are covered by the US benefit plans and have completed one year of service as of April 1, 2003 and remain employed until June 27, 2003 are eligible unless:

    - The employee or former employee has already entered into a separation agreement with the company prior to May 1, 2003

    - The employee is currently in an extended notice period and were part of a previous staff reduction or divestiture

- VSP benefits are a combination of enhanced retirement benefits, enhanced severance benefits, continued vesting of equity grants, outplacement services, and other benefits; at the conclusion of this offering period all enhanced benefits under the VSP will cease

    - The Committee will be asked to approve amendments to long-term incentive grants, and recommend amendments to the retirement plans

**Tab 3**
**June 18, 2003**

**SSC 05877**

CONFIDENTIAL

## Voluntary Separation Program (VSP)

### Program Details - Below EVP Level

- Eligible employees are grouped into five categories according to retirement plan eligibility. The exhibit below displays eligibility criteria as well as benefits each employee group receives under the VSP:

| Employee Group | Eligible Number of Employees | Enhanced Retirement Benefit | Equity Grants | Severance Pay | Accrued Vacation |
|---|---|---|---|---|---|
| Group 1 - Greater than age 55<br><br>Group 2 - Age 50 to 54 | 373<br><br>257 | Add 5 years to age to determine grandfathered pension benefit (reduce early retirement reduction factor, or actuarial increase for those age 62 or older)<br><br>Eligible for retiree medical benefits | Awards continue to vest and be exercisable under original terms of grant | Enhanced Severance Pay, payable as a lump sum | Full Year entitlement payable as a lump sum, reduced by vacation time taken |
| Group 3 - Less than age 50 | 1,279 | Receive accrued benefit under grandfathered formula (otherwise would have to wait to age 55 to be eligible) | Awards continue to vest and be exercisable under original terms of grant | Pay continuation under enhanced severance plan, benefits continue as per severance plan, COBRA coverage at end of severance | Prorated vacation entitlement payable as a lump sum, reduced by vacation time taken |
| Group 4 - Age 50 or greater with at least 5 years of service | 627 | Add 5 years to age (make eligible to retire); add 5 years of cash balance pay credits to account<br><br>Eligible for retiree medical benefits | Awards continue to vest and be exercisable under original terms of grant | Enhanced Severance Pay, payable as a lump sum | Full Year entitlement payable as a lump sum, reduced by vacation time taken |
| Group 5 - Less than age 50 or less than 5 years of service | 10,029 | Immediate vesting of accrued Cash Balance | Awards continue to vest and be exercisable under original terms of grant | Pay continuation under enhanced severance plan, benefits continue as per severance plan, COBRA coverage at end of severance | Prorated vacation entitlement payable as a lump sum, reduced by vacation time taken |

Tab 3
June 18, 2003

2

SSC 05878

CONFIDENTIAL

## Voluntary Separation Program (VSP)

### Program Details - Below EVP Level

- All benefit calculations for purposes of the VSP are done as of August 31, 2003

- Beginning July 1, 2003, benefit accrual for employees hired prior to 1990 under the grandfathered plan will be frozen (i.e., if an employee remains employed after June 30, 2003, no pay or service earned after that date will be recognized in the calculation of the grandfathered benefit

- Payment options are as follows:

  - Defer payment to a later date
  - Take an immediate annuity (single life and all other options)
  - Payment in five annual installments (equivalent to a 4.76% interest credit
  - Payment in a lump sum if present value is less than $5,000

- For participants in the SERP plan, which mirrors the retirement plan and covers compensation in excess of $200,000, the same enhancements will apply

- Enhanced Severance Program Summary:

| | | | | | | |
|---|---|---|---|---|---|---|
| | Standard | 8 weeks | 1 week/year | 52 weeks | (A) | N/A |
| | Enhanced | 8 weeks | 2 weeks/year | 60 weeks (B) | (A) | N/A |
| | Standard | 8 weeks | 2 weeks/year | 52 weeks | (A) | 10 weeks |
| | Enhanced | 8 weeks | 3 weeks/year | 60 weeks (B) | (A) | Continued Original Terms |
| | Standard | 12 weeks | 2 weeks/year | 52 weeks | (A) | 14 weeks |
| | Enhanced | 12 weeks | 3 weeks/year | 60 weeks (B) | (A) | Continued Original Terms |
| | Standard | 24 weeks | 3 weeks/year | 78 weeks | (A) | 26 weeks |
| | Enhanced | 24 weeks | 4 weeks/year | 86 weeks (B) | (A) | Continued Original Terms |

(A) Medical/Dental/Vision continued eligibility under active employee rates for duration of Fixed and Service Related Severance pay period.
(B) For retirement eligible employees, payment of severance will be lump sum.

- All employee groups are eligible for outplacement services

Tab 3
June 18. 2003                                        3                                        SSC 05879

CONFIDENTIAL

## Executive Voluntary Separation Program (EVSP)

**Program Details**

| | | | | | |
|---|---|---|---|---|---|
| Age 50 or greater with at least 5 years of service as of 08/31/2003 | 14 | Add 5 years to age and service<br><br>Executive who elects program will be deemed to be in the Executive SERP<br><br>Those not electing will have to wait for normal eligibility period to be in the Executive SERP | Awards continue to vest and be exercisable under original terms of grant | Severance Pay, payable as a lump sum | Full Year entitlement payable as a lump sum, reduced by vacation time taken |
| Less than age 50 or less than 5 years of service | 15 | Full vesting of SERP and Qualified Plan accrued benefit | Awards continue to vest and be exercisable under original terms of grant | Pay continuation under enhanced severance plan, benefits continue as per severance plan, COBRA coverage at end of severance | Prorated vacation entitlement payable as a lump sum, reduced by vacation time taken |

- The enhanced Executive SERP benefit is determined by applying the applicable Executive SERP formula to deemed age and service:
    - The benefit is offset by SERP and qualified plan benefits
    - The value of the benefit is paid as a life annuity (or optional forms), or a five-year certain annuity
    - Base salary as of April 1, 2003 and bonus payouts from March 3, 2003, are used in calculating the payment

Tab 3
June 18, 2003

4

SSC 05880

**CONFIDENTIAL**

## Voluntary Separation Program (VSP)

### Statistical Data for Employee Groups (as of June 6, 2003)

| VSP Employee Group | Total Eligible Employees | Number of Employees Who Elected VSP | Projected Annual Salary Expense Savings ($ millions) |
|---|---|---|---|
| Eligible for Retirement (Groups 1, 2, & 4) | 1,280 | 539 | $36.10 |
| Not Eligible for Retirement (Groups 3 & 5) | 11,870 | 1,156 | $57.39 |
| Executive Vice Presidents | 29 | 5 | $1.85 |
| Total | 13,179 | 1,700 | $95.34 |
| Cost of Benefits | | | $20.98 |
| Total Salary/Benefits Savings | | | $116.32 |

Tab 3
June 18, 2003

5

SSC 05881

# EXHIBIT 15

CONFIDENTIAL

Cost Reduction Initiative.

Board Presentation

June 19, 2003

Luis J. de Ocejo
Executive Vice President
Human Resources & Organizational Performance

June 19, 2003

SSC 01420

<u>CONFIDENTIAL</u>

Voluntary and Involuntary Separation Programs
Background

- Part of overall cost reduction initiatives

- Targeted savings of approximately  $50 + million

- Approximately 1,800 to 2,000 employees

- Primarily U.S. operations, but Non-U.S. also in scope for Involuntary Separation Program

- Includes all businesses/functions and all levels

- Excludes Deutsche acquisition related staffs (separate goals)

#2

June 19, 2003

SSC 01421

<u>CONFIDENTIAL</u>

Reduction Strategies

- Two phase approach to staff reductions.

- Voluntary Phase – Enhanced retirement and/or enhanced severance, continued vesting and exercise rights for life of equity grants.

- Involuntary Phase – Standard severance and termination benefits.

- Identify sufficient "involuntary" termination in anticipation of insufficient "voluntary" terminations.

June 19, 2003

#3

SSC 01422

**CONFIDENTIAL**

Grandfather Eligible

**Age 55 and older**

**Retirement Plan**
Add five years to age, reduce early retirement reduction factor
Retirement benefit payable only as an annuity or in five annual installments

**Retiree Medical Options**
Already eligible
Vested options continue to be exercisable under original terms
Unvested options continue to vest and be exercisable under original terms

**RSA's/DSA's**
Continue to vest (includes SSgA Equity program)

**Severance Pay**
Enhanced severance pay, payable in lump sum

**Accrued Vacation**
Full year accrued payable in lump sum (less time taken)

**Age 50 to 54**

**Retirement Plan**
Add five years to age, reduce early retirement reduction factor
Retirement benefit payable only as an annuity or in five annual installments

**Retiree Medical Options**
Becomes eligible
Vested options continue to be exercisable under original terms
Unvested options continue to vest and be exercisable under original terms

**RSA's/DSA's**
Continue to vest (includes SSgA Equity program)

**Severance Pay**
Enhanced severance pay, payable in lump sum

**Accrued Vacation**
Full year accrued payable in lump sum (less time taken)

June 19, 2003

#4

CONFIDENTIAL

Grandfather Eligible (cont'd)

_Less than 50 years old_

Retirement Plan
Accrued benefit (greater of cash balance or benefit under grandfathered formula)
Maybe be deferred or payable as lump sum

Options
Vested options continue to be exercisable under original terms
Unvested options continue to vest and be exercisable under original terms

RSA's/DSA's
Continue to vest (includes SSgA Equity program)

Severance Pay
Enhanced severance pay, benefits continue as per severance plan
COBRA eligible at end of severance

Accrued
Vacation
Prorated accrued vacation payable in lump sum ( less time taken)

Outplacement
Eligible for coverage

Exit Date
June 25, 2003

#5

June 19, 2003

SSC 01424

CONFIDENTIAL

Not-Grandfather Eligible

_Age 50 and older with at least 5 years of service_

| | |
|---|---|
| Retirement Plan | Add five years to age, and 5 years of service |
| | Add 5 additional years cash balance credit based on current crediting rate |
| | Retirement benefit payable only as an annuity or in five annual installments |
| Retiree Medical | Eligible for retiree medical |
| Options | Vested options continue to be exercisable under original terms |
| | Unvested options continue to vest and be exercisable under original terms |
| RSA's/DSA's | Continue to vest (includes SSgA Equity program) |
| Severance Pay | Enhanced severance pay, payable in lump sum |
| Accrued Vacation | Full year accrued payable in lump sum ( less time taken) |

_Less than 50 years old or less than 5 years of service_

| | |
|---|---|
| Retirement Plan | Immediate vesting of accrued cash balance |
| | Maybe be deferred or payable as lump sum |
| Options | Vested options continue to be exercisable under original terms |
| | Unvested options continue to vest and be exercisable under original terms |
| RSA's/DSA's | Continue to vest (includes SSgA Equity program) |
| Severance Pay | Enhanced severance pay, benefits continue as per severance plan |
| | COBRA eligible at end of severance |
| Accrued Vacation | Prorated accrued vacation payable in lump sum ( less time taken) |
| Outplacement | Eligible for coverage |

**Exit Date**    June 25, 2003

#6

June 19, 2003

SSC 01425

<u>CONFID<sub>EN</sub>TIAL</u>

Early Retirement Payout Options

- Life Annuity (multiple options).

- 5 annual installments (minimum 5% interest PA).

Note:  Normal Lump Sum creates Settlement Charge exposure under FAS88.

#7

June 19, 2003

SSC 01426

## CONFID..TIAL

Enhanced Severance Plan

| | Standard | Enhanced |
|---|---|---|
| Non-officer | 10 weeks + 1 wk./yr., maximum 52 weeks | Standard + 1 week/year – max 60 weeks |
| Grades 33 – 36 | 10 weeks + 2 wks./yrs., maximum 52 weeks | Standard + 1 week/year – max 60 weeks |
| Grades 37 –39 | 14 weeks + 2 wks./yrs., maximum 52 weeks | Standard + 1 week/year – max 60 weeks |
| Grades 40 – 43 | 26 weeks + 3 wks./yrs., maximum 78 weeks | Standard + 1 week/year – max 86 weeks |

#8

June 19, 2003

SSC 01427

CONFID┄┄TIAL

Results to Date
(As of June 16, 2003)

| Voluntary Reductions | Involuntary Reductions | Total Reductions | Total Annualized Savings | Total Exit Costs |
|---|---|---|---|---|

\* Information not available until June 17th.

June 19, 2003

#9

SSC 01428

**CONFIDENTIAL**

Senior Departures

| Name | Level | Business/Function | Years of Service |
|------|-------|-------------------|------------------|

\* Information not available until June 17th.

#10

June 19, 2003

SSC 01429

## CONFIDENTIAL

## Next Steps

- Implement VSP/ISP on June 25.

- Conclude separation process during July/August.

- Organizational reviews by business/function.

- Recruit for new talent (selectively).

June 19, 2003

#11

SSC 01430

# EXHIBIT 16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **ALAN BROWN** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **C.A. No. 05-11178-NG** |
| **STATE STREET CORPORATION** | ) | |
| **and STATE STREET GLOBAL** | ) | |
| **ADVISORS,** | ) | |
| **Defendants** | ) | |

## ALAN BROWN'S ANSWERS TO STATE STREET CORPORATION'S AND STATE STREET GLOBAL ADVISORS' SECOND SET OF INTERROGATORIES

### General objection

The plaintiff objects generally to the extent that any interrogatory seeks information that is neither relevant to the subject matter involved in the pending litigation nor reasonably calculated to lead to the discovery of admissible evidence, in accordance with Fed. R. Civ. P., Rule 26(b)(1). The plaintiff further objects to the extent that any interrogatory seeks information previously provided by the plaintiff.

### Interrogatory No. 1
**State the basis for the claim set forth in your March 18, 2005 email to William Hunt, with the subject line "Your e:mail", that State Street and SSgA "constructively dismissed" you.**

The plaintiff objects to this interrogatory on the ground that it calls for information that is protected by attorney client privilege and, further, because it calls on the plaintiff to state a legal opinion. Without waiving

<u>Interrogatory No. 2</u>
**Provide your calculation of how the value to you of the State Street Corporation Supplemental Defined Benefit Pension Plan component of the VSP or the modified-VSP would be reduced by any benefit you receive or have received (a) from any benefit plan, pension plan or retirement plan or (b) in lieu of participating in any benefit plan, pension plan or retirement plan.**

The table below details the contributions the plaintiff received year by year in lieu of participating in any State Street pension plans (2nd column). The third column is the value of that contribution compounded at 5% p.a. with the contribution assumed to have been received mid year. This produces an implied capital sum of £931,876 to which the plaintiff has applied a 5% annuity rate, being a representative rate available in the UK.

Accordingly, the pension benefit under the VSP would be reduced by either £931,876 as a capital sum, or by £46,594 if paid as an annuity. [Note: these are alternatives. Only one would apply.]

|  | Contribution | Compounded Contribution |
|---|---|---|
| 1995 | £60,667 | £96,438 |
| 1996 | £63,700 | £96,438 |
| 1997 | £64,971 | £93,679 |
| 1998 | £64,971 | £89,218 |
| 1999 | £67,438 | £88,195 |
| 2000 | £79,083 | £98,500 |
| 2001 | £82,658 | £98,050 |
| 2002 | £82,658 | £93,381 |
| 2003 | £84,725 | £91,158 |
| 2004 | £84,725 | £86,817 |
| **Total contribution** | | £931,876 |
| **Annuity at 5%** | | £46,594 |

3

**Interrogatory No. 3**
**Identify all benefit plans that relate to the "modified VSP package" you allege David Spina offered you in paragraph 12 of the complaint.**

- Supplemental Executive Retirement Plan with the age 55 requirement waived.

- Severance payment (To be calculated on the same formula as that set out in the Executive Voluntary Separation Program Decision Guide)

- Equity Based Awards – Benefits extended on all awards made prior to June 30th 2003 as set out in the Executive Voluntary Separation Program Decision Guide.

**Interrogatory No. 4**
**Identify all communications you made to State Street, State Street Bank or SSgA concerning any action or determination by the ECC that affected or related to you in connection with the VSP or the modified VSP.**

Since the plaintiff was unaware of any actions or determinations made by the ECC that affected or related to him in connection with the VSP or the modified VSP, there were none.

**Interrogatory No. 5**
**Provide a typed or print copy of the documents bates numbered Plaintiff 46 – Plaintiff 55 and Plaintiff 431 – Plaintiff 441.**

Plaintiff objects to this interrogatory on the ground that it calls for the creation of a document not in existence at any time relevant to the events at issue. Without waiving that objection plaintiff agrees that he will provide a printed version of the stated documents.

4

I certify, subject to the pains and penalties of perjury, that the foregoing

statements are true and accurate.

Alan Brown

As to all objections.

Alan Brown, plaintiff
By his attorneys

HARVEY A. SCHWARTZ
  BBO. # 448080
LAURIE A. FRANKL
BBO.## 647181
Rodgers, Powers & Schwartz
18 Tremont Street
Boston, MA 02108
(617) 742-7010

# EXHIBIT 17

# STATE STREET CORPORATION

## Supplemental Defined Benefit Pension Plan

(2000 Restatement)

SSC 01106

## TABLE OF CONTENTS

ARTICLE 1 ESTABLISHMENT AND PURPOSE .................................................. 1

    1.1    ESTABLISHMENT ................................................................................. 1
    1.2    2000 RESTATEMENT ............................................................................ 1
    1.3    PURPOSE ............................................................................................ 1

ARTICLE 2 DEFINITIONS ............................................................................... 2

    2.1    ACTUARIALLY EQUIVALENT ................................................................ 2
    2.2    ADDITIONAL COMPANY BENEFIT ......................................................... 2
    2.3    BASIC PLAN ....................................................................................... 2
    2.4    BASIC PLAN OFFSET ........................................................................... 2
    2.5    BOARD .............................................................................................. 2
    2.6    CAUSE .............................................................................................. 2
    2.7    CODE ................................................................................................ 3
    2.8    COMMITTEE ...................................................................................... 3
    2.9    COMPANY ......................................................................................... 3
    2.10   CREDITED SERVICE ............................................................................ 3
    2.11   EARLY RETIREMENT .......................................................................... 3
    2.12   EARLY RETIREMENT AGE .................................................................... 3
    2.13   EARNINGS ......................................................................................... 3
    2.14   EMPLOYEE ........................................................................................ 4
    2.15   EMPLOYER ........................................................................................ 4
    2.16   EMPLOYMENT .................................................................................... 4
    2.17   ERISA ............................................................................................. 4
    2.18   FINAL AVERAGE EARNINGS ................................................................ 4
    2.19   NORMAL RETIREMENT ....................................................................... 4
    2.20   NORMAL RETIREMENT AGE ................................................................. 4
    2.21   OTHER RETIREMENT INCOME .............................................................. 4
    2.22   PARTICIPANT ..................................................................................... 5
    2.23   PARTICIPATION DATE ......................................................................... 5
    2.24   PLAN ................................................................................................ 5
    2.25   RETIREMENT ..................................................................................... 5
    2.26   SERVICE ........................................................................................... 5
    2.27   SPOUSE ............................................................................................. 5
    2.28   SCHEDULE ......................................................................................... 5
    2.28   TOP HAT PLAN .................................................................................. 5

ARTICLE 3 PARTICIPATION ......................................................................... 6

    3.1    ELIGIBILITY ....................................................................................... 6
    3.2    PARTICIPATION ................................................................................. 6
    3.3    AGE/SERVICE REQUIREMENTS FOR SUPPLEMENTAL BENEFIT .................. 7
    3.4    FORFEITURE ...................................................................................... 7

ARTICLE 4 AMOUNT, FORM, AND PAYMENT OF SUPPLEMENTAL BENEFIT ......... 9

    4.1    NORMAL RETIREMENT BENEFIT .......................................................... 9
    4.2    EARLY RETIREMENT BENEFIT ............................................................. 9
    4.3    FORM OF BENEFIT ............................................................................ 10

ARTICLE 5 ADMINISTRATION ...................................................................... 14

    5.1    AUTHORITY OF THE COMMITTEE ....................................................... 14
    5.2    AGENTS ........................................................................................... 14

SSC 01107

5.3    DECISIONS BINDING..........................................................14
5.4    INDEMNITY OF COMMITTEE.............................................14
5.5    COST OF ADMINISTRATION................................................14
5.6    REVIEW OF CLAIMS AND APPEALS...................................14

ARTICLE 6  AMENDMENT AND TERMINATION...............................16

6.1    AMENDMENT/TERMINATION OF PLAN...............................16
6.2    TERMINATION OF PARTICIPANT INTERESTS......................16

ARTICLE 7  MISCELLANEOUS...........................................................17

7.1    UNFUNDED PLAN................................................................17
7.2    UNSECURED GENERAL CREDITOR.....................................17
7.3    TRUST FUND........................................................................17
7.4    NONASSIGNABILITY...........................................................17
7.5    NOT A CONTRACT OF EMPLOYMENT................................18
7.6    VALIDITY.............................................................................18
7.7    SUCCESSORS........................................................................18
7.8    TAX WITHHOLDINGS...........................................................18
7.9    GOVERNING LAW.................................................................18

INDEX OF SCHEDULES...........................................................................20

SCHEDULE A:  EMPLOYEE 390084..........................................21
SCHEDULE B:  EMPLOYEE 401289..........................................22
SCHEDULE C:  EMPLOYEE 390230..........................................23
SCHEDULE D:  EMPLOYEE 314011..........................................28
SCHEDULE E:  EMPLOYEE 390135..........................................30
SCHEDULE F:  EMPLOYEE 397552..........................................32
SCHEDULE G:  EMPLOYEE 311691..........................................33
SCHEDULE H:  EMPLOYEE 395309..........................................34
SCHEDULE I:   EMPLOYEE 413102..........................................35
SCHEDULE J:  EMPLOYEE 391630..........................................37

EXHIBIT I.................................................................................................38

EXHIBIT II...............................................................................................39

SSC 01108

**Article 1**    **Establishment and Purpose**

    1.1    **Establishment.** The State Street Corporation Supplemental Defined Benefit Pension Plan was originally effective January 1, 1995. It was subsequently amended in 1998 to change the definition of Earnings in the case of certain Participants and to add an installment form of distribution effective with respect to benefits commencing after June 18, 1998 for Participants retiring after that date.

        The Plan was amended and restated effective as of December 16, 1999. Except as otherwise provided to the contrary, the amended and restated Plan expressly included certain employees of State Street Corporation and its affiliates with individual pension arrangements.

        The provisions of the 1999 amended and restated Plan shall apply to those Employees who are actively employed as of December 16, 1999, to terminated employees with deferred benefits, and to those retired employees receiving annuity payments who are specified in the Schedules attached to and made a part of the Plan.

    1.2    **2000 Restatement.** The Plan is amended and restated effective March 1, 2000 to reflect a change in the Plan's benefit formula to be applied to executives who were elected as Executive Vice President on or after such date and who become Group A Participants as set forth on Exhibit II.

    1.3    **Purpose.** The principal purposes of this amended and restated Plan (as the same may be further amended) are to provide certain key Employees with competitive retirement benefits, protect against reductions in retirement benefits due to tax law limitations on qualified plans, and encourage the continued employment of such Employees with the Employer.

SSC 01109

**Article 2     Definitions**

2.1     **Actuarially Equivalent.** A benefit is "Actuarially Equivalent" to or the "Actuarial Equivalent" of a benefit payable in a different form or at a different time if the two benefits are of actuarially equivalent value as determined by the Committee based upon a computation by an actuary chosen by the Committee using the actuarial assumptions in effect at the time of such determination with respect to the Basic Plan.

2.2     **Additional Company Benefit.** "Additional Company Benefit" means the annual retirement supplemental benefit, expressed in the form of a single life annuity, payable to a Participant under the State Street Corporation Supplemental Executive Retirement Plan (the "SERP") or any other Employer-sponsored supplemental retirement plans or other arrangements identified by the Committee from time to time and shown on Exhibit I attached hereto.

2.3     **Basic Plan.** "Basic Plan" means the State Street Retirement Plan as the same may be amended from time to time.

2.4     **Basic Plan Offset.** "Basic Plan Offset" means the annual benefit, expressed in the form of a single life annuity, payable to a Participant from the Basic Plan or any successor defined benefit retirement income plan or plans maintained by the Employer which are intended to qualify under Section 401(a) of the Code.

2.5     **Board.** "Board" means the Board of Directors of the Company.

2.6     **Cause.** "Cause" means:

(i)     the willful and continued failure of the Participant to perform substantially the Participant's duties with the Employer (other than any such failure resulting from incapacity due to physical or mental illness), after a written demand for substantial performance is delivered to the Participant by the Participant's supervisor which specifically identifies the manner in which it is asserted that the Participant has not substantially performed the Participant's duties, or

(ii)     the willful engaging by the Participant in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Employer.

2

SSC 01110

For purposes of this definition, no act or failure to act on the part of the Participant shall be considered "willful" unless it is done or omitted to be done by the Participant in bad faith or without reasonable belief that the Participant's action or omission was in the best interests of the Employer.

2.7    **Code.** "Code" means the Internal Revenue Code of 1986, as the same may be amended from time to time.

2.8    **Committee.** Committee means such persons as the Board may designate to administer the Plan. For the period prior to September 21, 2000, "Committee" means the Executive Compensation Committee of the Board. Effective September 21, 2000, "Committee" consists of the following executives of the Company: the Chief Executive Officer, the Chief Administrative Officer and the Executive Vice President of Human Resources.

2.9    **Company.** "Company" means State Street Corporation and any successor company.

2.10    **Credited Service.** "Credited Service" means a Participant's years of credited service or benefit service (as determined under the Basic Plan) that are taken into account for benefit accrual purposes under the Basic Plan; provided, that, for purposes of the Plan, Credited Service shall continue to accrue during any period of a Participant's disability (as determined under the Basic Plan).

2.11    **Early Retirement.** "Early Retirement" means any termination of a Participant's Employment with the Employer upon or after the Participant's attainment of Early Retirement Age and prior to the Participant's attainment of Normal Retirement Age, other than: (i) a voluntary termination without the consent of the Committee; or (ii) an involuntary termination for Cause.

2.12    **Early Retirement Age.** "Early Retirement Age" means, for purpose of this Plan, age fifty-five (55).

2.13    **Earnings.**

    (a)    <u>In General</u>. "Earnings" means a Participant's total annual base salary, unreduced by voluntary deferrals of base salary under Employer-sponsored plans, plus any annual incentive compensation awards (whether or not payable in cash) under the Company's Executive Annual Incentive Plan and the Senior Executive Annual Incentive Plan (collectively referred to as "SEAIP"). For purposes of determining Earnings for any

3

SSC 01111

particular year, Earnings for the year shall consist of base salary as of January 1 of that year and annual incentive compensation awards under SEAIP relating to performance in the prior fiscal year, regardless of when paid. For the avoidance of doubt, "Earnings" shall not include any long-term incentive awards or any other incentive awards other than awards under SEAIP.

(b) Exception. For those Employees who were Participants on June 18, 1998 and who were then participants in an annual incentive plan other than SEAIP, "Earnings" means a Participant's total annual base salary, unreduced by voluntary deferrals of base salary under Employer-sponsored plans, plus any annual incentive compensation.

2.14 **Employee.** "Employee" means an individual who renders services to the Employer as a common law employee.

2.15 **Employer.** "Employer" means the Company and its subsidiaries.

2.16 **Employment.** "Employment" means the period or periods during which a Participant is an Employee of the Employer.

2.17 **ERISA.** "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor act thereto.

2.18 **Final Average Earnings.** "Final Average Earnings" means, for any Participant, the average annual Earnings amount obtained by averaging the Participant's Earnings over the five-consecutive year period during the last ten (10) years of a Participant's Employment which yields the highest such annual average.

2.19 **Normal Retirement.** "Normal Retirement" means any termination of a Participant's Employment with the Employer upon or after the Participant's Normal Retirement Age, other than an involuntary termination for Cause.

2.20 **Normal Retirement Age.** "Normal Retirement Age" means, for purposes of this Plan, age sixty-five (65).

2.21 **Other Retirement Income.** "Other Retirement Income" means the sum of the following:

(a) the Basic Plan Offset; plus

(b) any Additional Company Benefit; plus

4

(c)    any retirement income payable under plans of a Participant's employers other than the Employer, expressed in the form of a single life annuity, as determined by the Committee.

2.22    **Participant.** "Participant" means an eligible Employee of the Employer who is selected to participate in the Plan as provided in Article 3 below. Unless specifically indicated to the contrary, the term "Participant" means both a Group A Participant and a Group B Participant.

2.23    **Participation Date.** For a Group A Participant, Participation Date means the date as of which such Participant was designated to participate in the Plan in accordance with Section 3.1. For a Group B Participant, Participation Date means the participation date set forth in the applicable Schedule.

2.24    **Plan.** "Plan" means the State Street Corporation Supplemental Defined Benefit Pension Plan, as the same may be amended from time to time.

2.25    **Retirement.** "Retirement" means Normal Retirement or Early Retirement.

2.26    **Service.** "Service" means a Participant's years of service for vesting and eligibility (as determined under the Basic Plan).

2.27    **Spouse.** "Spouse" means the individual (if any) who is legally married to the Participant at the time that the Participant's benefits commence or at death if death occurs prior to such benefit commencement date.

2.28    **Schedule.** "Schedule" means the attachment to the Plan that sets forth identifying information concerning individual pension arrangements providing for the payment of supplemental retirement benefits to specified executive Employees of the Employer (each, to the extent of the retirement benefit provisions thereof). To the extent consistent with the intent that the Plan be at all times a Top Hat Plan and to the extent not inconsistent with the terms of such arrangement, each of the individual pension arrangements shall be incorporated into the Plan and payments of supplemental retirement benefits under each such Schedule shall be paid and provided under the Plan.

2.28    **Top Hat Plan.** "Top Hat Plan" means an unfunded plan maintained primarily to provide deferred compensation benefits to a select group of management or highly compensated Employees within the meaning of Sections 201, 301 and 401 of ERISA.

5

SSC 01113

**Article 3**    **Participation**

3.1    **Eligibility.** Only those Employees of the Employer who comprise a select group of management or highly compensated Employees shall be eligible to be selected to participate in the Plan.

3.2    **Participation.** The Committee, or such person or entity as may be designated by the Committee, acting in his, her or its discretion, may designate any eligible Employee as a Participant under this Plan.

    (i)    Unless otherwise specified by the Committee, any such Participant shall be considered a Group A Participant whose benefits are to be determined in accordance with Section 4.1(a) or Section 4.1(b), whichever is applicable. Such Group A Participants and their dates of participation shall be as set forth in Exhibit II in effect from time to time.

    (ii)    To the extent specified by the Committee, a Participant may have an individual pension arrangement as set forth in a Schedule attached hereto; such Participant shall be considered a Group B Participant whose benefits are to be determined in accordance with Section 4.1(c). The Committee may at any time exclude or add one or more individual pension arrangements from or to the Schedules; provided, that the exclusion by the Committee of an individual pension arrangement from the Plan shall not, in and of itself, adversely affect the rights of the individual to whom such individual pension arrangement pertains.

    (iii)    To the extent set forth in the applicable Schedule, a Group B Participant may cease to have his or her benefit determined in accordance with Section 4.1(c) and instead may have his or her benefit determined under Section 4.1(a) or Section 4.1(b), whichever is applicable, without further action by the Committee.

    (iv)    Any designation of participation hereunder shall be in writing and shall be effective as of the date contained therein.

    (v)    Subject to subparagraph (ii) above, participation in the Plan is terminable by the Committee, in its discretion, upon written notice to the Participant, and such termination of participation shall be effective as of the date contained therein, but in no event earlier than the date of such notice.

6

SSC 01114

**3.3**  **Age/Service Requirements for Supplemental Benefitfits.**

    (a)  **Group A Participant.** Subject to Section 3.4, a Group A Participant who satisfies the following requirements during the Group A Participant's Employment shall be eligible to receive a supplemental benefit in accordance with Article 4:

        (i)  attainment of Early Retirement Age; and

        (ii)  completion of ten (10) full years of Employment.

    (b)  **Group B Participant.** The provisions of Section 3.3(a) above shall apply to a Participant designated as a Group B Participant unless otherwise provided in the Schedule applicable to the Group B Participant.

**3.4**  **Forfeiture.**

    (a)  **Failure to Satisfy Age/Service Requirements.** In the event that a Participant's Employment terminates for any reason other than death (including without limitation if the Participant's employer ceases to be a subsidiary of the Company) prior to satisfying the age and service requirements of Section 3.3, then such Participant shall forfeit his or her right to receive any and all benefits set forth in this Plan, unless otherwise determined by the Committee in its sole discretion.

    (b)  **Death.** In the event that a Participant's Employment terminates by reason of death prior to satisfying the age and service requirements of Section 3.3, then no benefits set forth in this Plan shall be payable to any surviving Spouse or other beneficiary, unless otherwise determined by the Committee in its sole discretion.

    (c)  **Without Consent.** In the event that a Participant's Employment terminates for any reason, other than death, after satisfying the age and service requirements of Section 3.3 and prior to his or her Normal Retirement Age, then such Participant shall forfeit his or her right to receive any and all benefits set forth in this Plan, unless such termination of Employment constitutes Early Retirement and unless otherwise determined by the Committee in its sole discretion.

    (d)  **Noncompetition.** Notwithstanding any other provisions hereof, neither a Group A Participant (or, to the extent provided in the applicable Schedule, a Group B Participant) nor his or her Spouse

SSC 01115

nor any other beneficiary of the Participant shall receive any further benefits hereunder if the Participant without the prior written consent of the Committee engages, either directly or indirectly, in any of the activities described in (i), (ii) or (iii) below within two years after termination of Employment with the Employer:

(i)     employment or retention of any person whom the Employer has employed or retained during the two-year period prior to the Participant's termination of employment with the Employer. For purposes of the foregoing sentence, a person retained by the Employer means anyone who has rendered substantial consulting services to the Employer and has thereby acquired material confidential information concerning any aspect of the Employer's operations;

(ii)    any sale, offer to sell, or negotiation with respect to orders or contracts for any product or service similar to or competitive with a product or service or any equipment or system containing any such product or service sold or offered by the Employer, other than for the Employer's account, during the two-year period after the Participant's termination of employment with the Employer, to or with anyone with whom the Employer has so dealt or anywhere in any state of the United States or in any other country, territory or possession in which the Employer has, during said period, sold, offered, or negotiated with respect to orders or contracts for any such product, service, equipment or system; or

(iii)   ownership of any direct or indirect interest (other than a less-than-1% stock interest in a corporation) in, or affiliation with, or rendering any services for, any person or business entity which engages, during the two-year period after the Participant's termination of employment with the Employer, either directly or indirectly, in any of the activities described in subparagraph (i) or (ii) above.

8

SSC 01116

**Article 4**      **Amount, Form, and Payment of Supplemental Benefit**

4.1    **Normal Retirement Benefit.** Subject to the terms of the Plan (including the terms of the applicable Schedule in the case of a Group B Participant), the annual supplemental benefit payable to a Participant hereunder in connection with Normal Retirement, expressed as a single life annuity commencing as of the date determined under Section 4.3 below, shall equal either (a), (b) or (c), whichever shall be applicable, minus (d) below:

(a)    For a Group A Participant who was elected an Executive Vice President prior to March 1, 2000, fifty percent (50%) of the Participant's Final Average Earnings.

(b)    For a Group A Participant who was elected an Executive Vice President on or after March 1, 2000, 2.5% of the Participant's Final Average Earnings multiplied by the Participant's years of Service, but not more than twenty (20) years of Service shall be taken into account.

(c)    For a Group B Participant, according to the applicable Schedule attached hereto.

(d)    Other Retirement Income.

4.2    **Early Retirement Benefit.** Subject to the terms of the Plan (including the terms of the applicable Schedule in the case of a Group B Participant), the annual supplemental benefit payable to a Participant hereunder in connection with Early Retirement, expressed as a single life annuity commencing as of the date determined under Section 4.3 below, shall equal (a) minus (b) where:

(a)    the annual pre-offset supplemental benefit determined under Section 4.1(a), (b) or (c), as applicable, above reduced by:

(i)    .0833% for each whole calendar month by which the Participant's date of benefit commencement precedes his or her sixty-fifth (65th) birthday, excluding any period prior to the Participant's (60th) birthday; and

(ii)    .2083% for each whole calendar month by which the Participant's benefit commencement precedes his or her sixtieth (60th) birthday;

9

SSC 01117

(b)    Other Retirement Income, computed on an early retirement basis in accordance with the provisions of the plan or plans providing such Other Retirement Income. Provided, however, if such Plan (or Plans) does not contain provisions for early retirement, or such provisions are not ascertainable as of the date of determination, the Committee shall determine the actuarial equivalence basis to be used for such purpose.

4.3    **Form of Benefit.**

(a)    **Basic Plan Applies.** Except as provided at (b) below and subject to the Committee's discretion, a Participant's election as to the form and date of commencement of his or her benefit under the Basic Plan shall automatically apply to the payment of his or her supplemental benefit under the Plan, and any consent or waiver effected by a Participant or a Participant's Spouse under any provision of the Basic Plan shall automatically operate as a consent to the corresponding election or a waiver of the corresponding benefit or right under the Plan. In the event that a Group B Participant becomes entitled to a supplemental benefit hereunder and not under the Basic Plan, such Participant may make an election as though he or she were entitled to a benefit under the Basic Plan. If such Participant fails to make an election pursuant to the foregoing, such Participant shall be treated as making an election of the normal form of benefit under the Basic Plan.

(b)    **Installment Option.** Effective for benefits commencing after June 18, 1998 and subject to the Committee's discretion, in lieu of payment in the same form and at the same time as the payment of benefits under the Basic Plan, a Participant may elect to receive his or her supplemental benefit hereunder in the form of annual installments over a period of five, ten or fifteen years. Except as otherwise permitted by the Committee, any election under this Section 4.3(b) must be made not later than by the earlier of (i) the close of the calendar year preceding the calendar year in which falls the date of the Participant's Retirement, or (ii) the date which precedes by six months the date of the Participant's Retirement. In the absence of an effective election under this Section 4.3(b), the Participant's supplemental benefit, if any, under the Plan shall be paid in accordance with Section 4.3(a) above.

The foregoing installment election shall specify a beneficiary or beneficiaries who, upon the Participant's death, shall receive any supplemental installment benefits remaining after the Participant's death. All designations shall be signed by the Participant and shall

SSC 01118

be in such form as the Committee may prescribe. The Participant may change his or her designation of beneficiary at any time, on such form as the Committee may prescribe. The filing of a new beneficiary designation form by a Participant shall automatically revoke all prior beneficiary designations by that Participant.

(c)    **Equivalent Benefits.** The amount of benefits payable under Section 4.3(a) above shall be the Actuarial Equivalent of the benefit determined under Section 4.1 or Section 4.2 above, whichever is applicable. If the Participant makes an effective election to receive his or her supplemental benefits, if any, in installments under Section 4.3(b) above, the amount of such installments shall be determined as follows.

(i)    First, an annual benefit amount shall be determined assuming payment to the Participant as a single life annuity under Section 4.1 or Section 4.2, whichever is applicable.

(ii)    Second, the Committee shall determine the lump sum Actuarial Equivalent of that benefit as of the benefit commencement date.

(iii)    Third, the lump sum amount determined under the preceding sentence shall be credited to a book account (the "installment account"). The amount of each annual installment payable to the Participant shall be determined by dividing the installment account or the remaining portion thereof by the number of installments remaining to be paid. In determining the remaining portion of the installment account for purposes of determining the amount of any installment payment (the "payment in question") after the first installment payment, the installment account shall be adjusted for notional interest through the date immediately preceding the date of the payment in question using the rate of interest credit applied to cash balance accounts under the Basic Plan for the calendar year in which the payment in question falls (i.e., a rate equal to the greater of five percent or one-half percent plus the average of the twelve-month interest rate paid on ninety-day U.S. Treasury Bills for the previous calendar year (the Basic Plan's year) and no more than ten percent per annum).

(d)    **Certain Death Benefits.** Upon the death of a Participant after satisfying the age and service requirements of Section 3.3, a death

11

SSC 01119

benefit shall be paid to the extent provided in the following paragraphs:

(i)    If the Participant had begun receiving a benefit under Section 4.3(a) at the time of death, his or her Spouse or other beneficiary shall receive a survivor benefit only to the extent, if any, that the form of benefit in which the Participant's benefit was being paid, provided for such a survivor benefit. The death benefit under this subparagraph (i) shall be paid to the same person or persons for whom the corresponding death benefit under the Basic Plan is paid (or would have been paid if the Participant had been vested in his or her Basic Plan benefit).

(ii)    If the Participant had begun receiving a benefit under Section 4.3(b) at the time of his or her death, any remaining installment payments shall be paid to the Participant's beneficiary designated in accordance with Section 4.3(b), or, if no such beneficiary has been designated (or no such beneficiary survives), to the Participant's estate.

(iii)    If the Participant dies after satisfying the age and service requirements set forth in Section 3.3 but before commencement of benefit payments, a death benefit shall be paid hereunder to the person or persons to whom a death benefit is payable under the Basic Plan, in the same form and at the same time as the death benefit under the Basic Plan. The amount of the death benefit payable under this subparagraph (iii) to the Participant's beneficiary shall be equal to the Actuarial Equivalent of the 50% surviving spouse portion of the Qualified Joint and Survivor Annuity that would have been payable from the Plan had the Participant retired on the date of his death and commenced receiving such benefit. In making the determination of Actuarial Equivalence in the case of an unmarried Participant it shall be assumed that the Participant is married with a spouse of the same age as the Participant. The form of payment of the death benefit from the Plan to the beneficiary shall be the same as the form applicable under the Basic Plan.

(e)    **Commutation.** Notwithstanding the foregoing, the Committee may at any time elect to commute any or all remaining payments to a Spouse or other beneficiary by paying a single lump sum (of Actuarial Equivalent value to such remaining payments, or the

12

SSC 01120

remainder of the installment account in the case of a benefit paid under Section 4.3(b)) to such Spouse or beneficiary.

(f) **No Death Benefits.** Except as provided in this Section 4.3(d), no death benefits shall be paid under the Plan.

13

SSC 01121

**Article 5    Administration**

5.1    **Authority of the Committee.** This Plan shall be administered by the Committee. Subject to the provisions of the Plan, the Committee shall have the discretionary authority to make, amend, interpret, and enforce all appropriate rules and regulations for the administration of this Plan and to decide or resolve any and all questions, including interpretations of this Plan, that may arise in connection with this Plan.

5.2    **Agents.** In the administration of this Plan, the Committee may, from time to time, employ agents and delegate to such agents such administrative duties as it deems advisable and allowable under the terms of the Plan.

5.3    **Decisions Binding.** The decision or action of the Committee with respect to any question arising out of or in connection with the administration, interpretation, and application of the Plan and any rules or guidelines made in connection with the Plan shall be final and conclusive and shall be binding upon all persons and entities having or claiming any interest in the Plan.

5.4    **Indemnity of Committee.** The Company shall indemnify and hold harmless the Committee and its individual members against any and all claims, loss, damage, expense, or liability arising from any action or failure to act with respect to this Plan.

5.5    **Cost of Administration.** The Company shall bear all expenses of administration of this Plan.

5.6    **Review of Claims and Appeals.** If any person believes he or she is being denied any rights or benefits under the Plan, such person may file a claim in writing with the Committee. If any such claim is wholly or partially denied, the Committee shall notify such person of its decision in writing. Such notification shall contain specific reasons for the denial, specific reference to pertinent Plan provisions, a description of any additional material or information necessary for such person to perfect such claim and an explanation of why such material or information is necessary, and information as to the steps to be taken if the person wishes to submit a request for review. Such notification shall be given within 90 days after the claim is received by the Committee (or within 180 days, if special circumstances require an extension of time for processing the claim, and if written notice of such extension and circumstances is given to such person within the initial 90-day period). If such notification is not given within such period, the claim shall be considered denied as of the last day of such period; and such person may request a review of his or her claim. Within

14

SSC 01122

60 days after the date on which a person receives a written notice of a denied claim (or, if applicable, within 60 days after the date on which such denial is considered to have occurred), such person (or his or her duly authorized representative) may file a written request with the Committee for a review of his or her denied claim and of pertinent documents and may submit written issues and comments to the Committee. The Committee shall notify such person of its decision in writing. Such notification shall be written in a manner calculated to be understood by such person and shall contain specific reasons for the decision, as well as specific references to pertinent Plan provisions. The decision on review shall be made within 60 days after the request for review is received by the Committee (or within 120 days, if special circumstances require an extension of time for processing the request, such as an election by the Committee to hold a hearing, and if written notice of such extension and circumstances is given to such person within the initial 60-day period). If the decision on review is not made within such period, the claim shall be considered denied.

SSC 01123

Article 6    Amendment and Termination

6.1    **Amendment/Termination of Plan.**  The Company hereby reserves the right to amend, modify, or terminate the Plan at any time by action of a majority of the members of the Executive Compensation Committee of the Board of Directors.  Except as described below in this Article 6, no such amendment or termination shall in any material manner reduce or adversely affect any Participant's rights to benefits for which the Participant has satisfied the age and service requirements of Section 3.3 hereunder without the consent of the Participant.

6.2    **Termination of Participant Interests.**  The Plan is intended to be a Top Hat Plan and therefore to be exempt from the provisions of Parts 2, 3, and 4 of Subtitle B of Title I of ERISA.  Accordingly, the Board may terminate the Plan and commence termination distributions for all or certain Participants, or remove certain Employees as Participants, if it is determined by the United States Department of Labor or a court of competent jurisdiction that the Plan constitutes an employee pension benefit plan within the meaning of Section 3(2) of ERISA which is not so exempt.  If distribution is commenced pursuant to the operation of this Article 6, the payment of such amounts shall be made in the manner, and at the times selected by the Committee; provided, however, that such payment shall not be extended for a longer period of time than would have been the case has the payment of benefits occurred as scheduled immediately prior to such accelerated distribution.

16

SSC 01124

**Article 7      Miscellaneous**

7.1  **Unfunded Plan.** This Plan's status as a Top Hat Plan shall not be adversely affected by the establishment of any trust pursuant to Section 7.3 below.

7.2  **Unsecured General Creditor.** No Participant, nor any spouse or other beneficiaries of a Participant, shall have any legal or equitable right, interest, or claim in any property or assets of the Employer, other than that of an unsecured general creditor of the Employer. Without limiting the generality of the foregoing, no such person shall have any right, claim, or interest in any life insurance policies, annuity contracts, or the proceeds therefrom owned or which may be acquired by the Employer. Except as provided in Section 7.3, such policies, annuity contracts, or other assets of the Employer shall not be held under any trust for the benefit of a Participant, his or her beneficiaries, heirs, successors or assigns, or held, in any way, as collateral security for the fulfilling of any obligations of the Employer under this Plan. The Employer's assets shall be, and shall remain for purposes of this Plan, the general assets of the Employer. The Employer's obligation under this Plan shall be that of an unfunded and unsecured promise to pay money in the future.

7.3  **Trust Fund.** At its discretion, the Employer may establish one or more grantor trusts, with such trustees as the Committee may approve for the purpose of providing for the payment of benefits under this Plan. Such trust or trusts may be irrevocable, but the assets thereof shall be subject to the claims of the Employer's general creditors in the event of bankruptcy or insolvency of the grantor. To the extent any benefits provided under this Plan are actually paid from any such trust, the Employer shall have no further obligation with respect thereto, but to the extent not so paid, such benefits shall remain the obligation of, and shall be paid by, the Employer.

7.4  **Nonassignability.** Neither a Participant nor any other person shall have any right to sell, assign, transfer, pledge, anticipate, mortgage, or otherwise encumber, hypothecate or convey in advance of actual receipt the amounts, if any, payable hereunder, or any part thereof, which are, and all rights to which are, expressly declared to be nonassignable and nontransferable. No part of the amount payable shall, prior to actual payment, be subject to seizure or sequestration for the payment of any debts, judgments, alimony or separate maintenance owed by a Participant or any other person, nor shall such amounts or rights to such amounts be transferable by operation of law in the event of a Participant's or any other person's bankruptcy or insolvency.

17

SSC 01125

7.5 **Not a Contract of Employment.** The terms and conditions of this Plan shall not be deemed to constitute a contract of employment between the Employer and any Participant, and Participants (and a Participant's Spouse or beneficiaries) shall have no rights against the Employer except as may otherwise be specially provided herein. Moreover, nothing in this Plan shall be deemed to give a Participant the right to be retained in the service of the Employer or to interfere with the right of the Employer to discipline or discharge any Participant at any time.

7.6 **Validity.** If any provision of this Plan shall be held illegal or invalid for any reason, said illegality or invalidity shall not affect the remaining parts hereof, but this Plan shall be construed and enforced as if such illegal and invalid provision had never been inserted herein.

7.7 **Successors.** The provisions of this Plan shall bind and inure to the benefit of the Employer and its successors and assigns, and the Employer shall require all its successors and assigns to expressly assume its obligations hereunder. The term "successors," as used herein, shall include any corporate or other business entity which shall, whether by merger, consolidation, purchase or otherwise, acquire all or substantially all of the business and assets of the Employer.

7.8 **Tax Withholdings.** The Employer shall have the right to require Participants to remit to the Employer an amount sufficient to satisfy Federal, state, and local income and/or employment tax withholding requirements, or to deduct from payment made pursuant to the Plan amounts sufficient to satisfy such tax withholding requirements.

7.9 **Governing Law.** The provisions of this Agreement shall be construed and interpreted according to the laws of the Commonwealth of Massachusetts except as preempted by Federal law.

18

SSC 01126

IN WITNESS WHEREOF, this amended and restated Supplemental Defined Benefit Pension Plan was adopted by the Board of Directors of State Street Corporation on September 21, 2000 and is hereby executed on behalf of the Committee by a duly authorized officer this _____ day of _ _ _____, 2002.

STATE STREET CORPORATION

By: _____

Title: _____

\\bosrvfs05\data\clients\ss\sbv\leg\non-qualified\superserp 2000.doc

19

SSC 01127

# EXHIBIT 18



Volume: I
Pages: 1-76
Exhibits: 1-12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11178-NG

ALAN BROWN,

        Plaintiff

vs.

STATE STREET CORPORATION and
STATE STREET GLOBAL ADVISORS,

        Defendants

Deposition of BOON OOI, a witness called on behalf
of the Plaintiff, pursuant to the Federal Rules of Civil
Procedure, before Virginia Dodge, Registered Professional
Reporter and Notary Public in and for the Commonwealth of
Massachusetts, at the offices of RODGERS, POWERS &
SCHWARTZ, 18 Tremont Street, 5th Floor, Boston,
Massachusetts, commencing at 2:45 p.m. on Tuesday,
June 20, 2006.

```
 1   A.    I got an email from Lou de Ocejo on the 30th.

 2   Q.    On June 30?

 3   A.    Yeah.

 4   Q.    Saying what?

 5   A.    I think he just asked me to -- I think his comments,

 6   "Let's discuss."  And it was -- I think it was a forward

 7   of an email that I think Mr. Brown sent to -- and I don't

 8   know who it's sent to, but it was forwarding an email to

 9   me with a comment, "Let's discuss."

10   Q.    Let me show you what we've marked as Exhibit 3 at

11   Mr. Darehshori's deposition.  Is that the email that

12   you're referring to?

13   A.    Yes.

14   Q.    So on June 30, 2004, you received that email from

15   Mr. Darehshori?

16   A.    Yes.

17   Q.    And what happened next in regard to that?

18   A.    I think we had a brief conversation.  I don't

19   remember the details of it, but I was surprised to read

20   this.  This is the first I learned about this discussion.

21   So he wanted me to essentially figure out what it really

22   meant and what my interpretation of it would be.

23   Q.    What did you do to accomplish that?

24   A.    I guess over the next few days or few weeks -- and I
```

1    don't remember precisely when -- I tried to come up with

2    an estimate, sort of a worst-case scenario of how much

3    this would cost the company.  So for -- first, it was

4    originally for Lou's -- for his own information so he

5    knows what's at stake here or how much is.

6    Q.    Now, did you ever speak with Mr. Spina about his

7    discussions with Mr. Brown?

8    A.    No.

9    Q.    Did you ever speak with Mr. Brown about his

10    discussions with Mr. Spina?

11    A.    No.

12    Q.    Did you speak with Mr. Harbert about those

13    discussions at all?

14    A.    No.

15    Q.    Did you speak with Mr. Logue about any discussions

16    he had with Mr. Harbert?

17    A.    No.

18    Q.    So is it fair to say that the only sources of

19    information as to what was said in any conversations

20    between Mr. Spina and Mr. Brown about the VSP came from

21    your seeing these two documents, which would be the

22    Exhibit 3 from Mr. Darehshori's deposition and Exhibit 1

23    from your deposition?

24    A.    I guess I could say that I -- the first time I

1   be.

2   Q.    (By Mr. Schwartz)  And did you do that?

3   A.    Yes, I did.

4   Q.    First, as to what's in there, what do you mean by

5   that?

6   A.    Well, the language here is not very clear.  "In

7   exchange for their continued commitment" -- I really don't

8   know what he meant by that.

9         And "would hold available for them the same

10  separation package."  I have no -- "the company was

11  offering U.S. employees under the VSP."

12        I know what the VSP offered, so the only thing I

13  could rely upon is to say, well, what was the VSP?  And

14  calculate a worst-case scenario.

15  Q.    Based on the information that you had available to

16  you, what was your understanding of what Mr. Spina

17  referred to as the commitment he had made?  What were the

18  terms?

19            MR. CALAMARI:  Objection to form.

20  A.    I don't know because I wasn't there when he talked

21  to them.  I didn't even know that he had had any

22  discussions with them at all.

23        We were quite explicit when we rolled out the VSP

24  and the EVSP that managers don't talk to their employees

1   about any arrangements, deals or things like that.  It was

2   all communication came from a central location, central

3   office.  It came from me to the EVPs and from general HR

4   to the other employees.

5   Q.    (By Mr. Schwartz)  What was your understanding of

6   what the terms of any arrangement that Mr. Spina claimed

7   he had reached with Mr. Brown were?

8           MR. CALAMARI:  Again, objection to form.

9   A.    What do you mean by "what was understanding of

10  arrangement"?

11  Q.    (By Mr. Schwartz)  Well, you did some certain

12  calculations to determine a cost, correct?

13  A.    Yeah.  Based on what to do --

14  Q.    And how --

15          MR. CALAMARI:  Do you want to hear the end

16      of the answer?

17          MR. SCHWARTZ:  No.

18  Q.    (By Mr. Schwartz)  And how did you know what to

19  calculate?

20  A.    How do I know what to calculate?

21          MR. CALAMARI:  I'm going to object to the

22      form.

23  Q.    (By Mr. Schwartz)  I'll rephrase it.

24          What was your understanding of what the terms of any

1    agreement that you were asked to calculate were?

2              MR. CALAMARI:   I'm going to object to the

3         form.

4    A.    What was terms?  I would calculate what severance

5    would be, would do a worst-case scenario how much it would

6    cost to extend the terms of a equity program, whether it's

7    to Mr. Brown or anybody else.  I want to change an equity

8    grant, how much would it cost.  We would calculate it.

9    And then we'd calculate an estimate of what a pension

10   could be on a worst-case basis.

11   Q.    (By Mr. Schwartz)  And how did you go about doing

12   that?

13   A.    How did I go about doing that?  We would collect

14   the, you know, essentially personal information on each

15   individual, their salaries, their ages, their dates of

16   birth, their length of service, and calculate.

17   Q.    And did you ask people to help you with that?

18   A.    For pension calculations, yeah.  I usually have a

19   staff that do it.  And for equity calculations, I get the

20   finance department to calculate.

21   Q.    And did you ask your staff and ask equity to do

22   that?

23   A.    Yes.

24

1    age and service to any person who has eligibility for the

2    EVSP.

3    Q.    And was there some provision in the EVSP for offset

4    to the executive SERP?

5    A.    Yes.

6    Q.    And how did the offset work?

7    A.    The offset -- the executive SERP -- regardless of

8    the EVSP, the executive SERP formula itself has an offset.

9    And the offset is the super SERP, executive SERP formula,

10   less all pensions that an individual received from the

11   current employer or any other prior employer.

12   Q.    Was that stated in the EVSP document?

13   A.    No.  It's governed by the blank document.  Because

14   EVSP document basically says we'll add five years age and

15   service to your demographics and then the pension formula

16   applies.

17             MR. SCHWARTZ:  Let's mark this.

18             (Exhibit 3, Executive Voluntary Separation

19             Program Decision Guide, Election Period:

20             May 1-June 16, 2003, marked for identification.)

21   Q.    (By Mr. Schwartz)  Showing you what we've marked as

22   Exhibit 3, can you identify what this is, please?

23   A.    Yeah.  This is a guide that we sent to employees

24   when they are making the decision about the VSP program;

```
1              (Exhibit 9, Agenda for Executive Compensation
2              Committee Meeting, September 15, 2004 -
3              1:45 p.m. to 3:45 p.m., marked for
4              identification.)
5    Q.    (By Mr. Schwartz)   Showing you what we just marked
6    as Exhibit 9, it's SSC 05610.  This is an agenda for the
7    compensation committee meeting of September 15, 2004.  Did
8    you prepare this?
9    A.    Yes.
10   Q.    Now, in executive session, you list a number of
11   employees.  And why is it that you did not list -- put the
12   word "vote" next to Alan Brown?
13   A.    Because Mr. de Ocejo advised me that the committee
14   was going to take affirmative action on Mr. Chow's
15   benefits, Mr. Spina's pension and Mr. Harbert's benefits,
16   but he wanted to be briefed and updated on Mr. Brown's
17   situation.
18   Q.    And in relation to the September 15 meeting,
19   approximately when did you prepare this document?
20   A.    I don't know, but a final version would have to be
21   prepared probably the Friday before the September 15.
22          MR. CALAMARI:  Is this a good time for a
23       short break?
24          MR. SCHWARTZ:  Sure.
```

# EXHIBIT 19

**THIS AGREEMENT** is made the 7th day of December 1994

**BETWEEN:-**

(1)  State Street Global Advisors UK Ltd whose registered office is 1 Canada Square, London E14 5AF ("the Company"); and

(2)  Alan J Brown ("the Appointee").

**WHEREBY IT IS AGREED** as follows:-

**APPOINTMENT**

1.    1.1  The Appointee will act as Managing Director of the Company;

      1.2  For the purposes of determining the Appointee's continuous period of employment pursuant to the Employment Protection (Consolidation) Act 1978. This employment begins on 16.1.95

      1.3  The Appointee warrants and represents to the Company that he will not be in breach of any former terms of employment whether express or implied or of any other obligations binding on him by reason of his entering into this Agreement or of the other agreements or arrangements made or proposed to be made between the Company and him.

**DUTIES OF APPOINTEE**

2.    2.1  The Appointee shall:-

           2.1.1  (except as specifically agreed in writing by the Board) devote the whole of his time and attention and ability during business hours (and such time as may be necessary outside these hours) to the duties of his appointment;

           2.1.2  faithfully and diligently perform those duties and exercise such powers consistent with them which are from time to time assigned to or vested in him;

           2.1.3  obey all lawful directions of the Board and comply with all the Company's rules, regulations, policies and procedures from time to time in force; and

           2.1.4  use his best endeavours to promote the interest of the Company and any other company within the group and for the purposes of this Agreement (save where otherwise expressly provided) the expression "the Group" shall mean the Company and any holding company of the Company and any subsidiary of such holding company within in each case the definitions contained in Section 736 of the Companies Act 1985 (as amended).



SSGA U.K. is a member of IMRO

SSC 01983

2

─── STATE STREET GLOBAL ADVISORS ───

2.2 The Appointee shall (without further remuneration) if and for so long as the Company requires:-

    2.2.1 carry out the duties of his appointment on behalf of any company within the Group;

    2.2.2 act as a director or hold any other appointment or office as nominee or representative of the Company or of any other company within the Group; and

    2.2.3 carry out such duties and the duties attendant on any such appointment as if they were duties to be performed by him on behalf of the Company.

## COMPLIANCE

3.    3.1 The Appointee acknowledges that the Company is authorised to conduct investment business in accordance with the rules of the Investment Management Regulatory Organisation Limited ("IMRO") being one of the self-regulating organisations set up under the Financial Services Act 1986.

    3.2 The Appointee agrees that he will comply at all times with the rules of IMRO, any other regulatory authority to which the company may from time to time be subject and with any internal dealing rules and regulations of the Company from time to time in force. In particular, the Employee agrees to observe those rules set out at Schedule I hereto.

## HOURS OF WORK

4.    The Appointee shall conform to such hours of work as may from time to time be reasonably required of him and shall not be entitled to receive any additional remuneration for work outside normal hours.

## REPORTING

5.    The Appointee shall at all times keep the Board properly and fully informed (in writing if so requested) of his conduct of the business or affairs of the Company or of any company within the Group and provide such explanations as the Board or his immediate superior may require.

## SECONDMENT

6.    The Company may, subject to the Appointee's consent, second him to be employed by any company within the Group without prejudice to his rights under this Agreement.

SSC 01984

State Street

SSGA U.K. is a member of IMRO

3

## PLACE OF WORK

7.  The Appointee shall perform his duties at such place or places of business of the Company or of any company within the Group as the Company shall from time to time require (including travel, both throughout and outside the UK) PROVIDED ALWAYS that if the Appointee is required to relocate by the Company the Company shall be responsible for reimbursement to the Appointee of his proper and reasonable relocation costs including the costs of removal and legal and Estate Agents' fees.  Relocation outside of the Greater London area will not take place without the prior consent of the Appointee.

## COPYRIGHT, INVENTIONS AND PATENTS

8.  8.1  All records documents papers (including copies and summaries thereof) and other copyright protected works made or acquired by the Appointee in the course of employment shall together with all the world-wide copyright and design rights in all such works be and at all times remain the absolute property of the Company

8.2  The Appointee hereby irrevocably and unconditionally waives all moral rights granted by Chapter IV Part I of the Copyright Designs and Patents Act 1988 that vests in him (whether before on or after the date hereof) in connection with his authorship of any copyright works in the course of his employment with the Company wherever in the world enforceable.

8.3  The Company and the Appointee acknowledge and accept the provisions of Sections 39 and 42 of the Patents Act 1977 ("the Act") relating to ownership of employees' inventions and the compensation of employees for certain inventions respectively

8.4  The Appointee acknowledges and agrees that by virtue of the nature of his duties and the responsibilities arising he has a special obligation to further the interests of the Company within the meaning of Section 39(1)(b) of the Act

8.5  Any invention development process plan design formula specification program or any other matter of work whatsoever (collectively "the Inventions") made developed or discovered by the Appointee either alone or in concert whilst the Appointee is employed by the Company shall forthwith be disclosed to the Company and subject to Section 39 of the Act shall belong to and be the absolute property of the Company

8.6  With respect to those rights in the Inventions which do not belong to the Company pursuant to Clause 7.5 (collectively "Appointee Rights") the Appointee at the request and cost of the Company (and notwithstanding the termination of his employment) shall forthwith license or assign (as determined by the Company) to the Company the Appointee Rights and shall deliver to the Company all documents and other materials relating to the Inventions.  The Company shall pay to

SSC 01985

the Appointee such compensation for the licence or assignment as the Company shall determine in its absolute discretion subject to Section 40 of the Act.

8.7    The Appointee shall at the request and cost of the Company (and notwithstanding the termination of his employment) sign and execute all such documents and do all such acts as the Company may reasonably require:-

8.7.1    to apply for and obtain in the sole name of the Company alone (unless the Company otherwise directs) patent registered design or other protection of any nature whatsoever in respect of the Inventions in any country throughout the world and when so obtained or vested to renew and maintain the same;

8.7.2    to resist any objection or opposition to obtaining and any petitions or applications for revocation of any such patent registered design or other protection; and

8.7.3    to bring any proceedings for infringement of any such patent registered design or other protection

8.8    The Company shall decide in its sole discretion whenever to apply for patent registered design or other protection in respect of the Inventions and reserves the right to work any of the Inventions as a secret process in which event the Appointee shall observe the obligations relating to confidential information which are contained in Clause 11 of this Agreement.

## CONFLICT OF INTEREST

9.    During the continuance of this Agreement the Appointee save as agreed by the board shall not become a director of any other company or otherwise be engaged or interested either directly or indirectly in any business other than those of the Company and any companies within the Group except as the owner for investment purposes only of not more than 5% of the issued shares or securities in a company, the share capital of which is quoted or dealt in on a stock exchange in the United Kingdom or elsewhere, whose business does not compete with any business carried on by the Company or any companies within the Group and whose business does not include the supply of goods and/or services to the Company or any companies within the Group;

PROVIDED THAT if any company referred to in this clause 8 commences the carrying on of a business competitive with any business carried on by the Company or any companies within the Group or commences supplying goods and/or services to the Company or any companies within the Group the Appointee shall forthwith disclose the fact and extent of his investment to the Board and the Appointee shall carry out and abide by any ruling of the Board in respect thereof in accordance with its terms. In this clause 8 the term

"whose business" shall encompass the business of the relevant company and of all companies in which the relevant company owns shares or securities.

10.    The Appointee shall comply with:-

   10.1    every rule of law; and

   10.2    every regulation of the Company for the time being in force in relation to dealings in shares or other securities of the Company.

11.    Subject to any regulations issued by the Company which may be applicable to him the Appointee shall not be entitled to receive or obtain directly or indirectly any discount rebate or commission in respect of any sale or purchase of goods effected or other business transacted (whether or not by him) by or on behalf of the Company or of any company within the Group and if he (or any firm or company in which he is interested) shall obtain any such discount rebate or commission he shall account to the Company for the amount received by him.

## CONFIDENTIALITY

12.    The Appointee recognises that, whilst performing his duties for the Company, he will have access to and come into contact with trade secrets and confidential information belonging to the Company or companies within the Group and will obtain personal knowledge of and influence over its customers and employees. The Appointee therefore agrees that the restrictions contained or referred to in Clauses 11 and 29 are reasonable and necessary to protect the legitimate business interests of the Company and the companies within the Group, both during and after the termination of his employment. The Appointee shall not either during or after the termination of the said appointment:-

   12.1    divulge or communicate to any person persons company business entity or other organisation whatsoever except to those of the officials of the Group whose province it is to know the same; or

   12.2    use for his own purpose or for any purposes other than those of the Group; or

   12.3    through any failure to exercise all due care and diligence cause any unauthorised disclosures of any secret confidential or private information:-

   12.4    the expression "secret confidential or private information" shall include but not limited to information:-

      12.4.1    comprising details of the customers, suppliers or agents of the Company or any company within the Group; or

SSC 01987


State Street
SSCA U.K. is a member of IMRO

6

STATE STREET GLOBAL ADVISORS

> 12.4.2 relating to the private affairs of the Company or of any company within the Group or any of its customers or suppliers; or

> 12.4.3 in respect of which the Company or any company within the Group is bound by an obligation of confidence to any third party;

> 12.4.4 relating to the working of any process, product, invention or know-how or to any computer program which is carried on or used by the Company or any company within the Group or which he may discover or make during his appointment hereunder.

But so that these restrictions shall cease to apply to any information or knowledge which may (otherwise than through the default of the Appointee or through any other unauthorised disclosure) become available to the public generally.

13.   The Appointee shall not at any time during the continuance of his employment with the Company make any notes, memoranda or writings or take copies thereof relating to any matter within the scope of the Company's business, dealings or affairs, otherwise than for the benefit of the Company or any company within the Group.

14.   All notes memoranda records and writings and copies thereof made by the Appointee relative to the business of the Company or any company within the Group shall be and remain the property of the appropriate company within the Group and shall be handed over by him to such company from time to time on demand and in any event upon his leaving the service of the Company.

15.   The Appointee shall not at any time make or communicate any untrue or misleading statement in relation to the Company or any company within the Group nor in particular after the termination of his employment hereunder represent himself as being employed by or connected with the Company or any company within the Group.

16.   The Appointee shall not make or communicate any statement to any representative of the press, television, radio, film or other media and shall not write any article for the press or otherwise for publication or any matter connected with or relating to the business of the Company or any company within the Group without first obtaining the approval of the Head of Community Affairs, save where it is impractical so to do.

## PAY

17.   During his appointment the Company shall pay to the Appointee:-

SSC 01988



SSGA U.K. is a member of IMRO

17.1  A salary at the rate of £280,000 (Two hundred and eighty thousand pounds) per annum which shall accrue day to day and be payable by equal monthly instalments in arrears.

## BENEFITS

18.    18.1  **Pension**
             In lieu of participating in the State Street UK Pension and Life Assurance Scheme, the Company shall make a supplementary payment of such amount as to leave after tax a net payment equivalent to 13% of base salary. Such payment to be paid monthly in arrears.

             As a result of opting out of the State Street Scheme, life cover is limited to 2 times basic salary.

       18.2  **Private Medical Insurance**
             During the continuance of this Agreement the Company shall provide private medical insurance for the Appointee his spouse and dependent children under 18 in accordance with the existing arrangements.
             N.B. The provider may change from year to year.

       18.3  **Season Ticket Loan**
             You will be entitled to benefit from an interest free season ticket loan repayable over 6 or 12 months so long as you meet the criteria specified in the rules of the scheme.

       18.4  **Mortgage Assistance**
             Should you fulfil the requirements outlined in the Staff Handbook the Company will subsidise your mortgage up to a maximum mortgage of £100,000. The subsidy is based on a benchmark yearly interest for endowment mortgages and currently stands at 8.5%. You will be subsidised on the difference between this rate and 5% on your current mortgage or £100,000 whichever is the lower. Further details can be found in the Staff Handbook. The rate of interest support is subject to change at the Companies discretion.

       18.5  **Bonus**
             The Appointee is granted a minimum bonus guarantee of £140,000 for the first 3 years of his employment, the first bonus being payable in February 1996.

       18.6  **Restricted Stock Units (RSU's)**
             Pending approval by the Executive Compensation Committee of the Board of Director of State Street Bank & Trust Co, the Appointee will be awarded 6000 RSU's (at 2000 per year for the first three years). Such awards being made on 30th June 1996, 1997 and 1998.

**SSC 01989**


State Street
SSGA U.K. is a member of IMRO

8

─── STATE STREET GLOBAL ADVISORS ───

### EXPENSES

19.    The Company shall reimburse to the Appointee all travelling hotel
entertainment or other expenses reasonably incurred by him in the proper
performance of his duties subject to the Appointee complying with such
guidelines or regulations issued by the Company from time to time in this
respect and to the production to the Company of such vouchers or other
evidence of actual payment of expenses as the Company may reasonably
require.

### CAR

20.    The Company will provide the Appointee with a car of make and model
commensurate with his status and will meet the cost of the road fund licence,
insurance, maintenance, testing, repair and business use petrol thereof. The
Appointee will take reasonable care of the car and return it to the Company
upon the termination of this Agreement howsoever terminated. The
Appointee's use of the car is subject to his compliance with the provisions
relating thereto in the Company Car Procedures Manual. As an alternative the
Appointee may choose to take the cash allowance.

### HOLIDAY

21.    21.1    In addition to public holidays the Appointee is entitled to 25 working
days paid holiday in each holiday year from 1st April to 31st March to
be taken at such time or times as are agreed with his immediate
Manager. For part years, holidays are awarded on a pro rata basis.

       21.2    For the holiday year during which his appointment commences or
terminates the Appointee is entitled to two working days holiday for
each calendar month completed in the employment of the Company for
that year.

### DEDUCTIONS

22.    The Company shall be entitled at any time during the employment, or in any
event on termination, howsoever arising, to deduct from the Appointee's
remuneration hereunder any monies due from him to the Company.

### INCAPACITY

23.    23.1    If the Appointee shall be prevented by illness (including mental
disorder) injury or other incapacity from properly performing his duties
hereunder he shall report this fact forthwith to the Company and if the
Appointee is so prevented for seven or more consecutive days he shall
provide a Medical Practitioner's Statement on the eighth day and
weekly thereafter so that the whole period of absence is certified by
such Statements. Immediately following his return to work after a
period of absence the Appointee shall complete a Self Certification



StateStreet

SSGA U.K. is a member of IMRO

9

— STATE STREET GLOBAL ADVISORS —

Form available from the Company Secretary detailing the reason for his absence;

23.2  The Company reserves the right to require the Appointee to undergo a medical examination by a doctor or consultant nominated by it, in which event the Company will bear the cost thereof;

23.3  If the Appointee shall be absent from his duties hereunder due to illness (including mental disorder), accident or other incapacity duly certified in accordance with the provisions of the preceding sub-clause he shall be paid his full remuneration hereunder for up to 180 working days absence in any period of 12 months ("the Permitted Illness Allowance Period") and thereafter such remuneration if any as the Board shall in its discretion from time to time allow provided that such remuneration shall be inclusive of any statutory sick pay to which the Appointee is entitled under the provisions of the Social Security and Housing Benefits Act 1982 and any social security sickness benefit or other benefits recoverable by the Appointee (whether or not recovered) may be deducted therefrom; In the event of absence beyond 180 days the Appointee may be covered by the Company Permanent Health Insurance policy subject to medical evidence and agreement by the Insurers for a maximum period of 2 years. Any cover beyond 2 years is for the Appointees own account.

23.4  For statutory sick pay purposes the Appointee's qualifying days shall be his normal working days.

## SUSPENSION

24.    In the event that the Company decides at it's sole discretion to carry out an investigation into the Appointee's conduct:-

24.1  The Company shall not be under any obligation to provide any work or work of any kind for the Appointee and the company may at any time suspend the Appointee from the performance of his duties or exclude him from any or all of the premises of the Company provided that throughout any such suspension or exclusion the Appointee's salary and other benefits hereunder shall continue to be paid or provided in full. The Company shall not continue any such suspension for longer than is reasonably necessary to carry out it's investigations.

## IMMEDIATE TERMINATION OF AGREEMENT

25.    The Company may by notice terminate this Agreement with immediate effect if the Appointee:-

25.1   commits any act of gross misconduct or repeats or continues (after written warning) any other material breach of his obligations under this Agreement; or

SSC 01991


State Street

SSGA U.K. is a member of IMRO

10

STATE STREET GLOBAL ADVISORS

25.2    is guilty of any conduct which in the opinion of the Board brings him the Company or any company within the Group into disrepute; or

25.3    is convicted of any criminal offence (excluding an offence under the Road Traffic Legislation in the United Kingdom or elsewhere for which he is not sentenced to any term of imprisonment whether immediate or suspended); or

25.4    commits any act of dishonesty whether relating to the Company, any company within the Group or any of its or their employees; or

25.5    becomes bankrupt or makes any arrangement or composition with his creditors generally; or

25.6    be or becomes prohibited by law from being a Director; or

25.7    be or becomes of unsound mind; or

25.8    resigns as a director of the Company without the board's written consent; or

25.9    contravenes or procures the contravention (whether by act or omission) of the Financial Service Act 1986, all or any rules made from time to time by the Securities and Investments Board, IMRO (including but not limited to the rules contained in Schedule 1 hereto) and any other regulatory authority to which the Company may from time to time be subject; or

25.10   commits any contravention of the personal share dealings guidelines as set out in Schedule II.

Any delay by the Company in exercising such right shall not constitute a waiver thereof.

## NOTICE PERIOD

26.     The Company may terminate this Agreement as follows:-

26.1    by not less than 60 day's notice in writing to the Appointee.

26.2    by not less than six month's prior notice if the Appointee has been offered but has refused to agree to the transfer of this Agreement by way of novation to a person firm or company which has acquired or agreed to acquire the whole or substantially the whole of the undertaking (as defined in the Transfer of Undertakings (Protection of Employment) Regulations 1981) in which he is employed.

SSC 01992



State Street

SSGA U.K. is a member of IMRO

11

STATE STREET GLOBAL ADVISORS

NB In the event of dismissal or redundancy for reasons other than professional misconduct the appointee will receive:-

In the first year of employment – a year's basic salary.
In the second year of employment – six months basic salary.
Thereafter in accordance with the normal State Street Bank and Trust policy.

27. The Appointee may terminate this agreement as follows:

27.1 by not less than 60 day's notice in writing to the Company:-

## PAY IN LIEU

28. On serving notice for any reason to terminate this Agreement or at any time thereafter during the currency of such notice the Company shall be entitled to pay to the Appointee his salary for the unexpired portion of the notice entitlement, in lieu of giving the notice to which the Appointee would otherwise be entitled and this Agreement shall thereupon be terminated with immediate effect.

### 'GARDEN LEAVE'

29. 29.1 If the Company shall determine that it will not require the Appointee to perform his duties during the continuance of any Notice Period, the Company may continue to pay the Appointee his full remuneration and other benefits to which he is entitled hereunder, in which event:-

29.1.1 the company hereby undertakes that it will not take any consequential action against the Appointee; and

29.1.2 the Appointee hereby undertakes that he will continue to observe this Agreement and, in particular, (but without prejudice to the generality of the foregoing) Clauses 8, 11 and 29.

29.2 For the avoidance of doubt, the Company is not obliged to provide the Appointee with work during any Notice Period.

## MISCELLANEOUS PROVISIONS REGARDING TERMINATION

30. On the termination of this Agreement for whatever reason the Appointee shall:-

30.1 at the request of the Company resign without compensation for loss of office from office as a director of the Company and from all offices held by him in any company within the Group and from all other appointments or offices which he holds as nominee or representative of the Company or of any company within the Group and should he fail to


State Street
SSGA U.K. is a member of IMRO

12

SSC 01993

STATE STREET GLOBAL ADVISORS

do so the company is irrevocably authorised to appoint some person in his name or on his behalf to sign and do any documents or things necessary or requisite to give effect thereto; and

30.2    immediately deliver to the Company or to its order all books documents papers (including copies) materials credit cards keys and other property of or relating to the business of the Company or of any company within the Group which are in his possession or which are under his control.

## POST TERMINATION OBLIGATIONS OF THE APPOINTEE

31.    31.1    For the purposes of this clause:-

31.1.1 "the Group" shall mean "the Company" and any company within the Group (as defined in Clause 2.1.4) for whom the Appointee has performed services within the period of two years preceding the termination of his employment and not any other company;

31.1.2 "the business" shall mean the business carried on by the Group at the date of the termination of the Appointee's appointment hereunder;

31.1.3 "the territory" shall mean (A) the United Kingdom and Northern Ireland, the Isle of Man and the Channel Islands and (B) any other country in which the Company or any company within the Group carries on the business or has an authority in to carry on the business at the date of termination of the Appointee's appointment hereunder;

31.1.4 "employee of the Group" shall mean any person who was employed by the Group; and

31.1.4.1 with whom the Appointee had personal contact or dealings in performing his duties of his employment; or

31.1.4.2 reported to the Appointee; or

31.1.4.3 who had material contact with customers or suppliers of the Group in performing his duties of employment with the Group; or

31.1.4.4 who was a member of the management team of the Group.

31.2    The Appointee shall not during or for a period of three months after the termination of his employment hereunder either on his own account or on behalf of any other person firm company or organisation directly or



SSCA U.K. is a member of IMRO

SSC 01994

13

STATE STREET GLOBAL ADVISORS

indirectly endeavour to entice away from the Group or to solicit business of a type which is competitive with or similar to the business from any person firm company or organisation who at any time during the period of 18 months immediately preceding the date of termination of his employment were clients of the Group; provided that this shall not prevent the Appointee from endeavouring to entice away from the Group or from soliciting business of a type which is competitive with or similar to the business or from accepting or facilitating acceptance of, or dealing with any customer, supplier or business of any customer or supplier with whom or which he had previously had personal dealings or contact in the 12 months prior to his appointment under this agreement

31.3    As a separate and distinct agreement and undertaking, the Appointee shall not for a period of three months after the termination of his employment hereunder either on his own account or on behalf of any other person firm company or organisation directly or indirectly accept or facilitate acceptance of or deal with in competition with the Group, a client:-

31.3.1  with whom the Appointee has had personal contact or dealings on behalf of the Company during the 18 months immediately preceding the termination of his employment; or

31.3.2  with whom the employees reporting to the Appointee have had dealings on behalf of the Company during the 18 months immediately preceding the termination of his employment;

provided that this shall not prevent the Appointee from endeavouring to entice away from the Group or from soliciting business of a type which is competitive with or similar to the business or from accepting or facilitating acceptance of, or dealing with any customer, supplier or business of any customer or supplier with whom or which he had previously had personal dealings or contact in the 12 months prior to his appointment under this agreement

31.4    As a separate and distinct agreement and undertaking the Appointee shall not for a period of three months after the termination of his employment hereunder either on his own account or on behalf of any other person firm company or organisation directly or indirectly solicit the employment of or interfere with or endeavour to entice away from the Group so as to obtain the employment of any person who is at such time an employee of the Group or had been an employee of the Group three months immediately preceding the date of termination of the Appointee's employment.

31.5    The company and the Appointee accept and agree that clauses 31.2, 31.3 and 31.4 above are not intended to and shall not prevent the Appointee after the termination of his employment hereunder from, subject to his full compliance with the undertakings contained therein,


SSGA U.K. is a member of IMRO

14      SSC 01995

STATE STREET GLOBAL ADVISORS

merely carrying on or being engaged or concerned in any business which competes with the business.

31.6   Whilst the restrictions in the two preceding clauses hereof are considered by the parties having taken or been given the opportunity of taking appropriate legal advice to be reasonable in all the circumstances as at the date hereof it is acknowledged that restrictions of such a nature may be invalid because of changing circumstances or other unforeseen reasons and accordingly it is hereby agreed and declared that if any one or more of such restrictions shall be judged to be void as going beyond what is reasonable in all the circumstances for the protection of the interests of the Company (or the Group as the case may be) but would be valid if part of the wording thereof were deleted or the period thereof reduced or the range of activities covered thereby reduced in scope the said restrictions shall be deemed to apply with such modifications as may be necessary to make them valid and effective and any such modifications shall not thereby affect the validity of any other restrictions contained herein.  The Appointee hereby further undertakes to execute and do and irrevocably appoints the Company to be his attorney in his name and on his behalf to execute and do all such further acts documents and things as may be required to give effect to this clause.

31.7   The Appointee agrees that in the event of receiving from any person, company, business entity or other organisation an offer of employment during the continuance of this Agreement, or during the continuance in force of any of the restrictions set out in Clause 28 he shall forthwith provide such person, company, business entity or other organisation making such an offer of employment a full and accurate copy of this Agreement signed by the parties hereto.

**GENERAL**

32.   32.1   The provisions of the Company's Employee Handbook (as amended from time to time) shall be terms of the Appointee's employment except so far as inconsistent with this Agreement;

32.2   If the Appointee wishes to obtain redress of any grievance relating to his employment or is dissatisfied with any reprimand, suspension or other disciplinary steps taken by the Company he shall apply in writing setting out the nature and details of any such grievance or dissatisfaction to the Board of Directors of the Company who shall consider the matter and whose decision shall be final;

32.3   This agreement sets out the entire agreement and understanding of the parties.

32.4   The expiration or termination of this Agreement howsoever arising shall not operate to affect such of the provisions of this Agreement as


StateStreet
SSGA U.K. is a member of IMRO

15                    SSC 01996

─── STATE STREET GLOBAL ADVISORS ───

are expressed to operate or have effect thereafter and shall be without
prejudice to any accrued rights or remedies of the parties;

32.5    The validity construction and performance of this Agreement shall be
        governed by English law;

32.6    All disputes claims proceedings between the parties relating to the
        validity construction or performance of this Agreement shall be subject
        to the non-exclusive jurisdiction of the High Court of Justice in
        England and Wales to which the parties irrevocably submit;

32.7    Any notice to be given by a party under this Agreement must be in
        writing and must be given by delivery at or sending by first class post
        or other faster postal service or facsimile transmission or other means
        of communication in permanent written form to the last known postal
        address or relevant telecommunications number of the other party or by
        delivery personally to the Appointee. Where notice is given by sending
        in a prescribed manner it shall be deemed to have been received when
        in the ordinary course of the means of transmission it would be
        received by the addressee. To prove the giving of a notice it shall be
        sufficient to show it was despatched. A notice shall have effect from
        the sooner of its actual or deemed receipt by the addressee.

AS WITNESS the hands of the parties hereto the day and year first before written

SSC 01997


StateStreet
SSGA U.K. is a member of IMRO

STATE STREET GLOBAL ADVISORS

SIGNED by Nicholas A Lopardo
for and on behalf of State Street Global Advisors UK Limited
in the presence of:-

Name

Address   4 Thomas Cole, South Bretton, Peterborough PE3 9AY

Occupation   Bank officer.


SIGNED by the said Alan J Brown
in the presence of:-

Name     RICHARD BERMAN

Address

Occupation   INVESTMENT BANKER.


DATED   4.12.94          1994

SSC 01998

State Street
SSGA U.K. is a member of IMRO

17

03-FEB-2005  15:33        State Street GA                         020 698 6355     P.18/29

STATE STREET GLOBAL ADVISORS

**SCHEDULE I**

**IMRO RULES**

**IMRO Rulebook requirements**

1.      The Appointee agrees that he will:-

1.1     act and conduct himself in conformity with, and so as to result in
        the Employer complying with, the rules of IMRO as if they were
        directly binding upon him, so far as it is reasonably within his
        power to do so;

1.2     comply and cooperate fully with all instructions, directions,
        requirements or requests properly made or imposed by, or on
        behalf of, IMRO under its rules, including, but not limited to, a
        requirement to make himself readily available for the purposes
        of, and truthfully to answer all questions put to him in the course
        of:

1.2.1   an inspection under Chapter VI of the IMRO rulebook
        (Compliance Arrangements, Reporting and Access); or

1.2.2   an Investigation under Chapter VIII (Investigation and
        Intervention - Summary Process and Membership Tribunal); or

1.2.3   any Summary Process or proceeding of a Membership or Appeal
        Tribunal under Chapter VII above or Chapter IX (Appeals).

1.3     observe the requirements of Chapter IV Rule 26 (Dealings by
        Officers and Employees) of the IMRO Rules. A notice setting
        out the terms of Rule 26 will be provided to you by the
        Compliance Manager.

2.      A copy of the IMRO rulebook is available for the Employee's
        inspection from the Compliance Manager.

SSC 01999

 State Street

SSGA U.K. is a member of IMRO

18

STATE STREET GLOBAL ADVISORS

## SCHEDULE II

## PERSONAL SHARE DEALINGS

### INTRODUCTION

It is a requirement of IMRO's rules and SSGA/SSUTM policies that employees involved in or who may have knowledge of investment decisions taken in respect of funds under our management, do not use this knowledge for their personal gain and to the detriment of State Street clients.

Set out below are the rules regarding personal share dealings ("The Rules"). The application of the rules to an individual is dependent upon his/her involvement in, or knowledge of, our investment dealings. All staff at SSGA/SSUTM are affected.

The Rules apply to you either because you have knowledge of our investment dealings or, as a consequence of your position, such knowledge could be implied to you or obtained by you intentionally or unintentionally. The Rules apply to all SSGA/SSUTM staff unless we have in place a system of Restricted Communication. We apply such a system and as a consequence all other State Street staff or agents ("Restricted Individuals") are exempted.

### THE RULES

1.    Introduction

1.1    The Rules represent good business practice for the protection of our clients and individual employees.

1.2    They refer to "investment". This is widely defined and includes stocks, shares, debentures, options and futures. It does not include:

    i)    Life policies, e.g. endowments, bonds, etc.

    ii)    Units in regulated collective investment schemes, e.g. unit trusts, shares in open-ended investment companies.

    iii)    A Type A PEP, i.e. one where the terms of which provide that your cash subscriptions are to be invested in units of an authorised unit trust scheme.

SSC 02000



SSGA U.K. is a member of IMRO

19

STATE STREET GLOBAL ADVISORS

**Schedule II Continued.....**

iv) A Type B PEP, i.e. one where the terms of which provide that your cash subscriptions are to be invested in securities listed on the International Stock Exchange of the U.K. and Republic of Ireland Ltd, and are classified by it as an alpha or beta stock or in units of authorised unit trust schemes or in any specified categories of such stocks or units.

v) Government Securities.

N.B. Investments include overseas investments.

1.3 They apply to you as an individual when acting on your own account or on that of any person with whom you are connected. A person may be "connected" by reason of a domestic or business relationship. The former will include spouses (or cohabitors) and infant children. The latter refers to a business relationship outside of SSGA/SSUTM.

1.4 They do not exempt you from observing the requirements of the Company Securities (Insider Dealing) Act 1986 (see Chapter 5, Section 1 of SSGA/SSUTM Compliance Manual).

2. **Prohibited Dealings**

2.1 You must not either on your own account or on that of a person connected to you:

(a) Effect a transaction relating to an investment at any time if you know or should reasonably know:

i) That SSGA/SSUTM has decided to effect a transaction in that investment in respect of any of its funds under management in the U.K. and that transaction has not yet been effected.

ii) Where SSGA/SSUTM is prohibited from dealing in that investment as a result of receiving insider information. (Note: in practice this will only apply to staff who have received insider information and in such circumstances SSGA/SSUTM imposes a prohibition to other individuals.)

(b) Effect any transaction if you know or should know that to do so would involve you in a conflict of your own interest or that of a person connected with you or with that of SSGA/SSUTM's clients.

(c) Use your knowledge of SSGA SSUTM's transactions to make personal gains.

SSC 02001


SSGA U.K. is a member of IMRO

STATE STREET GLOBAL ADVISORS

### Schedule II Continued....

(d)   Receive any form of remuneration for recommending, introducing or
acting as agent in the sale, purchase or financing of property.

### 2.2   Disclosure of Status

(a)   If you deal in an investment, either on your account or through a
connected person, you must advise the firm or brokerage concerned
that you are an employee of SSGA/SSUTM (or that you are an officer,
director or company secretary of any SSGA/SSUTM company).  This
may be done verbally or in writing and confirmation of this disclosure
must also be recorded in the Records of Personal Transactions (see 2.3
below).

(b)   You must not ask for or accept from the firm or brokerage concerned
any credit or special dealing facilities in connection with the transaction
unless the Compliance Officer has given his specific consent.

### 2.3   Authority to Deal in Investments and Records of Dealings

(a)   i)    All Staff at SSGA/SSUTM must obtain the prior approval from
the Compliance Officer before dealing personally in an
investment. This does not apply to publicly advertised new
issues.

ii)   Staff are permitted to deal in investments subject to any
restrictions which SSGA/SSUTM may apply (see (f) below).

(b)   If you deal in an investment, e.g. purchase shares, you must as soon as
possible (see (d) below) deliver to the Compliance Officer a copy of the
contract note or otherwise sufficient detail by which the nature and
value of the investment together with the time and date of dealing can
be identified.

(c)   At the time the deal is recorded under (b) above, you must complete a
note provided confirming that:

i)    you have authority to deal in the investment;

ii)   your status has been disclosed in accordance with 2.2;

iii)  whether you have obtained any credit or special dealing
facilities and if so, whether it has been approved;

iv)   that you have not contravened the prohibitions contained in 2.1.

SSC 02002

 State Street

SSGA U.K. is a member of IMRO

21

───── STATE STREET GLOBAL ADVISORS ─────

**Schedule II Continued....**

(d)  Records of Personal Transactions are maintained by the Compliance Officer. This information is maintained on a confidential basis. However, the records may be viewed at any time by IMRO and SSGA/SSUTM reserves the right to disclose the information to any persons as it considers necessary to ensure compliance with the requirements of any regulatory body.

(e)  The transaction must be reported to the Compliance Officer within 12 hours in the case of a transaction on the U.K. market and 24 hours in the case of a transaction on an overseas market.

(f)  SSGA/SSUTM reserves the right to prohibit any proposed and future dealings by you in investments or investments of any class.

**2.4  Connected Persons**

Where a person is connected with you (e.g. your spouse; see 1.3) and you have some influence over that person's judgement in relation to his personal investments, you should take reasonable steps to ensure that the connected person observes these rules.

**2.5  Restricted Communication**

You must not communicate to any "Restricted Individuals" whether verbally or in writing any information relating to SSGA/SSUTM's current investment activities.

SSC 02003



SSGA U.K. is a member of IMRO

03-FEB-2005  15:34        State Street GA                    020 698 6355        P.23/29

—STATE STREET GLOBAL ADVISORS UK LTD ——————————————

State Street Global Advisors United Kingdom Ltd                     Telephone: 071 344 7000
Almack House                                                              Fax: 071 344 7020
28 King Street                                                     VAT Reg. No. 577 4557 91
London SW1Y 6QW                                               Regd. in England No. 2509928

        Mr Alan J Brown
        Whytehall Cottage
        Forest Green Road
        Holyport
        Berks
        SL6 2NR


        7th December 1994


        Dear Alan,

        This letter is to confirm the terms of the indemnity which State Street Global Advisors
        have agreed to provide to you in consideration of your agreeing to enter into a service
        agreement with State Street Global Advisors.

        1.    State Street Global Advisors will provide to you your full remuneration
              package from 16.1.95 being the date of commencement of your
              employment with State Street Global Advisors even if you are restrained from
              performing your normal work for State Street Global Advisors as a direct
              result of legal proceedings instituted against you by your former employer,
              PanAgora Asset Management Limited ("PAM") or any of its shareholders
              (subject only to deduction of any monies paid to you by PAM by way of
              remuneration (other than accrued bonus) in respect of that period.)

        2.    State Street Global Advisors will indemnify you against any reasonable costs
              and/or reasonable expenses you may incur in respect of any legal action or
              allegation brought or made against you by PAM or any of its associated
              companies or shareholders arising out of your acceptance of State Street
              Global Advisors offer of employment and/or your carrying out your duties in
              the course of employment with State Street Global Advisors and/or the offer
              or the acceptance of any offer from State Street Global Advisors of
              employment by any other employees of PAM. This indemnity will include
              (but will not be limited to) the full amount of any legal expenses you may
              incur together with the reasonable cost of all disbursements, VAT and in
              addition any costs or damages awarded against you in the litigation.

              However, it must be understood that this indemnity will not apply to any
              breach by you of clause 14 or 16.2 and 16.5 of your employment agreement
              with PAM dated 4 September 1989. These clauses refer to the disclosure
              of confidential information, the return of PAM's property and holding yourself
              out as being connected with PAM or any associated company.

                                                                         **SSC 02004**

         State Street                              Member of IMRO

03-FEB-2005 15:34    State Street GA    020 698 6355    P.24/29

STATE STREET GLOBAL ADVISORS

-2-

3.  You have undertaken to us, which undertaking is being confirmed by your signing a copy of this indemnity that you reasonably believe you have not induced or attempted to induce a breach of any employee's contract of employment. You have also undertaken that to your knowledge there are no circumstances of which you are aware which would lead you to believe that you have broken your contract of employment or carried out any actions which could lead to this indemnity being exercised.

Yours sincerely,

Nicholas A. Lopardo
**Principal and Chief Executive Officer**

Signed and Agreed: _____

Alan J. Brown

Dated: ___7.12.94___

SSC 02005



SSGA U.K. is a member of IMRO

### STATE STREET GLOBAL ADVISORS UK LTD

State Street Global Advisors United Kingdom Ltd
Almack House
28 King Street
London SW1Y 6QW

Telephone: 071 344 7000
Fax: 071 344 7020
VAT Reg. No. 577 4557 91
Regd. in England No. 2509928

Mr Alan J Brown
Whytehall Cottage
Forest Green Road
Holyport
Berks
SL6 2NR

14 December, 1994

Dear Alan,

Further to our recent discussion, I have pleasure in confirming the following information in respect of Section 20 (Car) of your Service Agreement:

There are two options open to you. Firstly to take a lease vehicle on a 4 year lease. Typically this is based on a BMW525 Auto / Merc 280. The monthly lease costs including extras is a maximum of £750 per month. Clearly you would need to take into account the capital value of the vehicle in respect of your own tax liability. All vehicles are insured under our lease policy. Alternatively, you may choose to take the cash allowance instead of participating in the lease scheme. This is currently £800 per month and is paid directly to you via the payroll.

Additionally the following information may be of interest to you.

Ref: 18.5    After the first three years guaranteed bonus payments, you will continue to be included in the State Street Global Advisors Annual Incentive Plan.

Ref: 31.6    The Company agrees that you will not be required to grant it power of attorney as it relates to this clause.

The salary review date for Officers within Global Advisors is the 1st February. Your next formal review date will therefore be 1st February 1996.

SSC 02006

 State Street

Member of IMRO

─── STATE STREET GLOBAL ADVISORS ───

I have also enclosed an IMRO registration form for you to complete as appropriate. Could you please complete this as soon as possible and return it direct to Mr Peter Bright our Compliance Officer. If this could be done by lunchtime on Thursday 15th December, it would be ideal as Tim Harbert is due to visit IMRO that afternoon.

Should you have any queries please do not hesitate to contact me.

Kindest regards.

Yours sincerely,

Christopher J Mossop
**Human Resources Director**

SSC 02007



SSGA U.K. is a member of IMRO

# EXHIBIT 20



Serving Institutional Investors Worldwide™

David A. Spina
President and Chief Executive Officer

August 18, 2000

Alan J. Brown
State Street Global Advisors
LSJ

Dear Alan:

Let me convey again my personal congratulations for having been elected an executive vice president of State Street at the Board meeting in March.    With this title comes significant responsibilities representing the corporation as one of its highest level executives. As I assume my role as Chief Executive Officer, I am pleased to have you as an important part of the team.

When you were elected to this position, we were in the process of reviewing our executive compensation programs and were not able to confirm to you precisely what to expect in the way of total compensation elements.    Recently we have reached a number of decisions in this regard and I am pleased to be able to confirm the programs in which you will be a participant.

Compensation Programs

Your total compensation will be based upon market pricing for your job which has been assigned a salary grade within an executive total compensation salary structure.    This is consistent with the methods that are used to determine compensation amounts for all officers of the company.   You will be eligible for a salary increase in March 2001.   You will participate in a new 2001 bonus plan that will cover the vast majority of executive vice presidents.   This plan will operate in a manner that is very similar to the Senior Executive Annual Incentive Plan that is in place today.   A target award under the plan will be established each year and communicated to you at the beginning of the plan year.

State Street Corporation
225 Franklin Street
Boston, MA 02110-2804

Telephone: (617) 664-3125
Facsimile: (617) 664-4340

Plaintiff 300

Alan Brown
August 18, 2000
Page 2

The current Senior Executive Annual Incentive Plan which is formula driven will now be limited to very few senior executives in order to allow this plan and the new plan maximum flexibility in determining all awards

You will receive long-term compensation under the same plan as all executive vice presidents and above. Market priced long-term compensation value will be delivered through biennial performance awards (every other December) and annual stock option awards (December) each year. You will be eligible to participate in the next review cycle for both a performance award grant and a stock option grant. All grants will be approved and communicated at the end of December this year. There will be performance criteria associated with the performance awards. Our success in meeting these criteria will determine how much of the grant you will actually earn. The award value will be calculated at the end of 2002 using the price of State Street Corporation stock at that time and amounts earned will be payable in February of 2003. You will receive more details on the performance awards once they are granted.

Other Benefits

We have adopted a policy of linking the Change In Control agreements with the new salary grades that have recently been communicated across the company. All individuals in salary grades 40-43 and E-1 will receive a Level III Change In Control agreement. This is the same agreement that had previously been given to senior vice presidents. Your job has been placed in grade E-1.

In 1994 the company introduced a Senior Executive Defined Benefit Pension Plan that covers all executives at the executive vice president level and above. Individuals are eligible to be covered by this non-qualified plan four years after they are elected executive vice president. The plan currently provides an enhanced retirement benefit to executive vice presidents who are at least 55 years old with 10 years of service. A recent review of this plan has indicated that it should be revised to be based on a longer service requirement. We are in the process of preparing a recommendation to the Board of Directors to revise this plan. We will recommend that any revisions will be effective for anyone who was elected as executive vice president after February of 2000. Once we receive Board approval for this plan, we will notify you of the details.

Alan Brown
August 18, 2000
Page 3


I regret that we were not able to provide you with this information at the time of your promotion and hope that you will understand that all of these issues have been under consideration for some time. I am pleased that we have now reached a conclusion on most of these matters which I know are of great interest to you.

Alan, I look forward to your continued support and commitment as we embark on the next stage of State Street's impressive track record.

Sincerely,

DAS:mss

cc:  Nicholas Lopardo

# EXHIBIT 21

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **ALAN BROWN** | ) | |
| **Plaintiff** | ) | |
| | ) | **CA No. 05-11178-NG** |
| **v.** | ) | |
| | ) | |
| **STATE STREET CORPORATION,** | ) | |
| **and STATE STREET GLOBAL** | ) | |
| **ADVISORS** | ) | |
| **Defendants** | ) | |

### AMENDED COMPLAINT
### and jury trial demand

### Introduction

1.  This is a civil action by the former Vice Chairman and Group Chief

    Investment Officer of State Street Global Advisors, the largest institutional

    asset manager in the world, against his former employer. The plaintiff

    alleges the defendants breached an agreement he entered into with State

    Street Corporation's Chief Executive Officer as an inducement for the

    plaintiff to remain with the business at a time when many other senior

    managers were leaving.  The plaintiff alleges that the defendants abruptly

    terminated his employment when he sought to enforce that agreement.

**Parties**

2.    The plaintiff, Alan Brown, is a British citizen and a resident of London, England.  Until his termination, he was Group Chief Investment Officer and Vice Chairman of State Street Global Advisors ("SSgA") and an Executive Vice President of State Street Corporation. Mr. Brown has over 30 years experience in investment management.  He joined State Street in 1995. He was named Chief Investment Officer of the Year two years consecutively by "Financial News."

3.    The defendant State Street Corporation is a Massachusetts corporation with offices in Boston, Suffolk County, Massachusetts. State Street Corporation does business as, among other entities, State Street Global Advisors. SSgA holds itself out as the largest institutional asset manager in the world, with assets under management of approximately $1.4 trillion. It is based in Boston, Massachusetts. (The defendants will be collectively referred to as "State Street.")

**Jurisdiction**

4.    Jurisdiction is founded on diversity of citizenship and amount.  Plaintiff is a citizen of the United Kingdom and defendant is a corporation incorporated under the laws of the Commonwealth of Massachusetts having its principal

place of business in Massachusetts. The matter in controversy exceeds,

exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

5.      Venue is proper in this Court in accordance with 28 U.S.C. § 1391(a)(1) and

(2).

### Facts

6.      Mr. Brown began working for State Street in 1995.

7.      Mr. Brown initially served as Managing Director of State Street Global

Advisors Limited, then called State Street Global Advisors U.K. Limited,

the United Kingdom operations of SSgA.

8.      In 1996, Mr. Brown became Non-U.S. Chief Investment Officer of SSgA

and, in 1997, Group Chief Investment Officer of SSgA. Although he

maintained his London residence, he was in daily contact with the Boston

office and worked approximately one week per month in the United States,

in addition to traveling world wide.

9.      In 2000, Mr. Brown was appointed Executive Vice President of State Street

Corporation. He received bonuses and benefits in that capacity.

10.     In 2003, State Street offered a Voluntary Separation Plan to many of its

employees and an enhanced Executive Voluntary Separation Plan to

Executive Vice Presidents as an inducement to accept early retirement.

(Both plans are collectively referred to as "VSP").

11.   An unexpectedly large number of employees opted for early retirement
      under this program, including at least two of the four senior managers at
      SSgA. As a result, State Street became concerned that it would lose all
      senior management at SSgA, including Mr. Brown.

12.   In response to this concern and at Mr. Brown's suggestion, at a meeting in
      Boston in or about June 2003, David Spina, Chairman and Chief Executive
      Officer of State Street Corporation, offered a modified VSP package to Mr.
      Brown and another senior SSgA manager, SSgA's Chief Executive Officer,
      if they would agree not to leave the company in the immediate future but,
      instead, remain active as leaders of SSgA. Mr. Spina proposed extending the
      time in which Mr. Brown could opt for the VSP package up to age 55, rather
      than the brief opt-in period then available for other State Street employees.
      (This agreement will be collectively referred to as Mr. Spina's
      "Commitment"). Mr. Brown was 50 years old at that time.

13.   Mr. Brown accepted Mr. Spina's offer.

14.   In reliance on Mr. Spina's Commitment to extend his eligibility for the VSP
      to age 55, Mr. Brown continued to work for SSgA and to devote his time
      and energies to the company's best interests. Mr. Brown chose not to pursue
      potential employment with other firms in reliance on Mr. Spina's

commitment to extend the VSP option to him and otherwise relied to his

detriment on Mr. Spina's promise.

15.    On June 10, 2004, Mr. Brown wrote to Mr. Spina memorializing the terms

of the VSP Commitment.

16.    On June 15, 2004, Mr. Spina replied to Mr. Brown, affirming the

Commitment and telling Mr. Brown that he would inform State Street's

Executive Compensation Committee of its Board of Directors ("ECC")

about this Commitment at its meeting the following day, "so I will get it on

the record." Mr. Spina's last day with State Street was to be June 30, 2004.

17.    At its June 16, 2004 meeting, Mr. Spina informed the ECC of the

Commitment he made to Mr. Brown.

18.    The ECC took no action at that June 16, 2004 meeting to deny or repudiate

Mr. Spina's commitment to Mr. Brown.

19.    State Street did not inform Mr. Brown following that June 16, 2004 meeting

that it repudiated Mr. Spina's commitment. Similarly, State Street did not

inform Mr. Brown following that June 16, 2004 meeting that Mr. Spina

lacked authority to enter into such a Commitment.

20.    Mr. Spina memorialized his Commitment to Mr. Brown in a letter dated

June 30, 2004 to the Chairman of the ECC. In that letter Mr. Spina

specifically informed the ECC that he had made a "commitment" to Mr.

Brown and Tim Harbert, SSgA chairman, that "[i]n exchange for their continued commitment to remain active as leaders of SSgA, State Street Corporation would hold available for them the same separation package the company was offering U.S. employees under what is known as the Voluntary Separation Program (VSP)" up to age 55.

21. Mr. Spina sent copies of that June 30, 2004 letter to Mr. Harbert and Mr. Brown.

22. The ECC did not deny or repudiate Mr. Spina's Commitment to Mr. Brown following that June 30, 2004 letter.

23. State Street did not inform Mr. Brown following that June 30, 2004 letter that it repudiated Mr. Spina's commitment. Similarly, State Street did not inform Mr. Brown following that June 30, 2004 letter that Mr. Spina lacked authority to enter into such a commitment.

24. Mr. Spina was replaced as Chairman and Chief Executive Officer by Ronald Logue on July 1, 2004. Shortly after assuming that position, Mr. Logue was informed about Mr. Spina's Commitment to Mr. Brown.

25. After learning of Mr. Spina's Commitment, Mr. Logue did not inform Mr. Brown that State Street repudiated Mr. Spina's Commitment. Similarly, Mr. Logue did not inform Mr. Brown that Mr. Spina lacked authority to enter into such a Commitment.

26. At the ECC's September 15, 2004 meeting, Luis J. de Ocejo, State Street's Senior Vice President for Human Resources, presented detailed information to the ECC concerning what he termed Mr. Spina's "commitment" to Mr. Brown, together with a calculation of the value of those benefits at more than $5 million.

27. The ECC took no vote at that September 15, 2004 meeting to deny or repudiate Mr. Spina's Commitment to Mr. Brown.

28. State Street did not inform Mr. Brown following that September 15, 2004 meeting that it repudiated Mr. Spina's Commitment. Similarly, State Street did not inform Mr. Brown following that September 15, 2004 meeting that Mr. Spina lacked authority to enter into such a Commitment.

29. On January 13, 2004, Mr. Logue affirmed to Mr. Brown that Mr. Brown was eligible for a modified VSP package. Similarly, Mr. de Ocejo also confirmed Mr. Brown's entitlement to VSP benefits and assisted in calculating the value of those benefits.

30. At no time prior to March 11, 2005 did State Street inform Mr. Brown that Mr. Spina lacked authority to enter into the Commitment described above.

31. At no time prior to March 11, 2005 did State Street inform Mr. Brown that it repudiated the Commitment described above.

32.    At no time prior to March 11, 2005 did the ECC or State Street's Board of
       Directors vote to repudiate or deny the Commitment described above.

33.    On March 11, 2005, Mr. Brown notified Mr. Logue that he was electing to
       exercise his rights under the VSP pursuant to Mr. Spina's Commitment.

34.    In response to this notification, State Street terminated Mr. Brown's
       employment and denied that he was entitled to any VSP benefits. State
       Street has refused to provide Mr. Brown with any of the benefits of the VSP
       program or otherwise to comply with Mr. Spina's Commitment.

## COUNT ONE
## Breach Of Contract

The plaintiff repeats and realleges the foregoing.

35.    Mr. Spina had actual authority to commit State Street to the modified VSP
       benefits agreement he offered to Mr. Brown and that Mr. Brown accepted.

36.    In addition, Mr. Spina had apparent authority to commit State Street to the
       modified VSP benefits agreement he offered to Mr. Brown and that Mr.
       Brown accepted. Mr. Brown reasonably believed Mr. Spina had authority to
       enter into the agreement on behalf of State Street.

37.    Mr. Spina's offer of the modified VSP benefits to Mr. Brown in return for
       Mr. Brown's commitment to remain an active leader of SSgA and Mr.
       Brown's acceptance of that offer constituted an offer and acceptance such
       that a contract was created between Mr. Brown and State Street.

38.   Mr. Brown continued to work for State Street in accordance with the terms
      of that contract and his other contractual relationships with State Street and
      its subsidiaries.

39.   State Street breached this contract by failing to provide Mr. Brown with the
      VSP benefits called for by this contract.

## COUNT TWO
### Ratification
The plaintiff repeats and realleges the foregoing.

40.   By the above conduct State Street ratified Mr. Spina's Commitment to Mr.
      Brown and was bound by the terms of that agreement.

41.   State Street breached the Commitment made to Mr. Brown.

## COUNT THREE
### Detrimental Reliance, Promissory Estoppel

The plaintiff repeats and realleges the foregoing.

42.   State Street reasonably expected the above promises and statements by Mr.
      Spina to induce Mr. Brown to continue in his employment, to decline other
      employment prospects and to accept Mr. Spina's offer in regard to the
      modified terms of the VSP package.

43.   Mr. Brown relied to his detriment on Mr. Spina's promises and
      representations. Such reliance was reasonable in the circumstances. He
      continued his employment with State Street. He chose not to follow up on
      potentially lucrative alternative employment prospects from time to time and

he devoted thousands of hours both at home and far from home to State Street's interests.

## COUNT FOUR
### Breach of covenant of good faith and fair dealing

The plaintiff repeats and realleges the foregoing.

44. Mr. Brown performed all duties required of him to receive the benefits to which Mr. Spina committed.

45. State Street discharged Mr. Brown in an attempt to avoid paying him the VSP benefits Mr. Spina promised would be paid.

46. By all the above conduct the defendants breached the covenant of good faith and fair dealing implied in their employment contract with the plaintiff.

47. WHEREFORE, the plaintiff demands judgment against the defendants as follows:

   a.   For the full amount of all past, present and future benefits due to him pursuant to the VSP and Mr. Spina's Commitment and all other benefit plans in which he is entitled to participate.

   b.   For the full amount of his damages.

   c.   A declaratory judgment stating Mr. Brown's rights to receive all benefits due to him pursuant to the VSP.

    d.    For the full amount of his attorneys fees and costs in this action,

           pursuant to Mass. G.L. c. 231 § 6F and otherwise.

    e.    Prejudgment interest and costs in this action.

    f.    Such other relief as this Court deems just.


**Jury demand** – The plaintiff demands a jury trial.


                      Alan Brown, plaintiff
                      By his attorneys,

                      /s/ Harvey A. Schwartz
                      HARVEY A. SCHWARTZ
                       BBO. # 448080
                      LAURIE A. FRANKL
                       BBO # # 647181
                      Rodgers, Powers & Schwartz
                      18 Tremont Street
                      Boston, MA 02108
                      (617) 742-7010

# EXHIBIT 22

03-FEB-2005  15:35     State Street GA                   020 698 6355     P.27/29

 **StateStreet**

Mr Alan Brown
Whytehall Cottage
Forest Green Road
Holyport
Berkshire
SL6 2NR

The State Street UK
Pension & Life Assurance Scheme
One Canada Square
London E14 5AF

Telephone 071-416 2597
Telex 929974/929976
Fax 071-416 2507

11th August 1995

Dear Alan,

Re:  Supplementary Life Assurance Arrangement

The above arrangement will provide the following benefits on your death while in our service before your Normal Retirement Age (as defined under the provisions of the State Street UK Pension and Life Assurance Scheme.)

The formal Deed and rules which regulate the Agreement are enclosed with this letter for you to sign and return.

The details of the arrangement are confirmed as follows:

**Lump Sum Death Benefit**

On your death a lump sum of £252,800 will be payable under the Arrangement.  The Company will review the amount of this benefit from time to time, and may increase or reduce it.  Any alteration to the amount of the benefit will be notified to you in writing.

The Company will decide who among your Beneficiaries as defined in the Rules will receive the benefit.  At any time you can notify the Company of any individual (but not a club, charity or society) which you wish to be considered from time to time by completing the Nomination form which you will find attached to this letter, and sending it in a sealed envelope to the undersigned.  Your existing nomination may be altered by the completion of a new nomination.

**Notes For You To Consider**

1.  The Company will normally insure the benefits under the Arrangement, and if it is not possible to obtain satisfactory cover, then under the powers contained in the Arrangement's rules the benefits promised can be reduced.  If this occurs you will be notified in writing.

SSC 02008



2. If you are temporarily absent from service, any benefit under the Arrangement will continue only so long as the Company decides in the individual circumstances.

3. You will be liable to pay income tax on any premium that the Company pays to provide benefits for you under the Arrangement. If you feel that there is no advantage in having the benefit, perhaps because you have no dependants, you can apply in writing to the Company to terminate the Arrangement.

4. The benefits are subject to the rules of the Arrangement, and the Company has the power to alter or terminate the Arrangement at any time.

Please confirm your agreement to the Arrangement by completing the attached document by signing it at the place indicated on page 2 and having your signature witnessed, and return it to me. If you have any questions regarding this letter, please contact me.

Yours sincerely,

Christopher J Mossop
**Administrator**

SSC 02009

**SSgA.**
STATE STREET
GLOBAL ADVISORS

<u>State Street UK Pension and Life Assurance Scheme</u>

<u>ALAN BROWN</u>

I hereby agree that it is my intention to continue as a non-member of the State Street UK Pension and Life Assurance Scheme for retirement benefits, but acknowledge that I am covered for Life Assurance in the event of my death whilst an employee of State Street Global Advisors Ltd (SSgA), as follows:

Total Life Assurance lump sum benefit:        2 x Base Salary

Amount of Life Assurance benefit
approved by the Inland Revenue:        4 x Earnings Cap*

* The Earnings Cap for the tax year commencing 6 April 2002 is £97,200.

In the event that the total benefit (2 x Base Salary) exceeds the maximum benefit approved by the Inland Revenue, the excess benefit will be provided, as far as possible, through unapproved means, under the Supplementary Life Assurance Arrangement. The amount provided under this Arrangement will be subject to annual review and so there may be times, following an increase in Base Salary, when the total amount is not covered.

I note that I will be liable to pay income tax on the amount of any premium paid under the Arrangement by the Company to the insurer. The amount and the tax due will need to be accounted and reported as necessary on my self-assessment tax return.

I agree to the Company (or other parties who act on their behalf, such as the administrators of the Arrangement) holding and processing the data, which they collect in respect of the Arrangement.

Signed...................................................

Date.................24.10.2002.......

SSC 02010

# EXHIBIT 23



**SSGA.**
STATE STREET GLOBAL ADVISORS

### State Street Global Advisors
### 2003 Annual Total Compensation Summary
### Alan Brown - 411669

**CASH SUMMARY**

| | Local Currency: GBP | Exchange Rate 0.628731 | | US Dollars | |
|---|---|---|---|---|---|
| **Cash** | **Local Currency** | | | **US Dollars** | |
| 2003 Current Salary | 391,038 GBP | | | 621,969 | USD |
| 2002 Bonus | 198,746 GBP | | | 316,117 | USD |
| Total Cash Paid | 203,034 | | | 322,93_ | |
| 2003 Total Cash Comp | 792,818 GBP | | | 1,261,023 | USD |

**2003 NON-CASH SUMMARY**

| | Award Date | Shares | Economic Value/Share | Local Currency: GBP Economic Value (GBP) | US Dollars Economic Value (USD) |
|---|---|---|---|---|---|
| Equity 00 | 09/29/2003 | 17,706 | 45.38 | 505,167 | 803,4__ |
| Equity 96 | 09/29/2003 | 9,706 | 45.38 | 276,921 | 440,4__ |
| **Total Equity** | | | | 782,088 | 1,243,957 |
| **Total Comp** | | | | 1,574,906 | 2,504,980 |

*For more details on how economic value was derived and calculated, see Compensation Plan descriptions.

## PERSONAL AND CONFIDENTIAL
### 10/10/2003

Plaintiff 78

# State Street Global Advisors
## 2003 Annual Total Compensation Summary
### Alan Brown - 411669

**NON-CASH DETAIL**

**Stock Options**

| Grant Date | Shares Granted | Strike Price on Grant (USD) | 2002 Vesting | 2003 Vesting | 2004 Vesting | 2005 Vesting | 2006/2007 Vesting |
|---|---|---|---|---|---|---|---|
| 06/01/2000 | 5,626 | 53.05 | 1,876 | 1,876 | 0 | 0 | 0 |
| 12/20/2001 | 38,600 | 51.98 | 12,867 | 12,867 | 12,866 | 0 | 0 |
| 02/21/2002 | 8,200 | 49.71 | | | 8,200 | 0 | 0 |
| 12/19/2002 | 24,200 | 40.22 | | | 8,067 | 8,067 | 8,066 |
| Total | | | 14,743 | 14,743 | 29,133 | 8,067 | 8,066 |

**DSA**

| Grant Date | Shares Granted | Share Value at Grant (USD) | 2003 Vesting | 2005 Vesting | 2004 Vesting | 2005 Vesting | 2006 Vesting |
|---|---|---|---|---|---|---|---|
| 02/17/2000 | 18,000 | 39.50 | 6,000 | | | | |
| Total | | | 6,000 | 0 | 0 | 0 | 0 |

**Equity 1995**

| Grant Date | Shares Granted | Share Value at Grant (USD) | 2001 Vesting | 2002 Vesting | 2003 Vesting | 2004 Vesting | 2005 Vesting |
|---|---|---|---|---|---|---|---|
| 06/01/1995 | 40,000 | 13.66 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
| 07/27/2000 | 4,000 | 51.42 | 800 | 800 | 800 | 800 | 800 |
| 09/19/2002 | 24,850 | 38.85 | | | 8,283 | 8,283 | 8,284 |
| 09/29/2003 | 9,706 | 45.12 | | | | 4,853 | 4,853 |
| Total | | | 8,800 | 8,800 | 17,083 | 21,936 | 21,937 |

**Equity 2000**

| Grant Date | Shares Granted | Share Value at Grant (USD) | 2001 Vesting | 2002 Vesting | 2003 Vesting | 2004 Vesting | 2005 Vesting | 2006 Vesting | 2007 Vesting |
|---|---|---|---|---|---|---|---|---|---|
| 10/03/2000 | 3,030 | 66.03 | 758 | 758 | 758 | 756 | 0 | 0 | 0 |
| 11/16/2001 | 23,794 | 39.57 | | 5,949 | 5,949 | 5,949 | 5,947 | 0 | 0 |
| 09/29/2003 | 17,706 | 45.12 | | | | 4,426 | 4,426 | 4,427 | 4,427 |
| Total | | | 758 | 6,707 | 6,707 | 11,131 | 10,373 | 4,427 | 4,427 |

# PERSONAL AND CONFIDENTIAL
**10/10/2003**

Plaintiff 80

# EXHIBIT 24

STATE STREET BOSTON CORPORATION
225 Franklin Street
Boston, Massachusetts 02101


July 11, 1996


Alan Brown


Dear Alan:


On June 20, 1996, the Company awarded you a non-qualified stock option under the 1994 Stock Option and Performance Unit Plan, as amended (the "1994 Plan") of State Street Boston Corporation (the "Company") to purchase shares of the Common Stock, $1.00 par value, of the Company. This letter will serve as an option agreement between you and the Company and sets forth the terms and conditions relating to the option granted to you.

The option granted by the Company is subject to the following terms and conditions:


1.  Grant of Option

You are hereby granted an option to purchase all or any part of an aggregate of 500 shares of Common Stock at an exercise price of $52.8125 per share. This option shall be treated as a non-qualified stock option under the 1994 Plan (the "Option").


2.  Term and Exercise Period

Subject to paragraphs 6 and 7 hereof, the Option may be exercised

        [X]   (i)    five years from date of grant; or


        [ ]   (ii)  in annual installments of twenty percent
              (20%) beginning December 31, 1996.


p:\msoffice\winword\letters\96so.doc

In no event, however, shall the exercise of the Option or any installment thereof be made later than ten (10) years from the original date of grant.  You may not exercise the Option with respect to less than fifty (50) shares at any one time except when the number of remaining shares of the Option is less than fifty (50); and except as is otherwise provided herein you may not exercise the Option or any installment thereof unless you are then an employee of the Company or one of its subsidiaries.

3.   Method of Exercising Option

The Option may be exercised from time to time by written notice to the Company, to the attention of Global Human Resources, stating the number of shares (but not fewer than fifty (50) shares or the remaining shares under the Option, if fewer) which the exercise is intended to cover and accompanied by full payment for such shares, in cash, or by certified or bank check.  In lieu of a cash payment in full, you may pay the exercise price by tendering a whole number of shares of Common Stock of the Company held for at least six months with a fair market value equal to the exercise price less any cash included in the tender.  Payment for any shares subject to an Option may also be made by delivering a properly executed exercise notice to the Company, together with a copy of irrevocable instructions to a broker to deliver promptly to the Company the amount of sale or loan proceeds to pay the purchase price, and, if required, the amount of any federal, state, local or foreign withholding taxes.  Certificates for shares for which you exercise the Option shall be delivered to you promptly.

4.   Employee Rights and Duties

You shall not have any right of a stockholder with respect to the shares covered by the Option prior to the issuance thereof nor shall this agreement grant you any rights of employment with the Company.

5.   Non-Transferability

The Option shall not be transferable otherwise than by will or the laws of descent and distribution and it may be exercised only by you during your lifetime.  Any attempt to assign or transfer the Option, either voluntarily or involuntarily, contrary to the provisions hereof, shall be null and void and without effect and shall render the Option itself null and void.

Plaintiff 107

6.  <u>Termination of Employment</u>

(a)  If your employment terminates by reason of death,
disability or retirement at or after the normal or early
retirement age under any retirement plan or supplemental
retirement agreement maintained by the Company or any Subsidiary
prior to exercise, expiration, surrender or cancellation of the
Option, the Option shall remain exercisable after the date of
such termination of employment in accordance with this Agreement
whether or not such Option was exercisable at the time of such
termination, and the Option may be exercised by you or the person
or persons to whom your rights shall pass by will or by the
applicable laws of descent or distribution at such time and to
the same extent that the Option would have been exercisable had
your employment not terminated; provided, however, that the
Option shall terminate on the later of (i) one (1) year after the
Option first becomes exercisable or if exercisable in install-
ments after the last installment becomes exercisable; and (ii)
one (1) year from termination of employment.

(b)  If your employment terminates for any reason other
than death, disability or retirement prior to exercise,
expiration, surrender or cancellation of the Option, such Option
shall terminate three (3) months from the date of such
termination, during which period the Option may be exercised only
to the extent that it was exercisable on the date of such
termination.  If you die within such three (3) month period, the
Option shall expire (1) year after the date of your termination,
during which period the Option may be exercised at any time by
the person or persons to whom your rights shall pass by will or
by the applicable laws of descent or distribution, but only to
the extent it was exercisable on the date of such termination.
In  no event, however, may the Option be exercised after the
expiration date set out in the applicable Option or Agreement.

(c)  Your rights with respect to any unexercised Option
after termination of your employment otherwise than by reason of
death shall be subject to the conditions that until any such
Option is exercised you shall (i) not engage either directly or
indirectly, in any manner or capacity as advisor, principal,
agent, partner, officer, director, employee, member of any
association, or otherwise, in any business or activity which is
at the time competitive with any business or activity conducted
by the Company or any of its direct or indirect subsidiaries, and
(ii) be available at reasonable times for consultations at the

Plaintiff 108

request of the Company's management with respect to phases of the business with which you were actively connected during your employment. In the event that either of the above conditions is not fulfilled, you shall forfeit all rights to any unexercised Option. Any determination by the Board of Directors that you are, or have, engaged in a competitive business or activity as aforesaid or have not been available for consultations as aforesaid shall be conclusive. Notwithstanding the foregoing this paragraph 6(c) shall be inapplicable following a Change of Control (as defined in the 1994 Plan).

7.  Acceleration of Options

Upon a Change of Control the Option shall remain exercisable following a termination of your employment other than by reason of your death, disability or retirement for a period of seven (7) months after termination, or until expiration of the original term of the Option, whichever period is shorter.

Upon a Change of Control (as defined in the 1994 Plan), the Option shall become fully exercisable. Optionees subject to Section 16 shall have certain rights to receive cash in lieu of exercising the option in the amount of the Spread, all as set forth in the 1994 Plan.

8.  Changes in Capitalization

The Board of Directors of the Company may make appropriate adjustments in the aggregate number and kind of shares and the price per share subject to the Option when it deems such action necessary by reason of any stock dividend, split or any recapitalization, reclassification, merger, consolidation, combination or similar transaction.

9.  Withholding

The Committee will have the right to require that you remit to the Company an amount sufficient to satisfy the withholding requirements, or make other arrangements satisfactory to the Committee with regard to such requirements, prior to the delivery of any Common Stock. If and to the extent that such withholding is required, the Committee may permit you to elect at such time and in such manner as the Committee provides to have the Company hold back from the shares to be delivered, or to

deliver to the Company, Common Stock having a value calculated to satisfy the withholding requirement.

10. <u>Securities Act Considerations</u>

The shares of Common Stock acquired by you upon exercise of the Option are registered under the Securities Act of 1933, as amended (the "Act"). Under current regulations, you may freely resell all or a part of such shares from time to time, provided you are not deemed to be an "affiliate" of the Company as that term is defined in the Act. Officers filing Forms 4 - Statement of Changes in Beneficial Ownership are deemed to be affiliates. As an affiliate of the Company, you may resell such shares only pursuant to a currently effective registration statement on Form S-3 or Form S-1 as promulgated by the Securities and Exchange Commission, or pursuant to Rule 144 or other exemption under the Act.

If the Option and the foregoing terms and conditions are acceptable to you, please sign the enclosed counterpart of this letter and return the same to the undersigned.


Very truly yours,

STATE STREET BOSTON CORPORATION



By: _____
    Trevor Lukes
    Senior Vice President

Plaintiff 110

The undersigned hereby accepts the Option granted hereby, and agrees that the Option is subject to the foregoing terms and conditions and to all other terms and conditions of the Company's 1994 Plan.  In the event of a conflict between the provisions of this Agreement and the 1994 Plan, the provisions of the 1994 plan shall control.

Alan Brown

Dated: _23rd July_, 1996

Plaintiff 111

## State Street Boston Corporation
### Stock Option Plan
*Value Overview*

The intent of this overview is to provide you, as a recipient of a stock option, with background information on the rationale and value of stock options.

<u>What is a Stock Option?</u>
Simply, a stock option is a right to purchase shares of stock at a stipulated price over a specified period time. While there are some limitations such as continued employment and vesting, stock options become valuable to employees over a long period of time when the stock price rises significantly from the stipulated right to purchase price (commonly referred to as the exercise price.)

<u>Why are Stock Options Granted to Employees?</u>
Reading the preamble of our stock plan you will see the stated purpose is "...to provide an incentive ...for certain officers of the company...to devote their full abilities to the success of the Company's business." On a practical basis, this can be translated into two important aspects.

First, usually stock options are given only to a select group of employees who are expected to significantly contribute to the company's future growth and success. Your selection to be a recipient of a stock option indicates that you are one of a relatively small group of key employees. Also, from an outside shareholder standpoint, your stock options are one of the ways that link your long-term compensation with their long-term investment value as measured by the increase in stock price.

Second, stock options are a long-term component and an integral part of your total compensation. Generally, the number of shares of your stock option is made in conjunction with other components (e.g., base salary and annual cash incentive) with respect to the competitiveness of your compensation when comparing similar positions in similar companies. Among other factors considered are the strategic importance of your position as well as your future potential within the company.

You should take time to carefully read your stock option agreement, the plan document and prospectus. These materials explain the specific details of your option as well as important legal and tax information. If you have additional questions, please contact your manager or the human resources manager for your group. When the time comes to exercise your options, you can speak with either the payroll manager or the manager of executive compensation.

# EXHIBIT 25

**State Street Global Advisors**
**Equity Compensation Plan**

**AWARD AGREEMENT**

This agreement by and between State Street Bank and Trust Company ("State Street") and Alan Brown ("Executive") is dated September 19, 2002.

WHEREAS State Street has established an equity incentive program for key officers of State Street Global Advisors ("SSgA") providing for the deferred delivery of shares of common stock of State Street Corporation (the "Corporation") (such program, as it may be amended and in effect from time to time, being hereinafter referred to as the "State Street Global Advisors Equity Compensation Plan" or the "Plan"); and

WHEREAS Executive had been designated to receive an award under the Plan subject to the terms and conditions thereof; and

WHEREAS the Plan requires that each award shall be subject to the execution of an agreement by the award recipient pertaining to noncompetition and other undertakings;

NOW, THEREFORE, in consideration of these presents and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, State Street, the Corporation and Executive hereby agree as follows:

1. <u>Award.</u> Executive acknowledges that he has been granted an award (the "Award") for 24,850 shares of common stock of the Corporation ("Stock") under the Plan, subject to the terms of this Agreement. The Award consists of a commitment by the Corporation to deliver to Executive (or in the event of Executive's death, to his/her beneficiary) the shares of Stock subject to the Award, or a portion thereof, at a future time upon satisfaction by Executive of, and subject to, the terms of this Agreement. Executive acknowledges that the Corporation's commitment to deliver shares hereunder is an unfunded and unsecured promise to make future delivery of shares and that until such shares have been delivered, Executive shall have no rights of a shareholder with respect to such shares.

2. <u>Incorporation of Plan.</u> This Agreement shall be subject to the terms of the Plan, which is incorporated herein by reference. A copy of the plan as in effect on the date hereof is attached hereto as Exhibit A.

3. <u>Agreement Not to Compete, etc.</u> Executive, the Corporation and State Street, hereby agree that the following shall apply in satisfaction of the requirements of Section V. (b) of the Plan:

   (a) Executive shall hold in a fiduciary capacity for the benefit of the Corporation all secret or confidential information, knowledge or data relating to the Corporation or any of its subsidiaries, and their respective businesses and Clients (as defined below), which shall have been obtained by Executive during his/her employment by the Corporation or any of its affiliated companies and which shall not be or become public knowledge (other than by acts of Executive or representatives of Executive in violation hereof). After termination of Executive's employment, Executive shall not, without the prior written consent of the Corporation or as may otherwise be required by law or legal process, communicate or divulge any such information, knowledge or data to anyone other than the Corporation and those designated by it. The term "Client" means any person or entity that is a customer or client of the Corporation or any of its subsidiaries.



**EXHIBIT**

Brown #2

Plaintiff 260

(b) During the term of employment of Executive and during the Nonsolicitation Period (as defined below), Executive shall not, without the prior written Consent of the Corporation, solicit, directly or indirectly (other than through a general solicitation of employment not specifically directed to employees of the Corporation or its subsidiaries), the employment of any person who within the previous 12 months was an officer of, or held a position of comparable responsibilities with, the Corporation or any of its subsidiaries. The term "Nonsolicitation Period" means the period beginning on the date of termination of Executive's employment with the Corporation and its subsidiaries (the "Termination Date") and ending eighteen (18) months after the Termination Date.

(c) During the term of employment of Executive and during the Nonsolicitation period, Executive shall not, without the prior consent of the Corporation, engage in the Solicitation of Business (as defined below) from any Client on behalf of any person or entity other than the Corporation and it subsidiaries. The term "Solicitation of Business" means the attempt through direct personal contact (including by correspondence, telephone or similar means of communication) on the part of Executive with a Client with whom Executive has had significant personal contact while employed by the Corporation and its subsidiaries to induce such Client to transfer its business relationship from the Corporation and its subsidiaries to any other person or entity.

(d) For a period of eighteen (18) months following termination of employment for any reason, the participant shall not engage, either directly or indirectly, in any manner or capacity as advisor, principal, agent, partner, officer, director or employee of any of the Top Five (5) (as defined below) institutions, or their subsidiaries.

The Top Five (5) institutions shall mean the five institutions with the highest value of total assets under management as listed in the most recent annual rankings of either Institutional Investor or Pensions & Investments magazine; provided, that if one or both of these change their names, or cease to carry out annual rankings, the ranking(s) utilized will be by the publication(s) that are recognized in the worldwide investment community as the most trustworthy rankings, as determined by the Executive Compensation Committee of the Board of Directors of the Corporation. If for any reason the publications used to determine the Top Five (5) institutions have different rankings, then any institution listed in the Top Five (5) list of any such publication will be considered an institution in the Top Five (5). For purposes of this Agreement, the Top Five (5) Institutions shall be determined without regard to, and shall not include, the Corporation or its subsidiaries and divisions.

(e) In the event of a breach by Executive of any of the foregoing, Executive shall forfeit all rights to any and all awards under the Plan (including without limitation the Award) then held by Executive and shall promptly refund to the Corporation any and all payments previously received by him/her under the Award or any such other awards.

(f) Upon and following the occurrence (as determined by the Committee) of a "covered transaction" as described in Section V.(a) of the Plan, the nonsolicitation and noncompetition restrictions described in paragraphs (b), (c), and (d) above shall cease to apply, but the remaining provisions of the Agreement shall continue to apply.

4. Other remedies. Executive, by signing this Agreement, gives the Corporation and State Street assurance that he/she has carefully read and considered all the terms and conditions of this Agreement and the Plan, including the restraints imposed on Executive under Section 3 above. The Corporation and State Street, or either of them, in addition to any other remedies available to it or them (including without limitation the remedies described at Section 3(e) above), shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by Executive of any of those covenants. Executive, the Corporation and State Street further agree that, in the event that any provision of this

Agreement is determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, that provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

5.  Binding effect. This Agreement shall be binding upon Executive and his/her heirs, beneficiaries and assigns. Nothing in the preceding sentence shall be construed as permitting any assignment of Executive's rights under this Agreement or under the Award except as expressly permitted by the Plan. This Agreement shall inure to the benefit of, and shall be enforceable by, the Corporation and State Street and their successors and assigns by merger or otherwise.

6.  Governing law: construction. This Agreement should be construed under and governed by the laws of the Commonwealth of Massachusetts. Executive hereby expressly acknowledges that the Executive Compensation Committee of the Board of Directors of the Corporation has full discretionary power and authority to construe the terms of the Plan and of this Agreement.

IN WITNESS WHEREOF, each of the Corporation and State Street has caused this Agreement to be executed on its behalf, and Executive shall set his/her hand hereto, intending to be bound hereby, as of the date first set forth above.

State Street Corporation

BY:   _Timothy B. Harbert_
      Timothy B. Harbert

State Street Bank and Trust Company

BY:   _Timothy B. Harbert_
      Timothy B. Harbert

By: _____      Date:  24. 2. 2003
    Brown, Alan

# EXHIBIT 26

**2001 OFFER OF GRANT OF AWARD
AND AWARD AGREEMENT**

**STATE STREET CORPORATION
STATE STREET GLOBAL ADVISORS**
Two International Place
Boston, Massachusetts 02110

Alan John Brown

Dear Alan:

As a member of a select group of key management of SSgA, you have been chosen to participate in SSgA's 2000 Deferred Equity Program. SSgA offers to you, as of November 16, 2001 (the "Award Date"), in consideration of your execution of this Award Agreement, an Award consisting of an unfunded and unsecured commitment by State Street Corporation (the "Company") to make future delivery of 23,794 shares of the common stock of the Company (the "Stock"). The Company makes no representation, warranty or guarantee as to the value of the Stock on the vesting dates nor on the date on which the Stock may be distributed to you according to the terms of the Program (defined below).

Should you accept SSgA's offer of this Award, you agree that the Award is granted under, subject to and governed by the Company's 1997 Equity Incentive Plan ("Plan") (a copy of which is attached hereto and specifically incorporated herein) *and* State Street Global Advisors 2000 Deferred Equity Program ("Program") (a copy of which is attached hereto and specifically incorporated herein). As more specifically set forth in the Program, the shares of Stock shall vest as to 25% of the shares subject to the Award on the first through fourth anniversary dates of the Award Date, provided you have been continuously employed by SSgA up to and including each vesting date, with delivery of vested shares of Stock to be made on, or as soon as reasonably practicable, after the fifth and sixth anniversary dates of the Award Date.

The Program includes provisions which require that you hold in a fiduciary capacity for the benefit of the Company all secret or confidential information, knowledge or data; prohibit you from soliciting the employment of a Company officer or principal during your employment and for an eighteen-month period following the termination of your employment; prohibit you from engaging in the solicitation of business from any client for a period of eighteen months after the termination of your employment; and prohibit you from becoming an advisor, principal, agent, partner, officer, director, employee or consultant to a Top Five institution for and during the period of eighteen months following the termination of your employment. These obligations are specifically set out in paragraph V.(b)1., 2., 3. and 4. of the Program which you acknowledge you have read, understand and if desired, have consulted with an advisor of your choice regarding the same.

Plaintiff 213

By your signature below, you agree that you accept the Award offered to you subject to all of the terms, provisions and conditions of the Plan and the Program. Once accepted, this Award Agreement, the Plan and the Program shall contain and constitute the entire understanding and agreement between you, SSgA and the Company and this Award Agreement, the Plan and the Program shall supersede and cancel all previous oral and written agreements, commitments and writings of any kind with respect to the subject matter of this Award Agreement. Should you not accept the Award offered to you by Monday, December 10, 2001, it shall be rescinded and you shall receive no Award. Upon your timely acceptance, this Award Agreement shall be dated as of the Award Date.

STATE STREET CORPORATION

BY: _____

Timothy B. Harbert

AGREED TO AND ACCEPTED:

_____28.11.2001_____

Date of Signature

_____

Alan John Brown

Plaintiff 214

# EXHIBIT 27



# Confidential

## STATE STREET.
*For Everything You Invest In™*

**Interoffice Memorandum**

Date:   March 19, 2002

To:   **Stock Option Award Recipient,**
**Senior Management Team**

From:   Boon Ooi
Senior Vice President, Compensation & Benefits

Subject:   **Stock Option Awards**

The enclosed agreement for Non-Qualified Stock Options represents half of your bonus awarded under the 2001 Annual Incentive Plan. Senior management, with Board concurrence, decided that a mix of cash and options for individuals at the senior vice president level and above was appropriate given the Corporation's performance in 2001. Understanding the inherent risk with options, management increased the economic value of the option award by 25%. This enhanced award provides you with an opportunity for greater gains in the future.

The attached material provides you with the legal and administrative documents supporting your award of stock options granted on February 21, 2002 and communicated to you by your manager. Please review the documents referenced below and submit the required paperwork by the specified timeframes.

- **Notice of Grant of Stock Options and Option Agreement** -- Enclosed are two copies of the agreement pertaining to Non-Qualified Stock Options (NQOs). This agreement contains terms regarding your award, specifically the number of shares you may purchase upon vesting, the grant price per share and the vesting schedule. It is important that you complete this legally required agreement by signing *one copy* of the Notice of Grant of Stock Options and Option Agreement **and sending the signed agreement to Andrea Duncan (Compensation-JAB 1N) by April 5, 2002.** Please retain one copy of the agreement for your records.

Plaintiff 250

Stock Option Awards
March 19, 2002
Page 2 of 2

- **<u>Terms and Conditions (for Options Granted on and after February 21, 2002)</u>** – The enclosed Terms and Conditions addresses the specific terms governing the option grant such as the vesting schedule, exercise period, forfeiture, employee rights and duties, tax withholding, etc.

Please also reference related plan documents on our website:
http://employee.statestr.com/stockoptioninfo/

- **<u>The State Street Corporation 1997 Equity Incentive Plan</u>** – This document describes the Plan under which your options have been awarded.

- **<u>Prospectus</u>** – The Prospectus provides information about the shares covered by the Plan, certain SEC regulations and the administration of the State Street Corporation 1997 Equity Incentive Plan.

If you have any questions about this package of materials, please feel free to speak with your Human Resources Manager or call Dave Cogliano at 617-985-8033 or Liz Waters at 617-985-2325.

Plaintiff 251



STATE STREET

*Serving Institutional Investors Worldwide ™*

PLEASE NOTE: Due to system constraints, all stock option award letters will reference an award of

either an Incentive Stock Option or a Non-Qualified Stock Option. Please be aware that any award

letter that grants Incentive Stock Options are actually shares under the UK APPROVED Plan, and

any letter that grants Non-Qualified Stock Options are actually shares granted under the UK

UAPPROVED Plan. State Street is currently looking towards new software venders and will have

the appropriate terminology included in future option grants.

Plaintiff 252

| **Notice of Grant of Stock Options And Option Agreement** | State Street Corporation<br>Human Resources & Organizational Performance<br>Compensation<br>1776 Heritage Drive<br>North Quincy, MA 02171 |
|---|---|

Mail Stop: JAB1N

| Alan Brown<br>SSGA<br>UK | Plan:<br>SSN/ID: | 18<br>411669 |
|---|---|---|

On 02/21/2002 you were granted a(n) Non-Qualified Stock Option to buy 8,200 shares of State Street Corporation (the "Company") Common Stock, $1.00 par value, at $49.7050 per share (the "Option").

Shares in each period will become fully exercisable on the date shown.

| Shares | Fully Exercisable | Expiration |
|---|---|---|
| 8,200 | 02/21/2004 | 02/21/2012 |

By your signature and the Company's signature below, you and the Company agree that these awards are granted under and governed by the Company's 1997 Equity Incentive Plan and the Terms and Conditions attached hereto.

Boon Ooi
State Street Corporation

March 21, 2002

Alan Brown

April 18, 2002
Date

Plaintiff 253

## TERMS AND CONDITIONS
### For Stock Option Grants on or after February 21, 2002

### These Terms and Conditions apply to Incentive Stock Options(ISOs) and/or Non-Qualified Stock Options(NQOs)

1. Term and Exercise Period

    Subject to paragraphs 5 and 6 hereof and to this paragraph 1, the Option shall vest according to the vesting schedule detailed in your Stock Option Agreement.

    In no event, however, shall the exercise of the Option or any installment thereof be made later than ten (10) years from the original date of grant. You may not exercise the Option with respect to less than fifty (50) shares at any one time except when the number of remaining shares of the Option is less than fifty (50); and except as is otherwise provided herein you may not exercise the Option or any installment thereof unless you are then an employee of the Company or one of its subsidiaries.

2. Method of Exercising Option

    The Option may be exercised from time to time by written notice to the Company, to the attention of Global Human Resources, stating the number of shares (but not fewer than fifty (50) shares or the remaining shares under the Option, if fewer) which the exercise is intended to cover and accompanied by full payment for such shares, in cash, or by certified or bank check. In lieu of a cash payment in full, you may pay the exercise price by tendering a whole number of shares of Common Stock of the Company held for at least six months with a fair market value equal to the exercise price less any cash included in the tender. Payment for any shares subject to an Option may also be made by delivering a properly executed exercise notice to the Company, together with a copy of irrevocable instructions to a broker to deliver promptly to the Company the amount of sale or loan proceeds to pay the purchase price, and, if required, the amount of any federal, state, local or foreign withholding taxes. Certificates for shares for which you exercise the Option shall be delivered to you promptly.

3. Employee Rights and Duties

    You shall not have any right of a stockholder with respect to the shares covered by the Option prior to the issuance thereof nor shall the attached agreement grant you any rights of employment with the Company.

4. Non-Transferability

    The Option shall not be transferable otherwise than by will or the laws of descent and distribution and it may be exercised only by you during your lifetime. Any attempt to assign or transfer the Option, either voluntarily or involuntarily, contrary to the provisions hereof, shall be null and void and without effect and shall render the Option itself null and void.

Plaintiff 254

## 5.  Termination of Employment

(a)  If your employment terminates by reason of death, disability or retirement at or after the normal or early retirement age under any retirement plan or supplemental retirement agreement maintained by the Company or any Subsidiary prior to exercise, expiration, surrender or cancellation of the Option, the Option shall remain exercisable after the date of such termination of employment in accordance with this Agreement whether or not such Option was exercisable at the time of such termination, and the Option may be exercised by you or the person or persons to whom your rights shall pass by will or by the applicable laws of descent or distribution at such time and to the same extent that the Option would have been exercisable had your employment not terminated; provided, however, that the Option shall terminate on the later of (i) one (1) year after the Option first becomes exercisable or if exercisable in installments after the last installment becomes exercisable; and (ii) one (1) year from termination of employment.

(b)  If your employment terminates for any reason other than death, disability or retirement prior to exercise, expiration, surrender or cancellation of the Option, such Option shall terminate three (3) months from the date of such termination, during which period the Option may be exercised only to the extent that it was exercisable on the date of such termination. In the event that the undersigned is eligible to receive severance when terminated from the Company, the Option shall continue to vest through the end of the "bridging period" as defined in the Company's severance policy. If you die within such three (3) month period, the Option shall expire (1) year after the date of your termination, during which period the Option may be exercised at any time by the person or persons to whom your rights shall pass by will or by the applicable laws of descent or distribution, but only to the extent it was exercisable on the date of such termination. In no event, however, may the Option be exercised after the expiration date set out in the applicable Option or Agreement.

(c)  Your rights with respect to any unexercised Option after termination of your employment otherwise than by reason of death shall be subject to the conditions that until any such Option is exercised you shall (i) not engage either directly or indirectly, in any manner or capacity as advisor, principal, agent, partner, officer, director, employee, member of any association, or otherwise, in any business or activity which is at the time competitive with any business or activity conducted by the Company or any of its direct or indirect subsidiaries, and (ii) be available at reasonable times for consultations at the request of the Company's management with respect to phases of the business with which you were actively connected during your employment. In the event that either of the above conditions is not fulfilled, you shall forfeit all rights to any unexercised Option. Any determination by the Board of Directors that you are, or have, engaged in a competitive business or activity as aforesaid or have not been available for consultations as aforesaid shall be conclusive. Notwithstanding the foregoing this paragraph 5(c) shall be inapplicable following a Change of Control (as defined in the 1997 Plan).

Plaintiff 255

6.  Acceleration of Options

Upon a Change of Control the Option shall remain exercisable following a termination of your employment other than by reason of your death, disability or retirement for a period of seven (7) months after termination, or until expiration of the original term of the Option, whichever period is shorter.

Upon a Change of Control (as defined in the 1997 Plan), the Option shall become fully exercisable. Optionees subject to Section 16 shall have certain rights to receive cash in lieu of exercising the option in the amount of the Spread, all as set forth in the 1997 Plan; provided, that for purposes of this Option, "Spread" shall mean, with respect to any share subject to the Option, the excess of fair market value of such share on the date of exercise over the per-share exercise price.

7.  Changes in Capitalization

The Board of Directors of the Company may make appropriate adjustments in the aggregate number and kind of shares and the price per share subject to the Option when it deems such action necessary by reason of any stock dividend, split or any recapitalization, reclassification, merger, consolidation, combination or similar transaction.

8.  Withholding

(a)  Incentive Stock Options (ISOs)

If, in connection with the exercise of the Option, the Committee determines that the Company could be liable for withholding requirements with respect to such exercise or with respect to a disposition of any shares received upon exercise, the Committee may require as a condition of exercise that you (i) remit to the Company an amount sufficient to satisfy any such withholding requirements or make other arrangements satisfactory to the Committee with regard to such requirements (if and to the extent that such withholding is required, the Committee may permit you to elect at such time and in such manner as the Committee provides to have the Company hold back from the shares to be delivered, or to deliver to the Company, shares having a value calculated to satisfy the withholding requirement), (ii) inform the Company promptly of any disposition (within the meaning of Section 424 (c) of the Internal Revenue Code) of any shares received upon exercise, and (iii) give such security as the Committee deems adequate to meet the potential liability of the Company for the withholding requirements and to augment such security from time to time in any amount reasonably deemed necessary by the Committee to preserve the adequacy of such security.

Plaintiff 256

(b) Non-Qualified Stock Options(NQOs)

The Committee will have the right to require that you remit to the Company an amount sufficient to satisfy the withholding requirements, or make other arrangements satisfactory to the Committee with regard to such requirements, prior to the delivery of any Common Stock. If and to the extent that such withholding is required, the Committee may permit you to elect at such time and in such manner as the Committee provides to have the Company hold back from the shares to be delivered, or to deliver to the Company, Common Stock having a value calculated to satisfy the withholding requirement.

9.    <u>Securities Act Considerations</u>

The shares of Common Stock acquired by you upon exercise of the Option are registered under the Securities Act of 1933, as amended (the "Act"). Under current regulations, you may freely resell all or a part of such shares from time to time, provided you are not deemed to be an "affiliate" of the Company as that term is defined in the Act. Officers filing Forms 4 - Statement of Changes in Beneficial Ownership are deemed to be affiliates. As an affiliate of the Company, you may resell such shares only pursuant to a currently effective registration statement on Form S-3 or Form S-1 as promulgated by the Securities and Exchange Commission, or pursuant to Rule 144 or other exemption under the Act.

Plaintiff 257

# EXHIBIT 28



**STATE STREET.**
*Serving Institutional Investors Worldwide*

# Interoffice Memorandum

Date:     December 7, 2000

To:       Alan Brown

From:     Trevor Lukes

Subject:  Senior Executive Defined Benefit Pension Plan

This is to follow-up David Spina's August 18, 2000, letter to you that outlined how our compensation and benefit programs would impact you as an executive vice president of State Street. He indicated to you that we were in the process of redesigning the Executive Defined Benefit Pension Plan which would apply to anyone elected as an executive vice president after February 2000. The Board of Directors has approved this amended plan, details of which are outlined below.

## Eligibility

Individuals are eligible to be considered for participation after four years as an executive vice president. Actual formal participation in the plan requires approval of a committee consisting of the chief executive officer, the vice chairman and chief administrator officer and the executive vice president Global Human Resources.

## Vesting

To be vested and eligible to receive benefits from the plan, participants must be age 55 combined with at least ten years of service. For this purpose all service with State Street is recognized.

Normal retirement age is 65.

## Benefits

The benefit formula provides a retirement benefit that is calculated using a percentage of final average pay reduced by retirement benefits payable from other qualified and non-qualified defined benefit pension plans (not 401(k)'s, or non-qualified deferred compensation plans). These other benefit offsets can be from, not only State Street plans, but, where relevant, plans from prior employment.

Plaintiff 303

Pay for benefit plan purposes includes base salary and bonus from the Executive Annual Incentive Plan. Final average pay is calculated on the highest average base and bonus earnings of any five consecutive years during the last ten years of service.

The benefit formula at normal retirement (age 65) is 2.5% of final average pay times years of service with State Street to a maximum of twenty years less income from other qualified an non-qualified retirement plans. This translates to a maximum of 50% of final average pay at age 65.

The minimum benefit by applying 2.5% of final average pay times the required vesting of ten years of service would be 25% of final average pay at age 65. Again, the benefit would be offset by benefits from other qualified and non-qualified retirement plans.

Early Retirement

The benefits described above assume retirement at normal retirement age (65). If however, vested participants elect to retire earlier than age 65, the benefit would be reduced according to the following formula:

Early retirement between age 60 and 65    ➢   Benefit reduction of 0.0833% per month

Early retirement between age 55 and 59    ➢   Benefit reduction of 0.2083% per month

With the above in mind, the benefit for early retirement at age 60 is 95% of the age 65 retirement benefit while early retirement at age 55 would provide a benefit of 82.5% of the age 65 retirement benefit. Please note that the equivalent early retirement benefit under State Street's qualified retirement plan would be 67% at age 60 and 50% at age 55.

Form of Payment

While the benefit is calculated as an annuity, various payment options are available similar to the qualified pension plan. Among these options is a lump sum payment.

While I recognize your potential participation in this plan is in the future, we feel it is important that you are made aware of this significant retirement benefit. This memorandum is just a summary and a copy of the governing plan document will be given to participants upon entry into the plan. In the meantime, if you have any questions in relation to this memo please call either me at 5-8059 or Boon Ooi at 5-6348.

TL:mss

cc:   D. Spina
      T. Harbert

2

Plaintiff 304

# EXHIBIT 29

PROSPECTUS

STATE STREET BOSTON CORPORATION

3,500,000 SHARES OF COMMON STOCK

$1 Par Value

1994 STOCK OPTION AND PERFORMANCE UNIT PLAN

The shares of Common Stock, $1 par value (the "Common Stock"), of State Street Boston Corporation (the "Company") offered by this Prospectus are shares which are subject to stock options or stock appreciation rights ("SARs") heretofore granted and which may hereafter be granted from time to time by the Company to certain officers of the Company and its Subsidiaries under the Company's 1994 Stock Option and Performance Unit Plan ("the 1994 Plan"). This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933.

Certain persons who purchase shares of Common Stock pursuant to the exercise of options may be deemed to be "underwriters" or "affiliates" within the meaning of the Securities Act of 1933 and may not resell such shares except pursuant to a separate prospectus or pursuant to a specific exemption from the registration requirements of the Securities Act of 1933.

The Company's executive offices are located at 225 Franklin Street, Boston, Massachusetts 02110 and its telephone number is (617) 786-3000.



EXHIBIT

Brain #
4/24/06    6

The date of this Prospectus is January 19, 1995

Plaintiff 113

TABLE OF CONTENTS

| | PAGE |
|---|---|
| Incorporation of Documents by Reference | 3 |
| Reports to Stockholders | 4 |
| 1994 Stock Option and Performance Unit Plan | 5 |
| General Plan Information | 5 |
| Administration | 5 |
| Shares Subject to the 1994 Plan; "Per Executive" Limitation | 6 |
| Employees Who May Participate in the 1994 Plan | 6 |
| Grant of Options, SARs and Performance Units | 6 |
| Options | 6 |
| SARs | 7 |
| Performance Units | 7 |
| Change of Control | 8 |
| Window Period | 8 |
| Option, SARs and Performance Unit Agreements | 8 |
| Termination of Employment | 9 |
| Amendments | 9 |
| Adjustments Upon Changes in Stock | 10 |
| Termination of the 1994 Plan | 10 |
| Employees Abroad | 10 |
| Federal Income Tax Consequences | 10 |
| Incentive Options | 10 |
| Special Considerations Where Option Price Paid With Stock | 11 |
| Nonqualified Options | 12 |
| Special Rule Where Option Price is Paid with Stock | 12 |
| SARs | 12 |
| Performance Units | 12 |
| Tax Consequences to the Corporation | 12 |
| Withholding | 13 |

Plaintiff 114

INCORPORATION OF DOCUMENTS BY REFERENCE

The following documents have been filed by the Company with the Commission and are incorporated herein by reference:

(1)    The Company's latest Annual Report on Form 10-K for the fiscal year ended December 31, 1993, filed pursuant to Section 13(a) of the Exchange Act.

(2)    The Company's Quarterly Report on Form 10-Q for each of the periods ended March 31, 1994, June 30, 1994 and September 30, 1994, filed pursuant to Section 13(a) of the Exchange Act.

(3)    The Company's Current Reports on Form 8-K dated February 1, 1994 and September 27, 1994.

(4)    The description of the Company's Common Stock included in the Company's effective registration statement report on Form 10, as filed with the Securities and Exchange Commission on September 3, 1970 and amended on May 12, 1971.

(5)    The description of the Company's Preferred Share Purchase Rights included in the Company's effective registration statement on Form 8-A filed with the Securities and Exchange Commission on September 30, 1988 as amended by Amendment dated as of September 20, 1990 filed with the Securities and Exchange Commission on Form 8 on October 19, 1990.

(6)    Indenture dated as of May 1, 1983 between State Street Boston Corporation and Morgan Guaranty Trust Company of New York, Trustee, relating to the Company's 7 3/4% Convertible Subordinated Debentures due 2008 (filed with the Securities and Exchange Commission as Exhibit 4 to the Registrant's Registration Statement on Form S-3 filed on April 22, 1983, Commission File No. 2-83251 and incorporated by reference).

(7)    Indenture dated as of August 2, 1993 between State Street Boston Corporation and the First National Bank of Boston, as trustee relating to the Company's 5.95% Notes due 2003 (filed with the Securities and Exchange Commission as Exhibit 4 to the Registrant's Current Report on Form 8-K dated October 8, 1993 and incorporated by reference).

All documents filed pursuant to Section 13, 14 or 15(d) of the Securities Exchange Act of 1934 after the date of this Prospectus and prior to the filing of a post-effective amendment to the Registration Statement to which this Prospectus relates which indicates that all interests or shares offered hereby have been sold or which deregisters all interests or shares then remaining unsold shall be deemed to be incorporated by reference in this

- 3 -

Prospectus and to be part hereof from the date of filing of such documents.    Any statement contained herein or in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Prospectus to the extent that a statement contained herein or in any other subsequently filed document which also is or deemed to be incorporated by reference herein modifies or supersedes such statement.    Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Prospectus.

    The Company will provide without charge to each person to whom this Prospectus is delivered a copy of any or all of the foregoing documents incorporated by reference herein (other than certain exhibits to such documents) upon written or oral request to the Corporate Secretary of the Company, 225 Franklin Street, Boston, Massachusetts 02101, telephone (617) 654-3104.

Plaintiff 116

## 1994 STOCK OPTION AND PERFORMANCE UNIT PLAN

### General Plan Information.

The 1994 Plan was adopted by the Board of Directors of the Company on December 16, 1993 and approved by the stockholders of the Company on April 20, 1994.

The purpose of the 1994 Plan is to provide an incentive, through the grant of options for the purchase of Common Stock, SARs and performance units, for certain officers of the Company, thereby providing them with an incentive to devote their full abilities and industry to the success of the Company's businesses.

Each share of Common Stock issued under the 1994 Plan will be accompanied by a Preferred Share Purchase Right.

The 1994 Plan is not subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and is not a qualified plan under Section 401(a) of the Internal Revenue Code.

Additional information about the 1994 Plan and its administration may be obtained by contacting Senior Vice President, Human Resources, State Street Bank and Trust Company, 1776 Heritage Drive, Quincy, Massachusetts 02171, telephone (617) 985-8059.

### Administration.

The 1994 Plan is administered by the Executive Compensation Committee of the Board of Directors. The Committee consists of not fewer than three members of the Board of Directors who are outside directors and are not eligible to participate in the 1994 Plan.

Members of the Committee are appointed by the Board of Directors on an annual basis and serve at the pleasure of the Board.

The Committee has authority to grant options and SARS to officers of the Company, to designate the number of shares to be covered by each option, to determine whether an option is intended to qualify as an incentive stock option, the number of SARs and performance units to be granted, the number of SARs permitted to be exercised and the performance factors and targets that will determine performance unit payments. In making such determinations, the Committee takes into account the nature of the services rendered by the respective officers, their present and potential contributions to the Company's success and such other factors as the Committee in its discretion deems relevant. The Committee also has authority to interpret the 1994 Plan, to prescribe, amend and rescind rules and regulations relating to its administration, to determine the terms and provisions of the respective granting agreements (which need not be identical) and to make all other determinations necessary or advisable for the administration of the 1994 Plan. The Board of Directors, upon the recommendation of the Committee, approves all grants to officers who are also directors of the Company.

— 5 —

<u>Shares Subject to the 1994 Plan; "Per-Executive" Limitation</u>.

Options, SARs and performance units awarded under the 1994
Plan are, in general, intended to qualify for the performance-based
exception to Section 162(m) of the Internal Revenue Code of 1986,
as amended, (the "Code"), which beginning in 1994 limits the
deduction the Corporation may claim for compensation paid to
certain executive officers to $1 million per year, subject to
certain exceptions.

The maximum number of shares of the Common Stock of the
Corporation which may be issued under the 1994 Plan is 3,500,000
shares, subject to adjustment in the event of stock dividends,
stock splits, recapitalizations, mergers or similar transactions.
The maximum number of performance units that may be issued under
the 1994 Plan is 1,000,000. To the extent consistent with certain
provisions of the Code, shares subject to an option that terminates
without exercise (other than an option that terminates by reason of
the exercise of an accompanying SAR) shall again be available for
the purposes of the 1994 Plan, and if payment is not made with
respect to performance units issued under the 1994 Plan, the shares
subject to the performance units shall again be available for the
purposes of the 1994 Plan. Common Stock issued upon exercise of
options may be shares of authorized but unissued stock or treasury
stock.

No participant shall be entitled to grants of options or
options/SARs covering more than an aggregate of 500,000 shares over
the term of the 1994 Plan. No participant shall be entitled to
grants of performance units covering more than 250,000 units over
the term of the 1994 Plan, unless the Committee determines that
such units are not intended to qualify for the performance-based
exception to Section 162(m). Each of the foregoing limitations is
subject to adjustment in the event of stock dividends, stock
splits, recapitalizations and similar corporate transactions.

<u>Employees Who May Participate in the 1994 Plan</u>.

Any salaried officer who, in the determination of the
Committee, is in a position to contribute importantly to the
success of the Company may participate in the 1994 Plan. The
Corporation has approximately 500 salaried officers eligible to
participate.

<u>Grant of Options, SARs and Performance Units</u>.

<u>Options</u>. The 1994 Plan authorizes the grant of stock options,
which may be either options intended to qualify as incentive stock
options, as defined in Section 422(b) of the Code, or options not
intended to so qualify ("non-qualified options"). The Committee
will determine the option price, term and manner of exercise of
each option granted, but the option price may not be less than the
fair market value of the Common Stock on the date of grant. No
option may have a term greater than ten years, and, in general, an
option may not first become exercisable earlier than one year after

— 6 —

the date of grant. The Committee may provide that options be exercisable in installments and may also accelerate the exercise date of options that have been outstanding for more than 6 months. Certain other restrictions apply in connection with the award of options intended to qualify as incentive stock options.

Unless otherwise determined by the Committee, an option may in general be exercised by the payment of the option price in cash, by the surrender of shares of Common Stock having a fair market value equal to the option price, or by a combination of cash and stock, or by irrevocable instructions to a broker to pay the purchase price to the Corporation.

SARs. The Committee may also grant non-transferable SARs in conjunction with the grant of options. Upon exercise of a SAR and the surrender of the related option, the holder will receive an amount in any combination of cash or shares of Common Stock (as determined by the Committee) equal to the excess of the fair market value of a share of Common Stock on the date the SAR is exercised over the option price specified in the related stock option, multiplied by the number of shares covered by the option. A SAR will terminate upon the exercise or termination of the related option unless earlier terminated by the Board. The Committee may authorize the acceleration of SARs that have been outstanding for at least six months.

Performance Units. A performance unit entitles the recipient to receive in cash an amount equal to the fair market value of a share of Common Stock at the end of a specified performance period, provided that established performance targets have been achieved. The 1994 Plan provides for certain limits on the award and terms of performance units, in order that a performance unit may qualify for the performance-based exception to Code Section 162(m). In particular, the Committee must establish in writing "performance goals." Under the terms of the 1994 Plan, performance goals may be established with respect to any or all of the following three performance measures: return on equity, earnings per share, and total stockholder return as compared to a standard market reference. The Committee will also establish in writing the period over which targeted performance will be measured (a "performance period"), which may be of any duration between one and five fiscal years. In any given performance period, no participant may have the opportunity to earn performance units in excess of 250,000 units (subject to adjustment in the event of certain stock or corporate transactions).

Prior to payment in respect of any performance unit, the Committee must certify that targeted performance has been achieved. The Committee, however, retains the discretion to reduce or eliminate any payment in respect of performance units, even after targeted performance has been achieved.

- 7 -

Change of Control. The 1994 Plan provides for certain changes in the terms of awards in the event of a change in control (as defined in the 1994 Plan). A change of control is defined generally as the acquisition of 20% or more of the Company's then outstanding stock or other change of control as determined by regulatory authorities; a significant change in the composition of the Board of Directors; reorganization, merger or consolidation or sale or other disposition of all or substantially all of the Company's assets by the Company under certain circumstances, or the approval by the stockholders of the Company of a complete liquidation or dissolution of the Company.

In general, in the event of a change of control, (1) options and SARs held by optionees who are subject to Section 16 of the Exchange Act or have termination agreements with the Corporation will become immediately exercisable, (2) options may be settled for cash based on the increase in the value of the shares of Common Stock covered by the option from the option grant date to the change of control, (3) SARs may be settled only in cash, (4) options and SARs shall remain exercisable for seven months following termination of employment, (5) restrictions are imposed on the rights of the Committee to amend the terms of certain awards, and (6) payments under awards are based on a "change of control" price (as defined in the 1994 Plan), which may differ from the actual fair market value of a share of Common Stock on the date an award is exercised. Payment of performance units following a change of control held by participants who are subject to Section 16 of the Exchange Act or have termination agreements with the Corporation would be made on a pro rata basis with respect to designated performance periods.

Window Period. In order to take advantage of the safe harbor provisions of Rule 16b-3 of the Securities Exchange Act of 1934 and avoid the short swing profit liability under Section 16 thereof, officers may not exercise SARs for a period of six months from the date of grant, and any exercise by such officers of the SARs in whole or in part for cash subsequent to the six month period must be made only during the period beginning on the third business day following the date of release by the Company of quarterly and annual summary statements of earnings and ending on the twelfth business day following such date.

Options, SARs or performance units granted under the 1994 Plan may not be transferred except by will or the laws of descent and distribution.

Option, SARs and Performance Unit Agreements.

Options, SARs and performance units granted under the 1994 Plan are evidenced by agreements in such form as the Executive Compensation Committee from time to time approves. The agreements set forth the terms and conditions of the options and SARs including the timing and manner of their exercise.

- 8 -

Plaintiff 120

Termination of Employment.

In general, if an optionee's employment with the Company terminates by reason of normal or early retirement, death or disability, the option or SAR remains exercisable in accordance with its terms and may be exercised by the optionee or his or her legal representative until the later of one year after the last installment becomes exercisable and one year after termination of employment. If an optionee's employment terminates for any other reason, the optionee may exercise outstanding options or SARs within three months from the date of such termination to the same extent, if any, that they were exercisable immediately prior to such termination. In no event, however, may an option or SAR be exercised after ten years from the date of grant. In the event a participant who has been awarded performance units terminates employment for any reason prior to the end of a performance period, such participant's performance units will be forfeited unless the Committee approves payment, to the extent consistent with Code Section 162(m), of such performance units in whole or in part. A participant's rights to unexercised options, SARs and unearned performance units upon termination of employment are forfeitable for failure to observe non-competition provisions of the 1994 Plan and for failure to consult with the Company at the request of the Company.

Amendments.

The Board of Directors has discretionary authority to suspend or terminate the 1994 Plan and may amend it from time to time in such respects as the Board may deem advisable in order that options, SARS and performance units shall conform to changes in applicable law or in other respects that may be in the best interest of the Company; except that no amendments shall, without stockholder approval either before or after Board action, (i) effectuate any change inconsistent with the qualification of awards as performance-based under Code Section 162(m) (unless the Committee determines that awards affected by such changes are not intended to qualify for the performance-based exception to Section 162(m) of the Code) or (ii) effectuate any other change for which stockholder approval is required in order for the Plan to continue to qualify for the award of Incentive Stock Options under Section 422 of the Code and to continue to qualify under Rule 16b-3 promulgated under Section 16 of the Exchange Act.

In connection with or following a Change of Control the Board of Directors may not suspend or terminate the 1994 Plan or amend the 1994 Plan in any manner adverse to the holder of such an Option or SAR without the written consent of such holder. Awards granted prior to that time may extend beyond that date according to 1994 Plan provisions and award terms. No option, SAR or performance unit may be granted during any suspension or after termination of the 1994 Plan. No amendment, suspension or termination of the 1994 Plan shall, without the optionee's consent, alter or impair any of the rights or obligations under any Option theretofore granted to the optionee under the Plan. Except as so provided, any rights or

- 9 -

Plaintiff 121

obligations with respect to SARs or to performance units may be suspended or terminated, and rights or obligations with respect to SARS may be altered, without the consent of the employee.

Adjustments Upon Changes in Stock.

In the event of changes in the Common Stock of the Company resulting from any recapitalization, reclassification, merger, consolidation, combination or other similar change, each Option shall become exercisable and each performance unit adjusted for the number and kinds of shares, cash, securities or other property so distributed in accordance with the terms of the 1994 Plan. Appropriate adjustments shall also be made in the terms of SARs and in the terms of outstanding performance units, performance targets and changes in the length of performance periods.

Termination of the 1994 Plan.

No awards may be granted under the Plan after April 30, 1999.

Employees Abroad.

The Committee has discretion to make options granted to officers of the Company, or a Subsidiary, who reside outside the United States subject to additional terms and conditions as may be appropriate to qualify as approved share options under the applicable laws and regulations of the country of residence.

Federal Income Tax Consequences.

*The following is only a general summary of the federal income tax effects to the participant and the Corporation of options, SARs and performance units granted under the 1994 Plan. There are a number of special tax rules which may be applicable under certain circumstances. In particular, the following discussion assumes that the Preferred Share Purchase Right does not separate from the share of Common Stock which it accompanies. If the Preferred Share Purchase Right did so separate, the federal income tax treatment of awards under the 1994 Plan may differ from the treatment summarized below. The discussion is based on the provisions of the Code, regulations, proposed regulations and rulings thereunder, as in effect on the date hereof, all of which are subject to change at any time. This summary does not address state, local or non-U.S. taxation of awards under the 1994 Plan, which may differ significantly from federal income tax rules and regulations. Individuals should consult with their own tax advisors.*

Incentive Options. The grant of an incentive option does not produce taxable income to the optionee. If an optionee exercises an incentive option while the optionee is employed or within three months following termination of employment (twelve months in the case of employment termination because of permanent disability), or after the optionee's death if the optionee dies during such periods, exercise of the option will also not produce taxable

- 10 -

income.  The exercise of an incentive option, however, may result in the imposition of the alternative minimum tax ("AMT"), as described in more detail below.

The following description assumes that the employment requirements described above have been met.  If an optionee acquires shares under an incentive option and sells such shares more than two years from the date of grant of the option and more than one year after the date of exercise, any gain or loss on sale will be a long-term capital gain or loss.  If the stock is disposed of before the end of the two- and one-year statutory holding periods, a "disqualifying disposition," then, in general, the optionee will have ordinary income at time of disposition equal to the difference between the exercise price and the fair market value of the stock on the date of exercise, with any additional gain recognized upon disposition treated as a capital gain (short-term or long-term depending on how long the shares have been held).  If the optionee sells the stock within these holding periods for less than the fair market value of the stock at time of exercise, then, in general, the ordinary income realized by the optionee at time of sale will be limited to the gain realized on the sale.

Incentive options granted under the 1994 Plan will be treated for tax purposes as non-qualified options to the extent that the aggregate fair market value of the stock with respect to which such options, in the aggregate, are exercisable for the first time by an individual during any calendar year exceeds $100,000.  For purposes of the preceding sentence, fair market value is determined as of the time of grant of the option.

Exercise of an incentive option increases the optionee's alternative minimum taxable income ("AMTI") by an amount equal, in general, to the excess of the fair market value of the shares acquired under the option over the option price.  This increase may result in an AMT liability to the optionee.  The amount of AMT, if any, paid by the optionee in respect of the option exercise may, subject to certain limitations, be applied as a credit against regular income tax liability in subsequent years.  If an optionee who exercises an incentive stock option makes a disqualifying disposition of the shares in the same year in which falls the AMTI adjustment associated with exercise of the option, the disqualifying disposition will eliminate the AMTI adjustment.

<u>Special Considerations Where Option Price Paid With Stock</u>. Where the exercise price of an incentive stock option is paid using previously acquired shares of the Company's Common Stock, the basis and capital gains holding period of the surrendered shares will carry over to an equivalent number of new shares acquired upon exercise, and the remaining shares will have a zero basis and a new capital gains holding period.  (Where a portion of the exercise price is paid in cash, it is not clear from proposed I.R.S. regulations how the basis of various shares acquired upon exercise is to be increased to reflect the cash payment.)  For purposes of determining whether the shares acquired upon exercise have been

- 11 -

Plaintiff 123

held long enough to avoid a disqualifying disposition, the holding period of all shares commences at exercise. The use of previously acquired shares to exercise an incentive stock option will not result in recognition of a capital gain or loss with respect to those shares. However, if the surrendered shares were themselves acquired pursuant to the exercise of an incentive stock option or other statutory option, and have not been held long enough to avoid a disqualifying disposition, the surrender of those shares will constitute a disqualifying disposition and will give rise to ordinary income as described above.

<u>Nonqualified Options</u>. The grant of a nonqualified stock option will not result in any taxable income to the optionee. Upon exercise of such an option, the excess of the fair market value of the acquired stock on the date of exercise over the option price is taxable to the optionee as ordinary income and is subject to tax withholding. When an optionee sells shares acquired pursuant to the exercise of a non-qualified option, the optionee will realize a capital gain or loss, long-term or short-term, depending on how long the shares have been held.

<u>Special Rule Where Option Price is Paid with Stock</u>. Where the exercise price of a non-qualified option is paid in whole or in part with shares of the Company's Common Stock, the amount and timing of the ordinary income realized upon exercise will be unaffected, but special rules will apply in determining the basis and holding period of the shares received. In such event, the shares received must, in effect, be treated as consisting of two blocks, one equal in number to the number of previously held shares applied in full or partial payment of the exercise price, and the other constituting the balance. Shares in the first block will have a basis equal to the cost basis of the shares surrendered in payment of the purchase price. The holding period of these shares will include the period during which the surrendered shares were held. No gain or loss will be recognized by reason of the surrender of the previously owned shares. The remaining shares will have a basis equal to the amount of income realized on exercise plus any additional cash paid, and will have a holding period determined under the general rule described above.

<u>SARs</u>. An optionee will realize no income upon the grant of a SAR. When the optionee exercises the SAR, the optionee will generally recognize ordinary income, subject to withholding, in an amount equal to the amount of cash received plus the fair market value of any stock received.

<u>Performance Units</u>. The grant of a performance unit will not be taxable to the officer in the year of grant nor at any time prior to payment for the unit. The receipt of cash by an officer in payment for a performance unit will be taxable as ordinary income, subject to withholding, in the year of receipt.

<u>Tax Consequences to the Corporation</u>. In general and subject to the limitations described below, the Corporation is entitled to a deduction in respect of awards under the 1994 Plan at the time and to the extent that a Plan participant has ordinary income. However, if an optionee satisfies the requisite one- and two-year

Plaintiff 124

holding periods applicable in the case of incentive stock options and thereby recognizes only capital gain or loss upon sale of stock, the Corporation will not be entitled to any deduction (even if the optionee has alternate minimum tax liability).

Under Section 162(m) of the Code, starting in 1994 a publicly traded corporation may not deduct more than $1 million for remuneration paid to any of its five highest paid executive officers. Some types of remuneration are not subject to this limit, including certain performance-based pay. In order to qualify for the performance-based pay exemption, remuneration must, among other things, be paid pursuant to a plan the material terms of which, including the performance goals, are disclosed to stockholders and approved by a majority vote of the stockholders.

It is intended, in general, that compensation income attributable to stock options, SARs and performance units granted under the 1994 Plan qualify for exemption from the $1 million deduction limitation. The IRS has issued proposed rules under Code Section 162(m) (the "Proposed Rules") interpreting the statutory requirements applicable to exempt performance-based remuneration. The Proposed Rules, which are subject to change, would require among other things that the performance targets applicable to performance-based awards under the 1994 Plan be preestablished by the Committee based on the performance measures set forth in the 1994 Plan and described above, and that the Committee certify that the preestablished targets have been satisfied before payment is made.

Under the so-called "golden parachute" provisions of the Code, certain awards vested or paid in connection with a change of control may also be non-deductible to the Corporation and may be subject to an additional 20% federal excise tax. Non-deductible "parachute payments" will in general reduce the $1 million limit on deductible compensation described above.

<u>Withholding</u>.

The Company will withhold from any cash payment made pursuant to an award an amount sufficient to satisfy all federal, state and local withholding tax requirements. In the case of an award pursuant to which Common Stock may be delivered, the Committee will have the right to require that the officer or other appropriate person remit to the Company an amount sufficient to satisfy the withholding requirements, or make other arrangements satisfactory to the Committee with regard to such requirements, prior to the delivery of any Common Stock. If and to the extent that such withholding is required, the Committee may permit the officer or such other person to elect at such time and in such manner as the Committee provides to have the Company hold back from the shares to be delivered, or to deliver to the Company, Common Stock having a value, taken at fair market value, calculated to satisfy the withholding requirement.

If at any time an Incentive Stock Option is exercised the Committee determines that the Company could be liable for withholding requirements with respect to a disposition of the

Plaintiff 125

- 13 -

Common Stock received upon exercise, the Committee may require as a condition of exercise that the person exercising the Incentive Stock Option agree (i) to inform the Company promptly of any disposition (within the meaning of Section 424(c) of the Code) of Common Stock received upon exercise, and (ii) to give such security as the Committee deems adequate to meet the potential liability of the Company for the withholding requirements and to augment such security from time to time in any amount reasonably deemed necessary by the Committee to preserve the adequacy of such security.

No charges or deductions, except as outlined above, may be made against officers participating in the 1994 Plan, and no other person has or may create a lien on any funds, securities or other property under the 1994 Plan.

Plaintiff 126

# EXHIBIT 30

PROSPECTUS

## STATE STREET CORPORATION

## 31,800,000 SHARES OF COMMON STOCK

### $1 Par Value

---

### 1997 EQUITY INCENTIVE PLAN

---

The shares of Common Stock, $1 par value (the "Common Stock"), of State Street Corporation (the "Company") offered by this Prospectus are shares which are subject to stock options, stock appreciation rights, restricted and unrestricted stock awards or deferred stock awards which have been granted and which may be granted from time to time by the Company to certain key employees of the Company and its Subsidiaries and other key persons and entities under the Company's 1997 Equity Incentive Plan (the "1997 Plan"). This document constitutes part of a prospectus covering securities that have been (or are being) registered under the Securities Act of 1933.

Certain persons who purchase shares of Common Stock pursuant to the exercise of options or receive restricted, unrestricted or deferred stock may be deemed to be "underwriters" or "affiliates" within the meaning of the Securities Act of 1933 and may not resell such shares except pursuant to a separate prospectus or pursuant to a specific exemption from the registration requirements of the Securities Act of 1933.

The Company's executive offices are located at 225 Franklin Street, Boston, Massachusetts 02110 and its telephone number is (617) 786-3000.

The date of this Prospectus is October 1, 2001



EXHIBIT 4

Plaintiff 127

INCORPORATION OF DOCUMENTS BY REFERENCE

The following documents filed by the Company with the Securities and Exchange Commission (the "Commission") are incorporated herein by reference:

(1)    The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2001, as filed with the Commission on February 16, 2001.

(2)    The Company's Quarterly Report on Form 10-Q for each of the periods ended March 31, 2001 and June 30, 2001, as filed with the Commission on May 2, 2001 and August 8, 2001, respectively.

(3)    The description of the Company's Common Stock included in the Company's effective registration statement report on Form 8-A, as filed with the Commission on January 18, 1995.

(4)    The Company's Current Reports on Form 8-K dated January 17, 2001, February 6, 2001, February 15, 2001 and April 18, 2001.

(5)    All other reports filed by the Company with the Commission pursuant to Section 13(a) or Section 15 (d) of the Securities Exchange Act of 1934 (the "Exchange Act") since the end of the fiscal year covered by the Company's Annual Report referred to above.

All documents filed pursuant to Section 13, 14 or 15(d) of the Exchange Act after the date of this Prospectus and prior to the filing of a post-effective amendment to the Registration Statement to which this Prospectus relates which indicates that all interests or shares offered hereby have been sold or which deregisters all interests or shares then remaining unsold shall be deemed to be incorporated by reference in this Prospectus and to be part hereof from the date of filing of such documents. Any statement contained herein or in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Prospectus to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Prospectus.

The Company will provide without charge to each person to whom this Prospectus is delivered a copy of any or all of the foregoing documents incorporated by reference herein (other than certain exhibits to such documents) or other documents required to be provided pursuant to Rule 428(b) under the Securities Act of 1933 upon written or oral request to the Corporate Secretary of the Company, 225 Franklin Street, Boston, Massachusetts 02110, telephone (617) 786-3000.

No person has been authorized to give any information or to make any representations other than those contained or incorporated by reference in this Prospectus in connection with the offer contained in this Prospectus, and, if given or made, such

Plaintiff 128

information or representations must not be relied upon as having been authorized by the Company. This Prospectus relates solely to shares of Common Stock of the Company issuable under the 1997 Plan and it may not be used or relied on in connection with any other offer or sale of securities of the Company. Neither the delivery of this Prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Company since the date hereof. This Prospectus does not constitute any offer or solicitation in any jurisdiction in which, or to any person to whom, it is unlawful to make such offer or solicitation.

Registration statements under the Securities Act in respect to the shares of Common Stock of the Company issued or issuable pursuant to the 1997 Plan have been (or are being) filed with the Securities and Exchange Commission, Washington, D.C. 20549. This Prospectus does not contain all of the information with respect to the matters referred to herein, and reference is made to the registration statements and any schedules and exhibits filed therewith.

## 1997 EQUITY INCENTIVE PLAN

### General Plan Information.

The 1997 Plan was adopted by the Board of Directors of the Company on December 19, 1996 and approved by the stockholders of the Company on April 16, 1997. It was amended by the Executive Compensation Committee (the "Committee") on June 19, 1997. On December 16, 1999, the Board of Directors adopted, subject to the approval of the stockholders, an amendment to the 1997 Plan increasing the number of shares available under the 1997 Plan by 15,800,000 to ensure that the Company is able to continue to make Awards at levels determined to be appropriate by the Board and to meet the competitive situation created by the varied compensation programs of other companies. On April 19, 2000, the stockholders approved the amendment authorizing the increase of the number of shares available for issuance under the 1997 Plan.

The purpose of the 1997 Plan is to advance the interests of the Company and its subsidiaries by enhancing their ability to attract and retain employees and other persons or entities who are in a position to make significant contributions to the success of the Company and its subsidiaries through ownership of shares of the Company's common stock ("Common Stock").

The 1997 Plan is intended to accomplish these goals by enabling the Company to grant key employees of the Company and its subsidiaries, non-employee directos and other key persons, Awards in the form of Stock Options, Stock Appreciation Rights, Restricted Stock or Unrestricted Stock Awards, Deferred Stock Awards, Performance Awards, or Supplemental Grants, or combinations of Awards, all as more fully described below.

Each share of Common Stock issued under the 1997 Plan will be accompanied by a Preferred Share Purchase Right.

The 1997 Plan is not subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and is not a qualified plan under Section 401(a) of the Internal Revenue Code.

Additional information about the 1997 Plan and its administration may be obtained by contacting the Senior Vice President, Global Human Resources, State Street Corporation, 1776 Heritage Drive, Quincy, Massachusetts 02171, telephone (617)985-6348.

**Administration of the 1997 Plan.**

The 1997 Plan is administered by a Committee of the Board of Directors (which currently is the Executive Compensation Committee) consisting of at least two directors. During such times as the Common Stock is registered under the Securities Exchange Act of 1934 (the "1934 Act") (and except as the Board otherwise determines), all members of the Committee will be "non-employee" directors within the meaning of Rule 16b-3 under the 1934 Act and "outside directors" as that term is used in Section 162(m) of the Internal Revenue Code. All members of the Committee serve at the pleasure of the Board of Directors.

The Committee has full power, subject to the 1997 Plan, to grant awards at such times as it chooses, determine the size, type and terms of any award, waive compliance with award terms, amend and cancel awards and interpret the 1997 Plan and decide any questions that may arise in connection with the 1997 Plan.

**Persons Who May Participate in the 1997 Plan.**

The persons eligible to participate in the 1997 Plan are key employees of the Company and its subsidiaries and other key persons or entities, including non-employee directors, who are in a position to make significant contributions to the success of the Company and its subsidiaries, as selected from time to time by the Committee.

**Shares Subject to the 1997 Plan.**

Under the 1997 Plan, an aggregate of 31,800,000 shares of Common Stock of the Company is authorized for issuance. The maximum number of shares for which any individual may be granted options or stock appreciation rights under the 1997 Plan during a calendar year is in each case 1,600,000. The maximum number of shares (or their equivalent fair market value in cash) that may be delivered to any individual under performance awards made under the 1997 Plan is 1,000,000. (The 31,800,000, 1,600,000, and 1,000,000 amounts are subject to adjustment upon certain occurrences and reflect a two-for-one stock split distributable to stockholders of record on April 30, 2001.) The maximum number of shares of Restricted Stock that may be delivered under the Plan will not exceed 40% of the total number of shares authorized for issuance. No Awards may be made under the 1997 Plan after December 18, 2006.

Under the 1997 Plan, the Company may offer and sell either authorized but unissued shares or shares that the Company previously issued and reacquired on the open market or otherwise (including shares reacquired by an optionee's payment of an exercise price in shares).

**Stock Options.**

The 1997 Plan permits the granting of stock options that qualify as incentive stock options under Section 422(b) of the Internal Revenue Code ("ISOs") and stock options that do not qualify ("nonqualified options"). The option exercise price of each option is determined by the Committee in its discretion but may not be less than the fair market value of the Common Stock on the date the option is granted. Once granted, an option cannot be repriced.

The term of each option is fixed by the Committee but may not exceed 10 years from the date of grant.

The Committee determines when each option may be exercised. Options may be made exercisable in installments, and the exercisability of options may be accelerated by the Committee.

The option exercise price of options granted under the 1997 Plan must be paid in cash, or, if the Committee so determines, by delivery of shares of unrestricted Common Stock (including by attestation of ownership), by delivery of an unconditional broker's undertaking to deliver the exercise price, or by a combination of such methods of payment.

Stock Appreciation Rights.

The Committee may also grant stock appreciation rights ("SARs") entitling the holder upon exercise to receive an amount in any combination of cash or shares of Common Stock (as determined by the Committee), measured in whole or in part by reference to the appreciation since the date of grant in the value of the shares of Common Stock covered by such right. SARs may be granted separately from or in tandem with the grant of an option. Each tandem SAR terminates upon the termination or exercise of any accompanying option.

In addition to SARs exercisable at the discretion of the holder, the Committee may also determine in its sole discretion that, if so requested by an option holder, the Company will pay the optionee, in cancellation of the related option, any combination of cash or Common Stock, equal to the difference between the fair market value of the shares covered by the option and the exercise price.

Based on current accounting and reporting standards, there would be a charge to earnings with respect to any SARs which have been granted, based upon the amount of appreciation, if any, in the market value of the shares covered under the rights, and there would be a credit to earnings, to the extent of previously recognized charges for appreciation, for decline in the market value of such shares. Based on current accounting and reporting standards, applicable charges and credits would commence with the granting of SARs based on market appreciation or depreciation and would continue to be recorded quarterly until the exercise, surrender, or termination of the rights.

Restricted Stock and Unrestricted Stock.

The Committee may also award shares of Common Stock subject to such conditions and restrictions as the Committee may determine ("Restricted Stock"). The Committee may require that recipients of Restricted Stock enter into a Restricted Stock Award agreement with the

Company setting forth the terms and conditions of the Award, or may establish the terms and conditions of the Award in some other manner. The Committee may at any time waive the restrictions and conditions applicable to a Restricted Stock Award. Shares of Restricted Stock are non-transferable and except as otherwise provided by the Committee, if a participant who holds shares of Restricted Stock terminates employment for any reason other than death or disability prior to the lapse or waiver of the restrictions, the Company will have the right to require the forfeiture or repurchase of the shares in exchange for the amount, if any, which the participant paid for them. Except as determined by the Committee, Restricted Stock will vest (i.e., become free of restrictions under the 1997 Plan) in the event of death or disability. Prior to the lapse of restrictions on shares of Restricted Stock, the participant will have all rights of a stockholder with respect to the shares, including voting and dividend rights, subject only to the conditions and restrictions generally applicable to Restricted Stock.

The Committee may also grant shares (for a purchase price not less than par value) which are free from any restrictions under the 1997 Plan ("Unrestricted Stock").

Restricted Stock or Unrestricted Stock may be issued under the 1997 Plan in payment of Awards under the Company's Senior Executive Annual Incentive Plan.

## Deferred Stock.

The Committee may also make Deferred Stock awards under the 1997 Plan entitling the recipient to receive shares of Common Stock in one or more installments at a future date or dates, as determined by the Committee. Receipt of Deferred Stock may be conditioned on such matters as the Committee shall determine, subject to acceleration in the Committee's discretion. Except as otherwise determined by the Committee all such rights to which a participant is not irrevocably entitled will terminate upon the participant's termination of employment.

## Performance Awards.

The Committee may also award Performance Awards entitling the recipient to receive shares of Common Stock or cash in such combinations as the Committee may determine, up to a maximum of 1,000,000 shares (or their equivalent value in cash) to any individual over the life of the 1997 Plan. Payment of the Performance Award may be conditioned on achievement of individual, corporate, departmental or other performance goals and will be subject to such other conditions as the Committee shall determine. Except as otherwise determined by the Committee, rights under a Performance Award will terminate upon a participant's termination of employment.

Performance Awards under the 1997 Plan that are intended to qualify as performance-based compensation under Section 162(m)(4)(C) of the Internal Revenue Code ("exempt awards") must provide for payment solely upon attainment of one or more objectively determinable performance goals established by the Committee (in accordance with the rules under Section 162(m) of the Internal Revenue Code) based on one or more of the following performance criteria: (i) return on equity, (ii) earnings per share, (iii) the Company's total stockholder return during the performance period compared to the total stockholder return of a generally recognized market reference (e.g., the S&P 500 or the S&P Financial Index), (iv) revenue growth, (v) operating leverage, or (vi) market share. To the extent consistent with

the exemption rules under Section 162(m) of the Internal Revenue Code, the Committee may provide that performance goals will be adjusted to eliminate the effect of extraordinary items (as determined in accordance with generally accepted accounting principles) or changes in the Common Stock by reason of a stock dividend, stock split, extraordinary dividend or similar event.

**Supplemental Grants.**

In connection with Awards under the 1997 Plan, the Committee may at any time grant to a participant the right to receive a cash payment up to the amount estimated to be necessary to cover federal, state, and local income taxes with respect to such Award and with respect to the cash payment itself.

**Change of Control.**

The 1997 Plan provides for certain changes in the terms of Awards in the event of a Change of Control (as defined in the 1997 Plan). A Change of Control is defined generally as the acquisition of beneficial ownership of 25% or more of the Company's then outstanding stock or other change of control as determined under the Exchange Act; a significant change in the composition of the Board of Directors; reorganization, merger or consolidation or sale or other disposition of all or substantially all of the Company's assets by the Company under certain circumstances, or the approval by the stockholders of the Company of a complete liquidation or dissolution of the Company.

In general, in the event of a Change of Control:

(1)    options and SARs held by optionees will become immediately exercisable,

(2)    options and SARs shall remain exercisable for seven months following termination of employment,

(3)    Restricted Stock which is not already vested will vest,

(4)    holders of Performance Awards following a Change of Control would be entitled to a cash payment in such amounts as are specified in the Award, and

(5)    restrictions are imposed on the rights of the Committee to amend the terms of certain Awards.

**Nontransferability of Awards.**

Awards granted under the 1997 Plan may not be transferred except by will or the laws of descent and distribution. During a participant's lifetime an Award requiring exercise may be exercised only by the participant. The Committee has the authority in its discretion to permit transfers to other persons or entities.

**Documentation of Awards.**

Plaintiff 133

Awards granted under the 1997 Plan will be evidenced by in writing in a form that the Committee approves. The writing may be in the form of an agreement to be executed by the Company and the participant or a certificate or a letter which need not be executed by the participant in which case acceptance by the participant will constitute agreement to the terms of the Award.

<u>Noncompetition</u>.

The Committee may provide in connection with any Award that the participant's rights to enjoyment of the Award or to any cash or Common Stock deliverable under the Award be conditioned upon the participant's agreeing (on terms determined by the Committee) not to compete with the Company and its subsidiaries, not to disclose confidential information, and not to solicit employees, advisors or business from the Company and its subsidiaries.

<u>Events Affecting Outstanding Awards</u>.

<u>Death, Retirement or Disability</u>

In general, if the employment of a participant who is an employee of the Company terminates by reason of normal or early retirement, death or disability, the option or SAR remains exercisable in accordance with its terms and may be exercised by the optionee or his or her legal representative until the later of one year after the last installment becomes exercisable and one year after death.

If the employment of a participant who is an employee of the Company terminates by reason of death or disability all Restricted Stock held by the Participant shall be vested. If the employment terminates by reason of retirement, all Restricted Stock must be transferred to the Company.

Any payment or benefit under a Deferred Stock Award, Performance Award, or Supplemental Grant to which the Participant was not irrevocably entitled prior to termination of employment will be forfeited and the Award canceled as of the time of such termination of employment.

<u>Other Termination of Service</u>

If a Participant who is an employee ceases to be an employee for any reason other than death, retirement, or disability, or if there is a termination of the consulting, service or similar relationship of a nonemployee participant who was granted an Award under the 1997 Plan ("Status Change"):

(a) All Options and SARs held by the participant that were not exercisable immediately prior to the Status Change will terminate at the time of the Status Change. Any Options or SARs that were exercisable immediately prior to the Status Change will continue to be exercisable for a period of three months, and then shall terminate; but if the participant dies within such three-month period, the Option or SAR will be exercisable (to the extent it was exercisable immediately prior to death) for a period of one year following the Status Change. In no event,

however, shall an Option or SAR remain exercisable beyond the latest date on which it could have been exercised.

(b) All Restricted Stock held by the participant at the time of the Status Change must be transferred to the Company.

(c) Any payment or benefit under a Deferred Stock Award, Performance Award, or Supplemental Grant to which the participant was not irrevocably entitled prior to the Status Change will be forfeited and the Award canceled as of the date of such Status Change.

(d) For a participant who is an employee, (i) a sick leave or other bona fide leave of absence approved for purposes of the 1997 Plan by the Committee, so long as the Employee's right to reemployment is guaranteed either by statute or by contract, or (ii) a transfer of employment between the Company and a subsidiary or between subsidiaries, or to the employment of a corporation (or a parent or subsidiary corporation of such corporation) issuing or assuming an Option in a transaction to which Section 424(a) of the Code applies, will not be considered a Status Change.

<u>Amendments</u>.

The Committee may at any time amend or discontinue the 1997 Plan or amend Awards for the purpose of satisfying changes in the law or for any other lawful purpose. However, no such action shall adversely affect any rights under outstanding awards without the holder's consent. Moreover, any amendment requiring stockholder approval for purposes of satisfying any then-applicable incentive stock option rules or Section 162(m) rules shall be subject to such stockholder approval to the extent then required.

In connection with or following a Change of Control neither the Committee nor the Board of Directors may impose additional conditions on exercise or otherwise amend an Award or the terms of the 1997 Plan in any manner adverse to the holders of an Option, SAR, share of Restricted Stock, Deferred Stock Award or Performance Award without the written consent of such holder. After such a Change of Control, options and SARs shall remain exercisable following a termination of employment or other service relationship (other than in the event of death, retirement or disability) for seven months or until the expiration of the original term of the Award if earlier. Stock may be substituted for cash in certain circumstances where cash payments would result in adverse accounting treatment.

<u>Adjustments Upon Changes in Stock</u>.

In the event of changes in the Common Stock of the Company resulting from any recapitalization, reclassification, merger, consolidation, combination or other similar change, outstanding Awards may be adjusted for the number and kinds of shares, cash, securities or other property so distributed in accordance with the terms of the 1997 Plan. Appropriate adjustments shall also be made in the terms of SARs and in the terms of performance targets and changes in the length of performance periods.

Plaintiff 135

<u>No Lien on Funds.</u>

No person has or may create a lien under the 1997 Plan or pursuant to a contract in connection therewith on any funds held under the 1997 Plan.

<u>Termination of the 1997 Plan.</u>

No awards may be granted under the Plan after December 18, 2006.

<u>Federal Income Tax Consequences.</u>

The following is only a general summary of the federal income tax effects to the participant and the Company associated with Awards under the 1997 Plan. There are a number of special tax rules which may be applicable under certain circumstances. In particular, the following discussion assumes that the Preferred Share Purchase Right does not separate from the share of Common Stock which it accompanies. If the Preferred Share Purchase Right did so separate, the federal income tax treatment of awards under the 1997 Plan may differ from the treatment summarized below. The discussion is based on the provisions of the Code, regulations, proposed regulations and rulings thereunder, as in effect on the date hereof, all of which are subject to change at any time. This summary does not address state, local or non-U.S. taxation of awards under the 1997 Plan, which may differ significantly from federal income tax rules and regulations. Individuals should consult with their own tax advisors.

<u>Incentive Stock Options.</u>  No ordinary taxable income is realized by the optionee upon the grant or exercise of an ISO. If no disposition of shares issued to an optionee pursuant to the exercise of an ISO is made by the optionee within two years from the date of grant or within one year after exercise, then upon a later sale of such shares, any gain or loss recognized in the sale will be taxed to the optionee as a long-term capital gain or loss. If shares of Common Stock acquired upon the exercise of an ISO are disposed of by the optionee prior to the expiration of the two-year or one-year holding periods (a "disqualifying disposition"), generally the optionee will realize ordinary income in the year of disposition in an amount equal to the excess (if any) of the fair market value of the shares at exercise (or, if less, the amount realized on a sale of such shares) over the option price thereof. Any further gain recognized will be taxed as short-term or long-term capital gain.

If an ISO is exercised at a time when it no longer qualifies for the tax treatment described above, the option is treated as a nonqualified option. Generally, an ISO will not be eligible for the tax treatment described above if it is exercised more than three months following termination of employment (one year following termination of employment, in the case of termination by reason of permanent and total disability), except in certain cases where the ISO is exercised after the death of the optionee. Options otherwise qualifying as ISOs will also be treated for federal income tax purposes as nonqualified options to the extent they (together with other ISOs granted by the Company to the optionee) first become exercisable in any calendar year for shares having a fair market value, determined at the time of the option grant, exceeding $100,000.

Exercise of an ISO increases the optionee's alternative minimum taxable income ("AMTI") by an amount equal, in general, to the excess of the fair market value of the shares acquired under the option over the option price. This increase may result in an alternative minimum tax ("AMT") liability to the optionee. The amount of AMT, if any, paid by the

optionee in respect of the option exercise may, subject to certain limitations, be applied as a credit against regular income tax liability in subsequent years. If an optionee who exercises an ISO makes a disqualifying disposition of the shares in the same year in which falls the AMTI adjustment associated with exercise of the option, the disqualifying disposition will eliminate the AMTI adjustment.

Where the exercise price of an ISO is paid using previously acquired shares of the Company's Common Stock, the basis and capital gains holding period of the surrendered shares will carry over to an equivalent number of new shares acquired upon exercise, and the remaining shares will have a zero basis and a new capital gains holding period. (Where a portion of the exercise price is paid in cash, it is not clear from proposed I.R.S. regulations how the basis of various shares acquired upon exercise is to be increased to reflect the cash payment.) For purposes of determining whether the shares acquired upon exercise have been held long enough to avoid a disqualifying disposition, the holding period of all shares commences at exercise. The use of previously acquired shares to exercise an ISO will not result in recognition of a capital gain or loss with respect to those shares. However, if the surrendered shares were themselves acquired pursuant to the exercise of an ISO or other statutory option, and have not been held long enough to avoid a disqualifying disposition, the surrender of those shares will constitute a disqualifying disposition and will give rise to ordinary income as described above.

Nonqualified Options.  The grant of a nonqualified option will not result in any taxable income to the optionee. Upon exercise of such an option, the excess of the fair market value of the acquired stock on the date of exercise over the option price is taxable to the optionee as ordinary income.  When an optionee sells shares acquired pursuant to the exercise of a nonqualified option, any gain or loss recognized in the sale will be taxed to the optionee as a long-term or short-term capital gain or loss.

Special Rule Where Option Price is Paid with Stock.  Where the exercise price of a nonqualified option is paid using previously acquired shares of the Company's Common Stock, the basis and capital-gains holding period of the surrendered shares will carry over to an equivalent number of new shares acquired upon exercise, and the remaining shares will have a tax basis equal to their fair market value on the date of exercise. No gain or loss will be recognized by reason of the surrender of the previously acquired shares.

SARs.  An optionee will realize no income upon the grant of a SAR. When the optionee exercises the SAR, the optionee will generally recognize ordinary income in an amount equal to the amount of cash received plus the fair market value of any stock received.

Restricted Stock.  A participant to whom shares of restricted stock are awarded under the Plan will realize income with respect to the Award, in general, only when the shares are no longer subject to a substantial risk of forfeiture. The amount of income realized will be the fair market value of the shares at the time the substantial risk of forfeiture lapses, less any price paid for the shares. However, a participant who is awarded Restricted Stock may elect under Section 83(b) of the Code (as so-called "83(b) election") to recognize income at the time of the Award (in an amount equal to the then fair market value of the shares less any price paid) rather than when the substantial risk of forfeiture lapses. An 83(b) election must be made not later than thirty days after the shares are transferred to the participant and must satisfy other requirements specified in regulations. A participant who makes a proper 83(b) election and later forfeits the

shares may not claim a tax loss with respect to the ordinary income realized by reason of the election. Where a proper 83(b) election is made, the participant's capital-gain holding period in the shares acquired in the Award will be measured from the date of transfer and the participant's tax basis in the shares will be their fair market value on the date of transfer. If a proper 83(b) election is not made, the participant's capital-gain holding period will be measured from the date the substantial risk of forfeiture lapses and the participant's tax basis in the shares will be their fair market value at that time.

Deferred Stock. The grant of a Deferred Stock Award will not itself produce taxable income to the participant. Instead, the participant will have ordinary income only when the shares of stock are actually transferred. The amount of ordinary income realized at that time will be the then fair market value of the shares less any price paid for the shares.

Performance Awards. The tax treatment to a participant of Performance Awards under the 1997 Plan will depend on the nature of the Award. In general, a participant will not have income upon the grant of a Performance Award but will have ordinary income when cash or shares are paid or made available to the participant under the Award (for example, upon payment following attainment of the specified performance goal). The amount of such income will equal the cash and the fair market value of the shares paid or made available, less any price paid by the participant. If shares delivered under a Performance Award are subject to a substantial risk of forfeiture, the rules applicable above to Restricted Stock will apply and may affect the date on which income with respect to such shares is recognized (and the amount of such income).

Tax Consequences to the Company. In general and subject to the limitations described below, the Company is entitled to a deduction in respect of Awards under the 1997 Plan at the time and to the extent that a 1997 Plan participant has ordinary income (but not income taxed as a capital gain). Where the ordinary income is associated with the transfer of shares (including in connection with the disqualifying disposition of shares acquired upon exercise of an ISO), the Company's ability to claim the deduction may depend upon its satisfaction of tax reporting requirements with respect to the income.

Section 162(m) of the Code limits to $1 million the deduction the Company may claim for compensation paid in any year to its chief executive officer or any of its other four most highly compensated officers, subject to a number of exceptions and special rules. Stock options and SARs awarded under the 1997 Plan, as well as certain Performance Awards made under the 1997 Plan, are intended to qualify for exemption from the Section 162(m) limit. The Code also denies a deduction for so-called "excess parachute payments" made in connection with a change in control (*see* below). Non-deductible excess parachute payments will in general reduce the $1 million deduction limit under Section 162(m) of the Code.

## Miscellaneous.

In general, ordinary income under 1997 Plan Awards, including in connection with the transfer or vesting of shares of Common Stock, made to employee participants will be subject to tax withholding.

Under currently applicable law, long-term capital gains are taxed at more favorable rates than short-term capital gains. Gains on the sale or exchange of capital assets with a holding

period of more than one year are treated as long-term capital gains. The Taxpayer Relief Act of 1997 provides, in general, that the long-term capital gain on sale of capital assets with a holding period of more than eighteen months will be taxed at a lower rate than long-term capital gains on assets with a holding period of eighteen or fewer months (but more than one year). A special favorable rate is also available with respect to gain on the sale of assets with a more than five-year holding period commencing on or after January 1, 2001, although for this purpose property acquired pursuant to an option that was granted prior to 2001 would appear not to qualify.

In the event of a change of control of the Company, payments in the nature of compensation, including the grant or vesting of Awards under the 1997 Plan, that are treated as being contingent on the Change of Control ("parachute payments") may be required to be taken into account in whole or in part in determining whether the recipient has received "excess parachute payments" subject to a special 20% additional tax. In general, if an individual's parachute payments equal or exceed three times his or her annual average taxable compensation from the employer for the five calendar years preceding the change of control, all of the individual's parachute payments over one times the five-year average are treated as "excess parachute payments". Excess parachute payments may not be deducted by the employer.

**Withholding.**

The Company will withhold from any cash payment made pursuant to an Award an amount sufficient to satisfy all federal, state and local withholding tax requirements. In the case of an award pursuant to which Common Stock may be delivered, the Committee will have the right to require that the officer or other appropriate person remit to the Company an amount sufficient to satisfy the withholding requirements, or make other arrangements satisfactory to the Committee with regard to such requirements, prior to the delivery of any Common Stock. If and to the extent that such withholding is required, the Committee may permit the officer or such other person to elect at such time and in such manner as the Committee provides to have the Company hold back from the shares to be delivered, or to deliver to the Company, Common Stock having a value, taken at fair market value, calculated to satisfy the withholding requirement.

If at any time an ISO is exercised the Committee determines that the Company could be liable for withholding requirements with respect to a disposition of the Common Stock received upon exercise, the Committee may require as a condition of exercise that the person exercising the ISO agree (i) to inform the Company promptly of any disposition (within the meaning of Section 424(c) of the Code) of Common Stock received upon exercise, and (ii) to give such security as the Committee deems adequate to meet the potential liability of the Company for the withholding requirements and to augment such security from time to time in any amount reasonably deemed necessary by the Committee to preserve the adequacy of such security.

# EXHIBIT 31

State Street Global Advisors
Equity Compensation Plan

Exhibit A

I.    Introduction: purpose

The purpose of the State Street Global Advisors Equity Compensation Plan set forth herein (the "Plan") is to increase the financial success of State Street Global Advisors ("SSgA"), a division of State Street Bank and Trust Company (the "Bank"), and thereby further the interests of State Street Corporation (the "Corporation") and its subsidiaries, including the Bank, and the interests of the Corporation's shareholders by granting to key officers of SSgA awards ("Awards") based on the common stock of the Corporation ("Stock").

II.    Administration

The Plan will be administered by the Executive Compensation Committee (the "Committee") of the Board of Directors of the Corporation. The Committee shall have complete authority, subject to the terms of the Plan, to do any of the following in its discretion: (i) grant Awards in accordance with III. below; (ii) waive compliance by a holder of an Award with any obligation to be performed by the holder under the Award, and waive any terms or conditions of an Award; (iii) amend or cancel an existing Award in whole or in part (and if an Award is canceled, grant another Award in accordance with III. below, with the same or different terms, in its place), except that no such action shall adversely affect the rights of a holder of an Award without the holder's consent; (iv) prescribe and modify the form or forms of all notices, elections, agreements, or other instruments, if any, to be used under the Plan; (v) adopt, amend, and rescind rules for the administration of the Plan; and (vi) interpret the Plan and Awards and decide any questions and settle all controversies and disputes that may arise in connection with the Plan or any Award. Determinations and actions by the Committee shall be conclusive and shall bind all parties.

III.    Eligibility and participation; Awards

Participation in the plan is limited to the Chief Executive Officer (CEO) of SSgA and those other senior officers of SSgA whose responsibilities are expected to have a direct impact on the financial success of SSgA and who are selected for participation in the Plan by the CEO of SSgA with the prior approval of the CEO of the Corporation. The initial Awards under the Plan as approved by the Committee, covering all shares initially available under the Plan, shall be made to the individuals and for the number of shares specified in Exhibit A. If additional shares become available under the Plan pursuant to IV.(b) below, additional Awards may be made as follows: (a) if to the CEO of SSgA, by the Committee in its discretion; and (b) if to any other officer of SSgA, by the CEO of SSgA with the prior approval of the CEO of the Corporation.

IV.    Terms and Conditions

(a) *Awards.* Except as otherwise specifically provided, each Award shall consist of an unfunded and unsecured commitment by the Corporation to make future delivery of shares of Stock in accordance with the terms of the Plan.

(b) *Shares Available for Awards.* The total number of shares of Stock reserved for issuance under the Plan is 300,000. Except as otherwise specified by the Committee, all shares delivered under the Plan shall be treasury shares. In the event of a stock dividend, stock split, recapitalization or similar change in the capitalization of the Corporation, the Committee shall make appropriate adjustment in the number and type of shares reserved for issuance under the Plan. To the extent an Award or any portion thereof is forfeited under (c) below prior to vesting, the shares of Stock underlying the forfeited portion of the Award shall again be available for future Awards under the Plan.

(c) *Vesting and Distributions.*

1. In the event a Participant's employment with SSgA terminates for any reason, each Award held by the Participant shall be immediately forfeited (and no payment shall be made with respect thereto) except to the extent the Award was vested at time of termination. Except as hereinafter provided, each Award shall be vested as to 33.33% of the shares subject to the Award on December 21, 2003 and as to an additional 33.33% of the shares subject to the Award on December 21 of each of 2004 and 2005.

2. If a Participant's employment with SSgA terminates by reason of death, permanent disability as determined by the Committee, or retirement at or after age 55 with at least ten years of service with the Corporation and its subsidiaries ("retirement"), each Award then held by the Participant shall be considered vested immediately prior to such termination for a number of shares equal to the product of (i) the full number of shares initially covered by the Award, times (ii) a fraction, the numerator of which is the full number of years elapsed since January 1, 1996, and the denominator of which is ten (10). Vesting under this paragraph shall be in lieu of any vesting under the second sentence of 1. above.

3. Notwithstanding 1. above, if a Participant ceases to be employed by SSgA but continues in the employment of the Corporation and its subsidiaries (a "transfer"), or if a Participant requests a change from full-time to part-time employment within SSgA or requests reassignment to another position within SSgA and such other position involves fewer responsibilities or lower levels of remuneration (as determined by the Committee in its sole discretion) and in either case such request is granted (a "voluntary reduction in position"), the

Participant (i) shall promptly forfeit so much of his or her Awards as would be treated as not having vested under 2. above had the Participant retired (as defined under 2. above) on the date of the transfer or voluntary reduction in position, and (ii) shall forfeit the remainder of such Awards (the "remaining portion") if and when he or she suffers a termination of employment with the Corporation and its subsidiaries (other than by reason of death, permanent disability as determined by the Committee, or retirement (as defined at 2. above)) prior to having worked continuously for the Corporation and its subsidiaries until the date (the "deferred vesting date") on which, under the second sentence of 1. above, the Participant, had he or she continued to work continuously in his or her original position at SSgA, would have vested in a percentage of his or her Award at least equal to the remaining portion. On the deferred vesting date (if the Participant has continued to work continuously for the Corporation and its subsidiaries until such date), or in the event of the Participant's earlier death, permanent disability as determined by the Committee, or retirement (as defined at 2. above), the Participant shall be deemed vested in so much of his or her Award as has not been forfeited.

4.  The Committee may prescribe different vesting rules than those specified in 1., 2., or 3. above in connection with additional Awards described in III.(a) or III.(b) above or in such other circumstances as the Committee may determine. A Participant shall not be deemed to have suffered a termination of employment with SSgA merely by reason of a *bona fide* leave of absence, as determined by the Committee in its discretion.

5.  On or as soon as practicable after December 31, 2005 (or such other date as shall be specified in connection with the grant of an Award or by the Committee after grant), the Corporation shall deliver to each Participant or former Participant then holding a vested Award (or to the beneficiary of a deceased Participant who died holding an Award vest or deemed vested under 1., 2., 3. above) the share of Stock subject to the vested Award. In the event of the death, permanent disability or retirement of a Participant, such shares shall instead be delivered as soon as practicable after such death, permanent disability or retirement.

(d)  *Shareholder rights.*  A Participant shall have no rights as a shareholder with respect to Stock subject to Awards under the Plan, including but not limited to rights to dividends or voting rights, until such shares have been delivered.

(e)  *Nontransferability of Awards.*  Awards granted under the Plan and rights thereunder may not be pledged, encumbered, sold, exchanged or otherwise transferred or disposed of by a Participant or by any other person, and any attempt to pledge, encumber, sell, exchange or otherwise transfer or dispose of an Award or any such interest shall be null and void. Notwithstanding the foregoing, a Participant may designate a beneficiary or beneficiaries to receive in accordance with (c)2. or (c)3. above any shares of Stock payable under an Award held by the

Participant at time of death. Any beneficiary designation hereunder shall be made in a form acceptable to the Committee and subject to such conditions as the Committee may impose. In the absence of an effective beneficiary designation form, a Participant's estate shall be deemed to be the Participant's sole designated beneficiary for purposes of the Plan.

V.    *Miscellaneous provisions*

(a)    *Change in Control.* In the event the Corporation sells all or substantially all of SSgA (a "covered transaction"), as determined by the Committee, each Participant employed by SSgA immediately prior to consummation of the covered transaction shall be entitled to the delivery, as soon as practicable following consummation of the covered transaction, of a number of shares of Stock equal to the product of (i) the full number of shares subject to all Awards then held by the Participant, times (ii) a fraction, the numerator of which is the number of full years elapsed from January 1, 1996 (determined as of the consummation of the covered transaction) and the denominator of which is ten (10). A different vesting proration formula may be provided for in connection with additional Awards described in III.(a) or III.(b) above. The benefits provided by this paragraph shall be in addition to, and not in lieu of, benefits provided under any change in control agreement to which the Participant is a party.

(b)    *No hire/no solicitation/non*-compete agreement. Each Award to a Participant under the Plan shall be conditioned upon the Participant's execution of an agreement in form satisfactory to the Committee substantially to the effect that:

1. The Participant shall hold in a fiduciary capacity for the benefit of the Corporation all secret or confidential information, knowledge or data relating to the Corporation or any of its subsidiaries, and their respective businesses and Clients (as defined below), which shall have been obtained by the Participant during the Participant's employment by the Corporation or any of its affiliated companies and which shall not be or become public knowledge (other than by acts by the Participant or representatives of the Participant in violation hereof). After termination of the Participant's employment, the Participant shall not, without the prior written consent of the Corporation or as may otherwise be required by law or legal process, communicate or divulge any such information, knowledge or data to anyone other than the Corporation and those designated by it. The term "Client" means any person or entity that is a customer or client of the Corporation or any of its subsidiaries.

2. During the term of employment of the Participant and during the Nonsolicitation Period (as defined below), the Participant shall not without the prior written consent of the Corporation, solicit, directly or indirectly (other than through a general solicitation of employment not specifically directed to employees of the

Corporation or its subsidiaries), the employment of any person who within the previous 12 months was an officer of the Corporation or any of its subsidiaries. The term "Nonsolicitation Period" means the period beginning on the date of termination of the Participant's employment with the Corporation and its subsidiaries (the "termination Date") and ending eighteen (18) months after the Termination _ date.

3. During the term of employment of Participant and during the Nonsolicitation Period, the Participant shall not, without the prior consent of the Corporation, engage in the Solicitation of Business (as defined below) from any Client on behalf of any person or entity other than the Corporation and its subsidiaries. The term "Solicitation of Business" means the attempt through direct personal contact on the part of the Participant with a Client with whom the Participant has had significant personal contact while employed by the Corporation and its subsidiaries to induce such Client to transfer its business relationship from the Corporation and its subsidiaries to any other person or entity.

4. For a period of eighteen (18) months following termination of employment for any reason, the Participant shall not engage, either directly or indirectly, in any manner or capacity as advisor, principal, agent, partner, officer, director, employee, member of any association, or otherwise, in any business or activity which is at the time competitive with any business or activity conducted by the Corporation or any of its subsidiaries.

5. In the event of a breach by the Participant of any of the foregoing, (a) the Participant shall forfeit all rights to any and all Awards then held by the Participant and shall promptly refund to the Corporation any and all payments previously received by him or her under Awards, and (b) the Corporation may seek injunctive relief in addition to, and not in lieu of, any other relief to which it may be entitled, including the relief described at (a) immediately above.

6. Upon and following the occurrence (as determined by the Committee) of a "covered transaction" as described in V.(a), the nonsolicitation and noncompetition restrictions described in paragraphs 2., 3., and 4. above shall cease to apply.

(c)    *No right to employment.* Nothing herein shall entitle any Participant to continued employment with the Corporation or its subsidiaries, nor shall a claim of lost profits under any Award be deemed an element of damages in any claim relating to any termination of employment.

(d)    *Tax withholding, etc.*  No shares of Stock shall be required to be delivered under any Award until the Participant (or if the Participant has died, his or her beneficiary(ies) or estate) shall have paid to the Corporation in cash the full amount of any tax withholding due in connection with such delivery of shares or shall have made other provision satisfactory to the Committee for the payment of such taxes.    The Corporation may require that a Participant remit to the Corporation in cash the full amount of any FICA or similar taxes that may become due prior to delivery of shares of Stock hereunder, the payment of such taxes to be a condition to the delivery to the Participant or his or her beneficiary(ies) of any shares of Stock hereunder.

(e)    *Successors and assigns; certain mergers, etc.*  The obligations of the Corporation under the Plan shall be binding upon any successor to all or substantially all of the Corporation's assets or business.    In the event of a merger or consolidation involving the Corporation in which the Corporation is not the surviving entity, or which results in the acquisition of all or substantially all of the Corporation's outstanding stock by another entity, or in the event of a sale of all or substantially all of the Corporation's business or assets or the liquidation of the Corporation, (any of the foregoing, a "termination event"), the Corporation may arrange for the assumption of Awards by the successor or for substitute awards to be granted by any successor on substantially the same terms, taking into account changes in capitalization and related terms; but if the Corporation does not or cannot provide for such assumption or substitution, (i) each Award outstanding immediately prior to the termination event shall be deemed vested for the number of shares for which it would then have been vested had a change in control of SSgA occurred on the date of the termination event, and (ii) the Corporation prior to the termination event (but contingent upon its consummation) shall transfer such shares to the person holding such Award.    Upon consummation of the termination event, all Awards shall terminate unless assumed by a successor.

(f)    *Amendment and termination.*  The Committee may at any time terminate the Plan and may at any time and from time to time prior thereto amend the Plan or any Award in such manner and to such extent as it may determine; provided, that no such action shall adversely affect the rights of any person then holding an Award, without such person's consent; *and further provided,* that the Committee may not increase the number of shares of Stock reserved for issuance under the Plan, other than in accordance with the adjustment provisions of IV.(b) above, without the approval of the Board of Directors.

(g)    *Governing law.*  The Plan and all Awards hereunder shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

# EXHIBIT 32

CONFIDENTIAL

## STATE STREET CORPORATION
## EXECUTIVE ANNUAL INCENTIVE PLAN - 2002

### I.    Purpose

The purpose of the Executive Annual Incentive Plan (the "Plan") is to provide additional incentive and reward to top executives of State Street Corporation (the "Company") to achieve targeted levels of corporate financial performance.

### II.    Eligibility and Participation

Participants in the Plan shall include all Executive Vice Presidents of the Company except those designated as participants in the Senior Executive Annual Incentive (162(m)) Plan.

### III.    Performance Goals

No payment under an award granted under the Plan shall be made unless the performance goals specified with respect to the award are met or exceeded. For purposes of the Plan, a "performance goal" means an objectively determinable target level of achievement based on any or any combination of the following criteria: earnings or earnings per share; return on equity; total stockholder return; revenue; market share; quality/service; organizational development; strategic initiatives (including acquisitions or dispositions) and risk control.

Annual financial performance goals are subject to the approval of the Executive Compensation Committee (the "Committee") of the Board of Directors of the Company. Performance goals with respect to an award must be pre-established by the Committee not later than ninety (90) days after the beginning of the year with respect to which the award is granted. Once established in accordance with the preceding sentence, performance goals may not be modified except to reflect gains or losses from unusual, non-recurring, single transactions which have a significant impact on financial results (relative to State Street Corporation's principles for administration of executive incentive plans) or changes in the stock of the Company (such as stock splits, stock dividends or recapitalizations).

Annual financial performance criteria and weighting is subject to Committee approval. Annual financial performance targets and award procedures are shown in Schedule A, and shall be reviewed for amendments on an annual or as required basis.

### IV.    Incentive Compensation Funding

Upon approval of the Committee and the Chairman and CEO of the Company, target incentive levels for each eligible executive, expressed as a percent of

CONFIDENTIAL

# STATE STREET CORPORATION
## EXECUTIVE ANNUAL INCENTIVE PLAN - 2002

base salary, are established. Funding for the Plan is based on the sum of the target incentives for each executive.

An amount of no less than 30% of the sum of target incentives shall be funded incentive compensation, which applies only if the funding level of the Plan does not meet at least a 30% payout level. The maximum payout under the Plan is 200% of the target incentives. A detailed summary of payout opportunity as related to corporate financial performance can be found in Schedule B.

**V.    Additional Terms**

A. The Committee reviews recommendations of the Chairman and CEO and ultimately approves individual awards.

B. Plan participants must be an employee of the Company on December 31st of the Plan year in order to receive their incentive payout; the Committee may cause forfeiture for participants no longer employed on the date that the Committee approves incentive amounts.

C. Payouts are not restricted by Section 162(m) of the Internal Revenue Code.

D. All payments, if any, under an award shall be paid in cash as soon as practicable following certification by the Committee as described above. Notwithstanding the foregoing, the Committee may provide that some portion or all of any award payment be made in shares of common stock of the Company ("Stock"), or stock options, in lieu of cash. Any shares of stock delivered shall be issued under the 1997 Equity Incentive Plan and may include Restricted Stock, Unrestricted Stock or Deferred Stock (as those terms are defined in the 1997 Equity Incentive Plan). The number of shares of Stock delivered in lieu of any cash amount under an award (the "replaced cash portion") shall be that number which equals the replaced cash portion divided by the fair market value of a share of Stock (determined without regard to any restrictions) on the date the Committee certifies that the performance goal or goals with respect to the award have been met.

E. Subject to such rules and limitations as the Committee may prescribe from time to time, a participant may elect to have all or any portion of an award payment deferred to the Voluntary Deferred Compensation Plan approved by the Committee in December 1998. A participant may elect to have all or any portion of an award payment deferred for a fixed term

CONFIDENTIAL

## STATE STREET CORPORATION
## EXECUTIVE ANNUAL INCENTIVE PLAN - 2002

of years, until retirement, death, disability or other termination of employment, or until the occurrence of some other event. Any amount so deferred shall be credited to the participant's account on the books of the Company and shall represent an unfunded and unsecured liability of the Company to pay the amount so deferred plus such additional amount, if any, representing notional earnings on the deferral ("earnings") as may be prescribed under the deferral rules. The portion of any award payable in Deferred Stock (as defined in the 1997 Equity Incentive Plan) shall likewise represent an unfunded and unsecured promise by the Company to deliver shares in the future pursuant to the terms of the 1997 Equity Incentive Plan. Earnings with respect to a deferred award shall be limited so as to satisfy the requirements of Treas. Regs. § 1.162-27(e)(2)(iii)(B) (relating to reasonable rates of interest or other returns based on predetermined actual investments) and any limitations imposed by the Federal Deposit Insurance Corporation or similar limitations.

VI.   **Miscellaneous**

    A. Payments will be made as soon as practically possible upon release of Company year-end earnings for 2002 and approval of incentive funding by the Chairman and CEO of the Company and the Committee.

    B. No payment of any incentive shall be made to any employee who ceases to be employed, on or before the payment date, by the Company, or one of its subsidiaries, provided, however, that this provision shall not apply if a participant's employment is terminated by reason of death or disability or retirement prior to the date of actual payment of incentive. Should a participant's employment be terminated due to death, disability, or retirement a prorated amount will be paid out to the participant or his/her estate.

    C. The Committee and/or the Chairman and CEO of the Company may make adjustments to reported financial results as they consider appropriate in determining performance for incentive compensation purposes.

    D. The Company reserves the right to change, amend, or cancel the terms of the Plan at any time.

CONFIDENTIAL

## STATE STREET CORPORATION
## EXECUTIVE ANNUAL INCENTIVE PLAN - 2002

### Schedule A
### Financial Targets and Operating Procedures

*I.  Corporate Financial Performance Targets*

Performance targets are established for both *Return on Equity* and *Earnings per Share*, each to be treated independently.

- Weighting for ROE = 40% of Award
- Weighting for EPS = 60% of Award
- ROE Target = 18.0%
- EPS Target = $2.34

Please see Schedule B for a detailed summary of total incentive payout opportunity as related to corporate financial performance.

*II.  Incentive Award Procedures*

Payment of awards shall be made in accordance with the following provisions:

- Awards are generally paid in February following the Plan year
- The Committee reviews recommendations from the Chairman and CEO and ultimately approves individual awards
- Payout of awards shall be made in cash; such form of payment to be at the discretion of the Committee and pursuant to administrative procedures established by the Committee
- All payments are subject to applicable country, state, and local tax requirements and shall be made in accordance with the procedures and standards established by the Company for other compensation.

CONFIDENTIAL

# STATE STREET CORPORATION
## EXECUTIVE ANNUAL INCENTIVE PLAN - 2002

### Schedule B
### Performance Payout

| ROE | Performance Percent | Weight 40% | EPS | EPS Growth vs $2.00 | Performance Percent | Weight 60% | Total Payout |
|-----|--------------------|-----------|-----|--------------------|--------------------|-----------|-------------|
| 14.00% | 30% | 12% | $1.75 | -12.5% | 30% | 18% | 30% |
| 15.00% | 40% | 16% | $1.88 | -6.0% | 40% | 24% | 40% |
| 16.82% | 50% | 20% | $2.13 | 6.5% | 50% | 30% | 50% |
| 18.00% | 85% | 34% | $2.29 | 14.5% | 85% | 51% | 85% |
| 18.32% | 100% | 40% | $2.34 | 17.0% | 100% | 60% | 100% |
| 19.45% | 150% | 60% | $2.50 | 25.0% | 150% | 90% | 150% |
| 20.85% | 200% | 80% | $2.70 | 35.0% | 200% | 120% | 200% |

# EXHIBIT 33

# STATE STREET CORPORATION
## 225 Franklin Street
## Boston, MA 02110

### Notification of Grant of Performance Award

June 30, 2003

Alan J. Brown

Re: <u>Performance Award</u>

Dear Alan:

This letter shall serve as an agreement between you and State Street Corporation (the "Company") setting forth the terms and conditions relating to the Performance Award granted to you under the Company's 1997 Equity Incentive Plan, as amended (the "Plan"), if certain performance targets are met during designated performance periods.

## 1. <u>Grant of Performance Award.</u>

You have been granted an Award consisting of 17,200 units (a "Performance Award") entitling you to payment as described below upon satisfaction of the terms and conditions of this Award. The Award has been granted with respect to the performance period (the "Performance Period") commencing January 1, 2003 and ending on December 31, 2004 (the "Maturity Date").

## 2. <u>Performance Targets: Committee Certification.</u>

Your Performance Award shall be earned as follows:

(a) Earnings Per Share (EPS). Seventy percent (70%) of the Performance Awards granted (12,040) shall be earned based upon the Company's fully diluted aggregated earnings per share (EPS) during the Performance Period.

(b) Return on Equity (ROE). Thirty percent (30%) of the Performance Awards granted (5,160) shall be based on the Company's average return on common stockholders' equity (ROE) during the Performance Period.

The specific EPS and ROE targets were established by the Committee on February 20, 2003 and are attached. Achievement of the specific performance target(s) will be a condition to the earning of any payment under this Award. The earning of the Award is also conditioned upon Committee certification, following the close of the Performance Period, that the specific performance targets have been achieved.

Plaintiff 280

### 3. Form of Payment.

(a) Each Performance Award is payable in cash, on or before the March 31st next following the end of the Performance Period, in an amount equal to the fair market value of one share of the Company's common stock, $1.00 par value (the "Common Stock"). For this purpose, fair market value shall mean the average of the closing high and low prices of the Common Stock on the ten trading days preceding the end of the Performance Period.

(b) Upon your request made prior to January 1st of the year of the Maturity Date, payment under this Award may be deferred on such terms and for such period as the Committee may approve. Until such time, the Company will pay an interest equivalent on the deferred amount at a rate equal to the effective yield to maturity on the one-year Treasury constant maturity rate with an issue date closest to the March 31st following the Maturity Date and with issue dates closest to March 31st of each succeeding year.

### 4. Non - Transferability, Etc.

The Award, including Performance Awards represented thereby, shall not be transferable otherwise than by will or the laws of descent and distribution.

### 5. Termination of Employment

(a) No amount shall be paid in respect of the Award in the event that you cease to be employed by the Company prior to the end of the Performance Period, except as the Committee may otherwise determine.

(b) Any payment under the Award pursuant to an exercise by the Committee of its discretion under (a) above will take into account the time between the date your employment so terminated and the end of the Performance Period. In addition, payment to you of any unearned Performance Awards after termination of your employment otherwise than by reason of your death shall be subject to the conditions that until the Maturity Date you shall (i) not engage whether directly or indirectly, in any manner or capacity as advisor, principal, agent, partner, officer, director, employee, member of any association, or otherwise, in any business or activity which is at the time competitive with any business or activity conducted by the Company or any of its direct or indirect subsidiaries, and (ii) be available at reasonable times for consultations at the request of the Company's management with respect to phases of the business with which you were actively connected during your employment. In the event that either of the above conditions is not fulfilled, you shall receive no payment of the unearned Performance Award. Any determination by the Board of Directors [Committee] that you are, or have engaged in a competitive business or activity as aforesaid or not have been available for consultations as aforesaid shall be conclusive. Notwithstanding the foregoing this paragraph 5(c) shall be inapplicable following a Change of Control.

## 6. Acceleration of Performance Award.

Notwithstanding anything in this Agreement to the contrary, in the event of a Change of Control occurring prior to the Maturity Date, you shall be entitled at the time of such Change of Control to receive a cash payment per Performance Award equal to the adjusted fair market value of a share of the Common Stock. For purposes of the preceding sentence, "adjusted fair market value" shall mean the higher of the (i) the highest average of the reported daily high and low prices per share of the Common Stock during the 60 day period prior to the first date of actual knowledge by the Board of Directors of a Change of Control, and (ii) if the Change of Control is the result of a transaction or series of transactions described in Section 7.4(b)(1) or (3) of the Plan, the highest price per share of the Common Stock paid in such transaction series of transactions (which in the case of a transaction described in Section 7.4(b)(1) of the Plan shall be the highest price per share of the Common Stock as reflected in a Schedule 13D filed by the person having made the acquisition.

## 7. Changes in Capitalization or Corporate Structure.

The aggregate number of Performance Awards reflected in the Award shall be appropriately adjusted pursuant to Section 8.6 of the Plan to reflect transactions, events or circumstances described in said Section 8.6.

## 8. Amendments to Performance Units.

Subject to the specific limitations set forth in the Plan, the Board of Directors [Committee] may at any time suspend or terminate any rights or obligations relating to Performance Awards prior to their Maturity Date without your consent.

## 9. Compliance with Section 162(m).

The Committee shall exercise its discretion with respect to this award in all cases so as to preserve the deductibility of payments under the Award against disallowance by reason of Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code).

## 10. Provisions of the Plan.

The provisions of the Plan are incorporated herein by reference, and all terms not otherwise defined herein shall have the meaning given to them in the Plan. In the event of any conflict between the provisions of this Agreement and the provisions of the Plan, the provisions of the Plan shall control. You acknowledge that you have received a copy of the Plan [and a copy of the Prospectus for the Plan].

If the Award and the foregoing terms and conditions are acceptable to you, please sign the enclosed counterpart of this letter and return the same to the undersigned.

Very Truly Yours,

STATE STREET CORPORATION

By

Boon Ooi
Senior Vice President

The undersigned hereby accepts the Award and the Performance Awards represented thereby on the terms and subject to the conditions set forth above.

Alan J. Brown

Dated: _14th July, 2003_

# EXHIBIT 34

1

# COPY

Volume: 1
Pages: 1 to 50
Exhibits: 1 to 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-11178-NG

ALAN BROWN,                      )
                Plaintiff        )
                                 )
                                 )
        vs.                      )
                                 )
                                 )
STATE STREET CORPORATION,        )
STATE AND STREET GLOBAL          )
ADVISORS,                        )
                Defendants       )

        **DEPOSITION of DAVID A. SPINA**,
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Massachusetts Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108, on
Wednesday, May 31st, 2006, commencing at
10:00 a.m.

*   *   *   *

SHEA COURT REPORTING SERVICES
ONE UNION STREET, SECOND FLOOR
BOSTON, MASSACHUSETTS 02108-2408

12

```
 1            periodic meetings at which Tim Harbert,
 2            the president of SSGA, and Alan and I
 3            were the only three people present.  I
 4            don't believe anyone else was in the room
 5            at that time.
 6   Q.   Tell me what you recall being said at
 7            that meeting?
 8   A.   Well, I think there was other business
 9            matters discussed.  And then I recall
10            Alan saying that there was discontent
11            among the employees of State Street
12            Global Advisors in the UK, because the
13            VSP only applied to U.S. employees and
14            excluded them.  There was a general
15            feeling among those employees in the
16            UK that that was unfair, and they were
17            being badly treated.
18                    I don't know how the transition
19            was made, but it then got -- I've a clear
20            recollection of Alan making it clear of
21            not just talking about the attitude of
22            employees in the UK, but that it was
23            a matter that was of great personal
24            importance to him as well on an
```

13

```
 1        individual level.
 2   Q.   And before that conversation were
 3        you aware of any discontent among the
 4        UK employees concerning the VSP?
 5   A.   I don't have any recollection of being
 6        aware.
 7   Q.   And before that conversation had you
 8        considered that the EVSP had not been
 9        offered to Alan?
10   A.   No.
11   Q.   What happened next in the conversation?
12   A.   I think we continued the conversation,
13        and I think I either asked questions,
14        or we had a dialogue, we meaning Alan
15        and I, trying to understand a little
16        more specifically what his concerns
17        were.  And I recall one of the ideas that
18        Alan expressed was about the fact that
19        he had worked perhaps for ten years
20        very hard at doing his job, and he was
21        concerned about potential instability
22        in the company, and him getting
23        disadvantaged at some point in the
24        process.  And here was this great EVSP.
```

20

Q.   And was there any discussion that you
     had with Mr. Brown about whether this
     proposal would be available at his
     option?

A.   I don't recall.

Q.   Was there any discussion about this
     proposal being available to him only
     if he were terminated without cause?

A.   Again, I don't recall.  My impression
     was that we were talking about that
     general argument that I've worked very
     hard, and haven't achieved the fruits of
     my labors, and bad things can happen in
     a corporate world.  We could get taken
     over.  Somebody could get your job,
     David or Tim Harbert's job, and somebody
     could turn around and fire me.  If that
     happens, then he wanted some protection
     that would represent not protection, but
     remuneration for his labors of the prior
     ten years.

Q.   Did the discussion actually get to the
     level of specificity that I could be
     fired, or was it more generalized that

22

```
 1        you have seen recently, in which you

 2        refer to having made a commitment to

 3        Mr. Brown.

 4   A.   Right.

 5   Q.   By the end of this conversation did you

 6        consider that you had made a commitment

 7        to him to provide these benefits?

 8              MR. CALAMARI:  I'll object to

 9        the form.

10   A.   Well, I made a commitment that I was

11        empowered to make by my office, which

12        was to use my office to get him these

13        benefits that he felt were fair, and

14        would make him comfortable.

15   Q.   What did you believe you were empowered

16        to do in that regard?

17   A.   Well, I couldn't go over to my desk.  I

18        think the meeting was actually in my

19        office, and sort of open up a drawer and

20        a vault, take out the money and give it

21        to him.  It was to direct HR to put it

22        into details to either ask HR or me to

23        negotiate with Alan to make sure we had

24        the agreement with Alan and Tim, things
```

23

```
 1        that we got the spirit of what we were

 2        discussing onto paper.  And then to the

 3        extent it involved, you know, options,

 4        in particular, that was a thing that

 5        management, including the CEO, was never

 6        able to grant, or do, or agree to without

 7        permission of the Board.

 8    Q.  Were there some aspects of an EVSP

 9        like benefit that you felt you had the

10        authority to commit State Street to

11        without the Board?

12    A.  Well, I think that comes back to this

13        word commitment.  Maybe I need to ask

14        you to push that a little further for me.

15    Q.  Sure.  Let's do that.

16              MR. SCHWARTZ:   Mark this.

17              (Exhibit No. 1 marked for
          identification.)
18

19    Q.  I'm showing you what we've marked as

20        Exhibit 1.  This is a letter dated June

21        30th, 2004 to Robert Weissman from you.

22        Is this a letter that you wrote?

23    A.  It is.

24    Q.  It has stamped in the upper right-hand
```

25

```
 1        play a role that approached advocacy,
 2        even without the benefit of a law degree,
 3        or being accepted by the member of the
 4        bar, or something like that, because I
 5        thought this was in the best interest of
 6        the company for the Board to honor what I
 7        felt was the general ideas of the program
 8        that Alan and I had talked about.  So I
 9        was trying to put some spin on the ball
10        by using stronger letters or stronger
11        words with the Board in the letter,
12        because it was the only action I had
13        left that I could really do at that
14        point.
15   Q.   So when you use the word commitment in
16        this letter, what was your understanding
17        of what commitment meant?
18   A.   Well, I was trying to convey an
19        impression to them that while they had
20        the ultimate authority on these things,
21        that I had made -- I don't know what
22        the right word is -- I had made
23        representations to Alan that he would
24        get his needs addressed.
```

26

```
 1   Q.   And had you made those representations?

 2   A.   Well, whatever I said to him in that

 3        meeting back in '03, I said I would go

 4        and do my best to get what I could get.

 5   Q.   And between that meeting in '03 and

 6        this letter in June of '04, had you done

 7        anything in furtherance of that?

 8   A.   Well, unfortunately, shortly after the

 9        conversation in '03, I had quadruple

10        bypass surgery, and was out for quite a

11        while, and had a few other little things

12        going on.  So until the spring of '04 I

13        had done nothing to advance the issues

14        that Alan and Tim and I had discussed.

15   Q.   Getting back to that '03 conversation

16        with Alan, you made representations

17        that you would make efforts, as you've

18        discussed.  On the other side was

19        there anything Alan was expected to do

20        in return for receiving the benefits that

21        you discussed with him?

22               MR. CALAMARI:  I object to the

23        form.

24   A.   I don't really know what Alan was
```

27

```
 1           expecting.  I know what was in my mind
 2           was that we were trying to design at a
 3           high level something that would protect
 4           him from ages 50 to 55 if things happened
 5           that were out of our control, and that
 6           precluded him from getting some of the
 7           economic benefits that he had helped
 8           create for the company because of things
 9           beyond his control.  I guess I was -- my
10           impression was that we were talking about
11           Alan staying, and that these things were
12           going to accrue to him while he was at
13           the company.
14      Q.   And, in fact, in this June 30th letter,
15           Exhibit 1, in the third paragraph in the
16           second sentence you say, "In exchange
17           for their continued commitment to remain
18           active as leaders of SSGA State Street
19           Corporation would hold available for them
20           the same separation package the company
21           was offering U.S. employees under the
22           VSP."  Is that a summary of what your
23           understanding is of the agreement that
24           you reached with Alan Brown in 2003 was?
```

28

```
 1            MR. CALAMARI:  I object to the
 2       form.
 3   A.  I'm not sure I reached an agreement with
 4       Alan.  I think we talked about what his
 5       concerns were, and what my reaction --
 6       what I felt about that.  I think we were
 7       a long way from getting it put into
 8       specific ideas that were understandable
 9       by other people, and could be implemented
10       and carried out.  Having said that, I
11       think that sort of the spirit of what
12       we were talking about at a high level
13       at that 2003 meeting was what I was --
14       was as it is described in the sentence
15       you just read.
16   Q.  I assume you looked at this June 30th,
17       2004 letter in preparation for this
18       deposition?
19   A.  Yes.
20   Q.  Having read the letter recently, is
21       there anything in the letter that you
22       now believe is not accurate?
23   A.  Well, I'm going to want to read it again.
24   Q.  There is only --
```

32

```
 1        self-awareness that I didn't know exactly
 2        what he was talking about.  I think the
 3        language about "I would get the package
 4        amortized over five years", I do
 5        remember talking about the five years.
 6        I guess I would get is accurate, but it
 7        doesn't really deal with the practical
 8        questions of how do you get from ideas
 9        being exchanged at one meeting to an
10        agreement that's sort of actionable by
11        a corporation.  So, again, the concept
12        was right, but not -- I don't think this
13        gives full expression to what I think
14        the practical reality would have to be.
15   Q.   What do you mean by that?
16                 MR. CALAMARI:  I object to the
17        form.
18   A.   Well, I think that you have to -- there's
19        a skill and craft regarding compensation
20        and severance arrangements of any and all
21        kind, and then there are processes that
22        go with that.  Until we call in de Ocejo
23        and others to put this in to use their
24        skills to make this more granular and
```

33

```
 1        more specific, I think that you don't
 2        know all the issues you're going to face
 3        until you do that.  So you don't really
 4        know that you have an agreement until
 5        everything is spelled out, and a
 6        sufficient level of granularity to do
 7        that.
 8              Number 2, given that this whole
 9        thing always involves options, anything
10        to do with options has to go -- is beyond
11        my authority, and had to go to the Board.
12   Q.   When you first spoke about this topic
13        with Mr. Brown in 2003, did he appear to
14        be somewhat upset about the status of not
15        being offered VSP?
16   A.   Well, I don't know how he appeared.  I
17        don't remember that.  I remember that I
18        felt that he was upset.
19   Q.   And did you have concerns that this upset
20        might translate into him leaving State
21        Street?
22   A.   Yes.
23   Q.   As a result of the conversation that you
24        had with Alan, whatever was said there,
```

39

```
 1        wasn't anything on the record.
 2        At the time of this I was in discussions
 3        with the Board about my own situation;
 4        so I was mindful of the fact that I could
 5        be and probably would be leaving.  So I
 6        wanted to make sure that I had gotten
 7        something into other people's hands for
 8        them to act on.
 9   Q.   And we've had testimony from other
10        witnesses that at the Compensation
11        Committee meeting in June of 2004, you
12        did make a report concerning Mr. Brown.
13                 MR. CALAMARI:  I object to the
14        form.
15   Q.   Do you have a memory of that?
16                 MR. CALAMARI:  I object to
17        form.  I'm not allowed to say the reason
18        I objected to the form, but I object to
19        the form.
20   Q.   My question is, do you have a memory of
21        speaking to the Executive Compensation
22        Committee in June about Mr. Brown?
23                 MR. CALAMARI:  Then I don't
24        object to the form.
```

40

```
 1   A.   I do have a memory of presenting to the
 2        Executive Compensation Committee the
 3        matters about Alan, Tim and John Towers.
 4   Q.   What do you recall you said and they
 5        said?
 6   A.   I don't recall a lot about what I said.
 7        I recall that they were fairly abrupt,
 8        and said, "Put it in writing." So it was
 9        not a lengthy dialogue, discourse back
10        and forth. So I don't recall, again, the
11        words I said, but I would have described
12        the situation, what my sense was, what
13        was right for the company, and wanted
14        them to be aware that this had happened.
15   Q.   And your June 30th letter was your
16        response to their putting it in writing?
17   A.   My attempt to respond to their putting it
18        in writing, yes.
19   Q.   Does the June 30th letter reflects
20        basically what you had said to the
21        Committee June 16th or so?
22             MR. CALAMARI:  Objection to
23        form.
24   A.   Well, I suspect the written -- what you
```

45

```
 1        you had health issues, and other matters
 2        came up.  Was there any other reason why
 3        there was no follow-up on implementing
 4        this?
 5   A.   No.
 6   Q.   So you did not intentionally decide,
 7        Well, I've satisfied Alan, and I don't
 8        have to do anything more, anything
 9        similar to that, did you?
10   A.   No.
11   Q.   Is it fair to say that you did intend
12        to follow-up on the June -- on the 2003
13        conversation?
14   A.   Yes.
15   Q.   Now, your June 30th, 2004 letter to
16        Mr. Weissman, the copy that we have has
17        a stamp that was received by Tim Harbert,
18        and I notice there's a handwritten BCC
19        Tim Harbert at the bottom.  Is that your
20        handwriting?
21   A.   No.
22   Q.   Did you send a copy of this letter to
23        Mr. Harbert?
24   A.   Yes.
```

SHEA COURT REPORTING SERVICES (617) 227-3097

46

```
 1    Q.   I'm sorry, go ahead.

 2    A.   I believe I asked my assistant to

 3         distribute a copy to Lou, and blind

 4         carbons to both Tim and Alan.

 5    Q.   Why did you want copies sent to those

 6         people?

 7    A.   Well, I was going to go off into

 8         neverland of retirement, and I wanted

 9         them to know that this had been

10         communicated to Bob Weissman.

11    Q.   You mentioned a few moments ago that

12         you did have a conversation with Tim

13         Harbert.   When was that?

14    A.   I don't remember exactly, but after the

15         '03 conversation, which would have been

16         April, May time frame, April, May, June,

17         it would have been something like the

18         fall, autumn where Tim told me that in a

19         conversation with Alan, Alan had brought

20         up and asked what the status was of the

21         things that we discussed in the spring

22         meeting, and was restless about it.

23    Q.   How did you reply?

24    A.   I don't remember.
```

SHEA COURT REPORTING SERVICES (617) 227-3097

# EXHIBIT 35

Alan Brown

06/10/2004 10:06 PM

To: David A Spina/USA/StateStreet@StateStreet
cc: Tim Harbert/USA/StateStreet@StateStreet
Subject: Post VSP understanding

David

It is now virtually a year since the end of the VSP. At the time, as you know, the VSP was not offered to me in spite of my central US role. However, you reassured me that if I remained with SSgA, I would be entitled to a severance package similar to that of the VSP, provided I left without cause. Specifically you agreed that Tim and I would get the VSP package amortised over 5 years, save in one regard that vesting of equity would be limited to equity granted before 30.6.2003. So for example, where the VSP programme granted 5 years additional service for the purposes of the EVP top-up pension plan, if I were to leave after 3 years from the VSP, I would be credited two additional years of service for the EVP plan.

As a separate matter, we also agreed that we would clarify how the EVP plan would apply in my circumstances where I have no DB benefits at all from State Street or any former employers.

Given the importance of both of these matters, it is important for both myself and State Street that we should have a written record of this understanding. You said that you intended to write to me to confirm this, but I appreciate that the business pressures at the time may have got in the way. However, I don't think we should let the anniversary of the VSP go by without putting a written record on file. I would be perfectly happy for this e:mail to stand as the record of our agreement. However, please do let me know if this is not, in your view, an accurate statement of our agreement.

And separately, I would request clarification as to how the EVP plan will apply in my case.

Many thanks and best wishes.

Alan

Alan J Brown
Group Chief Investment Officer
SSgA

Authorised and regulated by the Financial Services Authority
Recipient of the Queen's Award for Enterprise 2003

020 7698 6007 (Direct Line)
020 7004 2907 (Direct Fax)

Please visit our Web site at www.ssga.com

**SSC 01306**

# EXHIBIT 36

**Alan Brown**

03/06/2004 09:15

To: Tim Harbert/USA/StateStreet@StateStreet
cc:
Subject: Draft note for DAS

Tim

You will remember this issue from last year. I am thinking of sending the following draft to David to try and clarify matters. Any thoughts/suggestions? Do you agree that I have the substance of our understanding right?

One question for you. Do you have a severance agreement already agreed? If not, would you like me to change the language to "we" instead of "I" to cover you as well?

Welcome your thoughts here.

Alan

_____ Draft _____

David

It is now virtually a year since the end of the VSP. At the time, the VSP was not offered to me in spite of my central US role. However, you reassured me that if I remained with SSgA, I would be entitled to a severance package similar to that of the VSP, provided I left without cause. Specifically you agreed that Tim and I would get the VSP package amortised over 5 years, save in one regard that vesting of equity would be limited to equity granted before 30.6.2003. So for example, where the VSP programme granted 5 years additional service for the purposes of the EVP top-up pension plan, if I were to leave after 3 years from the VSP, I would be credited two additional years of service for the EVP plan.

As a separate matter, we also agreed that we would clarify how the EVP plan would apply in my circumstances where I have no DB benefits at all from State Street or former employees.

Given the importance of both of these matters, it is important for both myself and State Street that we should have a written record of this understanding. You said that you intended to write to me to confirm this, but I appreciate that the business pressures at the time may have got in the way. However, I don't think we should let the anniversary of the VSP go by without putting a written record on file. I would be perfectly happy for this e:mail to stand as the record of our agreement. However, please do let me know if this is not, in your view, an accurate statement of our agreement.

And separately, I would request clarification as to how the EVP plan will apply in my case.

Best wishes.

Alan

**Alan J Brown**
*Group Chief Investment Officer*
*SSgA*
State Street Global Advisors Limited

*Authorised and regulated by the Financial Services Authority*
*Recipient of the Queen's Award for Enterprise 2003*

020 7698 6007 (Direct Line)
020 7004 2907 (Direct Fax)

*Please visit our Web site at www.ssga.co.uk*

Plaintiff 31

# EXHIBIT 37



Serving Institutional Investors Worldwide™

# Received by

### JUL 0 1 2004

# Tim Harbert

June 30, 2004

David A. Spina
Chairman and Chief Executive Officer

Robert E. Weissman
Chairman, Shelburne Investments
152 Shelburne Center Road
P.O. Box 309
Shelburne, MA  01370

Dear Bob:

At the meeting of the Executive Compensation Committee on Wednesday, June 16, 2004, I reported to the committee that I made oral commitments to several executives during 2003 for the purpose of retaining their services to State Street during 2003 and beyond.  You suggested I record these commitments in the form of a letter to you as Chairman of the Executive Compensation Committee.  This would enable you and the committee to act on these situations if and when the individual circumstances require.

I made oral commitments to Tim Harbert and Alan Brown, Chairman and Vice Chairman of SSgA, respectively, and Executive Vice Presidents of State Street Corporation, explained more fully below.  This was made to both individuals together simultaneously.  Separately, I made a commitment to John Towers, Vice Chairman and Chief Administrative Officer of State Street Corporation, also described below.

The commitment I made to Tim and Alan was as follows.  In exchange for their continued commitment to remain active as leaders of SSgA, State Street Corporation would hold available for them the same separation package the company was offering U.S. employees under what is known as the Voluntary Separation Program (VSP).  In 2003, both Tim and Alan were in their early 50's.  My stated commitment to them was stated as for the period when they were between the ages of 50 and 55.  The communication was clear that when they reached the age of 55, any extra compensation under the commitment or under the VSP would no longer be available to them.  By way of extension, the longer each stay as active employees, the shorter and smaller any additional benefits will be.

The major elements of the VSP involved additional credits for service under programs, severance payments and modification of treatment of previously issued stock options.  In the case of Tim Harbert, these are quite straightforward.  Tim is a U.S. employee and has salary, and retirement benefits that are similar to other Executive Vice Presidents who elected the VSP.  Accordingly, if the committee honors my oral commitments, which I strongly recommend it do, then the Human Resources and Organization Performance Division will be able to define the effects with precision.

The application of this promise to Alan's situation requires thought and judgment.  Alan is a U.K. employee although his duties are global and his performance has a profound effect on our business in the U.S.  The difficulty in applying the additional years of service for retirement

Plaintiff 29

purposes for Alan is that we did not offer the VSP to any non-U.S. employees and we do not have similar DB type retirement plans in place for Alan. Hence, the definition and application of additional service will require some development. Alan sent me an e-mail on June 10, 2004, explaining his understanding and I have forwarded his email to Lou de Ocejo for continuity.

The promise I made to John Towers was different, although it also involved the application of the VSP. John was 61 when we made the VSP available. He had a long expressed plan to retire in 2003. When we designed the VSP, I told John that he would not be eligible VSP as his service was critical to the smooth running of the corporation's business. John pointed out the many benefits of the VSP from which he was excluded by my decision to render him ineligible.

I told John that the one element of the VSP that I would recommend for him was the modification of previously issued stock options. Without modification, when an executive with John's background would leave with options, those options would have to be exercised within one year of his retirement date. The modification was to allow the term of the options to run in accordance with their original terms. This would allow John greater participation in any future increases in State Street's stock price. I told John this would be fair for both him and the company as the company would benefit from his leadership during a period of significant employee turnover.

Bob, if you have any questions, I would be happy to amplify. As you know, being CEO of a 20,000 person publicly owned company often requires rapid, situational decision making. I strongly recommend the Executive Compensation act in accordance with these decisions if and as the circumstances arise that make them relevant.

Sincerely,

*[signature: David]*

cc. Luis de Ocejo

/cmf

bcc. Tim Harbert

Plaintiff 30

# EXHIBIT 38

David A
Spina/USA/StateStreet

06/15/2004 04:13 PM

To   Alan Brown/Europe/StateStreet@StateStreet

cc   Tim Harbert/USA/StateStreet@StateStreet

bcc

Subject   Re: Post VSP understanding

Alan – greetings – I am not ignoring you!!!  Thanks for the 'first cut' at a record.  I will share with Lou de
Ocejo and plan to discuss the general outline with our Executive Comp Committee of the Board of
Directors tomorrow.  So I will get it on the record.  More after the meeting with the board on
Wed/Thursday.  David.

SSC 01207

# EXHIBIT 39

CONFIDENTIAL

A meeting of the Executive Compensation Committee of State Street Corporation was held on Wednesday, June 16, 2004, at 225 Franklin Street, Boston, Massachusetts.

Mr. Weissman, the Chairman, presided. Mr. Darehshori and Mr. Sergel were also present. Ms. Hill participated by teleconference.

Also present by invitation were Mr. Spina and Mr. Cutrell, who kept the minutes, and Messrs. de Ocejo and Ooi.

Mr. Weissman called the meeting to order noting the presence of a quorum.

Mr. de Ocejo presented and reviewed a summary of actions taken at the Committee's March 3, 2004, meeting following which Mr. Cutrell presented minutes of that meeting, which had been distributed previously. Upon motion duly made and seconded, it was unanimously

VOTED:   That the minutes of the meeting of the Executive Compensation Committee held on March 3, 2004 having been provided to the members, be and hereby are approved as presented.

Mr. Ooi presented and reviewed information on the State Street Retirement Plan and the State Street Salary Savings Program. He noted that State Street Corporation is the plan sponsor for both plans and reported that as of December 31, 2003, Retirement Plan assets were                    , and Salary Savings Program assets were                 He reviewed information on the Retirement Plan portfolio and noted that the SSgA Office of the Fiduciary Advisor was engaged in February 1999 to provide fiduciary advisory services, operational oversight and investment management. He reviewed Retirement Plan asset allocation information, and performance as of December 31, 2003 compared to the prior year period. He reviewed the State Street Salary Savings Program, which is a defined contribution program. He reviewed the benefit formula, and noted that vesting is immediate. He discussed investment options noting that there are fourteen options including the self-managed brokerage account. Mr. Ooi then reviewed information on the status of the Salary Savings Program funds and fund performance. He also briefed the Committee on the proposed restructuring of the Retirement and Salary Savings Program Committee into two separate committees, a Benefit Plans Committee and Plans Investment Committee. Discussion followed.

**REDACTED**

Mr. Ooi presented and reviewed information on the Corporation's two non-qualified benefit plans. He reviewed generally the terms of the Supplemental Executive Retirement Plan (SERP) which restores normal retirement benefits for executives earning over a certain salary. He also reviewed the Supplemental Defined Benefit Pension Plan (Executive SERP) which provides enhanced retirement benefits for certain executives at the executive vice president level and above, and which includes two individual agreements incorporated into the Plan in 1999. For each plan, he reviewed the number and nature of participants, eligibility, vesting, benefit formula, and for the combined plans he reviewed financial information, 2003 performance, and hypothetical market values. Discussion followed.

**REDACTED**

Mr. Ooi presented and reviewed a planning calendar for the Executive Compensation Committee which reviewed an annual cycle of items requiring action by the Committee. Discussion followed.

Mr. de Ocejo introduced a discussion on compensation philosophy and identified preliminary items for discussion and presentation at the October Board meeting. Discussion followed.

Mr. de Ocejo presented and reviewed a proposed compensation action for Executive Vice President. Mr. de Ocejo reviewed background information and reviewed the terms of the proposed compensation action. Following discussion, and upon motion duly made and seconded, it was unanimously

2

**REDACTED**

Mr. de Ocejo previewed a preliminary list of actions to be taken at the Committee's next meeting scheduled for September 2004.  Discussion followed.

The meeting went into executive session at which time Messrs. Ooi and Cutrell left the meeting.  Mr. Weissman kept the minutes in the absence of the Secretary.

Mr. Spina briefed the Committee on a proposed severance package for a senior executive.  The Committee reviewed the rationale for the proposed deal and withheld a decision pending further review.  Mr. de Ocejo then left the meeting.

The Committee reviewed bonus award recommendations for several executives,                                                    who had been instrumental in the successful integration of the Global Securities Services business purchased from Deutshe Bank.   It was the consensus of the Committee that the proposed amounts are appropriate and are to be payable as soon as practicable and with appropriate communication.

The Committee reviewed bonus award recommendations for .                               The Committee discussed the proposed amounts as well as the date the awards would be payable.  Following discussion, and upon motions duly made and seconded, it was in each case unanimously

VOTED:

VOTED:

SSC 04670

The executive session concluded, and there being no further business, the meeting adjourned.

Dissolved.

A true record.

Attest:

_Charles C. Cutrell, III_
Charles C. Cutrell, III

_Robert E. Weissman_
Robert E. Weissman

4

SSC 04671

# EXHIBIT 40

July 12, 2004


Mr. Robert E. Weissman
Chairman
Shelburne Investments
152 Shelburne Center Road
P.O. Box 309
Shelburne, MA  01370

Dear Bob:

As you requested, attached are:

1.  Peter Egan's letter providing you and the Executive Compensation
    Committee with his recommendations on Ron's compensation.  Please
    feel free to contact Peter if you have any questions.

2.  5 Year Schedule of Compensation Actions for Ron and David Spina.

3.  A summary of the financial impact and suggested interpretations of
    David's "oral promises" to John Towers, Alan Brown and Tim Harbert.

Please call me if you have any questions.

Sincerely,



cc:    Boon Ooi


**SSC 05477**

1) John Towers
   a) Permit options granted prior to 6/03 to continue to be exercisable under original terms of grants.
   b) Number of share options involved -- 654,200
   c) Estimated accounting cost - $6.0 million

2) Tim Harbert
   a) Provide protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to executive for duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end.
   b) Current age: 53, protection ends on 3/18/2006
   c) Interpretation:
      i) Terms are provided only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, executive would be forced to terminate employment just prior to 3/18/2006 to take advantage of such benefits.
      ii) Options granted prior to 6/03 to continue to be exercisable under original terms of grants. (392,800 options)
      iii) Severance payable as of 6/30/2003 (in terms of number of weeks), will be provided – 104 weeks
      iv) Health benefits will continue until age 65 (under retiree medical plan)
      v) Executive SERP value calculated under EVSP as of 8/31/2003 is protected until 3/18/2006.
   d) Estimated cost (as of 7/1/04):
      i) Options =              $3.0 million
      ii) Severance =           $1.25 million
      iii) Exec. SERP =         $5.0 million
      iv) Total =               $9.25 million *(Some of Exec SERP cost is already expensed under FASB 87. Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)*

3) Alan Brown
   a) Provide protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to executive for duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end.
   b) Current age: 51, protection ends on 4/27/2008
   c) Interpretation:
      i) Terms are provided only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, executive would be forced to terminate employment just prior to 4/27/2008 to take advantage of such benefits.
      ii) Options granted prior to 6/03 to continue to be exercisable under original terms of grants. (135,500 options)
      iii) Severance payable as of 6/30/2003 (in terms of number of weeks), will be provided – 84 weeks
      iv) Health benefits will continue until age 65 (under UK medical plan)
      v) Executive SERP value calculated under EVSP as of 8/31/2003 is protected until 3/18/2006. The challenge here is that the requisite offset to this Exec SERP will be the pension equivalent of an individual pension contribution provided by State Street UK (21.66% per year). We will need to apply the annuity equivalent of this accumulation as an offset to the Exec SERP benefit.
   d) Estimated cost:
      i) Options = $1.5 million
      ii) Severance =     $1.14 million (est.)
      iii) Exec. SERP =     $2.9 million (assuming $0 offset from UK plan)
      iv) Total =     $5.54 million *(Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)*

SSC 05479

# EXHIBIT 41

**CONFIDENTIAL**

**SSgA Executive Vice President**
**Verbal Commitment by David Spina**

## Background

- Certain verbal commitments were made to Alan Brown during EVSP period

- It suggests that the executive would be eligible for EVSP benefits during an open period of employment until age 55 (at which point the commitment expires)

- We summarize these commitments below and suggest certain interpretations/modifications should the Committee agree to these expectations

## Alan Brown "EVSP" Agreement

### Summary

- Provides protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to the executive for the duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end. Current age 51; protection ends 4/27/08

- Severance pay of 84 weeks

- Continued exerciseability of options

- Payment of Executive SERP

### Interpretations/Modifications

- Condition of Termination – The agreement terms are applicable only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, the executive would be forced to terminate employment just prior to 4/27/08 to take advantage of these benefits

- Stock Options – Options granted prior to 6/03 continue to be exercisable under the original terms of grants (135,500 options)

- Severance Pay – Severance payable as of 6/03 (in terms of number of weeks) will be provided (84 weeks)

- Health Benefits – Continue until age 65 (under UK medical plan)

<u>**CONFIDENTIAL**</u>

- Executive SERP – Value calculated under EVSP as of 8/31/03 is protected until 3/18/06. The requisite offset to this Exec SERP will be the pension equivalent of an individual pension contribution provided by State Street UK (21.66% per year).

The annuity equivalent of this accumulation will need to be applied as an offset to the Exec SERP benefit

- Estimated Cost:

  - Options =          $1.50 million
  - Severance =       $1.14 million (est.)
  - Exec SERP =      $2.90 million (assuming $0 offset from UK plan)
  - Total =             $5.54 million (Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)

# EXHIBIT 42



**State Street Corporation**

STATE STREET.

CONFIDENTIAL

Executive Compensation Committee Meeting
September 15, 2004 - 1:45 pm to 3:45 pm


1. **Organizational Chart**


1:45 pm  2. **Previous Meeting** (5 minutes)

      A. Summary of Actions                                 **Luis de Ocejo**
      B. Record of Meeting                                   **Skip Cutrell**


1:50 pm  3. **Committee Business** (1 hour, 35 minutes)

      A. Update Compensation Philosophy           **Luis de Ocejo**
      B. Executive Compensation Review -- Hewitt     **Peter Egan**
      C. October Board Review                       **Luis de Ocejo**
      D. Executive SERP Amendment - Vote          **Boon Ooi**


3:25 pm  4. **Executive Session**

      A.  CEO Compensation Action - Vote          **Luis de Ocejo**
      B.  Executive Actions/Updates                **Luis de Ocejo**
          – Alan Brown
          – Joseph Chow - Vote
          – Thomas McCrossan - Vote
          – David Spina Pension - Vote
          – Timothy Harbert Death Benefits - Vote
      C.  Financial Update - Annual Incentive Plan    **Ronald Logue**


SSC 05610

# EXHIBIT 43

A meeting of the Executive Compensation Committee of State Street Corporation was held on Wednesday September 15, 2004 at the Saybrook Point Inn in Old Saybrook, Connecticut.

Mr. Weissman, the Chairman, presided. The following directors were also present: Ms. Hill and Messrs. Darehshori and Sergel. Also present were Messrs. Logue, de Ocejo, Ooi, and Cutrell, who kept the minutes. Also in attendance was Mr. Peter Egan, Principal, Hewitt Associates.

Mr. Weissman called the meeting to order noting the presence of a quorum.

Mr. deOcejo reviewed a summary of actions taken at the Committee's June 16, 2004 meeting following which Mr. Cutrell presented minutes of that meeting, which had been distributed previously. Upon motion duly made and seconded, it was unanimously

VOTED:      That the minutes of the meeting of the Executive Compensation Committee held on June 16, 2004, having been provided to the members, be and hereby are approved.

Mr. de Ocejo presented and reviewed information on State Street's compensation philosophy and practices. He reviewed information on the components of compensation compared to market for various employee groups as follows: base salary; annual incentives; total cash compensation; long-term incentives; and total compensation. He noted that management has reviewed the Company's current compensation practice and has identified issues for the 2005 plan year and thereafter. In this regard, he reported that cash compensation has lagged the competition and discussed alternatives to address this by shifting the focus away from equity awards towards cash. He also reported that bonus targets are competitive, but have been underfunded. He reviewed possible implications as well as a process for addressing these issues.  He reviewed pay mix recommendations that would increase annual incentive opportunity and replace stock options with SARs (stock appreciation rights) an equity grant similar to stock options which he described. He reviewed recommendations for the EVP population, and for the AVP to SVP levels, and discussed a change in the proposed vesting schedule of grants. He reviewed a proposed plan to shift to the new strategy to replace option grants with SARs in March 2005 and discussed related considerations. Discussion followed.

Mr. Egan, by referring to a report, which was included in the materials presented to the meeting, presented an analysis of executive compensation of twelve executives in relation to a comparator group of companies.

REDACTED

CONFIDENTIAL

**REDACTED**

Mr. de Ocejo presented a review of executive compensation strategy for thirty-five senior executives of the Corporation noting that total compensation is targeted and includes base salary, annual incentive awards, and long term compensation. He reviewed a comparator group of companies used to measure compensation levels. He reviewed components of the compensation architecture including the terms and participants in the Senior Executive Annual Incentive Plan (162 (m) plan), and the Executive Annual Incentive Plan. He reviewed the terms of performance awards under the 1997 Equity Incentive Plan and discussed the benefits of replacing option grants with SARs. He reviewed the annual incentive plan funding architecture, discussed executive total compensation structure, and reviewed the annual planning cycle for the executive compensation committee. Discussion followed.

Mr. Ooi reviewed proposed amendments to the Executive SERP to provide a death and disability benefit. He noted that Executive SERP vesting is age 55 and 10 years' service and that there is no death or disability benefit prior to the vesting date. He reviewed proposed amendments to provide benefits for deaths in service occurring prior to vesting. Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:    That an amendment to the State Street Corporation Supplemental Defined Benefit Pension Plan (the "Executive SERP") providing for the immediate vesting in a pension benefit upon termination of employment by a Participant due to his or her death or long-term disability calculated as (i) with respect to a Participant's death, 50% of the Participant's accrued benefit reduced for early retirement age and multiplied by a percentage determined by dividing the sum of the Participant's age and years of service by 85; and (ii) with respect to a Participant's long-term disability, the Participant's accrued benefit reduced for early retirement age and multiplied by a percentage determined by dividing the sum of the Participant's age and years of service by 85, be and it is hereby approved in principle, to be adopted in such form as and made effective as provided below.

VOTED:    That such amendment to the Executive SERP be in such form as, and made effective as determined by, the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance, in his or their discretion; and the officers of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to execute such documents and take such other measures as such officer or officers deem necessary or appropriate to effectuate the foregoing, the execution of any such document and the taking of

SSC 04673

**CONFIDENTIAL**

any such other measure by such officer or officer so acting to be conclusive evidence that the same has been approved by this Committee.

The meeting went into executive session at which time Messrs. Logue and Cutrell left the room. Mr. Ooi kept the minutes in the absence of the Secretary.

**REDACTED**

Mr. Logue returned to the meeting.

Mr. de Ocejo presented and reviewed proposed actions in order to accommodate verbal commitments made to an executive during the period the Executive Voluntary Separation Program (EVSP) was available. He reviewed proposed modifications to the EVSP. Mr. de Ocejo presented and reviewed a proposed compensation package for :             Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:      That effective July 1, 2004, the Executive Voluntary Separation Program ("EVSP") be interpreted to provide that, in order to meet critical business needs of the Corporation, the Corporation's executive management may exercise its discretion by rehiring as an employee or consultant prior to the lapse of the two-year restricted period a former employee who terminated his or her employment pursuant to the EVSP.

VOTED:      That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. de Ocejo presented and reviewed a proposed severance agreement for             Following discussion, and upon motion duly made and seconded, it was unanimously

SSC 04674

VOTED:

REDACTED

VOTED:      That the Chairman and Chief Executive Officer, the Vice-Chairman, or
            the Executive Vice President, Human Resources and Organizational
            Performance of the Corporation be and they are and each of them is
            hereby authorized and directed, in the name and on behalf of the
            Corporation, to take such actions as such officer or officers deem
            necessary or appropriate to effectuate the foregoing vote; and that the
            taking of any such action by such officer or officer so acting shall be
            conclusive evidence that the same has been approved by this
            Committee.

        Mr. de Ocejo also presented and reviewed a compensation action for
                                        Following discussion, and upon motion duly made and
seconded, it was unanimously

VOTED:

VOTED:      That the Chairman and Chief Executive Officer, the Vice-Chairman, or
            the Executive Vice President, Human Resources and Organizational
            Performance of the Corporation be and they are and each of them is
            hereby authorized and directed, in the name and on behalf of the
            Corporation, to take such actions as such officer or officers deem
            necessary or appropriate to effectuate the foregoing vote; and that the
            taking of any such action by such officer or officer so acting shall be
            conclusive evidence that the same has been approved by this
            Committee.

        Mr. de Ocejo presented and reviewed awards, payments,
                                        . Following discussion, and
upon motion duly made and seconded, it was unanimously

VOTED:

4

SSC 04675

CONFIDENTIAL

VOTED:     That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. Logue presented and reviewed a financial update on the annual incentive plan. Discussion followed.

There being no further business, the meeting adjourned.

Dissolved.

A true record.

Attest:

_____
Charles C. Cutrall, III

_____
Boon S. Ooi

5

SSC 04676

# EXHIBIT 44

Linda Hill
5/23/2006

1

**COPY**    Volume:
          Pages:   1 - 29
          Exhibits:  1 - 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALAN BROWN,

                    Plaintiff
                                    C.A.
Vs.                                 No. 05-11178-NG

STATE STREET CORPORATION and
STATE STREET GLOBAL ADVISORS,

                    Defendants

        Deposition of LINDA HILL, a witness

called on behalf of the Plaintiff, pursuant

to the Federal Rules of Civil Procedure,

before Rosamond K. Marcy, a Certified

Shorthand/Registered Professional Reporter

and Notary Public in and for the Commonwealth

of Massachusetts, at the Offices of Rodgers,

Powers & Schwartz, LLP, 18 Tremont Street,

Boston, Massachusetts 02108, commencing at

2:00 P.M. on Tuesday, May 23, 2006.

Linda Hill
5/23/2006

16

```
 1            have any conversation you want but

 2            there's a charter about who makes

 3            decisions about compensation for

 4            executives of his level.

 5    Q.    I take it the Board didn't take any vote

 6            concerning Mr. Brown or Mr. Spina at

 7            that meeting.

 8                    MR. CALAMARI:  Objection.

 9    A.    No.

10    Q.    A few weeks after the June 16 meeting

11            Mr. Spina wrote this letter to

12            Mr. Weissman on June 30, and was a copy

13            provided to you?

14    A.    I don't recall.

15    Q.    I take it that at the June 16 meeting

16            the Compensation Committee did not

17            formally, by taking a vote, renounce or

18            reject any agreements that Mr. Spina

19            might have made with Mr. Brown.

20                    MR. CALAMARI:  Objection.

21    A.    No.

22    Q.    Was there discussion as to whether or

23            not Mr. Spina had exceeded his

24            authority?
```

Linda Hill
5/23/2006

23

| | | |
|---|---|---|
| 1 | | implement. |
| 2 | Q. | No vote was taken concerning this |
| 3 | | commitment. |
| 4 | A. | No vote was taken. |
| 5 | Q. | When you say you disagreed with it, what |
| 6 | | did you mean by the Committee disagreed |
| 7 | | with it? |
| 8 | A. | David had mentioned that he had |
| 9 | | conversations with a number of |
| 10 | | individuals, three to be precise.    We |
| 11 | | asked Bob as a Committee to find out |
| 12 | | what the nature of those conversations |
| 13 | | was, find out what the story was and get |
| 14 | | back to us about that.    This was the |
| 15 | | result of his explanation about Alan |
| 16 | | Brown and it was informational.    He |
| 17 | | provided us with this information.    We |
| 18 | | all felt David can have a conversation |
| 19 | | with whomever he pleases about what he |
| 20 | | would like to have conversations about |
| 21 | | but it's actually our fiduciary |
| 22 | | responsibility to do something like this |
| 23 | | and there was no action to be taken.    We |
| 24 | | just had the information and we had it |

Linda Hill
5/23/2006

24

1       because it was important to know.

2   Q.  The document, de Ocejo Exhibit 10, that

3       was given to you doesn't describe it as

4       a conversation.  It describes certain

5       verbal commitments made to Alan Brown,

6       correct?

7   A.  I think the most relevant point here is

8       point 3.  "We summarize these

9       commitments below and suggest certain

10      interpretations/modifications should the

11      Committee agree to these expectations."

12      The Committee did not agree to these

13      expectations.  I think that's important

14      here so I suppose the title on this

15      should be more precise.  I think this

16      was a summary for us of an understanding

17      of a conversation at which none of us

18      were at that conversation and this was

19      Bob's summary of what happened in that

20      conversation so perhaps it should have

21      been conversation but should the

22      Committee agree to these expectations.

23      That, to me, is what this is about.

24  Q.  After the Committee was informed that

Linda Hill
5/23/2006

1         Mr. Spina had made certain verbal

2         commitments to Alan Brown did the

3         Committee vote to renounce those

4         commitments?

5    A.   We took no votes.  This was

6         informational.

7    Q.   After the September 15, 2004 meeting did

8         the topic of Alan Brown and any

9         conversations he had had with Mr. Spina

10        ever come before the Compensation

11        Committee again?

12   A.   After this?

13   Q.   Yes.

14   A.   Between then and now?

15   Q.   Yes.

16   A.   Did it come up?  I don't think it did.

17   Q.   Did the Compensation Committee at the

18        September 15, 2004 meeting direct any of

19        the managers or officers of the

20        corporation to communicate with

21        Mr. Brown?

22   A.   No, I don't believe so.

23   Q.   Do you think it would have been fair to

24        tell him that any commitments that

SHEA COURT REPORTING SERVICES
(617) 227-3097

Linda Hill
5/23/2006

26

```
 1          Mr. Spina might have made the
 2          corporation was rejecting?
 3     A.   I don't think it was unfair so I don't
 4          know how to answer your question.  There
 5          was no action.  This was informational.
 6          I don't know why we would have been
 7          informing him.
 8     Q.   You were told the Chief Executive
 9          Officer of the corporation had made
10          verbal commitments to Mr. Brown,
11          correct?
12     A.   We were told that he had this
13          conversation about these matters, yes.
14     Q.   You were told that he made verbal
15          commitments, correct?
16     A.   Yes.
17     Q.   Would it have been reasonable for
18          Mr. Brown to have relied on a commitment
19          made by the CEO of the corporation?
20     A.   I don't know how Mr. Brown thinks but
21          Mr. Brown never asked us about this.
22          This is David reporting this information
23          when he was leaving with the
24          recommendations.  We wanted to find out
```

Linda Hill
5/23/2006

27

1      waht the nature of the conversation was.

2      We then knew.  Someone may have actually

3      reported back to him, I don't know that,

4      but as far as I knew we had the

5      information and that was the end of it.

6                  MR. SCHWARTZ:  Thank you.

7                  [The deposition was

8      concluded.]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 45

1

# COPY

Volume: 1
Pages:  1 to 53
Exhibits:  1 to 7

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

C.A. No. 05-11178-NG

ALAN BROWN,                          )
                    Plaintiff        )
                                     )
        vs.                          )
                                     )
STATE STREET CORPORATION,            )
STATE AND STREET GLOBAL              )
ADVISORS,                            )
                    Defendants       )

**DEPOSITION of RICHARD P. SERGEL**,
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108,
on Friday, May 26, 2006, commencing at
10:00 a.m.

\* \* \* \*

### SHEA COURT REPORTING SERVICES
### ONE UNION STREET, SECOND FLOOR
### BOSTON, MASSACHUSETTS 02108-2408

42

```
 1   Q.   I apologize for using this term because
 2        it's a lawyer's term.  I am talking
 3        about exhaust your memory about what the
 4        various committee members said about Alan
 5        Brown, and Mr. Spina, and this matter at
 6        the June meeting, and at the September
 7        meeting.  So tell me, as best you can
 8        recall, everything that was said?
 9   A.   It's just my memory of those
10        conversations that it was the collective
11        view of the group that granting some, or
12        making a modification to the plan, that
13        would be required to do this, was not
14        something that we were proposing to do.
15        I don't have any specific memories of
16        other people's views.  I have to just
17        tell you that I can only remember my
18        own, which undoubtedly I expressed.
19        Unfortunately, I can't tell you what
20        other people said.  No, I don't have any
21        memories of that.
22   Q.   Do you recall that other people did say
23        something on the topic?
24   A.   Yes.
```

43

```
 1   Q.  Was anybody in favor of it?

 2   A.  Not that I recall.

 3   Q.  Was there any question or any discussion

 4       about whether or not Mr. Spina had

 5       authority to make the verbal commitments

 6       that are described in Exhibit 6?

 7   A.  Is there a discussion about whether

 8       he had the authority to do it?

 9   Q.  Yes.

10   A.  My memory of the discussion was about

11       what action we were going to take.

12       We knew we were the ones who were

13       responsible for taking an action or not

14       taking it.  We knew he didn't have the

15       authority.

16   Q.  Whether or not Mr. Spina used the word

17       commitment at the June meeting, at

18       least in the material presented to the

19       committee for the September meeting,

20       Exhibit 6, you were told that Mr. Spina

21       made verbal commitments to Alan Brown?

22   A.  I wouldn't have had a memory of that

23       prior to now.  That's on the page, but,

24       again, this is being described as what
```

# EXHIBIT 46

1

# COPY

Volume 1, Pages 1-53

Exhibits 1-7

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No.:  05-11178-NG

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ALAN BROWN,

        Plaintiff

    vs.

STATE STREET CORPORATION and

STATE STREET GLOBAL ADVISORS,

        Defendants

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF:  ROBERT WEISSMAN

Home of Robert Weissman

152 Shelburne Center Road

Shelburne, Massachusetts

Thursday, July 13, 2006

2:00 p.m. - 3:38 p.m.

Reporter:  Kelly M. Bruce

Shea Court Reporting Services

One Union Street

Boston, MA 02108

(617) 227-3097

**Robert Weissman**
**July 13, 2006**

44

1    attended some of the executive committee -- not

2    executive committee, excuse me, Executive

3    Compensation Committee's meetings where it was a

4    topic of conversation.

5         Q.    Did you speak with Mr. Logue about

6    whether or not somebody should inform Mr. Brown

7    that he was not entitled to these benefits?

8         A.    I didn't have that discussion with

9    him.

10        Q.    Did you speak with anybody in human

11   resources --

12        A.    Did I?

13        Q.    Yes, did you.  -- about whether

14   Mr. Brown should be told?

15        A.    No.

16        Q.    Did you believe that Mr. Brown had

17   been told that the committee did not approve his

18   receipt of these benefits?

19        A.    I didn't talk to anybody about that.

20   I don't think it would have entered my mind

21   because no decision, that I was aware of, had

22   been made.  And so it would have been premature

23   to say to Mr. Brown either that it had been

24   approved or that it had -- when you say not been

Robert Weissman
July 13, 2006

45

1    approved, I interpret that as rejected.  And

2    during this time frame, I don't think either was

3    the case.  I was not aware of any further

4    contact by Mr. Brown with the company on the

5    issue.

6              MR. SCHWARTZ:  That's all I've

7        got.

8              MR. CALAMARI:  We might have one

9        or two.  But, as usual, we want a

10       conference before.

11             (Recess taken)

12             MR. CALAMARI:  I actually do have

13       two questions.

14

15    EXAMINATION BY MR. CALAMARI:

16

17       Q.     Mr. Weissman, could I ask you to look

18    again at what has been marked as Exhibit 5, and

19    that is the letter dated June 30, 2004,

20    addressed to you.

21       A.     Okay.

22       Q.     Now, you may recall that

23    Mr. Schwartz asked you, on reviewing this

24    letter, if you would review it and look for

# EXHIBIT 47

| | |
|---|---|
| **From:** | Alan Brown |
| **Sent:** | Friday, March 11, 2005 11:14 AM |
| **To:** | Ronald E Logue; Luis de Ocejo |
| **Cc:** | William W Hunt; John F Marrs; Nigel Wightman; NWalker@HHLAW.com; Harvey@TheEmploymentLawyers.com; jane.amphlett@addleshawgoddard.com |
| **Subject:** | Voluntary Separation Program |
| **Attach:** | 675_LTR-REL-110305.doc.zip |

Please see attached letter. Signed fax copy and original to follow.

Regards,

Alan


Alan J Brown
Group Chief Investment Officer
SSgA

Authorised and regulated by the Financial Services Authority
Recipient of the Queen's Award for Enterprise 2003

020 7698 6007 (Direct Line)
020 7004 2907 (Direct Fax)

Please visit our Web site at www.ssga.com


<<...>>

SSC 02123

21 Sutherland Place
London W2 5BZ


Tel: 020-7727-8957


Ronald E Logue Esq
State Street Corporation
State Street Financial Center
One Lincoln Street
Boston MA 02111

Dear Ron

As you know I have been considering my position following Bill's appointment as
SSgA's President and CEO, and I have now taken the view that my position with State
Street is no longer tenable. I do not intend to detail the reasons here although I would be
happy to do so if you think it would be helpful.

In the circumstances, I am writing to exercise my rights to a Voluntary Separation
Program. As you know, in 2003 David Spina, on behalf of State Street, entered into an
agreement with me in which in exchange for my continued commitment to remain active
as a leader of SSgA, State Street Corporation would hold available for me the same
separation program the Company was offering U.S. employees under what is known as
the Voluntary Separation Program or, in view of my position, the Executive Voluntary
Separation Progam (EVSP). The agreement was that this commitment would be
available to me until I reached age 55 and could be exercised by me at any time.

The EVSP itself required an Election Form and Release Agreement to be completed. In
my case, this letter should serve as my election. Could you or Lou please provide me
with any further necessary paperwork for my review?

Having greatly enjoyed my tenure at State Street until latterly and the contribution I have
made, this has been a difficult decision for me. You will appreciate, however, that I
would now like to get this sorted out as quickly as possible and await your early response.

Yours sincerely




Alan J. Brown


Cc: Lou de Ocejo


**SSC 02124**

# EXHIBIT 48

**REDACTED**

William W
Hunt/USA/StateStreet
03/17/2005 06:36 PM

To   Alan Brown/Europe/StateStreet

cc   Mitch Shames/USA/StateStreet@StateStreet

Subject   Follow up

Dear Alan:

As you state in your email to Ron dated March 11, 2005, your conclusion that your position at the Company has become untenable compels us to agree that your employment with State Street must end, as the implications of your considered view are unmistakable. Therefore, tomorrow, Friday, March 18, 2005, will be the date on which your voluntary resignation from employment with State Street will take effect. A representative from HR&OP will contact you regarding the return of any State Street property in your possession, including your ID badge, credit cards, cellular phone, Blackberry, and all business documents.

In accordance with your employment agreement dated December 7, 1994, you are entitled to 60 days' pay in lieu of notice. Payment will be forthcoming in the form of salary continuation through May 17, 2005. However, with regard to your request to elect a "Voluntary Separation Program," we reject your assertion that you are entitled to the benefits of any such program. As you know, the VSP program was never extended to any U.K.-based employees or executives, and a number of aspects of the program do not even apply to persons (such as yourself) who do not participate in the subject benefit plans. Moreover, you do not satisfy the timing requirement for making a VSP election, which expired in June, 2003.

In addition, despite whatever communications you may have had with David Spina, no actual agreement was ever reached as to the substance of any promise to provide you with VSP benefits at some indefinite time in the future, and no document was ever executed to this effect. Moreover, David Spina did not have the authority to commit State Street to enhance your benefits package in the extraordinary manner you now allege — a fact made clear to you in both an email and a letter in which David stated that his assurances to you were only that he would make a recommendation to the Board that you be made eligible (through some means) to receive VSP-type separation benefits. You never registered disagreement with David's assertions, no doubt because you understood full well that the Board's Executive Compensation Committee needed to approve any substantial adjustments to the compensation arrangements of the Company's senior executives. David did, as apparently promised, recommend your eligibility for VSP-type benefits upon separation; but, as we understand you were informed some eight months ago, the Committee rejected such proposal.

Thank you for your contributions to SSgA.

SSC 01151

Sincerely yours,

Bill

SSC 01152