UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------- x

ALAN BROWN,                                  :
                                             :
                    Plaintiff,               :
                                             :        Case No. 05 Civ. 11178 (NG)
           -against-                         :
                                             :
STATE STREET CORPORATION                     :
and STATE STREET GLOBAL                      :
ADVISORS,                                    :
                                             :
                    Defendants.              :

------------------------------------------------------- x


### DEFENDANTS' MEMORANDUM OF LAW IN
### SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT


QUINN EMANUEL URQUHART
  OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

HARE & CHAFFIN
160 Federal Street, 23rd Floor
Boston, MA 02110
(617) 330-5000

## TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 1

Statement of Facts .................................................................................................... 2

    A.    The Voluntary Separation Program ............................................................ 2

    B.    Alan Brown.................................................................................................. 4

    C.    Brown Knew That Executive Compensation Agreements, To Be Effective, Had To Be In Writing. ............................................................................ 5

    D.    Brown Knew That ECC Approval Was An Independent Prerequisite To A Binding Executive Compensation Agreement. ............................................ 5

    E.    Brown's Conversation With David Spina ................................................... 7

    F.    Brown's June 10, 2004 Email.................................................................... 10

    G.    The ECC Never Approved Brown's Proposal............................................ 11

    H.    Brown Begins To Record His Conversations With State Street Employees......... 13

    I.    Brown Resigns From State Street............................................................... 13

Argument .................................................................................................................. 14

I.    BROWN'S BREACH OF CONTRACT CLAIM FAILS BECAUSE HE NEVER FORMED AN AGREEMENT WITH STATE STREET................................... 14

    A.    Brown Never Reached An Agreement With Spina On The Material Terms Of The Alleged Deal................................................................................... 14

    B.    Brown And Spina Never Executed A Writing Despite Agreeing To Do So......... 18

    C.    The ECC Never Approved The Proposal. ................................................... 19

        1.    Brown's Proposal Was Conditioned On The ECC's Approval................. 20

        2.    Spina Did Not Have Actual Or Apparent Authority To Commit State Street To Special Compensation Arrangements............................... 21

II.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO STATE STREET ON BROWN'S REMAINING COMMON-LAW CLAIMS (COUNTS TWO THROUGH FOUR).................................................................... 23

i

A.    State Street Is Entitled To Summary Judgment On Brown's Claim For Promissory Estoppel. ..............................................................................23

B.    Brown Cannot Demonstrate Ratification. ............................................25

C.    State Street Is Entitled To Summary Judgment On Brown's Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing. ...................27

III.  BROWN'S CLAIMS INDEPENDENTLY FAIL BECAUSE THEY ARE PREEMPTED BY ERISA..............................................................................29

A.    ERISA Preempts Brown's Claims For Benefits....................................30

      1.    The Executive SERP And The Severance Plan Are ERISA Plans............30

      2.    Brown's Claims "Relate To" ERISA Plans....................................31

B.    Preemption Is Especially Warranted Because Brown Cannot State An ERISA Claim And His State-Law Claims Are An Attempted End Run Around That Deficiency. ..................................................................32

Conclusion ...............................................................................................35

# TABLE OF AUTHORITIES

**Page**

## Cases

*Andersen v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................14

*Aretakis v. General Signal, Inc.*,
    No. 05-cv-10257, 2006 WL. 1581781 (D. Mass. June 7, 2006) ...............23, 24, 25

*Armstrong v. Rohm and Hass Co., Inc.*,
    349 F. Supp. 2d 71 (D. Mass. 2004).........................................................15, 17, 23

*Balestracci v. NStar Electric and Gas Corporation*,
    449 F.3d 224 (1st Cir. 2006).......................................................................30

*Bell v. B.F. Goodrich Company*,
    270 N.E.2d 926 (Mass. 1971)......................................................................14

*Bellino v. Schlumberger Technologies, Inc.*,
    944 F.2d 26 (1st Cir. 1991).........................................................................33

*Caggiano v. Marchegiano*,
    99 N.E.2d 861 (Mass. 1951)......................................................................15

*Cefalu v. B.F. Goodrich Co.*,
    871 F.2d 1290 (5th Cir. 1989)..............................................................31, 32, 33

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...............................................................................14

*Coll v. PB Diagnostic Systems, Inc.*,
    50 F.3d 1115 (1st Cir. 1995).......................................................................25

*Commercial Credit Corp. v. Stan Cross Buick, Inc.*,
    180 N.E.2d 88 (Mass. 1962)......................................................................27

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
    290 F.3d 42 (1st Cir. 2002).......................................................................26

*Fortune v. National Cash Register Co.*,
    373 Mass. 96 (1977) ...............................................................................27

*Frankina v. First Nat. Bank of Boston*,
    801 F. Supp. 875 (D. Mass. 1992).............................................................28

*Gel Systems, Inc. v. Hyundai Engineering & Construction Co., Inc.*,
    902 F.2d 1024 (1st Cir. 1990).....................................................................19

*Giuliano v. Nations Title, Inc.*,
    No. 96-cv-2331, 1998 WL. 45459 (1st Cir. Jan. 23, 1998) ......................17

*Hall v. Horizon House Microwave, Inc.*,
    506 N.E.2d 178 (Mass. App. Ct. 1987) .............................................24

*Hampers v. W.R. Grace & Co., Inc.*,
    202 F.3d 44 (1st Cir. 2000)...........................................................30, 31

*Harrison v. NetCentric Corp.*,
    744 N.E.2d 622 (Mass. 2001) .........................................................29

*Held v. Zamparelli*,
    431 N.E.2d 961 (Mass. App. Ct. 1982) .........................................15, 17

*I & R Mechanical, Inc. v. Hazelton Manufacturing Co.*,
    817 N.E.2d 799 (Mass. App. Ct. 2004) .............................................15

*In re IT Group, Inc.*,
    448 F.3d 661 (3rd Cir. 2006) ..........................................................34

*Ingersoll-Rand Co. v. McClendon*,
    498 U.S. 133 (1990) ....................................................................31

*Knight v. Brodnax, III*,
    No. 92-cv-10111, 1994 WL. 51635 (D. Mass. Jan. 31, 1994) ................19

*Lieberman v. Storagenetworks, Inc.*,
    No. 02-P-1177, 804 N.E.2d 961, 2004 WL. 360489 .......................14, 17

*Marya v. Slakey*,
    190 F. Supp. 2d 95 (D. Mass. 2001).................................................27

*Mass Cash Register, Inc. v. Comtrex Systems Corp.*,
    901 F. Supp. 404 (D. Mass. 1995)...................................................19

*McMahon v. Digital Equipment Corp.*,
    162 F.3d 28 (1st Cir. 1998)......................................................25, 30, 31

*Nachwalter v. Christie*,
    805 F.2d 956 (11th Cir. 1986) .....................................................33, 34

*Penta v. Concord Auto Auction, Inc.*,
    511 N.E.2d 642 (Mass. App. Ct. 1987) .............................................22

*Perreca v. Gluck*,
    295 F.3d 215 (2d Cir. 2002) ..........................................................33

*Sandler v. Marconi Circuit Technology Corp.*,
    814 F. Supp. 263 (E.D.N.Y. 1993)..................................................33

*Sands v. Ridefilm Corp.*,
    212 F.3d 657 (1st Cir. 2000)......................................................20, 24

*Sargent v. Tenaska, Inc.,*
    108 F.3d 5 (1st Cir. 1997)................................................................................29

*Shapiro v. American Home Assurance Co.,*
    584 F. Supp. 1245 (D. Mass. 1984)...............................................................27

*Sheldon v. First Federal Savings & Loan Assoc. of Puerto Rico,*
    566 F.2d 805 (1st Cir. 1977)......................................................................21, 22

*Theos & Sons, Inc. v. Mack Trucks, Inc.,*
    729 N.E.2d 1113 (Mass. 2000).......................................................................21

## Statutes

29 C.F.R. § 2510.3-1 .........................................................................................31

29 U.S.C. § 1002(2)(A) ......................................................................................31

29 U.S.C. § 1002(3)............................................................................................30

29 U.S.C. § 1002(a)(B)........................................................................................31

29 U.S.C.  § 1101(a)(1) .......................................................................................33

29 U.S.C. § 1102(a)(1) ........................................................................................33

29 U.S.C. § 1132(a)(1)(B) ...................................................................................32

29 U.S.C. § 186(c)...............................................................................................31

## Other Authorities

RESTATEMENT (THIRD) OF AGENCY, § 4.01 (2006) ..................................................25, 26

RESTATEMENT (THIRD) OF AGENCY, § 4.01 (Draft No. 2, 2001)...................................26

Defendants State Street Corporation (the "Corporation") and State Street Global Advisors ("SSgA") (collectively, "State Street") respectfully submit this memorandum of law in support of their motion for summary judgment dismissing the amended complaint of plaintiff Alan Brown ("Brown").

## Preliminary Statement

In 2003, State Street initiated a major cost reduction program, the centerpiece of which was a Voluntary Separation Program ("VSP") offered to certain of its United States employees. While State Street was and remains a global institution, it focused its cost-cutting efforts on its largest and most costly business segment, its U.S. operations. The VSP was a complex, carefully constructed program set forth in comprehensive written agreements and plans and had been approved by State Street's Board of Directors (the "Board") and its committee on employee compensation matters, the Executive Compensation Committee (the "ECC"). Pursuant to the VSP, eligible U.S. employees who accepted State Street's offer received several benefits, including a severance payment, continued vesting of equity awards following retirement and enhanced retirement benefits, in return for their agreement to resign by a specified date and execute a release of all legal claims against State Street.

State Street did not offer the VSP to Brown, a U.K. employee who did not participate in any of the benefit plans affected by the VSP. Despite the fact that he had no familiarity with how the VSP worked and despite his understanding of the legitimate business reasons behind State Street's decision to include only U.S. employees in the VSP, Brown approached David Spina, then State Street's Chief Executive Officer, seeking VSP benefits. In his amended complaint, Brown alleges that he made a private oral contract with David Spina under which Brown would not only become eligible for benefits similar to those granted by the

1

VSP but would additionally stand above everyone else who participated in the program in that he would be entitled to elect to receive these benefits whenever he wanted.

The undisputed facts adduced during discovery refute Brown's account and undermine his claims for relief as a matter of law. Those facts show that while Brown and Spina had a single, hour-long conversation concerning the mere possibility of Brown receiving a special severance package, they never reached an understanding as to the material terms necessary to form a binding contract under Massachusetts law, including, at the most basic level, what benefits Brown would receive, how these would be calculated and what he had to do to receive them. Moreover, involved in all the executive functions of SSgA, Brown knew that State Street would not bind itself to such a contract unless it was (1) in writing and (2) approved by the ECC. Yet, as he conceded at his deposition, neither prerequisite was satisfied here. Additionally, even if Brown could demonstrate the existence of a definite agreement, his claims are still preempted by the Employee Retirement Income Security Act of 1974. As a result, State Street is entitled to summary judgment dismissing Brown's amended complaint.

### **Statement of Facts**

The undisputed material facts entitling State Street to summary judgment are set forth in State Street's accompanying Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1. ("Rule 56.1 Statement"). The following statement summarizes those undisputed facts and includes additional background facts where necessary to provide context.

A.    The Voluntary Separation Program

In 2003, as part of an effort to reduce its overall expenses, State Street conceived and developed the Voluntary Separation Program. (Rule 56.1 Statement, ¶ 5). It also offered a corresponding plan, the Executive Voluntary Separation Program, to its U.S. executive vice presidents. (*Id.*). (We refer to both plans collectively as the "VSP.")

Through the VSP, State Street offered certain U.S. employees enhanced benefits if they resigned their employment by a predetermined date and provided State Street with a release of all legal claims against it.  (*Id.*, ¶ 11).  These benefits included, among other things, (i) enhanced severance paid through the U.S. severance pay plan (the "Severance Plan"); (ii) extended vesting of stock options and exercise deadlines; and (iii) enhanced retirement benefits, which for eligible executive vice presidents were paid pursuant to the Supplemental Defined Benefit Pension Plan (the "Executive SERP").  (*Id.*, ¶¶ 6, 13).

To implement these enhanced benefits within the context of the Executive SERP and State Street's existing stock option plans, State Street had to take action to modify the terms of these underlying benefit plans.  (*Id.*, ¶ 7).  (The Severance Plan did not require a formal vote to modify its terms.)  Such modifications required the formal approval of the ECC, which it granted on June 18, 2003.  (*Id.*, ¶ 8).

Importantly, not all State Street employees were eligible for these benefits.  Rather, participation in the VSP was limited to employees who were on State Street's U.S. payroll, participated in State Street's U.S.-based benefit plans and had satisfied certain service requirements and other eligibility criteria.  (*Id.*, ¶ 9).  These employees received letters and detailed handbooks (collectively, the "VSP Decision Guide") summarizing the enhancements to their stock option, severance and retirement benefits that State Street was offering.  (*Id.*, ¶ 10).  They were also told that to obtain these benefits, they had to sign and submit written election forms and releases by a certain date.  (*Id.*, ¶ 11).

State Street reserved its right to exclude any employee from participation in the VSP based on its business needs or to condition employees' participation upon their agreement

3

to remain with State Street for a specified and definite period of time before resigning and/or to enter a non-compete agreement applicable in the post-resignation period. (*Id.*, ¶ 12).

B.    Alan Brown

Alan Brown, who was based in London, England, was the Group Chief Investment Officer and Vice Chairman of SSgA and an executive vice president of the Corporation. (*Id.*, ¶ 19). Not only was he the CIO but he was also a member of the "G4," a senior management group responsible for SSgA's overall direction. (Brown Tr. 51; Rule 56.1 Statement, ¶ 23). In that capacity, Brown was "involved in all of the executive functions of SSgA." (*Id.*). As a result, he was extremely well compensated for his services, earning over $2.5 million in 2003 alone. (Rule 56.1 Statement, ¶ 24).

Brown -- like all other non-U.S. employees and, indeed, many U.S. employees -- was not eligible to participate in the VSP and never received the formal VSP program materials, such as the VSP Decision Guide.[1] (*Id.*, ¶ 31). This was so because he was paid on the U.K. payroll and participated in U.K.-based benefit plans. (*Id.*, ¶ 22). Indeed, Brown did not participate in any of the U.S.-based benefit plans affected by the VSP. (*Id.*, ¶¶ 14, 22, 34). Moreover, he was fully aware of the legitimate business reasons why State Street limited the VSP only to certain U.S. employees. (*Id.*, ¶ 33).

---

[1]    Brown admitted at his deposition that he did not receive the VSP Decision Guide until he obtained a copy during the course of this litigation. (Brown Tr. 66, 87, 88, 161; Rule 56.1 Statement, ¶ 32).

Even if he were eligible, because of his importance to SSgA as one of the members of the G4, State Street would have had the right to exclude him from the program or extract a non-competition agreement from him in exchange for his participation. (Rule 56.1 Statement, ¶ 12).

C.     Brown Knew That Executive Compensation Agreements, To Be Effective, Had To Be In Writing.

Having worked at State Street for ten years, Brown was familiar with State Street's employment and compensation practices and understood that, as a general business practice, State Street, like most companies, required agreements to be in writing. (*Id.*, ¶¶ 25-27). For example, when he first joined State Street Global Advisors U.K. Limited, SSgA's U.K. affiliate, he negotiated and signed a written employment agreement. (*Id.*, ¶¶ 26-27). Similarly, when he opted out of SSgA U.K. Limited's standard pension plan, he did so via a signed, written agreement. (*Id.*). Additionally, the stock option grants and equity awards Brown received during his employment with State Street were subject to separate written agreements that he read and signed. (*Id.*).

In each of these instances, Brown executed the agreement with the advice of counsel. (*Id.*, ¶ 30). Indeed, Brown was represented by counsel in connection with all matters related to his employment from the moment he began negotiating his first employment contract to the day he left State Street. (*Id.*).

D.     Brown Knew That ECC Approval Was An Independent Prerequisite To A Binding Executive Compensation Agreement.

Brown also understood that the ECC's approval was a necessary condition to the effectiveness of any executive compensation agreement because the ECC was the final authority on executive compensation.  For example, Brown understood that executive bonuses, as a whole, were only paid following the ECC's approval:

Q.  Was there a specific day upon which bonuses were actually paid?

A.  Each year there would be a date upon which bonuses would be paid.

Q.  And was that a date that followed the executive compensation committee approving the bonuses?

A.  Yes. (Brown Tr. 74; Rule 56.1 Statement, ¶ 28).

Moreover, he read every agreement that affected him, including his award agreements and the plan documents and prospectuses underlying them. (Brown Tr. 30; Rule 56.1 Statement, ¶¶ 25, 28). From these, he knew that only the ECC could modify the terms of his equity awards. (Brown Tr. 35; Rule 56.1 Statement, ¶ 28). For example, the SSgA Equity Compensation Plan, which he read and understood, clearly states: "[The ECC] shall have <u>complete authority</u>, subject to the terms of the Plan, to...<u>amend</u> or cancel an existing Award in whole or in part...." (Rule 56.1 Statement, ¶ 28) (emphasis added). As he admitted at his deposition, the ECC is the "<u>ultimate authority</u>" on these awards. (Brown Tr. 35; Rule 56.1 Statement, ¶ 28).

His understanding of the ECC's final authority over compensation matters was reinforced by other documents as well. Most importantly, the ECC's charter, which Brown admitted having read (Brown Tr. 75; Rule 56.1 Statement, ¶ 29), plainly states that:

> The [ECC] shall annually review, evaluate and advise the Board with respect to, for the CEO and the senior executives of the Corporation, (a) the annual base salary level, (b) the annual incentive opportunity level, (c) the long-term incentive opportunity level, (d) <u>employment agreements, severance arrangements</u>...and (e) <u>any special or supplemental benefits</u>. (Rule 56.1 Statement, ¶ 4) (emphasis added).

The charter further states that the ECC has "direct responsibility...for director and officer compensation plans, policies and programs of the Corporation." (*Id.*). To similar effect, Brown's compensation awards pursuant to State Street's Executive Annual Incentive Plan were accompanied by copies of the plan documents, each of which reminded him that the ECC "ultimately approve[d]" his "individual" award. (*Id.*, ¶ 28).

When it came to the VSP, Brown had no reason to think it would be an exception to the normal rule of ECC approval. Indeed, Brown conceded that he assumed the ECC had approved the VSP before its issuance:

Q. ...when you say it's implied by virtue of the fact that the program went ahead, that's because it's your knowledge that [the VSP] could not have gone ahead without the executive compensation committee's approval?

A. Correct, correct.

Q. And so you assume that the executive compensation committee approved it?

A. I assumed. (Brown Tr. 79-80; Rule 56.1 Statement, ¶ 28).

E.    Brown's Conversation With David Spina

In May 2003, aware that two of the four members of the G4 were eligible for the VSP and intended to participate, Brown recruited the final member of the G4, Tim Harbert, and together they approached David Spina, then State Street's CEO, to request similar treatment under the VSP.[2] (Rule 56.1 Statement, ¶¶ 35-36). While he initially raised the VSP under the guise of addressing "low morale" of U.K. employees caused by their exclusion from the program, Brown soon made clear to Spina that he was really only there to address his dissatisfaction with being left out of the VSP. (Spina Tr. 12-13; Rule 56.1 Statement, ¶¶ 35-36). Then, after insinuating that SSgA stood to lose the two remaining members of its senior management group, Brown suggested that he, along with Harbert, be made eligible for the VSP even though he did not qualify for its benefits (like so many others) or have any intention to resign imminently. (Rule 56.1 Statement, ¶¶ 32, 36). Their conversation lasted less than an hour and covered a number of additional, unrelated topics. (Brown Tr. 99; Rule 56.1 Statement, ¶ 36). Brown and Spina differ only slightly on what was said concerning Brown and the VSP:

Alan Brown

And I said to David Spina that I didn't think he would want, you know, any more departures, any more departures, and that I had a proposal which I thought would be equitable both to myself and Tim if we stayed to continue to support SSgA and could potentially cost the company nothing... (Brown Tr. 100; Rule 56.1 Statement, ¶ 36).

_____

[2]  Tim Harbert passed away in August 2004.

\*\*\*

Q.  So you were proposing first that David make you eligible for the VSP and then extend the time at which you could elect for a five-year period?

A.  Correct.

Q.  What was David's response?

A.  Well, David made it clear that there were certain things which were beyond his control.  So things like the equity plans he wasn't in a position to be amending any equity plans.  But otherwise, he accepted the basis of the proposal.  (Brown Tr. 102-03; Rule 56.1 Statement, ¶ 40).

<u>David Spina</u>

...he wanted some protection that would represent not protection, but remuneration for his labors of the prior ten years.  (Spina Tr. 20; Rule 56.1 Statement, ¶ 36).

\*\*\*

Well, whatever I said to him in that meeting back in '03, I said I would go and do my best to get what I could get.  (Spina Tr. 26; Rule 56.1 Statement, ¶¶ 37-38).

From the testimony of both men, it is absolutely clear that this discussion was over mere possibilities and not an agreement on any specific contractual arrangement:

<u>Alan Brown</u>

[On how long he was required to stay with SSgA:]

Q.  So we have a situation where you're not eligible for any benefits under this plan and you make a proposal that you might stay for an additional period in return for benefits under the plan?

A.  Correct.

Q.  But that period is unstated?

A.  The period is unstated.  (Brown Tr. 112; Rule 56.1 Statement, ¶ 38).

[On how his total benefits would be calculated:]

A.  The provisions of the SERP include a deduction from the benefit equal to accrued pension rights under alternative arrangements, DB and DC type arrangements...Yes.  I had talked about the fact that I didn't fit quite within the standard VSP formula because of the fact that my benefits were outside of the DB and DC arrangements contemplated in the documentation...

Q.  And what did David say about that?

A.  No more at the time.  No more.  We didn't get into any more detail on that.  (Brown Tr. 143-4; Rule 56.1 Statement, ¶ 38).

David Spina

I think we were a long way from getting it put into specific ideas that were understandable by other people, and could be implemented and carried out...[ ³ ]  (Spina Tr. 28; Rule 56.1 Statement, ¶ 38).

Their testimony further makes clear that they expected they would turn their discussion into a

written agreement:

Alan Brown

Q.  Is that all he said?

A.  No.  And we then agreed that we would need to reflect this in writing and he said that he would do that.  (Brown Tr. 104; Rule 56.1 Statement, ¶ 39).

David Spina

It was to direct HR to put it into details to either ask HR or me to negotiate with Alan to make sure we had the agreement with Alan and Tim, things that we got the spirit of what we were discussing onto paper.  (Spina Tr. 22-3; Rule 56.1 Statement,¶ 39).

Indeed, Brown was advised by counsel to negotiate a written agreement but deliberately chose

not to:

Q.  And yet you had a specific employment agreement with the company and dozens of award agreements with the company and multiple letters from the company to you setting forth the terms of compensation, yet something as valuable as this, you were sufficient, you felt was sufficiently clear that you could rely on it?

A.  I very much regret that I didn't take the advice of my counsel to get it down in more concrete form.  (Brown Tr. 138; Rule 56.1 Statement, ¶ 39).

After their conversation, Brown interacted frequently with Spina but never spoke to him again, in

person, during their time at State Street, regarding what they had discussed (no doubt content to

continue to receive millions in compensation).  (Brown Tr. 106; Rule 56.1 Statement, ¶ 42).

---

³  As Spina himself testified in describing his state of mind: "there's a skill and craft regarding compensation and severance arrangements of any and all kind, and then there are processes that go with that.  Until we call in [Luis] de Ocejo [then head of Human Resources] and others to put this in to use their skills to make this more granular and more specific, I think that you don't know all the issues you're going to face until you do that.  So you don't really know that you have an agreement until everything is spelled out, and a sufficient level of granularity to do that."  (Spina Tr. 32-3; Rule 56.1 Statement, ¶ 38).

F.    Brown's June 10, 2004 Email

Indeed, Brown ignored the entire matter for over a year, and it was not until there were rumors that Spina was about to leave State Street that Brown sent Spina an email, on June 10, 2004, to renew his VSP request. (Rule 56.1 Statement, ¶¶ 43-44).  Reflecting his knowledge that no agreement had been reached, Brown described his June 10th email as an attempt to "clarify matters."[4]   (Id., ¶ 44).

While Brown purported to set forth in the email the arrangement he suggested to Spina, even he could not explain what he meant by the use of certain terms:

> Q.  Before you said it was the SERP that was going to be amortized, but [the June 10th email] says the VSP package, the entire package is going to be amortized, is that correct?
>
> A.  It says I would get the VSP package amortized over five years.  Aspects of that are not capable of being amortized.  And the example that I subsequently give relates specifically to the EVP top up pension plan.
>
> Q.  Wouldn't severance, a severance arrangement be capable of being amortized?
>
> A.  It would be capable of it.
>
> Q.  Doesn't this say VSP package amortized?
>
> A.  It says a severance package similar to that of the VSP.  This is, as you will appreciate, a rather short form to go through all of the detail concerned.  It's my clear understanding that the amortization related to the EVP top up pension plan, the SERP.
>
> Q.  But you wrote this document?
>
> A.  I did.
>
> Q.  With advice of counsel?
>
> A.  Yes.
>
> Q.  But it wasn't complete?

_____

[4]  In an earlier email, on June 3, 2004, Brown informed Harbert that he planned to send Spina an email (his June 10th email) to "try and clarify matters" and asked if Harbert, who was also included in Brown's proposal to Spina, wanted him to "change the language to 'we' instead of 'I' to cover [Harbert] as well." (Rule 56.1 Statement, ¶ 44). While Harbert's testimony is unavailable, Brown's June 10th email makes plain that he never joined in Brown's effort. (Id.).

A. I don't think one could describe three paragraphs as being a complete, detailed agreement of something which is relatively complex. (Brown Tr. 120-21; Rule 56.1 Statement, ¶ 45).

Spina's reaction to Brown's June 10th email was to do what everyone expected he needed to do to negotiate a deal of this nature -- seek the ECC's approval -- and he informed Brown accordingly. (Rule 56.1 Statement, ¶ 46). Specifically, Spina's response to the email acknowledged receipt of Brown's "'first cut' at a record" and informed him that there would be "[m]ore after the meeting with the board." (*Id.*). Brown did not reply. (*Id.*). The reason is obvious: he knew ECC approval was necessary and hoped that Spina would get it.

G.    The ECC Never Approved Brown's Proposal.

Spina did his best with the ECC. At its June 16, 2004 meeting, Spina informed the ECC of the discussion he had with Brown and Harbert and a similar conversation he had with another senior executive, John Towers. (*Id.*, ¶ 47). However, because the matter was not a scheduled agenda item for that meeting and because Spina did not have any back up material, the ECC requested that he prepare a letter setting forth the discussions he had. (*Id.*, ¶¶ 48-49).

In response, on his last day with State Street, Spina provided a letter dated June 30, 2004, to Robert Weissman, the chairman of the ECC, in which he outlined the conversations he had with Brown, Harbert and Towers. (*Id.*, ¶ 51). Because Spina knew that any final decision would have to come from the ECC, he tried to portray his discussion with Brown as favorably as possible in his letter, using words such as "commitment." (*Id.*, ¶¶ 53-54). As he testified at his deposition, he was merely attempting to play the role of an advocate:

Q. Now getting back to the word commitment, in this letter you use the word commitment repeatedly. What did you mean by commitment when you told Mr. Weissman that you made oral commitments to Mr. Harbert and Mr. Brown?

***

A. Well, I think there was a considerable passage of time between the conversation I had with Alan and Tim...[a]nd I was purposeful in this letter to play a role that approached advocacy...[s]o I was trying to put some spin on the ball by using stronger letters or stronger words with the

11

Board in the letter, because it was the only action I had left that I could really do at that point. (Spina Tr. 24-5; Rule 56.1 Statement, ¶ 54).

In his letter, Spina also cautioned Weissman that significant work would need to be done to complete an agreement with Brown because Brown did not participate in any of the plans underlying the VSP, except for his stock options, and thus it was unclear how his benefits would be calculated in light of this. (Rule 56.1 Statement, ¶ 51). Spina concluded the letter by asking the ECC to approve and finalize agreements with Brown and the others. (*Id.*, ¶ 53).

Brown was apparently copied on this letter so he knew that the ECC had not approved his request at its June 2004 meeting. (*Id.*, ¶¶ 50, 52). In response to Spina's June 30th letter, the ECC asked Luis de Ocejo, then head of Human Resources and one of the principal architects of the VSP, to prepare cost estimates of Brown's proposed severance package with an intent to review it at the next scheduled ECC meeting. (*Id.*, ¶ 55). de Ocejo did so with Boon Ooi, then head of Compensation and Benefits, based on their reading of the recommendation set forth in Spina's letter. (*Id.*, ¶ 56). Yet, because Spina and Brown had left open many necessary terms, they could only create, what Ooi described as, a "worst-case scenario." (Ooi Tr. 10; Rule 56.1 Statement, ¶ 56).

de Ocejo and Ooi prepared these materials for the ECC to review at its September 15, 2004 meeting. While it was an agenda item for discussion, Brown's request was not scheduled for a vote because no one, not even Brown, requested that the ECC vote on the matter. (Rule 56.1 Statement, ¶ 57). While not voting on the matter, the ECC members did reach a consensus that they were unwilling to offer Brown the type of special severance package that he had discussed with Spina. (*Id.*). Nor did they offer a similar package to Harbert (who had since passed away) or Towers.

12

H.    Brown Begins To Record His Conversations With State Street Employees.

After the ECC's meeting in September 2004, Brown was informed by de Ocejo

that the ECC was unwilling to grant him the severance package that he had raised with Spina. de

Ocejo told Brown:

> Alan, it will never see the light of day. The Committee will never agree to something like this
> and I know they have looked at it and this letter that David wrote and nothing is going to
> happen.[5] (de Ocejo Tr. 40; Rule 56.1 Statement, ¶ 59).

Brown obviously knew the score because, beginning in "the fourth quarter of 2004," on the

advice of counsel, he began taking notes of his conversations with State Street employees in

order to "document" what was said in case he "wanted to exercise [his] option." (Brown Tr. 67,

153; Rule 56.1 Statement, ¶ 60).

I.    Brown Resigns From State Street.

After Harbert died in August 2004, Brown began vying to succeed him as head of

SSgA. (Rule 56.1 Statement, ¶ 63). State Street considered Brown in good faith for the position

but ultimately decided to offer it to another individual in January 2005. (*Id.*). At that point,

Brown decided to quit. On March 11, 2005, he sent a letter to Ronald Logue, who replaced

Spina as State Street's CEO, giving him notice of his resignation. (*Id.*, ¶ 64). In this letter,

Brown informed Logue that, while he "greatly enjoyed [his] tenure at State Street," he believed

his position with the company was "no longer tenable." (*Id.*). In addition, he requested to

receive benefits pursuant to the VSP. (*Id.*). State Street accepted Brown's resignation and

reiterated to him that the VSP arrangement he discussed with Spina, almost two years earlier,

---

[5]    de Ocejo also testified that he spoke with Harbert on this subject twice before his death and
that both times Harbert informed him he knew that the ECC would never approve the proposal. (de Ocejo
Tr. 26, 38-9, Rule 56.1 Statement, ¶ 61). In fact, Harbert, who was also included in Brown's proposal to
Spina, was "very dismissive of this whole thing ever seeing the light of day." (de Ocejo Tr. 26; Rule 56.1
Statement, ¶ 61).

was never approved by the ECC. (*Id.*, ¶ 65). Informed of this, Brown made no offer to revoke his resignation. (*Id.*, ¶ 64). Instead, he accepted a position with a competitor. (*Id.*, ¶ 66).

<u>**Argument**</u>

## I.    BROWN'S BREACH OF CONTRACT CLAIM FAILS BECAUSE HE NEVER FORMED AN AGREEMENT WITH STATE STREET.

The burden is on Brown to show that he entered into a valid and enforceable agreement. Yet, given the undisputed facts, he cannot do so. First, Brown and Spina never progressed beyond a discussion of "ideas" and never achieved a meeting of the minds on the material terms that are a prerequisite to an enforceable contract under Massachusetts law. Second, they agreed that, per State Street's practices, any arrangement would have to be reduced to writing before it would become binding; yet no writing was ever executed. Finally, the ECC never approved Brown's proposal as was required to bind State Street.

Summary judgment is appropriate where, as here, there is an absence in the record of evidentiary support for any essential element of the plaintiff's claim, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the plaintiff can only support essential elements of his claims with mere allegations. *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (a scintilla of evidence insufficient to satisfy plaintiff's burden). Because Brown cannot show that he entered into a contract with either Spina or State Street, his breach of contract claim should be dismissed with prejudice.

### A.    Brown Never Reached An Agreement With Spina On The Material Terms Of The Alleged Deal.

Caselaw makes plain that "to create an enforceable contract, there must be agreement between the parties on the material terms of that contract...." *Lieberman v. Storagenetworks, Inc.*, No. 02-P-1177, 804 N.E.2d 961, 2004 WL 360489, at *1 (Mass. App. Ct. February 26, 2004 (omitting citation); *see also Bell v. B.F. Goodrich Company*, 270 N.E.2d 926,

14

927 (Mass. 1971) (parties did not create a contract where they failed to agree on the value or duration of the agreement); *Caggiano v. Marchegiano*, 99 N.E.2d 861, 865 (Mass. 1951) (contract not binding where it failed to specify how parties were to perform).

Whether an agreement is too vague to be an enforceable contract is a question of law for the Court, *Armstrong v. Rohm and Hass Co., Inc.*, 349 F. Supp. 2d 71, 79 (D. Mass. 2004), and therefore plainly suitable for disposition on summary judgment. While courts can on occasion impute terms where the parties have procedures to narrow uncertainties, courts will not write "a contract for the parties which they themselves did not make." *Held v. Zamparelli*, 431 N.E.2d 961, 962 (Mass. App. Ct. 1982) (omitting citations).

As an initial matter, there is nothing in the record to justify the conclusion that Spina even assented to Brown's request. *See I & R Mechanical, Inc. v. Hazelton Manufacturing Co.*, 817 N.E.2d 799, 802 (Mass. App. Ct. 2004) (mutual assent is created only where parties have "'a meeting of the minds' on the same propositions on the same terms at the same time.") (omitting citation). But even if he generally agreed with the spirit of Brown's suggested arrangement, an exhaustive review of the record uncovers no evidence that he and Brown ever took the requisite further step and reached an agreement with respect to any material terms of a definite arrangement, including:

- How long Brown was required to stay with SSgA to receive these benefits and the circumstances under which he would get them if he left. Brown has frankly admitted that this term was left "unstated." (Brown Tr. 112; Rule 56.1 Statement, ¶ 38).

- Whether there would be any severance and, if so, the method by which it would be calculated. (Rule 56.1 Statement, ¶ 38).

- How his total benefits would be calculated under the Executive SERP. Again, Brown admits that this question was never answered. (Brown Tr. 143-44; Rule 56.1 Statement, ¶ 38).[6]

- How his equity grants and stock options would vest. (Rule 56.1 Statement, ¶ 38).

- Whether and how his arrangement would, as Brown claims, "amortize." (Brown Tr. 120-21; Rule 56.1 Statement ¶ 45).

- Whether Brown would be required to execute an non-competition agreement as a condition for receipt of benefits. (Rule 56.1 Statement, ¶¶ 12, 38).

In his interrogatory responses, Brown claims that these various elements of his purported arrangement, such as his severance, can be calculated using the formulas set forth in the VSP Decision Guide.[7] Yet, Brown conceded at his deposition that, while he may have understood generally that the VSP was a rich package, he never saw any of the program documents, much less those specific to executive vice presidents, like him. (Brown Tr. 66, 87-88, 161; Rule 56.1 Statement ¶ 32). It is therefore clear that Brown never had a specific picture of what he was looking for when he approached Spina in May 2003 and that any reliance he now places on the information contained in the VSP Decision Guide is merely a *post hoc* attempt to define what he and Spina had never agreed upon in the first place.

Rather, the facts show that, while Brown and Spina may have discussed the mere possibility of allowing Brown to receive special benefits, there was no agreement on how this would be done or what their definite obligations were. Discussions such as these are

---

[6] In his responses to State Street's Second Set of Interrogatories, Brown claimed that he is also entitled to benefits under State Street's Supplemental Executive Retirement Plan. Plaintiff's Responses to State Street's Second Set of Interrogatories, Interrogatory No. 3 (a copy of which is attached as Exhibit 16 to the Declaration of Rex Lee (the "Lee Decl.")). Yet, the Supplemental Executive Retirement Plan merely supplemented benefits first provided under State Street's U.S. retirement plan. Thus, to the extent he seeks benefits from the Supplemental Executive Retirement Plan, there is equally no evidence that he and Spina discussed how this plan would even apply to Brown, who had no U.S. benefits.

[7] Plaintiff's Responses to State Street's First Set of Interrogatories, Interrogatory No. 8, Lee Decl. ¶ 14, Ex. 13; Plaintiff's Responses to State Street's Second Set of Interrogatories, Interrogatory No. 3, Lee Decl. ¶ 17, Ex. 16.

unenforceable under Massachusetts law. *Giuliano v. Nations Title, Inc.*, No. 96-cv-2331, 1998 WL 45459, at *4 (1st Cir. Jan. 23, 1998) ("A purported contract which is no more than an agreement to agree in the future on essential terms, or one which does not adequately specify essential terms" is unenforceable) (omitting citation).

For example, in *Lieberman*, the plaintiff asserted that the defendant orally promised to grant him stock options. *Lieberman*, 2004 WL 360489, at *1. Yet, similar to the situation here, the parties never agreed on when he could exercise these options or how much they were initially worth. *Id.* Affirming summary judgment for the defendant, the court held that the parties never created a contract because they never agreed on its material terms. *Id.*

*Armstrong* is also instructive. There, the plaintiffs claimed the defendant orally promised to outsource work to them if they quit their jobs and opened their own shop. *Armstrong*, 349 F. Supp. 2d at 73. Like Brown and Spina, the parties never discussed how long they were to perform or the method by which they would determine how much the plaintiffs were entitled to receive. *Id.* The court concluded that, absent these terms, the plaintiffs' alleged oral promise was too vague to be enforceable. *Id.* at 80.

*Held* is to the same effect. There, the plaintiff alleged that the defendants orally promised to pay her a portion of the profits they earned from leasing land that she previously conveyed to them. *Held*, 431 N.E.2d at 961-62. Finding that the parties never addressed how long or in what manner the defendants were required to do so, the court concluded that the plaintiff's oral agreement was too imprecise to be enforceable. *Id.*

Like the plaintiffs in *Lieberman*, *Armstrong* and *Held*, Brown cannot show that he reached an agreement with Spina on the material terms of his proposal. Accordingly, his breach

of contract claim fails as a matter of law because he cannot demonstrate its central element -- the existence of defined, material terms that are a prerequisite to an enforceable contract.

B.     Brown And Spina Never Executed A Writing Despite Agreeing To Do So.

Even if Brown and Spina had agreed on the material terms of a contract, they did not reduce that agreement to a signed, written contract, as both parties expressly contemplated and as they understood was the customary practice at State Street for this type of agreement. As Brown admitted, following their May 2003 conversation, "we then agreed that we would need to reflect this in writing and he said that he would do that." (Brown Tr. 104; Rule 56.1 Statement, ¶ 39). Spina also testified he believed that State Street's Human Resources had to be involved in preparing the final written agreement because neither he nor Brown could accurately predict the manifold issues that would arise. (Spina Tr. 22-3; Rule 56.1 Statement, ¶ 39).

Yet, the closest Brown and Spina came to a written, signed agreement was the three-paragraph email that Brown prepared on June 10, 2004, over a year after their conversation occurred, an email that he admitted was neither a complete nor detailed summary of what he had raised with Spina. (Brown Tr. 120-21; Rule 56.1 Statement, ¶ 45). Echoing Brown's own assessment, Spina's response to the June 10th email indicates that Spina understood it to be merely a "first cut" at a written agreement. (Rule 56.1 Statement, ¶ 46). He then advised Brown that he would get back to him "after the meeting with the board." (*Id.*). These facts make plain that they never turned their discussion into a signed writing as they had agreed and understood was necessary.

Massachusetts law is clear that, in this situation, no contract is formed. "If both parties intend to have a written instrument signed by them as evidence of any contract they might make, and neither considered the contract concluded until the written instrument was fully executed, no contract would come into existence with respect to that subject-matter until the

writing was signed." *Knight v. Brodnax, III*, No. 92-cv-10111, 1994 WL 51635, at *3 (D. Mass. Jan. 31, 1994) (omitting citation); see also *Gel Systems, Inc. v. Hyundai Engineering & Construction Co., Inc.*, 902 F.2d 1024, 1027-28 (1st Cir. 1990) (parties never reached an agreement where they failed to execute a written agreement as intended); *Mass Cash Register, Inc. v. Comtrex Systems Corp.*, 901 F. Supp. 404, 416 (D. Mass. 1995) ("Parties can agree on every term in a contract, yet not be bound until they sign a written agreement, if they so indicate.") (omitting citation).

In *Gel Systems*, the plaintiff claimed that a letter of intent the defendant issued created a binding contract. *Gel Systems*, 902 F.2d at 1026. In this letter, however, the defendant referred to a formal contract to be made in the future. *Id.* at 1028. The First Circuit concluded that the parties did not create a binding contract because the defendant's reference to a future writing demonstrated that it did not assent to the plaintiff's proposals but rather "reserved the right to renegotiate the terms prior to entering into a formal contract." *Id.*

The same result follows *a fortiori* here, where *both parties* to the purported contract agreed that they would turn their discussion into a written agreement. As the First Circuit instructs, their failure to execute a written agreement as they intended precludes Brown's claim for breach of contract.

C.      The ECC Never Approved The Proposal.

Fatal to Brown's claim is that, even if Brown and Spina had reached a definite, written and signed agreement, Brown still cannot demonstrate the existence of an enforceable contract with State Street because, as he knew well, any such arrangement, to be effective, first had to be approved by the ECC -- but indisputably never was so approved.

1.    Brown's Proposal Was Conditioned On The ECC's Approval.

The record demonstrates that the alleged agreement between Brown and Spina, to be binding upon State Street, was entirely contingent on the ECC's approval. As Brown admitted at his deposition, Spina informed him that there were elements of what they had discussed "which were beyond his control." (Brown Tr. 103; Rule 56.1 Statement, ¶ 40). As a result, in response to Brown's June 10, 2004 email, Spina reiterated to him that they only had a "first cut" at an agreement, that he intended to bring Brown's idea to the attention of the Board and that there would be "more after [that] meeting." (Rule 56.1 Statement, ¶ 46).

As if this were not enough, Brown himself knew the limits of Spina's authority from his extensive experience at State Street. He specifically admitted at deposition that:

- He read and signed every award agreement he entered into with State Street, from which he understood that "[the ECC] reviews recommendations of the Chairman and CEO [here, Spina] and ultimately approves individual awards." (Brown Tr. 30; Rule 56.1 Statement, ¶¶ 25-28).

- He read the ECC charter, which plainly sets forth the broad scope of the ECC's final authority over executive compensation arrangements. (Brown Tr. 75; Rule 56.1 Statement, ¶ 29).

- There was no doubt in his mind that the ECC was the "ultimate authority" on equity awards. (Brown Tr. 35; Rule 56.1 Statement, ¶ 28).

From these facts, reasonable jurors would be compelled to find that Brown and Spina conditioned their agreement on the consent of the ECC. And because the ECC never approved the purported agreement, it is equally clear that Brown failed to create a binding contract with State Street.

A condition precedent, such as the ECC's approval, "defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract." *Sands v. Ridefilm Corp.*, 212 F.3d 657, 661-62 (1st Cir. 2000) (omitting citation). Thus, "[i]f the condition is not fulfilled, the contract, or the obligations attached to the condition,

20

may not be enforced." *Id.* at 662 (omitting citation). Here, as Brown knew, the approval of the ECC was necessary for his agreement with Spina to be effective. That it never consented warrants dismissal of his claim.

> 2.  Spina Did Not Have Actual Or Apparent Authority To Commit State Street To Special Compensation Arrangements.

Even if Brown's purported agreement was not contingent on the consent of the ECC, he cannot show that Spina had any authority to bind State Street to compensation arrangements, such as his. Under Massachusetts agency law, "the principal has liability for the agent's acts toward third parties only if the agent was acting with the actual or apparent authority of the principal in that transaction." *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 729 N.E.2d 1113, 1120 (Mass. 2000). Actual authority exists only when the principal (here, State Street) informs the agent (here, Spina) either expressly or implicitly that the agent may act on its behalf. *Id.* Apparent authority is created where a third party (here, Brown) reasonably relies on the agent's authority in light of the manifestations of the principal (here, State Street). *Id.* at 1120-21. Neither can be created by the putative agent's actions alone. *Id.*

The plaintiff has the burden of proving authority, *Sheldon v. First Federal Savings & Loan Assoc. of Puerto Rico*, 566 F.2d 805, 808 (1st Cir. 1977), and the undisputed facts demonstrate that Brown cannot do so here as a matter of law. First, the record makes clear that State Street never granted Spina the actual authority to enter into commitments with respect to executive compensation. Instead, it demonstrates the complete opposite. The ECC charter plainly states that the ECC has "direct responsibility...for director and officer compensation plans, policies and programs of the Corporation." (Rule 56.1 Statement, ¶ 4). And, in the same meeting during which Spina first raised Brown's proposal with the ECC (June 16, 2004), he also formally briefed the ECC on a proposed severance package for another executive, which was

21

awaiting the ECC's approval.  Moreover, as Spina himself conceded, he believed that he was empowered only to ask Human Resources to negotiate arrangements, not to make them himself. (Spina Tr. 22-3; Rule 56.1 Statement, ¶ 39).

Brown's own admissions with respect to the supremacy of the ECC makes equally clear that he had no basis to believe that Spina had the apparent authority to do more. *See supra*, at 20.  Indeed, there is no evidence that State Street did anything to suggest to him that Spina had the authority to commit it orally to lavish compensation packages.  Brown so conceded in his interrogatory responses, stating that his belief that Spina had authority rested only on his own assumptions given Spina's position at State Street.[8]

Yet, the mere fact that Spina was State Street's CEO is irrelevant to whether he had apparent authority.  In *Sheldon*, for example, the plaintiff, a gift shop owner, sought to bind the defendant, a bank, to a transaction she agreed to with one of its senior officers.  *Sheldon*, 566 F.2d at 806.  Rejecting the plaintiff's argument that apparent authority was created by the fact that the defendant held out the agent as one of its senior officers, the First Circuit concluded that because "being an officer did not import actual authority, it could not, standing alone, be the basis for apparent authority."  *Id.* at 809.  So too here, Brown cannot rely on Spina's title alone to show apparent authority.[9]

---

[8] Plaintiff's Responses to State Street's First Set of Interrogatories, Interrogatory No. 10, Lee Decl. ¶ 14, Ex. 13.

[9] Nor was Brown entitled to sit idly by and rely on his own idiosyncratic understanding of Spina's authority.  Rather, he had a duty to investigate the limits of this authority, which he never did. *See Penta v. Concord Auto Auction, Inc.*, 511 N.E.2d 642, 646 (Mass. App. Ct. 1987) (holding that only a written and unambiguous statement establishing authority relieves plaintiff of duty to investigate).

II.    **THE COURT SHOULD GRANT SUMMARY JUDGMENT TO STATE STREET ON BROWN'S REMAINING COMMON-LAW CLAIMS (COUNTS TWO THROUGH FOUR).**

The quasi-contractual claims to which Brown resorts as a fall back are equally unsupported by the record. Accordingly, the Court should grant summary judgment to State Street on these claims as well.

A.    State Street Is Entitled To Summary Judgment On Brown's Claim For Promissory Estoppel.

Brown's claim for promissory estoppel fails because as an initial matter he cannot demonstrate the existence of a definite promise. Under Massachusetts law, "an action based on reliance [such as promissory estoppel] is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration." *Aretakis v. General Signal, Inc.*, No. 05-cv-10257, 2006 WL 1581781, at *7 (D. Mass. June 7, 2006) (omitting citation). Thus, to prevail on his claim for promissory estoppel, Brown must first show that the alleged promise "included enough essential terms so that a contract including them would be capable of being enforced."[10] *Armstrong*, 349 F. Supp. 2d at 82. Because he cannot do so, *see supra*, at 14-18, his claim for promissory estoppel fails as a matter of law.

Nor can Brown demonstrate that he ever (1) relied on his conversation with Spina (2) to his detriment, two additional essential elements of a promissory estoppel claim. *Aretakis*, 2006 WL 1581781, at *7-8. There is no evidence of either reliance or detriment here because, while Brown claims he relied to his detriment by staying with SSgA, he was not required by the terms of his purported agreement to do so. *See supra*, at 15. That he stayed with SSgA was

---

[10]    To establish a claim for promissory estoppel in Massachusetts, a plaintiff must also show that: (1) the defendant made a promise which one would reasonably expect to induce action or forbearance of a definite and substantial character; (2) the promise does induce such action or forbearance; (3) the plaintiff (footnote continued)

therefore a result of his own desire to do so -- in particular, because he hoped to be Harbert's replacement as head of SSgA -- and has no relevance to his promissory estoppel claim.

Moreover, even if he relied on his conversation with Spina, he cannot show that this reliance was reasonable, which is yet another element of a promissory estoppel claim. This is so for three reasons. First, oral agreements that lack definite material terms, like Brown's, cannot serve as the basis for reliance. *See Sands*, 212 F.3d at 665 (1st Cir. 2000) (concluding that plaintiff's reliance "on the incomplete, tentative, and unwritten agreement" was unreasonable); *see also Hall v. Horizon House Microwave, Inc.*, 506 N.E.2d 178, 184 (Mass. App. Ct. 1987) ("Inchoate negotiations are no better basis for reliance than for an action on the purported contract as such."); *see also supra*, at 14-18.

Second, Brown understood that his purported agreement, to be binding upon State Street, was entirely contingent on the ECC's approval. *See supra*, at 20-21. That he understood further approval was required leads inexorably to the conclusion that he had no more than a hope that the deal would work itself out. Yet, mere hope does not render his reliance reasonable.

In *Aretakis*, for example, the plaintiff claimed that, pursuant to an oral promise, she was entitled to receive stock options in an anticipated spin-off from the defendant's company. 2006 WL 1581781, at *1. As in the instant case, the defendant informed the plaintiff that their deal was contingent on certain events, which he at no point guaranteed would occur. *Id.* at *8. On the defendant's motion for summary judgment, the court rejected the promissory estoppel claim, holding that the defendant's failure to "fir[m] up" his oral representations rendered the plaintiff's reliance on them unreasonable. *Id.*

---

reasonably relied to his detriment on the defendant's promise; and (4) injustice can be avoided only by enforcement of the promise. *Aretakis*, 2006 WL 1581781, at *7-8.

Third, even if Brown assumed that Spina had the authority to bind State Street, he knew from reading his compensation and equity agreements, as well as the ECC charter, that the ECC was the final authority on executive compensation arrangements. (Brown Tr. 35; Rule 56.1 Statement, ¶¶ 28-29). Courts applying Massachusetts law routinely hold that reliance is unreasonable where, as here, the plaintiff relies on oral discussions in spite of contradictory written statements. *See Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1124-25 (1st Cir. 1995); *see also McMahon v. Digital Equipment Corp.*, 162 F.3d 28, 39 (1st Cir. 1998) ("[r]ecovery under a promissory estoppel theory is not possible where a plaintiff has simply chosen to believe the more appealing of two conflicting statements."); *Aretakis*, 2006 WL 1581781, at *8 ("Where a written statement conflicts with an oral statement, Massachusetts law assumes that a reasonable person will investigate further.") (omitting citation).

*Coll* shows that Brown's reliance was unreasonable. There, the plaintiff claimed that the defendant orally promised to develop a long-term incentive plan in order to persuade him to accept the CEO position with the defendant. *Coll*, 50 F.3d at 1124. Like Brown, the plaintiff had seen written statements (his offer letters) that contained language at odds with what the defendant had orally represented. *Id.* Rejecting the plaintiff's claim for promissory estoppel on summary judgment, the First Circuit held that where, as here, written statements conflict with an oral representation, reliance on the latter is unreasonable. *Id.*

B.     Brown Cannot Demonstrate Ratification.

In Count II of his amended complaint, Brown asserts the theory that State Street implicitly ratified his purported agreement with Spina by failing to disavow it. This argument fails for three reasons. First, as demonstrated previously, *see supra*, at 14-19, Brown failed to create an agreement with Spina and as such there was no contract or "act" that State Street could ratify. *See* RESTATEMENT (THIRD) OF AGENCY, § 4.01 (2006) (explaining that ratification is

25

limited to acts that would be binding but for the agent's lack of authority). Since there was no contract, there was no ratification.

Second, even if Brown reached a definite, written and signed agreement with Spina (which he did not), he had no reason to believe that the ECC consented to it. Ratification can be implied only where principals act in such a manner that reasonably causes a third party to believe that they assent. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 59 (1st Cir. 2002) (citing RESTATEMENT (THIRD) OF AGENCY, § 4.01 (Draft No. 2, 2001)); *see also* RESTATEMENT (THIRD) OF AGENCY, § 4.01 (2006) (ratification can be established either expressly or by "conduct that justifies a reasonable assumption that the person so consents"). As his amended complaint makes plain, Brown rests his claim for ratification solely on the fact that the ECC declined to issue a formal vote on his proposal.

Yet, any reliance Brown placed on this omission was unreasonable because Spina reminded him that there were significant elements of their unique arrangement that were "beyond his control." (Brown Tr. 102-03; Rule 56.1 Statement, ¶ 40). Moreover, after Brown renewed his request, over a year after they first discussed it, Spina again reminded him that he would have to raise it with the ECC and that he would have "more after [its] meeting." (Rule 56.1 Statement, ¶ 46). Brown also knew, having received Spina's June 30, 2004 letter, that his proposal was not approved at the ECC's June 16, 2004 meeting and that Spina again requested the ECC to approve the proposal when it felt the time was right. Learning this, a reasonable person would understand that, if nothing more developed in terms of action rather than omission, then no agreement was created. *See also supra*, at 19-21. Of course, all this ignores the fact that de Ocejo informed Brown, shortly after the ECC's September 15, 2004 meeting, that the ECC

members had reviewed his request but reached a consensus that it was not something to which they would consent at that time. (de Ocejo Tr. 40; Rule 56.1 Statement, ¶ 59).

These facts demonstrate that there is absolutely no evidence the ECC did anything that would cause Brown to believe he had an agreement with State Street. Nor is there any evidence that Brown ever attempted to follow up or renew discussions with the ECC or State Street's Human Resources department, even after de Ocejo informed him of the ECC's negative consensus. To the contrary, Brown, advised by counsel and knowing precisely where he stood, intentionally ignored the issue, no doubt hoping to resurrect it at some future date. Accordingly, any reliance Brown placed on the lack of a formal vote from the ECC was not only unreasonable, it was deliberately so.

Finally, a remedy based on a theory of ratification is simply not available where, as here, the plaintiff knows the limits of the agent's authority. *See Marya v. Slakey*, 190 F. Supp. 2d 95, 102 n.3 (D. Mass. 2001) (no ratification where agent never informed plaintiffs that he was committing defendant); *Shapiro v. American Home Assurance Co.*, 584 F. Supp. 1245, 1252 (D. Mass. 1984) ("If the agent did not intend to act as agent...there can be no ratification...") (omitting citation); *Commercial Credit Corp. v. Stan Cross Buick, Inc.*, 180 N.E.2d 88, 92 (Mass. 1962) (no ratification where agent never represented that it could commit the principal); *supra*, at 20-22. Summary judgment is thus warranted on Count II of his amended complaint.

C.    <u>State Street Is Entitled To Summary Judgment On Brown's Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.</u>

In Count IV of his amended complaint, Brown claims that State Street breached a covenant of good faith implied in his employment agreement by firing him and refusing to pay him the benefits he purportedly agreed to with Spina. Because breach of the implied covenant is an exception to the rule that an employer can terminate an at-will employee at any time, *Fortune*

*v. National Cash Register Co.*, 373 Mass. 96, 104-05 (1977), courts have narrowly construed this

cause of action and impose liability only where employers (i) terminate employees (ii) and

deprive them of benefits they previously earned. *Frankina v. First Nat. Bank of Boston*, 801 F.

Supp. 875, 883-84 (D. Mass. 1992). It is in essence a theory of unjust enrichment. *Id.*

          Brown's claim fails for two reasons. First, the facts demonstrate beyond

reasonable dispute that Brown resigned voluntarily. In his March 11, 2005 letter to Ronald

Logue, Brown stated that, while he "greatly enjoyed [his] tenure at State Street," he believed his

position with the company was "no longer tenable." (Rule 56.1 Statement, ¶ 64). A plain

reading of Brown's own words leads to only one conclusion: he was informing Logue of his

resignation. And while, in his amended complaint, he claims that he was simply "notifying"

Logue that he was "electing" his VSP, his deposition testimony once again demonstrates

otherwise:

> Q.  Some[where] in that conversation did you say to Mitch [Shames, Chief Counsel for SSgA], Look, if you guys don't agree with my election of the VSP type benefits, I'm going back to work, I'm not resigning?
>
> A.  I said that this is not a letter of resignation, this is a letter of election.
>
> Q.  Well, but as a practical matter, you were doing two things. You were electing what you thought might be a benefit, but you were also telling them you didn't want to work there any more, isn't that correct?
>
> A.  As far as I'm concerned they're indivisible. (Brown Tr. 175-76; Rule 56.1 Statement, ¶ 64).

Even if Brown's resignation was conditioned on his receipt of benefits, when State Street

informed him that he would not receive these benefits, Brown made no offer to revoke his

resignation and return to work:

> Q.  ...In relationship to the subject of this letter [State Street's March 18, 2005 letter in which it accepted Brown's resignation], what was the next thing you did?
>
> A.  Consult with my lawyers.

Q. Did you ever go back to State Street and say, If you're not going to give me the EVSP, I'm coming back to work, I don't want to leave work right now?

A. No, I didn't. (Brown Tr. 180; Rule 56.1 Statement, ¶ 64).

Instead, he continued to act as if he had resigned and joined Schroders, a competitor.

Moreover, even if State Street did terminate Brown's employment, his claim still fails because he cannot show that State Street unjustly benefited from doing so. As demonstrated previously, *see supra*, at 14-22, the parties never created an enforceable contract or promise and thus Brown had no right to receive special benefits on top of his total compensation. There is also no dispute that he received all such compensation.

A claim for breach of the implied covenant applies only where the plaintiff seeks compensation directly related to his past services. *Sargent v. Tenaska, Inc.*, 108 F.3d 5, 8 (1st Cir. 1997); *Harrison v. NetCentric Corp.*, 744 N.E.2d 622, 629-30 (Mass. 2001). In *Harrison*, the plaintiff claimed that the defendant terminated his employment to prevent his remaining shares from vesting. *Harrison*, 744 N.E.2d at 629. The court held that the plaintiff could not state a claim for breach of the implied covenant because his shares, which had yet to vest, were not compensation directly connected to his past services. *Id.* at 630. Accordingly, because Brown cannot show that State Street is depriving him of anything that he earned in connection with his past services, State Street is entitled to summary judgment on this claim.

## III. BROWN'S CLAIMS INDEPENDENTLY FAIL BECAUSE THEY ARE PREEMPTED BY ERISA.

Even if Brown can show that he formed a contract with State Street or was the recipient of an enforceable promise, his common-law claims still fail because they are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"). Under ERISA, he cannot state a claim because ERISA requires his agreement to be in writing. No doubt to avoid this rule, on May 26, 2006, Brown filed his amended complaint, withdrawing his initial ERISA claim.

A.    ERISA Preempts Brown's Claims For Benefits.

Though Brown, in his amended complaint, characterizes his agreement with Spina as one for VSP benefits, the VSP did not provide any benefits -- it merely collected and described modifications State Street had made to other benefit plans, most pertinent here the Executive SERP and the Severance Plan.  Employees electing the VSP were then paid benefits pursuant to the terms of these underlying plans, as modified.  Thus, despite how Brown clothes his claims, in essence he seeks benefits from the Executive SERP and the Severance Plan, both of which are covered by ERISA.[11]

ERISA preemption routinely applies to claims, like those here, that in essence seek to recover from a "plan administrator's refusal to pay allegedly promised benefits." *Hampers v. W.R. Grace & Co., Inc.*, 202 F.3d 44, 51 (1st Cir. 2000).  To determine whether preemption applies, the First Circuit uses a two-step analysis: "(1) whether the plan at issue is an 'employee benefit plan' and (2) whether the cause of action 'relates to' this employee benefit plan." *McMahon*, 162 F.3d at 36.  Both elements are certainly satisfied here.

1.    The Executive SERP And The Severance Plan Are ERISA Plans.

There is no dispute that the Executive SERP is an employee benefit plan under ERISA.  ERISA provides that an "employee benefit plan" is either "an employee *welfare* benefit plan or an employee *pension* benefit plan" or a plan that combines aspects of both.  29 U.S.C. § 1002(3) (emphasis added).  ERISA further defines an "employee pension benefit plan" as any

---

[11]  To be clear, the VSP is not itself an ERISA plan, namely because it did not offer any benefits. That Brown characterizes his claim as one for VSP benefits, however, does not save it from ERISA preemption. As the First Circuit just recently instructed, whether an early retirement program is an ERISA plan is besides the point where the plaintiff ultimately seeks benefits from an ERISA plan that underlies such a program. *See Balestracci v. NStar Electric and Gas Corporation*, 449 F.3d 224, 228-29 (1st Cir. 2006) (concluding ERISA applied where plaintiffs sought benefits from an ERISA plan incorporated into an early retirement program).

plan that "provides retirement income to employees." 29 U.S.C. § 1002(2)(A).  The Executive

SERP provided certain key executives with retirement benefits that were payable at a future date

and thus falls squarely within the definition of an "employee pension benefit plan."  (Rule 56.1

Statement, ¶ 15).

It is equally clear that the Severance Plan is an ERISA plan.  ERISA incorporates

Section 302(c) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c), and

defines an "employee welfare benefit plan" as any plan that provides "severance benefits."  29

U.S.C. § 1002(a)(B); *see also* 29 C.F.R. § 2510.3-1 (clarifying interaction between ERISA and

the LMRA).  Here, the Severance Plan provided, among other things, a cash benefit to

employees whose jobs were terminated under certain enumerated circumstances.  (Rule 56.1

Statement, ¶ 14).  Under a plain reading of ERISA, it is thus an "employee welfare benefit plan."

2.    Brown's Claims "Relate To" ERISA Plans.

The Supreme Court has formulated various independent tests to determine

whether a claim relates to an ERISA plan, two of which are relevant here: (i) whether, to prevail,

Brown must prove the specific terms of an ERISA plan; or (ii) whether Brown's claims conflict

directly with an ERISA cause of action.  *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133,

140-43 (1990) (holding that ERISA preempted plaintiff's wrongful discharge action); *see also*

*McMahon*, 162 F.3d at 38 (discussing the tests set forth in *Ingersoll-Rand*).  The facts make plain

that both tests are satisfied here.

First, Brown can calculate his damages only by reference to the express terms of

the Executive SERP and the Severance Plan.  *See Hampers*, 202 F.3d at 52 (ERISA preempts

state law causes of action for damages where the damages must be calculated using the terms of

an ERISA plan) (omitting internal citation); *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1294

(5th Cir. 1989) (same). The formulas on which he will need to rely are found nowhere else, and they are certainly not in the VSP, because it has none.

Second, regardless of how many state-law claims he asserts against State Street, the real nature of his claims is to recover retirement and severance benefits that he believes State Street is wrongfully withholding from him. This is a garden-variety ERISA cause of action. Section 502(a)(1)(B) of ERISA allows a plaintiff to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Because Brown seeks through state law a remedy that ERISA already provides, his claims further "relate to" the Executive SERP and the Severance Plan.

*Cefalu* is instructive. There, the plaintiff asserted that he was not seeking recovery from any ERISA plan but rather pursuant to an oral contract. *Cefalu*, 871 F.2d at 1292. Rejecting this argument, the court concluded that preemption applied because, despite the plaintiff's characterization of his claim, to compute his damages, the court had to refer to the ERISA plan at issue. *Id.* at 1294. Like the plaintiff in *Cefalu*, Brown in essence seeks benefits from employee benefit plans, thus placing his claims squarely within ERISA. Accordingly, because ERISA preempts his amended complaint, which asserts only state-law claims, State Street is entitled to summary judgment.

B.  Preemption Is Especially Warranted Because Brown Cannot State An ERISA Claim And His State-Law Claims Are An Attempted End Run Around That Deficiency.

Brown cannot state a claim under ERISA because, even assuming that Brown had an agreement to receive benefits from the Executive SERP and the Severance Plan, he still has no formal writing so demonstrating. The absence of such a writing precludes him from stating a claim under ERISA.

32

Caselaw makes clear that oral promises are unenforceable under ERISA. *See Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26, 32-33 (1st Cir. 1991) (holding that ERISA plans cannot be modified orally); *Cefalu*, 871 F.2d at 1295-96 (same); *Perreca v. Gluck*, 295 F.3d 215, 225 (2d Cir. 2002) (same); *Sandler v. Marconi Circuit Technology Corp.*, 814 F. Supp. 263, 265 (E.D.N.Y. 1993) (same). They are unenforceable because ERISA requires all agreements relating to employee benefit plans to be in writing. 29 U.S.C. § 1102(a)(1). This rule prohibits not only oral promises but also modifications to plans through informal writings, such as letters. *Bellino*, 944 F.2d at 33 n.8 (concluding that mere letters were insufficient to amend plan); *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986) ("...Congress rejected the use of informal written agreements to modify an ERISA plan.").

Like Brown, the plaintiff in *Sandler* claimed he relied to his detriment on the defendant's oral promise of ERISA benefits. According to the plaintiff, the defendant told him that he would be entitled to retirement benefits after he worked for the company for three years, which was contrary to the plan's terms. *Sandler*, 814 F. Supp. at 264. He further claimed that he was not given a copy of the plan until after the defendant terminated his employment. *Id.* Because he did not have a writing reflecting the defendant's promise, the court easily rejected his claims. *Id.* at 265-66. As the result in *Sandler* dictates, because Brown relies exclusively on a conversation he had with Spina, he cannot recover benefits from the Severance Plan.

Nor can he rely on that conversation to obtain benefits from the Executive SERP, the terms of which plainly state that "[a]ny designation of participation...shall be in writing." (Rule 56.1 Statement, ¶ 16). While "top-hat" plans, like the Executive SERP, are normally exempt from ERISA's fiduciary requirements, including the writing requirement, *see* 29 U.S.C. § 1101(a)(1) (providing exemption status), where employers do establish top-hat plans pursuant

to writings, courts must give effect to their express and unambiguous terms. *See In re IT Group, Inc.*, 448 F.3d 661, 671-72 (3rd Cir. 2006) (holding oral representations irrelevant where the plan document was unambiguous). Here, the Executive SERP plainly indicates that an employee's participation in the program must be set forth in writing. (Rule 56.1 Statement, ¶ 16). It is undisputed that this never occurred here.

As the *Nachwalter* court explained, oral promises to ERISA plans are problematic because, as here, they are likely to be made "many years before any attempt to enforce them" and would operate to the detriment of other plan members by giving the plaintiff options they never had. 805 F.2d at 960-61. The court further explained that the importance of a writing is "nowhere better illustrated" than where a plaintiff, like Brown, is someone who could be expected to follow the written terms of plans. *Id.* at 960. As in *Nachwalter*, Brown seeks to enforce an oral promise that he believes he obtained over three years ago but that no one else verifies. ERISA does not provide him with a remedy.

## Conclusion

For the foregoing reasons, State Street's motion for summary judgment dismissing the amended complaint should be granted.

Dated:   New York, New York
         September 26, 2006

Respectfully submitted,

QUINN EMANUEL URQUHART
 OLIVER & HEDGES, LLP

By:   /s/ Peter Calamari
      Peter E. Calamari (*Pro Hac Vice*)
      Rex Lee (*Pro Hac Vice*)

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

HARE & CHAFFIN

By:   /s/ David B. Chaffin
      David B. Chaffin
      BBO No. 549245

160 Federal Street
Boston, MA 02110
(610) 330-5000

*Attorneys for Defendants*
 *State Street Corporation*
 *and State Street Global Advisors*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 26, 2006.

      /s/ Rex Lee

35