# EXHIBIT 39

CONFIDENTIAL

A meeting of the <u>Executive Compensation Committee</u> of State Street Corporation was held on <u>Wednesday, June 16, 2004</u>, at 225 Franklin Street, Boston, Massachusetts.

Mr. Weissman, the Chairman, presided. Mr. Darehshori and Mr. Sergel were also present. Ms. Hill participated by teleconference.

Also present by invitation were Mr. Spina and Mr. Cutrell, who kept the minutes, and Messrs. de Ocejo and Ooi.

Mr. Weissman called the meeting to order noting the presence of a quorum.

Mr. de Ocejo presented and reviewed a summary of actions taken at the Committee's March 3, 2004, meeting following which Mr. Cutrell presented minutes of that meeting, which had been distributed previously. Upon motion duly made and seconded, it was unanimously

VOTED:    That the minutes of the meeting of the Executive Compensation Committee held on March 3, 2004 having been provided to the members, be and hereby are approved as presented.

Mr. Ooi presented and reviewed information on the State Street Retirement Plan and the State Street Salary Savings Program. He noted that State Street Corporation is the plan sponsor for both plans and reported that as of December 31, 2003, Retirement Plan assets were                , and Salary Savings Program assets were                He reviewed information on the Retirement Plan portfolio and noted that the SSgA Office of the Fiduciary Advisor was engaged in February 1999 to provide fiduciary advisory services, operational oversight and investment management. He reviewed Retirement Plan asset allocation information, and performance as of December 31, 2003 compared to the prior year period. He reviewed the State Street Salary Savings Program, which is a defined contribution program. He reviewed the benefit formula, and noted that vesting is immediate. He discussed investment options noting that there are fourteen options including the self-managed brokerage account. Mr. Ooi then reviewed information on the status of the Salary Savings Program funds and fund performance. He also briefed the Committee on the proposed restructuring of the Retirement and Salary Savings Program Committee into two separate committees, a Benefit Plans Committee and Plans Investment Committee. Discussion followed.

**REDACTED**

Mr. Ooi presented and reviewed information on the Corporation's two non-qualified benefit plans. He reviewed generally the terms of the Supplemental Executive Retirement Plan (SERP) which restores normal retirement benefits for executives earning over a certain salary. He also reviewed the Supplemental Defined Benefit Pension Plan (Executive SERP) which provides enhanced retirement benefits for certain executives at the executive vice president level and above, and which includes two individual agreements incorporated into the Plan in 1999. For each plan, he reviewed the number and nature of participants, eligibility, vesting, benefit formula, and for the combined plans he reviewed financial information, 2003 performance, and hypothetical market values. Discussion followed.

**REDACTED**

Mr. Ooi presented and reviewed a planning calendar for the Executive Compensation Committee which reviewed an annual cycle of items requiring action by the Committee. Discussion followed.

Mr. de Ocejo introduced a discussion on compensation philosophy and identified preliminary items for discussion and presentation at the October Board meeting. Discussion followed.

Mr. de Ocejo presented and reviewed a proposed compensation action for Executive Vice President. Mr. de Ocejo reviewed background information and reviewed the terms of the proposed compensation action. Following discussion, and upon motion duly made and seconded, it was unanimously

SSC 04669

**REDACTED**

Mr. de Ocejo previewed a preliminary list of actions to be taken at the Committee's next meeting scheduled for September 2004.  Discussion followed.

The meeting went into executive session at which time Messrs. Ooi and Cutrell left the meeting.  Mr. Weissman kept the minutes in the absence of the Secretary.

Mr. Spina briefed the Committee on a proposed severance package for a senior executive.  The Committee reviewed the rationale for the proposed deal and withheld a decision pending further review.  Mr. de Ocejo then left the meeting.

The Committee reviewed bonus award recommendations for several executives,                                                        who had been instrumental in the successful integration of the Global Securities Services business purchased from Deutshe Bank.   It was the consensus of the Committee that the proposed amounts are appropriate and are to be payable as soon as practicable and with appropriate communication.

The Committee reviewed bonus award recommendations for.                              The Committee discussed the proposed amounts as well as the date the awards would be payable.  Following discussion, and upon motions duly made and seconded, it was in each case unanimously

VOTED:

VOTED:

3

SSC 04670

The executive session concluded, and there being no further business, the meeting adjourned.

Dissolved.

A true record.

Attest:

_____
Charles C. Cutrell, III

_____
Robert E. Weissman

4

SSC 04671

# EXHIBIT 40

July 12, 2004


Mr. Robert E. Weissman
Chairman
Shelburne Investments
152 Shelburne Center Road
P.O. Box 309
Shelburne, MA  01370


Dear Bob:


As you requested, attached are:

1. Peter Egan's letter providing you and the Executive Compensation Committee with his recommendations on Ron's compensation.  Please feel free to contact Peter if you have any questions.

2. 5 Year Schedule of Compensation Actions for Ron and David Spina.

3. A summary of the financial impact and suggested interpretations of David's "oral promises" to John Towers, Alan Brown and Tim Harbert.

Please call me if you have any questions.

Sincerely,




cc:    Boon Ooi


SSC 05477

1) John Towers
   a) Permit options granted prior to 6/03 to continue to be exercisable under original terms of grants.
   b) Number of share options involved -- 654,200
   c) Estimated accounting cost - $6.0 million

2) Tim Harbert
   a) Provide protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to executive for duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end.
   b) Current age: 53, protection ends on 3/18/2006
   c) Interpretation:
      i) Terms are provided only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, executive would be forced to terminate employment just prior to 3/18/2006 to take advantage of such benefits.
      ii) Options granted prior to 6/03 to continue to be exercisable under original terms of grants. (392,800 options)
      iii) Severance payable as of 6/30/2003 (in terms of number of weeks), will be provided – 104 weeks
      iv) Health benefits will continue until age 65 (under retiree medical plan)
      v) Executive SERP value calculated under EVSP as of 8/31/2003 is protected until 3/18/2006.
   d) Estimated cost (as of 7/1/04):
      i)   Options =          $3.0 million
      ii)  Severance =        $1.25 million
      iii) Exec. SERP ≈       $5.0 million
      iv)  Total =            $9.25 million *(Some of Exec SERP cost is already expensed under FASB 87. Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)*

3) Alan Brown
   a) Provide protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to executive for duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end.
   b) Current age: 51, protection ends on 4/27/2008
   c) Interpretation:
      i) Terms are provided only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, executive would be forced to terminate employment just prior to 4/27/2008 to take advantage of such benefits.
      ii) Options granted prior to 6/03 to continue to be exercisable under original terms of grants. (135,500 options)
      iii) Severance payable as of 6/30/2003 (in terms of number of weeks), will be provided – 84 weeks
      iv) Health benefits will continue until age 65 (under UK medical plan)
      v) Executive SERP value calculated under EVSP as of 8/31/2003 is protected until 3/18/2006. The challenge here is that the requisite offset to this Exec SERP will be the pension equivalent of an individual pension contribution provided by State Street UK (21.66% per year). We will need to apply the annuity equivalent of this accumulation as an offset to the Exec SERP benefit.
   d) Estimated cost:
      i) Options =    $1.5 million
      ii) Severance =    $1.14 million (est.)
      iii) Exec. SERP =    $2.9 million (assuming $0 offset from UK plan)
      iv) Total =    $5.54 million *(Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)*

SSC 05479

# EXHIBIT 41

**CONFIDENTIAL**

**SSgA Executive Vice President**
**Verbal Commitment by David Spina**

### Background

- Certain verbal commitments were made to Alan Brown during EVSP period

- It suggests that the executive would be eligible for EVSP benefits during an open period of employment until age 55 (at which point the commitment expires)

- We summarize these commitments below and suggest certain interpretations/modifications should the Committee agree to these expectations

### Alan Brown "EVSP" Agreement

### Summary

- Provides protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to the executive for the duration of employment until attainment of age 55.  Upon attainment of age 55, all provisions of such protection end.  Current age 51; protection ends 4/27/08

- Severance pay of 84 weeks

- Continued exerciseability of options

- Payment of Executive SERP

### Interpretations/Modifications

- Condition of Termination – The agreement terms are applicable only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55.  Otherwise, the executive would be forced to terminate employment just prior to 4/27/08 to take advantage of these benefits

- Stock Options – Options granted prior to 6/03 continue to be exercisable under the original terms of grants (135,500 options)

- Severance Pay – Severance payable as of 6/03 (in terms of number of weeks) will be provided (84 weeks)

- Health Benefits – Continue until age 65 (under UK medical plan)

<u>**CONFIDENTIAL**</u>

- **Executive SERP – Value calculated under EVSP as of 8/31/03 is protected until 3/18/06. The requisite offset to this Exec SERP will be the pension equivalent of an individual pension contribution provided by State Street UK (21.66% per year).**

**The annuity equivalent of this accumulation will need to be applied as an offset to the Exec SERP benefit**

- **Estimated Cost:**

  - ➤ **Options =**        **$1.50 million**
  - ➤ **Severance =**    **$1.14 million (est.)**
  - ➤ **Exec SERP =**   **$2.90 million (assuming $0 offset from UK plan)**
  - ➤ **Total =**         **$5.54 million (Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)**

# EXHIBIT 42



**State Street Corporation**

STATE STREET

CONFIDENTIAL

# Executive Compensation Committee Meeting
September 15, 2004 - 1:45 pm to 3:45 pm

### 1. Organizational Chart

**1:45 pm   2. Previous Meeting** (5 minutes)

    A. Summary of Actions                          **Luis de Ocejo**
    B. Record of Meeting                          **Skip Cutrell**

**1:50 pm   3. Committee Business** (1 hour, 35 minutes)

    A. Update Compensation Philosophy          **Luis de Ocejo**
    B. Executive Compensation Review -- Hewitt    **Peter Egan**
    C. October Board Review                  **Luis de Ocejo**
    D. Executive SERP Amendment - Vote       **Boon Ooi**

**3:25 pm   4. Executive Session**

    A.  CEO Compensation Action - Vote         **Luis de Ocejo**
    B.  Executive Actions/Updates            **Luis de Ocejo**
       &minus; Alan Brown
       &minus; Joseph Chow - Vote
       &minus; Thomas McCrossan - Vote
       &minus; David Spina Pension - Vote
       &minus; Timothy Harbert Death Benefits - Vote
    C.  Financial Update - Annual Incentive Plan    **Ronald Logue**

# EXHIBIT 43

**CONFIDENTIAL**

A meeting of the Executive Compensation Committee of State Street Corporation was held on Wednesday September 15, 2004 at the Saybrook Point Inn in Old Saybrook, Connecticut.

Mr. Weissman, the Chairman, presided.  The following directors were also present:  Ms. Hill and Messrs. Darehshori and Sergel.  Also present were Messrs. Logue, de Ocejo, Ooi, and Cutrell, who kept the minutes.  Also in attendance was Mr. Peter Egan, Principal, Hewitt Associates.

Mr. Weissman called the meeting to order noting the presence of a quorum.

Mr. deOcejo reviewed a summary of actions taken at the Committee's June 16, 2004 meeting following which Mr. Cutrell presented minutes of that meeting, which had been distributed previously.  Upon motion duly made and seconded, it was unanimously

VOTED:    That the minutes of the meeting of the Executive Compensation Committee held on June 16, 2004, having been provided to the members, be and hereby are approved.

Mr. de Ocejo presented and reviewed information on State Street's compensation philosophy and practices.  He reviewed information on the components of compensation compared to market for various employee groups as follows:  base salary; annual incentives; total cash compensation; long-term incentives; and total compensation.  He noted that management has reviewed the Company's current compensation practice and has identified issues for the 2005 plan year and thereafter.  In this regard, he reported that cash compensation has lagged the competition and discussed alternatives to address this by shifting the focus away from equity awards towards cash.  He also reported that bonus targets are competitive, but have been underfunded.  He reviewed possible implications as well as a process for addressing these issues.   He reviewed pay mix recommendations that would increase annual incentive opportunity and replace stock options with SARs (stock appreciation rights) an equity grant similar to stock options which he described.  He reviewed recommendations for the EVP population, and for the AVP to SVP levels, and discussed a change in the proposed vesting schedule of grants.  He reviewed a proposed plan to shift to the new strategy to replace option grants with SARs in March 2005 and discussed related considerations.  Discussion followed.

Mr. Egan, by referring to a report, which was included in the materials presented to the meeting, presented an analysis of executive compensation of twelve executives in relation to a comparator group of companies.

REDACTED

SSC 04672

CONFIDENTIAL

**REDACTED**

Mr. de Ocejo presented a review of executive compensation strategy for thirty-five senior executives of the Corporation noting that total compensation is targeted and includes base salary, annual incentive awards, and long term compensation. He reviewed a comparator group of companies used to measure compensation levels. He reviewed components of the compensation architecture including the terms and participants in the Senior Executive Annual Incentive Plan (162 (m) plan), and the Executive Annual Incentive Plan. He reviewed the terms of performance awards under the 1997 Equity Incentive Plan and discussed the benefits of replacing option grants with SARs. He reviewed the annual incentive plan funding architecture, discussed executive total compensation structure, and reviewed the annual planning cycle for the executive compensation committee. Discussion followed.

Mr. Ooi reviewed proposed amendments to the Executive SERP to provide a death and disability benefit. He noted that Executive SERP vesting is age 55 and 10 years' service and that there is no death or disability benefit prior to the vesting date. He reviewed proposed amendments to provide benefits for deaths in service occurring prior to vesting. Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:     That an amendment to the State Street Corporation Supplemental Defined Benefit Pension Plan (the "Executive SERP") providing for the immediate vesting in a pension benefit upon termination of employment by a Participant due to his or her death or long-term disability calculated as (i) with respect to a Participant's death, 50% of the Participant's accrued benefit reduced for early retirement age and multiplied by a percentage determined by dividing the sum of the Participant's age and years of service by 85; and (ii) with respect to a Participant's long-term disability, the Participant's accrued benefit reduced for early retirement age and multiplied by a percentage determined by dividing the sum of the Participant's age and years of service by 85, be and it is hereby approved in principle, to be adopted in such form as and made effective as provided below.

VOTED:     That such amendment to the Executive SERP be in such form as, and made effective as determined by, the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance, in his or their discretion; and the officers of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to execute such documents and take such other measures as such officer or officers deem necessary or appropriate to effectuate the foregoing, the execution of any such document and the taking of

2

SSC 04673

CONFIDENTIAL

any such other measure by such officer or officer so acting to be conclusive evidence that the same has been approved by this Committee.

The meeting went into executive session at which time Messrs. Logue and Cutrell left the room. Mr. Ooi kept the minutes in the absence of the Secretary.

**REDACTED**

Mr. Logue returned to the meeting.

Mr. de Ocejo presented and reviewed proposed actions in order to accommodate verbal commitments made to an executive during the period the Executive Voluntary Separation Program (EVSP) was available. He reviewed proposed modifications to the EVSP. Mr. de Ocejo presented and reviewed a proposed compensation package for :            Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:     That effective July 1, 2004, the Executive Voluntary Separation Program ("EVSP") be interpreted to provide that, in order to meet critical business needs of the Corporation, the Corporation's executive management may exercise its discretion by rehiring as an employee or consultant prior to the lapse of the two-year restricted period a former employee who terminated his or her employment pursuant to the EVSP.

VOTED:     That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. de Ocejo presented and reviewed a proposed severance agreement for            Following discussion, and upon motion duly made and seconded, it was unanimously

SSC 04674

**CONFIDENTIAL**

VOTED:


**REDACTED**


VOTED:      That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. de Ocejo also presented and reviewed a compensation action for. Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:


VOTED:      That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. de Ocejo presented and reviewed awards, payments, . Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:

SSC 04675

**CONFIDENTIAL**

VOTED:        That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. Logue presented and reviewed a financial update on the annual incentive plan. Discussion followed.

There being no further business, the meeting adjourned.

Dissolved.

A true record.

Attest:

_____
Charles C. Cutrell, III

_____
Boon S. Ooi

SSC 04676

# EXHIBIT 44

Linda Hill
5/23/2006

1

# COPY

Volume:
Pages:    1 - 29
Exhibits:    1 - 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALAN BROWN,

                    Plaintiff

                                        C.A.
Vs.                                    No. 05-11178-NG

STATE STREET CORPORATION and
STATE STREET GLOBAL ADVISORS,

                    Defendants

        Deposition of LINDA HILL, a witness

called on behalf of the Plaintiff, pursuant

to the Federal Rules of Civil Procedure,

before Rosamond K. Marcy, a Certified

Shorthand/Registered Professional Reporter

and Notary Public in and for the Commonwealth

of Massachusetts, at the Offices of Rodgers,

Powers & Schwartz, LLP, 18 Tremont Street,

Boston, Massachusetts 02108, commencing at

2:00 P.M. on Tuesday, May 23, 2006.

Linda Hill
5/23/2006

16

1      have any conversation you want but

2      there's a charter about who makes

3      decisions about compensation for

4      executives of his level.

5    Q.  I take it the Board didn't take any vote

6      concerning Mr. Brown or Mr. Spina at

7      that meeting.

8              MR. CALAMARI:  Objection.

9    A.  No.

10   Q.  A few weeks after the June 16 meeting

11      Mr. Spina wrote this letter to

12      Mr. Weissman on June 30, and was a copy

13      provided to you?

14   A.  I don't recall.

15   Q.  I take it that at the June 16 meeting

16      the Compensation Committee did not

17      formally, by taking a vote, renounce or

18      reject any agreements that Mr. Spina

19      might have made with Mr. Brown.

20              MR. CALAMARI:  Objection.

21   A.  No.

22   Q.  Was there discussion as to whether or

23      not Mr. Spina had exceeded his

24      authority?

Linda Hill
5/23/2006

23

1       implement.

2   Q.  No vote was taken concerning this

3       commitment.

4   A.  No vote was taken.

5   Q.  When you say you disagreed with it, what

6       did you mean by the Committee disagreed

7       with it?

8   A.  David had mentioned that he had

9       conversations with a number of

10      individuals, three to be precise.   We

11      asked Bob as a Committee to find out

12      what the nature of those conversations

13      was, find out what the story was and get

14      back to us about that.   This was the

15      result of his explanation about Alan

16      Brown and it was informational.   He

17      provided us with this information.   We

18      all felt David can have a conversation

19      with whomever he pleases about what he

20      would like to have conversations about

21      but it's actually our fiduciary

22      responsibility to do something like this

23      and there was no action to be taken.   We

24      just had the information and we had it

Linda Hill
5/23/2006

24

1        because it was important to know.

2   Q.   The document, de Ocejo Exhibit 10, that

3        was given to you doesn't describe it as

4        a conversation.  It describes certain

5        verbal commitments made to Alan Brown,

6        correct?

7   A.   I think the most relevant point here is

8        point 3.  "We summarize these

9        commitments below and suggest certain

10       interpretations/modifications should the

11       Committee agree to these expectations."

12       The Committee did not agree to these

13       expectations.  I think that's important

14       here so I suppose the title on this

15       should be more precise.  I think this

16       was a summary for us of an understanding

17       of a conversation at which none of us

18       were at that conversation and this was

19       Bob's summary of what happened in that

20       conversation so perhaps it should have

21       been conversation but should the

22       Committee agree to these expectations.

23       That, to me, is what this is about.

24   Q.   After the Committee was informed that

Linda Hill
5/23/2006

25

```
 1          Mr. Spina had made certain verbal

 2          commitments to Alan Brown did the

 3          Committee vote to renounce those

 4          commitments?

 5   A.     We took no votes.  This was

 6          informational.

 7   Q.     After the September 15, 2004 meeting did

 8          the topic of Alan Brown and any

 9          conversations he had had with Mr. Spina

10          ever come before the Compensation

11          Committee again?

12   A.     After this?

13   Q.     Yes.

14   A.     Between then and now?

15   Q.     Yes.

16   A.     Did it come up?  I don't think it did.

17   Q.     Did the Compensation Committee at the

18          September 15, 2004 meeting direct any of

19          the managers or officers of the

20          corporation to communicate with

21          Mr. Brown?

22   A.     No, I don't believe so.

23   Q.     Do you think it would have been fair to

24          tell him that any commitments that
```

Linda Hill
5/23/2006

26

1           Mr. Spina might have made the

2           corporation was rejecting?

3    A.    I don't think it was unfair so I don't

4           know how to answer your question.  There

5           was no action.  This was informational.

6           I don't know why we would have been

7           informing him.

8    Q.    You were told the Chief Executive

9           Officer of the corporation had made

10          verbal commitments to Mr. Brown,

11          correct?

12   A.    We were told that he had this

13          conversation about these matters, yes.

14   Q.    You were told that he made verbal

15          commitments, correct?

16   A.    Yes.

17   Q.    Would it have been reasonable for

18          Mr. Brown to have relied on a commitment

19          made by the CEO of the corporation?

20   A.    I don't know how Mr. Brown thinks but

21          Mr. Brown never asked us about this.

22          This is David reporting this information

23          when he was leaving with the

24          recommendations.  We wanted to find out

Linda Hill
5/23/2006

27

1      waht the nature of the conversation was.

2      We then knew.  Someone may have actually

3      reported back to him, I don't know that,

4      but as far as I knew we had the

5      information and that was the end of it.

6              MR. SCHWARTZ:  Thank you.

7              [The deposition was

8      concluded.]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 45

1

# COPY

Volume: 1
Pages:  1 to 53
Exhibits:  1 to 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-11178-NG

ALAN BROWN,                         )
                    Plaintiff       )
                                    )
        vs.                         )
                                    )
STATE STREET CORPORATION,           )
STATE AND STREET GLOBAL             )
ADVISORS,                           )
                    Defendants      )

**DEPOSITION of RICHARD P. SERGEL,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108,
on Friday, May 26, 2006, commencing at
10:00 a.m.

\* \* \* \*

SHEA COURT REPORTING SERVICES
ONE UNION STREET, SECOND FLOOR
BOSTON, MASSACHUSETTS 02108-2408

42

```
 1   Q.   I apologize for using this term because

 2        it's a lawyer's term.  I am talking

 3        about exhaust your memory about what the

 4        various committee members said about Alan

 5        Brown, and Mr. Spina, and this matter at

 6        the June meeting, and at the September

 7        meeting.  So tell me, as best you can

 8        recall, everything that was said?

 9   A.   It's just my memory of those

10        conversations that it was the collective

11        view of the group that granting some, or

12        making a modification to the plan, that

13        would be required to do this, was not

14        something that we were proposing to do.

15        I don't have any specific memories of

16        other people's views.  I have to just

17        tell you that I can only remember my

18        own, which undoubtedly I expressed.

19        Unfortunately, I can't tell you what

20        other people said.  No, I don't have any

21        memories of that.

22   Q.   Do you recall that other people did say

23        something on the topic?

24   A.   Yes.
```

43

1    Q.   Was anybody in favor of it?

2    A.   Not that I recall.

3    Q.   Was there any question or any discussion

4         about whether or not Mr. Spina had

5         authority to make the verbal commitments

6         that are described in Exhibit 6?

7    A.   Is there a discussion about whether

8         he had the authority to do it?

9    Q.   Yes.

10   A.   My memory of the discussion was about

11        what action we were going to take.

12        We knew we were the ones who were

13        responsible for taking an action or not

14        taking it.  We knew he didn't have the

15        authority.

16   Q.   Whether or not Mr. Spina used the word

17        commitment at the June meeting, at

18        least in the material presented to the

19        committee for the September meeting,

20        Exhibit 6, you were told that Mr. Spina

21        made verbal commitments to Alan Brown?

22   A.   I wouldn't have had a memory of that

23        prior to now.  That's on the page, but,

24        again, this is being described as what

# EXHIBIT 46

**Robert Weissman**
**July 13, 2006**

1

# COPY

Volume 1, Pages 1-53

Exhibits 1-7

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No.:  05-11178-NG

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ALAN BROWN,

       Plaintiff

   vs.

STATE STREET CORPORATION and

STATE STREET GLOBAL ADVISORS,

      Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF:  ROBERT WEISSMAN

Home of Robert Weissman

152 Shelburne Center Road

Shelburne, Massachusetts

Thursday, July 13, 2006

2:00 p.m. - 3:38 p.m.

Reporter:  Kelly M. Bruce

Shea Court Reporting Services

One Union Street

Boston, MA 02108

(617) 227-3097

**Robert Weissman**
**July 13, 2006**

44

1   attended some of the executive committee -- not

2   executive committee, excuse me, Executive

3   Compensation Committee's meetings where it was a

4   topic of conversation.

5       Q.    Did you speak with Mr. Logue about

6   whether or not somebody should inform Mr. Brown

7   that he was not entitled to these benefits?

8       A.    I didn't have that discussion with

9   him.

10      Q.    Did you speak with anybody in human

11  resources --

12      A.    Did I?

13      Q.    Yes, did you.  -- about whether

14  Mr. Brown should be told?

15      A.    No.

16      Q.    Did you believe that Mr. Brown had

17  been told that the committee did not approve his

18  receipt of these benefits?

19      A.    I didn't talk to anybody about that.

20  I don't think it would have entered my mind

21  because no decision, that I was aware of, had

22  been made.  And so it would have been premature

23  to say to Mr. Brown either that it had been

24  approved or that it had -- when you say not been

Robert Weissman
July 13, 2006

45

1  approved, I interpret that as rejected.  And

2  during this time frame, I don't think either was

3  the case.  I was not aware of any further

4  contact by Mr. Brown with the company on the

5  issue.

6          MR. SCHWARTZ:  That's all I've

7      got.

8          MR. CALAMARI:  We might have one

9      or two.  But, as usual, we want a

10      conference before.

11          (Recess taken)

12          MR. CALAMARI:  I actually do have

13      two questions.

14

15  EXAMINATION BY MR. CALAMARI:

16

17      Q.    Mr. Weissman, could I ask you to look

18  again at what has been marked as Exhibit 5, and

19  that is the letter dated June 30, 2004,

20  addressed to you.

21      A.    Okay.

22      Q.    Now, you may recall that

23  Mr. Schwartz asked you, on reviewing this

24  letter, if you would review it and look for

# EXHIBIT 47

| From: | Alan Brown |
|---|---|
| Sent: | Friday, March 11, 2005 11:14 AM |
| To: | Ronald E Logue; Luis de Ocejo |
| Cc: | William W Hunt; John F Marrs; Nigel Wightman; NWalker@HHLAW.com; Harvey@TheEmploymentLawyers.com; jane.amphlett@addleshawgoddard.com |
| Subject: | Voluntary Separation Program |
| Attach: | 675_LTR-REL-110305.doc.zip |

Please see attached letter. Signed fax copy and original to follow.

Regards,

Alan


Alan J Brown
Group Chief Investment Officer
SSgA

Authorised and regulated by the Financial Services Authority
Recipient of the Queen's Award for Enterprise 2003

020 7698 6007 (Direct Line)
020 7004 2907 (Direct Fax)

Please visit our Web site at www.ssga.com


<<...>>

SSC 02123

**21 Sutherland Place**
**London W2 5BZ**

**Tel: 020-7727-8957**

Ronald E Logue Esq
State Street Corporation
State Street Financial Center
One Lincoln Street
Boston MA 02111

Dear Ron

As you know I have been considering my position following Bill's appointment as SSgA's President and CEO, and I have now taken the view that my position with State Street is no longer tenable. I do not intend to detail the reasons here although I would be happy to do so if you think it would be helpful.

In the circumstances, I am writing to exercise my rights to a Voluntary Separation Program. As you know, in 2003 David Spina, on behalf of State Street, entered into an agreement with me in which in exchange for my continued commitment to remain active as a leader of SSgA, State Street Corporation would hold available for me the same separation program the Company was offering U.S. employees under what is known as the Voluntary Separation Program or, in view of my position, the Executive Voluntary Separation Progam (EVSP). The agreement was that this commitment would be available to me until I reached age 55 and could be exercised by me at any time.

The EVSP itself required an Election Form and Release Agreement to be completed. In my case, this letter should serve as my election. Could you or Lou please provide me with any further necessary paperwork for my review?

Having greatly enjoyed my tenure at State Street until latterly and the contribution I have made, this has been a difficult decision for me. You will appreciate, however, that I would now like to get this sorted out as quickly as possible and await your early response.

Yours sincerely

Alan J. Brown

Cc: Lou de Ocejo

SSC 02124

# EXHIBIT 48

**REDACTED**

William W
Hunt/USA/StateStreet
03/17/2005 06:36 PM

To  Alan Brown/Europe/StateStreet
cc  Mitch Shames/USA/StateStreet@StateStreet
Subject  Follow up

Dear Alan:

As you state in your email to Ron dated March 11, 2005, your conclusion that your position at the Company has become untenable compels us to agree that your employment with State Street must end, as the implications of your considered view are unmistakable. Therefore, tomorrow, Friday, March 18, 2005, will be the date on which your voluntary resignation from employment with State Street will take effect. A representative from HR&OP will contact you regarding the return of any State Street property in your possession, including your ID badge, credit cards, cellular phone, Blackberry, and all business documents.

In accordance with your employment agreement dated December 7, 1994, you are entitled to 60 days' pay in lieu of notice. Payment will be forthcoming in the form of salary continuation through May 17, 2005. However, with regard to your request to elect a "Voluntary Separation Program," we reject your assertion that you are entitled to the benefits of any such program. As you know, the VSP program was never extended to any U.K.-based employees or executives, and a number of aspects of the program do not even apply to persons (such as yourself) who do not participate in the subject benefit plans. Moreover, you do not satisfy the timing requirement for making a VSP election, which expired in June, 2003.

In addition, despite whatever communications you may have had with David Spina, no actual agreement was ever reached as to the substance of any promise to provide you with VSP benefits at some indefinite time in the future, and no document was ever executed to this effect. Moreover, David Spina did not have the authority to commit State Street to enhance your benefits package in the extraordinary manner you now allege — a fact made clear to you in both an email and a letter in which David stated that his assurances to you were only that he would make a recommendation to the Board that you be made eligible (through some means) to receive VSP-type separation benefits. You never registered disagreement with David's assertions, no doubt because you understood full well that the Board's Executive Compensation Committee needed to approve any substantial adjustments to the compensation arrangements of the Company's senior executives. David did, as apparently promised, recommend your eligibility for VSP-type benefits upon separation; but, as we understand you were informed some eight months ago, the Committee rejected such proposal.

Thank you for your contributions to SSgA.

SSC 01151

Sincerely yours,

Bill

SSC 01152