UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ALAN BROWN** ) | |
| **Plaintiff** ) | |
| ) | **C.A. No. 05-11178-NG** |
| **v.** ) | |
| ) | |
| **STATE STREET CORPORATION, and** ) | |
| **STATE STREET GLOBAL ADVISORS,** ) | |
| **Defendants** ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED,
PURSUANT TO L.R. 56.1**

The plaintiff, Alan Brown, suggest that there is no genuine issue to be tried as to the following facts.

**<u>Brown's history with State Street</u>**

1.  Plaintiff Alan Brown was the Chief Investment Officer of the State Street Global Advisors ("SSgA") division of State Street Bank and Trust Company, a wholly owned subsidiary of State Street Corporation ("State Street"). (Exhibit 11, Answer to First Amended Complaint, ¶ 1). SSgA holds itself out as "the world's largest institutional asset manager," with $1.5 trillion in assets under management. (Exhibit 12, SSgA web site).

2.  Brown is a British citizen and at all times relevant to this action was a resident of London, England. (Exhibit 11, Answer to First Amended Complaint, ¶ 2).

3.  State Street is a Massachusetts corporation that is based in and has offices in Boston, Massachusetts. SSgA is an unincorporated division of State Street. (Exhibit 11, Answer to First Amended Complaint, ¶ 3).

4.  Brown began working for State Street's United Kingdom subsidiary State Street Global Advisors U.K. Limited in 1995. (Exhibit 11, Answer to First Amended Complaint, ¶ 6).

5.      In 1996, Brown became Chief Investment Officer for non-United States offices for SSgA, rather than only the U.K. subsidiary. In 1997, he became Chief Investment Officer for SSgA worldwide. (Exhibit 1, Brown deposition p. 46).

6.      In 2000, Brown was appointed Executive Vice President of State Street Corporation. (Exhibit 11, Answer to First Amended Complaint, ¶ 9).

7.      Brown had a written United Kingdom employment contract with State Street Global Advisors U.K. Limited. His compensation from State Street was a combination of salary, bonuses and equity and option awards. This compensation was primarily from United States-based equity and option plans. (Exhibit 1, Brown deposition p. 28). In addition, Brown received bonus awards from State Street in his role as Executive Vice President. (Exhibit 1, Brown deposition p. 45).

8.      In 2001, Nicholas Lopardo left as SSgA's chief executive officer. After that, SSgA was managed collectively by its four top executives, who called themselves "the G4," Tim Harbert, John Serhant, John Snow and Brown. (Exhibit 1, Brown deposition p. 51). As a result, Brown became involved in all executive functions of SSgA, which was based in Boston. *(Id.)*

9.      Brown's salary was paid through the United Kingdom subsidiary (Exhibit 1, Brown deposition p. 17) but was charged back to SSgA's Boston office. (Exhibit 1, Brown deposition p. 91). Brown maintained offices in both London and Boston. (Exhibit 1, Brown deposition p. 95). Brown's responsibilities were not limited to any geographic area but, rather, he was head of the investment function worldwide. (Exhibit 2, deOcejo deposition p. 24). His global Chief Investment Officer role encompassed, among others, SSgA's offices in Boston, Tokyo, Hong Kong, London, Munich and Montreal. He found London was a

convenient time zone to remain in contact with all those offices. (Exhibit 1, Brown deposition p. 93).

10.     Brown was highly successful and was named Chief Investment Officer of the Year in Europe two years in a row. (Exhibit 1, Brown deposition p. 54).

## The Voluntary Separation Plan

11.     In April 2003, State Street employees were presented with a staff reduction plan referred to as the Voluntary Separation Plan ("VSP"). Eligible employees were given 45 days to decide whether to accept the plan benefits. (Exhibit 2, deOcejo deposition p. 9). In addition, there was a subplan, the Executive Voluntary Separation Plan ("EVSP") for State Street Executive Vice Presidents. (Exhibit 2, deOcejo deposition p. 6). The goal of the plans was an overall reduction in costs for State Street by reducing the number of employees. *(Id.)*.

12.     The VSP was offered to all U.S. employees with one year of service. Expatriate employees serving in offices abroad who were covered by U.S. benefit plans were included. Foreign citizens who were U.S. employees were also included in the VSP. (Exhibit 2, deOcejo deposition p. 11).

13.     Every United States-based Executive Vice President was offered the EVSP. (Exhibit 2, deOcejo deposition p. 23).

14.     The EVSP offered valuable benefits, including augmented severance pay, continued medical insurance benefits, an extension of stock options, and the addition of five years of service toward retirement eligibility under State Street's Supplemental Executive Retirement Plan ("the SERP"). The EVSP benefits were, in some cases, worth several million dollars. Brown described the EVSP as a "very, very attractive package" and said it would be hard not to accept the package if you were an Executive Vice President "given one's duties to one's

families and one's self to provide for them, it was that generous." (Exhibit 1, Brown deposition p. 90).

15.    The SERP was a U.S.-based benefit plan. Brown, in his role as a State Street Executive Vice President, was eligible to participate in the SERP. (Exhibit 1, Brown deposition p. 48; Exhibit 2, deOcejo deposition p. 12).

16.    The VSP was designed by State Street's human resources managers, including Louis deOcejo, head of Human Resources, and Boon Ooi, head of benefits. (Exhibit 2, deOcejo deposition p. 7). This was done "in the ordinary course of business." (*Id.*) The plan was discussed with and approved by State Street's two top executives, David Spina, chief executive officer and chairman, and Ronald Logue, chief operating officer and president, as well as the bank's operating group of senior managers. (Exhibit 2, deOcejo deposition p. 8).

17.    All decisions as to which State Street employees would be eligible for the VSP or EVSP were made by the bank's executives and managers in the strategy steering group. (Exhibit 2, deOcejo deposition p. 15).

18.    The ultimate decision-maker on the question of who would be considered a U.S. employee for purposes of the VSP was Spina. (Exhibit 3, Logue deposition p. 15-16).

19.    The VSP and EVSP were explained by corporate managers at the June 19, 2003 meeting of State Street's Board of Directors and the June 18, 2003 meeting of the Executive Compensation Committee of the Board of Directors. (*Id.;* Exhibit 14, June 19, 2003 Board of Directors minutes; Exhibit 13, June 18, 2003 Executive Compensation Committee minutes).

20.    The minutes of the Board of Directors meeting reflect no vote to accept or implement the complete terms of the EVSP. In fact, although the Board of Directors took several votes to modify the corporation's Retirement Plan and Supplemental Executive Retirement Plan, no

vote was taken concerning the eligibility requirements or opt-in period for the VSP or EVSP. In regard to whatever votes were taken by the Board of Directors involving what was termed  "the Corporation's 2003 Voluntary Separation Program," the votes specifically noted that "for avoidance of doubt, [references to the 2003 Program do not include] the 2003 Executive Voluntary Separation Program." (Exhibit 14, Bates 06099).

21. The minutes of the Executive Compensation Committee reflect no vote to accept or implement the complete terms of the EVSP, but only to modify some provisions of some benefit plans effected by the VSP. (Exhibit 13, June 18, 2003 Executive Compensation Committee minutes).

22. The minutes of the Board of Directors reflect no votes concerning which employees would be eligible for the EVSP. (Darshori deposition p. 7, Exhibit 14, June 19, 2003 Board of Directors minutes).

23. The minutes of the Executive Compensation Committee reflect no votes concerning which employees would be eligible for the EVSP. (Exhibit 13, June 18, 2003 Executive Compensation Committee minutes).

24. The topic of whether or not Brown should be offered the EVSP never came up among bank managers when the plan was implemented. (Exhibit 2, deOcejo deposition p. 25; Exhibit 5, Spina deposition p. 11).

25. Neither the VSP nor the EVSP were offered to Brown when they were offered to other State Street employees.

**Spina offers the EVSP to Brown**

26. The EVSP was offered to the other three members of the SSgA G4. Snow and Serhant accepted the plan and left SSgA. (Exhibit 1, Brown deposition p. 52). Spina, State Street's

CEO, became concerned about losing SSgA's top leadership. (Exhibit 5, Spina deposition p. 16).

27.    Brown was "very disappointed" that he was not offered the EVSP. (Exhibit 1, Brown deposition p. 90). He considered seeking legal advice as to whether he should have been included in the EVSP, due to the unique worldwide nature of his position, but instead chose to speak with David Spina, State Street's CEO, about his concerns. (Exhibit 1, Brown deposition p. 91). Brown believed the company might have acted illegally in failing to offer the EVSP to him, since he had an office in Boston and had global responsibilities. (Exhibit 1, Brown deposition p. 95).

28.    Brown was concerned, among other factors, about the possibility of being the only remaining member of the G4 at SSgA. (Exhibit 1, Brown deposition p. 100-101).

29.    Rather than going to an attorney, Brown chose to first speak with Spina, who he felt was "a fair minded person," (Exhibit 1, Brown deposition p. 101), about his "equitable position." (Exhibit 1, Brown deposition p. 98).

30.    Brown and Harbert met with Spina in the Spring of 2003, during the time the VSP was offered to State Street employees. Brown told Spina he was upset about not being offered the EVSP. (Exhibit 5, Spina deposition p.12). Brown told Spina that the VSP had caused discontent among SSgA's United Kingdom employees, who were not offered the lucrative plan. Brown also made clear to Spina that the plan was of great personal importance to him. (Exhibit 5, Spina deposition p. 12).

31.    Brown told Spina that he felt he deserved more financial payoffs for all of his efforts for State Street and that he felt cut off by the arbitrariness of the EVSP only applying to U.S. employees. (Exhibit 5, Spina deposition p. 14).

32.   These statements caused great concern to Spina. Brown's job was essential to "everything SSgA did." (Exhibit 5, Spina deposition p. 16). Spina said Brown's responsibilities were worldwide and not limited to the United Kingdom. Instead, Spina said Brown was "the heart of SSgA's business globally." (Exhibit 5, Spina deposition p. 17).  In addition, Spina found it better on a personal level to work with Brown than with Harbert, and Spina said it would be a bigger loss to the company if Brown were to be discontented and to leave than if Snow or Serhant left under the EVSP. (Exhibit 5, Spina deposition p. 16).

33.   Brown proposed that in return for remaining at SSgA through the turmoil caused by the VSP, that he be included in the EVSP and that his EVSP eligibility be extended until his 55th birthday. (Exhibit 1, Brown deposition p. 102). Brown was fifty years old at the time. The expectation, he said, was that the transition through the VSP period would take about a year. (Exhibit 1, Brown deposition p. 109-110). As Brown described it, "The commitment we made was to be there to lead SSgA through this very difficult time until it was definitely behind us and the firm was stable and cruising ahead again." (Exhibit 1, Brown deposition p. 110).

34.   State Street at that time was going through what Spina termed "instability" because so many employees were opting for the VSP. "It was going through tough times," Spina said. (Exhibit 5, Spina deposition p. 17). Spina told Brown that it was in the best interest of State Street for Brown to stay and that the company would undertake to provide whatever assurances or agreements were needed to address Brown's concerns. (Exhibit 5, Spina deposition p. 18). Spina testified that he wanted to give Brown "motivation to stay with the company" and that "I was prepared to do what I could do to effectuate whatever that would be." (Exhibit 5, Spina deposition p. 18).

35.    Spina told Brown he thought Brown's proposal was fair and equitable and that he would

think about it. Shortly afterwards, Spina got back to Brown and told him that the proposal

was fair and that with the exception of making changes to any equity plan, which Spina

could not do, he accepted it. Brown and Spina agreed that they should reflect this agreement

in writing. (Exhibit 1, Brown deposition p. 103-104).

36.    Spina said nothing to Brown in that conversation about requiring the approval of the

Executive Compensation Committee. (Exhibit 1, Brown deposition p. 105).

37.    Unfortunately, shortly after that meeting Spina had quadruple bypass heart surgery and was

away from work until the Spring of 2004. (Exhibit 5, Spina deposition p. 26). In the interim,

Spina had done nothing about the issues he'd discussed with Brown. *(Id.)*

### Documentation of Spina's commitment

38.    After Spina's return to work, and as the anniversary of their discussion approached, Brown,

whose wife is a British employment attorney, was getting increasing advice that he should

have his agreement with Spina on the record. (Exhibit 1, Brown deposition p. 116).

39.    Brown drafted an email to Spina concerning the EVSP agreement they'd reached. He first

sent a draft of that email to Harbert, then sent the email to Spina on June 10, 2004. (Exhibit

1, Brown deposition p. 125). In that email (Exhibit 15), Brown wrote to Spina, in part, as

follows:

>        It is now virtually a year since the end of the VSP. At the time, as you know,
>        the VSP was not offered to me in spite of my central US role. However, you
>        reassured me that if I remained with SSgA, I would be entitled to a severance
>        package similar to that of the VSP, provided I left without cause. Specifically,
>        you agreed that Tim and I would get the VSP package amortised (sic) over 5
>        years, save in one regard that vesting of equity would be limited to equity
>        granted before 30.6.03.

Brown also wrote that it was important to have a written record of "this understanding." He

wrote he would be satisfied if his email constituted the record of "our agreement" and asked

Spina to let him know if the email were not "an accurate statement of our agreement."

(Exhibit 15).

40.    Spina replied to Brown's email on June 15, 2004, (Exhibit 16), saying,

> Alan – greetings – I am not ignoring you!!! Thanks for the 'first cut' at a
> record. I will share with Lou deOcejo and plan to discuss the general outline
> with our Executive Comp Committee of the Board of Directors tomorrow.
> So I will get it on the record. More after meeting with the Board on
> Wd/Thursday. David.

41.    Spina sent a copy of Brown's email to deOcejo, State Street's Human Resources director,

telling deOcejo "I wanted you to have the background of Alan's version – which I find to be

essentially accurate." (Exhibit 17).

42.    Brown understood Spina's statement that he would notify the Executive Compensation

Committee to "get it on the record" as meaning that Spina would tell the Committee that the

agreement exists. (Exhibit 1, Brown deposition p. 129).

43.    Days after his email interchange with Brown, Spina told Robert Weissman, chairman of the

Executive Compensation Committee, about his 2003 conversation with Brown. (Exhibit 6,

Weissman deposition p. 21). By that time, it had been decided that Spina would be leaving

State Street and he met with Weissman to discuss various executive compensation issues.

*(Id.)* Spina told Weissman that since he was leaving State Street, he wanted Weissman to be

aware of his previous conversation with Brown about the VSP. *(Id.)* Spina said that Brown

had come to him and raised the issue of his treatment under the VSP. Spina told Weissman

that he had wanted to retain Brown and that he had talked with Brown about what might be

done. (Exhibit 6, Weissman deposition p. 24). Spina told Weissman he had taken these

actions during the VSP and had not told anyone about them but that he wanted Weissman

to be aware of what he had done. *(Id.)*

44.   Weissman was "pretty angry" to hear what Spina had done in regard to Brown. (Exhibit 6, Weissman deposition p. 24). He told Spina he was "very disappointed" and that Spina should tell the Executive Compensation Committee what he had done. Weissman believed Spina did not have authority to make such a commitment to Brown. In fact, Spina told Weissman that he may have overstepped his authority and that was one of the reasons he wanted Weissman to be aware of what he had done. (Exhibit 6, Weissman deposition p. 26).

45.   At its June 16, 2004 meeting Spina informed the Executive Compensation Committee of the Board of Directors about his 2003 conversation with Brown and the reason he had said what he had said. (Exhibit 6, Weissman deposition p. 27). There was some discussion about Spina having exceeded his authority. (Exhibit 7, Hill deposition p. 17). Weissman was amazed that Spina would have such discussions without authorization from the Committee and said Spina had no authority to make such commitments. (Exhibit 4, Darshori deposition p. 9). The Committee directed Spina to put down on paper the details of his agreement with Brown. (Exhibit 6, Weissman deposition p. 28).

46.   No member of the Committee proposed rejecting or renouncing any agreement Spina made with Brown. (Exhibit 4, Darshori deposition p. 11). The Executive Compensation Committee took no votes at its June 16, 2004 meeting concerning Brown. The Committee did not vote to renounce or reject any agreements Spina made with Brown. (Exhibit 7, Hill deposition p. 16; Exhibit 4, Darshori deposition p. 11). Compensation matters taken to the Committee "are always voted on." (Exhibit 3, Logue deposition p. 39). The minutes of the June 18, 2004 meeting reflect no mention of any matter specifically concerning Brown. (Exhibit 13, minutes of June 18, 2004 meeting). All matters that call for votes are reflected in the Committee's minutes. (Exhibit 3, Logue deposition p. 57). The minutes of that meeting do not mention Spina's discussion concerning Brown. (Exhibit 32).

47.    Spina followed the June 16, 2004 Executive Compensation Committee meeting by sending a June 30, 2004 letter to Weissman. (Exhibit 18). That letter, Spina said, was his attempt to follow the Committee's directive that he put in writing what he told them orally. (Exhibit 5, Spina deposition p. 40). The "basic message" of the letter was not different from what Spina had told the committee on June 18, 2004. (Exhibit 5, Spina deposition p. 41; Exhibit 9, Sergel deposition p. 18). Weissman, too, agreed that the June 30 letter did not contradict what Spina had told the Committee. (Exhibit 6, Weissman deposition p. 36).

48.    In his June 30, 2004 letter, (Exhibit 18), Spina confirmed in no uncertain terms what he described as his "commitment" to Brown and Harbert. He said, in part,

> I made oral commitments to Tim Harbert and Alan Brown, Chairman and Vice Chairman of SSgA, respectively, and Executive Vice Presidents of State Street Corporation, explained more fully below. . . . The commitment I made to Tim and Alan was as follows. In exchange for their continued commitment to remain active as leaders of SSgA, State Street Corporation would hold available to them the same separation package the company was offering U.S. employees under what was known as the Voluntary Separation Program (VSP). In 2003, both Tim and Alan were in their early 50's. My stated commitment to them was stated as for the period when they were between the ages of 50 and 55. (Exhibit 18).

The letter described in more detail the specifics of the "commitment" to Brown.

49.    After reading through his letter at his deposition, Spina said, "I don't think there are material misstatements here at all." (Exhibit 5, Spina deposition p. 29).

50.    Spina sent copies of his June 30, 2004 letter to Harbert and to Brown so they would know the information had been communicated to Weissman. (Exhibit 5, Spina deposition p. 45-46).  Brown was satisfied that the letter sufficiently documented State Street's commitment to him. "[I]t seemed to me evidence of a commitment from David Spina which I believed he'd entered into in good faith and I believe he's a man of integrity and I believed the corporation would honor it.  I believe there was sufficient there." (Exhibit 1, Brown deposition p. 138).

51.     After Spina's June 30, 2004 letter, nobody from State Street spoke with Spina or received any

further information from Spina about his interactions, described above, with Brown.

(Exhibit 3, Logue deposition p. 33-34; Exhibit 2, deOcejo deposition p. 32; Exhibit 8, Ooi

deposition p. 8). In fact, in its interrogatory answers, State Street said, in response to an

interrogatory asking for "all actions taken by State Street to determine what, if any, offers

had been made to Alan Brown in regard to VSP," (Exhibit 32), State Street identified only

Spina's June 30, 2004 letter to Weissman as its source of information.

**Valuation of Spina's commitment**

52.     Shortly after he saw Spina's June 30, 2004 letter, deOcejo spoke with Weissman and Ronald

Logue, Spina's successor, about it. (Exhibit 2, deOcejo deposition p. 32). DeOcejo told

Weissman that Spina was not authorized to make such a commitment. Weissman asked

deOcejo to quantify the cost of the commitment. (Exhibit 2, deOcejo deposition p. 47).

53.     DeOcejo worked with Boon Ooi, head of benefits, to calculate the cost to State Street of

what they termed Spina's "verbal commitments" to Brown. They did not speak with

anybody with direct knowledge of the agreement: Brown, Spina or Harbert. (Exhibit 8, Ooi

deposition p. 8). Ooi relied entirely on Brown's email to Spina (Exhibit 15) and Spina's letter

to Weissman, (Exhibit 18), to calculate the value of the EVSP for Brown. (Exhibit 8, Ooi

deposition p. 8). Ooi and deOcejo prepared several different documents.

         a.     On July 12, 2004, Ooi sent deOcejo an agenda of items to be discussed with Logue,

                which, he said, "included more details on Alan Brown and Tim Harbert." (Exhibit

                19). In that document, Ooi calculated the cost of Brown's package at $6.64 million.

                The first paragraph, (a), of this document, as it pertains to Brown, stated that that the

                commitment was to "[p]rovide protection as if the terms offered under the

                Executive VSP (EVSP) would continue to be provided to executive for duration of

employment until attainment of age 55." *(Id.)*. That statement, deOcejo said, was his best understanding of what was conveyed in Spina's June 30, 2004 letter to Weissman. The document included a section (c) titled "Interpretation." This portion was deOcejo's and Ooi's interpretation of modifications to the original agreement between Brown and Spina that would be in State Street's best interests. (Exhibit 2, deOcejo deposition p. 60). DeOcejo had no idea if these proposed modifications – particularly the provision that the terms would be provided only if the executive were terminated other than for cause – were ever discussed by Spina and Brown. (Exhibit 2, deOcejo deposition p.61). Spina had no memory of whether he and Brown had discussed such a provision. (Exhibit 5, Spina deposition p. 20). Brown was clear that the agreement was to extend the VSP "so that **at our election**, Tim's or mine, we could call for the VSP benefits at any time up to our 55th birthday, and that as long as we were not being terminated for cause, we would then be eligible to receive those benefits." (Exhibit 1, Brown deposition p. 102)(Emphasis added).

b. Also on July 12, 2004, deOcejo sent a letter to Weissman that included "as you requested … [a] summary of the financial impact and suggested interpretations of David's 'oral promises' to John Towers, Alan Brown and Tim Harbert." (Exhibit 20). In that document the cost of the "oral promise" to Brown was calculated at $5.54 million.

c. On July 16, 2004, Ooi sent an email to Weissman, which began, "Bob, I'm following up on a discussion that you had with Lou regarding David's verbal commitments to John Towers, Tim Harbert and Alan Brown. You may have seen this already but attached is a summary of those commitments and our best efforts in interpreting them (to keep to the spirit of intentions yet protect State Street's interests)." (Exhibit

21). In that document he calculated the cost of Spina's commitment to Brown at $5.54 million. *(Id.).*

54. The Executive Compensation Committee was scheduled to meet September 15, 2004. As part of their usual duties, DeOcejo and Ooi prepared notebooks for committee members that included information relevant to the upcoming meeting. At Tab 4B of that notebook they included a two-page entry titled "SSgA Executive Vice President Verbal Commitment by David Spina." (Exhibit 22). This document was broken down into sections they titled: Background, Alan Brown "EVSP" Agreement, Interpretations/Modifications, and Estimated Cost. This document was written by Ooi and approved by deOcejo. (Exhibit 2, deOcejo deposition p. 80).

    a. The "Background" section stated, "[c]ertain verbal commitments were made to Alan Brown during the EVSP period."

    b. The "Interpretations/Modifications" section included the same "interpretation" as in previous versions that the "terms are applicable only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55." DeOcejo agreed that "interpretation" was his and Ooi's and he had no knowledge that Spina and Brown ever discussed such an interpretation. (Exhibit 2, deOcejo deposition page 61). Ooi also agreed that provision was not derived from Spina's letter but was Ooi's "opinion" (Exhibit 8, Ooi deposition p. 37). He, too, said he did not know whether Brown and Spina had ever discussed that the benefits would only be provided were Brown terminated by State Street other than for cause. (Exhibit 8, Ooi deposition p. 38).

    c.   This document, presented to the Executive Compensation Committee, calculated the cost to State Street of Spina's "verbal commitment" to Brown at $5.54 million. (Exhibit 22).

55.    Ooi said that with Spina's letter to Weissman, Brown's email to Spina and his knowledge of the terms of the EVSP, he could think of no additional information he needed to calculate the dollar amount of Spina's verbal commitment to Brown. (Exhibit 8, Ooi deposition p. 55).

### The September 2004 Executive Compensation Committee meeting

56.    The Executive Compensation Committee of the Board of Directors met on September 15, 2004. (Exhibit 23). The third page of the minutes of that meeting, (Bates No. 04674[1]), simply states, "Mr. deOcejo presented and reviewed proposed actions in order to accommodate verbal commitments made to an executive during the period the Executive Voluntary Separation Program (EVSP) was available." That statement refers to the discussion concerning Spina's commitment to Brown. (Exhibit 4, Darshori deposition p. 19).

57.    The discussion was brief. (Exhibit 4, Darshori deposition p. 19). Committee members expressed Spina's lack of authorization to make verbal commitments to Brown. (Exhibit 4, Darshori deposition p. 19). They discussed how they now had information about what Spina's commitment to Brown was but they felt no obligation to accept it. (Exhibit 7, Hill deposition p. 22). Committee members expressed opinions that Spina had exceeded his authority. (Exhibit 4, Darshori deposition p. 18; Exhibit 7, Hill deposition p. 17; Exhibit 9, Sergel deposition p. 43).

---

[1] The minutes are redacted to protect personal information of irrelevant persons. The parties have stipulated that none of the redactions concerns Brown.

58.    No vote was taken to renounce the verbal commitment Spina had made to Brown. (Exhibit 4, Darshori deposition p. 20; Exhibit 9, Sergel deposition p. 49; Exhibit 7, Hill deposition p. 23).

59.    The Executive Compensation Committee never discussed Brown after the September 2004 meeting. (Exhibit 7, Hill deposition p. 25).

60.    Brown was never told by anybody at State Street that the Board or the Executive Compensation Committee had renounced or rejected Spina's commitment to him. (Exhibit 3, Logue deposition p. 82; Exhibit 2, deOcejo deposition p. 98). In fact, other than seeing a copy of Spina's June 30, 2003 letter to Weissman, Brown was never told that the matter had ever been presented to the Board or the Executive Compensation Committee nor that it had ever been discussed by them. (Exhibit 1, Brown deposition p. 179). The last definitive word Brown heard about the commitment was Spina's June 30, 2004 letter to Weissman. *(Id.)*.

61.    At most, deOcejo said that he told Brown his own **opinion** that "they [the Executive Compensation Committee] are never going to approve something like this." (Exhibit 2, deOcejo deposition p. 40.) DeOcejo knew of no one at State Street who had actually told Brown the Compensation Committee had reviewed the commitment and then rejected it. (Exhibit 2, deOcejo deposition p. 97).

**Brown's attempts to exercise his EVSP rights**

62.    Tim Harbert died unexpectedly in August 2004. (Exhibit 1, Brown deposition p. 52). State Street began a search process for a new head of SSgA. Brown was one of the candidates. It was a position he wanted. (Exhibit 1, Brown deposition p. 53, 163).

63.    Brown met with Logue in January 2005. They discussed the search for Harbert's successor. Brown mentioned that if he did not receive the position he had the VSP-type agreement he had concluded with Spina. Logue replied that he thought Brown's entitlement to the EVSP

only applied if State Street terminated Brown. Brown told him that was not the case. (Exhibit 1, Brown deposition p. 155). Based on that meeting, Logue said he was aware that he and Brown had a different understanding as to what Brown's "entitlement" was, with Logue believing it was triggered only by a not-for-cause termination and Brown believing he could exercise his rights at his option, the same way the original VSP worked. (Exhibit 3, Logue deposition p. 76-77).

64.     In fact, even at the time of his deposition in May 2006, Logue stated his belief that Spina and Brown had reached an agreement calling for EVSP benefits for Brown if Brown were terminated without cause. Logue testified that the Executive Compensation Committee, at its September 2004 meeting, which he attended, agreed that if Brown were terminated without cause he would be entitled to "some compensation that would be due similar to the VSP." (Exhibit 3, Logue deposition p. 8.) Logue said he was "sure discussion was had and it was determined that not only by cause, if he was terminated he would be eligible for benefits if State Street had terminated him without cause." (Exhibit 3, Logue deposition p. 72). He added that if Brown had asked him the status of the matter in September 2004, after the Compensation Committee meeting, Logue would have told Brown that he would have been eligible for the benefits if State Street terminated him without cause. (Exhibit 3, Logue deposition p. 75).

65.     Interestingly, neither Logue nor Brown held the belief that Brown had no right to any type of EVSP benefits under any circumstances, which is State Street's position in the present litigation. Logue testified that nobody at State Street ever told him that Brown had no right to any sort of VSP benefits under any circumstances. (Exhibit 3, Logue deposition p. 36).

66.     On January 31, 2005, William Hunt was appointed chief executive officer of SSgA. (Exhibit 24).

67.     After Hunt was appointed to that position, Ooi thought that Brown, who he knew wanted that appointment, might resign. (Exhibit 8, Ooi deposition p. 74). Ooi, who had calculated the cost of Spina's "oral promise" to Brown, began collecting information that would enable him to calculate the present value of those benefits for Brown on the same day that Hunt's appointment was announced. Ooi requested information from SSgA's United Kingdom office concerning Brown's U.K. payments in lieu of pension, information needed to calculate Brown's rights under the SERP. (Exhibit 8, Ooi deposition p. 65). Similarly, Ooi requested information that same day concerning Brown's stock options, information that would also be required to calculate his benefits under the commitment Spina had made. (Exhibit 8, Ooi deposition 66). Information about stock options had nothing to do with Brown's SERP pension rights, Ooi admitted. *(Id.).*

68.     Brown continued to work for SSgA after Hunt was appointed. In his words, he "waited to see how things would transpire." (Exhibit 1, Brown deposition p. 164.). They did not transpire well. *(Id.).* He perceived indications that Hunt wanted to make changes and that the "changes might include me." *(Id.).* Hunt moved Brown's Boston office, attempted to take away a major report of Brown's and took away his vice-chairman title. Hunt did not seem to pay attention to Brown's advice. *(Id.).*

69.     Brown perceived this as a "complete change in management style" from a partnership style to a top-down style. (Exhibit 1, Brown deposition p. 165).

70.     Brown concluded that the time had come to exercise the agreement he concluded with Spina. (Brown deposition p. 166). His belief that he was entitled to these benefits was a key factor in his decision to write to Logue as he did on March 11, 2005. If he did not believe he had those rights, "I certainly would have stayed on for a period of time, yes," he testified. (Exhibit 1, Brown deposition p. 167).

71.     Brown emailed a letter to Logue on March 11, 2005 exercising his rights under his agreement

        with Spina. In this letter, (Exhibit 25), Brown said, in part,

>       I have now taken the view that my position with State Street is no longer
>       tenable. . . . In the circumstances, I am writing to exercise my rights to a
>       Voluntary Separation Program. As you know, in 2003 David Spina, on behalf
>       of State Street entered into an agreement with me in which in exchange for
>       my continued commitment to remain active as a leader of SSgA, State Street
>       Corporation would hold available for me the same separation program the
>       Company was offering U.S. employees under what was known as the
>       Voluntary Separation Program or, in view of my position, the Executive
>       Voluntary Separation program (EVSP).

72.     State Street immediately placed Brown on a paid leave. He was contacted by Mitchell

        Shames, SSgA general counsel. (Exhibit 10, Shames deposition p. 8). In that telephone

        conversation – Brown was in London – and several other telephone calls in the following

        days, Brown emphasized that he was not giving notice that he was resigning, but, rather, that

        he was "electing under the VSP." (Exhibit 10, Shames deposition p.16).

73.     Even though Brown said he was not resigning, State Street chose to treat his March 11 letter

        as a resignation. (Exhibit 3, Logue deposition p. 90).

74.     On March 17, 2005, Hunt wrote to Brown saying that "your conclusion that your position at

        the Company has become untenable compels us to agree that your employment with State

        Street must end, as the implications of your considered view are unmistakable. Therefore,

        tomorrow, Friday, March 18, 2005, will be the date on which your voluntary resignation

        from employment with State Street will take effect." (Exhibit 27). By the time Brown

        received Hunt's letter informing him, for the first time, that State Street considered that he

        had voluntarily resigned, State Street had moved forward with an elaborate plan to announce

        Brown's "resignation" to the press. (Exhibit 26).

75.     State Street rejected Brown's claim to any VSP-type benefits. Hunt's March 17, 2005 letter,

        (Exhibit 27), said, in that regard,

In addition, despite whatever communications you may have had with David Spina, no actual agreement was ever reached as to the substance of any promise to provide you with VSP benefits at some indefinite time in the future, and no document was ever executed to this effect. Moreover, David Spina did not have authority to commit State Street to enhance your benefits package in the extraordinary manner you now allege . . ."

**Brown acted reasonably in relying on Spina's promise**

76.    Spina did not believe he exceeded his authority in any of his dealings with Brown. (Exhibit 5, Spina deposition p. 47).

77.    After June 30, 2004, nobody from State Street spoke with Spina about his "commitment" to Brown concerning the VSP. (Exhibit 3, Logue deposition p. 33; Exhibit 2, deOcejo deposition p. 32).

78.    Nobody from State Street told Brown that Spina had acted without authority in making the commitments Spina described in his June 30, 2004 letter to Weissman. (Exhibit 3, Logue deposition p. 50, 52; Exhibit 2, deOcejo deposition p. 73). Logue agreed that "in all fairness" somebody should have told Brown that Spina lacked authority to make the commitment he made to Brown. (Exhibit 3, Logue deposition p. 50).

79.    Prior to Hunt's March 17, 2005 email to Brown, nobody from State Street had told Brown the Executive Compensation Committee had rejected his agreement with Spina. (Exhibit 1, Brown deposition p. 140; Exhibit 3, Logue deposition p. 82) (Exhibit 28A, 9/15/06 letter from Rex Lee identifying documents produced in response to request for "All communications from any representative, employee, or officer of State Street to Alan Brown informing him of any action by the Executive Compensation Committee concerning the extension to Mr. Brown of any VSP, EVSP or modified VSP or EVSP benefits." Exhibit 28B shows the exhibits identified by Attorney Lee as responsive to that document request.

These exhibits are:  01151[2], Hunt's March 17, 2005 email to Brown, which was **after** Brown

had sought to exercise his EVSP rights; 01207, Spina's June 15, 2004 email to Brown, which

was **before** the Executive Compensation Committee was first notified of Spina's

commitments; 04672-76, minutes of the Sept. 15, 2004 Executive Compensation Committee

meeting, and 05610, the agenda for the Sept. 15, 2004 meeting. There is no evidence Brown

saw these last two documents prior to this litigation and, further, neither document reflects

that the Committee rejected Spina's commitment.)

80.    In the fourth quarter of 2004, Brown spoke with Peter Leahy, SSgA's chief operating officer,

and John Marrs, SSgA's human resources manager, about his VSP agreement with Spina.

(Exhibit 1, Brown deposition p. 139-140). Leahy "acknowledged" Brown's statement to him

about his entitlement to the VSP. (Exhibit 1, Brown deposition p. 142). Marrs was aware of

the agreement with Spina. (Exhibit 1, Brown deposition p. 143).

81.    State Street could not cite any instance, other than the present situation, in which Spina had

exceeded his authority. (Exhibit 3, Logue deposition 42; Exhibit 4, Darshori deposition 16;

Exhibit 2, deOcejo deposition p. 48). Brown was unaware of any instance in which State

Street had refused to put into effect any employment-related decision made by Spina. Brown

believed that Spina had made numerous significant decisions on behalf of State Street,

including decisions concerning employment matters, which State Street accepted and

implemented, without him having to obtain approval. (Exhibit 29, Brown's answers to

interrogatories, No. 10).

82.    Board member Darshori believed Spina was "an honest person" (Exhibit 4, Darshori

deposition p. 22) and could think of no reason why Spina would write to the chairman of the

---

[2]  The numbers refer to the Bates numbers on the document production.

Executive Compensation Committee that he had made a commitment to Brown if Spina did

not believe he had made a commitment. (Exhibit 4, Darshori deposition p. 23).

83.    In fact, Logue testified "it would seem reasonable to me" for Brown in his dealings with the

Chairman and CEO of State Street Corporation to have relied on a commitment that the

Chairman made with him. (Exhibit 3, Logue deposition p. 46). Logue said, "I see no reason"

Mr. Brown should not have relied on David Spina when David Spina made this

commitment. (Exhibit 3, Logue deposition p. 46). Asked if Spina made a commitment like

this whether he thought it would have appeared to Brown that Spina had the authority to

make that commitment, Logue replied, "I would assume so." (Exhibit 3, Logue deposition p.

46)[3].

84.    Brown relied on Spina's promise to him. Brown believed that State Street might have acted

illegally in failing to offer the EVSP to him, since he had an office in Boston and had global

responsibilities. (Exhibit 1, Brown deposition p. 95). He relied on Spina's VSP promise to

him, and chose not to pursue this legal claim. (*Id.*). Further, as a leading chief investment

officer, Brown regularly received calls from head hunters trying to recruit him away from

State Street. After reaching agreement with Spina in 2003, Brown relied on that agreement

and "consistently turned down these overtures without discussion or enquiry." (Exhibit 30,

Brown interrogatory answers, No. 11). He said, "If I hadn't got the VSP and if I was the only

person left standing on the deck, so to speak, I would have taken headhunter calls, which

---

[3] Logue attempted to withdraw from these candid admissions that Brown's reliance on Spina's promise was reasonable.
Logue submitted "corrections" to his deposition testimony in which he attempted to withdraw the testimony. The First
Circuit frowns on such attempts by a party to create a contested material fact by changing testimony during the course of
the case. "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and
resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of
why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons*, 44 F.3d 1, 4-5 (1st Cir. 1994). See *Cleveland v. Policy
Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)("The lower courts . . . have held with virtual unanimity that a party cannot
create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous
sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without
explaining the contradiction or attempting to resolve the disparity.")

come regularly, and listened to them, because the position would have been pretty

impossible.  And I might have gone potentially further.  I made no decision to do so, but I

might have gone potentially further to actually look for opportunities." (Exhibit 1, Brown

deposition p. 100-101).

85.    Brown's performance as Chief Investment Officer of SSgA from the time of his 2003

conversation with Spina up to his last day of employment with State Street in March 2005

was fully satisfactory. (Exhibit 3, Logue deposition p. 54; Exhibit 4, Spina deposition p. 47).


Alan Brown, plaintiff
By his attorneys,

/s/ Harvey A. Schwartz
HARVEY A. SCHWARTZ
 BBO. # 448080
LAURIE A. FRANKL
 BBO # # 647181
Rodgers, Powers & Schwartz
18 Tremont Street
Boston, MA 02108
(617) 742-7010


**Certificate of service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 28, 2006.

/s/ Harvey A. Schwartz
Harvey A. Schwartz

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ALAN BROWN** )<br> **Plaintiff** )<br> )<br> **v.** )<br> )<br> **STATE STREET CORPORATION** )<br> **and STATE STREET GLOBAL** )<br> **ADVISORS,** )<br> **Defendants** ) | **C.A. No. 05-11178-NG** |

**AFFIDAVIT OF HARVEY A. SCHWARTZ**

Now comes Harvey A. Schwartz, counsel of record for the plaintiff Alan Brown, who states as follows subject to the pains and penalties of perjury.

1. Exhibits 1-10 are copies of portions of the transcripts of depositions of Alan Brown, David Spina, Ronald Logue, Louis deOcejo, Nader Dareshori, Robert Weissman, Linda Hill, Mitchell Shames, Richard Sergel and Boon Ooi taken in this action.

2. Exhibit 12 is a copy of a posting on the internet web site of State Street Global Advisors, located at http://www.ssga.com/about_ssga/about_ssga_hm.html, downloaded on September 27, 2006.

3. Exhibits 13, 14 and 15 are copies of the minutes of the State Street Corporation Board of Directors and Executive Compensation Committee for the dates shown on the documents. These documents were produced by the defendant. By agreement of the parties irrelevant names have been redacted for privacy purposes. The parties have stipulated that no information identifying the plaintiff Alan Brown was redacted from these exhibits.

4. Exhibits 17, 18, 19, 20, 21, 22, and 27 are copies of correspondence and emails produced by the parties during discovery and authenticated at depositions by at least one party to each communication.

5. Exhibits 23, 24 and 26 are copies of documents produced by the defendants to the plaintiff in response to requests for production of documents as records of the defendant.

6. Exhibits 28A and 28B are copies of correspondence between counsel to this action and the attachment to that correspondence, respectively.

7. Exhibits 29, 30, and 31are answers to interrogatories by the plaintiff and the defendant in this action.

/s/ Harvey A. Schwartz
HARVEY A. SCHWARTZ
BBO. # 448080

Plaintiff's exhibit 1
Alan Brown deposition

COPY

Page 1

1                                          Volume:  I
                                           Pages: 190
2                                          Exhibits: 25

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5

6
   ALAN BROWN,
7                          Plaintiff
                                     Docket No.
8           vs.                      05 CIV 1178(NG)

9  STATE STREET CORPORATION and
   STATE STREET GLOBAL ADVISORS,
10                         Defendant

11

12

13              VIDEOTAPED DEPOSITION of ALAN BROWN, a
   witness called by and on behalf of the Defendant, taken
14 pursuant to the Federal Rules of Civil Procedure,
   videotaped by Craig Newman of Valed Videography
15 Services, before Cynthia F. Stutz, Certified Shorthand
   Reporter and Notary Public in and for the Commonwealth
16 of Massachusetts, at the offices of Hare & Chaffin, 160
   Federal Street, Boston, Massachusetts, on Monday, April
17 24, 2006, commencing at 10:31 a.m.

18

19

20

21

22

23

24

ALAN BROWN
4-24-06

Page 15

1    agreement.

2        Q.    Okay.  And can you tell me what that means to

3    you?

4        A.    It allows the company to second me to another

5    company within the group.

6        Q.    And did the company ever second you to another

7    company within the group?

8        A.    I think I need you to explain that question

9    more to me as to what you mean by secondment.

10       Q.    What do you understand it to mean within the

11   meaning of this contract?

12       A.    I understand that I could be required to

13   engage in work for other legal entities within the

14   group.

15       Q.    Would you --

16       A.    And I could be requested to move or not move.

17       Q.    Does that say with the appointee's consent?

18       A.    It does.

19       Q.    So you would have to consent to a secondment?

20       A.    I would.

21       Q.    And do you know what a secondment letter is?

22       A.    I know what -- Well, no, no, I've never seen a

23   secondment letter from State Street.

24       Q.    I didn't ask you that.  I asked if you knew

ALAN BROWN
4-24-06

Page 17

1    Q.    The company being State Street U.K.?

2    A.    State Street Global Advisors U.K.

3    Q.    I'm sorry, State Street Global Advisors U.K.,

4    I apologize.  If you turn back one page to Pay,

5    Paragraph 17, that paragraph provides for your base

6    salary?

7    A.    It does.

8    Q.    And was that base salary paid by State Street

9    Global Advisors U.K.?

10    A.    It was.

11    Q.    And was that true for the entire time that you

12    were an employee of State Street Global Advisors?

13                MR. SCHWARTZ:  Object to the form.

14    A.    Yes, subject to revisions of the rate.

15    Q.    But it was always paid by State Street Global

16    Advisors U.K.?

17    A.    Yes.

18    Q.    You see, coming back to Paragraph 18,

19    Paragraph 18, 1, Pension?

20    A.    Yes.

21    Q.    Can you read that?

22    A.    In lieu of participating in the State Street

23    U.K. Pension and Life Assurance scheme, the company

24    shall make a supplementary payment of such amount as to

ALAN BROWN
4-24-06

Page 27

1    Q.  Right.  This was just for U.K. company -- U.K.

2  employees?  I'm sorry.

3    A.  It have State Street group companies, U.K.

4  group companies, correct.

5    Q.  Okay.  Now, can you tell me over the years how

6  were you compensated at State Street?  What forms of

7  compensation did you receive?

8    A.  Cash as salary, cash as benefits in lieu of

9  things like pension, cash as bonus, sometimes deferred,

10  sometimes not, stock units in various forms, options in

11  various forms and compensation as a result of my role

12  as an executive vice president of State Street

13  Corporation.  I think that's all.

14    Q.  And was this compensation, if you will,

15  pursuant to your agreement?

16          MR. SCHWARTZ:  Object to the form.

17    A.  It was pursuant to the work that I undertook

18  for all companies in SSgA.

19    Q.  Well, what I'm driving at was was the

20  compensation that you received over the years

21  compensation that was provided for in your agreement?

22    A.  I don't believe it was.

23    Q.  Okay.  Was it compensation that was provided

24  for in various plans and programs of the company?

ALAN BROWN
4-24-06

Page 28

1      A.    It was compensation governed by various mainly

2    U.S. plans of the company.

3      Q.    And when there was a U.S. plan that -- was

4    there a U.K. supplement to the plan?

5      A.    I'm not sure.

6      Q.    Were you -- In any event, you were a

7    participant in the plans one way or the other?

8      A.    Correct.

9      Q.    And I want to focus a little on equity plans.

10   Did you participate in various kinds of equity plans?

11     A.    I did.

12     Q.    And what kinds of equity plans did you

13   participate in?

14     A.    Equity and option plans.

15     Q.    So you received awards from time to time of

16   equity and awards from time of options?

17     A.    Yes.

18     Q.    And those awards were pursuant to plans, is

19   that correct?

20     A.    Correct.

21     Q.    And how would you get an award?  What would

22   happen to get you an award?

23     A.    I would receive the awards either through

24   directly through SSgA, through its employment cycle

ALAN BROWN
4-24-06

Page 44

1    way of life insurance?

2        A.    Well, in my case, because I didn't participate

3    in the U.K. pension plan, if I recollect, instead of

4    having four times death and service benefit, my death

5    and service benefit was two times.

6        Q.    And that was provided from State Street

7    Advisors U.K. Limited?

8        A.    I can't be sure as to which legal entity, but

9    associated with that employment.

10        Q.    But it was provided out of the U.K., is that

11    correct?

12        A.    Correct.

13        Q.    And did you also -- And you have testified

14    about pension.  Now, were you a member of any U.S.

15    pension plan?

16        A.    None.

17        Q.    Okay.  And in other words, everything that you

18    received during the time you were employed by State

19    Street Advisors U.K. Limited with the exception of

20    equity awards came under U.K. plans, programs or

21    pursuant to your agreements in the U.K.?

22        A.    I don't think so.

23        Q.    Okay.  What else did you receive?

24        A.    They were called things like Cycle K, Cycle L

ALAN BROWN
4-24-06

Page 45

1     awards and they were associated with my role as an

2     executive vice president of State Street Corporation.

3          Q.    To the extent that you received any such

4     awards, to the extent that you received any such

5     awards, are they at issue in this lawsuit?

6          A.    I'm not sure I understand the scope of the

7     question.

8          Q.    Have all such awards been fully paid to you?

9          A.    I believe so.

10         Q.    Okay.  So you're not making a claim in this

11    lawsuit for an amount based on an award of Cycle K, did

12    you say?

13         A.    K, L, M, whatever, a number of them.

14         Q.    Right.

15         A.    No claim.  I'm just noting that I received

16    them.

17         Q.    Okay.  That was the question.

18                    What was your role when you started your

19    employment with State Street Global Advisors U.K.?

20         A.    I was managing director.

21         Q.    And did you have any functional title?

22         A.    I was also the chief investment officer of

23    that subsidiary.

24         Q.    Right from the start?

ALAN BROWN
4-24-06

Page 46

1     A.    Right from the start.

2     Q.    Okay.  And can you describe the function of a

3  chief investment officer?

4     A.    It's the most senior investment person within

5  that unit to whom typically all investment

6  professionals under them report to them and they take

7  ultimate responsibility for the investment activities

8  of the firm underneath them.

9     Q.    And did your role change at any time during

10  the time you were at State Street?

11     A.    Yes.

12     Q.    And how did it change?

13     A.    Changed several times.  First, in 1996 my role

14  was extended to be chief investment officer for the

15  non-U.S. offices of State Street Global Advisors in

16  partnership with an individual called Peter Sternberg,

17  who is the U.S. CIO.

18     Q.    And then how did it change again?

19     A.    Then a year later I became group chief

20  investment officer for all of State Street Global

21  Advisors activities in 1997.

22     Q.    Okay.  And when you became group chief

23  investment officer did you enter into a new employment

24  agreement?

ALAN BROWN
4-24-06

Page 47

1       A.    I did not.

2       Q.    Was there anything in your arrangements with

3   State Street Global Advisors U.K. that guaranteed that

4   you would keep that position?

5                   MR. SCHWARTZ:   Which position?

6       Q.    The position of group chief investment

7   officer.

8       A.    Did it guarantee that I would keep that

9   position?

10      Q.    Yes.

11      A.    No.

12      Q.    Then how did your role change after that?

13      A.    In 2000 I was made an executive vice president

14  of State Street Corporation.

15      Q.    Did that change your functional role?

16      A.    No.

17      Q.    What did that provide you?

18      A.    Greater compensation, change of control

19  agreements, those kinds of benefits.

20      Q.    And how was the change of control agreement

21  reflected?

22      A.    I can't recall the detail of it, but I can't

23  recall -- And also that made me eligible for the, after

24  I'd done enough service, the senior executive

ALAN BROWN
4-24-06

Page 47

1      A.   I did not.

2      Q.   Was there anything in your arrangements with

3   State Street Global Advisors U.K. that guaranteed that

4   you would keep that position?

5               MR. SCHWARTZ:  Which position?

6      Q.   The position of group chief investment

7   officer.

8      A.   Did it guarantee that I would keep that

9   position?

10     Q.   Yes.

11     A.   No.

12     Q.   Then how did your role change after that?

13     A.   In 2000 I was made an executive vice president

14   of State Street Corporation.

15     Q.   Did that change your functional role?

16     A.   No.

17     Q.   What did that provide you?

18     A.   Greater compensation, change of control

19   agreements, those kinds of benefits.

20     Q.   And how was the change of control agreement

21   reflected?

22     A.   I can't recall the detail of it, but I can't

23   recall -- And also that made me eligible for the, after

24   I'd done enough service, the senior executive

ALAN BROWN
4-24-06

Page 48

1    retirement plan.

2        Q.    So-called SERP?

3        A.    So-called SERP.

4        Q.    In terms of the change of control agreements,

5    were there specific agreements?

6        A.    I can't recall the detail of it right now.

7        Q.    How would a change of control impact you as an

8    employee?

9        A.    The principal way in which that happened was

10   through the vesting, immediate vesting of equity

11   awards.

12       Q.    And was that provided for in the equity award

13   agreements?

14       A.    It was provided for in an agreement.  I don't

15   recall which agreement.

16       Q.    And that was really my question.  In other

17   words, there was a specific agreement?

18       A.    I think there was.

19       Q.    That you were a party to?

20       A.    Yes.

21       Q.    It wasn't just some oral understanding?

22       A.    No.

23       Q.    Okay.  Now, you also became eligible for the

24   SERP.  What is the SERP?

ALAN BROWN
4-24-06

Page 50

1      Q.    And you had been a member of that?

2      A.    Since the first day I worked.

3      Q.    Right.  And you're still a member of that, I

4    trust?

5      A.    I am still, yes, thank you.

6      Q.    Where can we get documents that would

7    establish the value of your various pension rights from

8    either prior employment, State Street -- I'm sorry,

9    from the U.K. national pension plan or from your

10   private plan?

11     A.    The question was where could you get it from?

12     Q.    Yeah.

13     A.    The answer would be me.

14     Q.    Okay.  Do you have such documents?

15     A.    Yes.

16     Q.    And it would be -- Do those documents show

17   valuation?  Do you have periodic reports on valuation?

18     A.    I've just converted all of my pension

19   arrangements into a new one, so I happen to know its

20   current value.

21     Q.    Okay, good.  So you said in 2000 your

22   situation changed.  When did it next change?

23     A.    After the departure of Nick Lopardo.

24     Q.    And who was Nick Lopardo?

ALAN BROWN
4-24-06

Page 51

1      A.    He was the chief executive prior to Tim

2    Harbert of SSgA.

3      Q.    And when did he depart?

4      A.    If I remember right, it was 2001.

5      Q.    And how did your role change after that?

6      A.    Next role was replaced by something which

7    became known as the G4, which was a quasi-partnership

8    arrangement of four individuals who took over the

9    running of the firm.

10      Q.    And how did your role change as a result of

11    that?

12      A.    Well, the G4 now assumed all of the executive

13    arrangements.  So instead of being purely concerned

14    with CIO activities, I was now, within the context of

15    that quasi-partnership, involved in all of the

16    executive functions of SSgA.

17      Q.    And again, was this a role that was guaranteed

18    to you in some fashion?

19      A.    No.

20      Q.    Okay.  And did your role change after that?

21      A.    It did.

22      Q.    When was that?

23      A.    2003.

24      Q.    Okay.  And what happened then?

ALAN BROWN
4-24-06

Page 52

 1        A.    As a result of the voluntary severance program

 2    two members of the G4, John Serhant and John Snow left.

 3    So the G4 became a G2 with Tim Harbert and myself.

 4        Q.    Okay.  And how did that change your role?

 5        A.    There were now two of us undertaking the work

 6    that previously four had been doing.

 7        Q.    So your job became bigger?

 8        A.    Bigger, yeah.

 9        Q.    More important?

10        A.    More important.

11        Q.    Okay.  And did the role change after that?

12        A.    It did.

13        Q.    And what happened next?

14        A.    Tim Harbert died in August of 2005.

15        Q.    Okay.

16        A.    Sorry, correction.  August of 2004.

17              MR. SCHWARTZ:  Right.

18        Q.    And then what happened?

19        A.    The G2 became a G1 and I became acting head of

20    SSgA and worked with Peter Leahy to manage SSgA during

21    the succession planning arrangements.

22        Q.    Who was Peter Leahy?

23        A.    Peter Leahy was the chief operating officer.

24        Q.    And how long did that continue?

ALAN BROWN
4-24-06

Page 53

1      A.    Until the end of January 2005.

2      Q.    And then what happened?

3      A.    And then Bill Hunt was appointed as the new

4   chief executive of SSgA.

5      Q.    And how did you view that?

6      A.    It changed my role to going back to being the

7   group chief investment officer.

8      Q.    Which was the role you had occupied in, well,

9   for the bulk of your career at State Street Global

10   Advisors U.K.?

11      A.    For the period 1997 to 2001.

12      Q.    And was there anything wrong with that?

13            MR. SCHWARTZ:   Objection.

14      A.    Can you explain the question more?

15      Q.    Were you upset by that?

16      A.    I was not pleased with the way that the

17   succession plan, the succession, the succession

18   decision, no.

19      Q.    Were you unhappy about not becoming the

20   permanent head of SSgA as opposed to the acting head?

21      A.    I would have liked to have been appointed the

22   chairman and group chief investment officer of SSgA.

23      Q.    Which would have been the Number 1 position?

24      A.    Which would have been the Number 1 position.

ALAN BROWN
4-24-06

Page 54

1     Q.    And other than during the period you were

2   acting head, that was never a position you occupied?

3     A.    Correct.

4     Q.    Were you formally the acting head or were you

5   just serving in that capacity?

6     A.    I think Ron Logue announced it to the public

7   at large.  I'm not sure whether that constitutes a

8   formal appointment or not.

9     Q.    Was there any written document, any contract

10  or agreement naming you in that role?

11    A.    As I -- Not something that was delivered to

12  me, no.

13    Q.    During the period that you were at SSgA were

14  there any particular achievements or accomplishments

15  that you are particularly proud of, looking back now?

16    A.    Very much so.

17    Q.    Can you name one or two?

18    A.    At the personal level in two consecutive years

19  I was named as chief investment officer of the year in

20  Europe.  At a group level, in the last year, full year

21  that I was at SSgA, about 70% of the net new business

22  that SSgA gathered was from non-passive products,

23  whereas if you go back to when I joined SSgA, it was

24  much more dependent on passive products.

ALAN BROWN
4-24-06

Page 90

1    very, very attractive package.

2         Q.    Even though you had advocated that it was a

3    package that should be adopted by SSgA?

4         A.    The terms of the plans were proposed by State

5    Street Corporation.    The only issue initially in SSgA

6    was whether we would ask for a blanket exemption or

7    not, not in any way in relation to the negotiations of

8    the detailed terms of any of the plans.

9         Q.    But as I recall your earlier testimony, you

10   said you were in favor of not asking for an exemption?

11        A.    That's correct.

12        Q.    Were you disappointed that you weren't

13   included in the ambit of the program?

14        A.    Very disappointed.  I believe that it was hard

15   to not accept the program if you were an EVSP, given

16   one's sort of duties to one's families and one's self

17   to provide them, it was that generous.

18        Q.    What's the difference between the EVSP and the

19   VSP?

20        A.    The EVSP was extended to executive vice

21   presidents.

22        Q.    Were there different benefits?

23        A.    Yes, crucially the SERP.

24        Q.    And so on a technical level, if you were only

ALAN BROWN
4-24-06

Page 91

1    a participant in the VSP, you would not have any

2    benefit under the SERP?

3         A.   I think that's correct.

4         Q.   What did you do about -- Did you do

5    anything -- You said you were disappointed in not being

6    included as a participant in the EVSP.  What did you

7    do?

8         A.   My job in SSgA was in many ways unique.  And

9    therefore, I did consider the possibility of taking

10   legal advice as to whether I should have been included

11   in the offer of the EVSP.

12        Q.   And did you take such legal advice?

13        A.   I chose instead -- No, I didn't.  I chose

14   instead to go to David Spina.

15        Q.   Okay.  And what made you think that there was

16   some legal reason why you were required to be included

17   in the EVSP?

18        A.   My role was very much a global role, so much

19   so that my employment costs were reinvoiced back to

20   SSgA.  In fact, other than being chairman of the U.K.

21   company, I actually had no specific U.K. role.  And

22   therefore, it seemed to me that, with one exception the

23   technicality that paying me in pounds was easier to be

24   done through U.K. payroll than any other payroll, my

ALAN BROWN
4-24-06

Page 93

1    Q.    More than six months a year?

2    A.    More than six months a year.

3    Q.    But you had no U.K. role?  You just sat there

4    for, six, seven, eight months a year?

5    A.    I didn't just sit there, no.  I mean, I was

6    located there, but just sitting there suggests that I

7    wasn't doing anything.

8    Q.    It sounded like it if you said you had no U.K.

9    role.  What's the point have your being in the U.K. if

10   you had no role there?

11   A.    The global CIO role encompasses all of the

12   investment activities of State Street ranging from

13   those which are in Tokyo, in Hong Kong, in Singapore,

14   in London --

15   Q.    And --

16   A.    In Munich, in Paris, in Boston and in

17   Montreal.  London is actually a very convenient time

18   zone in order to be able to stay in touch with all of

19   those offices and operations.

20   Q.    Now, you mentioned eight, nine countries that

21   you were responsible for.

22   A.    And I omitted Sidney, come to think of it.

23   Q.    Good, maybe ten.  Were the employees in any of

24   those countries included in the VSP?

ALAN BROWN
4-24-06

Page 95

1    A.    No.

2    Q.    But it wouldn't surprise you if there were

3    others who were so designated?

4    A.    It would surprise me if there were many.

5    Q.    That didn't quite answer my question.  If I

6    could name another one, would that surprise you?

7    A.    If you could name another one, that wouldn't.

8    If you could name another ten, that would.

9    Q.    So you agree that you weren't eligible for

10   participation in this program.  And you agree that even

11   if you were eligible, the company could have designated

12   you as ineligible, is that fair to say?

13   A.    You're asking two questions there.  To the

14   first question, no, I don't agree with that.  I believe

15   that it would be open to potentially being legally

16   questioned.

17   Q.    And can you state the basis for the legal

18   questioning?

19   A.    Without trying to pretend to be a lawyer,

20   which I'm not, it goes back to the substance of the

21   fact that my job was in all respects a global job.  I

22   maintained an office in Boston.  You know, I spent

23   roughly a week a month in Boston at the time.  My role

24   was entirely a global role and could have been so

ALAN BROWN
4-24-06

Page 98

1    London, by phone.  We would meet roughly every

2    two weeks.  And we put on to the agenda that we wanted

3    to talk about the VSP arrangements as it related to the

4    two of us.

5        Q.    Why did you want to talk about them as they

6    related to you?

7        A.    Because I wanted, rather than going to a

8    lawyer, I wanted to talk about what I felt was an

9    equitable position with David.  And I was also

10   concerned about continuity of management in SSgA and I

11   believed I had a proposal which would be fair to all

12   sides.

13       Q.    Did you want to leave SSgA at that time?

14       A.    Not if my proposal was accepted.

15       Q.    So you were going there to threaten to quit

16   unless you received a benefit?

17       A.    I never threatened to quit and I never have

18   threatened.

19       Q.    Okay.  Well, then tell me what your state of

20   mind was.  Were you intending to leave State Street at

21   that time?

22       A.    No.  I was intending to find out what David's

23   reaction to my proposal was.  That's what I was

24   intending to do at that point.

ALAN BROWN
4-24-06

Page 100

1    really very difficult for an individual not to take

2    those benefits for the sake of themselves and their

3    families.  And I said that we knew that the two Johns

4    were going to elect to take the VSP and that therefore

5    half of the G4 was definitely leaving.

6                And I said to David Spina that I didn't

7    think he would want, you know, any more departures, any

8    more departures, and that I had a proposal which I

9    thought would be equitable both to myself and Tim if we

10   stayed to continue to support SSgA and could

11   potentially cost the company nothing.

12   Q.   What did you mean by he didn't want any more

13   departures?

14   A.   Well, I found it difficult to believe that he

15   would want all four of the top managers of SSgA to

16   leave at one go.

17   Q.   Why would you leave if you weren't going to

18   get the VSP?

19   A.   If I hadn't got the VSP and if I was the only

20   person left standing on the deck, so to speak, I would

21   have taken headhunter calls, which come regularly, and

22   listened to them, because the position would have been

23   pretty impossible.  And I might have gone potentially

24   further.  I made no decision to do so, but I might have

ALAN BROWN
4-24-06

Page 101

1    gone potentially further to actually look for

2    opportunities.

3        Q.    So in effect, you were threatening to leave?

4        A.    No, I didn't have that conversation with him.

5    I didn't have to say that I was threatening to leave.

6    I wasn't threatening in any respect.  I was talking to

7    David as a fair-minded individual about principles of

8    equity.

9        Q.    I'm still confused by the phrase, doesn't want

10   more departures.  Did that to you, does not imply the

11   possibility that you might leave?

12       A.    It implies the possibility.  It doesn't imply

13   anything more than that.

14       Q.    Okay.  What did David say?

15       A.    David understood the global nature of my job

16   very well and I believe appreciated that it was only a

17   technicality that I hadn't been included in the

18   program, which was why, when I put to him a proposal as

19   to what we could do about it, he accepted it.

20       Q.    Now, you said he appreciated it was a

21   technicality.  Did he use that word?

22       A.    Technicality was my word.

23       Q.    What did he say?

24       A.    With this distance of time, I can't remember

ALAN BROWN
4-24-06

Page 102

1    his individual words.

2        Q.    And you said he appreciated your proposal.

3    What was your proposal?

4        A.    My proposal was that under the EVSP

5    arrangements, you had a narrow window of time, window

6    of time in which you could elect to avail yourself of

7    those benefits.  My proposal to him was twofold.

8    First, that I be included in this proposal, whereas

9    hitherto I'd been excluded.  And secondly, that what we

10   considered doing was extending the VSP so that at our

11   election, Tim's or mine, we could call for the VSP

12   benefits at any time up to our 55th birthday, and that

13   as long as we were not being terminated for cause, we

14   would then be eligible to receive those benefits.  And

15   specifically in relation to the SERP I proposed that

16   the additional years of service, initially five

17   including the VSP program, be amortized over

18   five years, so that back -- by the time I reached my

19   55th birthday, I would have been exactly where I would

20   have been in relation to the SERP as if I'd just been a

21   regular employee.

22       Q.    So you were proposing first that David make

23   you eligible for the VSP and then extend the time at

24   which you could elect for a five-year period?

ALAN BROWN
4-24-06

Page 103

1      A.    Correct.

2      Q.    What was David's response?

3      A.    Well, David made it clear that there were

4  certain things which were beyond his control.  So

5  things like the equity plans he wasn't in a position to

6  be amending any equity plans.  But otherwise, he

7  accepted the basis of the proposal.

8           Now, David never makes an instant

9  decision.  It's not in his character.  But he said he

10  would think about it and subsequently he confirmed that

11  he thought the proposals were fair and equitable and I

12  accepted them -- accepted his word on that.

13      Q.    Okay.  Let's go slowly.  At that meeting he

14  said he would think about it.  And was that the end of

15  that meeting.

16      A.    Yes.

17      Q.    And nothing else was said about?

18      A.    Not about the EVSP.

19      Q.    Now, let me just come back to some of the

20  specifics.

21      A.    Can I apply for a break in a minute, just to

22  take a pit stop?  But carry on with your question until

23  we can get to a break.

24      Q.    Do you want to do that now, if that's --

ALAN BROWN
4-24-06

Page 104

1       A.    If that's all right.

2                    THE VIDEOGRAPHER:   The time is 1:50,

3    going off the record.

4                    (Brief recess.)

5                    THE VIDEOGRAPHER:    The time is 1:55,

6    back on the record.

7       Q.    Okay.  After you broke off on that meeting you

8    said that David Spina got back to you?

9       A.    Yes.

10      Q.    And when did that occur?

11      A.    Our next meeting.

12      Q.    How long?

13      A.    Within two weeks.  We always met every couple

14   of weeks.

15      Q.    And what did he say?

16      A.    He said that he'd considered my proposal and

17   with the exception of the piece that he couldn't deal

18   with, such as equity plans, he thought it was a fair

19   one and he was happy with it and I accepted it.

20      Q.    Is that all he said?

21      A.    No.  And we then agreed that we would need to

22   reflect this in writing and he said that he would do

23   that.

24      Q.    Now, did he talk to you about seeking approval

ALAN BROWN
4-24-06

Page 105

1    of the compensation committee for any arrangement that

2    he might make with you?

3        A.    No.  He told me the pieces that he could not

4    deal with, things like the equity plans.  He gave no

5    indication that there was any other process to go

6    through.

7        Q.    And what did you understand he was agreeing to

8    at that point in time?

9        A.    In essence, the entirety of the proposal that

10   I put to him.

11       Q.    That was a proposal that would first make you

12   eligible for the VSP except for in certain respects?

13       A.    Except for certain respects like, for example,

14   U.S. medical care, which isn't relevant to somebody

15   who's in the U.K. and with, as I said, the exception

16   there could be no amendment to the equity plans and

17   that as far as, therefore, the things like the vesting

18   of equity, that that would be limited to such equity as

19   had been already awarded prior to June 30th, 2003.

20       Q.    Well, those are two different things, I guess.

21   But was he saying that he couldn't deal with the equity

22   plans because he couldn't amend the equity plans?

23       A.    Sorry.  What does that question mean?

24       Q.    I'll strike the question.

ALAN BROWN
4-24-06

Page 109

1      A.    My wife is an employment lawyer and advises me

2    whenever there is anything to be advised on.

3      Q.    And I think I'm not invading a privilege, but

4    I'll leave that to you to decide, to ask if you at the

5    time of these discussions consulted with your wife

6    regarding the substance of the discussions.  You can't

7    tell me what was said, but I think you can tell me if

8    you had conversations about it?

9      A.    We did.

10      Q.    Now, how long were you required to stay with

11    State Street in return for this supposed agreement?

12      A.    Except in the event of unforeseeable

13    circumstances like health, for example, the expectation

14    was that we would fully see the transition of SSgA post

15    the VSP through to stability again, with whatever

16    changes that needed to be made to the management team

17    and whatever changes that, whatever reaction we had to

18    come up with as a result of any client or consultant

19    reaction to the VSP.

20      Q.    Now, was that ever put in writing anywhere?

21      A.    No.

22      Q.    And what did that mean?  How long would that

23    be?

24      A.    Well, I think our collective understanding was

ALAN BROWN
4-24-06

Page 110

1    that it was a process which could take about a year.  I

2    actually believe we sort of got there by about the end

3    of March of 2004.

4        Q.    Did you have a specific conversation with

5    David about that?

6        A.    Only as part of that conversation, the

7    conversations we've already talked about.

8        Q.    Well, you have already described that

9    conversation and you didn't mention this particular

10    aspect of it, so I'm trying to find out if --

11        A.    Oh, okay.  What I was talking about before was

12    about the benefits side of the proposal.  And what

13    you're now asking about is what commitment did we make.

14    And the commitment we made was to be there to lead SSgA

15    through this very difficult time until it was

16    definitely behind us and the firm was stable and

17    cruising ahead again.

18        Q.    So arguably, if you, in your version of this,

19    if you resigned the day after David Spina made whatever

20    commitment he made to you, you would not be eligible

21    for any additional benefits?

22        A.    Short of a serious health reason for so doing,

23    right.

24        Q.    And what if you resigned six months later?

ALAN BROWN
4-24-06

Page 116

1      Q.    Let's go to this.

2                   (Brown Exhibit No. 12 marked

3                   for identification.)

4      Q.    I show you a copy of Exhibit 12 and ask you if

5   you recognize that?

6                   (Document handed to the witness.)

7      Q.    Do you see that?

8      A.    I do.

9      Q.    Okay.  Now, was this your attempt to make a

10   written record of this arrangement?

11     A.    It was.

12     Q.    And you waited a year from when the

13   conversations took place before you attempted to do

14   that?

15     A.    Yeah.

16     Q.    And what was going on in your mind about this

17   particular arrangement all throughout that year?

18     A.    Well, I was getting increasing advice that I

19   should really move to get this written down for the

20   record, which as I said, I have not been diligent about

21   before, and certainly did not at the beginning want to

22   chase David with health problems, and finally responded

23   to that advice and this is the result.

24     Q.    Did anything else happen at about that time to

ALAN BROWN
4-24-06

Page 125

1    introduce it before you answer that question.

2                    (Brown Exhibit No. 13 marked

3                    for identification.)

4        Q.    This is Exhibit 13.  That's an e-mail chain,

5    actually, with the top e-mail being an e-mail to Tim

6    Harbert dated 3/6/2004 at 9:15 a.m. and it's numbered

7    Plaintiffs 31, is that correct?

8        A.    That's correct.

9        Q.    Okay.  And you were saying that Tim responded

10   to this e-mail?

11       A.    He did.  I sent the draft to him when I was in

12   London.  Weekend, I flew over to Boston.  I saw Tim on

13   the 10th and asked him if he'd seen this note and

14   whether he agreed with it.  He said that he did, so I

15   then forwarded it, as you see, to David Spina.

16       Q.    How did he say that he agreed with it?

17       A.    Verbally.  I was standing in his office and he

18   said verbally.

19       Q.    So if you e-mailed him, why couldn't you have

20   just handed it to him if you were standing in his

21   office?

22       A.    I beg your pardon?

23       Q.    I was confused.  Maybe I'm missing something

24   here.  You sent Tim an e-mail asking him if he had any

ALAN BROWN
4-24-06

Page 129

1      Q.    And perhaps that he didn't agree with every

2    word in it?

3      A.    I have no reason to believe that he didn't.

4    The tone of this note doesn't suggest to me that he's

5    planning to have any major issues with it.

6      Q.    And you notice he's informing you that he's

7    going to discuss this with the executive comp.

8    committee?

9      A.    Correct, yes.

10     Q.    Did you know why he was going to discuss it

11   with the executive comp. committee?

12     A.    Well, I think probably for the reasons stated

13   here, which was that he wanted to get it on the record.

14     Q.    What did that mean, to get it on the record?

15     A.    Well, I think it means exactly that, notify --

16     Q.    What record?

17     A.    Notify the compensation committee that an

18   agreement exists.

19     Q.    But you didn't interpret this as seeking

20   approval of the compensation committee?

21     A.    Well, I would have expected him to have said

22   that if that's what he meant.

23     Q.    And you didn't interpret the words, More after

24   the meeting with the board on Wednesday/Thursday.

ALAN BROWN
4-24-06

Page 137

1    Q.    Then this statement is not correct?

2    A.    There are elements of the package which are

3    necessarily effectively binary and incapable of being

4    amortized.  For example, equity vested before 2003.  It

5    either vests or it doesn't vest, right?

6    Q.    No, not necessarily.

7    A.    Well, it could proportionately vest, I

8    suppose.

9    Q.    Correct, it could.

10    A.    It could, but that was not the intent of the

11    agreement entered into between myself and David Spina.

12    Q.    The only question I have for you is why didn't

13    you write that here?

14    A.    For no reason.  I think I now rather wish I

15    had.

16    Q.    Okay.  What happened after the June 30th, 2004

17    letter as far as your agreement is concerned?

18    A.    After I'd received a copy of the letter that

19    was copied to Tim Harbert, that was it.

20    Q.    You no longer cared about getting a written

21    agreement?

22    A.    I believed that that was sufficient.

23    Q.    Why did you believe that that was sufficient?

24    A.    I can't speculate as to why.  I mean, it

ALAN BROWN
4-24-06

Page 138

1    seemed to me evidence of a commitment from David Spina

2    which I believed he'd entered into in good faith and I

3    believe he's a man of integrity and I believed the

4    corporation would honor it.  I believe there was

5    sufficient there.

6        Q.    Even though this was not a letter addressed to

7    you?

8        A.    Even though it wasn't a letter addressed to

9    me.

10       Q.    And yet you had a specific employment

11   agreement with the company and dozens of award

12   agreements with the company and multiple letters from

13   the company to you setting forth terms of compensation,

14   yet something as valuable as this, you were sufficient,

15   you felt was sufficiently clear that you could rely on

16   it?

17       A.    I very much regret that I didn't take the

18   advice of my counsel to get it down in more concrete

19   form.

20       Q.    So you did receive advice that you should have

21   a written agreement if it were to be an enforceable

22   agreement?

23       A.    No.  No.  Not if it were to be an enforceable

24   agreement.  I got advice of my counsel that matters of

ALAN BROWN
4-24-06

Page 139

1    this type are best detailed comprehensively in writing.

2        Q.    Was that the last you heard of this subject?

3              MR. SCHWARTZ:    From anybody?

4        Q.    Was that the last you heard of this subject

5    until -- Well, when was the next time you heard about

6    or discussed this subject?

7              MR. SCHWARTZ:    Well, I'll object to the

8    form.  What do you mean by this subject?

9              MR. CALAMARI:    I'll rephrase the

10   question.

11       Q.    When was the last time the purported agreement

12   made by David Spina was -- Strike it again.

13             When was the next time the purported

14   agreement with David Spina came up in your experience?

15       A.    Well, I discussed it with David over lunch on

16   the 28th of February.

17       Q.    And that was the next conversation about that

18   agreement with anybody?

19       A.    Other than counsel?

20       Q.    Other than counsel.

21       A.    No.

22       Q.    When was the next conversation?

23       A.    It was either in September or in the fourth

24   quarter or both of 2004.

ALAN BROWN
4-24-06

Page 140

1    Q.    What were the circumstances surrounding that

2    discussion?

3    A.    They were discussions that I had with Peter

4    Leahy and John Marrs and the discussions were in the

5    context of the succession process that SSgA was going

6    through at the time.

7    Q.    Did there come a point where someone advised

8    you that the compensation committee had rejected this

9    agreement?

10   A.    No.

11   Q.    And no one ever told you that?

12   A.    No.

13   Q.    Did anybody ever tell you that the

14   compensation committee had approved it?

15   A.    No.   May I add to my reply to your previous

16   question?

17   Q.    Of course.

18   A.    I also, during the fourth quarter, discussed

19   it with Lou de Ocejo and in January 2005 I mentioned it

20   in a meeting with Ron Logue.

21   Q.    Now, in terms of these four conversations,

22   I'll call them for the moment, Peter Leahy, John Marrs,

23   Lou de Ocejo and Ron Logue, which would have come

24   first, can you recall?

ALAN BROWN
4-24-06

Page 142

1          A.    Effectively, yes.  As you might imagine, we

2     had many conversations on the succession process that

3     we were going through.

4          Q.   What did this have to do with the succession

5     process?

6          A.   Well, Peter Leahy was very concerned about the

7     succession process that we were going through.  And by

8     his nature, you know, he's fairly tense individual and

9     he was very anxious that he and I stick together in

10    terms of the proper succession proposition that we had

11    put forward to Ron Logue, which was that the two of us

12    take over the leadership of the firm.

13         Q.   And why did you think that you should advise

14    him about this agreement?

15         A.   Well, in the spirit of full disclosure to a

16    close colleague, I thought that he ought to know that I

17    had what I regarded as a secure back stopper

18    arrangement, an option.

19         Q.   And what was his comment in response to this?

20         A.   Nothing specific.  Just acknowledged it.

21         Q.   Did he say, I'm surprised, or?

22         A.   No.

23         Q.   Or that's good for you?

24         A.   I can't speculate on what he said.

ALAN BROWN
4-24-06

Page 143

1      Q.    So you just talked to him about the agreement

2    and he had no particular response that you can recall?

3      A.    No special noteworthy response.

4      Q.    And what about John Marrs?

5      A.    John Marrs was already aware, that I believe,

6    I had this agreement, that I had this arrangement with

7    David Spina, but --

8      Q.    How did he become aware?

9      A.    I believe I must have told him sometime quite

10   a while ago.  His role, as you may know, was head of

11   HR, so it's not exactly surprising that would know that

12   kind of thing.  I can't recall how he became aware of

13   it, whether it was from me or Tim or both or when.

14     Q.    And what was the nature of that conversation?

15     A.    The nature of that conversation was that there

16   was one element of the benefit under the agreement with

17   David Spina that in particular I wanted to get more

18   closely defined.

19     Q.    Which was that?

20     A.    The provisions of the SERP include a deduction

21   from the benefit equal to accrued pension rights under

22   alternative arrangements, DB and DC type arrangements.

23   In the strict interpretation of that, I had no DB or DC

24   style benefits of the type contemplated by the plan,

ALAN BROWN
4-24-06

Page 155

1    but clearly, I was only going to exercise the option if

2    I believed that I no longer had an attractive career at

3    SSgA.

4        Q.    When did the conversation with Ron Logue

5    occur?

6        A.    In January of 2005.

7        Q.    And what was the nature of that conversation?

8        A.    The majority of the conversation was devoted

9    to inquiring as to where he was in relation to the

10   succession plan.  But I also took the opportunity to

11   advise him, because I didn't know whether he knew, that

12   I had this VSP agreement, VSP type agreement that I'd

13   concluded with David Spina.

14       Q.    And when you said he already knew --

15       A.    I didn't know whether he already knew.  That's

16   why I let him know.

17       Q.    And what did he say to you?

18       A.    He said that he thought it only applied if

19   State Street chose to terminate me.  And I told him

20   that that was not the case.

21       Q.    And did you ask him what the basis of his

22   thinking was on that?

23       A.    No.

24       Q.    Did you ask him what he knew about the

ALAN BROWN
4-24-06

Page 163

1    succession plan.  And with the help of John Marrs, we

2    put together a succession proposition.  And the essence

3    of it was that I'd be moved to the position of chairman

4    and CIO and Peter Leahy to the position of vice

5    chairman and CEO and that the two of us would then, if

6    you like, carry on from where Tim and I had previously

7    been, but with the chairmanship moving from the CEO to

8    the CIO spot.

9         Q.   And how did the succession planning play out?

10   What were the major steps over the course of time?

11        A.   Well, it was a process that we were kept

12   fairly distant from because we were candidates, but

13   it's a process which took a lot longer than I think any

14   of us on all sides really would have liked.  So

15   originally we'd hoped that it would all be done in

16   30 days, then by Thanksgiving, then by the end of the

17   year and ultimately to the 1st of January -- I'm sorry,

18   the 31st of January.

19        Q.   And was it clear that you wanted the Number 1

20   job?

21        A.   I believe it was.

22        Q.   And there came a point in time where you

23   didn't get it?

24        A.   Correct.

ALAN BROWN
4-24-06

Page 164

1     Q.    And what did you do in response to that?

2     A.    Well, I carried on with my duties and waited

3   to see how things would transpire.

4     Q.    And how did things transpire?

5     A.    From my perspective, not very well.

6     Q.    In what respect?

7     A.    I think I got ample indications that Bill Hunt

8   is the new boss, wanted to make some changes and that

9   those changes might very well include me.  Within the

10  first few weeks, he'd attempted to move my office

11  initially -- in Boston, out of the SSgA elevator bank,

12  completely out of the SSgA space.  I managed to get

13  that back to a move to an investment floor.  He

14  attempted to remove one report from me, the head of

15  research.  And of course, I think Ron Logue actually

16  took away the vice chairman title at that point.

17    Q.    And other than that, was there anything else

18  that troubled you at that time?

19    A.    Well, pretty much every time, most times when

20  we dealt, talked about any of the substantive issues

21  that we did talk about, it didn't seem that he paid any

22  attention to the advice that I was giving him.

23    Q.    Was your -- Any other things that made you

24  feel unwanted or unloved?

ALAN BROWN
4-24-06

Page 165

1    A.    I suppose the best way to describe this would

2    be the complete change in the management style of the

3    firm from one which had operated ever since the G4 came

4    into being and then the G2, from one which had operated

5    as a quasi-partnership into a more traditional

6    corporate top down CEO approach.

7    Q.    You were still the CIO, though, is that

8    correct?

9    A.    I was still the group chief investment

10   officer, yes.

11   Q.    That didn't change throughout this period?

12   A.    No.

13   Q.    And at this point in time about how much were

14   you making on an annual basis, would you say, if you

15   included in the phrase that we used before total

16   compensation?

17   A.    Well, actually, 2004 was my peak earning year

18   at SSgA.

19   Q.    And how much was that?

20   A.    Don't hold me to the last number, but I think

21   it's was around about $2.5 million, maybe even a little

22   bit more.

23   Q.    So that was 2004, which ended December 31,

24   2004?

ALAN BROWN
4-24-06

Page 166

1    A.    That's correct.

2    Q.    Was your best earnings year since you had been

3  with SSgA?

4    A.    Yes.

5    Q.    And that was $2.5 million?

6    A.    Or thereabouts.

7    Q.    Thereabouts, okay.  So what was your response

8  to the changes you discussed?

9    A.    My response was to reach the conclusion in

10  early March, when I came back from my trip to the

11  United States, the notes of which you have in front of

12  you, that my position was becoming untenable and that

13  therefore I should exercise my agreement that I had

14  concluded with David Spina.

15    Q.    In other words, you were going to resign and

16  in your view elect the, is it modified VSP or is

17  similar VSP, which?

18    A.    Whichever.

19    Q.    Whichever.

20    A.    That I was going to elect for the benefits,

21  and that in so doing, that would lead to my employment

22  terminating.

23    Q.    And if you did not have those benefits, would

24  you have stayed on?

ALAN BROWN
4-24-06

Page 167

1      A.    I certainly would have stayed on for a period

2   of time, yes.

3      Q.    And therefore, you wrote a letter to Ron

4   Logue?

5      A.    I did.

6      Q.    Now, you knew that Ron's opinion about

7   whatever arrangement you had was that you had to be

8   fired in order to get it, is that correct?

9      A.    That's what he had said, yes.

10     Q.    That's what he had said and yet you wrote a

11   letter to him, telling him that you were going to

12   leave, is that correct?

13     A.    I told him that I was going to elect for the

14   VSP.

15     Q.    Right, but you knew he already disagreed with

16   your ability to elect for the VSP?

17     A.    And he knew that I disagreed with him.

18     Q.    So what was the fundamental purpose of this

19   letter?  Was it to make a record so that you could

20   resign and have at least formally elected?

21     A.    The purpose of the letter was to gain the

22   benefits that I felt I was entitled to under my

23   agreement with David Spina and to accept as part of

24   that my employment with SSgA would come to an end.

ALAN BROWN
4-24-06

Page 177

1    fact that I would be consulting with my lawyers.

2    References some other housekeeping items, such as, you

3    know, what's going to be said to staff and clients

4    about my unexpected absence.  And also asks whether he

5    was planning to send the EVSP package to my lawyer for

6    his review.

7        Q.    Okay.  And then what happened?

8        A.    If memory serves me right, we had a

9    conversation over the weekend.

10       Q.    With whom?

11       A.    Mitch.

12       Q.    And what was said?

13       A.    I don't recall the detail of it.

14       Q.    You don't recall?

15       A.    It's in the notes.  When things are written

16   down, I don't try to second guess them in my head.

17       Q.    So you as we sit here today, you can't recall

18   what was said at that meeting?

19       A.    I can recall perfectly well if I see the

20   notes, but without it, I don't want to make inadvertent

21   errors.

22       Q.    You have no recollection of the conversation

23   of that meeting absent the notes, is that what you're

24   saying?

ALAN BROWN
4-24-06

Page 178

1     A.    My belief is that the conversation dealt

2   principally with housekeeping matters and it was not

3   until the end of the following week when I received a

4   further e-mail that we moved to the substance of SSgA's

5   position in relation to what I was claiming.

6                      (Brown Exhibit No. 24 marked

7                      for identification.)

8     Q.    I show you Exhibit 24.

9                      (Document handed to the witness.)

10    Q.    Do you recognize this document?

11    A.    Yes, I do.

12    Q.    What is this?

13    A.    It's an e-mail from Bill Hunt to me under the

14   subject of Follow-Up and was sent the 17th of March at

15   11:36 U.K. time.

16    Q.    And in substance what does this say?

17    A.    It says that March the 18th, Friday would be

18   taken by State Street as the date on which they would

19   regard my voluntary resignation to take effect.   Then

20   deals with certain housekeeping matters in relation to

21   State Street property and then it talks about paying me

22   60 days pay in lieu of notice under something called a

23   salary continuation.

24                      And then finally, it goes on to deny the

# Plaintiff's exhibit 2
# Louis deOcejo deposition

Louis de Ocejo
5/23/2006

1

1    [ORIGINAL logo]            Volume:
                               Pages:   1 - 102
2                            Exhibits:   1 -   7

3        UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
4

5    ALAN BROWN,

6                    Plaintiff
                                   C.A.
7    Vs.                        No. 05-11178-NG

8

     STATE STREET CORPORATION and
9    STATE STREET GLOBAL ADVISORS,

10                   Defendants

11

12        Deposition of LOUIS de OCEJO, a witness

13   called on behalf of the Plaintiff, pursuant

14   to the Federal Rules of Civil Procedure,

15   before Rosamond K. Marcy, a Certified

16   Shorthand/Registered Professional Reporter

17   and Notary Public in and for the Commonwealth

18   of Massachusetts, at the Offices of Rodgers,

19   Powers & Schwartz, LLP, 18 Tremont Street,

20   Boston, Massachusetts 02108, commencing at

21   10 A.M. on Tuesday, May 23, 2006.

22

23

24

Louis de Ocejo
5/23/2006

6

1    A.    The goal was simply reduction in cost,

2          reducing the number of employees and

3          therefore the cost which employees

4          represented the majority of the

5          operating cost of the business.

6    Q.    I understand there was a VSP and there

7          was a subset under that called the EVSP.

8    A.    Yes.

9    Q.    What was the EVSP?

10   A.    That was pretty much a mirror of the VSP

11         program.  It was directed at executive

12         vice presidents.

13   Q.    How were the VSP and the EVSP programs

14         designed?  What was the process in

15         deciding what the parameters should be?

16   A.    The parameters were initially stated as

17         goals in terms of overall reductions in

18         staff and subsequently we worked with

19         our outside consultants and actuaries

20         that we used in developing the program,

21         the people that did all the work for us

22         on pensions in particular to design a

23         program that would provide enhanced

24         benefits and therefore encourage people

Louis de Ocejo
5/23/2006

7

```
 1          to accept.

 2     Q.   Was there a committee formed or some

 3          sort of group put together to design the

 4          VSP?

 5     A.   No.  It was done pretty much in the

 6          normal ordinary course of business,

 7          folks that were primarily involved in

 8          design work and discussion of

 9          preparation for submission to my direct

10          staff.

11     Q.   Who were the managers responsible for

12          designing the VSP?

13     A.   Myself, Boon Ooi, the head of

14          compensation, Datz worked with us as the

15          lawyer.  We kind of got input from

16          various generalists as to the function

17          but the bulk of the work was done by the

18          three of us with our outside

19          consultants.

20     Q.   Did you report to anybody above you in

21          the chain of command about the design of

22          the VSP?

23     A.   Yes.  The normal reporting was expected

24          at State Street.  I reported to the vice
```

Louis de Ocejo
5/23/2006

8

| | | |
|---|---|---|
| 1 | | chairman. |
| 2 | Q. | Who was that? |
| 3 | A. | John Powers, so I obviously discussed it |
| 4 | | with him.  Also David Spina and Ron |
| 5 | | Logue who were the three senior folks. |
| 6 | | Subsequently it was presented to the |
| 7 | | operating group, I think it was called, |
| 8 | | a group of twelve executive vice |
| 9 | | presidents, and the Management Committee |
| 10 | | and subsequently to the Compensation |
| 11 | | Committee and the Board. |
| 12 | Q. | When you say that it was presented to |
| 13 | | the Compensation Committee and the |
| 14 | | Board, was it presented separately to |
| 15 | | the Board of Directors from the |
| 16 | | presentation to the Compensation |
| 17 | | Committee? |
| 18 | A. | No, in the sense that the Compensation |
| 19 | | Committee are members of the Board so |
| 20 | | they were all present so everyone was in |
| 21 | | the room. |
| 22 | Q. | My understanding is that persons |
| 23 | | eligible for the VSP and the EVSP were |
| 24 | | notified around May of 2003 and they had |

1        until sometime in June of 2003.

2   A.   I don't recall the exact date but

3        towards the end of April and so for

4        forty-five days sometime in June.

5   Q.   At any time prior to either the end of

6        April or early May when persons eligible

7        for the VSP were notified of their

8        eligibility at any time prior to that

9        had the parameters of the VSP been

10       presented to the Board or the

11       Compensation Committee?

12  A.   Yes.  The program was laid out and

13       presented to the Board for discussion

14       and approval I believe before the end of

15       May is my recollection and subsequently

16       amendments were made on how to execute

17       the change.

18  Q.   Did the Board actually vote to approve

19       or disapprove the parameters of the VSP?

20  A.   I can't recall the formal votes.  I

21       presented it and I know there was

22       subsequent discussion and I was informed

23       that it was approved.

24  Q.   Did you normally attend Board meetings?

Louis de Ocejo
5/23/2006

11

```
 1              being presented to them and David Spina
 2              subsequently had the discussion with
 3              them since it was a plan.  I wasn't
 4              present for that discussion.
 5      Q.      Who were the State Street employees who
 6              were eligible for the VSP?
 7      A.      U.S. State employees and it was defined
 8              as at least one year of service is my
 9              recollection and as long as they were on
10              the U.S. payroll and covered by U.S.
11              plans they were eligible.
12      Q.      What about ex-Pats?
13      A.      Americans that were out of the state but
14              on the U.S. payroll and covered by the
15              U.S. plans were technically eligible.
16      Q.      What about foreign citizens working in
17              the U.S.?
18      A.      If they were on the U.S. payroll and
19              covered under the U.S. plans they would
20              have been eligible.  If they were
21              British ex-Pats on assignment here for a
22              year they would have not.
23      Q.      Were there a number of employees as to
24              who decisions had to be made as to
```

Louis de Ocejo
5/23/2006

12

1              whether they would be eligible because

2              of their citizenship or residency?

3    A.    I don't recall many of those, if any.

4              It was pretty straightforward as to

5              eligibility.

6    Q.    What do you mean by covered under the

7              U.S. plans?

8    A.    Meaning they were paid out of the U.S.,

9              had U.S. benefits, were eligible under

10             the pension plan, the cash back plan or

11             the health and welfare plan.

12   Q.    What was the SERP?

13   A.    The SERP was the executive retirement

14             plan, a supplemental plan for

15             non-qualifieds.

16   Q.    Was that a U.S. plan?

17   A.    Yes.

18   Q.    Was Alan Brown covered by the SERP?

19   A.    I think Alan was eligible at the time,

20             is my recollection.

21   Q.    Do you know one way or the other?

22   A.    I don't.  I don't believe he was covered

23             by the SERP.  He had his own

24             arrangements.

15

```
 1              says, "All exceptions beyond sixty days

 2              must be submitted in writing and

 3              approved by the Strategy Steering

 4              Committee," and it names individuals.

 5              What was the Strategy Steering

 6              Committee?

 7    A.        That was that operating group that I

 8              referred to earlier.  It was a senior

 9              management group, operating management

10              committee is the best way to describe

11              it.

12    Q.        What was their role in the formulation

13              of the VSP?

14    A.        Before it was presented to the Board it

15              was shared with them for understanding

16              and agreement that it was, in fact,

17              going to work and be effective.

18    Q.        Let's take a look at the next bullet

19              point. "There is no cap to the number of

20              employees electing VSP; however, a

21              process will be defined for areas where

22              oversubscription puts the business at

23              risk (staggered release, etcetera)."

24              Was such a process defined?
```

Louis de Ocejo
5/23/2006

23

```
 1    Q.    So every U.S.-based executive vice
 2          president was offered the EVSP?
 3    A.    Yes.
 4    Q.    And including yourself?
 5    A.    Yes.
 6    Q.    And can you tell me on this list in
 7          Exhibit 3 who was not offered the EVSP?
 8    A.    K.K. Tse was not offered the EVSP.  Alan
 9          Brown was not offered it.
10    Q.    Mr. Tse was based where?
11    A.    In Hong Kong.
12    Q.    What were his responsibilities?
13    A.    He was the head of Asia Pacific for
14          investor services.
15    Q.    Did he have any global responsibilities?
16    A.    His region was Asia Pacific and he was a
17          senior officer of the company.  There
18          are a lot of things back here in the
19          U.S. that he had to do with, things
20          related to his region so he would come
21          here and spend a good amount of time
22          every year but his primary duties were
23          covering that region.
24    Q.    Did he supervise any U.S.-based
```

Louis de Ocejo
5/23/2006

24

1           employees?

2    A.    I don't know.

3    Q.    In comparison, were Mr. Brown's

4           responsibilities limited to any

5           geographic area?

6    A.    Not to my recollection.

7    Q.    I'm referring to around this time in

8           February, the early part of 2003.

9    A.    To my recollection Alan's role covered

10          the investment function in SSgA.  Chief

11          investment officer was his title.  He

12          was the head of that function worldwide.

13   Q.    Mr. Brown supervised U.S. employees

14          among others?

15   A.    Functionally, yes, I believe so.

16   Q.    Did he have an office in Boston?

17   A.    At that time I don't know.  He spent

18          time here but I don't know if he had an

19          office.

20   Q.    Do you recall at the time that EVSP was

21          being implemented whether or not there

22          were any discussions about whether

23          Mr. Brown would be included in the EVSP?

24   A.    No.

Louis de Ocejo
5/23/2006

25

```
 1    Q.    Did the topic ever come up about whether
 2          he should be considered eligible for
 3          EVSP?
 4    A.    No, not when it was being implemented at
 5          all.
 6    Q.    I take it you have come to learn that
 7          Mr. Spina and Mr. Brown had some
 8          conversations about whether or not some
 9          benefit would be offered to Mr. Brown.
10    A.    I did later that summer and I learned
11          that from Tim Harbert.
12                    [Short recess.]
13    Q.    We were talking about you becoming aware
14          of a conversation with Mr. Spina and
15          Mr. Brown and Mr. Harbert concerning
16          extension of certain benefits.
17                    MR. CALAMARI:  Objection to
18          the form.
19    Q.    How did you become aware of it?
20    A.    Tim was the one that raised it with me
21          and made a reference that Alan had had a
22          conversation with David during the VSP
23          about the fact that they were not going
24          to leave but wouldn't it be wonderful if
```

Louis de Ocejo
5/23/2006

32

1          got the letter that he is referring to

2          that he sent to Bob Weissman and I

3          looked it over and after that my

4          recollection is that I spoke to Ron

5          Logue first, I can't remember exactly

6          when, and subsequently spoke to Bob

7          Weissman, the Chairman of the Committee.

8    Q.    Did you speak with Mr. Spina about this?

9    A.    No.

10   Q.    Have you ever spoken with Mr. Spina

11         about this topic?

12   A.    No.

13   Q.    Have you spoken to Mr. Spina since he

14         left State Street?

15   A.    Except seeing him in the hallway a

16         couple of times to say hello that's it.

17   Q.    You spoke with Mr. Logue.

18   A.    That's my recollection.

19   Q.    Tell me about that conversation.

20   A.    As you can see Ron wasn't copied on this

21         letter so I told him that I had received

22         this note from David and another letter

23         that he had written to Bob Weissman that

24         I would then share with him since he had

Louise Decicco
5/23/2006

39

| | | |
|---|---|---|
| 1 | A. | In August. I'm pretty sure about that |
| 2 | | one because it was just before he passed |
| 3 | | away. |
| 4 | Q. | Tell me about that discussion with Tim |
| 5 | | in August of 2004. |
| 6 | A. | It was brief on this topic. |
| 7 | Q. | How did the topic come up? |
| 8 | A. | I think he raised it by saying, "I |
| 9 | | understand that Alan raised this issue |
| 10 | | with David and wrote letters to that |
| 11 | | effect," and I said, "Yes, he did, but |
| 12 | | my view is that David did not possess |
| 13 | | the authority to grant this and in the |
| 14 | | mood of the Board and particularly the |
| 15 | | Compensation Committee that it was very |
| 16 | | unlikely that anybody would ever agree |
| 17 | | to such terms." |
| 18 | Q. | What was Tim's reaction to that? |
| 19 | A. | He was very much of the same view that |
| 20 | | anybody would ever agree to those terms. |
| 21 | Q. | Let's go back to the conversation you |
| 22 | | had with Alan Brown about his |
| 23 | | conversation with Mr. Spina. When was |
| 24 | | the conversation with Alan? |

Louis de Ocejo
5/23/2006

40

```
 1                    MR. CALAMARI:  Objection.
 2    A.    He and I spoke either at the end of
 3          September or sometime in October of '04
 4          and the discussion was very limited in
 5          this respect that it was mostly about
 6          the question of the job search to
 7          replace Tim and whether Alan was going
 8          to be a candidate so that was the bulk
 9          of the discussion, but I recall Alan
10          making a comment about, "I had a
11          discussion with David and certain
12          arrangements about the VSP," and I said,
13          "Alan, it will never see the light of
14          day.  The Committee will never agree to
15          something like this and I know they have
16          looked at it and this letter that David
17          wrote and nothing is going to happen."
18    Q.    You told Alan that the Executive
19          Compensation Committee had looked at it?
20    A.    My recollection is that that's what I
21          shared with him, that it has been
22          reviewed and they are never going to
23          approve something like this.  Alan's
24          view at that point in time was very
```

Louis de Ocejo
5/23/2006

47

1          him what he asked me for was my

2          perspective and I shared that with him.

3     Q.   What did you tell him?

4     A.   I told him that as far as I was

5          concerned it was something that David in

6          no way, shape or form was authorized to

7          approve and agree to on behalf of the

8          company because it's a level of the

9          individuals that were involved and there

10         was no compelling business reason to do

11         this and that has always been the

12         rationale and that's what I shared with

13         him.

14    Q.   What did he say?

15    A.   He said, "Fine. Thank you for your

16         input. We will discuss this at an

17         upcoming meeting. What I want you to do

18         is to also make certain assumptions

19         about, "Okay if you're going to quantify

20         what this is about what does it mean,"

21         and that's what I did myself and my

22         staff to figure out what does that mean,

23         how many weeks of severance can a person

24         get if that were to happen.

Louis de Ocejo
5/23/2006

48

```
 1    Q.    Where Mr. Spina says, "I made a

 2          commitment to Mr. Brown," your

 3          conclusion was that Mr. Spina lacked

 4          authority to make that commitment, is

 5          that correct?

 6                    MR. CALAMARI:   Objection to

 7          form.

 8    A.    That's my perspective but I don't know

 9          what was going on in David's head at

10          that time.

11    Q.    Do you know of any other time when

12          Mr. Spina while he was at State Street

13          acted without authority?

14    A.    Not that I am aware of.  I am not aware

15          of other circumstances that I recall.

16    Q.    In your dealings with Mr. Spina was

17          there any time when you questioned his

18          authority to take an action that he

19          took?

20    A.    Yes, we did have discussions about

21          topics should we do this, not do that,

22          and what is the normal process for

23          making such a decision, but not in terms

24          of abrupt arguments or authority, no.
```

Louis de Ocejo
5/23/2006

59

```
 1    A.    This was our interpretation of what was
 2          being conveyed in that letter from David
 3          Spina to Bob Weissman.
 4    Q.    So where Mr. Spina in his letter refers
 5          to a commitment that he made and then he
 6          describes it, Paragraph a) is your
 7          understanding of what that comment was?
 8                    MR. CALAMARI:  I'm not going
 9          to object to form anymore but I just
10          want to confirm we have a standing
11          objection on that one issue.
12    A.    Again our best interpretation of what
13          the terms were that were being conveyed
14          by David in his letter in terms of the
15          specifics.
16    Q.    Are contained in Paragraph a).
17    A.    That was our interpretation.
18    Q.    Paragraph b), current age, 51, that
19          meant Mr. Brown's age?
20    A.    Yes.
21    Q.    Paragraph c) is headed Interpretation.
22          Whose interpretation is that?
23    A.    Again mine and Boon's.
24    Q.    What were you intending to do by this
```

Louis de Ocejo
5/23/2006

61

```
 1        interest.

 2   Q.   Did you believe that based on

 3        Mr. Spina's letter that there was any

 4        discussion between Mr. Spina and

 5        Mr. Brown about these terms would be

 6        provided only if he is terminated

 7        without cause?

 8   A.   Like I said, it was my interpretation.

 9        I have no idea if that was, in fact,

10        discussed that way.

11   Q.   Let's take a look at Mr. Spina's letter

12        and Mr. Brown's e-mail, Exhibit 4.

13                  Mr. Brown's e-mail and

14        Mr. Spina's letter both refer to the

15        terms of what they believe was an

16        agreement, correct?

17                  MR. CALAMARI:  Objection to

18        form.

19   A.   I don't know what to say.  There's a

20        version that was Alan's and then

21        David's.

22   Q.   Did you have any other source of

23        information besides those two documents

24        as to what the discussion was between
```

Louis de Ocejo
5/23/2006

73

```
 1              they were looking for information on the

 2              subject and that was it.  Not much

 3              beyond that.

 4    Q.  Did you tell Mr. Logue that you didn't

 5              think Mr. Spina had the authority to

 6              make that commitment?

 7    A.  Yes, I did.  I had said that to him

 8              prior to the meeting.

 9    Q.  What was his response when you said

10              that?

11    A.  Ron's view was fairly consistent with

12              mine that obviously no one could take

13              action such as this without the approval

14              of the Compensation Committee.

15    Q.  Did either you or Mr. Logue suggest that

16              somebody should speak with Alan Brown

17              about this?

18    A.  No.

19    Q.  Did you think that Mr. Brown should be

20              told that you were of the opinion that

21              Mr. Spina didn't have the authority to

22              make this commitment?

23    A.  That wasn't my responsibility to go out

24              and discuss with Alan my role.  My
```

Louis de Ocejo
5/23/2006

80

```
 1            September 15, 2004.  What does that

 2            mean?

 3    A.      That's the binder that's prepared for

 4            the Compensation Committee meeting.

 5    Q.      Who prepared that binder?

 6    A.      Boon Ooi and his staff with my review

 7            and approval.

 8    Q.      So this Exhibit 10 then was prepared by

 9            your staff for the Executive

10            Compensation Committee for their

11            September 15 meeting?

12    A.      Right.

13    Q.      Did you review this before it was

14            presented to the Committee members?

15    A.      Yes, I looked it over.

16    Q.      Do you know who wrote it?

17    A.      The actual drafting of the words was

18            probably done by Boon Ooi.

19    Q.      Did you approve it?

20    A.      I passed it on, yes.

21    Q.      Let's go through it.  The first heading

22            says Background.  The first bullet says,

23            "Certain verbal commitments were made

24            to Alan Brown during EVSP period."  Did
```

Louis de Ocejo
5/23/2006

97

1    A.    Not that I recall.  I remember talking

2          to him subsequently about the job search

3          because he kept asking but I don't

4          recall VSP discussion.

5    Q.    In that conversation with Alan you

6          didn't specifically tell him David Spina

7          didn't have authority to make that

8          commitment, did you?

9    A.    I don't recall specifically but I said

10         that I didn't think it was ever going to

11         see the light of day or something to

12         that effect because the Committee would

13         never approve something like that.

14   Q.    Do you know if anybody else from State

15         Street ever told Alan Brown that

16         Mr. Spina didn't have the authority to

17         make the commitment that he made?

18   A.    I have no idea.

19   Q.    Do you know if anybody else from State

20         Street told Alan Brown that the

21         Compensation Committee had reviewed

22         Mr. Spina's commitment and had rejected

23         it?

24   A.    I don't know.

Louis de Ocejo
5/23/2006

98

1    Q.    You don't know of anybody telling that

2          to Mr. Brown?

3    A.    No.

4    Q.    In March of 2005 did you see the letter

5          that Mr. Brown sent to Mr. Logue

6          asserting his rights under the VSP?

7    A.    I have to see the document.

8                        [Witness examining

9          document.]

10   A.    Yes, I did see this letter.

11                       [E-mail and letter marked

12                       de Ocejo Exhibit No. 13 for

13                       Identification.]

14   Q.    Exhibit 13 is SSC 02123 and 24.  What

15         did you do after you received this

16         letter?

17   A.    My recollection is I wrote him back a

18         note saying, "I won't be dealing with

19         this subject because I am leaving, I am

20         retiring."  I think I may have shared

21         with him my contact information but that

22         was it.

23                       [E-mail from Louis de Ocejo

24                       to Alan Brown dated

Plaintiff's exhibit 3
Ronald Logue deposition

Ronald E. Logue
May 8, 2006

1

| | 1 |
|---|---|
| 1 | 𝒟 **ORIGINAL** |
| 2 | Volume:<br>  Pages:   1 - 99<br>Exhibits:   1 - 13 |

3      UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS
4

5   ALAN BROWN,

6                   Plaintiff
                                         C.A.
7   Vs.                               No. 05-11178-NG

8

9   STATE STREET CORPORATION and
    STATE STREET GLOBAL ADVISORS,

10                  Defendants

11

12       Deposition of RONALD E. LOGUE, a witness

13   called on behalf of the Plaintiff, pursuant

14   to the Federal Rules of Civil Procedure,

15   before Rosamond K. Marcy, a Certified

16   Shorthand/Registered Professional Reporter

17   and Notary Public in and for the Commonwealth

18   of Massachusetts, at the Offices of Rodgers,

19   Powers & Schwartz, LLP, 18 Tremont Street,

20   Boston, Massachusetts 02108, commencing at

21   10 A.M. on Monday, May 8, 2006.

22

23

24

8

```
 1           just an issue that needed to be taken up

 2           by the Compensation Committee.

 3    Q.     Was it ever presented to the

 4           Compensation Committee?

 5    A.     It was, yes.

 6    Q.     When was that?

 7    A.     I believe that was September of '05.

 8    Q.     What action did the Compensation

 9           Committee take?

10    A.     It was discussed and there were no votes

11           taken and the Compensation Committee

12           after discussion I think their

13           interpretation of it was that if State

14           Street had terminated Mr. Brown without

15           cause there would be some compensation

16           that would be due that would be similar

17           to VSP, but just discussion and I think

18           it may have been minuted.

19    Q.     Have you seen those minutes?

20    A.     Yes.

21    Q.     When did you see them?

22    A.     Just the other day.

23    Q.     Just so I am clear on this your position

24           is that Executive Compensation Committee
```

Ronald E. Logue
May 8, 2006

14

```
 1          be a U.S. employee that was limited to
 2          U.S. citizens?
 3    A.    That's my assumption.  I didn't have any
 4          knowledge.  I didn't know what the
 5          criteria was in determining U.S. versus
 6          non-U.S.  I'm just making an assumption
 7          that it had to do with passports.
 8    Q.    Do you know who made the decision that
 9          the EVSP program would be limited to
10          U.S. employees?
11    A.    I do not.
12    Q.    Was that a decision made by the
13          Compensation Committee?
14    A.    Not to my knowledge, no.
15    Q.    That would have been a decision made at
16          some executive level in the bank?
17    A.    I'm making an assumption it would be
18          made within the HR Department.
19    Q.    As of May or June of 2003 would David
20          Spina have had the authority to make a
21          decision as to whether a particular
22          individual was to be considered a U.S.
23          or non-U.S. employee?
24    A.    I don't know.
```

Ronald E. Logue
May 8, 2006

15

1   Q.   Can you think of any reason why he would

2        not have that authority?

3   A.   I just don't know.

4   Q.   Is there any reason why he would not be

5        able to make that decision?

6   A.   Again I wasn't part of that discussion

7        so I don't know what took place.

8   Q.   You would agree that in some situations

9        somebody would have had to make a

10       decision as to whether individuals would

11       be considered U.S. or non-U.S.

12       employees, correct?

13  A.   Unless there was just an assumption made

14       on some criteria but I don't know.  Just

15       like I made an assumption but I don't

16       know.

17  Q.   Assuming that somebody would have to

18       make that decision as to who would be

19       considered a U.S. employee and who would

20       not be considered to be a U.S. employee

21       whoever that person was ultimately would

22       be reporting to Mr. Spina, correct?

23  A.   I would think so, yes.

24  Q.   And do you agree that if a lower-level

Ronald E. Logue
May 8, 2006

16

```
 1          person had the authority to make that
 2          decision that Mr. Spina would also have
 3          the authority to override that decision?
 4   A.     Yes, I would think so.
 5   Q.     At least in 2003 you would agree
 6          Mr. Spina had the authority to determine
 7          whether or not a particular employee
 8          would be considered a U.S. employee or
 9          not a U.S. employee.
10                    MR. CALAMARI:  I object to
11          the form.
12   A.     Again I don't know whether he had to go
13          somewhere else to get that approval or
14          not.
15   Q.     Where else could he conceivably go to
16          get that approval?
17   A.     To the Board.  I don't know what
18          happened during that process, whether he
19          did or he didn't.
20   Q.     What's your understanding as to what
21          Mr. Brown's position was in 2003?
22   A.     I think he was the CIO, Chief Investment
23          Officer of State Street Global Advisors.
24   Q.     In that position were his
```

Ronald E. Logue
May 8, 2006

33

```
 1              ludicrous, of course not," or something
 2              to that effect.  I said, "What does Alan
 3              Brown think, does he think the same
 4              thing?"  Tim said, "I'm not sure but I
 5              do know that Alan sent David a letter to
 6              seek clarification and I will send you a
 7              copy."
 8     Q.       Mr. Harbert confirmed to you that he and
 9              Mr. Brown and Mr. Spina had had a
10              conversation about extending some sort
11              of EVSP benefits to Mr. Harbert and
12              Mr. Brown.
13                        MR. CALAMARI:  I object to
14              the form.
15     A.       What he said is that there was a
16              discussion about some form of extension
17              of the VSP benefits given some
18              circumstances.
19     Q.       Did he say whether or not any agreements
20              had been reached?
21     A.       Not to my knowledge, no.
22     Q.       Do you remember speaking with Mr. Spina
23              about this topic?
24     A.       No.
```

Ronald E. Logue
May 8, 2006

34

```
 1    Q.   How come?

 2    A.   I didn't know about it and he left.

 3    Q.   After he left did you speak with him

 4         from time to time?

 5    A.   No.

 6    Q.   You haven't spoken with David Spina

 7         about State Street matters since he

 8         left?

 9    A.   No.

10    Q.   Is there some reason why when the matter

11         concerning Alan Brown came up you chose

12         not to speak with Mr. Spina about it?

13    A.   No, there's no reason.

14    Q.   Are you aware of whether or not anybody

15         else from State Street has spoken with

16         Mr. Spina about this EVSP or VSP matter

17         concerning Alan Brown since Mr. Spina

18         left the bank?

19    A.   Other than if he has been spoken about

20         in this matter, that's the only other

21         time I can think about.  I don't know of

22         any other time.

23    Q.   At or around the time in March of 2005

24         when Mr. Brown said words to the effect
```

Ronald E. Logue
May 8, 2006

35

```
 1          of, "I think I'm entitled to something,"

 2          are you aware of anybody from State

 3          Street contacting Mr. Spina to get his

 4          version of it?

 5   A.     No.

 6   Q.     When Mr. Harbert forwarded this e-mail

 7          to you in August of 2004 I take it you

 8          read the e-mail at the time.

 9   A.     I did.

10   Q.     Is there anything in this e-mail that

11          says words to the effect of, "I'm

12          entitled to these benefits if State

13          Street terminates my employment other

14          than for cause"?

15   A.     I have to look at it again.

16                        [Witness examining

17          document.]

18                        I guess there's something in

19          the first paragraph that suggests that

20          he was reassured that if he remained at

21          SSgA he would be entitled to a severance

22          package similar to the VSP provided he

23          left without cause.

24   Q.     Does that mean to you that he would only
```

Ronald E. Logue
May 8, 2006

36

| | | |
|---|---|---|
| 1 | | be entitled to something similar to the |
| 2 | | VSP package if State Street terminated |
| 3 | | the relationship rather than if he chose |
| 4 | | to end the relationship? |
| 5 | A. | I couldn't tell from that.  All I can |
| 6 | | tell from that is that this would be his |
| 7 | | impression of the agreement. |
| 8 | Q. | Did you ever speak with Lou de Ocejo |
| 9 | | about this VSP matter concerning Alan |
| 10 | | Brown? |
| 11 | A. | I may have when Weissman told me about |
| 12 | | it but I can't recall when. |
| 13 | Q. | Do you recall anything that you said or |
| 14 | | he said? |
| 15 | A. | No. |
| 16 | Q. | Do you recall saying anything to the |
| 17 | | effect of, "Alan doesn't have any such |
| 18 | | agreement"? |
| 19 | A. | I don't recall. |
| 20 | Q. | Do you recall anybody at State Street |
| 21 | | ever telling you that Mr. Brown had no |
| 22 | | right to any sort of VSP benefits under |
| 23 | | any circumstances? |
| 24 | A. | No. |

Ronald E. Logue
May 8, 2006

39

1        action that has been taken but they are

2        not asked to vote one way or the other.

3        Does that happen from time to time?

4                MR. CALAMARI:  Objection as

5        to form.

6    A.  Compensation actions that are presented

7        to the Committee in my experience are

8        always voted on because they are

9        compensation issues.

10   Q.  In Exhibit 4 where Mr. Spina says, "I

11       will discuss with the Executive

12       Compensation Committee so I will get it

13       on the record," do you have any

14       understanding what he means by getting

15       it on the record?

16   A.  No, I do not.  My experience with the

17       Compensation Committee is when

18       compensation matters are brought to the

19       Committee they are voted on.

20   Q.  Compensation matters?

21   A.  I haven't been to too many.  This is

22       recently as a CEO.

23   Q.  I don't want to start going through

24       minutes after minutes, but is it your

```
 1            something like that.
 2    Q.      Was he upset about what he had been
 3            told?
 4    A.      I think he was just upset generally
 5            about everything that was going on at
 6            that point in time so I couldn't tell
 7            whether he was upset specifically about
 8            this.
 9    Q.      How long have you worked with David
10            Spina?
11    A.      I never really worked for David Spina
12            until the latter part.  I worked for him
13            for, I think, four years right after.
14            It was probably 2000-2004.
15    Q.      Were you aware of any time when he acted
16            beyond his authority or without
17            authority?
18    A.      Not that I would be able to tell.
19    Q.      Did you ever hear any discussions or
20            comments about Mr. Spina exceeding his
21            authority?
22    A.      No.
23    Q.      Did he seem to be the kind of person who
24            would act beyond his authority?
```

Ronald E. Logue
May 8, 2006

45

```
 1        that?
 2   A.   There's a charter.  Every board
 3        committee has a charter so it should be
 4        outlined in the charter.
 5   Q.   Do you think Mr. Spina would have been
 6        aware of that charter?
 7   A.   Yes.
 8   Q.   Do you have any understanding as to why
 9        Mr. Spina would have exceeded his
10        authority here?
11   A.   No, I really don't.
12   Q.   How would Mr. Brown know whether or not
13        Mr. Spina had authority to make this
14        commitment?
15   A.   The only way he would know is if he knew
16        of the charter of the committee and
17        whether he understood it, but I don't
18        know.
19   Q.   Do you think it would be reasonable, at
20        least from Mr. Brown's viewpoint in his
21        dealings with the Chairman and CEO of
22        State Street Corporation to have relied
23        on a commitment that the Chairman made
24        with him?
```

Ronald E. Logue
May 8, 2006

46

```
 1    A.   It would seem reasonable to me.

 2    Q.   I take it from time to time you make

 3         commitments on behalf of the bank.

 4    A.   Sure.

 5    Q.   And do you expect people to rely on the

 6         commitments that you make?

 7    A.   Yes.

 8    Q.   And as far as you know there's no reason

 9         why Mr. Brown should not have relied on

10         David Spina when David Spina made this

11         commitment, is there?

12    A.   I see no reason.

13    Q.   If Mr. Spina made a commitment like this

14         do you think it would have appeared to

15         Mr. Brown that Mr. Spina had the

16         authority to make that commitment?

17    A.   I would assume so.

18    Q.   In Exhibit 5 in Mr. Spina's letter to

19         Mr. Weissman is there any mention of

20         this commitment only coming into effect

21         if Mr. Brown is terminated without

22         cause?

23                   [Witness examining

24         document.]
```

Ronald E. Logue
May 8, 2006

50

| 1 | Q. | Are you aware of anybody from State |
| 2 | | Street ever telling Mr. Brown that |
| 3 | | Mr. Spina did not have the authority to |
| 4 | | make this commitment? |
| 5 | A. | No, I'm not aware of anybody telling |
| 6 | | him. |
| 7 | Q. | Do you think in all fairness to |
| 8 | | Mr. Brown he should have been told that? |
| 9 | A. | I would think so, yes. |
| 10 | Q. | Mr. De Ocejo, what was his title? |
| 11 | A. | He was head of Human Resources. |
| 12 | Q. | There was a time in 2004 when he was |
| 13 | | aware of the commitment that Mr. Spina |
| 14 | | had made, correct? |
| 15 | | MR. CALAMARI: Objection to |
| 16 | | form. |
| 17 | A. | Yes. |
| 18 | Q. | Did you ever speak with Mr. De Ocejo |
| 19 | | about this commitment? |
| 20 | A. | Just that I knew there was a letter that |
| 21 | | existed. |
| 22 | Q. | Did you ever tell him David didn't have |
| 23 | | that authority? |
| 24 | A. | I never told him that, no. |

Ronald E. Logue
May 8, 2006

52

```
 1    A.    I can't remember discussing this with
 2          Boon Ooi.
 3    Q.    Did you ever tell Mr. Weissman, "We
 4          ought to let Alan know that David didn't
 5          have authority to make this commitment"?
 6    A.    No, I don't think I did.
 7    Q.    You never told Mr. de Ocejo that
 8          somebody should tell Alan that Mr. Spina
 9          didn't have authority to make this
10          commitment?
11    A.    No, I don't think I did.
12    Q.    As far as you know nobody from State
13          Street ever told Mr. Brown that
14          Mr. Spina lacked authority to make this
15          commitment.
16    A.    That's my understanding.
17    Q.    The commitment that Mr. Spina made,
18          whatever the terms were, was that State
19          Street would provide some sort of
20          benefit to Mr. Brown.
21                      MR. CALAMARI:  Objection as
22          to form.
23    A.    Please repeat that.
24    Q.    Mr. Spina says that he made a commitment
```

Ronald E. Logue
May 8, 2006

53

```
 1            to Mr. Brown, correct?
 2   A.    In this letter he does, yes.
 3   Q.    And the commitment was that some sort of
 4         benefit similar to the VSP would be made
 5         to Mr. Brown.
 6   A.    That's what Mr. Spina states in the
 7         letter.
 8   Q.    And in return for that Mr. Brown had to
 9         do something, correct?
10   A.    I believe the letter states that
11         Mr. Brown had to remain as an active
12         leader of SSgA.
13   Q.    And Mr. Brown did remain as an active
14         leader at SSgA up until March of 2005,
15         is that correct?
16   A.    Yes, he did.
17   Q.    Do you believe Mr. Brown complied with
18         his commitment to State Street as
19         Mr. Spina set forth?
20   A.    I believe he continued to perform as a
21         leader of State Street.  I don't know
22         whether it was considered an additional
23         commitment or something.
24   Q.    At least from May of 2003 to March of
```

Thomas E. Logue

May 8, 2006

57

1    A.    He says that he reported to the

2          Committee based on oral commitments that

3          he made, yes.

4    Q.    In your experience would a report such

5          as Mr. Spina refers to in his letter to

6          Mr. Weissman be reflected in the

7          minutes?

8    A.    Maybe, maybe not.  I couldn't tell you

9          for sure.

10   Q.    Do you have any understanding of why it

11         would not be reflected in the minutes?

12   A.    No.  I just don't know.

13   Q.    Would all matters that call for a vote

14         by the Committee be reflected in the

15         minutes?

16   A.    Yes.

17   Q.    But some matters that were simply a

18         report not requiring a vote would from

19         time to time not be reflected in the

20         minutes?

21   A.    That's possible.

22                              *  *  *

23                              *  *  *

24                              *  *  *

Ronald E. Logue
May 8, 2006

72

1          I have to go by the minutes here.

2          There was no vote for Alan Brown.  I'm

3          sure the terms and conditions of the

4          agreement were discussed by the

5          Compensation Committee.

6     Q.   Do you recall what the discussion was?

7     A.   No.

8     Q.   Do you recall what anybody said?

9     A.   I'm sure it had to do with the

10         conditions of the agreements that were

11         here.  I can't recall exactly what was

12         said.

13    Q.   From my memory you said that at the

14         September meeting the Board had agreed

15         that Mr. Brown would be eligible for

16         whatever the benefits were only if he

17         were terminated without cause.

18    A.   I don't know if I said that but as I

19         look at the minutes I'm sure that

20         discussion was had and it was determined

21         that not only by cause, if he was

22         terminated he would be eligible for

23         benefits if State Street had terminated

24         him without cause.

Ronald E. Logue
May 8, 2006

75

1    A.    It all depends on when he asked me.

2    Q.    If Mr. Brown had asked you the day after

3          the September 15 meeting what would you

4          have told him?

5    A.    I would have told him that the

6          discussion was that he would only be

7          eligible for benefits if, in fact, we

8          terminated him without cause.

9    Q.    Was this a unanimous decision?

10   A.    I don't know.

11   Q.    To the best of your knowledge was this

12         decision by the Compensation Committee

13         that Mr. Brown would only be eligible

14         for benefits if he were terminated

15         without cause, was that decision ever

16         communicated to Mr. Brown?

17   A.    I did not communicate it to Mr. Brown,

18         no.

19   Q.    Are you aware of anybody ever telling

20         Mr. Brown that?

21   A.    No.  Again I was going on the

22         conversation I had with Tim Harbert.

23                  [Discussion off the record.]

24   Q.    Do you recall meeting with Mr. Brown in

Ronald E. Logue
May 8, 2006

76

```
 1          early January of 2005?
 2    A.    Yes.
 3    Q.    Did you make any notes of that meeting?
 4    A.    No.
 5    Q.    Do you recall any discussion about the
 6          VSP or EVSP at that meeting?
 7    A.    I think that's probably when Alan first
 8          said to me that he believed he had some
 9          form of VSP.
10    Q.    What did you reply?
11    A.    I said, "I am aware that you had
12          discussions.  Tim had told me that his
13          interpretation was that if we were to
14          terminate either of you without cause
15          that there was some discussion that you
16          had with David Spina."
17    Q.    What did Mr. Brown say?
18    A.    He said, "I think I have the right to
19          accept the VSP."  I forget over what
20          period of time.  I don't remember at the
21          time.  He then said, "I hope it doesn't
22          come to that."
23    Q.    So at least as of early January of 2005
24          you were aware that you and Mr. Brown
```

Ronald E. Logue
May 8, 2006

77

| | | |
|---|---|---|
| 1 | | had a different understanding as to what |
| 2 | | his entitlement was. |
| 3 | A. | Correct. |
| 4 | Q. | Did you do anything to follow up on |
| 5 | | that? |
| 6 | A. | I did not. |
| 7 | Q. | How come? |
| 8 | A. | At the time we were in the middle of |
| 9 | | interviewing, I'm sure you know, a |
| 10 | | number of candidates for the job |
| 11 | | including Mr. Brown and I made no |
| 12 | | decision at that time as to what I was |
| 13 | | going to do. |
| 14 | Q. | As part of your decision-making process |
| 15 | | would you have wanted to know whether or |
| 16 | | not Mr. Brown had this entitlement? |
| 17 | A. | This was after the Compensation |
| 18 | | Committee had met so I'm pretty sure he |
| 19 | | did not have that entitlement. |
| 20 | Q. | Let's run through that again.  You were |
| 21 | | pretty sure Mr. Brown didn't have the |
| 22 | | option to elect to receive these |
| 23 | | benefits. |
| 24 | A. | Correct. |

Ronald E. Logue
May 8, 2006

81

| | | |
|---|---|---|
| 1 | A. | Again I don't recall. |
| 2 | Q. | So the last that Mr. Brown was aware of |
| 3 | | the Compensation Committee taking any |
| 4 | | action or being aware of this issue was |
| 5 | | Mr. Spina's e-mail to Mr. Brown saying, |
| 6 | | "I'll report this to the Compensation |
| 7 | | Committee's meeting tomorrow." |
| 8 | | MR. CALAMARI:  Objection as |
| 9 | | to form. |
| 10 | | MR. SCHWARTZ:  I can show |
| 11 | | you the e-mail again. |
| 12 | | MR. CALAMARI:  The objection |
| 13 | | is how can he tell what the Compensation |
| 14 | | Committee is aware of or what Mr. Brown |
| 15 | | is aware of? |
| 16 | | MR. SCHWARTZ:  I'll rephrase |
| 17 | | it. |
| 18 | Q. | Exhibit 4 is the e-mail from Mr. Spina |
| 19 | | to Mr. Brown in which he says, "I will |
| 20 | | take this up with the Compensation |
| 21 | | Committee tomorrow." |
| 22 | A. | Yes. |
| 23 | Q. | Are you aware of any communication from |
| 24 | | anybody at State Street to Mr. Brown |

Ronald E. Logue
May 8, 2006

82

1          after that e-mail in which Mr. Brown was

2          informed that the Compensation Committee

3          had considered or taken any action on

4          this issue?

5    A.    Again I don't know other than me telling

6          Mr. Brown my interpretation, and I can't

7          recall whether I told him it was a

8          discussion at the Executive Compensation

9          Committee nor did he ask me. I don't

10         recall that either.

11   Q.    You don't recall telling Mr. Brown that

12         the Compensation Committee had

13         considered this.

14   A.    I don't recall that discussion nor do I

15         recall him asking me.

16   Q.    You told us earlier that there was no

17         need for the Compensation Committee to

18         vote concerning Mr. Brown because no

19         action was necessary.

20               MR. CALAMARI:  I will object

21         to the form.

22   A.    Again if there was a decision that had

23         to be made we would have voted.

24   Q.    Under what circumstances would a

Ronald E. Logue
May 8, 2006

90

| | | |
|---|---|---|
| 1 | Q. | You used this letter, Exhibit 13, as the |
| 2 | | basis for a decision that Mr. Brown's |
| 3 | | employment at State Street was ended, |
| 4 | | correct? |
| 5 | A. | I took this as a resignation letter, |
| 6 | | that's correct. |
| 7 | Q. | And if you had been told that day, the |
| 8 | | day you received this or the next day |
| 9 | | that Mr. Brown's position was, "I'm not |
| 10 | | resigning," would you have still taken |
| 11 | | that as a resignation letter? |
| 12 | A. | It looks like a resignation letter to |
| 13 | | me, yes. |
| 14 | Q. | Doesn't it look like it's a resignation |
| 15 | | in order to exercise his VSP rights? |
| 16 | A. | That's what it says but I believe |
| 17 | | Mr. Brown had no VSP rights. |
| 18 | Q. | Do you believe Mr. Brown would have |
| 19 | | resigned if he was aware that he had no |
| 20 | | VSP rights? |
| 21 | A. | I don't know.  I can't speak for him. |
| 22 | Q. | Do you think somebody from the bank |
| 23 | | should have asked him that? |
| 24 | A. | Again I don't now.  I was just acting on |

Plaintiff's exhibit 4
Nader Dareshori deposition

ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11178-NG

ALAN BROWN,

          Plaintiff

vs.

STATE STREET CORPORATION and
STATE STREET GLOBAL ADVISORS,

          Defendants

      Deposition of NADER DAREHSHORI, a witness called on

behalf of the Plaintiff, pursuant to the Federal Rules of

Civil Procedure, before Virginia Dodge, Registered

Professional Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the offices of RODGERS,

POWERS & SCHWARTZ, 18 Tremont Street, 5th Floor, Boston,

Massachusetts, commencing at 12:54 p.m. on Tuesday,

June 20, 2006.

1  A.    Going forward or up to that period of time?

2  Q.    At any time before or after.

3  A.    On the whole plan, this was the first and the last

4  one, I think.

5  Q.    I understand that after this, there were a number of

6  votes taken in regard to individuals in the VSP or VSPs;

7  is that correct?

8  A.    Right.

9  Q.    Now, in addition to this compensation committee

10  meeting, do you know whether the board of directors as a

11  whole took any votes concerning the VSP?

12  A.    I don't think they took votes.

13  Q.    But was information about the VSP presented to the

14  board?

15  A.    Yes.

16         MR. SCHWARTZ:  Mark this one, please.

17         (Exhibit 2, Minutes of meeting on June 16, 2004,

18         marked for identification.)

19  Q.    (By Mr. Schwartz)  Showing you what we've marked as

20  Exhibit 2, this is SSC 04668 through 671, the minutes of

21  the executive compensation committee of June 16, 2004.

22         Were you at that meeting?

23  A.    Yes, I was.

24  Q.    Now, there has been testimony from other witnesses

1    Q.    You said the discussion between Mr. Spina and

2    Mr. Weissman got heated.  How?

3    A.    Heated in the sense of State Street.

4    Q.    Is it relative?

5    A.    He was just amazed that he would have discussions

6    without authorization from the compensation committee.

7    Q.    And how did Mr. Spina respond?

8    A.    He was very indifferent.  He didn't seem to be too

9    upset about it.

10   Q.    Did Mr. Weissman tell Mr. Spina that Mr. Spina had

11   exceeded his authority?

12          MR. CALAMARI:  Objection to the form.

13   A.    He said he had no authority.  He didn't have

14   authority to have this kind of discussion.

15   Q.    (By Mr. Schwartz)  And did Mr. Spina say that he

16   believed he did have authority to do this?

17   A.    No.

18   Q.    Did Mr. Spina agree that he had no authority to have

19   these discussions?

20   A.    Well, I didn't -- I didn't get that feeling.  He

21   just was indifferent.

22   Q.    Did Mr. Spina name the individuals who he had had

23   the discussions with?

24   A.    Yes.

1    A.     No.

2    Q.     Did anybody -- any member of the committee propose

3    renouncing or rejecting any agreements that Mr. Spina had

4    made with Mr. Brown?

5    A.     No.

6    Q.     Was that the first you had heard of those

7    discussions between Mr. Spina and Mr. Brown?

8    A.     Exactly.

9           MR. SCHWARTZ:  Can we mark this one?

10          (Exhibit 3, Email dated 06/29/2004 02:40 PM,

11          marked for identification.)

12   Q.     (By Mr. Schwartz)  Showing you what we have marked

13   as Exhibit 3, it's SSC 01206.  This is an email from Alan

14   Brown to David Spina forwarded by Mr. Spina to Lou de

15   Ocejo.

16          Have you seen this before?

17   A.     No.

18   Q.     Or any portion of it?

19   A.     No.

20   Q.     If you would, read the lower email, the one that

21   begins with "David."

22   A.     Yes.

23   Q.     Just read that to yourself, please.

24          Is any of the information that is contained in

1   A.    Yeah.  He was -- he had no authority to make that

2   commitment, if it was commitment.

3   Q.    (By Mr. Schwartz)  Did you question whether

4   Mr. Spina actually had made the commitments that he

5   claimed to have made in his letter to Mr. Weissman?

6          MR. CALAMARI:  Objection to the form again.

7   A.    You remember in June meeting, that was the last

8   meeting before the September meeting, he said -- before

9   the letter, he said that it was a discussion.  It wasn't a

10  commitment.  We didn't realize that it was a commitment

11  till July.  I got the letter in July.  David had written

12  it in June.

13  Q.    (By Mr. Schwartz)  Okay.  And by the time you

14  received the letter, Mr. Spina had left State Street?

15  A.    I don't know whether or not -- what date I got it in

16  July.  I'm not sure about that.

17  Q.    And had you known of any other time in his career at

18  State Street when Mr. Spina had acted without authority?

19          MR. CALAMARI:  Object to the form.

20  A.    No.

21  Q.    (By Mr. Schwartz)  Had you heard any discussions

22  from anybody at State Street in which anybody suggested

23  that Mr. Spina had acted beyond his authority at any time?

24  A.    No.

```
 1    marked as Exhibit 7, these are the minutes of the
 2    executive compensation committee for September 15, 2004.
 3    It's SSC 04672 through 76.
 4         Were you at that meeting?
 5    A.   Yes.
 6    Q.   If you turn to the third page, please, and in the
 7    middle of the third page is a paragraph that begins
 8    "Mr. de Ocejo presented and reviewed proposed actions in
 9    order to accommodate verbal commitments made to an
10    executive during the period the Executive Voluntary
11    Separation Program was available."
12         Do you recall that discussion?
13    A.   Yes.
14    Q.   Was that the discussion about what Mr. Spina
15    referred to as verbal commitments that he had made to Alan
16    Brown?
17    A.   Yes.
18    Q.   Tell me what you recall was said in that discussion.
19    A.   Again, committee members expressed his lack of
20    authorization to do that, especially when Mr. Brown was
21    not part of the plan right from beginning.  He was
22    international, and the plan was developed for U.S.
23    executives.
24    Q.   Was there any further discussion --
```

```
 1    A.    No.

 2    Q.    -- besides that?

 3    A.    Discussion was very brief.

 4    Q.    Were any votes taken about --

 5    A.    No.

 6    Q.    -- the matter at all?

 7    A.    No.

 8    Q.    Was any vote taken to renounce any verbal commitment

 9    that Mr. Spina had made?

10          MR. CALAMARI:  Objection to form.

11    A.    It's not the committee's tradition to renounce

12    presentations or recommendations or discussions.  They

13    only vote for what they approved.  So there wasn't.

14    Q.    (By Mr. Schwartz)  Was there any discussion about

15    whether Mr. Brown should be notified that the committee

16    was not going to approve --

17    A.    No.

18    Q.    -- this?

19          Did you believe that Mr. Spina had made the

20    commitments that he said he made in his letter to

21    Mr. Weissman?

22          MR. CALAMARI:  Objection to form.

23    A.    You know, I didn't get the feeling at that meeting

24    that he really had put his soul in and he had made that
```

1    about trying to clear up whether or not there had been a

2    commitment?

3    A.    I think they all felt the way I did, puzzled and

4    convinced that it wasn't.  I don't know.

5    Q.    What makes you think that they were convinced there

6    was no commitment?

7    A.    If I make a commitment, I make it appear a

8    commitment.  I don't go and tell people in their face it

9    was a discussion and then I write a letter and say it was

10   commitment.  When you have to be persuasive, when you are

11   in front of somebody.  I spend most of my time in selling.

12   You don't sell that way.

13   Q.    Why do you believe that a person with Mr. Spina's

14   business experience would say that he made a commitment if

15   he had not made a commitment?

16         MR. CALAMARI:  Objection to form.

17   A.    No idea.  No idea.

18   Q.    (By Mr. Schwartz)  In all of your other dealings

19   with Mr. Spina over the years, had you ever experienced

20   him making a misstatement about a business matter?

21   A.    No.

22   Q.    Do you find him to be an honest person?

23   A.    Yes.  As far as I can tell.

24   Q.    Do you know of any reason why Mr. Spina would write

Plaintiff's exhibit 5
David Spina deposition

1

ORIGINAL

Volume: 1
Pages: 1 to 50
Exhibits: 1 to 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-11178-NG

ALAN BROWN,                        )
                Plaintiff          )
                                   )
                                   )
        vs.                        )
                                   )
                                   )
STATE STREET CORPORATION,          )
STATE AND STREET GLOBAL            )
ADVISORS,                          )
                Defendants         )

        **DEPOSITION of DAVID A. SPINA,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Massachusetts Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108, on
Wednesday, May 31st, 2006, commencing at
10:00 a.m.


                *   *   *   *


        SHEA COURT REPORTING SERVICES
        ONE UNION STREET, SECOND FLOOR
        BOSTON, MASSACHUSETTS 02108-2408

```
 1        about whether the EVSP would be offered
 2        to Alan Brown?
 3   A.   I didn't have any discussions with
 4        anybody about that until Alan brought
 5        it up to me.
 6   Q.   Before Alan brought it up to you, did
 7        you have an understanding as to whether
 8        he would be offered the EVSP?
 9   A.   I hadn't given the matter any thought.
10   Q.   And you say Alan brought it up to you.
11        How did that happen?
12   A.   The investment management part of State
13        Street's business was organized with a
14        degree of independence under the name
15        State Street Global Advisors.  And it was
16        my practice in that time period to meet
17        fairly regularly, once or twice a month,
18        with four senior officers of State Street
19        Global Advisors.  Not all four came to
20        every meeting, because they were busy
21        doing things that were important.
22        Sometimes people participated by phone.
23        And the question of whether the EVSP
24        applied to Alan came up in one of those
```

1     periodic meetings at which Tim Harbert,

2     the president of SSGA, and Alan and I

3     were the only three people present.  I

4     don't believe anyone else was in the room

5     at that time.

6  Q.  Tell me what you recall being said at

7     that meeting?

8  A.  Well, I think there was other business

9     matters discussed.  And then I recall

10    Alan saying that there was discontent

11    among the employees of State Street

12    Global Advisors in the UK, because the

13    VSP only applied to U.S. employees and

14    excluded them.  There was a general

15    feeling among those employees in the

16    UK that that was unfair, and they were

17    being badly treated.

18         I don't know how the transition

19    was made, but it then got -- I've a clear

20    recollection of Alan making it clear of

21    not just talking about the attitude of

22    employees in the UK, but that it was

23    a matter that was of great personal

24    importance to him as well on an

```
 1        individual level.
 2   Q.   And before that conversation were
 3        you aware of any discontent among the
 4        UK employees concerning the VSP?
 5   A.   I don't have any recollection of being
 6        aware.
 7   Q.   And before that conversation had you
 8        considered that the EVSP had not been
 9        offered to Alan?
10   A.   No.
11   Q.   What happened next in the conversation?
12   A.   I think we continued the conversation,
13        and I think I either asked questions,
14        or we had a dialogue, we meaning Alan
15        and I, trying to understand a little
16        more specifically what his concerns
17        were.  And I recall one of the ideas that
18        Alan expressed was about the fact that
19        he had worked perhaps for ten years
20        very hard at doing his job, and he was
21        concerned about potential instability
22        in the company, and him getting
23        disadvantaged at some point in the
24        process.  And here was this great EVSP.
```

1       And he felt he deserved more financial

2       payoff for his efforts, the fruits of his

3       labor, and that he didn't want that cut

4       off from him by either the arbitrariness

5       of the EVSP only applying to U.S.

6       employees, or some event that none of us

7       could predict, Citigroup coming in and

8       taking over the bank, and kicking out all

9       of the investment management, whatever.

10  Q.  Let's try to put this conversation into a

11      time period. Do you recall when it was?

12  A.  Well, it was some time in the first half

13      of calendar year 2003. And it would have

14      been March, April, somewhere in there

15      is the best I can do, and that's only

16      because of looking at documents that

17      I've reviewed to refresh myself.

18  Q.  Did this conversation take place during

19      the time period when the VSP was offered?

20  A.  I'm not sure, meaning whether it had been

21      presented to the Board, approved, and

22      then published to employees as general

23      knowledge --

24  Q.  Yes.

```
 1   A.   -- as opposed to something that was still

 2        being discussed, and was underdeveloped

 3        within management?

 4   Q.   Yes.

 5   A.   I don't recall whether this was before or

 6        after that line in the sand.  And I have

 7        no records in my possession that would

 8        help me answer that.

 9   Q.   Now, the four managers at SSGA, who you

10        met with, I've heard the term used as

11        G4.  Was that how they were referred to?

12   A.   Yes.

13   Q.   It was Mr. Brown, Mr. Harbert,

14        Mr. Serhant and Mr. Snow?

15   A.   Right.

16   Q.   When you had this conversation with Alan,

17        did you know whether or not Mr. Serhant

18        and/or Mr. Snow were going to be leaving

19        State Street pursuant to the EVSP?

20   A.   I was under the strong impression that

21        John Serhant and John Snow would be

22        leaving State Street.

23   Q.   And did that cause you any concerns about

24        the leadership of SSGA?
```

```
 1        about whether the EVSP would be offered

 2        to Alan Brown?

 3   A.   I didn't have any discussions with

 4        anybody about that until Alan brought

 5        it up to me.

 6   Q.   Before Alan brought it up to you, did

 7        you have an understanding as to whether

 8        he would be offered the EVSP?

 9   A.   I hadn't given the matter any thought.

10   Q.   And you say Alan brought it up to you.

11        How did that happen?

12   A.   The investment management part of State

13        Street's business was organized with a

14        degree of independence under the name

15        State Street Global Advisors.  And it was

16        my practice in that time period to meet

17        fairly regularly, once or twice a month,

18        with four senior officers of State Street

19        Global Advisors.  Not all four came to

20        every meeting, because they were busy

21        doing things that were important.

22        Sometimes people participated by phone.

23        And the question of whether the EVSP

24        applied to Alan came up in one of those
```

1    periodic meetings at which Tim Harbert,

2    the president of SSGA, and Alan and I

3    were the only three people present.    I

4    don't believe anyone else was in the room

5    at that time.

6  Q.  Tell me what you recall being said at

7    that meeting?

8  A.  Well, I think there was other business

9    matters discussed.    And then I recall

10   Alan saying that there was discontent

11   among the employees of State Street

12   Global Advisors in the UK, because the

13   VSP only applied to U.S. employees and

14   excluded them.    There was a general

15   feeling among those employees in the

16   UK that that was unfair, and they were

17   being badly treated.

18            I don't know how the transition

19   was made, but it then got -- I've a clear

20   recollection of Alan making it clear of

21   not just talking about the attitude of

22   employees in the UK, but that it was

23   a matter that was of great personal

24   importance to him as well on an

```
 1        individual level.
 2   Q.   And before that conversation were
 3        you aware of any discontent among the
 4        UK employees concerning the VSP?
 5   A.   I don't have any recollection of being
 6        aware.
 7   Q.   And before that conversation had you
 8        considered that the EVSP had not been
 9        offered to Alan?
10   A.   No.
11   Q.   What happened next in the conversation?
12   A.   I think we continued the conversation,
13        and I think I either asked questions,
14        or we had a dialogue, we meaning Alan
15        and I, trying to understand a little
16        more specifically what his concerns
17        were.  And I recall one of the ideas that
18        Alan expressed was about the fact that
19        he had worked perhaps for ten years
20        very hard at doing his job, and he was
21        concerned about potential instability
22        in the company, and him getting
23        disadvantaged at some point in the
24        process.  And here was this great EVSP.
```

```
 1          And he felt he deserved more financial

 2          payoff for his efforts, the fruits of his

 3          labor, and that he didn't want that cut

 4          off from him by either the arbitrariness

 5          of the EVSP only applying to U.S.

 6          employees, or some event that none of us

 7          could predict, Citigroup coming in and

 8          taking over the bank, and kicking out all

 9          of the investment management, whatever.

10     Q.   Let's try to put this conversation into a

11          time period.  Do you recall when it was?

12     A.   Well, it was some time in the first half

13          of calendar year 2003.  And it would have

14          been March, April, somewhere in there

15          is the best I can do, and that's only

16          because of looking at documents that

17          I've reviewed to refresh myself.

18     Q.   Did this conversation take place during

19          the time period when the VSP was offered?

20     A.   I'm not sure, meaning whether it had been

21          presented to the Board, approved, and

22          then published to employees as general

23          knowledge --

24     Q.   Yes.
```

```
 1   A.   -- as opposed to something that was still
 2        being discussed, and was underdeveloped
 3        within management?
 4   Q.   Yes.
 5   A.   I don't recall whether this was before or
 6        after that line in the sand.  And I have
 7        no records in my possession that would
 8        help me answer that.
 9   Q.   Now, the four managers at SSGA, who you
10        met with, I've heard the term used as
11        G4.  Was that how they were referred to?
12   A.   Yes.
13   Q.   It was Mr. Brown, Mr. Harbert,
14        Mr. Serhant and Mr. Snow?
15   A.   Right.
16   Q.   When you had this conversation with Alan,
17        did you know whether or not Mr. Serhant
18        and/or Mr. Snow were going to be leaving
19        State Street pursuant to the EVSP?
20   A.   I was under the strong impression that
21        John Serhant and John Snow would be
22        leaving State Street.
23   Q.   And did that cause you any concerns about
24        the leadership of SSGA?
```

1    A.   That caused me concerns of, and the

2         potential of Alan saying to me that he

3         was upset caused me a lot of concern.

4    Q.   Why was that?

5    A.   Well, I think that while John Serhant and

6         John Snow were experienced and capable

7         managers and leaders and professionals,

8         their responsibilities were focused

9         on relatively narrow areas within the

10        general business that SSGA conducted.

11        Alan's job and Tim Harbert's job were,

12        essentially, to everything SSGA did.

13        And I also would say at a personal level

14        that I found it a lot better to work

15        with Alan than Tim.  While I didn't have

16        difficulties working with the others, but

17        was thinking of the cohesion of all the

18        management of all of State Street, I

19        thought that Alan had more than proven

20        that he was a very good team player as

21        had Tim.  And so while it would be a

22        loss to lose Serhant to Snow, it would

23        be a bigger and more serious loss to the

24        company, in my mind, to have Alan leave.

1    Q.   In this conversation did Alan make any

2         overt threat to leave State Street?

3    A.   I don't recall specific words, but I

4         certainly had an impression that he was

5         very upset about the unfairness of this,

6         No. 1, and about the general instability

7         we were all feeling about the company.

8         It was going through tough times.

9    Q.   Now, was Alan's salary and expenses

10        charged to the UK subsidiary?

11   A.   I don't know.  That's a detail that I

12        wouldn't know.

13   Q.   Were his responsibilities limited to the

14        UK subsidiary?

15   A.   No.  Alan was the spokesperson for

16        investments, the heart of SSGA's business

17        globally, and he was responsible for the

18        oversight of the investment professionals

19        globally, whether they were in Boston,

20        Tokyo, or Hong Kong, or Uk, wherever.

21   Q.   Let's get back to this conversation.

22        What happened next in the conversation?

23   A.   Well, I don't recall the words verbatim.

24        I do recall that I believed and attempted

1       to communicate to Alan that it was in

2       the best interest of the company that

3       he stay, and that the company would

4       undertake to provide whatever assurances

5       or agreements were needed to address

6       his concerns.  And at some point in the

7       conversation we got to the point where,

8       I believe, Alan and Tim Harbert had both

9       recently turned 50 years old, and we

10      got on to this notion somehow of the

11      vulnerable period being from age 50 to

12      55.  Once they were 55, and if they had

13      the same positions, they would have many

14      more benefits available to them under

15      State Street's standard option and

16      retirement programs, whatever.  So,

17      again, I don't recall the words.  What I

18      remember is making a couple of decisions

19      that I wanted to give Alan motivation for

20      staying with the company.  That whatever

21      I did for Alan, I also had to do for Tim,

22      who was there in the room.  And that

23      I was prepared to do what I could to

24      effectuate whatever that would be, but

```
 1          I had no idea about how to translate that

 2          into sort of details.

 3     Q.   Now, what level of detail did you get

 4          into in that discussion?

 5     A.   Well, certainly there was reference in,

 6          and whether it was by Alan, me or Tim, I

 7          don't recall, but reference to something

 8          that would be shaped like the EVSP.

 9          Certainly there was reference to the

10          period being covered here was five

11          years.  Somehow we got on to this notion

12          that if you went along for two or three

13          years, and then State Street got run over

14          by a truck or something, that whatever

15          extra benefits would be available would

16          be reduced, because they were closer to

17          age 55.  So we were trying to bridge them

18          somehow with extra compensation somehow

19          to make sure they would be whole sort of

20          when they were 55.

21     Q.   Now, the VSP and the EVSP could be

22          elected at the option of the employee, is

23          that correct?

24     A.   Correct.
```

```
 1   Q.   And was there any discussion that you
 2        had with Mr. Brown about whether this
 3        proposal would be available at his
 4        option?
 5   A.   I don't recall.
 6   Q.   Was there any discussion about this
 7        proposal being available to him only
 8        if he were terminated without cause?
 9   A.   Again, I don't recall.  My impression
10        was that we were talking about that
11        general argument that I've worked very
12        hard, and haven't achieved the fruits of
13        my labors, and bad things can happen in
14        a corporate world.  We could get taken
15        over.  Somebody could get your job,
16        David or Tim Harbert's job, and somebody
17        could turn around and fire me.  If that
18        happens, then he wanted some protection
19        that would represent not protection, but
20        remuneration for his labors of the prior
21        ten years.
22   Q.   Did the discussion actually get to the
23        level of specificity that I could be
24        fired, or was it more generalized that
```

```
 1   Q.  And had you made those representations?

 2   A.  Well, whatever I said to him in that

 3       meeting back in '03, I said I would go

 4       and do my best to get what I could get.

 5   Q.  And between that meeting in '03 and

 6       this letter in June of '04, had you done

 7       anything in furtherance of that?

 8   A.  Well, unfortunately, shortly after the

 9       conversation in '03, I had quadruple

10       bypass surgery, and was out for quite a

11       while, and had a few other little things

12       going on.  So until the spring of '04 I

13       had done nothing to advance the issues

14       that Alan and Tim and I had discussed.

15   Q.  Getting back to that '03 conversation

16       with Alan, you made representations

17       that you would make efforts, as you've

18       discussed.  On the other side was

19       there anything Alan was expected to do

20       in return for receiving the benefits that

21       you discussed with him?

22               MR. CALAMARI:  I object to the

23       form.

24   A.  I don't really know what Alan was
```

1              MR. CALAMARI:  I object to the

2        form.

3    Q.  Why don't you read it through again,

4        and let me know if you believe there

5        is anything in the letter that you now

6        believe is not accurate.

7    A.  Would you repeat your question?

8    Q.  Having just read the letter to yourself,

9        do you believe that there is anything

10       that you said in this letter that is not

11       accurate?

12             MR. CALAMARI:  I'm going to

13       object to the form again.

14   A.  Accuracy meaning -- I think whenever

15       you look at any letter you've done in

16       the past, you would obviously edit yet

17       again.  I edited it before I sent it.

18       I don't think there are material

19       misstatements here at all.

20   Q.  Now, let me show you a few documents that

21       preceded this letter.

22             MR. SCHWARTZ:  Let's mark this

23       Exhibit No. 2.

24             (Exhibit No. 2 marked for

         identification.)

1    A.   I do have a memory of presenting to the

2         Executive Compensation Committee the

3         matters about Alan, Tim and John Towers.

4    Q.   What do you recall you said and they

5         said?

6    A.   I don't recall a lot about what I said.

7         I recall that they were fairly abrupt,

8         and said, "Put it in writing."  So it was

9         not a lengthy dialogue, discourse back

10        and forth.  So I don't recall, again, the

11        words I said, but I would have described

12        the situation, what my sense was, what

13        was right for the company, and wanted

14        them to be aware that this had happened.

15   Q.   And your June 30th letter was your

16        response to their putting it in writing?

17   A.   My attempt to respond to their putting it

18        in writing, yes.

19   Q.   Does the June 30th letter reflects

20        basically what you had said to the

21        Committee June 16th or so?

22                  MR. CALAMARI:  Objection to

23        form.

24   A.   Well, I suspect the written -- what you

1         write in a letter is always different

2         from what you say orally, whatever.

3         But in terms of the basic message, I

4         don't think they would have been a lot

5         different.

6    Q.   Now let's take a look at Exhibit 4.

7         This is the e-mail that you sent to

8         Lou de Ocejo forwarding Mr. Brown's

9         e-mail to you.  What was your purpose

10        in sending this to Mr. de Ocejo?

11   A.   Well, I was trying to get into Lou's

12        hands as much information as was

13        available; so that he could be the

14        person to do the following up that needed

15        doing.

16   Q.   You say in your e-mail to Lou that you

17        find this to be essentially accurate.  Do

18        you see that?

19   A.   Yeah.

20   Q.   Do you still agree that Alan's e-mail to

21        you was essentially accurate?

22             MR. CALAMARI:  I object to the

23        form.

24   A.   Well, we didn't define essentially

```
 1          you had health issues, and other matters
 2          came up.  Was there any other reason why
 3          there was no follow-up on implementing
 4          this?
 5    A.    No.
 6    Q.    So you did not intentionally decide,
 7          Well, I've satisfied Alan, and I don't
 8          have to do anything more, anything
 9          similar to that, did you?
10    A.    No.
11    Q.    Is it fair to say that you did intend
12          to follow-up on the June -- on the 2003
13          conversation?
14    A.    Yes.
15    Q.    Now, your June 30th, 2004 letter to
16          Mr. Weissman, the copy that we have has
17          a stamp that was received by Tim Harbert,
18          and I notice there's a handwritten BCC
19          Tim Harbert at the bottom.  Is that your
20          handwriting?
21    A.    No.
22    Q.    Did you send a copy of this letter to
23          Mr. Harbert?
24    A.    Yes.
```

```
 1    Q.   I'm sorry, go ahead.

 2    A.   I believe I asked my assistant to

 3         distribute a copy to Lou, and blind

 4         carbons to both Tim and Alan.

 5    Q.   Why did you want copies sent to those

 6         people?

 7    A.   Well, I was going to go off into

 8         neverland of retirement, and I wanted

 9         them to know that this had been

10         communicated to Bob Weissman.

11    Q.   You mentioned a few moments ago that

12         you did have a conversation with Tim

13         Harbert.  When was that?

14    A.   I don't remember exactly, but after the

15         '03 conversation, which would have been

16         April, May time frame, April, May, June,

17         it would have been something like the

18         fall, autumn where Tim told me that in a

19         conversation with Alan, Alan had brought

20         up and asked what the status was of the

21         things that we discussed in the spring

22         meeting, and was restless about it.

23    Q.   How did you reply?

24    A.   I don't remember.
```

```
 1   Q.   Did you do anything to follow-up on that
 2        or as a result of that?
 3   A.   No.
 4   Q.   Do you recall any other conversations
 5        you had with anybody, except for counsel,
 6        about Alan Brown and any arrangements
 7        that you might or might not have made
 8        with him?
 9   A.   No.
10              MR. SCHWARTZ:  Just give me a
11        few moments.
12              (Off the record.)
13              (Back on the record.)
14   Q.   After your conversation with Alan in
15        2003, I take it he continued in his
16        same position with SSGA, correct?
17   A.   Yes.
18   Q.   And were you satisfied with his job
19        performance?
20   A.   Yes.
21   Q.   And do you believe that you exceeded your
22        authority in any of your dealings with
23        Alan Brown in this regard?
24   A.   I do not believe I exceeded my authority.
```

Plaintiff's exhibit 6
Robert Weissman deposition

1

⌐ **ORIGINAL**    Volume 1, Pages 1-53

Exhibits 1-7

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No.:  05-11178-NG

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ALAN BROWN,

      Plaintiff

   vs.

STATE STREET CORPORATION and

STATE STREET GLOBAL ADVISORS,

      Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF:  ROBERT WEISSMAN

Home of Robert Weissman

152 Shelburne Center Road

Shelburne, Massachusetts

Thursday, July 13, 2006

2:00 p.m. - 3:38 p.m.

Reporter:  Kelly M. Bruce

Shea Court Reporting Services

One Union Street

Boston, MA 02108

(617) 227-3097

**Robert Weissman**
**July 13, 2006**

24

1    contingent discussion because I don't think

2    Mr. Brown was in a position to take the VSP.  I

3    don't think he was eligible.  But Mr. Spina said

4    he wanted to retain Mr. Brown in his position

5    and that he had talked to him about how he might

6    be treated if he were to leave before the age of

7    55.  I think at the time Mr. Brown was in his

8    early fifties.

9            For the other individuals, their

10   circumstances were different so they were -- I

11   think in each of the other cases they were

12   eligible participants in the VSP program if they

13   decided voluntarily to leave.  And so he talked

14   about those discussions with me.

15   Q.     Did he ask you to do anything in

16   regard to Mr. Brown?

17   A.     No.  He put it in the form that he

18   wanted to make me aware that he had taken these

19   actions during the course of the VSP and had not

20   told me or anybody else of those discussions

21   until then.

22   Q.     And what was your reaction to that?

23   A.     I was pretty angry.

24   Q.     Why was that?

25

1      A.      I had been chairman of the

2   Compensation Committee for a number of years.  I

3   had been the lead director at that point for a

4   couple of years anyway.  I was meeting with

5   Mr. Spina on a regular basis to discuss a wide

6   range of business issues with him.  It was -- it

7   would have been my expectation that he would

8   have told me of these conversations when these

9   conversations took place, or at least shortly

10  thereafter, particularly since it was clear

11  during that conversation I had with him when he

12  finally did reveal them that we both knew that

13  he didn't have the authorization to make

14  commitments on behalf of the company.  And the

15  natural thing for him to have done would be to

16  talk to me about it at the point when the

17  discussions were taking place.  Because at that

18  point, I, at least, had the potential, that I

19  could have been helpful.

20      Q.      And did you say anything of this to

21  him?

22      A.      Yes.

23      Q.      What was it that you said to him?

24      A.      Well, I've never lost my temper with

26

1  David; no reason to.  I told him that I was very

2  disappointed.  I told him that this was

3  something that he needed to bring to the full

4  Compensation Committee, and that I expected him

5  to do that at the upcoming meeting.

6      Q.     What did he say?

7      A.     He said he would do that.

8      Q.     Did you tell anybody else what

9  Mr. Spina had told you?

10     A.     Prior to the Executive Compensation

11 Committee meeting?

12     Q.     Yes.

13     A.     Not that I can recall.

14     Q.     Did you believe that Mr. Spina had

15 authority to make a commitment to Mr. Brown?

16     A.     I believe he did not.  And as I said,

17 I believe he understood he did not.

18     Q.     And why do you -- why did you believe

19 that Mr. Spina understood he did not have the

20 authority to make that commitment?

21     A.     In the one-on-one conversation, he

22 said that he thought that he may have

23 overstepped his authority, and it was one of the

24 reasons why he wanted me to be aware of it.

27

1          My personal belief at the time was he

2    thought that I would back him as a CEO and

3    confirm those discussions.  I wasn't prepared to

4    do that, which is the reason I told him to bring

5    it to the Comp. Committee.

6       Q.      Okay.  Now, I understand sometime

7    around the middle of June of 2004 there was a

8    meeting of the Compensation Committee?

9       A.      I think so.

10      Q.      Just a few weeks before Mr. Spina

11   left?

12      A.      Yes.

13      Q.      Okay.  And Mr. Spina made some sort

14   of a presentation at that Compensation Committee

15   meeting concerning these commitments?

16              MR. CALAMARI:  Objection to form.

17              THE WITNESS:  My recollection is

18      that he did.

19      Q.      (By Mr. Schwartz)  What was it that

20   he said?

21      A.      He described his discussions he had

22   had with each of these individuals and the

23   reasons why he had done -- said what he had said

24   to these individuals.  I think that the

28

1    committee's reaction was parallel to mine.  I

2    had not preconditioned the committee.  I did not

3    want to do that.  I didn't think that was my

4    role.  I let David have the opportunity to say

5    whatever he was going to say.

6              There were a number of questions by

7    individual directors at that Compensation

8    Committee meeting.  I don't recall who asked

9    what.  I do recall directing him to put it down

10   on paper, because there was a lot of information

11   that was flowing orally.  I don't believe the

12   Committee took any action beyond that, at that

13   meeting.  I may be wrong, but I don't recall it.

14       Q.     I'll suggest to you that the minutes

15   of that meeting don't reflect any action taken.

16       A.     Okay.

17              MR. CALAMARI:  I'll object to the

18       form.

19       Q.     (By Mr. Schwartz)  What do you recall

20   Mr. Spina saying at that Compensation Committee

21   meeting about Mr. Brown?

22       A.     I don't recall any specific

23   statements he made regarding Mr. Brown.

24       Q.     Okay.  Let me show you a couple of

36

1      A.      Again, I don't recall.

2      Q.      Okay.  Did you do anything as a

3   result of receiving this letter?

4      A.      I don't believe I did.

5   *  Q.      Does Mr. Spina -- do the statements

6   that Mr. Spina made in this June 30th letter

7   contradict anything he had told you or had told

8   the Compensation Committee previously?

9            MR. CALAMARI:  Objection to form.

10            THE WITNESS:  Please read back

11        the question.

12            (* Question read)

13            THE WITNESS:  I don't see

14        anything that makes it apparent that

15        there's a contradiction here.

16      Q.      (By Mr. Schwartz)  Okay.  So after

17   you read this June 30th letter, did you believe

18   that Mr. Spina, whether or not he had authority

19   to do so, had made certain oral commitments to

20   Mr. Brown?

21            MR. CALAMARI:  Objection to form.

22            THE WITNESS:  I don't think at

23        any point in this process I, in my own

24        head, framed the question that way.  It

# Plaintiff's exhibit 7
# Linda Hill deposition

1

```
1                ORIGINAL        Volume:
                                  Pages:   1 - 29
2                                Exhibits:  1 - 2

3           UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
4

5     ALAN BROWN,

6                    Plaintiff
                                       C.A.
7     Vs.                          No. 05-11178-NG

8

      STATE STREET CORPORATION and
9     STATE STREET GLOBAL ADVISORS,

10                   Defendants

11

12        Deposition of LINDA HILL, a witness

13    called on behalf of the Plaintiff, pursuant

14    to the Federal Rules of Civil Procedure,

15    before Rosamond K. Marcy, a Certified

16    Shorthand/Registered Professional Reporter

17    and Notary Public in and for the Commonwealth

18    of Massachusetts, at the Offices of Rodgers,

19    Powers & Schwartz, LLP, 18 Tremont Street,

20    Boston, Massachusetts 02108, commencing at

21    2:00 P.M. on Tuesday, May 23, 2006.

22

23

24
```

5/23/2006

16

1        have any conversation you want but

2        there's a charter about who makes

3        decisions about compensation for

4        executives of his level.

5  Q.   I take it the Board didn't take any vote

6        concerning Mr. Brown or Mr. Spina at

7        that meeting.

8            MR. CALAMARI:  Objection.

9  A.   No.

10  Q.   A few weeks after the June 16 meeting

11       Mr. Spina wrote this letter to

12       Mr. Weissman on June 30, and was a copy

13       provided to you?

14  A.   I don't recall.

15  Q.   I take it that at the June 16 meeting

16       the Compensation Committee did not

17       formally, by taking a vote, renounce or

18       reject any agreements that Mr. Spina

19       might have made with Mr. Brown.

20           MR. CALAMARI:  Objection.

21  A.   No.

22  Q.   Was there discussion as to whether or

23       not Mr. Spina had exceeded his

24       authority?

Linda Hill
5/23/2006

17

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Did you speak on that topic? |
| 3 | A. | I don't recall. |
| 4 | Q. | Do you remember what anybody said? |
| 5 | A. | I don't recall what people specifically |
| 6 | | said. What I do recall is knowing very |
| 7 | | well that he had no authority to have |
| 8 | | such conversations and that I thought it |
| 9 | | was poor judgment on his part to have |
| 10 | | such conversations, and that's all I |
| 11 | | recall. We didn't take a vote. There |
| 12 | | was nothing to vote on. |
| 13 | Q. | You had those feelings. Did you voice |
| 14 | | those feelings at the meeting? |
| 15 | A. | I don't recall. |
| 16 | Q. | Did any of the other members of the |
| 17 | | Compensation Committee at the June 16, |
| 18 | | 2004 meeting say words to the effect of |
| 19 | | Mr. Spina not having authority to enter |
| 20 | | into commitments? |
| 21 | A. | He knew he didn't have authority. |
| 22 | Q. | How do you know that? |
| 23 | A. | Because he's the CEO of the company. |
| 24 | | That's what the charter says. |

Linda Hill
5/23/2006

18

```
 1    Q.   Did he acknowledge that he didn't have
 2         authority?
 3    A.   I don't recall.
 4    Q.   Did anybody say that he did not have
 5         authority at the meeting?
 6    A.   I don't think it needed to be said.  I
 7         think he told us because he knows he
 8         doesn't have authority.
 9    Q.   Whether or not it needed to be said, do
10         you recall anybody saying that he did
11         not have authority?
12    A.   I don't recall.
13    Q.   Did anybody at the meeting suggest that
14         Mr. Brown be told that Mr. Spina lacked
15         authority?
16    A.   No.
17    Q.   After the June 16, 2004 meeting when is
18         the next time that you had any
19         involvement of any kind regarding this
20         matter involving Mr. Brown and
21         Mr. Spina?
22    A.   I believe we would have asked Bob as the
23         head of the Committee to find out more
24         about whatever it was that David was
```

22

```
 1              out the result of Bob's research.
 2    Q.    What do you remember being discussed?
 3    A.    That we now had the information about
 4          what the commitment was and that's what
 5          he was to do.  We now know what David
 6          said.
 7    Q.    Was there any discussion about how to
 8          proceed based on that information?
 9    A.    Well, we felt no obligation to accept
10          this recommendation so that discussion
11          was had.  It's our privilege to make
12          these sort of decisions with an
13          executive, not David, so when we saw
14          this and the expense of it all we knew
15          we wanted to know what David had said
16          because obviously there would be a new
17          CEO and you never know quite what any
18          executive is going to assume.  This is
19          informational.
20    Q.    Having learned that information did the
21          Compensation Committee attempt to
22          implement the commitment by Mr. Spina?
23    A.    We didn't agree with it.  It was
24          informational.  There was nothing to
```

Linda Hill
5/23/2006

23

```
 1        implement.
 2   Q.   No vote was taken concerning this
 3        commitment.
 4   A.   No vote was taken.
 5   Q.   When you say you disagreed with it, what
 6        did you mean by the Committee disagreed
 7        with it?
 8   A.   David had mentioned that he had
 9        conversations with a number of
10        individuals, three to be precise.  We
11        asked Bob as a Committee to find out
12        what the nature of those conversations
13        was, find out what the story was and get
14        back to us about that.  This was the
15        result of his explanation about Alan
16        Brown and it was informational.  He
17        provided us with this information.  We
18        all felt David can have a conversation
19        with whomever he pleases about what he
20        would like to have conversations about
21        but it's actually our fiduciary
22        responsibility to do something like this
23        and there was no action to be taken.  We
24        just had the information and we had it
```

Linda Hill
5/23/2006

25

1        Mr. Spina had made certain verbal

2        commitments to Alan Brown did the

3        Committee vote to renounce those

4        commitments?

5  A.   We took no votes.  This was

6        informational.

7  Q.   After the September 15, 2004 meeting did

8        the topic of Alan Brown and any

9        conversations he had had with Mr. Spina

10       ever come before the Compensation

11       Committee again?

12  A.   After this?

13  Q.   Yes.

14  A.   Between then and now?

15  Q.   Yes.

16  A.   Did it come up?  I don't think it did.

17  Q.   Did the Compensation Committee at the

18       September 15, 2004 meeting direct any of

19       the managers or officers of the

20       corporation to communicate with

21       Mr. Brown?

22  A.   No, I don't believe so.

23  Q.   Do you think it would have been fair to

24       tell him that any commitments that

Plaintiff's exhibit 8
Boon Ooi deposition

# ORIGINAL

Volume: I
Pages: 1-76
Exhibits: 1-12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11178-NG

ALAN BROWN,

        Plaintiff

vs.

STATE STREET CORPORATION and
STATE STREET GLOBAL ADVISORS,

        Defendants

Deposition of BOON OOI, a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Virginia Dodge, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of RODGERS, POWERS & SCHWARTZ, 18 Tremont Street, 5th Floor, Boston, Massachusetts, commencing at 2:45 p.m. on Tuesday, June 20, 2006.

1    A.    I got an email from Lou de Ocejo on the 30th.

2    Q.    On June 30?

3    A.    Yeah.

4    Q.    Saying what?

5    A.    I think he just asked me to -- I think his comments,

6    "Let's discuss." And it was -- I think it was a forward

7    of an email that I think Mr. Brown sent to -- and I don't

8    know who it's sent to, but it was forwarding an email to

9    me with a comment, "Let's discuss."

10   Q.    Let me show you what we've marked as Exhibit 3 at

11   Mr. Darehshori's deposition. Is that the email that

12   you're referring to?

13   A.    Yes.

14   Q.    So on June 30, 2004, you received that email from

15   Mr. Darehshori?

16   A.    Yes.

17   Q.    And what happened next in regard to that?

18   A.    I think we had a brief conversation. I don't

19   remember the details of it, but I was surprised to read

20   this. This is the first I learned about this discussion.

21   So he wanted me to essentially figure out what it really

22   meant and what my interpretation of it would be.

23   Q.    What did you do to accomplish that?

24   A.    I guess over the next few days or few weeks -- and I

```
 1    don't remember precisely when -- I tried to come up with
 2    an estimate, sort of a worst-case scenario of how much
 3    this would cost the company.  So for -- first, it was
 4    originally for Lou's -- for his own information so he
 5    knows what's at stake here or how much is.
 6    Q.    Now, did you ever speak with Mr. Spina about his
 7    discussions with Mr. Brown?
 8    A.    No.
 9    Q.    Did you ever speak with Mr. Brown about his
10    discussions with Mr. Spina?
11    A.    No.
12    Q.    Did you speak with Mr. Harbert about those
13    discussions at all?
14    A.    No.
15    Q.    Did you speak with Mr. Logue about any discussions
16    he had with Mr. Harbert?
17    A.    No.
18    Q.    So is it fair to say that the only sources of
19    information as to what was said in any conversations
20    between Mr. Spina and Mr. Brown about the VSP came from
21    your seeing these two documents, which would be the
22    Exhibit 3 from Mr. Darehshori's deposition and Exhibit 1
23    from your deposition?
24    A.    I guess I could say that I -- the first time I
```

```
 1   learned about this was through these documents.
 2   Q.    And did you have any sources of information of any
 3   kind other than these two documents as to what was said in
 4   the conversations between Mr. Spina and Mr. Brown?
 5   A.    No.
 6   Q.    I'll leave these in front of you to help you.
 7   You'll notice in Mr. Spina's letter, he refers to certain
 8   commitments that he made to Mr. Brown.
 9              MR. CALAMARI:  Objection to form.
10   Q.    (By Mr. Schwartz)  Do you see where he refers to
11   oral commitments that he made?
12   A.    Yeah.  I see that.
13   Q.    And Mr. de Ocejo asked you to come up with an
14   interpretation of what these commitments were; is that
15   correct?
16              MR. CALAMARI:  Objection to form.
17              MR. SCHWARTZ:  You need to tell him what
18         that means.
19              MR. CALAMARI:  You can answer the question.
20         I'm just making --
21              THE WITNESS:  Oh, okay.
22   A.    Mr. de Ocejo asked me to take this letter and figure
23   out what's in there, and in terms of cost, to let him
24   know, you know, how much this -- what the expense would
```

1  A.    Mm-hmm.

2  Q.    And what do you mean by "protection ends on

3  4/27/2008"?

4  A.    It's basically five years, the date of the VSP.

5  Q.    And let's go to Paragraph C.  What did you mean by

6  "interpretation"?

7         MR. CALAMARI:  Objection as to form.

8  A.    This is to essentially put it down as sort of a

9  worst-case scenario.  What would be the maximum amount

10 that would be provided, the maximum amount it would cost

11 us if we were to follow and -- you know, follow what was

12 put in the June 30 letter.

13 Q.    (By Mr. Schwartz)  Let's take a look at the first

14 paragraph under "Interpretation."  You wrote, "Terms are

15 provided only if employment is terminated by State Street,

16 except for cause or due to change in control prior to

17 age 55."  Where did that information come from?

18 A.    Not in that letter.

19 Q.    Where did it come from?

20 A.    It was my opinion.

21 Q.    What was that opinion based on?

22 A.    Based on the -- what was in the second statement.

23 It says, you know, this agreement -- the way the letter

24 was written suggests that there's an amortization.  So in

```
1    the case of amortization, the value of whatever is in, you

2    know -- the beginning value kind of erodes and

3    deteriorates up to a certain point in time when it goes to

4    zero.

5         So the way I read it would mean that if you have a

6    declining benefit, and on the day -- in this case, it's a

7    cliff.  On the day before, if it were to go away, then why

8    would anyone stick around, unless they get some -- why

9    would they stick around?

10   Q.    Did you believe that Mr. Spina and Mr. Brown had any

11   discussion at all concerning the terms would be provided

12   only if Mr. Brown's employment were terminated by State

13   Street other than for cause?

14   A.    I don't know.  I wasn't there.

15   Q.    So you have no information that Mr. Brown and

16   Mr. Spina had that discussion, do you?

17         MR. CALAMARI:  Objection as to form.

18   A.    No.

19   Q.    (By Mr. Schwartz)  And nobody told you that

20   Mr. Brown and Mr. Spina had discussed that the terms would

21   be provided only if Mr. Brown were terminated by State

22   Street other than for cause, correct?

23   A.    No.

24   Q.    Let's turn to -- let's look at the options, the
```

1    calculate a value?

2            MR. CALAMARI:  Objection as to form.

3    A.    I don't know what -- I don't know what you mean by

4    that.  Were there any terms that were missing?

5            I don't know what was -- you know, what Mr. Spina

6    indicated to him, so I was just basing on the letter.

7    Q.    (By Mr. Schwartz)  And between Mr. Spina's letter,

8    Mr. Brown's email to Mr. Spina and your knowledge of the

9    terms of the EVSP, were there any additional terms of what

10   Mr. Spina termed his verbal commitment that you needed in

11   order to calculate a value for that?

12           MR. CALAMARI:  Objection as to form.

13   A.    I don't know of any.

14   Q.    (By Mr. Schwartz)  Okay.

15           (Exhibit 10, SSgA Executive Vice President,

16           Verbal Commitment by David Spina, marked for

17           identification.)

18   Q.    (By Mr. Schwartz)  Showing you what we've just

19   marked as Exhibit 10, it's SSC 05475 and 6 in the lower

20   left-hand corner.  It says Tab 4B, September 15, 2004.  Do

21   you know what this document is?

22   A.    Yes.

23   Q.    What is it?

24   A.    This was the briefing to the committee on --

1    before that, and I wanted to ascertain how much -- because

2    he becomes eligible for the plan as of that date.  So I

3    needed to collect that information at some point.  When he

4    retires from State Street, we will apply that offset.

5    Q.    Then why did you choose to do that on January 31 of

6    2005?

7    A.    I meant to get around to it, and there was a time

8    when I should have got around to collecting information.

9    If you recall, in the email from Paul Duggan to me, he

10   said he contacted UK.  And the only information that he

11   had was -- "I have asked Lucy for the value of Alan's UK

12   pension, but she informed us it is a special agreement.

13   She provided the following with regards to this pension."

14        We don't have information; we pay the following

15   amount.  With that information, and that had been sitting

16   in the back of my mind, he was the first and only EVP

17   going to be -- being eligible to be in the plan who's a

18   non-U.S. employee.  And he had unique arrangement.  At

19   some point in time, we needed to collect any offset

20   information.

21   Q.    Had anybody -- let's look at some documents.

22              (Exhibit 11, Email dated 02/01/2005 05:14 AM,

23              marked for identification.)

24   Q.    (By Mr. Schwartz)  Showing you what we just marked

1   as Exhibit 11, it's SSC 06079 and 080.  It's an email

2   chain between you and Mary Richards.  Starting on the

3   second page, on January 31, 2005, you asked Mary Richards

4   to find out from Gary Mills the history of how much was

5   contributed to Alan Brown's private pension.  Is that

6   correct?

7   A.    Yes.

8   Q.    And why did you do that?

9   A.    Because I wanted to figure out the offset to his

10   executive SERP because he becomes eligible that year.

11   Q.    Okay.  Did anybody ask you to gather that

12   information?

13   A.    No.

14   Q.    Had you had any discussions with anybody about Alan

15   Brown in the week or two prior to this?

16   A.    I don't remember.  I do remember coming off -- it

17   was unsatisfactory for me in the September ECC meeting

18   because I wasn't able to quantify for them the true amount

19   of Mr. Brown's executive SERP benefit because I didn't

20   have any offset information.  And we don't have the

21   records in the U.S.  So sometime in January, I decided I

22   really do need to gather information.

23       And nobody else has that information except payroll,

24   and we needed to do it confidentially because I don't know

1    who else within the UK management has a deal like

2    Mr. Brown's.

3    Q.    Who's Mary Richards?

4    A.    She's the compensation manager in Europe.

5    Q.    Okay.  And is it just a coincidence that this

6    happened on the day when Mr. Hunt's appointment was

7    announced?

8    A.    It is a coincidence because I don't know when

9    Mr. Hunt's appointment was announced.

10   Q.    Had anybody asked you to collect any information

11   about Mr. Brown --

12   A.    No.  I don't remember, but I don't think so.

13         Collecting this information was long overdue.  So

14   this is --

15   Q.    And was calculating information about the value of

16   Mr. Brown's options also something that you wanted to do

17   at that time?

18   A.    I don't remember.  I don't know.  I mean, the last

19   one we did was back in July 2004.  So I don't remember

20   when we went back to finance to update it.

21   Q.    Was calculating the value of Mr. Brown's options --

22   did calculating the value of Mr. Brown's options have any

23   relationship at all to the SERP?

24   A.    No.

1  Q.    So after you learned that Mr. Hunt had been

2  appointed to the position at SSgA, did the thought enter

3  your mind that Mr. Brown might be resigning?

4  A.    Yes.

5  Q.    Okay.  And after the thought that Mr. Brown might be

6  resigning, did you then write to Jennifer Bourgeois and

7  Mary Richards and ask them for this information?

8  A.    I don't know whether I wrote to them before or after

9  I thought that he would be resigning because I don't

10  remember when I saw this notice.  Obviously I did see it.

11  It came to all State Street employees.  I don't remember

12  when I saw the notice.

13           MR. SCHWARTZ:  Okay.  That's all I've got.

14           MR. CALAMARI:  Let us take a minute.

15

16                (A recess was taken.)

17

18           (Deposition concluded at 4:48 p.m.)

19

20

21

22

23

24

Plaintiff's exhibit 9
Richard Sergel deposition

ORIGINAL

Volume: 1
Pages: 1 to 53
Exhibits: 1 to 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-11178-NG

ALAN BROWN,                          )
                    Plaintiff        )
                                     )
        vs.                          )
                                     )
STATE STREET CORPORATION,            )
STATE AND STREET GLOBAL              )
ADVISORS,                            )
                    Defendants       )

**DEPOSITION of RICHARD P. SERGEL,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108,
on Friday, May 26, 2006, commencing at
10:00 a.m.

\*    \*    \*    \*

SHEA COURT REPORTING SERVICES
ONE UNION STREET, SECOND FLOOR
BOSTON, MASSACHUSETTS 02108-2408

```
 1        prior to that.  That's the only time I
 2        have seen this document.
 3   Q.   And at around the date of this letter,
 4        June 30th, 2004, were you aware, in
 5        general, of the matters that the letter
 6        discusses?
 7   A.   Yes.
 8   Q.   And how did you become aware of those
 9        matters?
10   A.   At the June -- I believe it would have
11        been the June 2004 executive compensation
12        committee meeting, and would have learned
13        about these facts directly from Mr.
14        Spina.
15   Q.   So in Exhibit 3 the first sentence
16        Mr. Spina says, "At the meeting of the
17        executive compensation committee on
18        Wednesday, June 16th, 2004 I reported
19        to the committee that I made oral
20        commitments to several executives during
21        2003."  That's what you're referring to,
22        something that Mr. Spina reported to the
23        committee on that day?
24   A.   I haven't seen this before.  That's my
```

1              (Exhibit No. 7 marked for

2         identification.)

3    Q.   I am showing you what we just marked

4         as Exhibit 7.  It's SSC4672.  It's

5         five pages.  These are minutes of the

6         September 15, 2004 meeting, and you

7         were present for that meeting?

8    A.   Yes, I believe I was.

9    Q.   And let me direct your attention to

10        page 3 right around the middle.  "Mr.

11        De Ocejo presented and reviewed proposed

12        actions in order to accommodate verbal

13        commitments made to an executive during

14        the period the EVSP was available."  Does

15        that refer to Mr. Brown?

16   A.   I think it's -- I'm not certain.

17   Q.   Do you have a memory of any discussions

18        at that September 15th meeting about

19        Mr. Brown?

20   A.   I have difficulty knowing whether they

21        were at the June 20th meeting or at the

22        September meeting.  It's hard for me

23        to tell whether we talked about --

24        and, additional, David talked to us,

```
 1    Q.   Was anybody in favor of it?

 2    A.   Not that I recall.

 3    Q.   Was there any question or any discussion

 4         about whether or not Mr. Spina had

 5         authority to make the verbal commitments

 6         that are described in Exhibit 6?

 7    A.   Is there a discussion about whether

 8         he had the authority to do it?

 9    Q.   Yes.

10    A.   My memory of the discussion was about

11         what action we were going to take.

12         We knew we were the ones who were

13         responsible for taking an action or not

14         taking it.  We knew he didn't have the

15         authority.

16    Q.   Whether or not Mr. Spina used the word

17         commitment at the June meeting, at

18         least in the material presented to the

19         committee for the September meeting,

20         Exhibit 6, you were told that Mr. Spina

21         made verbal commitments to Alan Brown?

22    A.   I wouldn't have had a memory of that

23         prior to now.  That's on the page, but,

24         again, this is being described as what
```

Plaintiff's exhibit 10
Mitchell Shames deposition

1

Volume: 1
Pages:   1 to 30
Exhibits:  1 to 5

ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-11178-NG

ALAN BROWN,                          )
                    Plaintiff        )
                                     )
                                     )
        vs.                          )
                                     )
                                     )
STATE STREET CORPORATION,            )
STATE AND STREET GLOBAL              )
ADVISORS,                            )
                    Defendants       )

**DEPOSITION of MITCHELL H. SHAMES,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Massachusetts Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108, on
Wednesday, May 31st, 2006, commencing at
12:30 p.m.


*  *  *  *

SHEA COURT REPORTING SERVICES
ONE UNION STREET, SECOND FLOOR
BOSTON, MASSACHUSETTS 02108-2408

7

```
 1        before you spoke with Mr. Brown?
 2   A.   Various people.
 3   Q.   Who's that?
 4   A.   Bill Hunt, my cocounsel, Dot Jacobson.
 5        There may have been other people, but I
 6        don't remember.
 7   Q.   And you called Mr. Brown.  Do you have
 8        a memory of that conversation?
 9   A.   Yes.
10   Q.   Did you take any notes?
11   A.   Yes.
12   Q.   Do you still have those notes?
13   A.   Yes.
14   Q.   Did you review those notes in preparation
15        for this deposition?
16   A.   Yes.
17   Q.   Tell me, as best you can recall, what
18        you said and what Mr. Brown said in that
19        conversation?
20   A.   Well, I explained to Alan that we had
21        received his letter.  I had also asked
22        him, as I was beginning the conversation,
23        if he was represented by counsel, and he
24        said that he was, and that his wife was
```

1    representing him.  I then explained that

2    in light of the letter, that it would

3    probably be best that he take a week

4    paid leave.  Alan then raised various

5    commitments, speaking engagements, client

6    commitments that he had; so we went

7    through, and we talked about some of

8    the logistics.  That was pretty much it.

9    I needed to -- in light of the various

10    commitments that he had, I needed to go

11    back and talk to my clients about how

12    they wanted certain things handled.

13  Q.  Did you have any conversation -- did

14    you speak in that conversation with

15    Mr. Brown about the VSP, or his claim to

16    entitlement to the VSP?

17  A.  I don't remember.

18  Q.  Did you speak about whether or not

19    Mr. Brown was resigning or intended to

20    resign?

21  A.  I don't remember.

22  Q.  And did you follow-up that phone

23    conversation with an e-mail to Mr. Brown?

24  A.  Yes.

16

```
 1        with Mr. Brown, was there a discussion
 2        about garden leave?
 3   A.   That I don't remember.
 4   Q.   In your phone conversation on March 12th
 5        with Mr. Brown, was there a discussion
 6        about the VSP at all?
 7   A.   I remember Alan stating that he was
 8        making an election; so I assume that
 9        was VSP related, and that he was not
10        giving notice.
11   Q.   Do you remember any more details about
12        what he said in regard to not giving
13        notice?
14   A.   No.
15   Q.   Did Mr. Brown use the words, I'm not
16        giving notice; I'm electing under the
17        VSP?
18   A.   I think so.
19   Q.   How did you respond to that?
20   A.   I was not engaging in a discussion of --
21        the purpose of the call from my --
22              MR. CALAMARI:  I'm just
23        cautioning you about discussing
24        privileged information.  You can say --
```

# Plaintiff's exhibit 11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------- x

ALAN BROWN,                              :    Case No. 05 Civ. 11178 (NG)
                                         :
                    Plaintiff,           :
                                         :    **ANSWER TO FIRST**
            -against-                     :    **AMENDED COMPLAINT**
                                         :
STATE STREET CORPORATION                 :
and STATE STREET GLOBAL                  :
ADVISORS,                                :
                                         :
                    Defendants.          :
---------------------------------------------------------- x

      Defendants State Street Corporation and State Street Global Advisors

(collectively "State Street"), by and through its undersigned counsel, Quinn Emanuel Urquhart

Oliver & Hedges, LLP, and Hare & Chaffin, as and for an Answer to the allegations in the First

Amended Complaint (the "Complaint") of plaintiff Alan Brown, filed May 26, 2006, respond:

### INTRODUCTION

      1.     Deny the allegations contained in paragraph 1 of the Complaint, except

admit that the Complaint purports to allege an action for breach of an agreement and that Brown

was the former Chief Investment Officer of the State Street Global Advisors division of State

Street Bank and Trust Company (the "Bank"), a wholly-owned subsidiary of State Street

Corporation.

### PARTIES

      2.     Deny the allegations contained in paragraph 2 of the Complaint, except

admit that Brown is a British citizen and a resident of London, England, admit that he was the

former Chief Investment Officer of the State Street Global Advisors division of the Bank and

deny knowledge or information sufficient to form a belief as to his notoriety.

3.    Deny the allegations contained in paragraph 3 of the Complaint, except admit that State Street Corporation is a Massachusetts corporation that is based and has offices in Boston, Suffolk County, Massachusetts and state that State Street Global Advisors is an unincorporated division of the Bank.

### JURISDICTION

4.    Admit the allegations contained in paragraph 4 of the Complaint.

5.    Admit the allegations contained in paragraph 5 of the Complaint.

### Facts

6.    Deny the allegations contained in paragraph 6 of the Complaint and state that in 1995 Brown began working for State Street Global Advisors Limited, formerly known as State Street Global Advisors U.K. Limited.

7.    Deny the allegations contained in paragraph 7 of the Complaint, except admit that Brown initially served as Managing Director of State Street Global Advisors Limited, formerly known as State Street Global Advisors U.K. Limited, and state that State Street Global Advisors Limited is the United Kingdom operations of the State Street Global Advisors division of the Bank.

8.    Deny the allegations contained in paragraph 8 of the Complaint, except admit that Brown is a resident of London, had periodic contact with the United States office and traveled to the United States and other places from time to time.

9.    Deny the allegations contained in paragraph 9 of the Complaint, except admit that Brown was appointed Executive Vice President of State Street Corporation in 2000.

10.    Deny the allegations contained in paragraph 10 of the Complaint and respectfully refer to the written documents of the Voluntary Separation Program and the

2

Executive Voluntary Separation Program (collectively "the VSP") for a complete and accurate statement of their contents.

11.    Deny the allegations contained in paragraph 11 of the Complaint.

12.    Deny the allegations contained in paragraph 12 of the Complaint, except admit that Brown was 50 years old at that time.

13.    Deny the allegations contained in paragraph 13 of the Complaint.

14.    Deny the allegations contained in paragraph 14 of the Complaint.

15.    Deny the allegations contained in paragraph 15 of the Complaint, except state that on June 10, 2004, Brown wrote an email to David Spina and respectfully refer to that email for a complete and accurate statement of its contents.

16.    Deny the allegations contained in paragraph 16 of the Complaint, except admit that Spina left his employment with State Street Corporation on or about June 30, 2004, state that on June 15, 2004, he sent an email to Brown and respectfully refer to that email for a complete and accurate statement of its contents.

17.    Deny the allegations contained in paragraph 17 of the Complaint.

18.    Deny the allegations contained in paragraph 18 of the Complaint.

19.    Deny the allegations contained in paragraph 19 of the Complaint.

20.    Deny the allegations contained in paragraph 20 of the Complaint, except admit that Spina sent a letter, dated June 30, 2004, to the Chairman of the Executive Compensation Committee of State Street Corporation's Board of Directors and respectfully refer to that letter for a complete and accurate statement of its contents.

21.     Deny the allegations contained in paragraph 21 of the Complaint, except admit that Spina sent a copy of that June 30, 2004 letter to Timothy Harbert and deny knowledge or information sufficient to form a belief as to whether Brown received a copy as well.

22.     Deny the allegations contained in paragraph 22 of the Complaint.

23.     Deny the allegations contained in paragraph 23 of the Complaint.

24.     Deny the allegations contained in paragraph 24 of the Complaint, except admit that Ronald Logue succeeded Spina as State Street Corporation's Chairman and Chief Executive Officer on or about July 1, 2004.

25.     Deny the allegations contained in paragraph 25 of the Complaint.

26.     Deny the allegations contained in paragraph 26 of the Complaint and state that Luis de Ocejo was an Executive Vice President for the Bank's Global Human Resources, formerly known as Human Resources and Organizational Performance.

27.     Deny the allegations contained in paragraph 27 of the Complaint.

28.     Deny the allegations contained in paragraph 28 of the Complaint.

29.     Deny the allegations contained in paragraph 29 of the Complaint.

30.     Deny the allegations contained in paragraph 30 of the Complaint.

31.     Deny the allegations contained in paragraph 31 of the Complaint.

32.     Deny the allegations contained in paragraph 32 of the Complaint.

33.     Deny the allegations contained in paragraph 33 of the Complaint.

34.     Deny the allegations contained in paragraph 34 of the Complaint, except state that Brown was not entitled to any benefits under the VSP.

4

### AS AND FOR AN ANSWER TO COUNT ONE
### BREACH OF CONTRACT

State Street incorporates by reference its responses to paragraphs 1-34 herein as though fully set forth in full.

      35.     Deny the allegations contained in paragraph 35 of the Complaint.

      36.     Deny the allegations contained in paragraph 36 of the Complaint.

      37.     Deny the allegations contained in paragraph 37 of the Complaint.

      38.     Deny the allegations contained in paragraph 38 of the Complaint.

      39.     Deny the allegations contained in paragraph 39 of the Complaint.

### AS AND FOR AN ANSWER TO COUNT TWO
### RATIFICATION

State Street incorporates by reference its responses to paragraphs 1-39 herein as though fully set forth in full.

      40.     Deny the allegations contained in paragraph 40 of the Complaint.

      41.     Deny the allegations contained in paragraph 41 of the Complaint.

### AS AND FOR AN ANSWER TO COUNT THREE
### DETRIMENTAL RELIANCE, PROMISSORY ESTOPPEL

State Street incorporates by reference its responses to paragraphs 1-41 herein as though fully set forth in full.

      42.     Deny the allegations contained in paragraph 42 of the Complaint.

      43.     Deny the allegations contained in paragraph 43 of the Complaint.

### AS AND FOR AN ANSWER TO COUNT FOUR
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

State Street incorporates by reference its responses to paragraphs 1-43 herein as though fully set forth in full.

44.    Deny the allegations contained in paragraph 44 of the Complaint.

45.    Deny the allegations contained in paragraph 45 of the Complaint.

46.    Deny the allegations contained in paragraph 46 of the Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (Failure to State a Claim)

47.    The Complaint fails to state a valid claim upon which relief can be

granted.

### Second Affirmative Defense
### (Federal Preemption)

48.    To the extent Brown alleges that he is entitled to benefits from any

severance, pension or retirement plan of State Street Corporation or State Street Global Advisors,

his claims are completely preempted by the Employee Retirement Income Security Act of 1974,

as amended, 29 U.S.C. §§ 1001, et seq., and should therefore be dismissed with prejudice.

### Third Affirmative Defense
### (29 U.S.C. §§ 1102(a)-(b))

49.    To the extent Brown alleges that he is entitled to benefits from any

severance, pension or retirement plan of State Street Corporation or State Street Global Advisors,

his claims are completely barred by the provisions of Sections 402(a) and 402(b) of ERISA, 29

U.S.C. §§ 1102(a)-(b), under which a plan can only be amended in writing and in accordance

with its terms.

### Fourth Affirmative Defense
### (Standing)

50.    To the extent Brown alleges that he is entitled to benefits from any

severance, pension or retirement plan of State Street Corporation or State Street Global Advisors,

6

he was not a participant in any such severance, pension or retirement plan and thus lacks

standing to bring his claims.

### Fifth Affirmative Defense
### (Standing)

51.    To the extent Brown alleges that he is entitled to benefits under the VSP,

he was not a participant in the VSP and thus lacks standing to bring his claims.

### Sixth Affirmative Defense
### (The Express Terms of the VSP)

52.    To the extent Brown alleges that he is entitled to benefits under the VSP,

his claims for relief are barred by the express language of the VSP documents.

### Seventh Affirmative Defense
### (Lack of Consideration)

53.    Brown's claims are barred on the grounds of lack of consideration.

### Eighth Affirmative Defense
### (Failure of Performance)

54.    Brown's claims are barred on the grounds of failure of performance.

### Ninth Affirmative Defense
### (MASS. GEN. LAWS CH. 259, § 1)

55.    Brown's claims are barred by the Statute of Frauds, MASS. GEN. LAWS CH.

259, § 1.

### Tenth Affirmative Defense
### (Parol-Evidence Rule)

56.    Brown had an employment agreement with State Street Global Advisors

U.K. Limited.  Paragraph 32.3 of that agreement states "This agreement sets out the entire

agreement and understanding of the parties."  To the extent Brown's claims assert obligations

not found in that agreement, they are barred by the parol-evidence rule.

### Eleventh Affirmative Defense
### (Waiver and Ratification)

57.     By his continued employment with State Street, with knowledge that he was not awarded the benefits he sought, Brown waived any claim he may have had respecting such benefits and ratified the decision made by the Executive Compensation Committee relating thereto.  Accordingly, his claims are barred on the grounds of waiver and ratification.

### Twelfth Affirmative Defense
### (Reserved Defenses; Further Investigation)

58.     State Street has not knowingly or intentionally waived any applicable defenses.  State Street presently lacks sufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, affirmative defenses, and reserves the right to assert such additional defenses.

8

### PRAYER FOR RELIEF

WHEREFORE, State Street respectfully requests judgment as follows:

A.    Dismissing the Complaint with prejudice;

B.    Awarding State Street its costs, disbursements, and any allowable attorney's fees incurred in this action; and

C.    Awarding such other relief as the Court deems just and proper.

Dated:    New York, New York
          June 15, 2006

                              Respectfully submitted,

                              QUINN EMANUEL URQUHART
                              OLIVER & HEDGES, LLP

                              By:    /s/ Peter Calamari
                                     Peter E. Calamari (*Pro Hac Vice*)
                                     Rex Lee (*Pro Hac Vice*)

                              51 Madison Avenue, 22nd Floor
                              New York, New York 10010
                              (212) 849-7000

                              HARE & CHAFFIN

                              By:    /s/ David B. Chaffin
                                     David B. Chaffin
                                     BBO No. 549245

                              160 Federal Street
                              Boston, MA  02110
                              (610) 330-5000

                              *Attorneys for Defendants*
                              *State Street Corporation*
                              *and State Street Global Advisors*

### CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 15, 2006.

                              /s/ Rex Lee

Plaintiff's exhibit 12

## STATE STREET GLOBAL ADVISORS
ssga.com

Enter Keywords Here    **Search**

Home | Contact | Login/Register | Help | Offices | Site Map

Find Products    Select Office/Site

SSgA Home > About SSgA

**Asset Management**
**Bundled Solutions**
**Research & Commentary**
**About SSgA**
  Organization
  ▪ Overview
    Rankings & Awards
    International Sites/Offices
    Global Alliance Companies
    Related Web Sites
  News and Press
    News Summaries
    Press Releases
  Careers
    Culture & Benefits
    Job Opportunities
  Relationship
  Management
    Institutional Clients
    Investment Consultants
    Financial Advisors
    Financial Services Companies

## About SSgA

### Bringing a World of Innovation to Sophisticated Investors

State Street Global Advisors (SSgA) is an acknowledged leader in institutional investing with $1.5 trillion in assets under management. The world's largest institutional asset manager and leader in several other investment rankings , SSgA is also the investment management arm of State Street Corporation, one of the world's largest custodians. Leveraging these combined strengths permits us to focus single-mindedly on delivering competitive investment strategies and integrated solutions to our clients worldwide, across virtually every asset class, capitalization range, region, and style. SSgA is led by William W. Hunt, President and Chief Executive Officer. For further information about SSgA, please see More about SSgA>>


**Sean Flannery: SSgA's North American Investment Capabilities** (08:47min)
Sean P. Flannery (Bio)
CIO North America, State Street Global Advisors
Transcript

Select Related Videos

### About SSgA Highlights

▪ John Balder: Goldilocks or Signs of Stagflation?
▪ Amos Rogers: REITs and Volatility
▪ Lawrence Dryden: Volatility and Inflation
▪ Vincent Kok: Expectation of Future Inflation
▪ Brad Aham: Emerging Markets - Rollercoaster Ride
▪ Alistair Lowe: Fasten Your Seat Belts

**Features**


**A Market Leader**
SSgA rankings and awards


**Global Alliance Companies**
Specialized equity, private equity and real estate solutions


**In the News**
SSgA news summaries


**Press Releases**
Recent press from SSgA

Home | Contact | Help | Site Feedback | Legal Info/Privacy | Copyright
© 2006 State Street Corporation - All Rights Reserved

Plaintiff's exhibit 13

CONFIDENTIAL

A meeting of the <u>Executive Compensation Committee</u> of <u>State Street Corporation</u> was held on <u>Wednesday, June 18, 2003</u>, at 225 Franklin Street, Boston, Massachusetts.

Mr. Weissman, the Chairman, presided. Committee members Ms. Hill and Messrs. Darehshori, Sergel and Summe were present. Also present were Messrs. Logue, Resch, de Ocejo, and Ooi, and Ms. Bateman, the Secretary, who kept the minutes of the meeting.

Mr. Weissman called the meeting to order noting the presence of a quorum.

Mr. de Ocejo presented and reviewed a summary of actions taken at the Committee's March 21, 2003, meeting following which Ms. Bateman presented minutes of that meeting, which had been distributed previously. Upon motion duly made and seconded, it was unanimously

> VOTED:     That the minutes of the Executive Compensation Committee held on March 21, 2003, having been provided to the members, be and hereby are approved.

Mr. de Ocejo presented and reviewed information on the Voluntary Separation Program, the early retirement and enhanced severance offers made available to employees. He noted that the program was part of the Company's effort to cut costs in order to better align expenses with revenues. He reviewed the goal of the program to reduce operating expenses by $125 million for the remainder of the year by reducing headcount by 1800 to 2000 through the voluntary program with possible involuntary reductions to follow. He reviewed the terms of the program for employees below the level of Executive Vice President. He stated that eligible employees are grouped into five categories based on retirement plan eligibility. He reviewed the eligibility criteria as well as the enhanced benefits available for each group. He also reviewed details of the Executive Voluntary Separation Program. He reviewed statistical data for the employees groups including the number of eligible employees that elected the Voluntary Separation Program and the annualized savings to the Company. Discussion followed.

Mr. de Ocejo reviewed recommended modifications of equity grants that would be necessary to effectuate the voluntary separation program. He noted that under the voluntary separation program options will continue to vest and be exercisable under the original terms of the grant, restricted stock awards and deferred stock awards, including those granted under the SSgA Equity Program will vest on June 30, 2003, and performance awards granted to Executive Vice Presidents under Cycle L will continue to be payable under the original terms and performance criteria. He reviewed information specific to employees in Private Asset Management, and employees of the International Depositary Services. Following discussion, and upon motion duly made and seconded, it was unanimously

### <u>Votes Relating to Stock-based Awards – Non-PAM/IDS Employees</u>

VOTED:     That in the case of each stock option (a "general-rule VSP-affected option") awarded under the Corporation's 1994 Stock Option and Performance Unit Plan or the 1997 Equity Incentive Plan that is outstanding and held, immediately prior to the applicable termination event, by a VSP participant (excluding, for the avoidance of doubt, anyone employed by the Private Asset Management ("PAM") business unit or the International Deposit Services ("IDS") business unit), the following vesting and exercise rules shall apply:

(i) the general-rule VSP-affected option, if not already fully exercisable, shall continue to become exercisable on the same basis as if the VSP participant had continued to be employed by the Corporation and its subsidiaries, subject to clause (iii) below;

(ii) the general-rule VSP-affected option shall continue to be exercisable in accordance with its terms, as modified by clause (i) above and subject to clause (iii) below, until the date on which it would have expired by its terms if the VSP participant had continued to be employed by the Corporation and its subsidiaries; and

(iii) notwithstanding clauses (i) and (ii) above, the special option-related vesting and exercise rules described therein shall apply only if the VSP participant satisfies all applicable Program requirements.

VOTED:    That each deferred stock award made under the SSgA Equity Compensation Plan or the Corporation's 1997 Equity Compensation Plan, (a "general-rule VSP-affected deferred stock award") and each restricted stock award made under the 1997 Equity Compensation Plan, in each case that is held immediately prior to the applicable termination event by a VSP participant (excluding, for the avoidance of doubt, anyone employed by the PAM business unit or the IDS business unit), shall be fully vested on June 30, 2003, subject to the VSP participant's satisfaction of all applicable tax withholding requirements and all applicable Program requirements; and that the shares of stock subject to each general-rule VSP-affected deferred stock award that is vested or that vests in accordance with the foregoing shall be delivered, subject to the VSP participant's satisfaction of all applicable tax withholding requirements and all applicable Program requirements, at or as soon as practicable after June 30, 2003.

VOTED:    That each Cycle L Performance Award made under the Corporation's 1997 Equity Compensation Plan that is held immediately prior to the applicable termination event by a VSP participant (excluding, for the avoidance of doubt, anyone who is employed by the PAM business unit or the IDS business unit) shall continue to be outstanding (and shall be payable, if at all, following completion of the 2003-2004 performance period), subject to the VSP participant's satisfaction of all applicable Program requirements, on the same basis as if the VSP participant had continued to be employed by the Corporation and its subsidiaries.

### Votes Relating to Stock-based Awards - PAM Employees          SSC 04643

VOTED:    That in the case of each stock option (a "PAM option") awarded under the Corporation's 1994 Stock Option and Performance Unit Plan or the 1997 Equity Incentive Plan to an individual who is currently employed by the PAM business unit (a "PAM participant"), who remains employed by the PAM business unit until the closing of the contemplated transaction (the "Transaction") to sell the PAM business (the "Closing"), and who is either not offered employment by the purchaser of the PAM business unit or an affiliate thereof (the "Purchaser") in connection with the Transaction or is offered and accepts such employment, the following vesting and exercise rules shall apply:

(i) if the PAM participant (A) is not offered employment by the Purchaser and ceases to be employed by the Corporation and its subsidiaries, or (B) is offered and accepts employment by the Purchaser and continues in the employment of the Purchaser (or is jointly employed by the Purchaser and the Corporation or its subsidiaries) for at least nine months following the Closing, or is involuntarily terminated by the Purchaser (other than for cause) prior to the expiration of such nine-month period,

2

the PAM option, if not then already fully exercisable, shall continue to be exercisable on the same basis as if the PAM participant had continued to be employed by the Corporation and its subsidiaries; *provided*, that in the circumstances described in sub-clause (B) above, no portion of the PAM option that could not have been exercised after the Closing and prior to the expiration of such nine-month period (or involuntary termination, if earlier) without regard to this clause (i) shall be exercisable prior to the expiration of such nine-month period (or involuntary termination, if earlier) by reason of the application of this clause (i);

(ii) if the PAM participant is offered and accepts employment by the Purchaser and his or her employment by the Purchaser thereafter terminates for any reason (other than involuntary termination by the Purchaser as described in clause (i)) prior to the expiration of the nine-month period following the Closing, that portion of the PAM option that was exercisable immediately prior to the Closing shall be exercisable for three months following termination of the PAM participant's employment by the Purchaser (or until the final expiration date of such option, if earlier), and thereupon shall expire, and the remainder of the PAM option shall expire immediately upon the termination of the PAM participant's employment by the Purchaser; *provided*, that in the event of a termination for cause the entire option shall immediately expire;

(iii) notwithstanding clauses (i) and (ii) above, the special option-related vesting and exercise rules described therein shall apply only if the PAM participant satisfies all applicable requirements (similar to the requirements applicable under the 2003 Program) applied by the Corporation to benefits available to employees affected by the sale of the PAM business unit; and

(iv) notwithstanding clauses (i), (ii) and (iii) above, if the PAM participant would have been eligible to retire (as that term is used under the applicable plan in determining rights to continued vesting of options) from the Corporation and its subsidiaries at or prior to the Closing, the rules set forth in clauses (i), (ii) and (iii) shall not operate to reduce the rights the PAM participant would have had with respect to the PAM option had he or she retired at the Closing.

VOTED:  That each deferred stock award made under the SSgA Equity Compensation Plan or the Corporation's 1997 Equity Compensation Plan (a "PAM deferred stock award") and each restricted stock award made under the 1997 Equity Compensation Plan (a "PAM restricted stock award") (PAM restricted stock awards and PAM deferred stock awards being herein referred to as "PAM stock awards"), in each case to a PAM participant who remains employed by the PAM business unit until the Closing and who is either not offered employment by the Purchaser in connection with the Transaction or is offered and accepts employment by the Purchaser in connection with the Transaction, shall be subject to the following special rules:

(i) if the PAM participant (A) is not offered employment by the Purchaser and ceases to be employed by the Corporation and its subsidiaries, or (B) is offered and accepts employment by the Purchaser and continues in the employment of the Purchaser (or is jointly employed by the Purchaser and the Corporation or its subsidiaries) for at least nine months following the Closing, or is involuntarily terminated by the Purchaser (other than for cause) prior to the expiration of such nine-month period, the PAM stock award shall vest fully at the expiration of such nine-month period (or immediately prior to such cessation or termination of employment, if earlier), subject to the PAM participant's satisfaction of all applicable tax withholding requirements; and the shares of stock subject to each PAM deferred award that is

3

SSC 04644

vested or that vests in accordance with the foregoing shall be delivered, subject to the PAM participant's satisfaction of all applicable tax withholding requirements, at or as soon as practicable after vesting of such award;

(ii) if the PAM participant is offered and accepts employment by the Purchaser and his or her employment by the Purchaser thereafter terminates for any reason (other than involuntary termination by the Purchaser as described in clause (i)) prior to the expiration of the nine-month period following the Closing, any then unvested PAM stock award shall be immediately forfeited; and

(iii) notwithstanding clauses (i) and (ii) above, the special rules described therein shall apply only if the PAM participant satisfies all applicable requirements (similar to the requirements applicable under the 2003 Program) applied by the Corporation to benefits available to employees affected by the sale of the PAM business unit.

## Votes Relating to Stock-based Awards – IDS Employees

VOTED:    That in the case of each stock option (an "IDS option") awarded under the Corporation's 1994 Stock Option and Performance Unit Plan or the 1997 Equity Incentive Plan to an individual who is employed by the IDS business unit (a "IDS participant"), who remains employed by the IDS business unit until his or her role completion date (provided he or she does not transfer to another position within the Corporation and its subsidiaries prior to signing his or her release agreement), the following vesting and exercise rules shall apply:

(i) the IDS option, if not already fully exercisable, shall continue to become exercisable on the same basis as if the IDS participant had continued to be employed by the Corporation and its subsidiaries, subject to clause (iii) below;

(ii) the IDS option shall continue to be exercisable in accordance with its terms, as modified by clause (i) above and subject to clause (iii) below, until the date on which it would have expired by its terms if the IDS participant had continued to be employed by the Corporation and its subsidiaries; and

(iii) notwithstanding clauses (i) and (ii) above, the special option-related vesting and exercise rules described therein shall apply only if the IDS participant satisfies all applicable requirements (similar to the requirements applicable under the 2003 Program) applied by the Corporation to benefits available to employees affected by the transfer of the IDS business unit.

VOTED:    That each deferred stock award made under the Corporation's 1997 Equity Compensation Plan (an "IDS deferred stock award") and each restricted stock award made under the 1997 Equity Compensation Plan (an "IDS restricted stock award") (IDS restricted stock awards and IDS deferred stock awards being herein referred to as "IDS stock awards"), in each case to an IDS participant who remains employed by the IDS business unit until his or her role completion date or the date he or she signs an applicable release, if later, shall be fully vested upon the later of such date or the satisfaction of all applicable requirements (similar to the requirements applicable under the 2003 Program) applied by the Corporation to benefits available to employees affected by the transfer of the IDS business unit, subject to the IDS participant's satisfaction of all applicable tax withholding requirements; and that the shares of stock subject to each IDS deferred stock award that is vested or that vests in accordance with the foregoing shall be delivered, subject to the IDS participant's satisfaction of all applicable tax withholding requirements and all

4

SSC 04645

other applicable requirements as described above, as soon as practicable after the vesting hereinabove described.

Mr. Ooi presented and reviewed proposed amendments to the Retirement Program, the Senior Executive Retirement Program (SERP) and the Executive SERP. He stated that the purpose of the amendments is to accommodate the enhanced benefits available under the voluntary separation program, which had been discussed earlier. He requested that the Committee recommend the amendments to the Retirement Plan and to the SERP for approval by the Board, and that the Committee approve the amendments to the Executive SERP as presented. Following discussion, and upon motion duly made and seconded, it was unanimously

### Vote Relating to Retirement Plan

RESOLVED:    To recommend to the Board of this Corporation that the amendment of the State Street Corporation Retirement Plan providing for (1) benefit enhancements pursuant to the 2003 Voluntary Separation Program and (2) the freezing of the grandfathered early retirement subsidies as of August 31, 2003, presented to the meeting and filed with the records of the meeting, be and hereby is approved and adopted substantially in the form presented.

### Vote Relating to SERP

VOTED:    That it be the recommendation of this Committee to the Board that the Board amend the Corporation's Supplemental Executive Retirement Plan (the "SERP") to provide that any VSP participant who is a participant in the SERP, other than any such VSP participant who holds the title of Executive Vice President or a superior position, be deemed fully vested in his or her SERP benefit without regard to whether he or she has at least five years of "Vesting Service" (as that term is defined in the SERP), subject to the VSP participant's satisfaction of all applicable Program requirements.

### Vote Relating to Executive SERP

VOTED:    That the amendment to the Corporation's Supplemental Defined Benefit Pension Plan (the "Executive SERP") presented to this Committee, relating to enhanced Executive SERP benefits for certain persons participating in the Corporation's 2003 Executive Voluntary Separation Program, be and it hereby is approved and adopted substantially in the form presented, but with such changes, not substantially at variance with said form, as the Chairman and Chief Executive Officer, the Vice-Chairman or the Executive Vice President, Human Resources and Organizational Performance, may determine; and that, subject to any such changes as may be so determined, the officers of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to execute such documents and take such other measures as such officer or officers deem necessary or appropriate to effectuate the foregoing, the execution of any such document and the taking of any such other measure by such officer or officer so acting to be conclusive evidence that the same has been approved by this Committee.

SSC 04646

## Definitions

**VOTED:**  That for purposes of the foregoing votes, the following terms shall have the meanings set forth below:

(i) "Applicable Program requirement":  the giving of an effective release or any other procedural requirement or contractual obligation described in the 2003 Program and applicable to a VSP participant, if the VSP participant's participation in or benefits under such Program are contingent upon the giving of such release or the satisfaction of such requirement or obligation;

(ii) "Applicable termination event":  in the case of any VSP participant, the termination under the 2003 Program of such VSP participant's employment with the Corporation and its subsidiaries;

(iii) "2003 Program":  the Corporation's 2003 Voluntary Separation Program (including the 2003 Executive Voluntary Separation Program); and

(iv) "VSP participant":  any individual who is eligible to and does elect to participate in the 2003 Program.

## General Authorization

**VOTED:**  That the officers of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing votes; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. Ooi reported that the UK Save-As-You-Earn (SAYE) Scheme approved by the Committee in June 2001 will be replaced by a new all-employee Share Incentive Plan (SIP), scheduled for launch in September 2003.  He stated that a similar plan has been promised to former Deutsche Bank employees which required a replication of employment rules, terms, and conditions of employment provided by Deutsche Bank.  He noted that the plan has received preliminary approval by UK Inland Revenue, and that State Street Brokerage would be used as the broker to purchase shares each month.  He noted that the Plan may have an unapproved sub-plan to allow State Street to extend the Plan to employees in Jersey, but that favorable tax treatment would not apply.  He reviewed the key terms of the plan, which were listed in the materials provided to the meeting.  He reviewed background data on the number of employees eligible, expected share contribution cost, and expected number of shares to be purchased each month.  He also reviewed summary information on UK tax provisions.  Following discussion, and upon motion duly made and seconded, it was unanimously

## Approval of UK Share Incentive Plan

SSC 04647

**VOTED:**  To adopt the Employee UK Share Incentive Plan as presented to this meeting for employees of State Street Bank and Trust Company, London Branch and other participating employers.

**VOTED FURTHER:**  That the General Counsel, Executive Vice President and Secretary, the Executive Vice President for Human Resources & Organizational Performance, and the Senior Vice President for Compensation and US Benefits of this Corporation and each of their respective delegates, be and each is hereby authorized to execute such documents and to take such actions as such officer deems necessary or appropriate

6

to implement and administer the preceding vote approved and adopted by the Committee.

Mr. de Ocejo presented and reviewed a summary of actions expected to be taken at the Committee's meeting in September 2003. Discussion followed.

There being no further business, the meeting adjourned.

Dissolved.

A true record.

Attest:

_____
Maureen Scannell Bateman

7

SSC 04648

Plaintiff's exhibit 14

<u>CONFIDENTIAL</u>

A meeting of the <u>Board of Directors</u> of <u>State Street Corporation</u> was held on <u>Thursday, June 19, 2003</u>, at 225 Franklin Street in Boston, Massachusetts.

Mr. Logue presided. The following Directors were also present: Dr. Albright and Ms. Hill and Messrs. Casner, Darehshori, Goldstein, Gruber, LaMantia, Poe, Sergel, Skates, Summe and Weissman.

Also present were Messrs. Towers, Resch and Breakspear, and Ms. Bateman the Secretary, who kept the minutes of the meeting.

Mr. Logue called the meeting to order noting the presence of a quorum.

At this point Mr. Logue introduced Ms. Cathy E. Minehan, President and Chief Executive Officer of the Federal Reserve Bank of Boston, Mr. Eric Rosengren, Senior Vice President of the Supervision, Regulation and Credit Department of the Federal Reserve Bank of Boston, and Mr. Allan Howe, Directing Examiner, and Resident Examiner at State Street Corporation since November 2000. Ms. Minehan, accompanied by Messrs. Rosengren and Howe then presented the annual Federal Reserve briefing to the board. Discussion followed.

Ms. Minehan and Messrs. Rosengren, Howe, and Breakspear left the meeting.

Minutes of the previous meeting held on April 16, 2003 were presented and upon motion duly made and seconded, it was unanimously

<u>VOTED</u>:    That the minutes of the meeting of the Board of Directors held April 16, 2003 having been distributed to Directors in advance of the meeting, be and they hereby are approved as presented.

Mr. Resch presented a financial review for the first two months of the 2003 second quarter. He discussed revenue, expenses and earnings measures for the quarter to date on a baseline, operating and reported basis. He reviewed changes from budget, the prior year and pro forma 2002 results (excluding corporate trust operations) for the major components of baseline revenue, expenses and earnings measures in the quarter to date. He reviewed Deutsche Global Securities Services operations revenue, expenses, earnings measures and one-time costs compared to budget for the quarter to date. He reviewed changes from budget for the major components of reported results in the quarter to date. He reviewed operating earnings per share, by quarter, for 2002 (baseline) and the first quarter of 2003 (baseline), for the second quarter of 2003 (baseline for April and May, otherwise budgeted) and budgeted for the third and fourth quarters of 2003. He reviewed the status of the stock purchase program as of May 31, 2003. He reviewed results for the year to date through May 31 on a baseline, operating and reported basis compared to budget. He reviewed year-to-date figures (baseline) compared to budget, to 2002 and pro forma 2002 (excluding corporate trust operations) for revenue, expenses and earnings measures, and GSS operations figures year-to-date for revenue, expenses,

SSC 06097

earnings measures and one time costs compared to budget. He reviewed year-to-date reported results compared to budget. Discussion followed.

Mr. Resch presented and reviewed a revised plan (baseline) for 2003 compared to budget and 2002. He reviewed a baseline quarterly earnings trend forecast for 2003 compared to budget and 2002. Discussion followed.

Mr. Resch reviewed comparative information on the Corporation's diluted earnings per share (actual and budgeted) for the period ended May 31, 2003 compared to 2002. He reviewed the consolidated statement of income for the month and five months ended May 31, 2003 compared to 2002. He reviewed the consolidated statement of condition at May 31, 2003 compared to the prior month-end and the prior year period, for the Corporation and State Street Bank and Trust Company. He reviewed financial policy guidelines at May 31, 2003 compared to the prior month-end and the prior year period. Discussion followed.

Mr. Logue presented and reviewed information on operational performance. He reviewed new relationships with clients, competitive wins and losses, and accounting wins. Discussion followed.

Mr. Logue presented and reviewed information providing an update on the integration of the Global Securities Services business purchased from Deutsche. He reviewed client composition in relation to percentage of total revenue, and reviewed information on client retention, loss status, and global client conversions. Discussion followed.

Mr. Logue introduced a management update and discussed the earnings outlook. Mr. Towers discussed strategy development. Discussion followed.

At this point Mr. Spina and Mr. Luis de Ocejo, Executive Vice President of Human Resources and Organizational Performance, and Mr. Boon Ooi, Senior Vice President of Human Resources and Organizational Performance, joined the meeting. Mr. de Ocejo, together with Mr. Towers, presented and reviewed information on the Corporation's cost reduction initiatives. Mr. de Ocejo presented and reviewed background information on the voluntary and involuntary separation programs. He noted that as part of the overall cost reduction initiatives, the company would seek to save $130 million by reducing headcount by 1800-2000 employees primarily in the United States first through voluntary offers, and then through involuntary terminations. He described related planning efforts. He reviewed results to date of the voluntary offers, discussed senior departures, and reviewed next steps which include implementing the voluntary/involuntary programs on June 25, concluding the process during July and August, completing organizational reviews by business and function, and recruiting for new talent selectively. He also discussed certain terms of the voluntary and involuntary program, which were included in the materials presented to the meeting. He briefed the Board on actions taken by the Executive Compensation Committee to accommodate the voluntary separation program and the involuntary separation program. In this regard, he discussed the Executive Compensation Committee's actions to modify the terms of equity grants, and to amend the Executive SERP. Mr. Towers reviewed the Executive Compensation Committee's recommendations to the Board to amend the State Street Retirement

SSC 06098

Plan, and the Supplemental Executive Retirement Plan (SERP). He reviewed the financial implications of these recommendations, as well as the financial implications of the actions taken by the Executive Compensation Committee. There followed a period of discussion and the Board reviewed the actions reviewed above and with the related financial implications. Following the discussion, and upon motion duly made and seconded, it was unanimously

VOTED:    That the amendment of the State Street Corporation Retirement Plan providing for (1) benefit enhancements pursuant to the 2003 Voluntary Separation Program and (2) the freezing of the grandfathered early retirement subsidies as of August 31, 2003, presented to the meeting and filed with the records of the meeting, be and hereby is approved and adopted substantially in the form presented.

VOTED:    That the amendment of the State Street Corporation Supplemental Executive Retirement Plan (the "SERP") providing that any VSP participant who is a participant in the SERP, other than any such VSP participant who holds the title of Executive Vice President or a superior position, be deemed fully vested in his or her SERP benefit without regard to whether he or she has at least five years of "Vesting Service" (as that term is defined in the SERP), subject to the VSP participant's satisfaction of all applicable Program requirements, presented to the meeting and filed with the records of the meeting, be and hereby is approved and adopted substantially in the form presented.

VOTED:    That for purposes of the foregoing votes, the following terms shall have the meanings set forth below:

    (i)    "Applicable Program requirement":  the giving of an effective release or any other procedural requirement or contractual obligation described in the 2003 Program and applicable to a VSP participant, if the VSP participant's participation in or benefits under such Program are contingent upon the giving of such release or the satisfaction of such requirement or obligation;

    (ii)    "2003 Program":  the Corporation's 2003 Voluntary Separation Program (and for the avoidance of doubt, not including the 2003 Executive Voluntary Separation Program); and

    (iii)    "VSP participant":  any individual who is eligible to and does elect to participate in the 2003 Program.

VOTED:    That the Chairman and Chief Executive Officer, the President and Chief Operating Officer, the Vice-Chairman, the Executive Vice President and Chief Financial Officer, the Executive Vice President and General Counsel, and the Executive Vice President, Human Resources and Organizational Performance, be and they are and

SSC 06099

each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to execute such amendments heretofore approved at this meeting, but with such changes therein that do not materially vary with the form presented to this meeting as the officer or officers so acting shall approve, and that the execution by such officer of such amendments shall be conclusive evidence that such amendments have been approved and adopted by this Board; and to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing votes; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Board.

Messrs. de Ocejo and Ooi left the meeting. Mr. Logue declared a recess following which the meeting resumed.

The meeting resumed in executive session during which Ms. Bateman and Messrs. Logue, Towers, Resch, and de Ocejo were not present. Mr. Weissman presided in the absence of Mr. Logue, and Mr. Casner kept the minutes of the meeting in the absence of the Secretary. Mr. Spina was present for a portion of this meeting. He then left after a discussion of the Voluntary Separation Program and Involuntary Separation Program.

At the conclusion of the executive session Ms. Bateman and Messrs. Logue, Towers, and Resch returned to the meeting. Ms. Hill left the meeting. Ms. Walsh joined the meeting by teleconference.

Mr. Casner, Chairman of the Executive Committee, reported on the meetings of that Committee held May 8, 2003 and June 12, 2003, the agendas and minutes of which were in the materials presented to the meeting. He summarized the reports to the Committee. Discussion followed.

Mr. LaMantia, Chairman of the Examining and Audit Committee, reported on the meeting of that Committee held June 18, 2003 the agenda of which was provided in the materials presented to the meeting.   He summarized the reports to the Committee and discussed other audit related matters. Discussion followed.

At this point Mr. Drew J. Breakspear, Executive Vice President and General Auditor, joined the meeting and presented and reviewed a Federal Reserve Bank of Boston report of examination and inspection of State Street Corporation and State Street Bank and Trust Company including the targeted inspection of Credit and Risk Policy. He reviewed the examination recommendations, and management responses. Discussion followed after which Mr. Breakspear left the meeting.

Mr. Weissman, Chairman of the Executive Compensation Committee, reported on the meeting of that Committee held on June 18, 2003, the agenda of which was included in the materials presented to the meeting. He summarized the reports to the Committee and noted the Committee's vote to establish the UK Share Incentive Plan for employees who came to State Street through the Deutsche acquisition. He noted the Committee's actions with regard to the Voluntary Separation Program and

SSC 06100

4

Involuntary Separation Program and reviewed the related financial implications, which had been discussed by the Board earlier in the meeting. Discussion followed.

Mr. Goldstein, Chairman of the Nominating and Corporate Governance Committee, reported on the meeting of that Committee held June 19, 2003, the agenda of which was included in the materials presented to the meeting. He summarized the reports to the Committee, and discussed other corporate governance matters. Mr. Goldstein discussed Mr. Summe's rotation off the Executive Compensation Committee. Mr. Goldstein then reviewed the Committee's recommendation to the Board that Mr. Summe be elected a member of the Nominating and Corporate Governance Committee. Following discussion, and upon motion duly made and seconded, with Mr. Summe abstaining, it was unanimously

> VOTED:    That Gregory L. Summe be, and hereby is, elected as a member of the Nominating and Corporate Governance Committee effective June 19, 2003 to serve as provided in the by-laws.

Mr. Resch presented and reviewed a recommendation for a dividend from State Street Corporation to the stockholders. Following discussion, and upon motion duly made and seconded, it was unanimously

> VOTED:    That a dividend of fourteen cents ($0.14) per share be declared upon the Common Stock of this Corporation, $1 par value, payable on July 15, 2003 to stockholders of record at the close of business on July 1, 2003.

Mr. Towers, Chairman of the State Street Retirement Plan Committee and the State Street Salary Savings Program Committee, then presented and reviewed information on these benefit plans, both of which are sponsored by the Corporation. He noted the founding date, and reviewed assets as of December 31, 2002 for each plan. He reviewed the State Street Retirement Plan Portfolio noting that State Street Global Advisors' Office of the Fiduciary Advisor was engaged in February 1999 to provide fiduciary services, operational oversight, and investment management. He discussed the strategic asset allocation, which was adopted in May 1999. Discussion followed.

Mr. Towers then reviewed the State Street Salary Savings Program, which is a defined contribution program. He reviewed the benefit formula, and noted that vesting is immediate. He discussed investment options noting that there are fourteen options including the self-managed brokerage account. Mr. Towers then reviewed supplemental information for the Retirement Plan and the Salary Savings Program including Retirement Plan investment returns, and Salary Savings Program fund performance. Discussion followed.

Mr. Towers presented and reviewed information on State Street's non-qualified benefit plans: the Supplemental Executive Retirement Plan (SERP) and the Supplemental Defined Benefit Pension Plan (Executive SERP). He discussed information with regard to individual agreements noting that there are four

SSC 06101

participants in these agreements, and he reviewed related financial information and performance. Discussion followed.

At this point, Mr. Timothy Harbert, Executive Vice President, and Chairman and CEO of State Street Global Advisors, Mr. James Caccivio, Senior Vice President, Corporate Advisory Services, and Mr. Eric Hayes, Senior Principal and Trust Counsel, Private Asset Management, joined the meeting. They presented and reviewed information on the proposed divestiture of the private asset management business. They provided an overview of the business, reviewed the strategic rationale for the sale, reviewed a summary of proposed bids, and discussed a timeline of events. Discussion followed.

There being no further business, the meeting adjourned.

Dissolved.

A true record.

Attest:

_Maureen Scannell Bateman_

SSC 06102

6

Plaintiff's exhibit 15

EXHIBIT 2

Spina

QRS 5/31/06

**Alan Brown**

06/10/2004 10:06 PM

To: David A Spina/USA/StateStreet@StateStreet
cc: Tim Harbert/USA/StateStreet@StateStreet
Subject: Post VSP understanding

David

It is now virtually a year since the end of the VSP. At the time, as you know, the VSP was not offered to me in spite of my central US role. However, you reassured me that if I remained with SSgA, I would be entitled to a severance package similar to that of the VSP, provided I left without cause. Specifically you agreed that Tim and I would get the VSP package amortised over 5 years, save in one regard that vesting of equity would be limited to equity granted before 30.6.2003. So for example, where the VSP programme granted 5 years additional service for the purposes of the EVP top-up pension plan, if I were to leave after 3 years from the VSP, I would be credited two additional years of service for the EVP plan.

As a separate matter, we also agreed that we would clarify how the EVP plan would apply in my circumstances where I have no DB benefits at all from State Street or any former employers.

Given the importance of both of these matters, it is important for both myself and State Street that we should have a written record of this understanding. You said that you intended to write to me to confirm this, but I appreciate that the business pressures at the time may have got in the way. However, I don't think we should let the anniversary of the VSP go by without putting a written record on file. I would be perfectly happy for this e:mail to stand as the record of our agreement. However, please do let me know if this is not, in your view, an accurate statement of our agreement.

And separately, I would request clarification as to how the EVP plan will apply in my case.

Many thanks and best wishes.

Alan

Alan J Brown
Group Chief Investment Officer
SSgA

Authorised and regulated by the Financial Services Authority
Recipient of the Queen's Award for Enterprise 2003

020 7698 6007 (Direct Line)
020 7004 2907 (Direct Fax)

Please visit our Web site at www.ssga.com

Plaintiff's exhibit 16

EXHIBIT 3

Spina
ARS 5/31/06

**David A Spina**
06/15/2004 09:13 PM

To: Alan Brown/Europe/StateStreet@StateStreet
cc: Tim Harbert/USA/StateStreet@StateStreet
Subject: Re: Post VSP understanding

Alan - greetings - I am not ignoring you!!! Thanks for the 'first cut' at a record. I will share with Lou de Ocejo and plan to discuss the general outline with our Executive Comp Committee of the Board of Directors tomorrow. So I will get it on the record. More after the meeting with the board on Wed/Thursday. David.

Plaintiff's exhibit 17






David A
Spina/USA/StateStreet
06/29/2004 02:40 PM

To  Luis de Ocejo/USA/StateStreet@StateStreet
cc
bcc
Subject  Post VSP understanding

Lou, I will send you a copy of a letter I am sending to Bob Weissman about this situation and I wanted you
to have the background of Alan's version - which I find to be essentially accurate.  David.

—— Forwarded by David A Spina/USA/StateStreet on 06/29/2004 02:37 PM ——

Alan Brown
06/10/2004 05:06 PM

To:  David A Spina/USA/StateStreet@StateStreet
cc: Tim Harbert/USA/StateStreet@StateStreet
Subject:  Post VSP understanding

David

It is now virtually a year since the end of the VSP.  At the time, as you know, the VSP was not offered to
me in spite of my central US role.  However, you reassured me that if I remained with SSgA, I would be
entitled to a severance package similar to that of the VSP, provided I left without cause.  Specifically you
agreed that Tim and I would get the VSP package amortised over 5 years, save in one regard that vesting
of equity would be limited to equity granted before 30.6.2003.  So for example, where the VSP
programme granted 5 years additional service for the purposes of the EVP top-up pension plan, if I were
to leave after 3 years from the VSP, I would be credited two additional years of service for the EVP plan.

As a separate matter, we also agreed that we would clarify how the EVP plan would apply in my
circumstances where I have no DB benefits at all from State Street or any former employers.

Given the importance of both of these matters, it is important for both myself and State Street that we
should have a written record of this understanding.  You said that you intended to write to me to confirm
this, but I appreciate that the business pressures at the time may have got in the way.  However, I don't
think we should let the anniversary of the VSP go by without putting a written record on file.  I would be
perfectly happy for this e:mail to stand as the record of our agreement.  However, please do let me know
if this is not, in your view, an accurate statement of our agreement.

And separately, I would request clarification as to how the EVP plan will apply in my case.

Many thanks and best wishes.

Alan

Alan J Brown
Group Chief Investment Officer
SSgA

Authorised and regulated by the Financial Services Authority
Recipient of the Queen's Award for Enterprise 2003

020 7698 6007 (Direct Line)
020 7004 2907 (Direct Fax)

Please visit our Web site at www.ssga.com

Plaintiff's exhibit 18



**Serving Institutional Investors Worldwide℠**

Received by

JUL 0 1 2004

# Tim Harbert

June 30, 2004

David A. Spina
Chairman and Chief Executive Officer

Robert E. Weissman
Chairman, Shelburne Investments
152 Shelburne Center Road
P.O. Box 309
Shelburne, MA  01370

> **EXHIBIT** /
> *Spina*
> *9RS 5/31/06*

Dear Bob:

At the meeting of the Executive Compensation Committee on Wednesday, June 16, 2004, I reported to the committee that I made oral commitments to several executives during 2003 for the purpose of retaining their services to State Street during 2003 and beyond.  You suggested I record these commitments in the form of a letter to you as Chairman of the Executive Compensation Committee.  This would enable you and the committee to act on these situations if and when the individual circumstances require.

I made oral commitments to Tim Harbert and Alan Brown, Chairman and Vice Chairman of SSgA, respectively, and Executive Vice Presidents of State Street Corporation, explained more fully below. This was made to both individuals together simultaneously.  Separately, I made a commitment to John Towers, Vice Chairman and Chief Administrative Officer of State Street Corporation, also described below.

The commitment I made to Tim and Alan was as follows.  In exchange for their continued commitment to remain active as leaders of SSgA, State Street Corporation would hold available for them the same separation package the company was offering U.S. employees under what is known as the Voluntary Separation Program (VSP).  In 2003, both Tim and Alan were in their early 50's.  My stated commitment to them was stated as for the period when they were between the ages of 50 and 55.  The communication was clear that when they reached the age of 55, any extra compensation under the commitment or under the VSP would no longer be available to them. By way of extension, the longer each stay as active employees, the shorter and smaller any additional benefits will be.

The major elements of the VSP involved additional credits for service under programs, severance payments and modification of treatment of previously issued stock options.  In the case of Tim Harbert, these are quite straightforward.  Tim is a U.S. employee and has salary, and retirement benefits that are similar to other Executive Vice Presidents who elected the VSP.  Accordingly, if the committee honors my oral commitments, which I strongly recommend it do, then the Human Resources and Organization Performance Division will be able to define the effects with precision.

The application of this promise to Alan's situation requires thought and judgment.  Alan is a U.K. employee although his duties are global and his performance has a profound effect on our business in the U.S.  The difficulty in applying the additional years of service for retirement

State Street Corporation
225 Franklin Street
Boston, MA  02110-2804

Telephone: (617) 664-3125
Facsimile: (617) 664-4340

purposes for Alan is that we did not offer the VSP to any non-U.S. employees and we do not have similar DB type retirement plans in place for Alan. Hence, the definition and application of additional service will require some development. Alan sent me an e-mail on June 10, 2004, explaining his understanding and I have forwarded his email to Lou de Ocejo for continuity.

The promise I made to John Towers was different, although it also involved the application of the VSP. John was 61 when we made the VSP available. He had a long expressed plan to retire in 2003. When we designed the VSP, I told John that he would not be eligible VSP as his service was critical to the smooth running of the corporation's business. John pointed out the many benefits of the VSP from which he was excluded by my decision to render him ineligible.

I told John that the one element of the VSP that I would recommend for him was the modification of previously issued stock options. Without modification, when an executive with John's background would leave with options, those options would have to be exercised within one year of his retirement date. The modification was to allow the term of the options to run in accordance with their original terms. This would allow John greater participation in any future increases in State Street's stock price. I told John this would be fair for both him and the company as the company would benefit from his leadership during a period of significant employee turnover.

Bob, if you have any questions, I would be happy to amplify. As you know, being CEO of a 20,000 person publicly owned company often requires rapid, situational decision making. I strongly recommend the Executive Compensation act in accordance with these decisions if and as the circumstances arise that make them relevant.

Sincerely,

cc. Luis de Ocejo

/cmf

bcc. Tim Harbert

Plaintiff's exhibit 19

From:       Boon S Ooi
Sent:       Monday, July 12, 2004 5:46 PM
To:         Luis de Ocejo
Subject:    Ron Logue update
Attach:     7582_Ron Logue Update 7-04.doc.zip

Lou, an expanded write up and agenda (included more details on Alan Brown and Tim Harbert)
Do you want to forward it to Ron prior to the meeting

Thanks,

Boon

<<...>>

Agenda

I Executive Issues
1. Tom McCrossan
2. John Towers
3. Tim Harbert
4. Alan Brown

II Process/Governance Issue
1. SVP promotions
2. EVP promotion
   a. SSgA nominations
3. ECC calendar
4. 2005 proxy season- additional equity

III Compensation philosophy update

IV Other HR&OP items
1. Outsourcing
2. Inclusion
3. PPR
4. Talent review

SSC 05546

## I. Executive Issues

1) Tom McCrossan
   a) Maintain EVSP provisions
   b) Cash severance 3.1 million (1.3 M in 2004, 0.459 M per year in next 4 years)
   c) Est. accounting cost of options modification – 1.3 M
   d) Est. cost of performance awards – 2.4 M
   e) Total – 6.8 M

2) John Towers
   a) Permit options granted prior to 6/03 to continue to be exercisable under original terms of grants.
   b) Number of share options involved – 654,200
   c) Estimated accounting cost - $10.0 million

3) Tim Harbert
   a) Provide protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to executive for duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end.
   b) Current age: 53, protection ends on 3/18/2006
   c) Interpretation:
      i) Terms are provided only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, executive would be forced to terminate employment just prior to 3/18/2006 to take advantage of such benefits.
      ii) Options granted prior to 6/03 to continue to be exercisable under original terms of grants. (392,800 options)
      iii) Severance payable as of 6/30/2003 (in terms of number of weeks), will be provided – 104 weeks
      iv) Health benefits will continue until age 65 (under retiree medical plan)
      v) Executive SERP value calculated under EVSP as of 8/31/2003 is protected until 3/18/2006.
   d) Estimated cost (as of 7/1/04):
      i) Options =              $6.0 million
      ii) Severance =           $1.25 million
      iii) Exec. SERP =         $5.0 million
      iv) Total =               $12.25 million *(Some of Exec SERP cost is already expensed under FASB 87. Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)*

SSC 05547

4) Alan Brown
   a) Provide protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to executive for duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end.
   b) Current age: 51, protection ends on 4/27/2008
   c) Interpretation:
      i) Terms are provided only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, executive would be forced to terminate employment just prior to 4/27/2008 to take advantage of such benefits.
      ii) Options granted prior to 6/03 to continue to be exercisable under original terms of grants. (135,500 options)
      iii) Severance payable as of 6/30/2003 (in terms of number of weeks), will be provided – 84 weeks
      iv) Health benefits will continue until age 65 (under UK medical plan)
      v) Executive SERP value calculated under EVSP as of 8/31/2003 is protected until 3/18/2006. The challenge here is that the requisite offset to this Exec SERP will be the pension equivalent of an individual pension contribution provided by State Street UK (21.66% per year). We will need to apply the annuity equivalent of this accumulation as an offset to the Exec SERP benefit.
   d) Estimated cost:
      i) Options = $2.6 million
      ii) Severance = $1.14 million (est.)
      iii) Exec. SERP = $2.9 million (assuming $0 offset from UK plan)
      iv) Total = $6.64 million *(Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)*

SSC 05548

Plaintiff's exhibit 20



July 12, 2004

Mr. Robert E. Weissman
Chairman
Shelburne Investments
152 Shelburne Center Road
P.O. Box 309
Shelburne, MA  01370

Dear Bob:

As you requested, attached are:

1. Peter Egan's letter providing you and the Executive Compensation Committee with his recommendations on Ron's compensation.  Please feel free to contact Peter if you have any questions.

2. 5 Year Schedule of Compensation Actions for Ron and David Spina.

3. A summary of the financial impact and suggested interpretations of David's "oral promises" to John Towers, Alan Brown and Tim Harbert.

Please call me if you have any questions.

Sincerely,

cc:    Boon Ooi

SSC 05477

1) John Towers
   a) Permit options granted prior to 6/03 to continue to be exercisable under original terms of grants.
   b) Number of share options involved – 654,200
   c) Estimated accounting cost - $6.0 million

2) Tim Harbert
   a) Provide protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to executive for duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end.
   b) Current age: 53, protection ends on 3/18/2006
   c) Interpretation:
      i) Terms are provided only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, executive would be forced to terminate employment just prior to 3/18/2006 to take advantage of such benefits.
      ii) Options granted prior to 6/03 to continue to be exercisable under original terms of grants. (392,800 options)
      iii) Severance payable as of 6/30/2003 (in terms of number of weeks), will be provided – 104 weeks
      iv) Health benefits will continue until age 65 (under retiree medical plan)
      v) Executive SERP value calculated under EVSP as of 8/31/2003 is protected until 3/18/2006.
   d) Estimated cost (as of 7/1/04):
      i) Options =          $3.0 million
      ii) Severance =       $1.25 million
      iii) Exec. SERP =     $5.0 million
      iv) Total =           $9.25 million *(Some of Exec SERP cost is already expensed under FASB 87. Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)*

3) Alan Brown
   a) Provide protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to executive for duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end.
   b) Current age: 51, protection ends on 4/27/2008
   c) Interpretation:
      i) Terms are provided only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, executive would be forced to terminate employment just prior to 4/27/2008 to take advantage of such benefits.
      ii) Options granted prior to 6/03 to continue to be exercisable under original terms of grants. (135,500 options)
      iii) Severance payable as of 6/30/2003 (in terms of number of weeks), will be provided – 84 weeks
      iv) Health benefits will continue until age 65 (under UK medical plan)
      v) Executive SERP value calculated under EVSP as of 8/31/2003 is protected until 3/18/2006. The challenge here is that the requisite offset to this Exec SERP will be the pension equivalent of an individual pension contribution provided by State Street UK (21.66% per year). We will need to apply the annuity equivalent of this accumulation as an offset to the Exec SERP benefit.
   d) Estimated cost:
      i) Options = $1.5 million
      ii) Severance = $1.14 million (est.)
      iii) Exec. SERP = $2.9 million (assuming $0 offset from UK plan)
      iv) Total = $5.54 million (*Finance does not see the need to recognize any contingent liability for these promises unless they are triggered*)

SSC 05479

Plaintiff's exhibit 21

| | |
|---|---|
| From: | Boon S Ooi |
| Sent: | Wednesday, July 28, 2004 11:38 AM |
| To: | Edward J Resch |
| Subject: | David Spina's verbal commitments |
| Attach: | 7370_Bweissman-evp commit.doc.zip |

CONFIDENTIAL
FYI,

Thanks,

Boon
----- Forwarded by Boon S Ooi/USA/StateStreet on 07/28/04 10:37 AM -----

        Boon S Ooi
        07/16/04 12:12 PM

                To: "BobW" <bayberry152@comcast.net>
                cc: Luis de Ocejo/USA/StateStreet@StateStreet
                Subject: David Spina's verbal commitments

        Bob, I'm following up on a discussion that you had with Lou regarding David's
        verbal commitments to John Towers, Tim Harbert and Alan Brown.

        You may have seen this already but attached is a summary of those commitments
        and our best efforts in interpreting them (to keep to the spirit of
        intentions yet protect State Street's interests)


        You also indicated to Lou that the commiittee should be notified. Do you want
        us to send them a copy of David's letter to you outlining his commitments to
        these 3 as well as the attached document? Please let me know.

        Thanks,
        Boon

        <<...>>

EXHIBIT
10
5/8/06
PENGAD 800-631-6989

1) John Towers

   a) Permit options granted prior to 6/03 to continue to be exercisable under original terms of grants.

   b) Number of share options involved – 654,200

   c) Estimated accounting cost - $6.0 million

2) Tim Harbert

   a) Provide protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to executive for duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end.

   b) Current age: 53, protection ends on 3/18/2006

   c) Interpretation:
      i) Terms are provided only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, executive would be forced to terminate employment just prior to 3/18/2006 to take advantage of such benefits.
      ii) Options granted prior to 6/03 to continue to be exercisable under original terms of grants. (392,800 options)
      iii) Severance payable as of 6/30/2003 (in terms of number of weeks), will be provided – 104 weeks
      iv) Health benefits will continue until age 65 (under retiree medical plan)
      v) Executive SERP value calculated under EVSP as of 8/31/2003 is protected until 3/18/2006.

   d) Estimated cost (as of 7/1/04):
      i) Options =          $3.0 million
      ii) Severance =      $1.25 million
      iii) Exec. SERP =    $5.0 million
      iv) Total =          $9.25 million *(Some of Exec SERP cost is already expensed under FASB 87. Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)*

SSC 05532

3) Alan Brown

a) Provide protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to executive for duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end.

b) Current age: 51; protection ends on 4/27/2008

c) Interpretation:
   i) Terms are provided only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, executive would be forced to terminate employment just prior to 4/27/2008 to take advantage of such benefits.
   ii) Options granted prior to 6/03 to continue to be exercisable under original terms of grants. (135,500 options)
   iii) Severance payable as of 6/30/2003 (in terms of number of weeks), will be provided – 84 weeks
   iv) Health benefits will continue until age 65 (under UK medical plan)
   v) Executive SERP value calculated under EVSP as of 8/31/2003 is protected until 3/18/2006. The challenge here is that the requisite offset to this Exec SERP will be the pension equivalent of an individual pension contribution provided by State Street UK (21.66% per year). We will need to apply the annuity equivalent of this accumulation as an offset to the Exec SERP benefit.

d) Estimated cost:
   i) Options = $1.5 million
   ii) Severance =        $1.14 million (est.)
   iii) Exec. SERP =      $2.9 million (assuming $0 offset from UK plan)
   iv) Total =            $5.54 million (*Finance does not see the need to recognize any contingent liability for these promises unless they are triggered*)

SSC 05533

Plaintiff's exhibit 22



CONFIDENTIAL

## SSgA Executive Vice President
### Verbal Commitment by David Spina

### Background

- Certain verbal commitments were made to Alan Brown during EVSP period

- It suggests that the executive would be eligible for EVSP benefits during an open period of employment until age 55 (at which point the commitment expires)

- We summarize these commitments below and suggest certain interpretations/modifications should the Committee agree to these expectations

### Alan Brown "EVSP" Agreement

### Summary

- Provides protection as if the terms offered under the Executive VSP (EVSP) would continue to be provided to the executive for the duration of employment until attainment of age 55. Upon attainment of age 55, all provisions of such protection end. Current age 51; protection ends 4/27/08

- Severance pay of 84 weeks

- Continued exerciseability of options

- Payment of Executive SERP

### Interpretations/Modifications

- Condition of Termination – The agreement terms are applicable only if employment is terminated by State Street (except for cause or due to change in control) prior to age 55. Otherwise, the executive would be forced to terminate employment just prior to 4/27/08 to take advantage of these benefits

- Stock Options – Options granted prior to 6/03 continue to be exercisable under the original terms of grants (135,500 options)

- Severance Pay – Severance payable as of 6/03 (in terms of number of weeks) will be provided (84 weeks)

- Health Benefits – Continue until age 65 (under UK medical plan)

CONFIDENTIAL

- Executive SERP – Value calculated under EVSP as of 8/31/03 is protected until 3/18/06. The requisite offset to this Exec SERP will be the pension equivalent of an individual pension contribution provided by State Street UK (21.66% per year).

The annuity equivalent of this accumulation will need to be applied as an offset to the Exec SERP benefit

- Estimated Cost:

  ➢ Options =      $1.50 million
  ➢ Severance =    $1.14 million (est.)
  ➢ Exec SERP =   $2.90 million (assuming $0 offset from UK plan)
  ➢ Total =         $5.54 million (Finance does not see the need to recognize any contingent liability for these promises unless they are triggered)

Plaintiff's exhibit 23

A meeting of the Executive Compensation Committee of State Street Corporation was held on Wednesday September 15, 2004 at the Saybrook Point Inn in Old Saybrook, Connecticut.

Mr. Weissman, the Chairman, presided. The following directors were also present: Ms. Hill and Messrs. Darehshori and Sergel. Also present were Messrs. Logue, de Ocejo, Ooi, and Cutrell, who kept the minutes. Also in attendance was Mr. Peter Egan, Principal, Hewitt Associates.

Mr. Weissman called the meeting to order noting the presence of a quorum.

Mr. deOcejo reviewed a summary of actions taken at the Committee's June 16, 2004 meeting following which Mr. Cutrell presented minutes of that meeting, which had been distributed previously. Upon motion duly made and seconded, it was unanimously

VOTED:     That the minutes of the meeting of the Executive Compensation Committee held on June 16, 2004, having been provided to the members, be and hereby are approved.

Mr. de Ocejo presented and reviewed information on State Street's compensation philosophy and practices. He reviewed information on the components of compensation compared to market for various employee groups as follows: base salary; annual incentives; total cash compensation; long-term incentives; and total compensation. He noted that management has reviewed the Company's current compensation practice and has identified issues for the 2005 plan year and thereafter. In this regard, he reported that cash compensation has lagged the competition and discussed alternatives to address this by shifting the focus away from equity awards towards cash. He also reported that bonus targets are competitive, but have been underfunded. He reviewed possible implications as well as a process for addressing these issues. He reviewed pay mix recommendations that would increase annual incentive opportunity and replace stock options with SARs (stock appreciation rights) an equity grant similar to stock options which he described. He reviewed recommendations for the EVP population, and for the AVP to SVP levels, and discussed a change in the proposed vesting schedule of grants. He reviewed a proposed plan to shift to the new strategy to replace option grants with SARs in March 2005 and discussed related considerations. Discussion followed.

Mr. Egan, by referring to a report, which was included in the materials presented to the meeting, presented an analysis of executive compensation of twelve executives in relation to a comparator group of companies.

**REDACTED**

REDACTED

Mr. de Ocejo presented a review of executive compensation strategy for thirty-five senior executives of the Corporation noting that total compensation is targeted and includes base salary, annual incentive awards, and long term compensation.  He reviewed a comparator group of companies used to measure compensation levels.  He reviewed components of the compensation architecture including the terms and participants in the Senior Executive Annual Incentive Plan (162 (m) plan), and the Executive Annual Incentive Plan.  He reviewed the terms of performance awards under the 1997 Equity Incentive Plan and discussed the benefits of replacing option grants with SARs.  He reviewed the annual incentive plan funding architecture, discussed executive total compensation structure, and reviewed the annual planning cycle for the executive compensation committee.  Discussion followed.

Mr. Ooi reviewed proposed amendments to the Executive SERP to provide a death and disability benefit.  He noted that Executive SERP vesting is age 55 and 10 years' service and that there is no death or disability benefit prior to the vesting date. He reviewed proposed amendments to provide benefits for deaths in service occurring prior to vesting.  Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:     That an amendment to the State Street Corporation Supplemental Defined Benefit Pension Plan (the "Executive SERP") providing for the immediate vesting in a pension benefit upon termination of employment by a Participant due to his or her death or long-term disability calculated as (i) with respect to a Participant's death, 50% of the Participant's accrued benefit reduced for early retirement age and multiplied by a percentage determined by dividing the sum of the Participant's age and years of service by 85; and (ii) with respect to a Participant's long-term disability, the Participant's accrued benefit reduced for early retirement age and multiplied by a percentage determined by dividing the sum of the Participant's age and years of service by 85, be and it is hereby approved in principle, to be adopted in such form as and made effective as provided below.

VOTED:     That such amendment to the Executive SERP be in such form as, and made effective as determined by, the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance, in his or their discretion; and the officers of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to execute such documents and take such other measures as such officer or officers deem necessary or appropriate to effectuate the foregoing, the execution of any such document and the taking of

2

any such other measure by such officer or officer so acting to be conclusive evidence that the same has been approved by this Committee.

The meeting went into executive session at which time Messrs. Logue and Cutrell left the room. Mr. Ooi kept the minutes in the absence of the Secretary.

REDACTED

Mr. Logue returned to the meeting.

Mr. de Ocejo presented and reviewed proposed actions in order to accommodate verbal commitments made to an executive during the period the Executive Voluntary Separation Program (EVSP) was available. He reviewed proposed modifications to the EVSP. Mr. de Ocejo presented and reviewed a proposed compensation package for ;        Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:      That effective July 1, 2004, the Executive Voluntary Separation Program ("EVSP") be interpreted to provide that, in order to meet critical business needs of the Corporation, the Corporation's executive management may exercise its discretion by rehiring as an employee or consultant prior to the lapse of the two-year restricted period a former employee who terminated his or her employment pursuant to the EVSP.

VOTED:      That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. de Ocejo presented and reviewed a proposed severance agreement for        Following discussion, and upon motion duly made and seconded, it was unanimously

3

VOTED:

REDACTED

VOTED:    That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. de Ocejo also presented and reviewed a compensation action for . Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:

VOTED:    That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. de Ocejo presented and reviewed awards, payments, . Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:

4

SSC 04675

VOTED:    That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. Logue presented and reviewed a financial update on the annual incentive plan. Discussion followed.

There being no further business, the meeting adjourned.

Dissolved.

A true record.

Attest:

_____
Charles C. Cutrell, III

_____
Boon S. Ooi

5

SSC 04676

# Plaintiff's exhibit 24

| From: | Employee-Communication |
|---|---|
| Sent: | Monday, January 31, 2005 9:34 AM |
| To: | ALL STATE STREET |
| Subject: | Announcement from Ron Logue |

To: All State Street Employees
From: Ron Logue

Dear Colleagues,

I have asked Bill Hunt, executive vice president, to take on the role of president and chief executive officer of State Street Global Advisors (SSgA), effective immediately. A press release is being issued now about this news, which can be accessed via the corporate intranet, http://sshome.statestr.com.

This appointment highlights a quality that I think is unique to State Street -- the strength and depth of our management team around the world. When Tim Harbert passed away suddenly last August, his legacy continued uninterrupted thanks to the incredible cadre of dedicated and talented colleagues that make up our company. At the same time, having conducted a thorough search for his replacement, I am proud that the most qualified candidate to emerge was one of our own. Having been hired by Tim in 1994 to manage SSgA's Japan operations, and then moving on to manage all of our businesses in Japan and most recently our Global Relationship Management group, Bill returns to SSgA with broad experience in our overall business strategy, and a deep understanding of the dynamics and qualities that have made our investment management arm such a success.

With Bill's move to SSgA, I have asked Doug Miller to lead the Global Relationship Management program on an interim basis. Rebecca McGrail, Creative Services, and Pamela Paton, Sales Support, will now report directly to Hannah Grove, head of global Corporate Communications. Both Doug and Hannah will report to me.

I want to thank Alan Brown and Peter Leahy who have so ably served as interim co-heads of SSgA for the past six months. Their vision and contributions continue to be greatly valued.

Please join me in congratulating Bill as he and his team work to take SSgA to the next phase of its growth. I have no doubt that the best is yet to come.

*** End ***

Plaintiff's exhibit 25



| | |
|---|---|
| From: | Alan Brown |
| Sent: | Friday, March 11, 2005 11:14 AM |
| To: | Ronald E Logue; Luis de Ocejo |
| Cc: | William W Hunt; John F Marrs; Nigel Wightman; NWalker@HHLAW.com; Harvey@TheEmploymentLawyers.com; jane.amphlett@addleshawgoddard.com |
| Subject: | Voluntary Separation Program |
| Attach: | 675_LTR-REL-110305.doc.zip |

Please see attached letter. Signed fax copy and original to follow.

Regards.

Alan



Alan J Brown
Group Chief Investment Officer
SSgA

Authorised and regulated by the Financial Services Authority
Recipient of the Queen's Award for Enterprise 2003

020 7698 6007 (Direct Line)
020 7004 2907 (Direct Fax)

Please visit our Web site at www.ssga.com

<<...>>

SSC 02123

21 Sutherland Place
London W2 5BZ

Tel: 020-7727-8957

Ronald E Logue Esq
State Street Corporation
State Street Financial Center
One Lincoln Street
Boston MA 02111

Dear Ron

As you know I have been considering my position following Bill's appointment as SSgA's President and CEO, and I have now taken the view that my position with State Street is no longer tenable. I do not intend to detail the reasons here although I would be happy to do so if you think it would be helpful.

In the circumstances, I am writing to exercise my rights to a Voluntary Separation Program. As you know, in 2003 David Spina, on behalf of State Street, entered into an agreement with me in which in exchange for my continued commitment to remain active as a leader of SSgA, State Street Corporation would hold available for me the same separation program the Company was offering U.S. employees under what is known as the Voluntary Separation Program or, in view of my position, the Executive Voluntary Separation Progam (EVSP). The agreement was that this commitment would be available to me until I reached age 55 and could be exercised by me at any time.

The EVSP itself required an Election Form and Release Agreement to be completed. In my case, this letter should serve as my election. Could you or Lou please provide me with any further necessary paperwork for my review?

Having greatly enjoyed my tenure at State Street until latterly and the contribution I have made, this has been a difficult decision for me. You will appreciate, however, that I would now like to get this sorted out as quickly as possible and await your early response.

Yours sincerely

Alan J. Brown

Cc: Lou de Ocejo

Plaintiff's exhibit 26

Highly Confidential

Communications Plan for March 18, 2005

Draft 1

March 17, 2005

Contact

Hannah Grove, 4-3377

Arlene Roberts, 4-3933

SSC 01162

Highly Confidential

# Contents

Timeline                                              3

Bill Hunt 9:00 a.m. email to all employees           4

Talking points for all audiences                     5

Q&A for external audiences                           6

Bill Hunt 2:00 p.m. email to all employees          11

Statement Q&A after 2:00 p.m.                       13

SSC 01163

Highly Confidential

# Timeline

| Date | Timing (ET) | What Will Happen |
|------|-------------|------------------|
| Thursday, March 17 | P.M. | Communication to AB accepting resignation |
| Friday, March 18 | 9:00 a.m. | Email from Bill Hunt to all SSgA and all SVP's and above informing them of Alan's decision to leave and that a further communication will follow.  Talking points are attached. |
| | | Chris Pope meets with sales team.  Client calls begin |
| | | Calls to U.K. regulators made |
| | | AB bio is removed from SSgA and statestreet.com |
| | 12:00 p.m. | Executive Management Group meets |
| | 2:00 p.m. | Email from Bill Hunt to all SSgA and all SVP's and above announcing further organizational changes. |
| | | Client calls made to communicate detail of organizational changes |
| | 5:00 p.m. | Letters to top 100 clients sent from Bill Hunt |
| | | Open letter to SSgA clients posted on SSgA internet |

SSC 01164

Highly Confidential

### 9:00 a.m. Email from Bill Hunt

Dear Colleagues

Alan Brown has informed me of his decision to leave SSgA, effective [insert time frame].

*which is* *today*

I know you will all join me in thanking Alan for the considerable contributions he has made to the success of our company over the past 10 years. Not only has he been a valued colleague, and mentor and friend to many here, but also he has helped create SSgA's unrivalled track record of achievement and growth within the institutional asset management industry. Our future is stronger than ever because of the foundation that colleagues like Alan have helped to build.

Later today we will announce some organizational changes that will augment our goals of growth outside the U.S. and enhance the products and services we deliver to our clients. In the interim, please use the attached talking points should you receive any questions from clients or consultants. As is our normal policy, please direct any media inquiries to Arlene Roberts – 617-664-3933.

SSC 01165

Highly Confidential

# Talking Points for all Audiences
## [9:00 a.m.-3:00 p.m. ET]

### The news

- Alan Brown has made a personal decision that it is time for a change, and he is leaving SSgA.

### Impact

- While we're going to miss Alan, SSgA already has a very strong and proven team in place.
- Alan was not managing money for the firm and that responsibility remains squarely with the investment teams. We have a shared vision across these investment teams to provide the very best solutions possible across investment styles from active to enhanced to passive - and that is not going to change.
- The Advanced Research Center will also continue to support all of the firm's quantitative investment activities.

### Business as usual

- Given the strong team that we already have in place it's very much business as usual at SSgA.
- We will reassign some of Alan's responsibilities to members of his team and will announce those changes shortly.
- We're in the process of finalizing the team assignments now and will inform you as soon as we're done, which will be within the next 24 hours.

SSC 01166

Highly Confidential

# Q&A for All Audiences - [9:00 a.m.-3:00 p.m. ET]

Reasons for departure

**Why is Alan leaving?**

Alan made a personal decision that it is time for a change. While we're going to miss him, SSgA already has a very strong and proven team in place. Alan also was not managing money for the firm -- that responsibility remains squarely with the investment teams. We have a shared vision across these investment teams to provide the very best solutions possible across investment styles from active to enhanced to passive - and that is not going to change.

**Was there any conflict between Alan and SSgA's new head, Bill Hunt?**

Absolutely not. Alan and Bill have worked closely together at State Street for ten years and know each other very well. The entire management team, including Alan, has been very supportive of Bill's appointment. The move to leave State Street was entirely Alan's decision.

**Did Alan want the top job at SSgA?**

Both Alan Brown and Peter Leahy, who shared the responsibility for managing SSgA after the death of Tim Harbert last year, were among the candidates considered for the SSgA CEO position. In assessing everyone's strengths both Ron Logue and the board of directors felt that Bill was best suited for the role. They also thought it was best for Alan, Peter and their teams to focus on their respective specialties.

SSC 01167

Highly Confidential

**Why did Ron Logue choose Bill Hunt over Alan Brown and Peter Leahy?**
Bill is the right person at the right time to position us for the future. He has experience internationally with both SSgA and State Street Corporation and he has worked closely with Ron Logue, who has stated that one of his goals is to make sure that SSgA is part of State Street's overall business growth strategy. SSgA needs someone at the helm who can marshal the resources of State Street to invest in our future. Bill's knowledge of State Street, combined with his time at SSgA makes him uniquely qualified for this position.

**Impact of departure.**

**Who will replace Alan?**
Given the strong team that we already have in place it's very much business as usual at SSgA. We will reassign some of Alan's responsibilities to members of his team and will announce those changes shortly.

**Why can't you tell me now what changes you're making?**
The changes aren't that significant and are aimed at further leveraging the talent of the strong team we have in place. We're in the process of finalizing the team assignments now and will inform you as soon as we're done, which will be within the next 24 hours.

**Did Alan's departure take you by surprise?**
Of course we can't predict what people will do. SSgA has very strong succession plans in place and this, combined with the team approach we have to managing our investment strategy, means that individual departures do not have the impact that they might have at other firms.

SSC 01168

Highly Confidential

**Will Peter Leahy remain at SSgA?**

Yes.  Peter is a key member of the management team and has recently
assumed extra responsibilities, in addition to his chief operating officer role, to
include oversight for client sales and strategy, the Fiduciary Services and
Advisory strategies teams, and the Global Alliance companies– SSgA's
alternative investment management joint venture with ABP.

**Isn't this a pretty big blow for SSgA to lose its Group Chief Investment
Officer, particularly one as high profile as Alan?**

Investment strategy and policy have always been managed on a team basis at
SSgA, so individual departures have a lot less impact than they might at other
firms.   The past five years have clearly demonstrated the strength that comes
from this team approach -- with record growth in assets under management
which has led to SSgA's position today as the world's largest institutional asset
manager.

**Do you expect that there will be other senior departures as a result of Alan
leaving the firm?**

We do not expect there to be any other departures other than ones in the normal
course of a company this size.  Alan's decision was entirely his own and we have
a very strong and deep management team in place.  Because our investment
strategy and policy are managed on a team basis, individual departures have a
lot less impact than they might have at other firms.  SSgA has made a significant
commitment in terms of resources and personnel to expand our investment
depth.  In fact, most of our major hires in the last two years have been in the
investment group. We grew our investment groups in total over 16% in 2004 and
will add another 5% in the first half of 2005.   We are an even deeper
organization on the investment side than we have been at any time in our history.
So we feel confident that we are still very well situated with outstanding talent.

SSC 01169

Highly Confidential

**What does Alan's departure say about your commitment to investment management?**

We have never had a stronger commitment to investment management across the board in all disciplines, and globally. State Street and SSgA are in fact more committed than ever to investing in this area of the business because we see it as the growth area for us.

**What does Alan's departure do to the structure of the organization?**

We expect the basic structure to remain the same. There may be a few changes in personnel but the basic structure will be unchanged. Bill Hunt has a high regard for what we've accomplished, and that is why we feel confident that our basic structure and core business and values will remain the same.

**Is there any litigation regarding Alan?**

If there were any such activity it would be private, and litigation of any kind regarding any employee would have no impact on the firm or our clients.

**What do you lose with Alan, what does it mean to the firm?**

Because we manage investment strategy on a team basis at SSgA, individual departures have a lot less impact than they would at other firms. Of course we will miss him as a person but we wish him all of the best for the future.

**Are my portfolios at risk?**

No, your portfolios are still being managed by the same investment groups. You should feel very confident that the portfolios are in good hands.

**What do you think about Alan leaving?**

On a personal level, I enjoyed working with Alan and will miss him. SSgA attracted Alan because we're an innovative organization and that doesn't change. I've also got a lot of confidence about the strong team already in place and their leadership.

SSC 01170

Highly Confidential

Moving forward:

**What do you think about the direction of the company?**

SSgA has a great future. After a record year in 2004, we are already off to a strong start this year –as an example we are seeing continuing new business from a variety of active products.

**What changes has Bill instituted and why?**

Bill has expanded the executive management group in recognition of key leaders' contributions to SSgA's success, including Arlene Rockefeller, head of active investment strategies and Marc Brown, head of global strategy. He has also named a chief administrative officer, Otello Sturino, to oversee HR, systems and finance, which frees up our COO, Peter Leahy to focus on client and strategic issues.

**What confidence can we have in SSgA retaining the remaining employees?**

We are quite confident that SSgA continues to attract top talent as proven by our ability to recruit recently several outstanding investment professionals. We have been able to attract top talent in the global active area, the Advanced Research Center, GFS, Global Enhanced Group and Fixed Income. We are continuing to actively recruit where we see the need to build our bench.

**What are Alan's plans now?**

Alan has indicated that, after ten years of a very demanding travel and work schedule, he would like to take some time to consider options for the next phase of his career.

SSC 01171

Highly Confidential

## Email to all Employees for Distribution at 2:00 p.m. ET

Dear Colleagues,

I am pleased to announce the following organizational changes that will strengthen our global service and product delivery and help us realize the vision that we all share for SSgA to be the pre-eminent global institutional asset manager.

Mark Lazberger, currently CEO for State Street in Japan, will assume additional responsibilities for SSgA's non-U.S. operations. During his time in Japan, Mark has been extremely successful in accelerating our business in what is a very important market for State Street. He has also participated as a senior member of the management team for SSgA in Asia Pacific and helped to significantly advance our strategy in this region. Mark's track record, combined with the stellar management team we have in place around the world, will no doubt bring further growth to our non-U.S. business and strengthen our contribution to State Street's goal of increasing revenues from outside the of North America.

In support of this global growth we will also expand the roles of Rick Lacaille and Lochiel Crafter, to regional chief investment officers for Europe and Asia-Pacific. In addition, I have asked Sean Flannery to assume the role of chief investment officer for North America. Rick and Lochiel will report to Mark Lazberger and Sean, who will retain his global fixed income responsibilities, will report directly to me.



SSC 01172

Highly Confidential

When I became your president and CEO in January, I highlighted my admiration for your resilience, composure, and professionalism.  These attributes, along with the united leadership team that we have in place today, will continue to guide us through the many opportunities ahead.

Please join me in congratulating [Mark, Lochiel, Rick, Sean] on their additional responsibilities.

SSC 01173

Highly Confidential

## Statement & Q&A – After 2:00 p.m. ET

Alan Brown has decided to leave State Street Global Advisors.  We respect his decision and wish him well.  Given the growth that we have experienced globally, we are expanding the roles of our regional chief investment officers for Europe and Asia-Pacific and we have appointed a chief investment officer for North America.  By leveraging our proven team of investment strategy experts we will strengthen our ability to tailor solutions and products for our clients around the world.

**Reasons for departure**

**Why is Alan leaving?**

Alan decided to leave State Street Global Advisors for personal reasons. He has been a valued colleague and we wish him well in his future endeavors.

**Was there any conflict between Alan and SSgA's new head, Bill Hunt?**

Absolutely not.  Alan and Bill have worked closely together at State Street for ten years and know each other very well.  The entire management team, including Alan, has been very supportive of Bill's appointment.  The move to leave State Street was entirely Alan's decision.

**Did Alan want the top job at SSgA?**

Both Alan Brown and Peter Leahy, who shared the responsibility for managing SSgA after the death of Tim Harbert last year, were among the candidates considered for the SSgA CEO position.  In assessing everyone's strengths both Ron Logue and the board of directors felt that Bill was best suited for the role. They also thought it was best for Alan, Peter and their teams to focus on their respective specialties.

SSC 01174

Highly Confidential

## Impact of departures

**Will Peter Leahy remain at SSgA?**

Yes. Peter is a key member of the management team and has recently assumed extra responsibilities, in addition to his chief operating officer role, to include oversight for client sales and strategy, the Fiduciary Services and Advisory strategies teams, and the Global Alliance companies – SSgA's alternative investment management joint venture with ABP.

**Isn't this a pretty big blow for SSgA to lose its Group Chief Investment Officer, particularly one as high profile as Alan?**

Investment strategy and policy have always been managed on a team basis at SSgA, so individual departures have a lot less impact here than they might at other firms. The past five years have clearly demonstrated the strength that comes from this team approach -- with record growth in assets under management which has led to SSgA's position today as the world's largest institutional asset manager. We already have in place very experienced chief investment officers for Europe and Asia Pacific and have now appointed a CIO for North America. By leveraging our proven team of investment strategy experts we will strengthen our ability to tailor solutions and products for our clients around the world.

**Do you expect that there will be other senior departures as a result of Alan leaving the firm?**

We do not expect there to be any significant departures. Alan's decision was entirely his own and we have a very strong and deep management team in place. Because our investment strategy and policy is managed on a team basis, individual departures have a lot less impact here than they might have at other firms.

Highly Confidential and Subject to Protective Order

SSC 01175

Highly Confidential

**Is this an indication that there is general unrest in management at SSgA?**
No it's not. SSgA has a relatively low staff turnover rate compared to its peers in
the industry and has a strong and deep management team with a combined
experience that spans more than three decades. SSgA had one of the best
years in its history in 2004 from a performance standpoint, achieving a 22
percent increase in assets. Employees are extremely motivated by this winning
track record.

**What impact will Alan's departure have on clients?**
It's very much business as usual at SSgA. There will be no disruption or change
in the investment process including the approach to our clients' investment
portfolios and our commitment to providing clients with superior service. In fact
with the new regional CIO structure we expect that we will strengthen our ability
to tailor solutions and products for our clients around the world.

**Does Alan have a non-compete agreement?**
Yes.

**When does the non-compete agreement expire?**
[Need answer]

**Did Alan receive a severance package?**
We don't comment on employee compensation beyond that which is disclosed in
our annual proxy statement.

Attorney Client Confidential Communication

15

SSC 01176

Highly Confidential

## Moving forward

### Who will replace Alan Brown?

We are expanding the roles of our current chief investment officers for Europe and Asia-Pacific and we have appointed a chief executive officer for North America. Repositioning the role of the group CIO by leveraging our proven team of investment strategy experts will strengthen our ability to tailor solutions and products for clients around the world. Sean Flannery will assume the role of CIO for North America in addition to his global fixed income responsibilities and work alongside Rick Lacaille, CIO for Europe and Lochiel Crafter, CIO for the Asia Pacific region.

### Will there be additional management changes announced by SSgA?

Bill Hunt is committed to continuing to execute against what is a very proven strategy for growth at SSgA. He and the rest of the executive management team will work together to identify any need for realignments, and announce them, as appropriate.

### Has Bill Hunt made any changes since assuming his new role?

Yes. He has added more leaders to his executive management team in recognition of their contributions to SSgA's success – these include Arlene Rockefeller, head of global equities and Marc Brown, head of global strategy.

### How have clients reacted to Bill Hunt's appointment?

They have reacted very positively. Bill was already very well known by our customers at both State Street and SSgA so the leadership transition has been seamless. Bill has also spent the majority of his first six weeks in office meeting with key clients and consultants.

State Street Corporate Communications.

SSC 01177

Highly Confidential

**What are Alan's plans now?**

Alan has indicated that, after ten years of a very demanding travel and work schedule, he would like to take some time to consider options for the next phase of his career.

**Will Sean Flannery retain his role for global fixed income?**

Yes.

**What confidence can we have in SSgA retaining the remaining employees?**

We are quite confident that SSgA continues to attract top talent as proven by our ability to recruit recently several outstanding investment professionals.  We have been able to attract top talent in the global active area, the Advanced Research Center, GFS, Global Enhanced Group and Fixed Income.  We are continuing to actively recruit where we see the need to build our bench.

**Is it true that.............**
**I heard that...............**

We don't comment on rumor or speculation.

SSC 01178

Plaintiff's exhibit 27



EXHIBIT 5
Shames
JRS 5/31/06

REDACTED

—

William W
Hunt/USA/StateStreet
03/17/2005 06:36 PM

To   Alan Brown/Europe/StateStreet

cc   Mitch Shames/USA/StateStreet@StateStreet

Subject   Follow up

Dear Alan:

As you state in your email to Ron dated March 11, 2005, your conclusion that your position at the Company has become untenable compels us to agree that your employment with State Street must end, as the implications of your considered view are unmistakable. Therefore, tomorrow, Friday, March 18, 2005, will be the date on which your voluntary resignation from employment with State Street will take effect. A representative from HR&OP will contact you regarding the return of any State Street property in your possession, including your ID badge, credit cards, cellular phone, Blackberry, and all business documents.

In accordance with your employment agreement dated December 7, 1994, you are entitled to 60 days' pay in lieu of notice. Payment will be forthcoming in the form of salary continuation through May 17, 2005. However, with regard to your request to elect a "Voluntary Separation Program," we reject your assertion that you are entitled to the benefits of any such program. As you know, the VSP program was never extended to any U.K.-based employees or executives, and a number of aspects of the program do not even apply to persons (such as yourself) who do not participate in the subject benefit plans. Moreover, you do not satisfy the timing requirement for making a VSP election, which expired in June, 2003.

In addition, despite whatever communications you may have had with David Spina, no actual agreement was ever reached as to the substance of any promise to provide you with VSP benefits at some indefinite time in the future, and no document was ever executed to this effect. Moreover, David Spina did not have the authority to commit State Street to enhance your benefits package in the extraordinary manner you now allege — a fact made clear to you in both an email and a letter in which David stated that his assurances to you were only that he would make a recommendation to the Board that you be made eligible (through some means) to receive VSP-type separation benefits. You never registered disagreement with David's assertions, no doubt because you understood full well that the Board's Executive Compensation Committee needed to approve any substantial adjustments to the compensation arrangements of the Company's senior executives. David did, as apparently promised, recommend your eligibility for VSP-type benefits upon separation; but, as we understand you were informed some eight months ago, the Committee rejected such proposal.

Thank you for your contributions to SSgA.

SSC 01151

Sincerely yours,

Bill

SSC 01152

# Plaintiff's exhibit 28A

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

WRITER'S DIRECT DIAL NO.
(212) 849-7163

WRITER'S INTERNET ADDRESS
rexlee@quinnemanuel.com

September 19, 2006

<u>VIA FEDERAL EXPRESS</u>

Harvey A. Schwartz, Esq.
Rodgers, Powers & Schwartz
18 Tremont Street
Boston, MA 02108

Re:   *Brown v. State Street Corporation, et al.*, 1:05-cv-11178 (NG)

Dear Harvey:

In reference to the above-captioned action, I am writing to provide you with the information the Court directed us to provide in its electronic discovery order dated September 9, 2006, granting plaintiff's motion to compel dated June 12, 2006.

In your motion to compel, you requested that defendants:

    (a)    identify, by Bates number, all document produced in response to Plaintiff's Second Request for Production of Documents, Request No. 4; and

    (b)    identify each of plaintiff's request for production of documents to which defendants agreed to produce responsive documents but after making a diligent search, they were unable to locate any responsive document in their custody, possession or control and therefore produced no document.

Accordingly, with respect to request (a), defendants state that they have produced documents Bates numbered SSC 01151, SSC 01207, SSC 01324-25, SSC 04672-76 and SSC 05610 in response to Plaintiff's Second Request for Production of Documents, Request No. 4.

quinn emanuel urquhart oliver & hedges, llp

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-601-5000 FAX 650-801-5100
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

Harvey A. Schwartz, Esq.
September 19, 2006
Page 2

With respect to request (b), defendants state that, after a diligent search, they have not produced documents (because no such documents exist) in response to Plaintiff's First Request for Production of Documents, Requests Nos. 10, 11, 47 and 48.

Please do not hesitate to contact me if you have any questions.

Yours very truly,

Rex Lee

Plaintiff's exhibit 28B

REDACTED

William W
Hunt/USA/StateStreet        To   Alan Brown/Europe/StateStreet
03/17/2005 06:36 PM         cc   Mitch Shames/USA/StateStreet@StateStreet
                       Subject   Follow up

Dear Alan:

As you state in your email to Ron dated March 11, 2005, your conclusion that your position at
the Company has become untenable compels us to agree that your employment with State Street
must end, as the implications of your considered view are unmistakable. Therefore, tomorrow,
Friday, March 18, 2005, will be the date on which your voluntary resignation from employment
with State Street will take effect. A representative from HR&OP will contact you regarding the
return of any State Street property in your possession, including your ID badge, credit cards,
cellular phone, Blackberry, and all business documents.

In accordance with your employment agreement dated December 7, 1994, you are entitled to 60
days' pay in lieu of notice. Payment will be forthcoming in the form of salary continuation
through May 17, 2005. However, with regard to your request to elect a "Voluntary Separation
Program," we reject your assertion that you are entitled to the benefits of any such program. As
you know, the VSP program was never extended to any U.K.-based employees or executives, and
a number of aspects of the program do not even apply to persons (such as yourself) who do not
participate in the subject benefit plans. Moreover, you do not satisfy the timing requirement for
making a VSP election, which expired in June, 2003.

In addition, despite whatever communications you may have had with David Spina, no actual
agreement was ever reached as to the substance of any promise to provide you with VSP benefits
at some indefinite time in the future, and no document was ever executed to this effect.
Moreover, David Spina did not have the authority to commit State Street to enhance your
benefits package in the extraordinary manner you now allege — a fact made clear to you in both
an email and a letter in which David stated that his assurances to you were only that he would
make a recommendation to the Board that you be made eligible (through some means) to receive
VSP-type separation benefits. You never registered disagreement with David's assertions, no
doubt because you understood full well that the Board's Executive Compensation Committee
needed to approve any substantial adjustments to the compensation arrangements of the
Company's senior executives. David did, as apparently promised, recommend your eligibility for
VSP-type benefits upon separation; but, as we understand you were informed some eight months
ago, the Committee rejected such proposal.

Thank you for your contributions to SSgA.

SSC 01151

Sincerely yours,

Bill

SSC 01152

David A
Spina/USA/StateStreet
06/15/2004 04:13 PM

To    Alan Brown/Europe/StateStreet@StateStreet

cc    Tim Harbert/USA/StateStreet@StateStreet

bcc

Subject    Re: Post VSP understanding 📄

Alan - greetings - I am not ignoring you!!! Thanks for the 'first cut' at a record. I will share with Lou de Ocejo and plan to discuss the general outline with our Executive Comp Committee of the Board of Directors tomorrow. So I will get it on the record. More after the meeting with the board on Wed/Thursday. David.

SSC 01207

A meeting of the Executive Compensation Committee of State Street Corporation was held on Wednesday September 15, 2004 at the Saybrook Point Inn in Old Saybrook, Connecticut.

Mr. Weissman, the Chairman, presided. The following directors were also present: Ms. Hill and Messrs. Darehshori and Sergel. Also present were Messrs. Logue, de Ocejo, Ooi, and Cutrell, who kept the minutes. Also in attendance was Mr. Peter Egan, Principal, Hewitt Associates.

Mr. Weissman called the meeting to order noting the presence of a quorum.

Mr. deOcejo reviewed a summary of actions taken at the Committee's June 16, 2004 meeting following which Mr. Cutrell presented minutes of that meeting, which had been distributed previously. Upon motion duly made and seconded, it was unanimously

VOTED: That the minutes of the meeting of the Executive Compensation Committee held on June 16, 2004, having been provided to the members, be and hereby are approved.

Mr. de Ocejo presented and reviewed information on State Street's compensation philosophy and practices. He reviewed information on the components of compensation compared to market for various employee groups as follows: base salary; annual incentives; total cash compensation; long-term incentives; and total compensation. He noted that management has reviewed the Company's current compensation practice and has identified issues for the 2005 plan year and thereafter. In this regard, he reported that cash compensation has lagged the competition and discussed alternatives to address this by shifting the focus away from equity awards towards cash. He also reported that bonus targets are competitive, but have been underfunded. He reviewed possible implications as well as a process for addressing these issues. He reviewed pay mix recommendations that would increase annual incentive opportunity and replace stock options with SARs (stock appreciation rights) an equity grant similar to stock options which he described. He reviewed recommendations for the EVP population, and for the AVP to SVP levels, and discussed a change in the proposed vesting schedule of grants. He reviewed a proposed plan to shift to the new strategy to replace option grants with SARs in March 2005 and discussed related considerations. Discussion followed.

Mr. Egan, by referring to a report, which was included in the materials presented to the meeting, presented an analysis of executive compensation of twelve executives in relation to a comparator group of companies.

REDACTED

REDACTED

Mr. de Ocejo presented a review of executive compensation strategy for thirty-five senior executives of the Corporation noting that total compensation is targeted and includes base salary, annual incentive awards, and long term compensation. He reviewed a comparator group of companies used to measure compensation levels. He reviewed components of the compensation architecture including the terms and participants in the Senior Executive Annual Incentive Plan (162 (m) plan), and the Executive Annual Incentive Plan. He reviewed the terms of performance awards under the 1997 Equity Incentive Plan and discussed the benefits of replacing option grants with SARs. He reviewed the annual incentive plan funding architecture, discussed executive total compensation structure, and reviewed the annual planning cycle for the executive compensation committee. Discussion followed.

Mr. Ooi reviewed proposed amendments to the Executive SERP to provide a death and disability benefit. He noted that Executive SERP vesting is age 55 and 10 years' service and that there is no death or disability benefit prior to the vesting date. He reviewed proposed amendments to provide benefits for deaths in service occurring prior to vesting. Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:    That an amendment to the State Street Corporation Supplemental Defined Benefit Pension Plan (the "Executive SERP") providing for the immediate vesting in a pension benefit upon termination of employment by a Participant due to his or her death or long-term disability calculated as (i) with respect to a Participant's death, 50% of the Participant's accrued benefit reduced for early retirement age and multiplied by a percentage determined by dividing the sum of the Participant's age and years of service by 85; and (ii) with respect to a Participant's long-term disability, the Participant's accrued benefit reduced for early retirement age and multiplied by a percentage determined by dividing the sum of the Participant's age and years of service by 85, be and it is hereby approved in principle, to be adopted in such form as and made effective as provided below.

VOTED:    That such amendment to the Executive SERP be in such form as, and made effective as determined by, the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance, in his or their discretion; and the officers of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to execute such documents and take such other measures as such officer or officers deem necessary or appropriate to effectuate the foregoing, the execution of any such document and the taking of

SSC 04673

any such other measure by such officer or officer so acting to be conclusive evidence that the same has been approved by this Committee.

The meeting went into executive session at which time Messrs. Logue and Cutrell left the room. Mr. Ooi kept the minutes in the absence of the Secretary.


REDACTED


Mr. Logue returned to the meeting.

Mr. de Ocejo presented and reviewed proposed actions in order to accommodate verbal commitments made to an executive during the period the Executive Voluntary Separation Program (EVSP) was available. He reviewed proposed modifications to the EVSP. Mr. de Ocejo presented and reviewed a proposed compensation package for ;            Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:        That effective July 1, 2004, the Executive Voluntary Separation Program ("EVSP") be interpreted to provide that, in order to meet critical business needs of the Corporation, the Corporation's executive management may exercise its discretion by rehiring as an employee or consultant prior to the lapse of the two-year restricted period a former employee who terminated his or her employment pursuant to the EVSP.

VOTED:        That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. de Ocejo presented and reviewed a proposed severance agreement for                Following discussion, and upon motion duly made and seconded, it was unanimously

3

VOTED:

REDACTED

VOTED:    That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. de Ocejo also presented and reviewed a compensation action for . Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:

VOTED:    That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. de Ocejo presented and reviewed awards, payments, . Following discussion, and upon motion duly made and seconded, it was unanimously

VOTED:

VOTED:    That the Chairman and Chief Executive Officer, the Vice-Chairman, or the Executive Vice President, Human Resources and Organizational Performance of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing vote; and that the taking of any such action by such officer or officer so acting shall be conclusive evidence that the same has been approved by this Committee.

Mr. Logue presented and reviewed a financial update on the annual incentive plan.  Discussion followed.

There being no further business, the meeting adjourned.

Dissolved.

A true record.

Attest:

_____
Charles C. Cutrell, III

_____
Boon S. Ooi

SSC 04676



**State Street Corporation**

STATE STREET.
For Everything You Invest In.

CONFIDENTIAL

## Executive Compensation Committee Meeting
September 15, 2004 - 1:45 pm to 3:45 pm

    **1. Organizational Chart**

**1:45 pm  2. Previous Meeting** (5 minutes)

    A. Summary of Actions                      **Luis de Ocejo**
    B. Record of Meeting                         **Skip Cutrell**

**1:50 pm  3. Committee Business** (1 hour, 35 minutes)

    A. Update Compensation Philosophy      **Luis de Ocejo**
    B. Executive Compensation Review -- Hewitt    **Peter Egan**
    C. October Board Review                    **Luis de Ocejo**
    D. Executive SERP Amendment - Vote        **Boon Ooi**

**3:25 pm  4. Executive Session**

    A.  CEO Compensation Action - Vote        **Luis de Ocejo**
    B.  Executive Actions/Updates               **Luis de Ocejo**
        – Alan Brown
        – Joseph Chow - Vote
        – Thomas McCrossan - Vote
        – David Spina Pension - Vote
        – Timothy Harbert Death Benefits - Vote
    C.  Financial Update - Annual Incentive Plan    **Ronald Logue**

Plaintiff's exhibit 29

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN BROWN,<br>　　　Plaintiff, | )<br>)<br>)<br>) |
| v. | )　　　　C.A. No. 05-11178-NG<br>) |
| STATE STREET CORPORATION, and<br>STATE STREET GLOBAL<br>ADVISORS,<br>　　　Defendants. | )<br>)<br>)<br>)<br>) |

PLAINTIFF'S RESPONSE TO DEFENDANTS'
FIRST SET OF INTERROGATORIES

Plaintiff, by his attorneys, objects generally to the defendants' first set of interrogatories

to the plaintiff on the grounds and to the extent that they are vague, ambiguous, overly broad,

unduly burdensome, seek information that is not relevant to the claims or issues raised in this

lawsuit, violate the privacy rights of the plaintiff or third parties, are not reasonably calculated to

lead to the discovery of admissible evidence, seek information that is protected by the work

product doctrine or attorney/client privilege, or any other privilege, or are otherwise not properly

discoverable under Fed. R. Civ. P. 26(b).  Subject to and without waiving these objections, the

plaintiff responds to each interrogatory below, and reserves the right to supplement his responses

as appropriate.

## INTERROGATORY NO. 10

*State the basis for your allegation in paragraph 27 of the complaint that "Mr Spina had apparent authority to commit State Street to the modified VSP benefits."*

<u>Answer:</u>

I believed based on his position that he had authority to make the offer and enter into the agreement as he did. He was an honourable person and I do not believe he would have entered into an agreement that he was not authorized to enter into. I believed and it appeared that the Compensation Committee had approved of the VSP in principle and that Mr. Spina had authority to make modifications and exceptions to portions of the general plan. I was unaware of any instance in which State Street had refused to put into effect any employment-related decision made by Mr. Spina. It was my belief that Mr. Spina made numerous significant decisions on behalf of State Street, including decisions concerning employment matters, which State Street accepted and implemented, without him having to obtain approval. Further, neither Mr. Spina nor any other representative of State Street ever informed me that State Street had repudiated the agreement I entered into with Mr. Spina.

Objection:

The plaintiff objects to this interrogatory as beyond the scope of discovery. The interrogatory does not seek relevant information nor is it reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 14

*Identify any current or former employee, officer or director of a) State Street, b) State Street Bank or c) SSgA with whom you have had contact on or after March 11, 2005.*

Objection:
The plaintiff objects to this interrogatory as beyond the scope of discovery. The interrogatory does not seek relevant information nor is it reasonably calculated to lead to the discovery of admissible evidence.

Answer:
Without waiver of the foregoing objection, please see my answer to Interrogatory No. 12 for explanation of post-March 11, 2005 communications with Hunt. Additionally, I communicated with Shames on March 11 and March 12, 2005.

Signed under the pains and penalties of perjury this 26th day of February 2006.

ALAN BROWN

As to objections only:

HARVEY A. SCHWARTZ

I certify that on February 27, 2006, I served a copy of the attached document on defendants counsel by overnight delivery.

HARVEY A. SCHWARTZ

8

Plaintiff's exhibit 30

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN BROWN,<br>    Plaintiff,<br><br>v.<br><br>STATE STREET CORPORATION, and<br>STATE STREET GLOBAL<br>ADVISORS,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      C.A. No. 05-11178-NG |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
FIRST SET OF INTERROGATORIES**

Plaintiff, by his attorneys, objects generally to the defendants' first set of interrogatories to the plaintiff on the grounds and to the extent that they are vague, ambiguous, overly broad, unduly burdensome, seek information that is not relevant to the claims or issues raised in this lawsuit, violate the privacy rights of the plaintiff or third parties, are not reasonably calculated to lead to the discovery of admissible evidence, seek information that is protected by the work product doctrine or attorney/client privilege, or any other privilege, or are otherwise not properly discoverable under Fed. R. Civ. P. 26(b). Subject to and without waiving these objections, the plaintiff responds to each interrogatory below, and reserves the right to supplement his responses as appropriate.

*Describe those acts you took, or failed to take, in reliance on the offer for the modified VSP or the offer to extend your eligibility for the VSP.*

Answer:

As a leading CIO while I was with SSgA, I regularly received calls from head hunters or others trying to interest me in alternative employment opportunities. After reaching an agreement with Spina in June 2003 and in reliance on that agreement, I consistently turned down these overtures without discussion or enquiry. Indeed, I had no conversations with other asset management companies during my employment with SSgA. Further, I did not challenge the fact that the original VSP was not offered to me, despite the fact that it was only by way of a technicality that it was not offered to me. The reason for that was that I understood that I had an agreement with Spina whereby he had extended in all material ways the VSP to me.

Objection:

The plaintiff objects to this interrogatory as beyond the scope of discovery. The interrogatory does not seek relevant information nor is it reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 14

*Identify any current or former employee, officer or director of a) State Street, b) State Street Bank or c) SSgA with whom you have had contact on or after March 11, 2005.*

Objection:
The plaintiff objects to this interrogatory as beyond the scope of discovery. The interrogatory does not seek relevant information nor is it reasonably calculated to lead to the discovery of admissible evidence.

Answer:
Without waiver of the foregoing objection, please see my answer to Interrogatory No. 12 for explanation of post-March 11, 2005 communications with Hunt. Additionally, I communicated with Shames on March 11 and March 12, 2005.

Signed under the pains and penalties of perjury this 26th day of February 2006.

ALAN BROWN

As to objections only:

HARVEY A. SCHWARTZ

I certify that on February 27, 2006, I served a copy of the attached document on defendants counsel by overnight delivery.

HARVEY A. SCHWARTZ

8

Plaintiff's exhibit 31

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------- x

ALAN BROWN,                          :    Case No. 05 Civ. 11178 (NG)
                                     :
                 Plaintiff,          :
                                     :    **DEFENDANTS STATE STREET**
        -against-                    :    **CORPORATION'S AND STATE**
                                     :    **STREET GLOBAL ADVISORS'**
STATE STREET CORPORATION             :    **OBJECTIONS AND RESPONSES TO**
and STATE STREET GLOBAL              :    **PLAINTIFF ALAN BROWN'S FIRST**
ADVISORS,                            :    **SET OF INTERROGATORIES (Nos. 1-**
                                     :    **13)**
                 Defendants.         :

------------------------------------------------------- x

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local

Rule 33.1 for the United States District Court for the District of Massachusetts, defendants State

Street Corporation (the "Corporation") and State Street Global Advisors ("SSgA") (collectively

"State Street") respond as follows to plaintiff Alan Brown's ("Brown") First Set of

Interrogatories to State Street, dated January 26, 2006 (Nos. 1-13).

## GENERAL OBJECTIONS

State Street incorporates by reference as though fully set forth in these answers

each of its general objections and each of its previous specific objections to any specific

numbered interrogatory.

1.      To the extent that any definition or instruction does not comport with the Local

Rules or the ordinary meaning of the word itself, State Street and its counsel will follow the rule

and apply the ordinary meaning of the word.

2.      State Street objects to the interrogatories to the extent they seek information or

documents protected by the attorney-client privilege, the work product doctrine, the accountant-

client privilege or any other applicable privilege or protection from discovery.  State Street's

**Interrogatory No. 7:**

Please identify all actions taken by State Street to determine what, if any, offers had been made to Alan Brown in regard to VSP.

**Response to Interrogatory No. 7:**

In addition to its general objections, State Street objects to this interrogatory on the grounds that it is vague and ambiguous, especially as to the terms "offer" and "VSP." State Street also objects to this interrogatory to the extent that it seeks information that is subject to the attorney-client privilege and that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to its general and specific objections, State Street responds as follows: David Spina prepared a letter, dated June 30, 2004, to Robert Weissman, Chairman of the Executive Compensation Committee. This letter concerned discussions Mr. Spina had with Brown regarding the Voluntary Separation Program. After receiving this letter, Mr. Weissman responded by requesting further information of Mr. Spina's discussions with Brown.

## VERIFICATION

I, Boon Ooi, declare under penalty of perjury that the information provided in response to the Interrogatories directed at defendants State Street Corporation and State Street Global Advisors, set forth in the foregoing Defendants' Objections and Responses to Brown's First Set of Interrogatories, is true and accurate to the best of my knowledge and belief, and that I am authorized to make this Verification on behalf of State Street Corporation and State Street Global Advisors.

Dated: _March 14_, 2006

_Boon Ooi_
Boon Ooi

16

Plaintiff's exhibit 32

CONFIDENTIAL

A meeting of the Executive Compensation Committee of State Street Corporation was held on Wednesday, June 16, 2004, at 225 Franklin Street, Boston, Massachusetts.

Mr. Weissman, the Chairman, presided. Mr. Darehshori and Mr. Sergel were also present. Ms. Hill participated by teleconference.

Also present by invitation were Mr. Spina and Mr. Cutrell, who kept the minutes, and Messrs. de Ocejo and Ooi.

Mr. Weissman called the meeting to order noting the presence of a quorum.

Mr. de Ocejo presented and reviewed a summary of actions taken at the Committee's March 3, 2004, meeting following which Mr. Cutrell presented minutes of that meeting, which had been distributed previously. Upon motion duly made and seconded, it was unanimously

VOTED:   That the minutes of the meeting of the Executive Compensation Committee held on March 3, 2004 having been provided to the members, be and hereby are approved as presented.

Mr. Ooi presented and reviewed information on the State Street Retirement Plan and the State Street Salary Savings Program. He noted that State Street Corporation is the plan sponsor for both plans and reported that as of December 31, 2003, Retirement Plan assets were            , and Salary Savings Program assets were            He reviewed information on the Retirement Plan portfolio and noted that the SSgA Office of the Fiduciary Advisor was engaged in February 1999 to provide fiduciary advisory services, operational oversight and investment management. He reviewed Retirement Plan asset allocation information, and performance as of December 31, 2003 compared to the prior year period. He reviewed the State Street Salary Savings Program, which is a defined contribution program. He reviewed the benefit formula, and noted that vesting is immediate. He discussed investment options noting that there are fourteen options including the self-managed brokerage account. Mr. Ooi then reviewed information on the status of the Salary Savings Program funds and fund performance. He also briefed the Committee on the proposed restructuring of the Retirement and Salary Savings Program Committee into two separate committees, a Benefit Plans Committee and Plans Investment Committee. Discussion followed.

REDACTED

Mr. Ooi presented and reviewed information on the Corporation's two non-qualified benefit plans. He reviewed generally the terms of the Supplemental Executive Retirement Plan (SERP) which restores normal retirement benefits for executives earning over a certain salary. He also reviewed the Supplemental Defined Benefit Pension Plan (Executive SERP) which provides enhanced retirement benefits for certain executives at the executive vice president level and above, and which includes two individual agreements incorporated into the Plan in 1999. For each plan, he reviewed the number and nature of participants, eligibility, vesting, benefit formula, and for the combined plans he reviewed financial information, 2003 performance, and hypothetical market values. Discussion followed.

REDACTED

Mr. Ooi presented and reviewed a planning calendar for the Executive Compensation Committee which reviewed an annual cycle of items requiring action by the Committee. Discussion followed.

Mr, de Ocejo introduced a discussion on compensation philosophy and identified preliminary items for discussion and presentation at the October Board meeting. Discussion followed.

Mr. de Ocejo presented and reviewed a proposed compensation action for _____ Executive Vice President. Mr. de Ocejo reviewed background information and reviewed the terms of the proposed compensation action. Following discussion, and upon motion duly made and seconded, it was unanimously

SSC 04669

REDACTED

Mr. de Ocejo previewed a preliminary list of actions to be taken at the Committee's next meeting scheduled for September 2004. Discussion followed.

The meeting went into executive session at which time Messrs. Ooi and Cutrell left the meeting. Mr. Weissman kept the minutes in the absence of the Secretary.

Mr. Spina briefed the Committee on a proposed severance package for a senior executive. The Committee reviewed the rationale for the proposed deal and withheld a decision pending further review. Mr. de Ocejo then left the meeting.

The Committee reviewed bonus award recommendations for several executives,                                          who had been instrumental in the successful integration of the Global Securities Services business purchased from Deutshe Bank.   It was the consensus of the Committee that the proposed amounts are appropriate and are to be payable as soon as practicable and with appropriate communication.

The Committee reviewed bonus award recommendations for .
                        The Committee discussed the proposed amounts as well as the date the awards would be payable. Following discussion, and upon motions duly made and seconded, it was in each case unanimously

VOTED:


VOTED:


3                                    SSC 04670

The executive session concluded, and there being no further business, the meeting adjourned.

Dissolved.

A true record.

Attest:

_____
Charles C. Cutrell, III

_____
Robert E. Weissman

4

SSC 04671