UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **ALAN BROWN** | ) | |
| **Plaintiff** | ) | |
| | ) | **C.A. No. 05-11178-NG** |
| **v.** | ) | |
| | ) | |
| **STATE STREET CORPORATION and** | ) | |
| **STATE STREET GLOBAL ADVISORS** | ) | |
| **Defendants** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AS TO LIABILITY**

The plaintiff, Alan Brown, submits this memorandum in support of his motion for summary

judgment as to liability.

**Facts[1]**

State Street Corporation faced a crisis in 2003 when an unexpectedly large number of its

employees opted to leave under the bank's Voluntary Separation Plan ("VSP") and, for top

executives, its Executive Voluntary Separation Plan ("EVSP"). This crisis was especially acute in

State Street's investment management subsidiary, State Street Global Advisors ("SSgA"), which

manages $1.5 trillion in assets.  SSgA was managed jointly by its four top managers, who called

themselves the G4. (Facts ¶ 4). Three of the four – John Snow, John Serhant and Timothy Harbert

– were offered the EVSP and at least Snow and Serhant indicated they were taking it, reducing the

G4 to the G2 or, possibly to just the plaintiff, Alan Brown.

Brown had not been offered the EVSP because of the technicality that although he was

SSgA's global Chief Investment Officer, (Facts ¶ 1), and although he had an office in Boston, (Facts

---

[1]  This statement of facts is based on the Plaintiff's Statement Of Material Facts as to Which There Is No Genuine Issue to be Tried. Paragraph references are to that document. To the extent that the summary of the facts in this memorandum is concise, plaintiff relies on the more complete factual recitation in the Statement of Material Facts.

¶ 9), in addition to London, and although his responsibilities were worldwide, *(Id.)*, he was carried on

the company's United Kingdom payroll so that he could be paid in British pounds. His salary,

nonetheless, was charged back from that subsidiary to SSgA's Boston-based headquarters. *(Id.)*.

Because of that technicality, however, the EVSP, which was offered only to what State Street

considered its U.S. employees, was not offered to Brown. (Facts ¶ 25).

Brown was upset and discouraged that he was not offered this benefit, (Facts ¶ 27), which

for senior managers such as him would be worth millions of dollars. He considered pursuing what

he believed were his legal rights to the EVSP, (Facts ¶ 27), but, instead, chose to discuss his

dissatisfaction first with David Spina, State Street's Chairman and Chief Executive Officer. Spina

was "a fair minded person," Brown believed, and would treat him fairly. (Facts ¶ 29).

Brown was correct in that assessment. He met with Spina while the VSP was under way,

together with the other remaining G4 member, Harbert. Brown made clear to Spina that the EVSP

was of great importance to him and that he felt cut off by the arbitrariness of the plan not being

offered to him. (Facts ¶ 31). Spina was concerned about Brown's dissatisfaction. Brown, who had

twice been selected Chief Investment Manager of the Year, (Facts ¶ 10), was essential "to everything

SSgA did," Spina believed, and was "the heart of SSgA's business globally." (Facts ¶ 32).

Spina told Brown it would be in State Street's interest for Brown to remain on board and

that the company would provide whatever assurances or agreements were needed to address

Brown's concerns. (Facts ¶ 34). Spina said, "I was prepared to do what I could do to effectuate

whatever that would be." *(Id.)*.

Spina and Brown reached an agreement that in return for Brown remaining at SSgA during

the transition following the VSP, (Facts ¶ 33), State Street would hold open the benefits of the

EVSP for him, with some slight modifications, up to age 55. (Brown was 50 at the time.) *(Id.)*.  The

specifics of Spina's promise to Brown were spelled out in a letter Spina wrote to the chairman of the

Executive Compensation Committee of the Board of Directors[2], (Exhibit 18), in which he said,

> I made oral commitments to Tim Harbert and Alan Brown,
> Chairman and Vice Chairman of SSgA, respectively, and Executive
> Vice Presidents of State Street Corporation, explained more fully
> below. . . . The commitment I made to Tim and Alan was as follows.
> In exchange for their continued commitment to remain active as
> leaders of SSgA, State Street Corporation would hold available to
> them the same separation package the company was offering U.S.
> employees under what was known as the Voluntary Separation
> Program (VSP). In 2003, both Tim and Alan were in their early 50's.
> My stated commitment to them was stated as for the period when
> they were between the ages of 50 and 55.

Nobody at State Street spoke with either Spina or Brown about this "commitment" after the

receipt of Spina's letter. (Facts ¶ 51, 77). As a result, the sum total of State Street's knowledge about

this "commitment" came from the letter and an earlier exchange of emails between Brown and

Spina, (Exhibit 15), in which Brown had written,

> At the time, as you know, the VSP was not offered to me in spite of
> my central US role. However, you reassured me that if I remained
> with SSgA, I would be entitled to a severance package similar to that
> of the VSP, provided I left without cause. Specifically, you agreed
> that Tim and I would get the VSP package amortised (sic) over 5
> years, save in one regard that vesting of equity would be limited to
> equity granted before 30.6.03.

Spina had responded to Brown by saying, (Exhibit 16),

> Alan – greetings – I am not ignoring you!!! Thanks for the 'first cut'
> at a record. I will share with Lou deOcejo and plan to discuss the
> general outline with our Executive Comp Committee of the Board of
> Directors tomorrow. So I will get it on the record. More after
> meeting with the Board on Wd/Thursday. David.[3]

Brown relied on Spina's commitment. He abandoned any efforts to obtain legal advice about

whether the bank's failure to offer the EVSP to him gave him any legal rights. He chose not to look

---

[2]  Spina sent a copy of that letter to Brown.

[3]  Spina was fired shortly after he sent that June 15, 2004 email. His last day at State Street was June 30, 2004.

for a position elsewhere and ignored the hordes of head hunters who regularly called on him in efforts to lure him away from SSgA. (Facts ¶ 84). He remained in his position as Chief Investment Officer of SSgA, serving admirably. Nobody at State Street had the slightest complaint about Brown's subsequent performance. (Facts ¶ 85).

State Street's top managers – Spina; his successor, Ronald Logue; Louis deOcejo, head of Human Resources, and Robert Weissman, chair of the Executive Compensation Committee – all knew Spina had made what they all referred to as a "commitment" to Brown to extend to him benefits similar to the lucrative EVSP. Under deOcejo's direction, the Human Resources department calculated the cost to State Street of what they labeled Spina's "verbal commitments" to Brown variously at $6.64 million (Exhibit 19) and $5.54 million. (Facts ¶ 53. Exhibit 22). Logue, after he succeeded Spina as Chairman and Chief Executive Officer, and the Executive Compensation Committee were informed of these figures. (Exhibit 19). Management told the Committee in no uncertain terms, with deOcejo's and Logue's approval, that "certain verbal commitments were made to Alan Brown during the EVSP period." (Facts ¶ 54).

Some members of the Executive Compensation Committee believed that Spina lacked authority to make the "commitment" he told them he had made to Brown. (Facts ¶ 57). Committee members formed that opinion in June 2004, (Facts ¶ 45), when they were first informed of the commitment, and again in September 2004, when they received a formal report from management about the commitment. (Facts ¶ 57).

Despite those avowed opinions, however, the Committee failed to renounce, disavow or revoke the commitment, either at their June 2004 meeting, (Facts ¶ 46), or their September 2004 meeting. (Facts ¶ 58). In fact, the minutes of those two meetings – the only meetings at which the matter was discussed – fail to reflect Brown's name, much less any vote or formal action to

disapprove what the corporation's Chairman and Chief Executive Officer had done. (Exhibit 13, 23).

Brown was never informed of the Board's dissatisfaction with Spina's agreement with him[4]. (Facts ¶ 79). The last communication on the matter he received was Spina's June 30, 2004 letter confirming that Spina had in fact made the commitment. (Facts ¶ 77). That letter followed an email from Spina to Brown in which Spina had told Brown, "[I] plan to discuss the general outline with our Executive Comp Committee of the Board of Directors tomorrow. So I will get it on the record." (Exhibit 16). As far as State Street told Brown, the agreement had been presented to the Board and was now "on the record."

Following the June and September 2004 meetings, Brown continued laboring away in his role as Chief Investment Officer, content with his agreement with Spina, which he now assumed had been reported to the Board and was documented by Spina's June 30, 2004 letter.

Unfortunately, Harbert, the other member of the SSgA G2, died in August 2004, (Facts ¶ 62), and a months-long search for a new head of SSgA was begun. Brown was a candidate for the position, a position he wanted. *(Id.)*.

The search continued until the end of January 2005, when Logue announced that William Hunt had been chosen for the position. (Facts ¶ 66). Brown was disappointed but continued in his Chief Investment Officer role. (Facts ¶ 68). Difficulties arose between Brown and Hunt until, finally, on March 11, 2005, Brown wrote to Logue that he found his position "untenable" and that he was electing to exercise his rights under the VSP. (Facts ¶ 70, 71).

State Street reacted by taking the position that Brown had no such rights, that there never was any agreement or commitment between Brown and State Street. (Facts ¶ 75). Even though

---

[4] At most, the record shows deOcejo expressed his own **opinion** that the Executive Compensation Committee would not approve the commitment. (Facts ¶ 61).

Brown explicitly told SSgA's general counsel that he was not resigning but had intended only to exercise his rights under the VSP, (Facts ¶ 72), Logue and Hunt treated Brown's letter as a "voluntary resignation." (Facts ¶ 73). State Street paid Brown 60 days salary, which it believed was required by his British employment contract, but refused to honor Spina's EVSP commitment. (Facts ¶ 75).

This lawsuit ensued.

## Discussion

I.    **WHETHER OR NOT SPINA HAD AUTHORITY TO MAKE THE COMMITMENT HE MADE TO BROWN, STATE STREET SUBSEQUENTLY RATIFIED THAT COMMITMENT BY FAILING TO TELL BROWN THAT IT REJECTED OR RENOUNCED IT.**

A.    **An agreement entered into by a corporate agent, regardless of the agent's authority, is considered to be ratified if the corporate directors learn of the conduct and fail to promptly disavow it.**

This case is a classic example of the doctrine of ratification by silence[5]. State Street's Chairman and Chief Executive Officer entered into a commitment with an employee on behalf of the corporation. The employee relied on that commitment. When the corporation's Board was informed of the commitment, the members believed the CEO had exceeded his authority. Despite forming that belief, the Board members failed to renounce the agreement but, instead, allowed the employee to continue in his belief that he was working under an agreement made by the corporation's highest officer and manager.

These facts sound like a first year Contracts course hypothetical.

---

[5] As described in the Restatement, "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Restatement (Second) of Agency, supra, § 82. *Goldman v. First Nat'l Bank*, 985 F.2d 1113, 1122 (1st Cir. 1993)(Applying Massachusetts law). The substantive law of Massachusetts, the location of the formation of the agreement at issue, should be applied because this Court has diversity jurisdiction over the present claim. *Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am.*, 338 F.3d 42, 46 (1st Cir. 2003)("It is a black-letter rule that state substantive law supplies the rules of decision for a federal court sitting in diversity jurisdiction. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 4 (1st Cir. 1994).")

Ratification, an ancient doctrine, has aged well. In 1870, the Massachusetts Supreme Judicial Court issued a warning that State Street's directors should have heeded in the present case: "If the transaction, when brought to his knowledge, was not seasonably disapproved, it is enough, and a ratification must be presumed, with all the consequences which follow. . . ." *Foster v. Rockwell*, 104 Mass. 167, 172 (1870). See *Thayer v. White*, 53 Mass. 343, 346 (1847)("the jury were well warranted in inferring the defendant's consent to the transaction thus notified to him, from his silence"); *Brigham v. Peters*, 67 Mass. 139, 147 (1854)("The rule is a very stringent one upon the principal in such cases . . . When the principal is informed of what has thus been done, he must dissent, and give notice of his dissent, within a reasonable time, and if he does not, his assent and ratification will be presumed.")

One-hundred-twenty-seven years later, the Supreme Judicial Court applied the identical doctrine to Boston University. The present-day standard of ratification was summarized by the Court as follows,

> Where an agent lacks actual authority to agree on behalf of his principal, the principal may still be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts. "It is the instant duty of a principal, upon ascertaining the facts, at once to disaffirm an act done in his name by an agent in execution of a power conferred but in a mode not sanctioned by the terms of the agency or in excess or misuse of the authority given."

*Linkage Corporation v. Trustees Of Boston University*, 425 Mass. 1, 18, 679 N.E.2d 191, 204 (1997)(citing *Hudson v. Massachusetts Prop. Ins. Underwriting Ass'n,* 386 Mass. 450, 457, 436 N.E.2d 155 (1982)(ratification of agent's unauthorized acts inferred where, after knowledge, principal made no effort to repudiate them). The Supreme Judicial Court noted that "[r]atification relates back, and has the same effect, as a prior grant of authority by the principal to the agent." *Id.* The Court affirmed a jury's finding that even though a Boston University employee lacked actual authority to enter into a

contract on behalf of the University, once officials with proper authority learned of the contract "their failure promptly to disavow [the employee's] conduct after learning material facts" constituted ratification of the original agreement. 425 Mass. at 19, 679 N.E.2d at 204.

As recently as February 2006, the Massachusetts Appeals Court applied various sections of the Restatement (Second) of Agency concerning ratification by silence, applying the doctrine even to tortious conduct by an agent, so long as the agent was motivated at least in part by a desire to serve his principal. In *Kourouvacilis v. American Federation Of State, County and Municipal Employees*, 65 Mass. App. Ct. 521, 535 n. 21, 841 N.E.2d 1273, 1284 (2006), the Court, in a footnote, cited Restatement (Second) of Agency § 94[6] (principal's affirmance of agent's unauthorized transaction inferable from principal's failure to repudiate it).

The lineage of the doctrine of ratification of an agent's unauthorized action by the principal's failure to promptly disavow the action was traced in *Rex Lumber Company v. Acton Block Company, Inc.*, 29 Mass. App. Ct. 510 562 N.E.2d 845 (1990). In that case the Appeals Court found that a seller of real estate ratified his attorney's modification of the sales contract by the seller's failure to repudiate a change to which the attorney had agreed. The Court said,

> Doubtless the principal, upon learning what the attorney has agreed to, may promptly disavow the modification, at least until others have relied on it to their detriment. See *Auringer v. Cochrane*, 225 Mass. 273, 275 (1916); *Boice-Perrine Co. v. Kelley*, 243 Mass. 327, 330-331 (1923)("It is the instant duty of a principal, upon ascertaining the facts, at once to disaffirm an act done in his name by an agent in execution of a power conferred but in a mode not sanctioned by the terms of the agency or in excess or misuse of the authority given. Prompt disavowal of such act is imperative because the inference of authority

---

[6] § 94 Failure to Act as Affirmance. An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it. COMMENTS & ILLUSTRATIONS: Comment: a. Silence under such circumstances that, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent, is evidence from which assent can be inferred. Such inference may be made although the purported principal had no knowledge that the other party would rely upon the supposed authority of the agent; his knowledge of such fact, however, coupled with his silence, would ordinarily justify an inference of assent by him. Whether or not such an inference is to be drawn is a question for the jury, unless the case is so clear that reasonable men could come to but one conclusion.

> flows readily from the trust reposed by a principal in his agent");
> *Irving Tanning Co. v. Shir*, 295 Mass. 380, 384 (1936)("Ratification of
> unauthorized acts of an agent is readily inferred where, after
> knowledge, the principal makes no effort to repudiate them").  See
> also Restatement (Second) of Agency § 94 (1958).

29 Mass. App. Ct. at 14-15, 562 N.E.2d at 849. Particularly in regard to situations in which corporate

directors learn of an agent's unauthorized actions, ratification of the unauthorized conduct will be

found by the failure of the directors to promptly disavow the agent's conduct. See cases collected in

*Puritan Medical Center, Inc. v. Edward L. Cashman, Jr.*, 413 Mass. 167, 172-173, 596 N.E.2d 1004, 1008-

1009(1992)("The cases in which courts imply ratification, unlike this case, involve third-party, arm's-

length transactions from which the corporation received a benefit, and directors who, at minimum,

had 'knowledge of such facts or circumstances as would put a reasonable person on inquiry and

which would lead to full discovery.' *Ingalls Iron Works Co. v. Ingalls*, 177 F. Supp. 151, 162 (N.D. Ala.

1959), aff'd, 280 F.2d 423 (5th Cir. 1960)(directors held to have ratified settlement contract where

they had constructive knowledge and their delay in approving contract benefited corporation).  See,

e.g., *Irving Tanning Co. v. Shir*, 295 Mass. 380, 384 (1936)(ratification of agent's unauthorized contracts

will be inferred where, after knowledge, principal made no effort to repudiate them); *Perkins v. Rich*,

11 Mass. App. Ct. 317, 323 (1981)(where church committee knew of 'radical physical and structural

changes to the church and its surroundings,' and had been informed of church projects through

annual reports and publications, ratification of mortgage transactions is inferred by its failure to

disavow them); *Torpey v. Interstate Equip. Leasing Co.*, 760 F.2d 364, 366 (1st Cir. 1985)(jury could find

that where defendant was put on notice of indemnity agreement, he manifested company's assent by

his silence and acceptance of the rental slip on back of which indemnity agreement was printed);

*Baltimore & O. R. Co. v. Foar*, 84 F.2d 67, 72 (7th Cir. 1936)(directors found to have ratified contract

where, if they did not have actual knowledge, ought to have known of lifetime contract offered to

striking worker to induce him to return to work.")

The Ohio Supreme Court addressed a situation similar to the present case in *Campbell v. Hospitality Motor Inns, Inc.,* 24 Ohio St. 3d 54, 57, 493 N.E.2d 239, 242 (1986). During a period of corporate upheaval, a compensation committee entered into a contract with an executive to induce him to remain with the company. Even though the board of directors never approved the contract, the board's awareness of the contract and its failure to disavow it constituted ratification, the Court said. "Where the principal is informed of what has been done, he must dissent, and give notice of it within a reasonable time; and if he does not, his assent and ratification will be presumed." *Id.*

If State Street's directors believed Spina acted without authority in committing State Street to provide EVSP benefits to Brown, those directors had a duty to promptly disavow Spina's commitment and to equally promptly inform Brown of their disavowal. The Executive Compensation Committee appears to have believed that by not affirmatively accepting Spina's commitment to Brown, the corporation could avoid liability. They were wrong in that belief. Inaction – after notice of their agent's unauthorized action on behalf of the corporation – was insufficient as a matter of law. The corporation had a duty to affirmatively renounce their agent's action and to promptly inform Brown of its action.

The uncontested facts demonstrate that State Street's directors failed to vote to renounce or repudiate Spina's action on behalf of the corporation, and they clearly failed to inform Brown that the corporation would not abide by a commitment made by the corporation's chairman and chief executive officer. As a result, State Street's silence constituted ratification of Spina's commitment,

regardless of whether or not Spina himself had authority to make that commitment on behalf of the corporation.[7]

**B.    Ratification relates back to the original commitment.**

The effect of ratification is to make the original agreement as effective as if the agent – in the present case, Spina – had actual authority to enter into the agreement in the first place. "Ratification relates back, and has the same effect, as a prior grant of authority by the principal to the agent. See *Canton v. Bruno*, 361 Mass. 598, 607 n.8, 282 N.E.2d 87 (1972); *White v. Apsley Rubber Co.*, 194 Mass. 97, 100, 80 N.E. 500 (1907)." *Linkage Corp.*, 425 Mass. at 18, 679 N.E.2d at 204. See *Rochford v. Rochford*, 188 Mass. 108, 74 N.E. 299 (1905)(ratification relates back to unauthorized action). Once State Street's directors were on notice of Spina's unauthorized commitment to Brown, their failure to "instantly" repudiate the commitment and notify Brown of their rejection, constituted a ratification. Even if Spina lacked actual authority to enter into the agreement with Brown, as a result of the directors' ratification the commitment became binding on the corporation.

**C.    State Street's directors were on notice of Spina's commitment to Brown.**

Spina gave written notice that "I made oral commitments to Tim Harbert and Alan Brown, Chairman and Vice Chairman of SSgA, respectively, and Executive Vice Presidents of State Street Corporation, explained more fully below." (Facts ¶ 48). A clearer statement that the bank's chief executive officer had entered into an agreement on the bank's behalf is difficult to imagine.

A "commitment" is the equivalent of a binding promise or agreement to take some action. In *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 849, 647 N.E.2d 1174, 1179 (1995),

---

[7] The issue of ratification is sometimes submitted to the trier of fact. In certain contexts, however, many courts, including the First Circuit, have found that ratification may be determined on a motion for summary judgment. See, e.g., *Inn Foods, Inc. v. Equitable Co-op. Bank*, 45 F.3d 594 (1st Cir. 1995); *In re New Commonwealth Pub. Co.*, 118 Bankr. 155 (D. Mass. 1990); and *Kiess v. Eason*, 442 F.2d 712 (7th Cir. 1971). See also *Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, 787 P.2d 109 (Ala. 1990)(summary judgment as to ratification may be granted if the "case is so clear that reasonable men could come to but one conclusion")(quoting Restatement (Second) of Agency § 94, comment a (1957)).

the Court equated words such as "offer" and "promise" with "commitment." The Court adopted

the use of the terms in Restatement (Second) of Contracts § 2 (1)(1981) that "[a] promise is a

manifestation of intention to act or refrain from acting in a specified way, so made as to justify a

promisee in understanding that a **commitment** has been made." (emphasis added). See *Situation*

*Mgmt. Sys. v. Malouf, Inc.*, 430 Mass. 875, 879, 724 N.E.2d 699 (2000)(Exchange of mutual

commitments constitutes enforceable contract). In fact, the terms "contract" and "commitment" are

often used interchangeably, or combined into the phrase "contract commitment." See *Ciardi v. F.*

*Hoffmann La Roche, Ltd.*, 436 Mass. 53, 78, 762 N.E.2d 303, 321 (2002)("contract commitments); *Stow*

*Mun. Elec. Dep't v. Department of Pub. Utils*, 426 Mass. 341, 350, 688 N.E.2d 1337, 1348

(1997)("contract commitments"); *Pratt v. Boston*, 396 Mass. 37, 39, 483 N.E.2d 812, 815

(1985)("contracts or commitments"); *Rayden Engineering Corp. v. Church*, 337 Mass. 652, 660, 151

N.E.2d 57, 62 (1958)("commitment such as would sustain an action of contract").

     If Spina's June 30, 2004 letter describing his "commitment" to Brown on behalf of State

Street were not enough to place the Directors on notice, the documentation of Spina's "oral

promise" to Brown submitted by the corporation's Human Resources managers to the September

15, 2004 Executive Compensation Committee, (Facts ¶ 54),  was explicit notice that Spina had

committed the corporation to provide specific benefits for Brown. DeOcejo, with Logue's approval,

submitted a document to the Committee titled "SSgA Executive Vice President Verbal Commitment

by David Spina." (Exhibit 22). This document stated, plainly, that  "[c]ertain verbal commitments

were made to Alan Brown during the EVSP period." *Id.*  A price was placed on these commitments

to Brown: $5.54 million.

     State Street cannot claim that it was not on notice of Spina's **commitment** to Brown

because some of the terms of that commitment were unclear. Those notifications from Spina and

from management, even if they lacked some details of the commitment, were sufficient to place the

directors on notice. Corporate directors are on notice, for purposes of ratification, when they have "knowledge of such facts or circumstances as would put a reasonable person on inquiry and which would lead to full discovery." *Puritan*, 413 Mass. at 173, 596 N.E.2d at 1008. The First Circuit noted in *Inn Foods v. Equitable Co-Operative Bank*, 45 F.3d 594, 597 (1st Cir. 1995), "Massachusetts courts, however, do not always require that the principal have actual knowledge. There may be ratification when the principal purposely shuts his eyes to means of information within his own possession and control." (citing *Torpey v. Interstate Equip. Leasing Corp.*, 760 F.2d 364, 365 (1st Cir. 1985)). In *Inn Foods*, *supra.*, the appellant claimed that because the record lacked any indication that the directors of the corporation had knowledge of the facts underlying the matter, no ratification occurred. The First Circuit found, however, that the directors should have known that "something was afoot," and charged the directors with ratification based on "deliberate ignorance." *Id.* at 597. Similarly, in *Perkins v. Rich*, 11 Mass. App. Ct. 317, 415 N.E.2d 895 (1981) aff'd, 385 Mass. 1001, 429 N.E.2d 1135 (1982), the Appeals Court found that a church was liable for a building contract entered into by its minister, without authority from the parish council, because the council was on sufficient notice about the repairs that it should have conducted an investigation.  On further appellate review, the Supreme Judicial Court, affirming, said, "The parish committee should have conducted an investigation, and, if it had done so, it would have discovered the mortgages. The failure of the parish committee to act to disavow the mortgages, of whose existence the committee should have known, constituted a ratification of them." 429 N.E.2d at 1136.

Another example of such ratification is found in *Lemanski v. Lenox Sav. Bank*, 1996 U.S. Dist. LEXIS 6471 (D. Mass. 1996), where Mag. Neiman held that a Board of Trustees ratified a deferred benefits plan, even though it never specifically voted to approve that plan, because the directors had documents that, in the Court's words, were sufficient to notify the Trustees that "something was afoot" and they failed to renounce the compensation plan. 1996 U.S. Dist. LEXIS 6471 at 30-31.

The Magistrate said about *Inn Foods*, *supra*, that "the First Circuit reaffirmed a long line of Massachusetts cases. See, e.g., *Perkins*, 11 Mass. App. Ct. at 322, 415 N.E.2d at 898; and *Puritan*, 413 Mass. at 171, 596 N.E.2d at 1008. See also *Waste Management of Massachusetts, Inc. v. Carver*, 37 Mass. App. Ct. 694, 698, 642 N.E.2d 1058, 1061 (1994)("One cannot – in order to avoid liability as principal for the unauthorized and damaging acts of an agent – purposefully shut his eyes to means of information within his possession and control having only that knowledge which he cares to have.")" 1996 U.S. Dist. LEXIS 6471 at 27.

State Street's directors were on notice of Spina's commitment to Brown at least as of the June 16, 2004 meeting of the Executive Compensation Committee when Spina informed the Committee of his 2003 agreement with Brown. (Facts ¶ 45). While recollections of precisely what Spina said at that meeting were unclear, witnesses agreed that his subsequent June 30, 2004 "commitment" letter (Ex. 18) conveyed the "basic message" of what he'd told the Committee orally and that the letter did not contradict Spina's oral statements. (Facts ¶ 47).

Any doubts about what Spina said to Brown were cleared up by his June 30, 2004 letter, which he wrote at the Compensation Committee's order that he "put it in writing." (Facts ¶ 47). If State Street's directors had any doubts about Spina's commitment to Brown after Spina's June 30, 2004 letter those doubts could have been clarified by speaking to the two parties to the commitment: Brown and Spina. State Street chose to speak to neither. As a result, it is too late now for State Street to claim it was unaware of details of the agreement. "[O]ne cannot purposefully shut his eyes to means of information within his own possession and control, having only that knowledge which he cares to have." *Perkins*, 11 Mass. App. Ct. at 322, 415 N.E.2d at 898 (citing *Kelley v. Newburyport & Amesbury Horse R.R.*, 141 Mass. 496, 498-499 (1886); *Dole Bros. v. Cosmopolitan Preserving Co.*, 167 Mass. 481, 483 (1897); *Kidder v. Greenman*, 283 Mass. 601, 615 (1933). In short, the Appeals

Court said in *Perkins, id.*, "By not asking the simple question – "What is going on?" . . . the Committee assumed the risk of what its investigation might have disclosed."

In fact, under agency law, State Street was on notice of Spina's commitment to Brown from its inception, since notice to an agent – Spina – constitutes notice to the principal. *Sunrise Props. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 66-67, 679 N.E.2d 540, 543 (1997)("Under agency principles, notice to a corporation's agent is notice to the corporation. 'When an agent acquires knowledge in the scope of [his] employment, the principal . . . is held to have constructive knowledge of that information.' *DeVaux v. American Home Assur. Co.*, 387 Mass. 814, 818, 444 N.E.2d 355 (1983)). See Restatement (Second) Agency § 9 Notice[8]. An agent's knowledge is not imputed to the principal only when the agent acts for his own purposes. See Restatement (Second) of Agency § 282 (1958)("[a] principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes"). *Sunrise Props, supra.* Spina clearly made his agreement with Brown for the corporation's benefit, not for Spina's own personal benefit.

Not only were the directors on specific notice of Spina's commitment to Brown, but they had concluded that Spina had exceeded his authority in making that commitment. Weissman, the committee chairman, told Spina he'd exceeded his authority. (Facts ¶ 44). Directors Hill, Darshori and Sergel also concluded Spina had exceeded his authority. (Facts ¶ 57). Notice, combined with their belief that Spina had acted without authority, placed a burden on the corporation's directors to affirmatively act if they wished to avoid liability for that commitment.

---

[8] (2) A person is given notification of a fact by another if the latter (a) informs him of the fact by adequate or specified means or of other facts from which he has reason to know or should know the facts. (3) A person has notice of a fact if his agent has knowledge of the fact, reason to know it or should know it, or has been given a notification of it, under circumstances coming within the rules applying to the liability of a principal because of notice to his agent.

**D.  Once they were on notice of their agent's conduct, the corporation's directors had a duty to "instantly" act to repudiate that conduct, and to notify Brown of their action.**

To avoid ratification of what they believed was an unauthorized commitment by Spina, State Street's directors were under a duty to "instantly" disavow the commitment at their June 2004 meeting. *Linkage Corporation*, 425 Mass. at 18, 679 N.E.2d at 204. They failed to take any action at that meeting, except to ask Spina to "put it in writing." Any anger some individual directors may have voiced at that meeting, or even a general discussion that Spina had acted without authority, did not constitute an official renunciation of the "commitment." Compensation matters before the Executive Compensation Committee "are always voted on." (Facts ¶ 46). Official acts of a corporate board or committee are recorded in its minutes. All matters that call for a vote are reflected in the minutes of the Executive Compensation Committee. (Facts ¶ 46). The June minutes show the Committee failed to affirmatively renounce Spina's commitment to Brown[9].

By their September 15, 2004 meeting, State Street's directors had specific information about Spina's $5.54 million commitment to Brown, information that went well beyond a hint that "something was afoot," *Inn Foods v. Equitable Co-Operative Bank*, 45 F.3d at 597, well beyond "knowledge of such facts or circumstances as would put a reasonable person on inquiry and which would lead to full discovery." *Puritan*, 596 N.E.2d at 1008. They had a letter from the highest corporate officer that he had made "a commitment" on behalf of the corporation. They had a calculation from the corporation's chief Human Resources manager that this "commitment" was a significant one, valued at $5.54 million. Under more than a hundred years of solidly established Massachusetts law, these corporate directors had a duty to do something, to formally and officially renounce this commitment, if the corporation were to escape liability for this corporate commitment.

---

[9]  In fact, the June 18, 2003 minutes (Exhibit 13) fail to even mention that Spina addressed the committee about Brown.

The directors chose to remain mum, to leave their official minutes void of any mention of Alan Brown[10]. The law imposes consequences for such inaction by corporate directors. One of those consequences is that by their failure to do what reasonable persons who wanted to reject such a commitment would have done, as a matter of law they ratified Spina's commitment to Brown.

As long ago as 1936, the Supreme Judicial Court said of such a situation,

> Ratification of unauthorized acts of an agent is readily inferred where, after knowledge, the principal makes no effort to repudiate them. This statement is particularly applicable where the principal knows that third parties are continuing to act in reliance upon the supposed authority.

*Irving*, 295 Mass. at 384, 3 N.E.2d at 843.

Applying that standard, this Court should find that State Street's directors "made no effort to repudiate" what their Chairman had done in the name of the corporation. They failed to tell Brown that they renounced the corporation's commitment to him. They knew Brown continued to travel the world on behalf of State Street in the belief that Spina had made a commitment to him on behalf of the corporation. The first Brown was told that State Street rejected Spina's commitment was Hunt's March 2005 response to his attempt to exercise his right to the EVSP. By then it was far too late for State Street to avoid liability for Spina's 2003 commitment.

This Court should find that State Street ratified Spina's agreement with Brown. The Court should enter summary judgment as to liability for the plaintiff Alan Brown on Count II of the Amended Complaint.

---

[10]  The minutes of the September 15, 2004, Executive Compensation Committee meetings simply state, "Mr. deOcejo presented and reviewed proposed actions in order to accommodate **verbal commitments** made to an executive during the period the Executive Voluntary Separation Program was available." (Exhibit 23, Bates 04674)(Emphasis added). That statement refers to Brown. (Facts ¶ 56). Whatever the "proposed actions" were, the Committee did nothing. (Facts ¶ 58). The minutes are redacted to protect personal information of irrelevant persons. The parties have stipulated that none of the redactions concerns Brown.

**II.    STATE STREET BREACHED ITS CONTRACTUAL OBLIGATION WITH BROWN BY FAILING TO HONOR SPINA'S COMMITMENT.**

    **A.    Spina's commitment to Brown constituted an enforceable contract between Brown and State Street.**

        **1.    The agreement satisfied all of the elements of an enforceable contract.**

The agreement between Brown and State Street, entered into by Spina, met all the essential requirements of an enforceable contract: offer, acceptance and consideration. *Quinn v. State Ethics Com.,* 401 Mass. 210, 216, 16 N.E.2d 124, 127 (1987). If Spina had actual authority to make such an agreement with Brown, the agreement they reached, as reflected in Brown's confirmatory email to Spina (Exhibit 15) and Spina's June 30, 2004 letter to Weissman (Exhibit 18), would have been an enforceable contract.

        **2.    The terms of the agreement were sufficiently clear to constitute an enforceable contract.**

Brown and Spina expected there would be some written memorial of their verbal agreement. (Facts ¶ 35). Unfortunately, Spina's health deteriorated and he was absent from State Street for many months while he recovered from heart bypass surgery. (Facts ¶ 37). As a result, he failed to follow up on making a record of their agreement. As the first anniversary of the agreement approached, Brown took the bull by the horns and wrote an email to Spina setting forth the general terms of the agreement. (Exhibit 15). Brown said he was satisfied to have that email stand as the record of "our agreement." *Id.* Spina replied, by email, telling Brown he would "discuss the general outline" with the Executive Compensation Committee "[s]o I will get it on the record." (Exhibit 16). Further documentation of the agreement was contained in an email Spina sent to deOcejo, State Street's Human Resources head, forwarding Brown's email with the comment that Spina found Brown's description of the agreement "essentially accurate." The final documentation of the agreement was

Spina's June 30, 2004 letter to Weissman, confirming that he had made a "verbal commitment" to

Brown. (Exhibit 18). Spina sent a copy of that letter to Brown. (Facts ¶ 56).

Those documents demonstrate that sufficient essential terms to constitute a binding contract

were agreed upon by Spina and Brown.

An enforceable contract requires agreement as to the essential terms by which the parties

intend to be bound, "with sufficient definiteness and clarity that a court, by interpretation with the

aid of existing and contemplated circumstances, may enforce it." *George W. Wilcox, Inc. v. Shell Eastern*

*Petroleum Products, Inc.*, 283 Mass. 383, 388, 186 N.E. 562  (1933). The fact that the parties

contemplated execution of a written agreement and none was signed does not preclude a finding

that they had entered into a binding contract. See *Situation Management Systems, Inc. v. Malouf, Inc.*, 430

Mass. 875, 879-80, 724 N.E.2d 699 (2000)(where material terms have been agreed upon, "it may be

inferred that the writing to be drafted and delivered is a mere memorial of the contract"). Both

Brown and Spina expressed the belief in their communications to one another that they intended a

written document to serve as a record of the "agreement" they had already made. Brown's email to

Spina said he "would be perfectly happy for this email to stand as the record of our agreement."

(Exhibit 15). Similarly, Spina wrote to Brown that he would inform the Executive Compensation

Committee of "the general outline" "to get it on record." (Exhibit 16). Those statements evidence

the intent of both parties to memorialize an agreement they had already reached, rather than that

they had no agreement until a new formal document were executed.

In such circumstances, it is the court's function to determine whether the agreement

between Spina and Brown contained all the necessary and essential terms, plus whether an omitted

provision can be supplied by implication. "In the absence of a mutual mistake permitting

reformation, the omission of an essential term, not supplied by reasonable implication, renders the

memorandum insufficient." *Simon v. Simon*, 35 Mass. App. Ct. 705,  709, 625 N.E.2d 564, 567 (1994).

Brown and Spina reached agreement on all the essential terms of State Street's commitment to Brown.  Those terms included:

Brown would remain as a leader at SSgA through the period of what Spina termed "instability" caused by the VSP. (Facts ¶ 33). Brown described his part of the bargain as follows, "The commitment we made was to be there to lead SSgA through this very difficult time until it was definitely behind us and the firm was stable and cruising ahead again." (Facts ¶ 33). The expectation was that the transition would take about a year. (Facts ¶ 33).

In return for Brown's commitment to remain at SSgA through the transition, he would have the option of receiving the EVSP benefits at any time up to age 55 (he was 50 at the time). Certain portions of the EVSP would have to be modified in accordance with Brown's specific circumstances. For example, he was not a participant in State Street's regular pension plan but had a special pension provision. Also, he did not receive medical insurance through State Street. Brown and Spina acknowledged that those modifications from the standard EVSP were necessary. Further, the EVSP added five years of service for eligibility for the SERP, a supplemental pension plan for senior executives. They agreed that for Brown the five years of additional service would amortize over the coming five years, so that by age 55, Brown would receive no supplemental years of service for SERP purposes.

The agreement was reached while State Street was dealing with the consequences of significantly more employees than had been anticipated opting for the Voluntary Separation Plan. Spina was faced with the loss of at least two and possibly four of SSgA's top four managers. He was especially desperate to retain Brown. Brown was unhappy and told Spina that he was upset that he had not been offered the EVSP. Viewed in light of those circumstances, Brown's obligation to remain at SSgA through the post-VSP transition becomes clear and understandable. While Brown and Spina did not specify a time period Brown was obligated to remain at SSgA, there can be no

question but that by the time Brown exercised his VSP rights in March 2005, that transition period was long over.

The best evidence that this agreement addressed all the essential terms necessary to constitute an enforceable contract is the candid admission by Boon Ooi, States Street's head of benefits, that he had no difficulty calculating the cost to State Street (and the amount Brown would receive) of this agreement. Ooi said that it was a simple matter to apply the terms of the EVSP modified by what was stated in Brown's email to Spina and Spina's letter to Weissman. (Facts ¶ 55). Ooi could think of no other information – no more "terms" – he would need to be able to make that calculation. (Facts ¶ 55). The agreement seems bare at first blush, but the incorporation of the detailed provisions of the EVSP provide substance to the benefits Brown would receive[11]. Agreement was reached as to all essential terms to the mutual commitments between Brown and State Street.

### 3. Spina had actual authority to enter into an employment contract with Brown.

Spina entered into the agreement with Brown acting in his capacity as chairman of the board and chief executive officer of State Street Corporation. Spina agreed that Brown would be eligible for the EVSP and he extended the time period for Brown to opt for the plan from the 45 days other employees were offered to five years. The evidence supports that Spina had authority to commit the bank to both offers, to determine that Brown was eligible for the EVSP and to modify the opt-in period for Brown.

---

[11] State Street may seek to interject a hypothetical unresolved contract term: whether Brown could elect to exercise his EVSP rights at any time or whether the benefit would only be available if Brown were to be terminated without cause. That "term" is a straw man. Ooi and deOcejo readily admitted that the concept that the benefits would apply only if State Street chose to fire Brown was their *post hoc* creation. (Facts ¶ 53(c)). Not only did deOcejo and Ooi say they had no idea whether Brown and Spina agreed to such a provision, *(Id.)*, but Spina, too, denied having any memory of such an agreement *(Id.)*, and Brown outright denied that they had reached such an agreement. *(Id.)*. There is no evidence that Brown and Spina agreed (or even discussed) that the benefits would only be triggered if State Street fired Brown without cause.

The decision concerning which State Street employees would be offered the VSP (and the EVSP) was made by corporate managers, all of whom reported to Spina. (Facts ¶ 16, 17). They decided the plans would be offered to U.S. employees, foreign employees who worked in the U.S. and U.S. expatriate employees who worked abroad. (Facts ¶ 12). Brown, however, was a unique employee. He was paid through the United Kingdom SSgA subsidiary, but that subsidiary charged his salary back to the U.S. headquarters. (Facts ¶ 9). He had offices in both London and Boston. His duties were global and not in any way restricted to the U.K. *(Id.).* Further, he was an executive vice president of the U.S. State Street Corporation. (Facts ¶ 6). Brown fit some parameters of the EVSP but not others. Making a judgment call as to such a unique situation was the role of top management.

The best evidence that Spina, and not the Executive Compensation Committee, had authority to offer the EVSP to Brown is that it was Spina, and those who reported to him, and not the Executive Compensation Committee, or the entire Board of Directors, who made the ultimate decision as to which employees would be eligible for the VSP. It is uncontested that management designed the VSP, including its eligibility requirements. While information about the program was presented to the Board for informational purposes, there is no record of any vote by the Board as a whole or its Executive Compensation Committee to adopt the eligibility standards decided on by Spina and his staff. The Board was informed, but its formal approval was neither sought nor received. The decision maker was management, not the Board. Some specific votes were required to modify some stock option programs to fit within the VSP, and the Executive Compensation Committee took such votes, but there was never a vote as to which State Street employees, individually or as a class, would receive the VSP and which would not. That decision was made by management alone. (Facts ¶ 20, 21, 22, 23).

Just as management had authority to decide, without benefit of any Board vote, to extend the VSP to all U.S. employees, management had the authority to decide how to handle the VSP in regard to a uniquely-situated employee, Brown. Spina acted within his authority when he used his judgment to include Brown within the EVSP. Spina testified that he did not believe he exceeded his authority in any of his dealings with Brown. (Facts ¶ 76).

An identical analysis applies to the second part of Spina's commitment, that rather than having only 45 days to decide whether to opt for the EVSP, Brown could elect the plan any time within the following five years. The Board never voted to approve the 45-day opt-in period. That was management's decision. If management – Spina – had authority to establish that opt-in period, it had authority to create an exception for an exceptional situation.

In the absence of any evidence that the Board of Directors or the Executive Compensation Committee ever voted to approve the VSP as a whole or the eligibility or opt-in period provisions specifically, this Court should find as a matter of law that management, in the form of Spina, had authority to make those decisions and that Spina had actual authority to enter into the agreement with Brown that he entered into.

> **4.      Spina had sufficient apparent authority to contract on behalf of State Street that State Street should be liable for the agreement between Spina and Brown.**

Apparent authority, like beauty, is in the eye of the beholder. "Apparent authority involves written or spoken words or any other conduct of the principal which, reasonably interpreted, **causes a third person to believe** that the principal consents to have the act done on his behalf by the person purporting to act for him. *Neilson v. Malcolm Kenneth Co.*, 303 Mass. 437, 441, 22 N.E.2d 20 (1939). See *Globe Ticket Co. of New England v. Boston Retail Grocers' Ass'n,* 290 Mass. 235, 238, 195 N.E.

309 (1935); Restatement (Second) of Agency § 8 (1958)[12]." *Haufler v. Zotos*, 446 Mass. 489, 498, 845

N.E.2d 322, 331 (2006)(emphasis added). See *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736,

745, 729 N.E.2d 1113, 1120-1121 (2000)(citing Restatement 2d of Agency, § 27, Creation of

Apparent Authority[13]).

 *Linkage Corporation*, *supra*, presents a situation similar to the present case. Boston University's

vice president for external affairs, Meng, signed an agreement on behalf of the University with the

plaintiff corporation. The University sought to avoid the contract by claiming that Meng lacked

actual authority. The Supreme Judicial Court held, nonetheless, that Meng had apparent authority to

contract on behalf of the University. Indicia of this apparent authority included Meng's "virtual

autonomy" in supervising the plaintiff's dealings with Boston University, his conduct in negotiating

and signing the contract, and the University Chancellor's instruction to Meng to deal with the

plaintiff. The Court disregarded the University's written policy that expenditures over $5,000

required approval by somebody superior to Meng, finding that the plaintiff could have reasonably

concluded that policy "was not always enforced." The Court noted, "After all, it is not uncommon

for an employer to issue a mandate concerning financial expenditures, and then to ignore or

overlook the mandate in circumstances that suggest benign oversight because the employer's

advantages are being advanced." 425 Mass. at 17, 679 N.E.2d at 203.

 Spina's authority to extend a modified EVSP to Brown was far more apparent than Meng's

authority was in *Linkage Corporation*. After all, Spina was the most senior executive and director at

State Street. If he lacked authority to enter into an employment contract, then no individual at State

---

[12] Restatement 2d of Agency, § 8, Apparent Authority – Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.

[13] Restatement 2d of Agency, § 27, Creation of Apparent Authority; General Rule – Except for the execution of instruments under seal or for the conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

Street had such authority. "Corporate officers are generally empowered, by delegation of authority of the board of directors, with general managerial functions. They are responsible for the day to day operation of the corporation." *Boston Athletic Asso. v. International Marathons, Inc.*, 392 Mass. 356, 365, 467 N.E.2d 58, 63 (1984). Corporate officers cannot reasonably be presumed to have authority to make **extraordinary commitments** on behalf of a corporation, but day-to-day employment matters are within their ordinary powers. For example, in *Boston Athletic Assoc., id.*, the Court found the organization's president did not have apparent authority to encumber the entirety of the organization's assets and "delegate away control of the very essence of the BAA's corporate existence." See *Stoneman v. Fox Film Corp.*, 295 Mass. 419, 4 N.E.2d 63 (1936)(Corporate president, although authorized to act as a general manager on behalf of a film company, was not authorized to commit the company to the purchase of a theatre, an **extraordinary transaction** which involved a large financial commitment.)(Emphasis added); *Bloomberg v. Greylock Broadcasting Co.*, 342 Mass. 542, 548, 174 N.E.2d 438 (1961)(A board of directors may not "delegate authority which is so broad that it enables the officer to bind the corporation to **extraordinary** commitments.")(Emphasis added).

Spina's agreement to extend the VSP to Brown was far from an **extraordinary** action for a corporation that had just extended a similar benefit plan to 20,000 other employees. Making a judgment call regarding a single uniquely-situated employee was merely a matter of fine-tuning the execution of the VSP, no more extraordinary than extending the same plan to the other three top managers of SSgA had been. Such a decision was clearly within Spina's apparent authority.

Further, Spina was universally recognized as a reasonable, cautious manager. Every witness agreed that aside from his interaction with Brown, Spina had never acted beyond his authority. (Facts ¶ 81). Brown, too, was unaware of any instance in which State Street had refused to put into effect any employment-related decision made by Spina. *(Id.).* There is no evidence of any employment decision by Spina that was not implemented. *(Id.).* It was entirely reasonable for Brown

to believe that Spina had authority to make this commitment, as he had authority for every other corporate action he had taken in his State Street career.

Even Logue, Spina's successor and State Street's present Chairman and CEO, testified that "it would seem reasonable to me" for Brown in his dealings with the former Chairman and CEO of State Street Corporation to have relied on a commitment that the Chairman made with him. Logue said, "I see no reason" Brown should not have relied on Spina when Spina made this commitment. Asked whether it would have appeared to Brown that Spina had the authority to make that commitment, Logue replied, "I would assume so." (Facts ¶ 83[14]). It is difficult to image an admission more definitive than Logue's statements.

This Court should find that the uncontested evidence supports a finding that Brown acted reasonably in concluding that Spina had apparent authority to enter into the mutual commitments they made in 2003.

### 5.    Brown's reasonable reliance on Spina's commitment to him created an enforceable option contract.

The amended complaint has a separate count – Count III – titled "Detrimental reliance, promissory estoppel." Massachusetts courts treat such claims as simply alternative methods of proving the element of consideration in a standard contract claim. As a result, "promissory estoppel" is not an independent cause of action; it is an alternative method of establishing that there was consideration sufficient to create a contract. See *Loranger Constr. Corp. v. F.F. Hauserman Co.*, 376

---

[14] Logue attempted to withdraw from these candid admissions that Brown's reliance on Spina's promise was reasonable. Logue submitted "corrections" to his deposition testimony in which he attempted to withdraw this testimony. The First Circuit frowns on such attempts by a party to create a contested material fact by changing testimony during the course of the case. "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons*, 44 F.3d 1, 4-5 (1st Cir. 1994). See *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)("The lower courts . . . have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.")

Mass. 757, 760, 384 N.E.2d 176 (1978)("When a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' antedating the modern doctrine of consideration"). The Supreme Judicial Court noted about *Loranger, supra,* that "[t]he clear implication of our decision in *Loranger* is that an action based on reliance is equivalent to a contract action." *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850, 647 N.E.2d 1174, 1179 (1995).

Put differently, promissory estoppel "consists simply of a promise that becomes enforceable because of the promisee's reasonable and detrimental reliance." *Rooney v. Paul D. Osborne Desk Co.,* 38 Mass. App. Ct. 82, 83, 645 N.E.2d 50 (1995), *rev. denied*, 419 Mass. 1110, 647 N.E.2d 720 (1995). The Supreme Judicial Court has adopted in this setting the Restatement's[15] formulation for option contracts: "An offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice." *Cataldo Ambulance Serv., Inc. v. City of Chelsea*, 426 Mass. 383, 386 n. 6, 688 N.E.2d 959, 961 (1998). See *Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 724 (1st Cir. 1999)("Under Massachusetts law, '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'")(quoting *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1380 (1st Cir. 1991)).

Spina's testimony presents a stark example of an offerer making an offer in the hope that it will "induce action." State Street was going through what Spina said were "tough times" as a result of so many employees leaving to take the VSP. (Facts ¶ 34). Spina was concerned, quite justifiably, that Brown, who alone among SSgA's top managers had not been offered the VSP, was upset and

---

[15] Restatement (Second) of Contracts § 87(2)(1981).

would leave the company. (Facts ¶ 32). Spina told Brown that it was in the best interest of State Street for Brown to stay and that the company would undertake to provide whatever assurances or agreements were needed to address Brown's concerns. (Facts ¶ 34). Spina testified that he wanted to give Brown "motivation to stay with the company" and that "I was prepared to do what I could do to effectuate whatever that would be." *(Id.)*

Spina was successful in inducing Brown to remain at State Street. Brown's dissatisfaction at not being offered the VSP was addressed and as a result he did not pursue a legal claim for such benefits. Just as significantly, he chose to ignore repeated contacts from headhunters seeking to lure him from SSgA and he chose not to actively seek other positions, which he would have done had Spina failed to address his concerns. (Facts ¶ 84). Brown continued in his role as Chief Investment Officer of SSgA through the "tough times" following the VSP exodus, through the uncertainties following Harbert's sudden death and through the selection of a new chief executive officer. Brown met his commitment to remain at SSgA, rather than leave in a disappointed huff. Brown's reliance on Spina's promise to him to hold the EVSP open, at Brown's option, to age 55 satisfied the element of consideration on Brown's part and created a binding option contract. State Street breached that contract by refusing to extend the EVSP benefits to Brown.

**B.    The uncontested material evidence in support of Brown's contract claim is sufficiently clear that summary judgment should be entered for Brown.**

As unusual as a plaintiff's motion for summary judgment might be, this is one of the rare cases in which the defendant's evidence alone is sufficient to find for the plaintiff on liability, as a matter of law. The existence of the contract is proven by Spina's June 30, 2004 letter to the Executive Compensation Committee. Spina says, "I made a commitment." There is no evidence that State Street's Board Chairman was lying to the Board when he made that declaration. That statement is an admission by the defendant's top manager of the existence of an agreement. The

statement was repeated by deOcejo's and Ooi's communications to the Executive Compensation Committee, baldly stating that "[c]ertain verbal commitments were made to Alan Brown during the EVSP period." (Facts ¶ 54(a)). As much as the defendant might wish these admissions had not been made, they are on the record and is binding.

State Street also cannot escape from the evidence, shown by the minutes of the Board of Directors and the Executive Compensation Committee, that neither body ever voted to implement the EVSP in general or the specific eligibility restrictions that excluded Brown. Rather than the Board, it was management that exercised the final decision making on these plans. The best State Street can suggest, from the evidence, is that management informed the Board about its intentions and the Board took no action to stop management. It is uncontroverted, however, that the Board never affirmatively approved these plans.

The consequence of this is that since management authorized the VSP, management had the authority to decide to include Brown, who stood in a unique status, having global responsibilities and offices in Boston and London, in the EVSP. Such an individualized judgment call was within management's – meaning, Spina's – actual authority.

Moreover, even if Spina lacked actual authority to commit State Street, it was reasonable to Brown to believe that Spina had apparent authority to do so. Brown had never appeared before the Executive Compensation Committee. The corporation acted in regard to Brown only through its executives. Spina had never before acted without authority. Logue's admission that it was reasonable for Brown to assume that Spina had authority to do what he did is binding on State Street.

Finally, Spina could not have been more explicit in testifying that he made his promises to Brown in the hope that Brown would rely on those promises and remain at State Street. Spina said he was concerned Brown would leave the corporation, and Brown confirmed that had his dissatisfaction not been addressed he likely would have done so. This is a classic example of a

situation in which "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Veranda Beach Club*, 936 F.2d at 1330.

This Court should enter summary judgment for Brown on Counts I – Breach of contract – and III – Promissory estoppel, detrimental reliance – of the Amended Complaint.

## CONCLUSION

This Court should find that the uncontested material evidence supports a finding on Counts I, II, and III of the Amended Complaint for the plaintiff, that State Street ratified the agreement between Brown and Spina, that Spina had actual and apparent authority to commit State Street to the agreement he entered into with Brown and that Brown's reasonable reliance on Spina's conduct bound State Street to the terms of the agreement. This Court should enter judgment as to liability for Brown. The case should proceed to trial on the issue of Brown's damages.

Alan Brown, plaintiff
By his attorneys,

/s/ Harvey A. Schwartz
HARVEY A. SCHWARTZ
 BBO. # 448080
LAURIE A. FRANKL
 BBO # # 647181
Rodgers, Powers & Schwartz
18 Tremont Street
Boston, MA 02108
(617) 742-7010

### Certificate of service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on Sept. 28, 2006.

/s/ Harvey A. Schwartz
Harvey A. Schwartz