UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **ALAN BROWN** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **C.A. No. 05-11178-NG** |
| **STATE STREET CORPORATION** | ) | |
| **and STATE STREET GLOBAL** | ) | |
| **ADVISORS,** | ) | |
| **Defendants** | ) | |

**PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The plaintiff opposes the defendants' motion for summary judgment. This is a case in which the plaintiff believes the evidence is so strong that he should be granted partial summary judgment. Concomitantly, there are sufficient contested factual issues that the defendants should not be granted judgment. The plaintiff relies on the arguments and discussion as follows and also on the plaintiff's response to defendants' statement of uncontested facts. Further, as many of the issues raised by the defendants in the summary judgment motion are similar to issues raised by the plaintiff in his motion for summary judgment, rather than repeat all those arguments in their entirety, the plaintiff refers to and incorporates his arguments made in his memorandum of law in support of plaintiff's motion for summary judgment.

**<u>Facts</u>**

The plaintiff disputes the version of the facts stated by the defendants in their summary judgment memorandum. The plaintiff refers to and incorporates the statement of facts in plaintiff's summary judgment memorandum and the facts as stated in far more detail in plaintiff's statement of uncontested facts and plaintiff's response to defendants' statement of uncontested facts.

<u>Discussion</u>

I.    **THE COURT SHOULD DENY STATE STREET'S SUMMARY JUDGMENT MOTION ON BROWN'S CONTRACT COUNTS. THE EVIDENCE, IF ACCEPTED BY THE JURY, EASILY SUPPORTS A VERDICT FOR BROWN ON THESE ISSUES.**

   A.    **A jury could take Spina at his word that he made a commitment to Brown to offer him the EVSP in return for Brown's commitment to remain an active leader at SSgA. Such an exchange of "commitments" would constitute an enforceable contract.**

David Spina, the chairman and chief executive officer of a $10.7 trillion financial institution, wrote to the corporation's board of directors that on behalf of the corporation he made a "commitment" to Alan Brown to hold open to Brown the Voluntary Separation Plan the corporation had recently offered to 20,000 other employees. Spina said that in return Brown "committed" to remain an active leader at SSgA, the corporation's investment management subsidiary, through the near future. Such a mutual exchange of "commitments," if believed by the jury, would be compelling evidence of an enforceable contract.

A "commitment" is the essence of a contract[1]. The two terms – "contract" and "commitment" – are often used interchangeably or in conjunction. A "commitment" is the equivalent of a binding promise or agreement. When given in exchange for consideration, a commitment constitutes a contractual obligation. See discussion at p. 20-21 infra. For summary judgment purposes, the Court should take Spina's June 30, 2004 letter for what it says, giving the words their usual meaning and, if anything could be found vague in his statement that he and Brown exchanged "commitments," such vagueness must be viewed in the light most favorable to Brown.

---

[1] The dictionary defines "commitment" as "an **agreement** or pledge to do something in the future; *especially* **:** an engagement to assume a financial obligation at a future date." Merriam-Webster Online Dictionary, http://www.m-w.com/cgi-bin/dictionary?va=commitment. (Emphasis added).

Based on this letter alone, a jury could find that Spina, acting on behalf of State Street, entered into a contract with Brown.

If Spina's statement that in return for a commitment from Brown he made a commitment to Brown on behalf of State Street is not sufficient to support a jury finding that Spina entered into a contract with Brown, State Street's subsequent acceptance of Spina's representation, without questioning it's veracity, buttresses such a conclusion. State Street management informed the Executive Compensation Committee that "[c]ertain verbal commitments were made to Alan Brown during the EVSP period." (Plaintiff's Facts[2] ¶ 54(a)). The minutes of that Committee's September 15, 2004 meeting say that "Mr. deOcejo presented and reviewed proposed actions in order to accommodate **verbal commitments made to an executive** during the period the Executive Voluntary Separation Program (EVSP) was available."[3] (Plaintiff's Facts ¶ 56)(Emphasis added).

Contrary to State Street's suggestion that a jury is required to find that Spina and Brown never reached an agreement, a jury could find that the Chief Executive Officer of one of the largest financial corporations in the world knows when he has reached an agreement with an employee or not. Spina said he had an agreement. State Street's executives and managers took him at his word. A jury can do the same.

> **B.    Brown and Spina reached agreement on the essential terms of their mutual commitments.**

An oral contract, like any other, requires an offer, acceptance, and consideration. *Vasconcellos v. Arbella Mutual Insurance Company*, 67 Mass. App. Ct. 277, 280, 853 N.E.2d 571, 574 (2006). To be enforceable, such a contract requires agreement as to the essential terms by which the parties intend to be bound, "with sufficient definiteness and clarity that a court, by interpretation with the aid of

---

[2] References to "Plaintiff's Facts" are to Plaintiff's L.R. 56.1 statement in support of Plaintiff's Motion for Summary Judgment.

[3] This statement in the minutes referred to a discussion about Spina and Brown. (Plaintiff's Facts ¶ 56).

existing and contemplated circumstances, may enforce it." *George W. Wilcox, Inc. v. Shell Eastern Petroleum Products, Inc.*, 283 Mass. 383, 388, 186 N.E. 562 (1933). State Street suggests that some essential terms of Brown's "modified EVSP" were left unspecified and, as a result, that no enforceable agreement was reached. State Street complains in particular that Spina and Brown never specified how long Brown was committed to remain at SSgA.

A reviewing court should look to the circumstances surrounding the formation of an agreement if any of the provisions are unclear. "[A] contract is not to be held unenforceable if, when applied to the transaction and construed in the light of the attending circumstances, the meaning can be ascertained with reasonable certainty." *Hastings Assocs. v. Local 369 Bldg. Fund*, 42 Mass. App. Ct. 162, 170, 675 N.E.2d 403 (1997). The Court should construe the agreement so as to make it enforceable, if that was the parties' intent. "Even if an aspect of an agreement is informal, obscure, difficult of satisfactory interpretation, and the subject of dispute by the parties as to its meaning, a court should 'so far as reasonably practicable . . . give a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties.'" *Finn v. McNeil*, 23 Mass. App. Ct. 367, 372, 502 N.E.2d 557 (1987), quoting from *Bray v. Hickman*, 263 Mass. 409, 412, 161 N.E. 612 (1928). "The judicial bias is towards interpreting a contract 'so as to make it a valid and enforceable undertaking rather than one of no force and effect." *Finn*, 23 Mass. App. Ct. at 372.

The Court's duty to apply a reasonable interpretation to the intention of the parties is especially significant when it comes to contractual time periods. *Simons v. American Dry Ginger Ale Co.*, 335 Mass. 521, 524, 140 N.E.2d 649 (1957)(Fact that contract did not state a definite period and was terminable at will by either party did not make it illusory during period prior to termination.) See *Emerson v. Ackerman*, 233 Mass. 249, 252, *124 N.E. 17* (1919)(The term of the contract is to be determined as a question of fact upon all the evidence including the words used, the course of

dealing, and other acts of the parties.) See also *Armstrong v. Rohm & Haas Co.*, 349 F. Supp. 2d 71, 78

n.9 (D. Mass. 2004)(Citing Restatement (Second) of Contracts § 33, comment d), "Valid contracts

are often made which do not specify the time for performance . . . the time for performance is a

reasonable time."

For example, Massachusetts courts apply such rules of interpretation regarding unspecified

time periods in construing noncompetition agreements as a matter of routine. An employer's

conduct in continuing to employ the employee after the execution of a noncompetition agreement is

routinely accepted as adequate consideration for the noncompetition agreement. Such

noncompetition agreements rarely, if ever, require the employer to provide continued employment

for a specified period of time, yet that lack of specificity is never found to invalidate the

noncompetition agreement. In *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 488

N.E.2d 22 (1986), for example, the Appeals Court found that the employer's continued employment

of the plaintiff for an unspecified period of time provided consideration for the noncompetition

agreement the parties entered into[4].

The key question in determining whether an enforceable contract exists is "whether the

parties intended to contract with one another and there is a reasonably certain basis for providing an

appropriate remedy." *Id.*, 349 F. Supp. 2d at 78, citing Williston on Contracts § 4:18 (4th ed. 1990).

It is obvious from Brown's and Spina's statements a year after their initial agreement that they both

believed they had reached an agreement. Brown emailed Spina that he would be satisfied if his email

---

[4] Interestingly, while courts examining noncompetition clauses parse the length and breadth of the noncompetition
restrictions, they rarely, if ever, consider the length of the employee's continued employment following the execution (or
imposition) of the agreement. Just as Brown's promise to remain at SSgA during the period of transition following the
VSP was indefinite, the standard promise by an employer of "continued employment" without reference to any specific
term is sufficient consideration for the exchange of commitments by the parties. Brown's own employment contract
(Defendants' Ex. 19) contained noncompetition provisions preventing him from competing with SSgA after
termination. That contract, however, did not require SSgA to employ Brown for any specific period of time. See *Campbell
v. General Dynamics Gov't Sys. Corp.*, 321 F. Supp. 2d 142, 148 n.3 (D. Mass. 2004)(Continued employment constitutes
consideration for employee's agreement to arbitration restriction in employment contract. No specific period of
continued employment was specified.)

constituted the record of "our agreement" and asked Spina to let him know if the email were not "an accurate statement of our agreement." (Plaintiff's Ex. 15). Spina referred to his interaction with Brown as a "commitment" in return for which he received a commitment from Brown. Spina made no mention of any need for further negotiations or drafting. (Plaintiff's Ex. 18). These statements by the only two parties to the negotiation provide a basis for the jury to find both parties intended to reach an agreement and believed they had done so.

The agreement addressed all the essential terms of State Street's commitment to Brown and Brown's commitment to State Street. Spina wanted Brown to remain at SSgA through the period of what Spina termed "instability" caused by the VSP. (Plaintiff's Facts ¶ 33). Spina was faced with the loss of at least two and possibly all four of SSgA's top four managers. He was especially desperate to retain Brown. (Plaintiff's Facts ¶ 32, 34). Brown was unhappy and told Spina that he was upset that he had not been offered the EVSP. Viewed in light of those circumstances, Brown's obligation to remain at SSgA through the post-VSP transition becomes clear and understandable. Brown described his part of the bargain as follows, "The commitment we made was to be there to lead SSgA through this very difficult time until it was definitely behind us and the firm was stable and cruising ahead again." (Plaintiff's Facts ¶ 33). The expectation was that the transition would take about a year. (Plaintiff's Facts ¶ 33). Spina described Brown's "commitment," made in the Spring of 2003, as remaining at State Street "during 2003 and beyond." (Plaintiff's Exhibit 18).

While no dates or periods of service were discussed, the Court can look to the circumstances surrounding the formation of the agreement and impute a "reasonable" period of time to Brown's commitment. Since Brown was an employee-at-will[5], his agreement to remain with SSgA for any "reasonable" length of time provided consideration for Spina's commitment to him. As the First Circuit noted in *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 10 (1st Cir. 2003), "When all is said and

---

[5] Subject to a sixty-day notice period and English statutory employment protection.

done, this is a classic case of consideration. When the modification took place, the employee had no right to continued employment and the employer had no right to the employee's future services. Thus, each party provided consideration to the other sufficient to support a continuation of the employment relationship, on modified terms, for an indeterminate future period."

Spina's commitment to Brown is equally clear. In return for Brown's commitment to remain at SSgA through the transition, he would have the option of receiving the equivalent of the EVSP benefits at any time up to age 55 (he was 50 at the time). They agreed certain portions of the EVSP would have to be modified in accordance with Brown's specific circumstances. For example, he was not a participant in State Street's regular pension plan but had a special personal pension arrangement. Also, he did not receive U.S. medical insurance through State Street. Brown and Spina acknowledged that those modifications from the standard EVSP were necessary. Further, the EVSP added five years of service for eligibility for the Executive SERP, a supplemental pension plan for senior executives. They agreed that for Brown the five years of additional service would amortize over the coming five years, so that by age 55, Brown would receive no supplemental years of service for SERP calculation purposes. (Plaintiff's Facts ¶ 37-38).

The Court should find that Spina wanted Brown to remain at SSgA for a "reasonable" period of time to help it through the transition following the VSP. Brown agreed to do that. The facts show that Spina (and State Street) received what he wanted from Brown: there is no question that by the time Brown left in March 2005 the last aftershocks of the VSP had faded away. State Street does not suggest that Brown breached his commitment and failed to remain at SSgA for a sufficient length of time. No State Street manager or director suggested that Spina's commitment was not binding because the terms were unclear; State Street's only justification for refusing to honor Spina's commitment was that Spina lacked authority to make it. In any event, whatever

Brown's obligation was, he met it. That conduct alone moots any uncertainty in the agreement on this issue[6].

Such agreements intended to keep an important employee on board during a period of transition are common and are almost always enforced. See *In re Aerovox, Inc.*, 269 B.R. 74 (Bankr. D. Mass. 2001)(Approving key employee retention agreements during bankruptcy, especially when employees state intention to leave if not given additional incentive beyond their normal salary.) The employee's conduct in remaining with the employer, even when no specific period is stated, is sufficient consideration for the employer providing a benefit to the employee, such as a stock option award. *In re Plymouth Rubber Company, Inc., and Brite-Line Technologies, Inc.*, 336 B.R. 16 (D. Mass. Bankruptcy 2005). See *Kerbs v. v. California Eastern Airways, Inc.*, 33 Del. Ch. 69, 90 A.2d 652, 656 (Del. 1952)(Same).

The best evidence that this agreement addressed all the essential terms necessary to constitute an enforceable contract is the candid admission by Boon Ooi, States Street's head of benefits, that he had no difficulty calculating the cost to State Street (and the amount Brown would receive) of this agreement. Ooi said that it was a simple matter to apply the terms of the EVSP modified by what was stated in Brown's email to Spina and Spina's letter to Weissman. (Plaintiff's Facts ¶ 55). Ooi could think of no other information – no more "terms" – he would need to be able to make that calculation. (Plaintiff's Facts ¶ 55). The agreement seems bare at first blush, but the incorporation of the detailed provisions of the EVSP provide substance to the value of the benefits Brown would receive. Agreement was reached as to all essential terms to the mutual commitments between Brown and State Street.

---

[6] This issue – lack of specificity as to Brown's commitment – is also mooted under a promissory estoppel theory. Just as Brown's reasonable reliance on Spina's promise satisfies the consideration issue, it also satisfies the lack of specificity issue since Brown clearly remained at SSgA for a sufficient period of time.

**C.    Brown and Spina never even discussed that their agreement would be binding only when reduced to a written, executed formal document.**

State Street is correct in stating that no contract is formed "if both parties intend to have a written instrument signed by them . . . and neither considered the contract concluded until the written instrument was fully executed." Defendants' Memorandum at p. 25 of 42.  On the other hand, "If all material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract already final by the earlier mutual assent of the parties to those terms." *Gel Systems, Inc. v. Hyundai Engineering & Constr. Co.*, 902 F.2d 1024, 1027-1028 (1st Cir. 1990). See *Goren v. Royal Invest., Inc.*, 25 Mass. App. Ct. 137, 141 (1987)(Even though purchase offer stated parties would execute subsequent purchase and sale agreement, since preliminary agreement covered all material points "the case falls into that category where execution of a more formal instrument was hardly more than a formality.")

In short, it is a fact question whether parties intend that there is to be no agreement until a formal document is executed, or whether the intention of the parties is to be bound by their original agreement, which they plan on memorializing in writing in the future. A jury could easily find in the present case that Spina and Brown intended to be <u>bound</u> by their oral commitments to one another and they wanted to have a written <u>record</u> of that agreement. The email interchange between Spina and Brown, a year after their oral agreement, provides a firm basis for such a jury finding.

Brown's June 10, 2004 email to Spina recited the general terms of their agreement. Brown added,

> Given the importance of these matters, it is important for both myself and State Street that we should have a written **record** of this understanding. You said that you intended to write to me to **confirm** this, but I appreciate that the business pressures at the time may have got in the way. However, I don't think we should let the anniversary of the VSP go by without **putting a written record on file**. I would

be perfectly happy for this e:mail to stand as a **record of our
agreement.**

(Plaintiff's Exhibit 15)(Emphasis added). That document reflects Brown's belief that he and Spina

already had an "agreement," but that there should be "a written record on file," for purposing of

memorializing the already existing agreement. No reasonable jury could read this email and draw the

conclusion that Brown did not believe he already had an agreement with State Street or that he

believed there would be no agreement unless a formal document were executed by the parties[7].

Spina's reply to Brown's email supports Brown's position that the purpose of the anticipated

written document was to record their preexisting oral agreement. Spina wrote back to Brown, saying,

> Thanks for the 'first cut' at a **record**. I will share with Lou deOcejo
> and plan to discuss the general outline with our Executive Comp
> Committee of the Board of Directors tomorrow. So **I will get it on
> the record**.

(Plaintiff's Exhibit 16)(Emphasis added). Spina twice refers to creating a "record." He refers to

Brown's email as a "first cut at a record," not as a "first cut" at a final agreement. He refers to the

Executive Compensation Committee not as a body that must approve a final agreement before it is

final, but as the repository of the "record" of their agreement.

Spina's June 30, 2004 letter to that Committee, (Plaintiff's Exhibit 18), further supports the

position that Brown and Spina believed they had an agreement, rather than that they both intended

not to be bound until a formal document were executed. Spina told the Committee that "I made oral

commitments." He wrote that the Committee told him to "**record** these commitments in the form

of a letter …" (Emphasis added). He makes no mention of any intention to execute a formal

document before this exchange of "commitments" is binding on the parties. (And he certainly says

nothing about needing to clarify any of the terms of these mutual commitments.) See *Vasconcellos v.*

---

[7]  Even the defendants' reference to Brown deposition testimony confuses the distinction between the real agreement
and it's "reflection." Brown testified that after he and Spina reached agreement they "then agreed that we would need to
reflect this in writing." (Plaintiff's Supplemental Exhibit 2, Brown deposition p. 104.) A written "reflection" of an
agreement is a record, a memorial, not the real thing itself.

*Arbella Mutual Insurance Company*, 67 Mass. App. Ct. at 280, 853 N.E.2d at 574 (Parties reached oral agreement then confirmed it by letter. "While the terms of an oral contract may be established entirely through testimony, in this case a written memorandum – a letter – was mailed the following day.") The jury can take Spina at his word, here, too, and find that Spina believed he had entered into an agreement, and his letter constituted a "record" of that previous agreement.

Whether or not parties intend to be bound by an initial agreement or whether they intend to be bound only after a formal document is executed is a question of fact. The evidence is uncontested that both Spina and Brown intended to be bound by their mutual exchange of oral commitments, and that their intention in regard to a written document was that it would serve only as a "record" of their oral agreement.

### D.     Brown was not told that his agreement with Spina had to be approved by the Executive Compensation Committee before State Street would honor it.

There is no evidence that Spina and Brown agreed that any agreement they reached was contingent on approval by the Executive Compensation Committee. In fact, the evidence is to the contrary, that Spina never mentioned the Committee in his conversations with Brown and that both Spina and Brown believed that they had made binding, oral commitments. Spina testified that he couldn't recall "one way or the other" whether he said anything to Brown concerning the Board or the compensation committee. (Spina transcript p. 21-22.) "I don't recall any specific situation where I walked Alan through that," Spina said, referring to the ECC. (Plaintiff's Supplemental Exhibit 3, Spina deposition p. 44).

Brown, too, testified that Spina did not talk with him about seeking approval of the compensation committee for any arrangement they made. (Brown transcript p. 104-105). To the contrary, Brown testified, "He gave no indication that there was any other process to go through." (Brown Transcript p. 105).

State Street's only evidence for its contention that Brown was on notice that the Executive Compensation Committee had to approve his participation in the EVSP is by reference to the fine print in various equity awards Brown had received during his State Street career. These awards all stated that the ECC had to approve all such awards. Brown agreed that the ECC was the ultimate authority on equity awards. This understanding, however, is completely consistent with Brown's and Spina's deposition testimony. Both men said that Spina had told Brown that he could not alter any preexisting equity awards. That understanding is the basis for Brown's statement in his June 10, 2004 email to Spina, summarizing their agreement, that he would "get the VSP package amortised over 5 years, save in one regard that vesting of equity would be limited to equity granted before 30.6.2003 [June 30, 2003]." (Plaintiff's Exhibit 15). It was precisely because Spina lacked authority to alter future equity awards that Spina limited the enhancement of equity and option rights to the date of the VSP. All modifications to equity awards prior to that date had already been approved by the ECC in order to facilitate the VSP.

State Street's final evidentiary prop for its contention that Brown knew the ECC had to approve any agreement made by Spina is based on Brown's testimony that as of the time of his 2006 deposition he had read the ECC charter on State Street's web site. State Street failed to ask Brown when he first read that charter, however, or if he had read it as of his agreement with Spina. In fact, as Brown's affidavit states, Brown first read the ECC's charter in 2005, around the time of his departure from State Street. (Plaintiff's Supplemental Exhibit 1, Brown affidavit ¶ 4).

There is no evidence in the record, much less uncontested evidence, that Brown believed that Spina's decision to offer him the equivalent of the EVSP benefits had to be approved by the Executive Compensation Committee before State Street would honor it.

E.    **The evidence is sufficient for a jury to find that Spina had authority, actual or apparent, to make a binding commitment to Brown.**

1.    **Spina had actual authority to enter into an employment contract with Brown**.

Spina entered into the agreement with Brown acting in his capacity as chairman of the board and chief executive officer of State Street Corporation. Spina agreed that Brown would be eligible for the equivalent of the EVSP benefits and he extended the time period for Brown to opt for these benefits from the 45 days other employees were offered to five years. The evidence supports that Spina had authority to commit the corporation to both offers: to determine that Brown was eligible for the EVSP and to modify the opt-in period for Brown.

The decision concerning which State Street employees would be offered the VSP (and the EVSP) was made by corporate managers, all of whom reported to Spina. (Plaintiff's Facts ¶ 16, 17). They decided the plans would be offered to U.S. employees, foreign employees who worked in the U.S. and U.S. expatriate employees who worked abroad. (Plaintiff's Facts ¶ 12). Brown, however, was a unique employee. He was paid through the United Kingdom SSgA subsidiary, but that subsidiary charged his salary back to the U.S. headquarters. (Plaintiff's Facts ¶ 9). He had offices in both London and Boston. His duties were global and not in any way restricted to the U.K. (*Id.*). Further, he was an executive vice president of the U.S. State Street Corporation. (Plaintiff's Facts ¶ 6). Brown fit some eligibility parameters of the EVSP but not others. Making a judgment call as to such a unique employee was the role of top management.

Spina, and those who reported to him, and not the Executive Compensation Committee, or the entire Board of Directors, made the ultimate decision as to which employees would be eligible for the VSP. It is uncontested that management designed the VSP, including its eligibility requirements. While information about the program was presented to the Board for informational purposes, there is no record of any vote by the Board or its Executive Compensation Committee to

adopt the eligibility standards as determined by Spina and his staff. The Board was informed, but its formal approval was neither sought nor received. The decision maker as to eligibility was management, not the Board. Some specific votes were required to modify some stock option programs to fit within the VSP, and the Executive Compensation Committee took such votes, but there was never a vote as to which State Street employees, individually or as a class, would receive the VSP and which would not. That decision was made by management alone. (Plaintiff's Facts ¶ 20, 21, 22, 23).

Just as management had authority to decide, without benefit of any Board vote, to extend the VSP to some State Street employees, management had the authority to decide how to handle the VSP in regard to a uniquely-situated employee, Brown. Spina acted within his authority when he used his judgment to include Brown within the EVSP. Spina testified that he did not believe he exceeded his authority in any of his dealings with Brown[8]. (Plaintiff's Facts ¶ 76).

An identical analysis applies to the second part of Spina's commitment, that rather than having only 45 days to decide whether to opt for EVSP benefits, Brown could elect at any time within the following five years. The Board never voted to approve the 45-day opt-in period. That was management's decision. If management – Spina – had authority to establish that opt-in period, it had authority to create an exception for an exceptional situation.

In the absence of any evidence that the Board of Directors or the Executive Compensation Committee voted to approve the VSP as a whole or the eligibility or opt-in period provisions

---

[8]  The Executive Compensation Committee's charter  (Defendants' Exhibit 2) is of little help to State Street. That Charter states that the ECC "determines" compensation only for the Chief Executive Officer. In regard to Executive Vice Presidents, such as Brown, the Committee merely "reviews, evaluates and advises" the Board as to the compensation levels set by management. At best for State Street, the ECC charter, which Brown did not see until 2005, authorized the Committee to review a compensation decision concerning Brown made by Spina. The Charter does not require that the ECC "determine" Brown's compensation. This intentional distinction between "determining" CEO compensation and "reviewing" EVP compensation, a jury could find, signifies that Spina had authority to "determine" Brown's compensation, subject to reversal by the Board if it chose to do so. The ECC did "review" Spina's commitment to Brown and could have voted to reject it, but it did not do so.

specifically, this Court should find that management, in the person of Spina, had authority to make those decisions and that Spina had actual authority to enter into the agreement with Brown that he entered into.

### 2. Spina had sufficient apparent authority to contract on behalf of State Street that State Street should be liable for the agreement between Spina and Brown.

Apparent authority, like beauty, is in the eye of the beholder. "Apparent authority involves written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him. *Neilson v. Malcolm Kenneth Co.*, 303 Mass. 437, 441, 22 N.E.2d 20 (1939). See *Globe Ticket Co. of New England v. Boston Retail Grocers' Ass'n*, 290 Mass. 235, 238, 195 N.E. 309 (1935); Restatement (Second) of Agency § 8 (1958) ." *Hanfler v. Zotos*, 446 Mass. 489, 498,  845 N.E.2d 322, 331 (2006)(emphasis added). See *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 745, 729 N.E.2d 1113, 1120-1121 (2000)(citing Restatement 2d of Agency, § 27, Creation of Apparent Authority ).

*Linkage Corporation v. Trustees of Boston University*, 425 Mass. 1, 679 N.E.2d 191 (1997), presents a situation similar to the present case. Boston University's vice president for external affairs, Meng, signed an agreement on behalf of the University with the plaintiff corporation. The University sought to avoid the contract by claiming that Meng lacked actual authority. The Supreme Judicial Court held, nonetheless, that Meng had apparent authority to contract on behalf of the University. Indicia of this apparent authority included Meng's "virtual autonomy" in supervising the plaintiff's dealings with Boston University, his conduct in negotiating and signing the contract, and the University Chancellor's instruction to Meng to deal with the plaintiff. The Court disregarded the University's written policy that expenditures over $5,000 required approval by somebody superior to Meng, finding that the plaintiff could have reasonably concluded that policy "was not always

enforced." The Court noted, "After all, it is not uncommon for an employer to issue a mandate concerning financial expenditures, and then to ignore or overlook the mandate in circumstances that suggest benign oversight because the employer's advantages are being advanced." 425 Mass. at 17, 679 N.E.2d at 203.

Spina's authority to extend a modified EVSP to Brown was far more apparent than Meng's authority was in *Linkage Corporation*. After all, Spina was the most senior executive and director at State Street. If he lacked authority to enter into an employment contract, then no individual at State Street had such authority. "Corporate officers are generally empowered, by delegation of authority of the board of directors, with general managerial functions. They are responsible for the day to day operation of the corporation." *Boston Athletic Assoc. v. International Marathons, Inc.*, 392 Mass. 356, 365, 467 N.E.2d 58, 63 (1984). Corporate officers cannot reasonably be presumed to have authority to make <u>extraordinary</u> commitments on behalf of a corporation, but day-to-day employment matters are within their ordinary powers. For example, in *Boston Athletic Assoc., id.*,  the Court found the organization's president did not have apparent authority to encumber the entirety of the organization's assets and "delegate away control of the very essence of the BAA's corporate existence."

Spina's agreement to extend the VSP to Brown was far from an extraordinary action for a corporation that was in the midst of offering a similar plan to 20,000 other employees. Making a judgment call regarding a single uniquely-situated employee was merely a matter of fine-tuning the execution of the VSP, no more extraordinary than extending the same plan to the other three top managers of SSgA had been. Such a decision was clearly within Spina's apparent authority.

Further, Spina was universally recognized as a reasonable, cautious manager. Every witness agreed that aside from this interaction with Brown, Spina had never acted beyond his authority. (Plaintiff's Facts ¶ 81). Brown, too, was unaware of any instance in which State Street had refused to

put into effect any employment-related decision made by Spina. (*Id.*). There is no evidence of any employment decision by Spina that was not implemented. (*Id.*). It was entirely reasonable for Brown to believe that Spina had authority to make this commitment, as he had authority for every other corporate action he had taken in his State Street career.

Even Ronald Logue, Spina's successor and State Street's present Chairman and CEO, testified that "it would seem reasonable to me" for Brown in his dealings with the former Chairman and CEO of State Street Corporation to have relied on a commitment that the Chairman made with him. Logue said, "I see no reason" Brown should not have relied on Spina when Spina made this commitment. Asked whether it would have appeared to Brown that Spina had the authority to make that commitment, Logue replied, "I would assume so." (Plaintiff's Facts ¶ 83). A jury is free to rely on this admission from State Street's Chief Executive Officer that Brown's reliance on Spina's apparent authority was reasonable.

This Court should find that the uncontested evidence supports a finding that Brown acted reasonably in concluding that Spina had apparent authority to enter into the mutual commitments they made in 2003.

**F.    State Street is not entitled to summary judgment on Brown's promissory estoppel claim because a jury could find that Brown reasonably relied on Spina's commitments to him.**

The amended complaint has a separate count – Count III – titled "Detrimental reliance, promissory estoppel." Massachusetts courts treat such claims as simply alternative methods of proving the element of consideration in a standard contract claim. As a result,  "promissory estoppel" is not an independent cause of action; it is an alternative method of establishing that there was consideration sufficient to create a contract. See *Loranger Constr. Corp. v. F.F. Hauserman Co.*, 376 Mass. 757, 760, 384 N.E.2d 176 (1978)("When a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' antedating

the modern doctrine of consideration"). The Supreme Judicial Court noted about *Loranger, supra,* that "[t]he clear implication of our decision in *Loranger* is that an action based on reliance is equivalent to a contract action." *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850, 647 N.E.2d 1174, 1179 (1995).

Put differently, promissory estoppel "consists simply of a promise that becomes enforceable because of the promisee's reasonable and detrimental reliance." *Rooney v. Paul D. Osborne Desk Co.,* 38 Mass. App. Ct. 82, 83, 645 N.E.2d 50 (1995), *rev. denied*, 419 Mass. 1110, 647 N.E.2d 720 (1995). The Supreme Judicial Court has adopted in this setting the Restatement's[9] formulation for option contracts: "An offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice." *Cataldo Ambulance Serv., Inc. v. City of Chelsea*, 426 Mass. 383, 386 n. 6, 688 N.E.2d 959, 961 (1998). See *Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 724 (1st Cir. 1999)("Under Massachusetts law, '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'")(quoting *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1380 (1st Cir. 1991)).

Spina's testimony presents a stark example of an offer made in the hope that it will "induce action." State Street was going through what Spina said were "tough times" as a result of so many employees leaving to take the VSP. (Plaintiff's Facts ¶ 34). Spina was concerned, quite justifiably, that Brown, who alone among SSgA's top managers had not been offered the VSP, was upset and would leave the company. (Plaintiff's Facts ¶ 32). Spina told Brown that it was in the best interest of State Street for Brown to stay and that the company would undertake to provide whatever

---

[9] Restatement (Second) of Contracts § 87(2)(1981).

assurances or agreements were needed to address Brown's concerns. (Plaintiff's Facts ¶ 34). Spina testified that he wanted to give Brown "motivation to stay with the company" and that "I was prepared to do what I could do to effectuate whatever that would be." *(Id.)*

Spina was successful in inducing Brown to remain at State Street. Brown's dissatisfaction at not being offered the VSP was addressed and as a result he did not pursue a legal claim for such benefits[10]. Just as significantly, he chose to ignore repeated contacts from headhunters seeking to lure him from SSgA and he chose not to actively seek other positions, which he would have done had Spina failed to address his concerns. (Plaintiff's Facts ¶ 84). Brown continued in his role as Chief Investment Officer of SSgA through the "tough times" following the VSP exodus, through the uncertainties following Harbert's sudden death and through the selection of a new chief executive officer.

Brown continued to rely on Spina's promise up to his final days at State Street. In March 2005, almost two years after Spina made his "commitment" to Brown and well after SSgA had passed through the turbulence caused by the VSP, Brown relied on Spina's promise by exercising what he believed were his rights under that commitment. Brown made clear to Mitchell Shames, SSgA's general counsel, that he was not giving notice that he was resigning, but, rather, that he was "electing under the VSP." (Plaintiff's Facts ¶ 72). State Street chose to treat that election – made in reliance on Spina's promise – as a resignation. But for that reliance on State Street honoring Spina's commitment, Brown could still be employed at SSgA.

Brown met his commitment to remain at SSgA through it's "tough times," rather than leave in a disappointed huff, as was his right as an employee at will. Brown's reliance on Spina's promise

---

[10]  Whether Brown would have succeeded in such a claim is irrelevant. "A party who abandons a claim made in good faith in order to settle a dispute over that claim provides sufficient consideration to support the settlement agreement even though the claim ultimately might have been unsuccessful." *Pandiscio v. Atkinson, 54 Mass. App. Ct. 482, 486, 766 N.E.2d 87, 88 (2002).*

satisfied the element of consideration on Brown's part and created a binding option contract. State

Street breached that contract by refusing to extend the EVSP benefits to Brown.

II.     **Even if Spina lacked authority to commit State Street to the agreement he reached with Brown, State Street's directors ratified that agreement when they failed to promptly renounce it[11].**

Ratification of an agent's unauthorized act – here, Spina's making a "commitment" to

Brown (assuming arguendo, that Spina lacked such authority) – takes place as follows,

> Where an agent lacks actual authority to agree on behalf of his
> principal, the principal may still be bound if the principal acquiesces
> in the agent's action, or fails promptly to disavow the unauthorized
> conduct after disclosure of material facts. "It is the instant duty of a
> principal, upon ascertaining the facts, at once to disaffirm an act done
> in his name by an agent in execution of a power conferred but in a
> mode not sanctioned by the terms of the agency or in excess or
> misuse of the authority given."

*Linkage Corporation*, 425 Mass. at 18, 679 N.E.2d at 204 (citing *Hudson v. Massachusetts Prop. Ins.*

*Underwriting Ass'n,* 386 Mass. 450, 457, 436 N.E.2d 155 (1982)(ratification of agent's unauthorized

acts inferred where, after knowledge, principal made no effort to repudiate them). The Supreme

Judicial Court noted that "[r]atification relates back, and has the same effect, as a prior grant of

authority by the principal to the agent." *Id.* State Street's conduct falls squarely within that doctrine.

Spina gave the directors written notice that "I made oral commitments to Tim Harbert and

Alan Brown, Chairman and Vice Chairman of SSgA, respectively, and Executive Vice Presidents of

State Street Corporation, explained more fully below." (Plaintiff's Facts ¶ 48). A clearer statement

that the bank's chief executive officer had entered into an agreement on the bank's behalf is difficult

to imagine.

---

[11]  Brown refers to and incorporates the much more extensive discussion of ratification in his memorandum in support of his motion for summary judgment. Because of the extent of that discussion, Brown will address ratification only briefly in this memorandum.

A "commitment" is a binding promise or agreement to take some action. "'Commitment' itself may be defined as 'a pledge or promise; obligation.'" *United States v. Agne*, 214 F.3d 47, 54 (1st Cir. 2000)(citing The Random House Dictionary of the English Language 412 (2d ed. 1983)); *Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002)("[P]romise required to create a binding contract must be an undertaking or **commitment** to do or refrain from doing something in the future"). In *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. at 849, 647 N.E.2d at 1179, the Court adopted the use of the terms in the Restatement (Second) of Contracts § 2 (1)(1981) that "[a] promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a **commitment** has been made." (emphasis added). See *Situation Mgmt. Sys. v. Malouf, Inc.*, 430 Mass. 875, 879, 724 N.E.2d 699 (2000)(Exchange of mutual **commitments** constitutes enforceable contract). In fact, the terms "contract" and "commitment" are often used interchangeably, or combined into the phrase "contract commitment." See *Cherokee Nation v. Leavitt*, 543 U.S. 631, 642 (2005)("contractual commitments"); *Ciardi v. F. Hoffmann La Roche, Ltd.*, 436 Mass. 53, 78, 762 N.E.2d 303, 321 (2002)("contract commitments); *Stow Mun. Elec. Dep't v. Department of Pub. Utils*, 426 Mass. 341, 350, 688 N.E.2d 1337, 1348 (1997)("contract commitments"); *Pratt v. Boston*, 396 Mass. 37, 39, 483 N.E.2d 812, 815 (1985)("contracts or commitments"); *Rayden Engineering Corp. v. Church*, 337 Mass. 652, 660, 151 N.E.2d 57, 62 (1958)("commitment such as would sustain an action of contract"). Spina's statement that he and Brown exchanged mutual "commitments" is the equivalent of saying they entered into a contract.

If Spina's June 30, 2004 letter describing his "commitment" to Brown were not enough to place the Directors on notice, the documentation of Spina's "oral promise" to Brown submitted by the corporation's Human Resources managers to the September 15, 2004 Executive Compensation Committee, (Plaintiff's Facts ¶ 54), was explicit notice that Spina had committed the corporation to provide specific benefits for Brown. DeOcejo submitted a document to the Committee titled "SSgA

Executive Vice President Verbal Commitment by David Spina." (Exhibit 22, Plaintiff's Facts ¶ 54). This document stated, plainly, that  "[c]ertain verbal commitments were made to Alan Brown during the EVSP period." *Id.*  A price was placed on these commitments to Brown: $5.54 million.

By their September 15, 2004 meeting, State Street's directors had specific information about Spina's $5.54 million commitment to Brown, information that went well beyond a hint that "something was afoot," *Inn Foods v. Equitable Co-Operative Bank*, 45 F.3d 594, 597 (1st Cir. 1995), well beyond "knowledge of such facts or circumstances as would put a reasonable person on inquiry and which would lead to full discovery." *Puritan Medical Center, Inc. v. Edward L. Cashman, Jr.*, 413 Mass. 167, 172, 596 N.E.2d 1004, 1008 (1992). They had a letter from the highest corporate officer that he had made "a commitment" on behalf of the corporation. They had a calculation from the corporation's chief Human Resources manager that this "commitment" was a significant one, valued at $5.54 million. The directors believed Spina lacked authority to make this commitment. (Plaintiff's Facts ¶ 57). Under more than a hundred years of solidly established Massachusetts law, these corporate directors had a duty to formally and officially renounce Spina's action and let Brown know they had done so, if the corporation were to escape liability for this corporate commitment.

The directors chose to remain mum, to leave their official minutes void of any mention of Alan Brown[12]. The law imposes consequences for such inaction by corporate directors. One of those consequences is that by their failure to do what reasonable persons who wanted to reject such an unauthorized commitment would have immediately done, as a matter of law they ratified Spina's commitment to Brown. This is a classic example of ratification by silence.

---

[12]  The minutes of the September 15, 2004, Executive Compensation Committee meetings simply state, "Mr. deOcejo presented and reviewed proposed actions in order to accommodate **verbal commitments** made to an executive during the period the Executive Voluntary Separation Program was available." (Exhibit 23, Bates 04674)(Emphasis added). That statement refers to Brown. (Plaintiff's Facts ¶ 56). Whatever the "proposed actions" were, the Committee did nothing. (Plaintiff's Facts ¶ 58). The minutes are redacted to protect personal information of irrelevant persons. The parties have stipulated that none of the redactions concerns Brown.

State Street's efforts to escape the consequences of its directors' inaction are futile. State Street argues that there was no "agreement" for the directors to ratify because Spina and Brown never concluded their negotiations. As discussed above, a mutual exchange of "commitments" constitutes a contract. A jury could easily find that the Chief Executive Officer of a corporation that handles more than $10 trillion of other people's money knows when he has or has not made a legally binding commitment. There is no evidence that State Street's directors, managers or successor CEO harbored any doubts as to whether Spina actually had made the "commitment" he told them he made. They questioned whether they were compelled to honor that commitment, but they never doubted that a commitment – a contract, an agreement, an exchange of obligations – had been made. Since State Street's CEO, its human resources managers and its directors could conclude that Spina and Brown had made commitments to one another, a jury could make the same finding. State Street also suggests that it can escape from ratification because Brown knew any agreement had to be approved by the Executive Compensation Committee. As discussed above, there is no evidence that Spina even mentioned <u>review</u>, much less approval, by the Compensation Committee to Brown.

State Street cannot escape from the legal consequences of its conduct resulting in ratification of Spina's commitment. As long ago as 1936, the Supreme Judicial Court said of such a situation,

> Ratification of unauthorized acts of an agent is readily inferred where, after knowledge, the principal makes no effort to repudiate them. This statement is particularly applicable where the principal knows that third parties are continuing to act in reliance upon the supposed authority.

*Irving*, 295 Mass. at 384, 3 N.E.2d at 843. This Court should deny State Street's motion for summary judgment on Count II of the Amended Complaint.

III.    **STATE STREET HAD IT RIGHT THE FIRST TIME WHEN IT ARGUED THAT THIS CASE IS NOT AN ERISA CASE. BROWN'S COMMON LAW CLAIMS ARE NOT PREEMPTED BY ERISA BECAUSE, AS STATE STREET PREVIOUSLY URGED TO THIS COURT, BROWN WAS NOT A "PARTICIPANT" IN AN ERISA "PLAN" IN REGARD TO HIS CLAIMS UNDER THE COMMITMENT SPINA MADE TO HIM.**

      A.     **State Street's present ERISA argument is the opposite of its ERISA argument when it filed its motion to dismiss the ERISA count.**

State Street's various ERISA arguments attempt to lead this Court down a garden path. Nothing would have caused greater apoplexy among State Street's attorneys in August 2005, when they filed the defendants' motion to dismiss Brown's ERISA count, than an assertion that "this is a garden-variety ERISA cause of action," as they now say in Defendants' Memorandum in Support of Motion for Summary Judgment, p. 39 of 42). A year ago, in its motion to dismiss the ERISA count, State Street argued, to the contrary, that "Brown tries to dress up his **garden-variety contract claim** as an ERISA claim." (Defendants' Memorandum of Law in Support of Motion to Dismiss Count I at p. 7 of 13)(Emphasis added). In seeking to dismiss Brown's ERISA count, State Street told this Court last year (1) that Brown's "modified-VSP" "is not a 'plan' under ERISA. It is axiomatic that the civil remedies of [ERISA] apply only to an ERISA 'plan,'" (*id.* at p. 8 of 13); (2) that "Brown is incapable of alleging – let alone establishing – that he is a 'participant' in the VSP and, thus, his ERISA claim should be dismissed, (*id.*); and, (3) that "**ERISA does not apply** to claims arising from early termination programs that **merely enhance pre-existing plans**, even if those plans are covered under ERISA." (Defendants' Reply Memorandum of Law in Further Support of the Defendants' Motion to Dismiss Count I at p. 7 of 9)(Emphasis added).

Now, in its summary judgment memorandum, executing a complete about face, State Street tells this Court that Brown's contract claims actually are preempted by ERISA and, now, that it is the contract claims that must be dismissed, rather than the ERISA claim. This is so, State Street now argues, because the VSP **enhanced benefits under preexisting ERISA plans**, such as the SERP.

State Street now argues that "[r]egardless of how many state-law claims he asserts against State Street, the real nature of his claims is to recover retirement and severance benefits that he believes State Street is wrongfully withholding from him." (Defendants' Memorandum in Support of Motion for Summary Judgment, p. 39 of 42).

Courts frown on such attempts to argue diametrically opposed legal positions in the same case. State Street offers no explanation, except convenience, for this change of heart.

This Court denied State Street's earlier motion to dismiss the ERISA claim, saying, "The fact-based nature of the ERISA analysis militates against granting a motion to dismiss at this early stage of the case." Order of November 1, 2005. The motion to dismiss was denied without prejudice and the ERISA issue was certain to be raised again at summary judgment, once the facts were fleshed out by discovery[13].

As discovery progressed, it became apparent to plaintiff that some of the State Street's arguments that this was not an ERISA case were likely to prevail at summary judgment. As State Street had argued, Brown's agreement with Spina was not itself an ERISA plan and "[a]s such, ERISA does not apply to his claim." (Defendants' Reply Memorandum at p. 7 of 9, *citing O'Connor v. Commonwealth Gas Co.*, 251 F.3d 262, 270 (1st Cir. 2001)). Brown acquiesced in State Street's position that ERISA did not apply to this case. On May 10, 2006, as discovery was closing, plaintiff filed a motion to amend his complaint by dismissing the ERISA claim. The Court allowed this motion, which was unopposed. As a result, the defendant received the relief it sought in its motion to dismiss the ERISA count.

---

[13] Brown agreed in his opposition to the motion to dismiss that eventually either the plaintiff or the Court would have to choose between going forward on the ERISA claim or the common law claims. In a footnote to his opposition memorandum Brown said, "The plaintiff readily concedes that he cannot prevail under both the ERISA claim in Count One and the state law claims in the following counts. This belt and suspenders complaint was brought in anticipation that State Street would move to dismiss either the ERISA count or the common law counts. Brown agrees that if the ERISA count is proper, it preempts the state law claims. If, as the defendants suggest, the ERISA claim should be dismissed, then the case should go forward under the common law counts." (Plaintiff's Opposition to Defendants' Motion to Dismiss Count One at p. 4 n. 2.)

Now, in its summary judgment motion, State Street attempts an ERISA about-face. Having

argued that the VSP was not an ERISA plan, that Brown's "modified-VSP" was certainly not an

ERISA plan, that Brown was not a "participant" in an ERISA plan, and that the fact that the VSP

enhanced other pre-existing plans did not implicate ERISA – in short, that Brown's complaint raised

no ERISA issues – State Street mutters a cautious "never mind" and suggests that all of Brown's

common law claims are preempted by ERISA. State Street's summary judgment memorandum reads

as if it were written by Brown in opposition to State Street's motion to dismiss the ERISA count.

**B.     State Street is judicially estopped from taking a legal position that is the
opposite of a position taken previously in the same case.**

The doctrine of judicial estoppel "should be employed when a litigant is playing fast and

loose with the courts, and when intentional self-contradiction is being used as a means of obtaining

unfair advantage in a forum provided for suitors seeking justice." *Patriot Cinemas v. General Cinema*

*Corp.*, 834 F.2d 208, 212 (1st Cir. 1987).  Judicial estoppel is well-recognized in the First Circuit.

> As a general matter, the doctrine of judicial estoppel prevents a
> litigant from pressing a claim that is inconsistent with a position
> taken by that litigant either in a prior legal proceeding or in an earlier
> phase of the same legal proceeding. The doctrine's primary utility is
> to safeguard the integrity of the courts by preventing parties from
> improperly manipulating the machinery of the judicial system.

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23 32-33 (1st Cir. 2004)(internal citations

omitted). See *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004) ("Judicial

estoppel applies to a party's stated position whether it is an expression of intention, a statement of

fact, or a legal assertion.") The Supreme Court summarized judicial estoppel as follows: "Where a

party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he

may not thereafter, simply because his interests have changed, assume a contrary position,

**especially if it be to the prejudice of the party who has acquiesced in the position formerly**

**taken by him.**" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)(Emphasis added).

State Street's position in its summary judgment memorandum is the direct opposite of the legal position it took in its motion to dismiss. For example, in its motion to dismiss, State Street argued, "ERISA does not apply to claims arising from early termination programs that merely enhance pre-existing plans, even if those plans are covered under ERISA." (Defendants' Reply Memorandum In Support of Motion To Dismiss at p. 7 of 9). Now, in its summary judgment memorandum, State Street argues, "Thus, despite how Brown clothes his claims, in essence he seeks benefits from the Executive SERP and the Severance Plan, both of which are covered by ERISA. ERISA preemption routinely applies to claims, like those here, that in essence seek to recover from a plan administrator's refusal to pay allegedly promised benefits." (Defendants' summary judgment memorandum at p. 37 of 42.)

Those two arguments – first that ERISA **does not apply** to agreements that enhance pre-existing ERISA plans and later that ERISA **does apply** to such agreements – are diametrical opposites, a classic example of a party "playing fast and loose with the courts" for its own advantage. This Court should exercise its equitable powers to refuse to accept such conduct. This Court should bar State Street from taking a legal position contrary to a position it previously took in its motion to dismiss the ERISA count, especially after the opposing "party . . . has acquiesced in the position formerly taken by [State Street]." *New Hampshire v. Maine*, 532 U.S. at 749.

**C.     Even if State Street is not judicially estopped from advancing an argument opposite to one it previously advanced, Brown's common law claims are not preempted by ERISA.**

The fundamental flaw to State Street's ERISA preemption argument is that Brown's entitlement to retirement and severance payments arises entirely from the agreement he reached with Spina, not from his "participation" in any ERISA "plan." But for that agreement with Spina, he

would not be entitled to either pension or severance[14] payments. See, Defendants' Statement of

Undisputed Facts, ¶ 34 ("In 2003, Brown was not yet eligible to be considered for participation in

the Executive SERP"). Brown was a "participant" in neither the Executive SERP nor the 2000

Severance Plan, which applied only to employee on U.S. payrolls. The agreement Brown reached

with Spina was that even though he had not been offered the right to participate in the EVSP, he

would be given the **equivalent** of the benefits other employees received under the EVSP, benefits

to which he was not otherwise entitled. As a result, Brown's entitlement to an amount of money

equivalent to the SERP pension benefits was based entirely on his agreement with Spina[15].  Because

he was discharged by State Street before age fifty-five, but for an enforceable agreement with Spina,

Brown had no right to any SERP benefits. (SERP, Defendants' Exhibit 17 at p. SSC 01115, ¶ 3.4(a)).

If that oral "commitment" from Spina is enforceable, then Brown is entitled to pension and

severance benefits under his agreement with Spina, not under the SERP or the 2000 Severance Plan.

The oral agreement is not itself an ERISA plan, for all the reasons the defendants argued in their

motion to dismiss. Similarly, the fact that this non-ERISA agreement triggers the equivalent of

payment of benefits from a pre-existing ERISA plan does not implicate ERISA preemption, as State

Street argued originally, citing *O'Connor, supra*. See *Nadworny v. Shaw's Supermarkets, Inc.*, 405 F. Supp.

---

[14]  State Street repeatedly refers to its "Severance Plan." That reference is a red herring. The 2000 Severance Plan, (Defendants' Exhibit 10), is a separate document, and a separate plan, from the severance benefits made available under the EVSP, which established its own severance benefits. Brown was never a participant in that Severance Plan, which applied only to employees on a U.S. payroll. (*Id.* at p. SSC 06105 ¶ 2.1). It is not clear that the Severance Plan even applied to Executive Vice Presidents, such as Brown, since the scheduled plan participants include only those up to the Vice President/Senior Vice President level. (*Id.* at p. SSC 06115). Additionally, the 2000 Severance Plan, on its face, states that it is not an ERISA plan. (*Id.* at p. SSC 06112, ¶6.8). The EVSP (Defendants' Exhibit 6 at p. Plaintiff 18) states its own severance benefits and makes no reference to the 2000 Severance Plan. Brown makes no claim to severance payments under State Street's 2000 Severance Plan, only under his agreement with Spina to receive the equivalent of the EVSP severance benefits, an entirely separate entitlement to severance payments. Brown's contract claim in regard to the one-time payment to him of a severance benefit equivalent to that created by the EVSP is clearly outside of ERISA's purview.

[15]  In fact, when Ooi calculated the value of Spina's "oral promise" to Brown, Ooi calculated the cost of buying an independent one-time annuity that would provide the equivalent annual payment to Brown of what he would have received if he had been eligible for the SERP, not the cost of including Brown in the preexisting Executive SERP. (Plaintiff's Response to defendants' Statement of Uncontested Facts ¶ 38).

2d 124 (D. Mass. 2005)(Young, J.)("ERISA may preempt state court actions involving employee

benefit plans, but will not reach adjudication of employee benefits, if the benefits are not part of a

benefit plan.") See also *Senior v. NSTAR Elec. & Gas Corp.*, 449 F.3d 206, 208 (1st Cir. 2006)(Suit

under union **contract** to enforce agreement that medical benefits would be provided to employees

who accepted early retirement plan was a contract action and stated "no independent ERISA

claim.")

Finally, State Street argues that preemption is "especially warranted" since Brown cannot

state an ERISA claim because his agreement with Spina was not formalized in a written document.

This argument ignores that the Executive SERP benefits were provided under an unfunded "top

hat" plan, rather than a conventional ERISA-protected pension plan. (SERP plan, Defendants'

Exhibit 17 at p. SSC 01124, Article 6.2, "The plan is intended to be a Top Hat Plan").  Such plans

do not trigger most ERISA protections, which are designed to protect average employees from

overreaching by their employers[16]. 29 USCS § 1051(2).  "Top hat plans, however, which benefit only

highly compensated executives, and largely exist as devices to defer taxes, do not require such

scrutiny and are exempted from much of ERISA's regulatory scheme." *Kemmerer v. ICI Ams., Inc.*, 70

F.3d 281, 286 (3d Cir. 1995). Among the ERISA requirements that do not apply to "top hat" plans

is the requirement that such plans and amendments be in writing[17]. "ERISA generally requires an

employee benefit plan to be embodied in a written instrument: 'Every employee benefit plan shall be

established and maintained pursuant to a written instrument.' 29 U.S.C.A.§ 1102(a)(1). Top hat

plans, however, are exempt from this requirement as they are excluded from the portion of ERISA

(Subchapter I, Subtitle B, Part 4) that imposes it. See 29 U.S.C.A. ß  1101(a)(1). Therefore, **top hat**

---

[16] For example, as a "top hat" plan, the State Street Executive SERP was exempt from ERISA's participation and vesting rules (the ERISA 200's), see ERISA § 201(2), 29 U.S.C. § 1051(2); ERISA's funding rules (the ERISA 300's), see ERISA § 301(a)(3), 29 U.S.C. § 1081(a)(3); and ERISA's rules of fiduciary responsibility (the ERISA 400's), see ERISA 401(a)(1), 29 U.S.C. § 1101(a)(1).

[17]  None of the ERISA cases cited by State Streets for the prohibition on oral agreements involved a "top hat" plan.

**agreements can be partially or exclusively oral.**" *Lund v. Citizens Fin. Group, Inc.*, 1999 U.S. Dist. LEXIS 22590, \*29 (D.N.H. 1999)(Citing *In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996))(Emphasis added).

Top hat plans are not governed by ERISA principles, but, rather, are controlled by contract law. "Top hat plans are unilateral contracts and, thus, are governed by contract principles. *See Kemmerer*, 70 F.3d at 287; *Spacek v. Maritime Assoc.*, 134 F.3d 283 (5th Cir. 1998) (discussing the Tenth and Third Circuits' reasoning that a top hat plan is a unilateral contract); *Amatuzio v. Gandalf Sys. Corp.*, 994 F. Supp. 253 (D.N.J. 1998) (discussing the Third Circuit's recognition of 'Top Hat plans as unilateral contracts in cases where plan participants allege that their employer breached such contracts')." *Benham v. Lenox Savings Bank*, 26 F. Supp. 2d 231, 238-239 (D. Mass. 1998).

As State Street originally argued, this is a "garden variety" contract case. In an effort to induce Brown, a critically valuable employee, to remain at SSgA during a time of turmoil, Spina made a special, one-person-only compensation offer to Brown: stay on board and you can have the same amount of money you would have received if you had been eligible for the EVSP. Spina offered Brown the financial equivalent of those benefits. Such an offer is not covered by ERISA, for all the reasons relied on in the long line of one-time-only early departure incentive cases State Street cited in support of its motion to dismiss[18]. State Street is simply wrong, this time around, in arguing that Brown's claims must be brought under ERISA and not as common law claims[19].

---

[18] Cases cited in support of its motion to dismiss the ERISA count, in support of the proposition that a one-time early departure plan was not an ERISA plan, included in addition *to O'Connor, supra; Belanger v. Wyman Gordon Co.*, 71 F.3d 451, 455-456 (1st Cir. 1995); and *New England Mut. Life Ins. Co., Inc. v. Baig*, 166 F.3d 1, 4-5 (1st Cir. 1999).

[19] In all fairness, if this Court is inclined to accept State Street's reversal on the ERISA issue, Brown should be permitted to amend his complaint to reinstate the original ERISA count. State Street would not be prejudiced by this amendment. The defendants had conducted discovery by the time Brown dismissed the ERISA count. The voluntary dismissal was without prejudice and the state of limitations has not run on Brown's ERISA claim, which is analogous to a breach of contract claim with a six-year limitations period under Massachusetts law. *Degnan v. Publicker Indus. Inc.*, 83 F.3d 27, 30 (1st Cir. 1996) ("ERISA is a remedial statute designed to fashion anodynes that protect the interests of plan participants and beneficiaries. Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." (citations omitted)).

## Conclusion

For all the above reasons, this Court should deny the defendants' motion for summary judgment.

Alan Brown, plaintiff
By his attorneys,

/s/ Harvey A. Schwartz
HARVEY A. SCHWARTZ
 BBO. # 448080
LAURIE A. FRANKL
 BBO # # 647181
Rodgers, Powers & Schwartz
18 Tremont Street
Boston, MA 02108
(617) 742-7010

## Certificate of service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 31, 2006.

/s/ Harvey A. Schwartz
HARVEY A. SCHWARTZ