UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **ALAN BROWN** | ) | |
| **Plaintiff** | ) | |
| | ) | **C.A. No. 05-11178-NG** |
| **v.** | ) | |
| | ) | |
| **STATE STREET CORPORATION, and** | ) | |
| **STATE STREET GLOBAL ADVISORS,** | ) | |
| **Defendants** | ) | |

**PLAINTIFF'S RESPONSE
TO DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED,
PURSUANT TO L.R. 56.1**

The plaintiff, Alan Brown, hereby responds to the Defendants' Statement of Material Facts

as to Which There is No Genuine Issue to be Tried. The plaintiff refers to and incorporates his

Statement of Material Facts as to Which There is No Genuine Issue to be Tried, filed in support of

plaintiff's Motion for Summary Judgment. As to the numbered paragraphs in Defendants'

Statement, the plaintiff replies:

1.      Agreed.

2.      Agreed.

3.      Agreed.

4.      Disagree. The Proxy Statement (Def. Ex. 1 at Plaintiff 315) referenced by the Defendants

states that the Executive Compensation Committee approves the Chief Executive Officer's

compensation, but makes no mention of compensation for other executives. Similarly, the

ECC Charter (Def. Ex. 2), states that the Committee **determines** the compensation of the

CEO, but in regard to Executive Vice Presidents, the Charter does not state that the

Committee "determines" compensation but only that it "shall **review, evaluate and advise**

the Board" as to their compensation. (Emphasis added). As a result, the ECC only sets the

compensation of the CEO. The compensation of executives below the CEO is set by management subject to the review of the Board, if it so chooses.

5.  Disagree. The VSP and EVSP were not limited to "U.S. employees," as the defendants state. Expatriate employees serving in offices abroad who were covered by U.S. benefit plans were included. Foreign citizens who were on U.S. payrolls were also included in the VSP. (Plaintiff Exhibit 2, deOcejo deposition p. 11).

6.  Agreed, except that the VSP and EVSP were not limited to "U.S. employees," as the defendants state. Expatriate employees serving in offices abroad who were covered by U.S. benefit plans were included. Foreign citizens who were on U.S. payrolls were also included in the VSP. (Plaintiff Exhibit 2, deOcejo deposition p. 11).

7.  Agreed.

8.  Agreed.

9.  The VSP and EVSP were not limited to "U.S. employees," as the defendants state. Expatriate employees serving in offices abroad who were covered by U.S. benefit plans were included. Foreign citizens who were on U.S. payrolls were also included in the VSP. (Plaintiff Exhibit 2, deOcejo deposition p. 11).

10.  Agreed.

11.  Agreed.

12.  Agreed.

13.  Disagree. The EVSP document (Def. Ex. 6, EVSP Decision Guide at Plaintiff 18) states the severance benefits paid under the EVSP. The EVSP makes no mention of State Street's prior "Severance Plan." (Def. Ex. 10). The EVSP, on its face, establishes an independent severance payment "based on your weekly base pay rate multiplied by the number of weeks. Service is equal to your completed years of service from your hire date . . . through August

31, 2003." (Defendants' Exhibit 10 at p. Plaintiff 18). Further, State Street's 2000 Severance Plan, (Defendants' Exhibit 10), does not state that it applies to Executive Vice Presidents. The scheduled plan participants include only those up to the Vice President/Senior Vice President level. (*Id.* at p. SSC 06115. Finally, the Severance Plan applied only to employees on a U.S. payroll, (*id.* at p.SSC 06105 ¶ 2.1), which Brown was not.

14. The provisions of State Street's standard "Severance Plan" are irrelevant to the EVSP. The severance provisions of the EVSP (Def. Ex. 6 EVSP Decision Guide at Plaintiff 18) make no reference to any other previous "Severance Plan," rather the EVSP establishes its own severance provisions. See prior response.

15. Agreed. The Executive SERP states that it is intended to be a Top Hat Plan and therefore exempt from many ERISA provisions, including Parts 2, 3 and 4 of Subtitle B of Title I of ERISA. (Defendants' Exhibit 17, ¶ 6.2).

16. Disagree. While the Executive SERP Plan Document includes an offset for pensions paid by prior employers, that provision was ignored for purposes of the EVSP. State Street's Benefits Manager, Boon Ooi, testified that "for expediency purposes" "[t]he EVSP as offered to U.S. employees does not apply an offset to the executive SERP from other employer plans." (Plaintiff's Supplemental Exhibit[1] 2, Ooi deposition p. 16). The EVSP document itself (Defendants' Exhibit 10), states that the "Executive SERP benefit will be offset by the sum of your actual accrued benefit from the tax-qualified State Street Retirement Plan and the State Street Corporation Supplemental Executive Retirement Plan (SERP) described below." (Defendants' Exhibit 10 at p. Plaintiff 10). Brown was a member of neither of these plans.

---

[1] References to "Plaintiff's Exhibit" refer to the exhibits in support of Plaintiff's summary judgment motion. References to "Plaintiff's Supplementary Exhibit" refer to additional exhibits plaintiff submits in support of this fact opposition statement.

17.    Disagree. Only the EVSP modified the Executive SERP.

18.    Agreed.

19.    Agreed.

20.    Agreed.

21.    Brown maintained SSgA offices in both London and Boston. (Plaintiff's Exhibit 1, Brown deposition p. 95). Brown's responsibilities were not limited to any geographic area but, rather, he was head of the investment function worldwide. (Plaintiff's Exhibit 2, deOcejo deposition p. 24). His global Chief Investment Officer role encompassed, among others, SSgA's offices in Boston, Tokyo, Hong Kong, London, Munich and Montreal. He found London was a convenient time zone to remain in contact with all those offices. (Plaintiff's Exhibit 1, Brown deposition p. 93).

22.    Disagree. While Brown was paid through the United Kingdom subsidiary of SSgA, so he could be paid in British pounds, his salary was charged back by the U.K. subsidiary to SSgA's primary office in Boston. (Plaintiff's Exhibit 1, Brown deposition p. 91). In addition, Brown participated in United States equity plans, as an executive vice president of State Street Corporation. (Plaintiff's Exhibit 1, Brown deposition p. 45). His compensation from State Street was a combination of salary, bonuses and equity and option awards. This compensation was governed by various U.S. plans of the company. (Plaintiff's Exhibit 1, Brown deposition p. 28).

23.    Agreed.

24.    Agreed.

25.    Disagree as to the word "numerous."

26.    Agreed. As a matter of English law, SSgA U.K. Limited was required to provide a written employment agreement to Brown. Further, both English and U.S. law require stock option

awards to be in writing. In fact, of the agreements listed, all but the first two were U.S. agreements pursuant to Brown's position with State Street, rather than under his English employment agreement.

27.    Agreed.

28.    Disagree. Certain equity plan documents presented to Brown included provisions stating that the Executive Compensation Committee had discretion to construe the terms of each specific plan and to modify its terms. (Plaintiff's Supplemental Exhibit 3, Brown deposition p. 33). In fact, while Brown was asked at his deposition whether he had seen the ECC charter and he replied that he had seen it on the State Street Web site (Plaintiff's Supplemental Exhibit 3, Brown deposition p. 75), he was not asked when he first saw that charter. Brown first saw the ECC charter at some time in 2005, at or around the time of his termination from State Street. (Plaintiff's Supplemental Exhibit 1, Brown affidavit ¶ 4). Brown never testified at his deposition that he knew all compensation matters "had to be approved by the ECC." Brown testified that his understanding was that the ECC reviewed the "total compensation" of Executive Vice Presidents, not necessarily individually person by person. (Plaintiff's Supplemental Exhibit 3, Brown deposition p. 78).

29.    Disagree. Brown testified that at the time of his deposition he had seen and was familiar with the ECC charter. (Plaintiff's Supplemental Exhibit 3, Brown deposition p. 75). He first saw that charter in 2005 and had not read or seen the ECC charter prior to that, certainly not at the time of his 2003 conversation with David Spina. (Plaintiff's Supplemental Exhibit 1, Brown affidavit ¶ 4).

30.    Brown's wife is an employment lawyer in the United Kingdom. She gave him legal advice from time to time, (Plaintiff's Supplemental Exhibit 3, Brown deposition p. 8, 13, 109),

although, to his regret, he did not always follow his wife's advice. (Plaintiff's Exhibit 1, Brown deposition p. 138).

31.     Disagree. Brown was in a unique situation at SSgA and at State Street. His responsibilities were global, not in any way limited to the United Kingdom. Brown maintained offices in both London and Boston. (Plaintiff's Exhibit 1, Brown deposition p. 95). Brown's responsibilities were not limited to any geographic area but, rather, he was head of the investment function worldwide. (Plaintiff's Exhibit 2, deOcejo deposition p. 24). As a convenience, Brown's salary was paid to him through the United Kingdom subsidiary (Plaintiff's Exhibit 1, Brown deposition p. 17) but was charged back to SSgA's Boston office. (Plaintiff's Exhibit 1, Brown deposition p. 91). After 2001, SSgA was managed collectively by its four top executives, who called themselves "the G4:" Tim Harbert, John Serhant, John Snow and Brown. (Plaintiff's Exhibit 1, Brown deposition p. 51). As a result, Brown became involved in all executive functions of SSgA, which was based in Boston. *(Id.)* Further, as a State Street Executive Vice President, Brown participated in some U.S.-based equity and bonus plans, which made up the larger part of his compensation. (Plaintiff's Exhibit 1, Brown deposition p. 28, 45). Brown believed that he had a legal right to participate in the EVSP, due to his unique situation. (Plaintiff's Exhibit 1, Brown deposition p. 91). In fact, senior management did not intentionally exclude Brown from the EVSP, instead they simply gave no consideration to whether or not Brown should be included in the EVSP at the time the plan was first implemented. (Plaintiff's Exhibit 2, deOcejo deposition p. 25; Plaintiff's Exhibit 5, Spina deposition p. 11).

32.     Disagree. Brown was not invited to participate in the VSP but he and Spina entered into an agreement for him to receive the equivalent of modified EVSP benefits, which is the reason for this lawsuit. Brown testified at his deposition that State Street did not provide him with

individualized VSP documents. (Brown deposition p. 88). However, as a senior manager

who had to supervise employees who received the VSP he was given training and

documentation concerning the program in 2003. He spoke at great length and in detail with

the other members of the G4 – Serhant, Snow and Harbert – about the terms of the EVSP,

which had been offered to them. In addition, when Brown stayed in Boston, he usually

stayed at an apartment with Snow and the two of them discussed the EVSP terms and

benefits at length. He was fully familiar with the provisions of the plan. (Plaintiff's

Supplementary Exhibit 1, Brown affidavit ¶ 2-3).

33.    Disagree. Brown was not part of the planning or decision-making concerning the VSP. He

testified only that he participated in discussions among SSgA managers as to whether they

believed the VSP should be offered to SSgA employees. (Plaintiff's Supplemental Exhibit 3,

Brown deposition p. 71-72).

34.    Agree. As of the time Brown entered into an agreement with Spina, Brown was not a

"participant" in the Executive SERP.

35.    Disagree. In or about May 2003 Brown learned that all three other members of the G4 had

been offered the EVSP and that at least Snow and Serhant were going to elect to take the

package and if Harbert were to take the package, Brown would be left "entirely on my own

at that point." (Plaintiff's Supplemental Exhibit 3, Brown deposition p. 97).

36.    Disagree. Brown was "very disappointed" that he was not offered the EVSP. (Plaintiff's

Exhibit 1, Brown deposition p. 90). Brown told Spina that "the value of the benefits to those

who took it was so great that it was really very difficult for an individual not to take those

benefits for the sake of themselves and their families. (Plaintiff's Supplemental Exhibit 3,

Brown deposition p. 99-100). He considered seeking legal advice as to whether he should

have been included in the EVSP, due to the unique worldwide nature of his position, but

instead chose to speak with David Spina, State Street's CEO, about his concerns. (Plaintiff's Exhibit 1, Brown deposition p. 91). Brown believed the company might have acted illegally in failing to offer the EVSP to him, since he had an office in Boston and had global responsibilities. (Plaintiff's Exhibit 1, Brown deposition p. 95). As a leading chief investment officer, Brown regularly received calls from head hunters trying to recruit him away from State Street. After reaching agreement with Spina in 2003, Brown relied on that agreement and "consistently turned down these overtures without discussion or enquiry." (Plaintiff's Exhibit 30, Brown interrogatory answers, No. 11). He said, "If I hadn't got the VSP and if I was the only person left standing on the deck, so to speak, I would have taken headhunter calls, which come regularly, and listened to them, because the position would have been pretty impossible.  And I might have gone potentially further.  I made no decision to do so, but I might have gone potentially further to actually look for opportunities." (Plaintiff's Exhibit 1, Brown deposition p. 100-101). Brown also made clear to Spina that the plan was of great personal importance to him. (Plaintiff's Exhibit 5, Spina deposition p. 12). Brown told Spina that he felt he deserved more financial payoffs for all of his efforts for State Street and that he felt cut off by the arbitrariness of the EVSP only applying to U.S. employees. (Plaintiff Exhibit 5, Spina deposition p. 14). Brown proposed that in return for remaining at SSgA through the turmoil caused by the VSP, that the EVSP benefits be made available to him and that this eligibility be extended until his 55th birthday. (Plaintiff's Exhibit 1, Brown deposition p. 102). Brown was fifty years old at the time. The expectation, he said, was that the transition through the VSP period would take about a year. (Plaintiff's Exhibit 1, Brown deposition p. 109-110).

37.    Disagree. Brown and Spina reached agreement on all the essential terms. As Brown described it, "The commitment we made was to be there to lead SSgA through this very

difficult time until it was definitely behind us and the firm was stable and cruising ahead again." (Plaintiff's Exhibit 1, Brown deposition p. 110). In return, Brown would be eligible for the benefits of the EVSP and this eligibility would be extended until his 55th birthday, so long as he was not terminated for cause. Further, in regard to the SERP, the five additional years of service provided toward the SERP by the EVSP would amortize over the coming five years until Brown reached age 55. (Plaintiff's Exhibit 1, Brown deposition p. 102).

38.    Disagree.  The agreement was straightforward.  Spina and Brown agreed that to the extent possible, Brown would receive the same benefits that he would have been entitled to under the EVSP program, save for the fact that the additional years of service in the SERP would be reduced by one each year. (Brown deposition p. 121). The extent of the benefits that the agreement called for were clearly enough described in Spina's June 30, 2004 letter to Weissman, (Plaintiff's Exhibit 18), and Brown's June 10, 2004 email to Spina, (Plaintiff's Exhibit 15), that Ooi was able to precisely calculate the cost of that agreement to State Street. Ooi testified that he could think of no more information he would need to calculate the dollar amount of Spina's verbal commitment to Brown. (Plaintiff's Exhibit 8, Ooi deposition p. 55).

39.    Disagree. Spina and Brown clearly did not agree that any agreement would not be effective until it were in writing and signed by the parties.  They agreed only that they should "reflect" their verbal agreement in writing. (Brown deposition p. 104). Brown said in his June 10, 2004 email that he was satisfied if that email constituted the record of "our agreement." (Plaintiff's Exhibit 15). Spina wrote to Brown that he would discuss the agreement with the ECC "so I will get it on the record." (Plaintiff's Exhibit 16). Brown and Spina agreed they should have a written record of the verbal agreement they had reached, not that the agreement would not be effective unless it were formally executed.

40.     Disagree. Spina told Brown that he could not agree to any future changes in any equity plan. (Plaintiff's Exhibit 1, Brown deposition p. 104). That was the only element of the agreement Spina said he could not authorize. In fact, the ECC approved all changes to equity plans necessary to put the EVSP into effect. (Plaintiff's Exhibit 13, June 18, 2003 Executive Compensation Committee minutes).

41.     Disagree. Spina did not tell Brown that he would need to bring the proposal to the attention of the ECC. Brown testified, "He gave no indication that there was any other process to go through." (Plaintiff's Exhibit 1, Brown deposition p. 105). Spina, too, testified that he did not recall telling Brown that the Executive Compensation Committee would have to approve any agreement before it could go into affect. (Plaintiff's Supplemental Exhibit 4, Spina deposition p. 44).

42.     Disagree. Shortly after their discussion, Spina was hospitalized and underwent quadruple bypass heart surgery and was away from work until Spring 2004. (Plaintiff's Supplemental Exhibit 4, Spina deposition p. 26).

43.     Disagree. Either before or after Brown sent Spina an email on June 10, 2004, Brown heard rumors that Spina would be leaving State Street. (Plaintiff's Supplemental Exhibit 3, Brown deposition p. 117).

44.     Disagree. On June 10, 2004, Brown sent an email to Spina. (Plaintiff's Exhibit 15). His purpose was to make a record of "our agreement." (*Id.*) Spina had said he would take steps to record the agreement but, because of his medical problems, he had failed to take any action. (Plaintiff's Exhibit 5, Spina deposition p. 26).

45.     Disagree. While the brief email was not exhaustive, Brown's testimony is that the agreement was straightforward and incorporated by reference the EVSP benefits. (Plaintiff's

Supplemental Exhibit 3, Brown deposition p. 121). Brown's June 10, 2004 email (Plaintiff's

Exhibit 15) stated,

> It is now virtually a year since the end of the VSP. At the time, as you know,
> the VSP was not offered to me in spite of my central US role. However, you
> reassured me that if I remained with SSgA, I would be entitled to a severance
> package similar to that of the VSP, provided I left without cause. Specifically,
> you agreed that Tim and I would get the VSP package amortised (sic) over 5
> years, save in one regard that vesting of equity would be limited to equity
> granted before 30.6.03.

46.    Spina's June 15, 2004 email to Brown (Plaintiff's Exhibit 16) said,

> Alan – greetings – I am not ignoring you!!! Thanks for the 'first cut' at a
> record. I will share with Lou deOcejo and plan to discuss the general outline
> with our Executive Comp Committee of the Board of Directors tomorrow.
> So I will get it on the record. More after meeting with the Board on
> Wd/Thursday. David.

Spina sent a copy of Brown's email to deOcejo, State Street's Human Resources director,

telling deOcejo "I wanted you to have the background of Alan's version – which I find to be

essentially accurate." (Exhibit 17).

47.    Agreed. Spina told the ECC on June 16, 2004 that he "wanted them to be aware that this

had happened," referring to his discussion with Brown. (Spina deposition p. 40).

48.    Disagree. The ECC did not ask Spina for more information. The Committee instructed

Spina to put what he had told the committee at its June 16, 2004 meeting "in writing." (Spina

deposition p. 40; Plaintiff's Exhibit 6, Weissman deposition p. 28).

49.    Disagree. The ECC was not told that Brown had made a request. The ECC was told that

Spina had made a "commitment" to Brown on behalf of State Street. (Plaintiff's Exhibit 5,

Spina deposition p. 29, 40-41; Plaintiff's Exhibit 6, Weissman deposition p. 36). The ECC

failed to renounce Spina's agreement on behalf of State Street. (Plaintiff's Exhibit 7, Hill

deposition p. 16; Plaintiff's Exhibit 4, Darshori deposition p. 11).

50.    Disagree. Brown had no knowledge about what action, if any, the ECC had taken or had

been asked to take at its June 16, 2004 meeting. Prior to Hunt's March 17, 2005 email to

Brown, nobody from State Street had told Brown the Executive Compensation Committee

had rejected his agreement with Spina. (Plaintiff's Exhibit 1, Brown deposition p. 140;

Plaintiff's Exhibit 3, Logue deposition p. 82). Spina's June 15, 2004 email to Brown, (Brown

(Plaintiff's Exhibit 16), had told Brown that Spina would "discuss" the matter with the ECC

"[s]o I will get it on the record." That email did not tell Brown the matter would be

submitted to a vote, or even that it required a vote, only that a discussion would serve the

purpose of getting it "on the record." In fact, that June 15, 2004 email was sent before Spina

first spoke with the ECC about his commitment to Brown.

51.    Disagree. Spina's June 30, 2004 letter, (Plaintiff's Exhibit 18), did more than "outline" a

discussion. In that letter Spina informed the ECC that he had "made a commitment" to

Brown. That letter said, in part,

> I made oral commitments to Tim Harbert and Alan Brown, Chairman and
> Vice Chairman of SSgA, respectively, and Executive Vice Presidents of State
> Street Corporation, explained more fully below. . . . The commitment I made
> to Tim and Alan was as follows. In exchange for their continued
> commitment to remain active as leaders of SSgA, State Street Corporation
> would hold available to them the same separation package the company was
> offering U.S. employees under what was known as the Voluntary Separation
> Program (VSP). In 2003, both Tim and Alan were in their early 50's. My
> stated commitment to them was stated as for the period when they were
> between the ages of 50 and 55.

The letter described in more detail the specifics of the "commitment" to Brown.

52.    Agreed.

53.    Disagree. The June 30, 2004 letter speaks for itself.

54.    Disagree. Spina did not testify as to whether or not he intended his June 30, 2004 letter to be

a complete summary of his discussion with Brown.

55.     Disagree. After Spina wrote to the ECC that he had made a commitment to Brown, Weissman asked deOcejo "to quantify what this is about." (deOcejo deposition p. 47).

56.     Disagree. Ooi and deOcejo, and those working for them, performed calculations based on the information contained in Spina's June 30, 2004 letter and their knowledge of the details of the EVSP. This did not require them to make "assumptions," rather, Ooi said that with Spina's letter to Weissman, Brown's email to Spina and his knowledge of the terms of the EVSP, he could think of no additional information he needed in order to calculate the dollar amount of Spina's verbal commitment to Brown. (Plaintiff's Exhibit 8, Ooi deposition p. 55). Ooi and deOcejo made assumptions about <u>changes</u> that could be made to what Spina termed as his commitment and provided an "interpretation" that would be in State Street's interest. DeOcejo agreed that this "interpretation" was his and Ooi's and he had no knowledge that Spina and Brown ever discussed such an interpretation. (Plaintiff's Exhibit 2, deOcejo deposition page 61). Ooi agreed that the proposed "modifications and interpretations" were not derived from Spina's letter but were Ooi's "opinion" about how to best protect State Street's interests. (Plaintiff's Exhibit 8, Ooi deposition p. 37).

57.     Disagree. The Executive Compensation Committee of the Board of Directors met on September 15, 2004. (Plaintiff's Exhibit 23). The third page of the minutes of that meeting, (Bates No. 04674[2]), simply states, "Mr. deOcejo presented and reviewed proposed actions in order to accommodate verbal commitments made to an executive during the period the Executive Voluntary Separation Program (EVSP) was available." That statement refers to the discussion concerning Spina's commitment to Brown. (Plaintiff's Exhibit 4, Darshori

---

[2] The minutes are redacted to protect personal information of irrelevant persons. The parties have stipulated that none of the redactions concerns Brown.

deposition p. 19). The discussion was brief. (Plaintiff's Exhibit 4, Darshori deposition p. 19).
Committee members expressed Spina's lack of authorization to make verbal commitments
to Brown. (Plaintiff's Exhibit 4, Darshori deposition p. 19). They discussed how they now
had information about what Spina's commitment to Brown was but they felt no obligation
to accept it. (Plaintiff's Exhibit 7, Hill deposition p. 22). Committee members expressed
opinions that Spina had exceeded his authority. (Plaintiff's Supplemental Exhibit 6, Darshori
deposition p. 18; Plaintiff's Exhibit 7, Hill deposition p. 17; Plaintiff's Exhibit 9, Sergel
deposition p. 43). No vote was taken to renounce the verbal commitment Spina had made to
Brown. (Plaintiff's Exhibit 4, Darshori deposition p. 20; Plaintiff's Supplemental Exhibit 7,
Sergel deposition p. 49; Plaintiff's Exhibit 7, Hill deposition p. 23).

58.     Disagree. Brown was never told by anybody at State Street that the Board or the Executive
        Compensation Committee had renounced or rejected Spina's commitment to him or taken
        any action concerning him. (Plaintiff's Exhibit 3, Logue deposition p. 82; Plaintiff's Exhibit
        2, deOcejo deposition p. 98). In fact, other than seeing a copy of Spina's June 30, 2003 letter
        to Weissman, Brown was never told that the matter had ever been presented to the Board or
        the Executive Compensation Committee nor that it had ever been discussed by them.
        (Plaintiff's Supplemental Exhibit 3,, Brown deposition p. 179). The last definitive word
        Brown heard about Spina's commitment was Spina's June 30, 2004 letter to Weissman. *(Id.)*.
        DeOcejo knew of no one at State Street who had told Brown the Compensation Committee
        had reviewed the commitment and then rejected it. (Plaintiff's Exhibit 2, deOcejo deposition
        p. 97). Prior to Hunt's March 17, 2005 email to Brown, nobody from State Street had told
        Brown the Executive Compensation Committee had rejected his agreement with Spina.
        (Plaintiff's Exhibit 1, Brown deposition p. 140; Plaintiff's Exhibit 3, Logue deposition p. 82;
        Plaintiff's Exhibit 28A, 9/19/06 letter from Rex Lee identifying documents produced in

response to request for "All communications from any representative, employee, or officer of State Street to Alan Brown informing him of any action by the Executive Compensation Committee concerning the extension to Mr. Brown of any VSP, EVSP or modified VSP or EVSP benefits." Exhibit 28B shows the exhibits identified by Attorney Lee as responsive to that document request. These exhibits are: 01151[3], Hunt's March 17, 2005 email to Brown, which was **after** Brown had sought to exercise his EVSP rights; 01207, Spina's June 15, 2004 email to Brown, which was **before** the Executive Compensation Committee was first notified of Spina's commitments; 04672-76, minutes of the Sept. 15, 2004 Executive Compensation Committee meeting, and 05610, the agenda for the Sept. 15, 2004 meeting. There is no evidence Brown saw these last two documents prior to this litigation and, further, neither document reflects that the Committee rejected Spina's commitment.)

59. Disagree. At most, deOcejo said that he told Brown his own **opinion** that "they [the Executive Compensation Committee] are never going to approve something like this." (Plaintiff's Exhibit 2, deOcejo deposition p. 40.) Brown's denies this conversation took place at all. (Plaintiff's Supplemental Exhibit 1, Brown affidavit ¶ 6).

60. Disagree. On the advice of counsel, Brown took notes of some conversations with some State Street employees. He took these notes during the conversations in full view of other persons or immediately afterwards. (Plaintiff's Supplemental Exhibit 3, Brown deposition p. 68). He took these notes while State Street was going through the succession process for a new head of SSgA. (Plaintiff's Supplemental Exhibit 3, Brown deposition p. 153).

61. Denied. This testimony is hearsay and is not admissible for summary judgment purposes. It should be stricken. See Plaintiff's Motion to Strike.

---

[3] The numbers refer to the Bates numbers on the document production.

62.    Disagree. Brown and Spina negotiated an agreement. That agreement was memorialized in

Brown's June 10, 2004 email to Spina, (Plaintiff's Exhibit 15), in Spina's emails to Brown

(Plaintiff's Exhibit 16) and to deOcejo (Plaintiff's Exhibit 17), and in Spina's June 30, 2004

letter to Weissman, (Plaintiff's Exhibit 18). Spina's "commitment" to Brown was also

memorialized in internal State Street documents. (Plaintiff's Exhibits 19, 20, 21 and 22).

63.    Agreed that Harbert died in August 2004 and that State Street offered his position to

William Hunt on January 31, 2005. Brown was among the candidates for the number one

position and he hoped to be selected. (Plaintiff's Exhibit 1, Brown deposition p. 53, 163).

64.    Disagree. Brown did not resign from State Street. He sent a letter, by email, to Logue.

(Plaintiff's Exhibit 25). In that letter Brown said, in part,

> I have now taken the view that my position with State Street is no longer
> tenable. . . . In the circumstances, I am writing to exercise my rights to a
> Voluntary Separation Program. As you know, in 2003 David Spina, on behalf
> of State Street entered into an agreement with me in which in exchange for
> my continued commitment to remain active as a leader of SSgA, State Street
> Corporation would hold available for me the same separation program the
> Company was offering U.S. employees under what was known as the
> Voluntary Separation Program or, in view of my position, the Executive
> Voluntary Separation program (EVSP).

65.    Disagree. After receiving Brown's March 11, 2005 letter, State Street immediately placed

Brown on a paid leave. He was contacted by Mitchell Shames, SSgA general counsel.

(Exhibit 10, Shames deposition p. 8). In that telephone conversation – Brown was in

London – and several other telephone calls in the following days, Brown emphasized that he

was not giving notice that he was resigning, but, rather, that he was "electing under the

VSP." (Exhibit 10, Shames deposition p.16). Even though Brown said he was not resigning,

State Street chose to treat his March 11 letter as a resignation. (Exhibit 3, Logue deposition

p. 90). Brown's employment contract (Defendant's Exhibit 19) required the company to pay

Brown for sixty days in lieu of notice of his termination. Hunt's March 17, 2005 email to

Brown (Defendant's Exhibit 48) informed Brown that the company was paying him "60 days' pay in lieu of notice." Hunt's letter makes no mention of "garden leave." Shames testified that it was clear that Brown's last day of employment with State Street was March 18, 2005. (Plaintiff's Supplemental Exhibit 5, Shames deposition p. 23).

66.    Agreed. Brown commenced work with Schroders on July 5, 2005.

Alan Brown, plaintiff
By his attorneys,

/s/ Harvey A. Schwartz
HARVEY A. SCHWARTZ
 BBO. # 448080
LAURIE A. FRANKL
 BBO # # 647181
Rodgers, Powers & Schwartz
18 Tremont Street
Boston, MA 02108
(617) 742-7010

**Certificate of service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 31, 2006.

/s/ Harvey A. Schwartz
Harvey A. Schwartz

Plaintiff's Supplemental Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALAN BROWN | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 05-11178-NG |
| STATE STREET CORPORATION and | ) | |
| STATE STREET GLOBAL ADVISORS | ) | |
|     Defendants | ) | |

## AFFIDAVIT OF ALAN BROWN

Now comes Alan Brown, who states as follows subject to the pains and penalties of perjury.

1.  My name is Alan Brown. I am the plaintiff in the above action.

2.  **The Voluntary Separation Plan** – Prior to the implementation of the VSP, and prior to my conversation with David Spina about the VSP not having been offered to me, I had been involved in numerous discussions about the VSP program and its likely impact on SSgA. As a senior manager of SSgA, I had been provided with detailed information about the VSP so I could communicate with staff about the program. This included the terms of the package plus draft communications to staff in "question and answer" format. It is fair to say that the VSP and its consequences were a topic of constant conversation right throughout the 2nd quarter of 2003 and beyond.

3.  As to the Executive Voluntary Separation Plan (the "EVSP"), I had numerous discussions with the other three senior managers of SSgA on the detailed terms of the package offered to them and on whether they were likely to take it. Moreover, at the time when I stayed in Boston I normally stayed with John Snow – who had been offered the EVSP with full documentation – and we had a number of detailed conversations on the terms of the EVSP and the specifics of what it would mean for him and for me, if I had been offered it. I cannot be absolutely certain whether I had actually seen and read John Snow's documentation, but all of the terms of the EVSP, as offered to him, were thoroughly discussed between us and understood by me, all before I spoke with David Spina about the EVSP. In fact, it was because both Mr. Spina and I so thoroughly understood the terms of the EVSP that we did not need to discuss those terms in detail in our conversation.

4.    **The Executive Compensation Committee charter** – I was aware of the Executive Compensation Committee's ("ECC") existence and had seen references to it in stock and option award agreements before my meeting with David Spina in 2003. However, I did not know the specific function and responsibilities of the ECC until I first read the ECC's charter from State Street's website in 2005, quite possibly not until after the present litigation had started. I had not seen the ECC's charter at the time I spoke with Mr. Spina in 2003, nor at any time before 2005.

5.    **My conversation with Louis deOcejo in the Fall of 2004** – I spoke with Lou deOcejo in the Fall of 2004 about the search for a replacement for Tim Harbert. Contrary to Mr. deOcejo's deposition testimony (page 37), I clearly proposed that I should be the Chairman and Chief Investment Officer, as opposed to my then current position of Vice-Chairman and CIO. This succession plan had in fact been put together by myself in collaboration with my senior colleagues at SSgA. It was not just what I wanted to happen; it was what the SSgA senior management team wanted to happen.

6.    The second element of the conversation related to the SERP. The SERP was important to me because of the EVSP and also because of important changes to UK pension legislation that were to come into force. This discussion with Mr. deOcejo touched briefly on my EVSP benefits rights. I have a clear memory as to the following:

    a.    Mr. deOcejo did not tell me that any proposal that I receive the EVSP had been presented to or considered by the ECC.

    b.    He did not tell me that the ECC had looked at the proposal and would not approve it.

    c.    He did not tell me that David Spina could not have made such a commitment on his own.

    d.    He did not say words to the effect of "it will never happen," referring to my receiving the EVSP.

    e.    I am absolutely certain that I left that meeting with Mr. deOcejo just as I went in, believing that I had an agreement with State Street that would be honoured if and when I called upon it.

7.    At the time that I sought to exercise my rights under that commitment on March 11, 2005, I believed that State Street would honour that commitment to me, as described in the June 30, 2004 letter David Spina wrote to the ECC. The first anybody from State Street told me that I had no EVSP agreement of any kind was in William Hunt's March 17, 2005 letter to me in which he said that David Spina did not have authority to enter into such a commitment and that no agreement existed.

I have read the above and state, subject to the pains and penalties of perjury, that it is true and accurate.

Date: 20th October, 2006          Alan Brown

Plaintiff's Supplemental Exhibit 2

# ORIGINAL

Volume: I
Pages: 1-76
Exhibits: 1-12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11178-NG

ALAN BROWN,

            Plaintiff

vs.

STATE STREET CORPORATION and
STATE STREET GLOBAL ADVISORS,

            Defendants

        Deposition of BOON OOI, a witness called on behalf

of the Plaintiff, pursuant to the Federal Rules of Civil

Procedure, before Virginia Dodge, Registered Professional

Reporter and Notary Public in and for the Commonwealth of

Massachusetts, at the offices of RODGERS, POWERS &

SCHWARTZ, 18 Tremont Street, 5th Floor, Boston,

Massachusetts, commencing at 2:45 p.m. on Tuesday,

June 20, 2006.

Q.    Okay.  So the executive -- the EVSP as it was provided to U.S. employees provided for an offset to the executive SERP for payments made under the State Street retirement plan, correct?

A.    The State Street qualified and non-qualified plan. For expediency purposes, we did not apply the non-employer -- other employer pensions because this was done in a very short time frame, and that would require us to go out and collect information from everybody.

But again, this is just a U.S. focus program.

Q.    Yeah.  You've told us that.

So you agree that the EVSP as it was offered to State Street employees did not include an offset for prior employer pension plans, correct?

MR. CALAMARI:  Objection to form.  The documents speak for themselves.

A.    Can you repeat the question?

Q.    (By Mr. Schwartz)  Do you agree that the EVSP, as it was offered to State Street employees, did not include an offset to the executive SERP for pension benefits from prior employers?

MR. CALAMARI:  Objection to form.

A.    The EVSP as offered to U.S. employees does not apply an offset to the executive SERP from other employer plans.

Plaintiff's Supplemental Exhibit 3

ALAN BROWN
4-24-06

Page 1

1                                  Volume:  I
                                   Pages: 190
2                                  Exhibits: 25

3            UNITED STATES DISTRICT COURT

4            DISTRICT OF MASSACHUSETTS

5

6
   ALAN BROWN,
7                        Plaintiff
                                      Docket No.
8            vs.                      05 CIV 1178(NG)

9  STATE STREET CORPORATION and
   STATE STREET GLOBAL ADVISORS,
10                       Defendant

11

12

13            VIDEOTAPED DEPOSITION of ALAN BROWN, a
   witness called by and on behalf of the Defendant, taken
14 pursuant to the Federal Rules of Civil Procedure,
   videotaped by Craig Newman of Valed Videography
15 Services, before Cynthia F. Stutz, Certified Shorthand
   Reporter and Notary Public in and for the Commonwealth
16 of Massachusetts, at the offices of Hare & Chaffin, 160
   Federal Street, Boston, Massachusetts, on Monday, April
17 24, 2006, commencing at 10:31 a.m.

18

19

20

21

22

23

24

ALAN BROWN
4-24-06

Page 8

1    A.   Correct.

2    Q.   And can you tell me what capacity she's

3  joining you here?

4    A.   Legal advice.

5    Q.   Okay.  And she's acting as your counsel?

6         MR. SCHWARTZ:  She's acting as my

7  assistant throughout this case.  She's an attorney in

8  the U.K.

9         MR. CALAMARI:  Okay.

10   Q.   And has she been advising you with regard to

11 matters from prior to the retention -- with regard to

12 employment matters prior to the retention of Mr.

13 Schwartz?

14   A.   Yes.

15   Q.   And was she advising you with regard to

16 employment matters throughout your tenure at State

17 Street?

18   A.   Yes.

19   Q.   And that question leads me to one more

20 definitional point.  I may use the phrase State Street

21 as a kind of a generic phrase for asking questions.  By

22 whom were you employed during your time at State

23 Street?

24   A.   My employment contract when I joined State

ALAN BROWN
4-24-06

Page 13

1    A.    No.

2    Q.    Okay.  How did you come to join State Street?

3    A.    I was approached by State Street.

4    Q.    And did they approach you directly or through

5    a headhunter?

6    A.    They approached me directly.

7    Q.    And who approached you?

8    A.    An individual called Tony Ryan.

9    Q.    And did you negotiate an employment

10   arrangement with State Street?

11   A.    I did.

12   Q.    How did you negotiate that employment

13   arrangement?

14   A.    I had legal advice, the presence of my wife.

15   Q.    Was it a -- Did you negotiate a formal

16   employment contract?

17   A.    Yes.

18                (Brown Exhibit No. 1 marked

19                 for identification.)

20   Q.    I show you, let me show you a document that's

21   marked as Brown Exhibit 1 and Brown Exhibit 1 consists

22   of a series of documents that are stapled together, I

23   believe, is that correct?

24   A.    Yes.

ALAN BROWN
4-24-06

Page 33

1    record?

2       A.    Governing Law Construction.  This agreement

3    shall be construed under and governed by the laws of

4    the Commonwealth of Massachusetts.  Executive hereby

5    expressly acknowledges that the executive compensation

6    committee of the board of directors of the corporation

7    has full discretionary power and authority to construe

8    the terms of the plan and of this agreement.

9       Q.    So does that give, in your view, the executive

10   compensation committee the authority to make changes in

11   this agreement?

12      A.    I'm not sure that that's what I understand by

13   the word construe.  I think I understand by the word

14   construe, interpret.

15      Q.    Could you turn to Page 263, and read Paragraph

16   2?  And I don't want you to read the whole paragraph

17   into the record, because it's long, but if you would

18   read the first sentence?

19      A.    The plan will be administered by the executive

20   compensation committee ("the committee") of the board

21   of directors of the corporation.

22      Q.    And then if you will go to the next sentence

23   and read until the colon?

24      A.    The committee shall have complete authority,

ALAN BROWN
4-24-06

Page 68

1   had with people?

2       A.   No.

3       Q.   Now, when you made notes did you sit there

4   while people were talking and jot down the notes?

5       A.   It depended.

6       Q.   What did it depend on?

7       A.   It depends on whether I was able to do that or

8   not.  In other words, if I was sitting on the end of a

9   phone and I could write on a pad, yes.  If I was eating

10  lunch and had other things in my hand, then I would

11  make the note afterwards.

12      Q.   Okay.  So if you had an in-person meeting and

13  you made notes of an in-person meeting, you would make

14  your notes after the meeting was over?

15      A.   Either after or at the same time, depending.

16      Q.   Well, would people see you jotting down notes

17  as they spoke to you?

18      A.   They might do if they were looking, yes.

19      Q.   Okay.  And would you show them copies of notes

20  when they were finished?

21      A.   I was never asked to.

22      Q.   Well, did you ever offer to?

23      A.   No.

24      Q.   Wouldn't it be important to you to make sure

ALAN BROWN
4-24-06

Page 71

1    What did you understand the VSP to be?

2        A.    A Voluntary Severance Program.

3        Q.    And how did you learn about it?

4        A.    I learned about it first in the management

5    capacity, as being a part of the G4 at the time, when

6    there were discussions about bringing out a VSP program

7    in 2003.

8        Q.    And did you participate in those discussions?

9        A.    I did.

10       Q.    And what was the nature of your participation?

11       A.    As one of the G4, and the initial issue that

12   we discussed was the question of whether we should or

13   should not ask for SSgA to be exempted from the program

14   in its entirety.

15       Q.    And what was your opinion?

16       A.    After much debate, we concluded that, and I

17   shared the view, we concluded that we should not ask

18   for an exemption.

19       Q.    And that was your opinion, that we should not

20   ask for an exemption?

21       A.    Mine and the G4.

22       Q.    And why did you feel that way?

23       A.    We -- There were several reasons.  The first

24   was that we obviously wanted to have motivated staff

ALAN BROWN
4-24-06

Page 72

1    and to deprive staff of a benefit that their colleagues

2    across the street were enjoying would not necessarily

3    lead them to be motivated.  Point 2 was that our turn-

4    over, staff turnover rate at that time had got down

5    extremely low and a VSP -- not without risk, but a VSP

6    could provide some room to move people on in their

7    careers.  And Point 3 was that it would potentially at

8    a stroke restore our profitability ratios to pre-bear

9    market levels.

10       Q.    So this was a plan you were in favor of?

11       A.    I was in favor of SSgA participating in any

12   such program that the corporation was bringing out,

13   yes.

14       Q.    And your position was based on what was good

15   for SSgA?

16       A.    Yes.

17       Q.    How did the VSP get adopted?

18       A.    By whom?

19       Q.    By the company.

20       A.    I don't know.

21       Q.    Let me try something different.  In your

22   experience as chief investment officer were you in a

23   position to recommend compensation for people that

24   worked for you?

ALAN BROWN
4-24-06

Page 75

1    approve the bonuses for the senior level people?

2        A.    I don't know how far down the organization

3    they would go, so I couldn't speculate on that.

4        Q.    Would it go as far down as you?

5        A.    Again, I don't know.  I know, because it says

6    so under its remit, that it includes David Spina's

7    compensation.  I don't know how much further down the

8    organization it goes.

9        Q.    Do you have a copy of the executive

10   compensation's remit, as you put it?

11       A.    Only such as is displayed on the Website.

12       Q.    And you have seen that?

13       A.    Yes.

14       Q.    And you know what it says?

15       A.    Yes.

16             Not wanting to break your flow, could I

17   request a top off of this jug of water?

18             MR. CALAMARI:  Yeah.  We could even take

19   a break at some point.  I don't know what everybody's

20   preference is on lunch.  I want to cut it quick,

21   because we're low on time because of the late start,

22   but I don't mind taking a break at some point.

23             MR. SCHWARTZ:  Yeah, let's -- Obviously

24   we'll take a lunch break.  We could shoot for a half

ALAN BROWN
4-24-06

Page 78

1      Q.    And this document that you're reading for, for

2   the record, is numbered SSC 047005 and 04706, correct?

3      A.    Correct.

4      Q.    Okay.  So does that refresh your recollection

5   as to whether or not the committee actually reviewed

6   bonus compensation for senior executives?

7      A.    Well, I don't want to be nit-picking, but it's

8   ambiguous, the language, because it says that the

9   committee shall annually review, dot, dot, dot, the

10  total compensation of all senior executives.

11     Q.    Uh-hum.

12     A.    That could be the total.  It doesn't

13  necessarily say the total of each individual.

14     Q.    You're correct, but is total compensation in

15  your -- let me see if I can get it right -- in your

16  experience a phrase that's used commonly in the

17  business to refer to how much money an individual

18  makes, including all phases of his compensation?

19     A.    That's certainly one meaning of it,

20  absolutely.

21     Q.    And that's a common meaning of the word total

22  compensation?

23     A.    It certainly is, yes.

24     Q.    In fact, everybody constantly in this business

ALAN BROWN
4-24-06

Page 97

1    being included and what happened?

2        A.    I discussed this with people like John Snow

3    and Tim Harbert, John Serhant, my close colleagues

4    there.   I was also concerned that we knew that the two

5    Johns, John Serhant and John Snow were going to elect

6    to take the package and, of course, if Tim Harbert were

7    to take the package, as well, then I would have been

8    left entirely on my own at that point.   And vice versa,

9    if Tim didn't take the package, then he too would be

10   foregoing an extremely valuable benefit.   So I asked

11   him if he -- I said I wanted to go and speak to David

12   Spina and I asked him if he would like to come with me

13   or whether he'd like to stay on his own.

14       Q.    And what did he say?

15       A.    And he asked me what I was proposing and I

16   told him.

17       Q.    And when did this occur?

18       A.    Around about the second half of May.

19       Q.    And what did he say?

20       A.    And he said that he would like to come with

21   me.

22       Q.    And then what happened?

23       A.    We went to meet with David Spina, which was a

24   routine event for us, either in person or if I was in

ALAN BROWN
4-24-06

Page 99

1    Q.    You had a meeting with David Spina.  Did you

2    sit down and talk to him?

3    A.    Yes, we did.

4    Q.    Was it in person?

5    A.    Yes, it was.

6    Q.    Where did the meeting occur?

7    A.    In his office.

8    Q.    And about how long did it last?

9    A.    Entire meeting, which we covered a number of

10   agenda items, not more than an hour.

11   Q.    Did you take any notes of the meeting?

12   A.    No.

13   Q.    Did you make any notes after the meeting to

14   record the substance of the meeting?

15   A.    No.

16   Q.    Did you make a tape recording of the meeting?

17   A.    No.

18   Q.    Tell me what transpired at the meeting, what

19   you said and what he said?

20   A.    The conversation went like this.  I told him

21   that I regarded my job as being a global one and that

22   it was but a technicality that I had not been included

23   in the program.  I also said that the value of the

24   benefits to those who took it was so great that it was

1    really very difficult for an individual not to take

2    those benefits for the sake of themselves and their

3    families.  And I said that we knew that the two Johns

4    were going to elect to take the VSP and that therefore

5    half of the G4 was definitely leaving.

6              And I said to David Spina that I didn't

7    think he would want, you know, any more departures, any

8    more departures, and that I had a proposal which I

9    thought would be equitable both to myself and Tim if we

10   stayed to continue to support SSgA and could

11   potentially cost the company nothing.

12   Q.   What did you mean by he didn't want any more

13   departures?

14   A.   Well, I found it difficult to believe that he

15   would want all four of the top managers of SSgA to

16   leave at one go.

17   Q.   Why would you leave if you weren't going to

18   get the VSP?

19   A.   If I hadn't got the VSP and if I was the only

20   person left standing on the deck, so to speak, I would

21   have taken headhunter calls, which come regularly, and

22   listened to them, because the position would have been

104

7     Q.    Okay.   After you broke off on that meeting you

8     said that David Spina got back to you?

9     A.    Yes.

10    Q.    And when did that occur?

11    A.    Our next meeting.

12    Q.    How long?

13    A.    Within two weeks.   We always met every couple

14    of weeks.

15    Q.    And what did he say?

16    A.    He said that he'd considered my proposal and

17    with the exception of the piece that he couldn't deal

18    with, such as equity plans, he thought it was a fair

19    one and he was happy with it and I accepted it.

20    Q.    Is that all he said?

21    A.    No.   And we then agreed that we would need to

22    reflect this in writing and he said that he would do

23    that.

24    Q.    Now, did he talk to you about seeking approval

ALAN BROWN
4-24-06

1     A.    My wife is an employment lawyer and advises me

2  whenever there is anything to be advised on.

3     Q.    And I think I'm not invading a privilege, but

4  I'll leave that to you to decide, to ask if you at the

5  time of these discussions consulted with your wife

6  regarding the substance of the discussions.  You can't

7  tell me what was said, but I think you can tell me if

8  you had conversations about it?

9     A.    We did.

10    Q.    Now, how long were you required to stay with

11 State Street in return for this supposed agreement?

12    A.    Except in the event of unforeseeable

13 circumstances like health, for example, the expectation

14 was that we would fully see the transition of SSgA post

15 the VSP through to stability again, with whatever

16 changes that needed to be made to the management team

17 and whatever changes that, whatever reaction we had to

18 come up with as a result of any client or consultant

19 reaction to the VSP.

20    Q.    Now, was that ever put in writing anywhere?

21    A.    No.

22    Q.    And what did that mean?  How long would that

23 be?

24    A.    Well, I think our collective understanding was

110

1    that it was a process which could take about a year.  I

2    actually believe we sort of got there by about the end

3    of March of 2004.

4        Q.   Did you have a specific conversation with

5    David about that?

6        A.   Only as part of that conversation, the

7    conversations we've already talked about.

8        Q.   Well, you have already described that

9    conversation and you didn't mention this particular

10   aspect of it, so I'm trying to find out if --

11       A.   Oh, okay.  What I was talking about before was

12   about the benefits side of the proposal.  And what

13   you're now asking about is what commitment did we make.

14   And the commitment we made was to be there to lead SSgA

15   through this very difficult time until it was

16   definitely behind us and the firm was stable and

17   cruising ahead again.

18       Q.   So arguably, if you, in your version of this,

19   if you resigned the day after David Spina made whatever

20   commitment he made to you, you would not be eligible

21   for any additional benefits?

22       A.   Short of a serious health reason for so doing,

ALAN BROWN
4-24-06

Page 117

1  trigger your desire to put something like this down on

2  a piece of paper?

3      A.   Not that I can link directly with this time.

4      Q.   What was David Spina's status at about this

5  time?

6      A.   Exactly.  I'm not sure whether I became aware

7  of the rumors of that before or after this.  I mean, it

8  was clearly around about that time, but I cannot with

9  confidence say which side of it.

10          MR. SCHWARTZ:  Why don't the two of you

11  stop hinting and be a little bit more explicit by what

12  you mean by that?

13     A.   Shall I go first?

14     Q.   I just asked you what his status was.  You can

15  answer.

16     A.   He was the chief executive of State Street,

17  but there was increasing rumor that he was likely to

18  depart fairly soon.

19     Q.   Okay.  And in this period of time did you

20  expect that David was going to seek compensation

21  committee approval for your arrangement?

22     A.   I didn't think that he needed any compensation

23  committee approval.  His response to this e-mail simply

24  said that he was going to put it on record with them.

ALAN BROWN
4-24-06

Page 121

1    Q.   Doesn't this say VSP package amortized?

2    A.   It says a severance package similar to that of

3  the VSP.  This is, as you will appreciate, a rather

4  short form to go through all of the detail concerned.

5  It's my clear understanding that the amortization

6  related to the EVP top up pension plan, the SERP.

7    Q.   But you wrote this document?

8    A.   I did.

9    Q.   With advice of counsel?

10    A.   Yes.

11    Q.   But it wasn't complete?

12    A.   I don't think one could describe three

13  paragraphs as being a complete, detailed agreement of

14  something which is relatively complex.

15    Q.   It's fair to say that there were many more

16  terms and conditions to your agreement than are in this

17  document?

18    A.   There is quite a lot which is implied by the

19  VSP package itself, which is not just within these

20  three paragraphs.  The agreement was very

21  straightforward.  It was very straightforward in that

22  we would, to the extent possible, receive the same

23  benefits that we would be have been entitled to under

24  the EVSP program, save for the fact that the additional

ALAN BROWN
4-24-06

Page 153

1    with various people that you had not recorded up until

2    that point in time?

3        A.    It's clear that we're going through

4    potentially, we're going through a succession process

5    the outcome of which could potentially be quite

6    uncertain in relation to my future career at SSgA,

7    depending upon the outcome.

8        Q.    Why would that matter, though?  What was so

9    important about the succession process discussions that

10   required you to suddenly start taking notes?

11       A.    Because I believe that there could be

12   circumstances under which I might find that I wanted to

13   exercise this option and I wanted to document, so I

14   didn't have to rely too much on my memory, as to what

15   people were saying as we went through that process.

16       Q.    I thought before you told me you were

17   satisfied once you got a copy of the letter to Robert

18   Weissman that Tim Harbert gave you that you were

19   satisfied with the status of your situation with regard

20   to that agreement?

21       A.    I was.

22       Q.    So then why would you need to take notes?

23       A.    The only note that I made in relation to that

24   was when I double checked on the 28th of May with David

ALAN BROWN
4-24-06

Page 179

1    VSP benefits to me and claims an understanding, which

2    is not correct, that I had been informed eight months

3    prior that the committee had rejected such proposal.

4        Q.    And that's something you deny?

5        A.    Absolutely.

6        Q.    As far as you were concerned, the letter to

7    Robert Weissman was the end of the line as far as the

8    executive compensation committee and their

9    consideration of your --

10       A.    I'm unaware of anything else.

11              MR. SCHWARTZ:  Object to the form.

12       A.    Unaware of anything else.

13       Q.    Okay.  And no one else told you anything else?

14       A.    No.

15       Q.    Okay.  All right.  You received this letter?

16       A.    Yes.

17       Q.    And you responded to it?

18       A.    Yes.

19       Q.    What was the substance of your response?

20       A.    To refute much of the content of this letter.

21              (Brown Exhibit No. 25 marked

22              for identification.)

23       Q.    Your show you an e-mail marked Plaintiff 36 to

24    William Hunt dated March 18, 2005.  Was this your

Plaintiff's Supplemental Exhibit 4

1

```
            ┌─┐
            │▓│  ORIGINAL   Volume: 1
            └─┘              Pages:  1 to 50
                             Exhibits:  1 to 4


            UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
                         C.A. No. 05-11178-NG


   ALAN BROWN,                         )
                        Plaintiff      )
                                       )
                                       )
          vs.                          )
                                       )
                                       )
   STATE STREET CORPORATION,           )
   STATE AND STREET GLOBAL             )
   ADVISORS,                           )
                        Defendants     )
```

**DEPOSITION of DAVID A. SPINA,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Massachusetts Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108, on
Wednesday, May 31st, 2006, commencing at
10:00 a.m.


                *  *  *  *


          SHEA COURT REPORTING SERVICES
          ONE UNION STREET, SECOND FLOOR
         BOSTON, MASSACHUSETTS 02108-2408

1   Q.   And had you made those representations?

2   A.   Well, whatever I said to him in that

3        meeting back in '03, I said I would go

4        and do my best to get what I could get.

5   Q.   And between that meeting in '03 and

6        this letter in June of '04, had you done

7        anything in furtherance of that?

8   A.   Well, unfortunately, shortly after the

9        conversation in '03, I had quadruple

10       bypass surgery, and was out for quite a

11       while, and had a few other little things

12       going on.  So until the spring of '04 I

13       had done nothing to advance the issues

14       that Alan and Tim and I had discussed.

15  Q.   Getting back to that '03 conversation

16       with Alan, you made representations

17       that you would make efforts, as you've

18       discussed.  On the other side was

19       there anything Alan was expected to do

20       in return for receiving the benefits that

21       you discussed with him?

22            MR. CALAMARI:  I object to the

23       form.

24  A.   I don't really know what Alan was

1     about this matter?

2  A.  I don't recall anything.  Certainly

3     nothing that had any depth or whatever.

4            MR. CALAMARI:  I just want to

5     object to the form.

6  Q.  Now, at any point, either in your 2003

7     conversation or in any of your e-mails

8     back and forth with Mr. Brown about

9     this matter, did you tell him that the

10     Executive Compensation Committee would

11     have to approve any arrangement before

12     it could be affected?

13  A.  I don't recall.  On the other hand, I do

14     recall sort of reciting part of one's

15     mantra past investment performances is

16     a good indicator of future returns.  To

17     the extent that compensation dealt with

18     stock, it was always going to have to

19     go to the Board.  I used to have, but I

20     don't recall any specific situation where

21     I walked Alan through that.

22  Q.  Now, let's just discuss a little bit more

23     about after the June conversation with

24     Mr. Brown and Mr. Harbert.  I understand

Plaintiff's Supplemental Exhibit 5

1

Volume: 1
Pages: 1 to 30
Exhibits: 1 to 5

# ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-11178-NG

ALAN BROWN,                    )
                   Plaintiff  )
                              )
                              )
                              )
        vs.                    )
                              )
                              )
STATE STREET CORPORATION,      )
STATE AND STREET GLOBAL        )
ADVISORS,                      )
                   Defendants  )

---

**DEPOSITION of MITCHELL H. SHAMES,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Massachusetts Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108, on
Wednesday, May 31st, 2006, commencing at
12:30 p.m.

\* \* \* \*

SHEA COURT REPORTING SERVICES
ONE UNION STREET, SECOND FLOOR
BOSTON, MASSACHUSETTS 02108-2408

1           the employment partner.

2   Q.   Was she in the Boston office or in the

3        UK?

4   A.   In the UK London office.

5   Q.   Is it clear to you that Mr. Brown's last

6        day of employment with State Street was

7        March 18th of 2005?

8   A.   Yes.

9   Q.   Mr. Brown was paid salary continuation

10       for 60 days after that date, is that

11       correct?

12  A.   I don't know.

13  Q.   Did you provide legal advice concerning

14       the payment to Mr. Brown of any salary,

15       or other items under his contract?

16  A.   I was involved in discussions concerning

17       advice on these issues.

18  Q.   Do you know whether or not Mr. Brown was

19       paid in a lump sum for the 60 days pay

20       in lieu of notice that's referred to in

21       Exhibit 5, or whether that payment was

22       made periodically?

23  A.   I have no knowledge of that.

24  Q.   Did the UK counsel provide guidance

Plaintiff's Supplemental Exhibit 6

# ORIGINAL

Volume: I
Pages: 1-27
Exhibits: 1-7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11178-NG

ALAN BROWN,

        Plaintiff

vs.

STATE STREET CORPORATION and
STATE STREET GLOBAL ADVISORS,

        Defendants

Deposition of NADER DAREHSHORI, a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Virginia Dodge, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of RODGERS, POWERS & SCHWARTZ, 18 Tremont Street, 5th Floor, Boston, Massachusetts, commencing at 12:54 p.m. on Tuesday, June 20, 2006.

```
 1                MR. SCHWARTZ:  Mark this one, please.

 2                (Exhibit 6, SSgA Executive Vice President,

 3                Verbal Commitment by David Spina, marked for

 4                identification.)

 5    Q.    (By Mr. Schwartz)  Showing you what we've just

 6    marked as Exhibit 6, it's SSC 05475 and 76.  I'm going to

 7    direct your attention to the lower left-hand corner where

 8    it says, "Tab 4B, September 15, 2004."

 9                Can you identify what this document is?

10    A.    No.

11    Q.    Have you seen this before?

12    A.    No.

13    Q.    Was it the practice for the compensation committee

14    to receive a binder with various tabbed documents prior to

15    meetings?

16    A.    Yes.

17    Q.    Could this have been one of the tabbed documents

18    prior to the September 15, 2004 meeting?

19    A.    If it was, I hadn't seen it.

20                MR. SCHWARTZ:  Okay.  Let's just mark the

21                minutes from that September 15 meeting then.

22                (Exhibit 7, Minutes of meeting on September 15,

23                2004, marked for identification.)

24    Q.    (By Mr. Schwartz)  Okay.  Showing you what we've
```

Plaintiff's Supplemental Exhibit 7

1

 **ORIGINAL**

Volume: 1
Pages:  1 to 53
Exhibits:  1 to 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS ·
C.A. No. 05-11178-NG

ALAN BROWN,                              )
                    Plaintiff           )
                                         )
    vs.                                  )
                                         )
STATE STREET CORPORATION,                )
STATE AND STREET GLOBAL                  )
ADVISORS,                                )
                    Defendants          )

**DEPOSITION of RICHARD P. SERGEL,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108,
on Friday, May 26, 2006, commencing at
10:00 a.m.

\* \* \* \*

SHEA COURT REPORTING SERVICES
ONE UNION STREET, SECOND FLOOR
BOSTON, MASSACHUSETTS 02108-2408

SHEA COURT REPORTING SERVICES (617) 227-3097

49

1   Q.  Do you agree that the committee took no

2       vote to renounce the verbal commitments

3       it had been told Mr. Spina had made to

4       Mr. Brown?  Do you agree with that?

5   A.  We didn't vote to modify the plan.

6   Q.  You did not vote to void any commitments

7       that Mr. Spina had made to Mr. Brown,

8       correct?

9   A.  No.  I'm sorry, we got in the double

10      negative there.

11  Q.  Yes, we did.

12  A.  I'm sorry.  I think that's a yes.  We did

13      not vote to renounce the -- I'm sorry,

14      maybe we should just read the question

15      back.

16  Q.  Did the committee vote to renounce

17      the certain verbal commitments it was

18      informed had been made by Mr. Spina to

19      Alan Brown?

20           MR. LEE:  I object to form.

21  A.  No.

22  Q.  Now, besides the June meeting and besides

23      the September meeting, do you recall the

24      subject of Mr. Spina and any commitments

SHEA COURT REPORTING SERVICES (617) 227-3097

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ALAN BROWN** <br>     **Plaintiff** | ) <br> ) <br> ) |
| **v.** | ) <br> )     **C.A. No. 05-11178-NG** |
| **STATE STREET CORPORATION** <br> **and STATE STREET GLOBAL** <br> **ADVISORS,** <br>     **Defendants** | ) <br> ) <br> ) <br> ) |

## AFFIDAVIT OF HARVEY A. SCHWARTZ

Now comes Harvey A. Schwartz, counsel of record for the plaintiff Alan Brown, who states as follows subject to the pains and penalties of perjury.

1.    Exhibits 2-7 are copies of portions of the transcripts of depositions of Boon Ooi, Alan Brown, David Spina, Mitchell Shames, Nader Dareshori, and Richard Sergel and taken in this action.

                                      /s/ Harvey A. Schwartz
                                      HARVEY A. SCHWARTZ
                                        BBO. # 448080