UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------ x
ALAN BROWN,                                            :
                                                       :
                        Plaintiff,                     :
                                                       :   Case No. 05 Civ. 11178 (NG)
            -against-                                   :
                                                       :
STATE STREET CORPORATION                               :
and STATE STREET GLOBAL                                :
ADVISORS,                                              :
                                                       :
                        Defendants.                    :
------------------------------------------------------ x
```

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
<u>FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

HARE & CHAFFIN
160 Federal Street, 23rd Floor
Boston, MA 02110
(617) 330-5000

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT ............................................................................................................ 6

I.    BROWN'S THEORY OF RATIFICATION FAILS ON BOTH THE LAW AND
      THE FACTS. ................................................................................................... 6

      A.    Brown's Knowledge That The ECC's Approval Was Necessary To A
            Valid And Enforceable Agreement With State Street Precludes His Theory
            Of Ratification. ....................................................................................... 7

      B.    Even If Brown Did Not Know The ECC's Approval Was Required, His
            Theory of Ratification Still Fails. .......................................................... 10

            1.    Brown Cannot Demonstrate That He Relied To His Detriment ........ 11

            2.    Even If Brown Relied On The ECC's Omission, His Reliance Was
                  Unreasonable. ......................................................................... 12

      C.    State Street's Conduct Was Inconsistent With An Intent To Ratify. ..... 14

II.   BROWN'S MOTION FOR SUMMARY JUDGMENT ON HIS REMAINING
      CLAIMS IS WITHOUT FACTUAL SUPPORT AND SHOULD BE DENIED. ........... 16

      A.    Brown's Breach of Contract Claim Should Be Rejected. .................... 17

            1.    Brown Never Agreed With Spina On The Material Terms Of The
                  Purported Agreement ................................................................ 17

            2.    Spina Did Not Have Authority To Commit State Street. ............ 20

                  a.    Spina Did Not Have Actual Authority. ........................... 21

                  b.    Spina Did Not Have Apparent Authority. ........................ 22

      B.    Summary Judgment Is Inappropriate On Brown's Promissory Estoppel
            Claim. .................................................................................... 23

CONCLUSION ...................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page**

### Cases

Allen v. Liston Lumber Co.,
  183 N.E. 747 (Mass. 1933)......................................................................................9

Andersen v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) ..............................................................................................19

Campbell v. Hospitality Motor Inns, Inc.,
  493 N.E.2d 239 (Ohio 1986) ................................................................................16

In re Chandler,
  76 B.R. 927 (Bankr. E.D.N.Y. 1987) ....................................................................14

Commercial Credit Corp. v. Stan Cross Buick, Inc.,
  180 N.E.2d 88 (Mass. 1962)....................................................................................9

Cooprider v. John Hancock Mutual Life Ins. Co.,
  No. 91-11834, 1992 WL 396326 (D. Mass. Dec. 29, 1992) ..................................20

Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,
  290 F.3d 42 (1st Cir. 2002)....................................................................................10

Ferro Concrete Const. Co. v. United States,
  112 F.2d 488 (1st Cir. 1940)..................................................................................22

Goldman v. First Nat'l Bank of Boston,
  985 F.2d 1113 (1st Cir. 1993)................................................................................14

Inn Foods v. Equitable Co-Operative Bank,
  45 F.3d 594 (1st Cir. 1995).............................................................................10, 16

Julien J. Studley, Inc. v. Gulf Oil Corp.,
  282 F. Supp. 748 (S.D.N.Y. 1968), *rev'd on other grounds*, 407 F.2d 521 (2d Cir. 1969).....11

Lemanski v. Lenox Savings Bank, No. Civ. A. 95-30074,
  1996 WL 253315 (D. Mass. Apr. 12, 1996).....................................................15, 16

Linkage Corp. v. Trustees of Boston University,
  679 N.E.2d 191 (Mass. 1997)........................................................................15, 16, 23

Marram v. Kobrick Offshore Fund, Ltd.,
  809 N.E.2d 1017 (Mass. 2004)..............................................................................13

Marya v. Slakey,
  190 F. Supp. 2d 95 (D. Mass. 2001).......................................................................9

Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland Limited,
    835 F.2d 32 (2d Cir. 1987) ................................................................................11

Penta v. Concord Auto Auction, Inc.,
    511 N.E.2d 642 (Mass. App. Ct. 1987) ............................................................22

Rex Lumber Co. v. Acton Block Co., Inc.,
    562 N.E.2d 845 (Mass. App. Ct. 1990) ............................................................11

Rezendes Family Ltd. P'ship v. Gates,
    No. 02-civ-10029, 2003 WL 22951900 (D. Mass. Dec. 12, 2003) ...................9, 14

Rhode Island Hosp. Trust Nat'l Bank v. Varadian,
    647 N.E.2d 1174 (Mass. 1995)..........................................................................24

Richards v. General Motors Corp.,
    876 F. Supp. 1492 (E.D. Mich. 1995) ................................................................7

Rydman v. Dennison Mfg. Co.,
    366 N.E.2d 763 (Mass. 1977)............................................................................14

Shapiro v. American Home Assurance Co.,
    584 F. Supp. 1245 (D. Mass. 1984) ....................................................................9

The Economists Advocate, LLC v. Cognitive Arts Corp.,
    No. 01-cv-9468, 2004 WL 728874 (S.D.N.Y. Apr. 6, 2004)............................14

The Editors, Inc. v. The Westford Regency Inn, Inc.,
    No. 9076, 1991 WL 35251 (Mass. App. Ct. Jan. 2, 1991) ..............................9, 10

The Evanston Bank v. ContiCommodity Services, Inc.,
    623 F. Supp. 1014 (N.D. Ill. 1985)..................................................................6, 14

Theos & Sons, Inc. v. Mack Trucks, Inc.,
    729 N.E.2d 1113 (Mass. 2000)..........................................................................21

Trifiro v. New York Life Ins. Co.,
    845 F.2d 30 (1st Cir. 1988)................................................................................13

Ziv Television Programs, Inc. v. Duchaine,
    191 F. Supp. 27 (D. Mass. 1961) ......................................................................20

## Statutes

Local Civil Rule 56.1...........................................................................................3

## Other Authorities

12 Richard A. Lord, *Williston on Contracts* § 35:24 (4th ed. 2006) ............................14

Restatement (Second) of Agency, § 94, comment a. (1958).......................................10

Restatement (Third) of Agency, § 4.01 (2006) .......................................................... 12

Restatement (Third) of Agency, § 4.01, comment a ................................................... 14

Restatement (Third) of Agency, § 4.01, comment b ..................................................... 9

Restatement (Third) of Agency, § 4.01, comment f ............................................... 10, 14

Restatement (Third) of Agency, § 4.03 ........................................................................ 9

Defendants State Street Corporation (the "Corporation") and State Street Global Advisors ("SSgA") (collectively, "State Street") respectfully submit this memorandum of law in opposition to plaintiff Alan Brown's ("Brown") motion for summary judgment and in further support of their motion for summary judgment dismissing Brown's amended complaint.

## Preliminary Statement

In May 2003, Brown learned that two of the four members of SSgA's senior management group were leaving the company. Seeking to take advantage of these departures, Brown privately suggested to State Street's former CEO, David Spina, that he receive a special severance package that he could elect to receive at any time. Brown knew, however, that, for such an arrangement to be binding on State Street, it had to be approved by the Executive Compensation Committee (the "ECC") of State Street's board of directors (the "Board").

Yet, for over a year, *Brown did nothing* to advance the issues he had discussed with Spina or to finalize an agreement that he claims would have been worth several million dollars. In June 2004, he finally sought to clarify the matter with Spina, who, as he knew, then planned to raise it with the ECC. Even when directly informed that the ECC would never approve his proposal, Brown *once again did nothing* to confirm his purported multi-million dollar agreement with State Street. Instead, he spent the next several months in pursuit of his real goal: to become CEO of SSgA. Only after Brown's quest for the top position was denied, and only then, did he try to resurrect his long dead proposal.

Brown's motion for summary judgment now seeks a determination by this Court that, despite his knowledge of the role of the ECC, he is nonetheless entitled to recover simply because, when his proposal was brought to the ECC for its approval, the ECC did not issue a formal vote rejecting it. Not only is his request extraordinary, it is wrong as a matter of law.

1

Putting aside the fact that Brown never formed a contract with Spina (which alone is enough to deny this motion[1]), his ratification argument fails because, as the full record of facts demonstrate, Spina expressly conditioned any understanding they might reach on the consent of the ECC. Even if he had not expressly said so (because it did not need to be said), Brown was fully aware of State Street's procedures and knew that the ECC had to be involved in any lucrative award granted to senior executives, like him. The doctrine of ratification, however, only provides a remedy to those who, unlike Brown, had no reason to believe that further approval was required to complete an enforceable agreement. Here, Brown's willful ignorance of the fact that he never obtained the ECC's (and thus State Street's) assent, precludes any recovery he now seeks under a theory of ratification.

Moreover, the cases cited by Brown in support of his ratification argument simply do not address the facts of this case, which show not only that Brown knew he had failed to properly complete an agreement with State Street but that State Street did nothing to make him believe otherwise. Because substantive agency law requires that, for ratification to apply, State Street must have misled Brown in some way, it is clear that no ratification can be inferred here. Indeed, not only has Brown failed to make the necessary showing to prevail on summary judgment but he has failed to even raise a genuine issue as to any material fact on this claim.

---

[1]    As demonstrated in State Street's memorandum of law in support of its motion for summary judgment, Brown cannot show that (i) he and Spina ever achieved a meeting of the minds on the material terms that are a prerequisite to an enforceable contract under Massachusetts law or (ii) that they executed a writing as they had agreed would be necessary for a binding agreement. *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment (D.E. 52) ("Def. Mem.") at 14-19. As State Street's moving papers further demonstrate, their failure to reach a definite, written agreement renders Brown's ratification theory completely inapplicable because there was no contract or act that State Street could then ratify. *Id.* at 25-26.

Accordingly, not only should his motion for summary judgment on his ratification theory be denied but summary judgment on this issue should be granted in favor of State Street.[2]

## Statement of Facts

State Street incorporates by reference the Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 (D.E. 50) ("Defendants' 56.1 Statement") accompanying its motion for summary judgment, filed on September 26, 2006. For the Court's convenience, State Street presents here some facts that are relevant to the determination of Brown's motion for summary judgment but that were omitted from his brief.

### Spina Tells Brown That He Has To Present The Proposal To The ECC.

In May 2003, when Brown first expressed his interest to Spina in receiving benefits similar to those State Street offered to certain other employees under the Voluntary Separation Program (the "VSP"), Spina only told him that he "would go and do [his] best to get what [he] could get" for him. (Spina Tr. 26; Defendants' 56.1 Statement, ¶¶ 37-38). As Brown admitted at his deposition, Spina "made it clear that there were certain things which were beyond his control." (Brown Tr. 103; Defendants' 56.1 Statement, ¶ 40) (emphasis added).

Over a year later, during which he had done nothing to finalize or confirm his alleged multi-million dollar agreement, Brown learned that Spina was leaving State Street and, as expected, quickly revisited the subject with him to "try and clarify matters." (Defendants' 56.1 Statement, ¶¶ 42, 44-45). In reply, and consistent with their initial discussion, Spina

---

[2] State Street is also entitled to summary judgment on the grounds that Brown's common-law claims not only are preempted by but fail under the Employment Retirement Income Security Act of 1974. Def. Mem. at 29-34.

reiterated to Brown that they only had a "'first cut' at a record" and that he would bring Brown's proposal to the ECC's attention at its next meeting.  (*Id.*, ¶ 46).

Brown, of course, did not have to be reminded that, for senior executives, this was a necessary step in securing an enforceable agreement with State Street.  This was so because, for ten years, Brown received compensation and equity awards from the company (each of which he read) that informed him of the ECC's role in "ultimately approv[ing]" his "individual" awards.  (*Id.*, ¶¶ 26-29).  Indeed, he believed that the ECC was the "ultimate authority" on these awards.  (Brown Tr. 35; Defendants' 56.1 Statement, ¶ 28).  Moreover, Brown admitted having read the ECC's charter, which states that, for "senior executives" (like Brown), the ECC must approve "severance arrangements...and any special or supplemental benefits" (like those offered under the VSP[3]) for them to be binding on State Street.  (Defendants' 56.1 Statement, ¶ 29).

<u>The ECC Declines To Approve Brown's Proposal To Spina.</u>

At the ECC's June 16, 2004 meeting, Spina informed the committee members of the conversation he had with Brown.  (*Id.*, ¶ 47).  At their request, on June 30, 2004, Spina sent a letter to Robert Weissman, chairman of the ECC, in which he (i) renewed his recommendation that the ECC approve a special benefits agreement with Brown and (ii) outlined the questions left open from his discussion with Brown that would have to be answered to do so.  (*Id.*, ¶¶ 51, 53-54).  Brown received a copy of this letter and thus knew that the ECC had not approved his request to Spina at its June 16th meeting.  (*Id.*, ¶¶ 52, 58).

---

[3] Even though Brown claims that the VSP was executed without any involvement of the ECC, *see* Pl. Mot. at 29, Luis de Ocejo, the officer primarily responsible for developing the program, did not seem to think so.  As de Ocejo testified: "My view has always been that the Board was the one that defined the parameters of the plan, so an expansion of the plan to include others than those that were presented to them it would have to seek their approval again."  (de Ocjeo Tr. 19; Defendants' Rule 56.1 Response to Plaintiff's Statement of Allegedly Undisputed Facts ("Defendants' 56.1 Response"), ¶ 16).

On September 15, 2004, the ECC considered whether to offer Brown the benefits he had discussed with Spina but ultimately decided not to. (*Id.*, ¶ 57). The evidence concerning this meeting makes two things clear: (1) not a single director on the ECC was in favor of awarding Brown the type of arrangement he had suggested to Spina and (2) they did not believe that they had to record a formal vote on Spina's recommendation because they were not implementing any specific action. (*Id.*, ¶¶ 57, 62; Defendants' 56.1 Response, ¶ 46, 57).

<u>Brown Learns Of The ECC's Position.</u>

Absolutely fatal to Brown's theory is the fact that, shortly after the ECC's September 15, 2004 meeting, Luis de Ocejo, then head of State Street's Human Resources department ("Human Resources"), told Brown that the ECC had reviewed his proposal but that "nothing [was] going to happen." (de Ocejo Tr. 40; Defendants' 56.1 Statement, ¶ 59). Moreover, in January 2005, Ronald Logue, State Street's current CEO, also told Brown that he did not believe he was entitled to receive VSP-like benefits at his discretion. (Logue Tr. 76; Defendants' 56.1 Response, ¶ 63; Affidavit of H. Schwartz dated September 28, 2006 ("Schwartz Aff."), Ex. 3). At no time after speaking with de Ocejo or Logue, however, did Brown do anything to clarify the situation. (Defendants' 56.1 Response, ¶ 86). The reason is clear: Brown knew that he did not have an agreement with State Street.

<u>Brown Resigns From SSgA.</u>

Indeed, Brown was more concerned with pursuing a bigger prize. (Defendants' 56.1 Statement, ¶ 63). After Timothy Harbert, then SSgA's CEO died in August 2004, Brown temporarily ascended to the number one position in SSgA and worked to make that appointment permanent. (*Id.*). Unsuccessful in doing so, Brown voluntarily resigned from SSgA in March 2005. (*Id.*, ¶ 64).

<u>Brown Did Not Act As If He Had A Multi-Million Dollar Agreement.</u>

If, prior to his resignation, Brown genuinely believed that he had a multi-million dollar agreement with State Street, he certainly did not act as if that were the case.  He waited over a year to contact Spina to clarify the issues they had initially discussed, and he never made any effort to execute a writing with him despite agreeing to do so.  (*Id.*, ¶¶ 39, 42, 62).  Moreover, he never attempted to clarify the status of his proposal after learning, from Spina's June 30, 2004 letter, that it was under review by the ECC.  (*Id.*, ¶ 58).  Nor did he try to do so after learning from both de Ocejo and Logue that no one shared in his belief that he was entitled to receive valuable benefits entirely at his option.  (*Id.*, ¶ 40; Defendants' 56.1 Response, ¶ 63).

## **Argument**

At the outset, Brown's portrayal of himself as unfairly disenfranchised from the VSP misstates the facts.  In reality, State Street offered the program only to *certain* of its U.S. employees because, as Brown knew, it wanted to reduce its costs solely in the United States.  (Defendants' 56.1 Statement, ¶ 33; Spina Tr. 9-10; Defendants' 56.1 Response, ¶ 11).  Moreover, Brown's plea that he should have been considered a U.S. employee ignores the fact that State Street did not even offer the VSP to all of its U.S. employees and that it had the unconditional right to exclude him, or anyone else, from the program.  (Defendants' 56.1 Statement, ¶¶ 9, 12).  In short, Brown had no right or entitlement whatsoever to participate in the VSP, and his mischaracterization of the events surrounding State Street's implementation of this program should be rejected out of hand.

## I.    BROWN'S THEORY OF RATIFICATION FAILS ON BOTH THE LAW AND THE FACTS.

The purpose of the doctrine of ratification is "to protect <u>innocent</u> third parties," or parties who have absolutely no reason to believe that the putative agent lacked authority to enter

into an agreement with them.  *The Evanston Bank v. ContiCommodity Services, Inc.*, 623 F.

Supp. 1014, 1034 (N.D. Ill. 1985) (emphasis added) (applying Illinois law).  It is for this reason

that courts routinely refuse to find ratification where, as here, "the party asserting it has

knowledge of or convenient access to facts contrary to those on which he purportedly relied."  *Id.*

at 1036; *see also Richards v. General Motors Corp.*, 876 F. Supp. 1492, 1507 (E.D. Mich. 1995)

("The operative word in the doctrine...is 'innocent.'") (omitting citation).

   Brown's ratification argument necessitates a presumption that he was completely

unaware the ECC was required to approve his proposal to Spina for it to be effective.  The

undisputed facts, however, conclusively demonstrate that the opposite is true and that Brown and

Spina specifically contemplated that any understanding they might reach would be subject to

ECC approval.  Having done so, Brown's effort to apply the doctrine here is merely an attempted

end run around his failure to obtain the necessary assent before.  *See* Def. Mem. at 20-21.

Moreover, given his prior testimony, Brown cannot even raise a genuine issue of material fact on

this subject and thus summary judgment should entered in favor of State Street.  *See id.*

   Even if Brown's "commitment," was not expressly or implicitly conditioned on

the ECC's approval, he still cannot prevail under his theory of ratification for two reasons.  First,

he cannot demonstrate that he relied to his detriment on anything State Street did after learning in

June 2004 of the conversation he had with Spina.  Second, he cannot prove that State Street's

conduct was consistent with an intent, constructive or otherwise, to ratify the agreement.

  A.  <u>Brown's Knowledge That The ECC's Approval Was Necessary To A Valid And
Enforceable Agreement With State Street Precludes His Theory Of Ratification.</u>

   Brown's portrayal of his conversation with Spina as a "run-of-the-mill" offer and

acceptance is at odds with a long list of facts showing both Brown and Spina understood that

many additional steps -- ECC approval, for example -- were necessary in order to effectuate an

agreement that would be binding on State Street. Most obviously, as Brown admitted, Spina made it clear to him that there were significant elements of what they had discussed "which were beyond his control." (Brown Tr. 103; Defendants' 56.1 Statement, ¶ 40). The entity who did have "control" over these matters was and still is the ECC, the committee charged with the fiduciary duty of overseeing the grant or modification of equity awards, severance arrangements and any special or supplemental benefits for senior executives, like Brown. (Defendants' 56.1 Statement, ¶¶ 4, 28-29).

Indeed, Brown already knew this. At his deposition, Brown specifically conceded that there was no doubt in his mind the ECC was the "ultimate authority" on granting and modifying equity awards. He also read the ECC's charter and reviewed every executive award agreement he had entered into with State Street, from which he learned that "[the ECC] reviews recommendations of the Chairman and CEO [here, Spina] and ultimately approves individual awards." (Defendants' 56.1 Statement, ¶ 28-29) (emphasis added). Reasonable jurors would not ignore Brown's sworn statements and thus would be compelled to find that he knew the ECC was the final authority on whether he received his proposed severance arrangement.

Even if Brown ignored everything that he had read and that Spina had initially told him, Spina reminded him again, when they next discussed Brown's proposal, that the ECC's involvement was necessary. In response to Brown's June 10, 2004 email, Spina reiterated to him that they only had a "first cut" at an agreement, which he intended to raise with the ECC at its next meeting. (Id., ¶ 46). Moreover, Spina concluded by telling Brown that he would have "more after [that] meeting." (Id.). Brown never responded to Spina's email because he knew the ECC's review was an inescapable part of the process.

These facts do not support a finding of ratification.  Rather, the doctrine of ratification is available only to protect third parties who justifiably believe that they have entered into valid agreements with the agent; it is not available where the third party (here, Brown) understands, from his own experience or from the agent's statements (here, Spina), that the principal's approval (here, State Street (through the ECC)) is a condition precedent to contract formation.  *See* RESTATEMENT (THIRD) OF AGENCY, § 4.01, comment b. (2006) (explaining that the only "legal consequence" of ratification is the creation of authority where none existed before; it does not create an agreement that the parties have failed to reach).

Instead, the situation here is more fairly analogous to the long line of Massachusetts cases which hold that there can be no ratification of an act of one who does not purport to commit the alleged ratifier.  *See* RESTATEMENT (THIRD) OF AGENCY, § 4.03; *Rezendes Family Ltd. P'ship v. Gates*, No. 02-civ-10029, 2003 WL 22951900, at *3 (D. Mass. Dec. 12, 2003) (no ratification where plaintiff ignored warnings that further approval was required and continued to believe it had a binding contract); *Marya v. Slakey,* 190 F. Supp. 2d 95, 102 n.3 (D. Mass. 2001) (no ratification where agent never informed plaintiffs that he was committing defendant); *Shapiro v. American Home Assurance Co.*, 584 F. Supp. 1245, 1252 (D. Mass. 1984) ("If the agent did not intend to act as agent...there can be no ratification...") (omitting citation); *Commercial Credit Corp. v. Stan Cross Buick, Inc.*, 180 N.E.2d 88, 92 (Mass. 1962) (no ratification where agent did not commit the principal); *Allen v. Liston Lumber Co.*, 183 N.E. 747, 749 (Mass. 1933) ("...there can be no ratification of the act of one not acting as agent."); *The Editors, Inc. v. The Westford Regency Inn, Inc.*, No. 9076, 1991 WL 35251, at *2-3 (Mass. App. Ct. Jan. 2, 1991) (no ratification where plaintiff knew agent had no final authority).

9

In *The Editors*, for example, the plaintiff attempted to invoke ratification to bind the defendant to proposals she had made to its agent. These proposals were presented to the defendant but were never approved. *The Editors*, 1991 WL 35251, at *2. The court rejected the plaintiff's ratification argument, finding she knew that only the defendant could make the final decision. *Id.* at *3. The same result follows here, where Spina specifically told Brown that there were material elements of what they had discussed over which he had no control and that he intended to bring the proposal to the ECC's attention. As in *The Editors*, Brown's knowledge that the ECC's approval was necessary to a valid agreement precludes him from recovering on a theory of ratification and entitles State Street to summary judgment on this issue.

B.    Even If Brown Did Not Know The ECC's Approval Was Required, His Theory of Ratification Still Fails.

Brown's argument that State Street ratified his purported agreement with Spina simply by declining to record a formal vote ignores two basic elements of the doctrine. To prevail on a theory of ratification, plaintiffs must also show (i) that they relied to their detriment on the principal's conduct and (ii) that such conduct was consistent with an intent to ratify the underlying act. *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 59 (1st Cir. 2002) (ratification requires "a manifestation of assent or other conduct indicative of consent by the principal." (citing RESTATEMENT (THIRD) OF AGENCY, § 4.01 (Draft No. 2, 2001)); RESTATEMENT (THIRD) OF AGENCY, § 4.01, comment f. (nonaction may constitute assent where the principal knows that third parties are relying on such silence). Whether ratification should be inferred is generally a question of fact to be answered in light of the surrounding circumstances. RESTATEMENT (SECOND) OF AGENCY, § 94, comment a. (1958). Yet, because Brown cannot prove these elements (nor does he try), his motion for summary judgment on his ratification theory should be denied and summary judgment should be entered in favor of State Street.

1.   Brown Cannot Demonstrate That He Relied To His Detriment.

Ratification may be inferred only where the party seeking a finding of ratification has detrimentally relied on the principal's actions or omissions. *See Inn Foods v. Equitable Co-Operative Bank*, 45 F.3d 594, 598 (1st Cir. 1995) (reasoning that ratification may be inferred only where principal's nonaction prevents third party from mitigating damages or perpetuates an inference that agent had authority); *Rex Lumber Co. v. Acton Block Co., Inc.*, 562 N.E.2d 845, 849-50 (Mass. App. Ct. 1990) (ratification found only where third party was "fully justified in assuming" that agent's action was binding on principal); *see also Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland Limited*, 835 F.2d 32, 36 (2d Cir. 1987) (applying New York law) (requiring that third party rely on principal's silence); *Julien J. Studley, Inc. v. Gulf Oil Corp.*, 282 F. Supp. 748, 752 (S.D.N.Y. 1968), *rev'd on other grounds*, 407 F.2d 521 (2d Cir. 1969) (same). Here, Brown asks the Court to infer ratification solely because the ECC members did not issue a formal vote on a recommendation they agreed they would never approve. Yet, there is no evidence that Brown relied to his detriment on this omission.

As an initial matter, Brown offers no proof to support his vague claims of reliance and detriment. Certainly, he does not establish a specific opportunity he walked away from after receiving Spina's June 30, 2004 letter, let alone something that would have paid him more money than what he was earning at State Street.

Nor can he establish either reliance or detriment here because, even under his own interpretation of his purported agreement with Spina, he was not required to do anything. At his deposition, Brown admitted that, while he believed his part of the bargain was to remain with SSgA, it was left "unstated" how long he was to do so. (Brown Tr. 112; Defendants' 56.1 Statement, ¶ 38). As a result, because he could have left SSgA at any time -- just as he could have before he procured his "commitment" from Spina -- Brown's position never changed.

Brown's argument in his moving papers that, even though he and Spina never addressed how long he was required to stay, their agreement nonetheless obligated him to "lead SSgA through this very difficult time," Pl. Mot. at 20, does nothing to help his case. This is so because, even under this *post hoc* interpretation, he satisfied his part of the bargain well before he claims the ECC first learned of and subsequently ratified the purported agreement.

According to Brown (and only Brown), "[t]he expectation was that the transition would take about a year," *id.*, but that SSgA may have "got there by about the end of March of 2004." (Brown Tr. 109-10; Schwartz Aff., Ex. 1). Putting aside the fact that he never shared this "expectation" with Spina (Defendants' 56.1 Response, ¶ 33), he also acknowledges that the ECC was not put on notice of the "commitment" until Weissman received Spina's June 30th letter -- almost three months after he claims to have discharged his obligations. As a result, to the extent he ignored head hunters and stayed with SSgA, he certainly could not have done so in reliance on any action or omission of the ECC. Rather, following Harbert's death in August 2004, Brown remained at SSgA for only one reason: to compete for SSgA's top position. (Brown Tr. 163; Defendants' 56.1 Statement, ¶ 63); *see also* Pl. Mot. at 5. When he failed to become SSgA's CEO, permanently, and his interests were no longer served by staying there, he sued State Street.

2.      Even If Brown Relied On The ECC's Omission, His Reliance Was Unreasonable.

Under the doctrine of ratification, the party seeking a finding of ratification must not only have relied on the principal's conduct, but such reliance must also have been reasonable. RESTATEMENT (THIRD) OF AGENCY, § 4.01 (principal can ratify act by either manifesting assent or by conduct "that justifies a reasonable assumption that the person so consents."). Here, the same undisputed facts showing that Brown knew the ECC's approval was

required for his proposal to become effective, *see supra*, at 6-8, demonstrate with greater force that any reliance Brown placed on the lack of a formal ECC vote was unreasonable.

Before he even suggested to Spina that he receive something similar to the VSP, Brown read document after document informing him that, for senior executives like him, only ECC-approved arrangements would be binding on State Street. Confronted with these written statements and Spina's persistent warnings to the same effect, Brown had no reasonable basis to rely on the absence of a formal ECC vote. *See Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 33-34 (1st Cir. 1988) (as a matter of law, reliance is unreasonable if parties act in a way contrary to their own acknowledged understanding of the facts); *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1031 (Mass. 2004) (while ordinarily a jury question, reliance in the face of contrary written statements is unreasonable as a matter of law).

The unreasonableness of Brown's reliance is further demonstrated by the fact that he did nothing to clarify his situation with the ECC or Human Resources after learning from de Ocejo, in September 2004, that the ECC would not approve his request. Just as he ignored his so-called promise from Spina for over a year, Brown did nothing after learning that the ECC was not going to approve his proposal to Spina. (Defendants' 56.1 Response, ¶ 86). His conduct in the face of that knowledge negates any finding that his reliance was reasonable (assuming there was reliance in the first place) and thus precludes him from establishing an essential element to his theory of recovery. No rational jury could conclude that a reasonable person, who believed he had a multi-million dollar commitment, would sit in silence after hearing firsthand that the commitment had been called in question. Yet, this is precisely what Brown did, no doubt actively contributing to, if not creating, the ECC's omission, rather than being misled by it.

C.    State Street's Conduct Was Inconsistent With An Intent To Ratify.

The final deficiency in Brown's attempt to invoke ratification is that his interpretation of the doctrine -- an agent's act, when discovered, is ratified merely by a principal's failure to "instantly" repudiate it -- is an oversimplification of the law.  More is required: the principal must also have acted in such a way that would cause third parties to reasonably believe that it consented to the agent's prior act.  *See, e.g.*, *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1123 (1st Cir. 1993) (no ratification where principal never assured third party that he had binding contract); *Rydman v. Dennison Mfg. Co.*, 366 N.E.2d 763, 764 (Mass. 1977) (no ratification where no officer with authority represented to plaintiff that he had a valid agreement); *Rezendes*, 2003 WL 22951900, at *3 (requiring express assent or conduct "justifiable only if" there were such assent).  As the Restatement explains, "[t]he act of ratification consists of an externally observable manifestation of assent to be bound by the prior act of another person." RESTATEMENT (THIRD) OF AGENCY, § 4.01, comment a.  Moreover, assent "must be clearly established and may not be inferred from doubtful or equivocal acts or language." *The Economists Advocate, LLC v. Cognitive Arts Corp.*, No. 01-cv-9468, 2004 WL 728874, at *9 (S.D.N.Y. Apr. 6, 2004) (omitting citation) (applying New York law); *In re Chandler*, 76 B.R. 927, 931 (Bankr. E.D.N.Y. 1987) (omitting citation) (same).

While a principal's silence can serve as some evidence that it assents to the prior transaction, silence alone is not ratification as a matter of law.  *The Evanston Bank*, 623 F. Supp. at 1036-37.  Typically, silence is not even evidence of acceptance unless the principal knows, or ought to know, that the third party is reasonably regarding its silence as assent.  12 Richard A. Lord, *Williston on Contracts* § 35:24 (4th ed. 2006); *see also* RESTATEMENT (THIRD) OF AGENCY, § 4.01, comment f. ("Failure to object may constitute such a manifestation [of assent] when the person has notice that others are likely to draw such an inference from silence.").

14

Here, even if Brown had reached an agreement with Spina, there is still no evidence State Street did anything that would justify a reasonable person in believing that it accepted Spina's actions. (Defendants' 56.1 Response, ¶ 87). Nor is there any evidence that it knew or should have known that Brown, for his own idiosyncratic reasons, believed Spina had the authority to commit millions of dollars of company assets to satisfy unwritten compensation agreements for its wealthiest officers.

Courts' application of the doctrine makes clear that Brown's burden of proving ratification is greater than he presumes it to be. For example, in *Linkage*, the court found that the principal ratified a renewal agreement, which its agent had entered into with the plaintiff, only because (i) after the agreement was executed, one of the principal's highest officers met with the plaintiff to discuss implementing the renewal agreement, as if it were approved, and (ii) the principal took advantage of provisions in the renewal agreement that allowed it to free itself from other obligations it owed the plaintiff under a related contract. *Linkage Corp. v. Trustees of Boston University*, 679 N.E.2d 191, 204-05 (Mass. 1997). Under *Linkage*, ratification should be inferred only where the principal interacts with the third party in such a manner that is inconsistent with an intent to repudiate the prior transaction.

*Lemanski v. Lenox Savings Bank*, No. Civ. A. 95-30074, 1996 WL 253315, at * (D. Mass. Apr. 12, 1996) supports this proposition. There, the plaintiff argued that the defendant's board of directors ratified a top hat plan (the "Brick Plan") implemented by one of its committees. In that case, there was no issue that the committee had, in fact, approved the Brick Plan or that the full board expressly voted to ratify this act. Rather, the issue was whether the board could void the Brick Plan as unauthorized on the basis that it was unaware this plan was among the actions it had voted to ratify. *Id.* at *9-11. Unlike here, this was a clear case of

ratification because, by voting to adopt its agent's actions, the board acted in such a way that caused its employees to believe that the Brick Plan was valid.

*Inn Foods* is to the same effect. There, the issue was whether a company, Atlantic, implicitly ratified its president's unauthorized deposit of Atlantic's money into his own personal account at a third-party bank. The court found ratification only because, unlike here, the third-party bank sought and received from Atlantic confirmation that the president had the authority to deposit such money in his own account. *Inn Foods*, 45 F.3d at 595, 597.

And in *Campbell v. Hospitality Motor Inns, Inc.*, 493 N.E.2d 239, 242 (Ohio 1986), the plaintiff raised a genuine issue of fact on his ratification argument only by presenting evidence that the defendant's actions were entirely consistent with an intent to ratify an agreement offered to him by an express resolution of the defendant's board of directors. These actions, none of which occurred here, included the defendant executing a written agreement with the plaintiff and making initial installment payments to him. *Id.* at 240.

As demonstrated by *Linkage Corp.*, *Lemanski*, *Inn Foods*, and *Campbell*, all of which are relied on by Brown, courts find ratification only where the principal acted in such a way to mislead an innocent third party into assuming the existence of a valid and enforceable agreement but then sought to void the agreement when it became advantageous to do so. Because no reasonable jury could agree that the ECC acted in such a way or that its members knew the omission of a formal vote would mislead Brown, his motion should be denied.

## II. BROWN'S MOTION FOR SUMMARY JUDGMENT ON HIS REMAINING CLAIMS IS WITHOUT FACTUAL SUPPORT AND SHOULD BE DENIED.

Perhaps as an afterthought, Brown argues that he is also entitled to summary judgment on his breach of contract and promissory estoppel claims. Yet, much like his theory of ratification, Brown's remaining claims are without evidentiary support and rely heavily on the

16

allegations in his amended complaint. As discussed in State Street's moving papers, there is no evidence in the record (i) that Brown and Spina ever progressed beyond a mere discussion of ideas or (ii) that Brown reasonably relied to his detriment on this vague conversation. *See* Def. Mem. at 14-25. Indeed, the undisputed facts demonstrate the complete opposite, thus entitling State Street to summary judgment on Brown's amended complaint. *Id.* Here, we address the specific factual and legal defects in the arguments Brown offers to support his remaining claims.

A.    Brown's Breach of Contract Claim Should Be Rejected.

Even assuming that Brown's failure to reduce his agreement with Spina to a signed, written contract as they had agreed does not preclude his breach of contract claim, *see* Def. Mem. at 18-19, for Brown to prevail, he must show that (i) he had a meeting of the minds with Spina on the material terms of the purported agreement and (ii) that Spina had authority, whether actual or apparent, to commit State Street. He can do neither.

1.    Brown Never Agreed With Spina On The Material Terms Of The Purported Agreement.

To support his claim that he reached an agreement with Spina on the material terms of a contract, Brown first points to his June 10, 2004 email to Spina, arguing that this concise email can be interpreted as the parties' agreement on the material terms. In reality, however, it shows neither the material terms nor any agreement on them. As Brown conceded at his deposition, this email was, "as you will appreciate, a rather short form to go through all of the detail concerned" and was thus incapable of capturing the material terms of his purported agreement with Spina, "which was relatively complex." (Brown Tr. 120; Defendants' 56.1 Statement, ¶ 45). Indeed, Brown did not intend the email to do more, because he had composed it for the sole purpose of "clarifying matters." (Defendants' 56.1 Statement, ¶ 44). Moreover,

Spina's refusal to agree that this email would reflect their final arrangement is demonstrated by his reply in which he told Brown that the June 10th email was only a "'first cut' at a record."

Next, Brown asserts that "[t]he final documentation of the agreement was Spina's June 30, 2004 letter to Weissman." Pl. Mot. at 18-19. Putting aside the fact that this letter was not even addressed to Brown and that it specifically requested further action from the ECC, Brown's reliance on Spina's letter is misplaced because this letter not only included less information than his June 10th email did but it also expressly stated that Spina and Brown had yet to determine how Brown's total pension benefits would even be calculated. (Defendants' 56.1 Statement, ¶ 53). Moreover, as Spina testified, he did not believe his June 30th letter could have reflected a complete agreement between him and Brown because their discussion of benefits in 2003 was left at a "high level." (Spina Tr. 28; Defendants' 56.1 Statement, ¶ 38).

Most obviously, they never agreed on how long Brown was obligated to remain at SSgA to receive his special benefits, a fact which Brown concedes. *See* Pl. Mot. at 20. Brown attempts to account for this deficiency by relying on his own self-serving testimony that he (alone) believed he had to stay at SSgA long enough to lead it through its period of "instability," a transition that he conveniently expected would take no longer than a year. Yet, even if Brown believed that this described his part of the bargain, under Massachusetts law, neither contracts nor the material terms necessary for their enforceability can be created unilaterally by the individual beliefs of only one party. *See* Def. Mem. at 14-18 (citing cases).

The "best evidence" on which Brown relies to show he had a definite agreement with Spina is the estimate prepared by Ooi in July 2004. *See* Pl. Mot. at 21. Once again, his reliance misses the point. As Brown has to acknowledge, *see id.* at 21 n.11, Ooi created this document based entirely on his own reading of the recommendation set forth in Spina's June

30th letter, yet because this letter lacked any specificity, Ooi could only prepare, what he described as, a "worst-case scenario." (Ooi Tr. 10; Defendants' 56.1 Statement, ¶ 56). Thus, even if Ooi's calculations contain some terms, which Brown no doubt seeks to incorporate, they do not show in any way that these were in fact the terms to which Brown and Spina had agreed.

Finally, Brown seemingly implies that the "detailed provisions of the EVSP" define what he agreed to with Spina. *See* Pl. Mot. at 20-21. This argument assumes, however, that Brown actually knew how the VSP would apply to him, an assumption that is again directly refuted by his own testimony. At his deposition, Brown admitted that "he reviewed general materials, but none obviously specific to [himself]." (Brown Tr. at 88; Defendants' 56.1 Statement, ¶ 32). Nor could he because he never saw the VSP plan documents until after he filed the present lawsuit. (Brown Tr. at 66; Defendants' 56.1 Statement, ¶ 32). Even so, Brown further conceded that his proposal to Spina was "clearly not the same agreement as the EVSP" (Brown Tr. at 119; Declaration of Rex Lee dated October 31, 2006, Ex. 49), and he offers no evidence that they reached an agreement on what ways it would be similar.

Realizing that no pre-existing document sets forth the material terms of the alleged agreement, Brown attempts in his memorandum of law to create these terms on his own. *See* Pl. Mot. at 20. Yet, a cursory glance of his description reveals that Brown has done nothing more than reword the text of his amended complaint (which itself incorporates the June 10, 2004 email that Brown has already disavowed as a complete or accurate summary of his discussion with Spina). Mere allegations, however, are insufficient to support a motion for summary judgment or to survive one. *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Thus, Brown's motion for summary judgment on his breach of contract claim should be denied.

2.    Spina Did Not Have Authority To Commit State Street.

Brown's argument that Spina had actual or apparent authority to commit State Street to unwritten compensation deals for the company's most senior executives, like him, again necessitates the assumption that Brown was unaware -- over the course of his ten years at State Street -- that the ECC was the final authority on executive compensation. As shown earlier, *supra*, at 6-8, this assumption is contradicted by the record. Thus, as an initial matter, Brown's claims of authority are precluded by his knowledge that Spina did not have the power to modify the terms of State Street's various compensation plans for executives' benefit. *See* Def. Mem. at 19-22. Under Massachusetts law, "[o]ne dealing with an agent with knowledge of the limitations on the agent's authority cannot hold the principal for acts of the agent outside those limitations." *Cooprider v. John Hancock Mutual Life Ins. Co.*, No. 91-11834, 1992 WL 396326, at *2 (D. Mass. Dec. 29, 1992) (omitting citation); *see also Ziv Television Programs, Inc. v. Duchaine*, 191 F. Supp. 27, 32 (D. Mass. 1961) (same).

In *Cooprider*, for example, the plaintiff alleged that the defendant breached an employment agreement he had entered into with the defendant's agent. The court found that the plaintiff's deposition testimony inescapably led to the conclusion that the plaintiff knew the agent lacked authority to bind the defendant to the agreement at issue. *Cooprider*, 1992 WL 396326, at *2. Granting the defendant's motion for summary judgment, the court also held that the plaintiff's knowledge of the limits on the agent's authority made it unnecessary to examine whether, as a matter of law, the agent had actual or apparent authority to commit the defendant. *Id.* So too here, because Brown knew there were significant aspects of his proposal "which were beyond [Spina's] control," it is unnecessary for the Court to determine whether Spina had actual or apparent authority to modify the terms of State Street's severance, equity and retirement plans

to grant Brown enhanced benefits to which he would not normally be entitled. Instead, Brown's motion as to this issue should be denied outright.

        a.    <u>Spina Did Not Have Actual Authority.</u>

Brown's argument that Spina had actual authority to commit State Street to an arrangement similar to the VSP rests entirely on the premise that the Board (including the ECC) played no role in the implementation of a cost-reduction program affecting thousands of State Street's employees. He argues that, because State Street's officers designed the VSP and implemented it, without Board approval, these officers, including Spina, had actual authority to determine who would be eligible. *See* Pl. Mot. at 22. This claim, however, is categorically refuted by the evidence, so much so that it cannot reasonably be at issue here.

The ECC minutes indisputably show that, on June 18, 2003, the ECC, by formal vote, approved the modifications to State Street's stock option and U.S. benefit plans that were necessary to implement the VSP. (Defendants' 56.1 Statement, ¶¶ 7-8). The minutes further indicate that at this same meeting, the ECC specified which employees would be eligible to participate in the program by reference to the criteria presented by management. (*Id.*). The documents outlining management's presentation, in turn, show that management proposed a program that would be limited to certain U.S. employees. (Defendants' 56.1 Response, ¶ 20).

Not only is Brown's factual argument wrong, but so is his application of the law. Actual authority exists only when the principal informs its agents either expressly or implicitly that they may act on its behalf. *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 729 N.E.2d 1113, 1120 (Mass. 2000). Here, if, as Brown claims, the ECC did not formally approve the VSP, including its eligibility requirements, that would not mean that management then had actual authority to develop or offer this program to whomever it wanted. Instead, it would mean that management had absolutely no authority to make these decisions and that, as a result, the entire program was,

in fact, invalid. Thus, Brown's argument not only fails to establish that Spina had actual authority but it undermines his authority even more.

b.     Spina Did Not Have Apparent Authority.

To establish that Spina had the apparent authority to orally modify the terms of State Street's compensation and retirement plans for the benefit of its most senior executives, Brown relies primarily on Spina's title. Yet, as discussed in State Street's moving papers, this is not enough. Def. Mem. at 22. Instead, Brown must show some conduct by State Street contradicting the consistent representations it made in his award agreements and the ECC charter of Spina's lack of authority (all of which he read) and thus causing him to reasonably believe that Spina had the authority to make oral award agreements. *Id.* at 21-23.

Brown attempts to make such a showing arguing that, since State Street had just offered the VSP to its employees and management was involved in developing the VSP, he was justified in assuming that Spina had the ability to make exceptions to the program's eligibility requirements. *See* Pl. Mot. at 25. This argument is again contradicted by his deposition testimony. There, as Brown conceded, the simple fact that State Street was able to offer the VSP at all implied that the ECC had first approved the parameters of the program. (Brown Tr. 79-80; Defendants' 56.1 Statement, ¶ 28).

Even if Brown's admissions do not reflect his full understanding of the situation, he nonetheless had a duty to investigate the limits of Spina's authority himself. *See Ferro Concrete Const. Co. v. United States*, 112 F.2d 488, 491 (1st Cir. 1940) ("It is of course an elementary rule of law that a person dealing with an alleged agent is bound to ascertain his authority...") (omitting citation); *Penta v. Concord Auto Auction, Inc.*, 511 N.E.2d 642, 646 (Mass. App. Ct. 1987) (only a written and unambiguous statement establishing authority relieves plaintiff of such duty). Yet, there is no evidence that Brown undertook to satisfy this duty.

Finally, Brown's reliance on *Linkage* is again misplaced.  There, the court found that the agent, Meng, had apparent authority to enter into a renewal agreement with the plaintiff for two reasons that are absent here.  First, Meng had negotiated and signed the underlying agreement that the parties were seeking to renew, and, second, the principal had communicated to the plaintiff that Meng was its official representative with respect to these matters.  *Linkage Corp.*, 679 N.E.2d at 203.  Moreover, while the court chose not to consider certain written statements as dispositive of the agent's lack of authority, this was only so because, unlike here, the plaintiff had offered substantial evidence of the defendant consistently transacting business in violation of these written mandates.  *Id.*  The opposite result follows here, where there is no evidence that State Street has ever provided special benefits to its senior executives without the involvement of the ECC or that, as a public company, it authorized its CEO to privately negotiate and orally commit it to rich benefits arrangements for its wealthiest and most powerful senior executives, in violation of the terms of its underlying benefit plans.[4]

B.    <u>Summary Judgment Is Inappropriate On Brown's Promissory Estoppel Claim.</u>

State Street's moving papers demonstrate that, as an initial matter, Brown's claim for promissory estoppel fails because to prevail on such a claim, Brown still must prove the existence of definite agreement, which he cannot do.  Def. Mem. at 29.

---

[4] Brown's use of Ronald Logue's deposition testimony is an attempt to distort the burden of proof that he cannot satisfy.  First, as an initial matter, Mr. Logue properly submitted clarifications to his deposition within the thirty-day period agreed upon by the parties.  The cases Brown cites in support of his proposition are completely inapplicable because they only address the situation, not present here, where a party offers an affidavit in support of an opposition to a motion for summary judgment solely for the purpose of creating an issue of material fact.  Indeed, Brown's interpretation suggests that deponents should never review their deposition transcripts or provide clarifications or corrections when necessary.

Moreover, Mr. Logue's testimony, even without the clarifications he provided, is irrelevant to the real issue, which Brown is seemingly hoping to avoid, of whether he -- and not anyone else -- reasonably believed that Spina had authority.  This, he cannot show for the reasons set forth here and in State Street's moving papers.  *See* Def. Mem. at 21-22.

Summary judgment on his promissory estoppel claim should be denied (and should, in fact, be granted on State Street's motion) for two additional reasons. First, Brown cannot show that he relied on his conversation with Spina or, even if he did, that he did so to his detriment. As discussed earlier, Brown claims he so relied by ignoring head hunters and remaining with State Street, yet, even under his version of the facts, he was not required by the terms of his purported agreement to do either. *Supra*, at 10-12; *see also* Def. Mem. at 15, 23-24.

Brown vaguely asserts that he also refrained from seeking legal advice concerning his ineligibility for the VSP. The fact that he was represented by an employment lawyer throughout his time at SSgA, however, demonstrates that this assertion is disingenuous. Moreover, there is certainly no evidence that he would have benefited from such a frivolous lawsuit. Nor is there any evidence that Spina knew Brown contemplated bringing a baseless legal action and thus intended to induce him from doing so.

Second, any reliance Brown placed on Spina's vague and indefinite assurance that he "would go and do [his] best to get what [he] could get," which never turned into a written agreement as they both had expected, is unreasonable as a matter of law. *See Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 647 N.E.2d 1174, 1179 (Mass. 1995) (holding reliance was unreasonable as a matter of law where parties failed to execute a written agreement as intended); *see also* Def. Mem. at 24-25 (citing cases). That Brown ignored the matter for over a year and then sat silently by after learning that the ECC would not approve his request further makes plain the unreasonableness of any reliance he placed in his conversation with Spina over three years ago. *Supra*, at 10-13. For promissory estoppel to apply, Massachusetts law requires more than just a showing that Spina hoped Brown would stay at SSgA. Because Brown cannot make a showing greater than that, his motion for summary judgment should be denied.

## Conclusion

For these reasons and those set forth in Defendant's Memorandum of Law in Support of Their Motion for Summary Judgment (D.E. 52), Brown's motion should denied in its entirety and summary judgment should be granted in favor of State Street.

Dated:    New York, New York
         October 31, 2006

Respectfully submitted,

QUINN EMANUEL URQUHART
   OLIVER & HEDGES, LLP

By:  ____/s/ Peter Calamari_____
      Peter E. Calamari (*Pro Hac Vice*)
      Rex Lee (*Pro Hac Vice*)

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

HARE & CHAFFIN

By:  ____/s/ David B. Chaffin_____
      David B. Chaffin
      BBO No. 549245

160 Federal Street
Boston, MA  02110
(610) 330-5000

*Attorneys for Defendants*
   *State Street Corporation*
   *and State Street Global Advisors*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 31, 2006.

_____/s/ Rex Lee_____