UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------- x
ALAN BROWN,                                            :      Case No. 05 Civ. 11178 (NG)
                                                       :
                               Plaintiff,              :
                                                       :      DECLARATION OF REX LEE
               -against-                               :
                                                       :
STATE STREET CORPORATION                               :
and STATE STREET GLOBAL                                :
ADVISORS,                                              :
                                                       :
                               Defendants.             :
------------------------------------------------------- x
```

I, REX LEE, under penalty of perjury, do declare:

1.     I am an associate of the firm of Quinn Emanuel Urquhart Oliver &
Hedges, LLP and a member of the bar of the State of New York.  I have also been admitted *pro
hac vice* before this Court.  I submit this declaration in opposition to plaintiff Alan Brown's
motion for summary judgment dated September 28, 2006, and in support of defendants State
Street Corporation's (the "Corporation") and State Street Global Advisors' ("SSgA")
(collectively, "State Street") motion for summary judgment dated September 26, 2006, to place
before the Court the documents and materials relied up on by State Street.

2.     Attached as Exhibit 49 are true and correct copies of select pages from the
transcript of the deposition of Alan J. Brown taken April 24, 2006.

3.     Attached as Exhibit 50 is a true and correct copy of a document entitled
"State Street Corporation 1997 Equity Incentive Plan UK Subplan," adopted June 18, 1998,
which bears the Bates Numbers Plaintiff 140 through Plaintiff 154.

4.     Attached as Exhibit 51 are true and correct copies of select pages from the
transcript of the deposition of David A. Spina taken May 31, 2006.

5.    Attached as Exhibit 52 are true and correct copies of select pages from the transcript of the deposition of Luis de Ocejo taken May 23, 2006.

6.    Attached as Exhibit 53 are true and correct copies of select pages from the transcript of the deposition of Ronald Logue taken May 8, 2006.

7.    Attached as Exhibit 54 are true and correct copies of select pages from the transcript of the deposition of Richard P. Sergel taken May 26, 2006.

8.    Attached as Exhibit 55 are true and correct copies of select pages from the transcript of the deposition of Linda Hill taken May 23, 2006.

9.    Attached as Exhibit 56 are true and correct copies of select pages from the transcript of the deposition of Robert Weissman taken July 13, 2006.

Dated: New York, New York
      October 31, 2006

                                        /s/ Rex Lee
                                        Rex Lee

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 31, 2006.

                                        /s/ Rex Lee

# EXHIBIT 49

Page 1

1    Volume:  I
     Pages: 190
     Exhibits: 25
2

3              UNITED STATES DISTRICT COURT

4              DISTRICT OF MASSACHUSETTS

5

6
     ALAN BROWN,
7                         Plaintiff
                                        Docket No.
8              vs.                      05 CIV 1178(NG)

9    STATE STREET CORPORATION and
     STATE STREET GLOBAL ADVISORS,
10                        Defendant

11

12

13              VIDEOTAPED DEPOSITION of ALAN BROWN, a
     witness called by and on behalf of the Defendant, taken
14   pursuant to the Federal Rules of Civil Procedure,
     videotaped by Craig Newman of Valed Videography
15   Services, before Cynthia F. Stutz, Certified Shorthand
     Reporter and Notary Public in and for the Commonwealth
16   of Massachusetts, at the offices of Hare & Chaffin, 160
     Federal Street, Boston, Massachusetts, on Monday, April
17   24, 2006, commencing at 10:31 a.m.

18

19

20

21

22

23

24

ALAN BROWN
4-24-06

Page 12

1      A.    Christ's.

2      Q.    And before that?

3      A.    Cranley.

4      Q.    Okay.  Are you a citizen of the United States?

5      A.    No.

6      Q.    Do you pay taxes in the United States?

7      A.    No.

8      Q.    Have you ever paid taxes in the United States?

9      A.    Only withholding taxes.

10     Q.    And did you get those taxes refunded?

11     A.    No.

12     Q.    So did you file U.S. tax returns?

13     A.    No.

14     Q.    Could you explain how you could have taxes

15     withheld, but not file tax returns?

16     A.    Yes.  On dividend income, for example, if you

17     are a non-U.S. citizen, an alien, then taxes are

18     withheld.

19     Q.    Okay.  And was that the nature of the

20     withholding taxes that you were referring to, dividend

21     income?

22     A.    Yes, yes.

23     Q.    Did you have any income taxes that you paid as

24     a result of your salary, bonus compensation?

ALAN BROWN
4-24-06

Page 13

1      A.    No.

2      Q.    Okay.  How did you come to join State Street?

3      A.    I was approached by State Street.

4      Q.    And did they approach you directly or through

5   a headhunter?

6      A.    They approached me directly.

7      Q.    And who approached you?

8      A.    An individual called Tony Ryan.

9      Q.    And did you negotiate an employment

10  arrangement with State Street?

11     A.    I did.

12     Q.    How did you negotiate that employment

13  arrangement?

14     A.    I had legal advice, the presence of my wife.

15     Q.    Was it a -- Did you negotiate a formal

16  employment contract?

17     A.    Yes.

18                  (Brown Exhibit No. 1 marked

19                  for identification.)

20     Q.    I show you, let me show you a document that's

21  marked as Brown Exhibit 1 and Brown Exhibit 1 consists

22  of a series of documents that are stapled together, I

23  believe, is that correct?

24     A.    Yes.

ALAN BROWN
4-24-06

Page 92

1    job was a truly global one and therefore could have

2    been considered to be eligible for the program.

3        Q.    You had no U.K. role?

4        A.    Other than being the chairman of the U.K.

5    company, no.

6        Q.    You don't regard that as a U.K. role?

7        A.    The principal executive function that was

8    carried out by the managing director, Nigel Wightman.

9        Q.    I thought before you described the chairman

10   role as the Number 1 spot?

11       A.    That was the chairman of SSgA.

12       Q.    The same would not hold true for the chairman

13   of the U.K. entity?

14       A.    No, it wouldn't, because the chairman role in

15   SSgA was very much an executive role.  The executive,

16   senior executive carrying out the day-to-day management

17   of the U.K. company was the managing director.

18       Q.    Okay.  So you don't think the chairman role

19   was a role in the U.K. company.  How many weeks a month

20   did you stay in the U.K.?

21       A.    At what point in time?

22       Q.    At this point in time.

23       A.    Okay.  I was in the U.K. somewhere around

24   about between seven and eight months of the year.

ALAN BROWN
4-24-06

Page 94

1    A.    I don't know specific names, but if there were

2    U.S. ex-pats out there who had not gone local, I

3    believe they were eligible.

4    Q.    Other than a U.S. ex-pat, the employees were

5    on the payroll?

6    A.    No.

7    Q.    No.  They were not eligible, right?

8    A.    No.

9    Q.    No different than you?

10    A.    In terms of the fact that they didn't receive

11    an offer, no different than me.

12    Q.    Okay.  And I mentioned to you before the fact

13    that State Street had the ability to designate specific

14    people as not eligible, even if they technically were

15    eligible.  Do you recall that?

16    A.    I do recall you mentioning that.

17    Q.    Do you recall that that was the fact or are

18    you just recall that I asked you about that?

19    A.    I recall that it was a fact.

20    Q.    And but you couldn't recall any employee who

21    was designated in that fashion?

22    A.    I believe David Spina and Ed Resch and

23    possibly Ron Logue may have been so designated.

24    Q.    Anybody else you can think of?

ALAN BROWN
4-24-06

Page 106

1          Let me go on to what David was agreeing

2    to.  You mentioned -- Was that the whole of your

3    conversation, the second conversation?

4        A.   As it related to this.

5        Q.   Right, okay.  Did you have occasion to talk to

6    David again about it?

7        A.   Not to talk, no.

8        Q.   So that was the last conversation you had with

9    David about this arrangement?

10       A.   Until the 28th of February 2005.

11       Q.   Right, okay, sorry.  And you said David -- I'm

12   sorry.  Did you say that it has to be put in writing?

13       A.   Yes.

14       Q.   Okay.  And did you attempt to put it in

15   writing?

16       A.   I did, after a gap of some time, in 2004.

17       Q.   But you didn't attempt to do anything at that

18   point in time?

19       A.   No, because David had said he would get back

20   to me with something in writing.

21       Q.   Well, he didn't get back to you a week,

22   two weeks later?

23       A.   He didn't.  David suffered a heart condition

24   and had to go into hospital and, I think the technical

ALAN BROWN
4-24-06

Page 107

1    term is have stents put in or something like that.   And

2    I said I certainly wasn't going to try and add to his

3    pressure of what was obviously a difficult time.

4        Q.   How long was he out of work because of the

5    heart condition?

6        A.   I think he started to come back in towards the

7    end of Q3, Q4, somewhere around there.

8        Q.   And when did he go out because of the heart

9    condition?

10       A.   I don't recall.

11       Q.   Well --

12       A.   I think it was July or something like that,

13   but I don't recall the exact date.

14       Q.   Well, Q3 is starts in July, right?

15       A.   Yes.

16       Q.   And Q4 goes all the way to December?

17       A.   Yes.

18       Q.   So was he out that whole six months?

19       A.   He wasn't totally out.   I mean, when he came

20   back to work he phased -- As you would expect, he

21   phased that in.   So he didn't, for example, to the best

22   of my recollection, he didn't take up any overseas

23   travel until the following year, for example, I don't

24   think.

ALAN BROWN
4-24-06

Page 111

1    A.    Once you get out to six months or beyond, you

2    have to make some judgment as to whether SSgA had been

3    put back onto an even keel or not.  I believe that

4    there were some events which allow one to signal that

5    as being somewhere around the end of the first quarter

6    of 2004.

7    Q.    Any of this show up in any writing anywhere

8    that you've ever seen?

9    A.    Well, certainly the events that I have in my

10   head were in writing, but not as part of the agreement

11   process with David.

12   Q.    In other words, this is something in your

13   head, but was it part of the agreement that you

14   reached?

15   A.    No.

16   Q.    And arguably, at least as I understand the

17   agreement, you could have quit -- Strike that.

18              As I understand the alleged agreement,

19   you could have walked out the door the very next day

20   and opted for these benefits?

21   A.    I think that would have been entirely counter

22   to the spirit of the agreement that we entered into.

23   Q.    Would it have been consistent with the spirit

24   of the agreement that you entered into that you would

ALAN BROWN
4-24-06

Page 119

1    language that says you're entitled to a severance

2    package similar to that of the VSP.  Is that the same

3    as a membership in the VSP or is it something similar

4    to it?

5        A.    It's something similar to it.

6        Q.    But it was not the VSP itself?

7                MR. SCHWARTZ:  Objection to the form.

8        A.   It's clearly not the same agreement as the

9    EVSP.  It can't be, because it's not identical to it.

10   We've already discussed that.

11       Q.    Well, is it similar to it or is it a

12   modification of it?  Are those words difficult for you

13   to understand the difference between the word similar

14   and the word modification?

15       A.    Yes, they are.  I'm not sure of the import of

16   those two.

17       Q.    Well, they're your words.

18       A.    Yeah, I used the word similar.  Similar could

19   include a modification, but similar doesn't necessarily

20   have to.  Are you with me?

21       Q.    Which is it?  Which did you think you were

22   getting?

23       A.    A severance package similar to that of the

24   VSP.

# EXHIBIT 50

**STATE STREET CORPORATION**
**1997 EQUITY INCENTIVE PLAN**
**UK SUBPLAN**

Adopted by the Company on 18 June 1998
and approved by the Inland Revenue under
Schedule 9 ICTA 88 on 25 June 1998 under reference X19509/PC

**ERNST & YOUNG**
**7 Rolls House**
**Rolls Buildings**
**Fetter Lane**
**LONDON, EC4A 1NH**
**Tel: 0171-928-2000**

FINAL - 3 JULY 1998
P:\WORD\PRP\SXP\CLIENT\STATE STREET\RULES

Plaintiff 140

## STATE STREET CORPORATION

## 1997 EQUITY INCENTIVE PLAN

## UK SUBPLAN

### INDEX

| Clause Heading | Clause Number |
|---|---|
| DEFINITIONS AND INTERPRETATION | 1 |
|     Additional Definitions | 1.1 |
|     Amended Definitions | 1.2 |
|     Interpretations | 1.3 |
|     Statutory Provisions | 1.4 |
|     Clause Headings | 1.5 |
| LIFE OF THE SUBPLAN | 2 |
| INDIVIDUAL LIMITS | 3 |
|     Revenue Limit | 3.1 |
|     Market Value | 3.2 |
| GRANT OF OPTIONS | 4 |
|     Committee Discretion | 4.1 |
|     Acquisition Price | 4.2 |
|     Performance Condition | 4.3 |
| OPTION CERTIFICATES | 5 |
|     Issue | 5.1 |
|     Content | 5.2 |
| RIGHTS TO EXERCISE OPTIONS | 6 |
|     General Exercise Rights | 6.1 |
|     Latest Exercise Date | 6.2 |
|     Termination of Employment | 6.3 |
|     Change of Control | 6.4 |
|     Material Interest | 6.5 |
|     Performance Conditions | 6.6 |
|     Lapse of Rights | 6.7 |

Plaintiff 141

**INDEX (cont'd)**

| Clause Heading | Clause Number |
|---|---|
| EXERCISE OF OPTION | 7 |
| Notice | 7.1 |
| Partial Exercise | 7.2 |
| Allotment | 7.3 |
| Stock Certificates | 7.4 |
| Ranking of Stock | 7.5 |
| EXCHANGE OF OPTIONS ON A TAKEOVER | 8 |
| Replacement of Options | 8.1 |
| Option Certificates | 8.2 |
| Lapse of Options | 8.3 |
| No Immediate Exercise | 8.4 |
| VARIATION OF CAPITAL | 9 |
| Adjustment | 9.1 |
| Inland Revenue Approval | 9.2 |
| Notice of Adjustment | 9.3 |
| ADMINISTRATION AND ALTERATION | 10 |
| Committee Decisions | 10.1 |
| Amendments | 10.2 |
| Inland Revenue Consent | 10.3 |
| Circulars | 10.4 |
| GENERAL | 11 |
| Availability of Stock | 11.1 |
| Employment Rights | 11.2 |
| Non-Admission | 11.3 |
| Consequence of Lapse | 11.4 |
| Transfer, Assignment or Charge | 11.5 |
| Termination | 11.6 |
| Notices | 11.7 |
| Law | 11.8 |
| DISAPPLIED PROVISIONS | 12 |

Plaintiff 142

**STATE STREET CORPORATION**
**1997 EQUITY INCENTIVE PLAN**
**UK SUBPLAN**

Scheme Rules approved under Section 185 and Schedule 9
Income and Corporation Taxes Act 1988

The purpose of this plan for UK based Participants is to obtain Approved Scheme status for UK Participants under the Plan (the "Subplan"). These rules are to be read as a continuation of the Plan and only modify the Options granted under the Plan to UK based Participants. These rules do not add to or modify the Plan in respect of any other category of Participant and the Committee has adopted these additional rules in accordance with Section 2.

1.    DEFINITIONS AND INTERPRETATION

1.1.   **Additional Definitions:**  The following additional definitions shall have the respective meanings set out below:-

| | |
|---|---|
| *"Acquisition Price"* | means the price at which each share  of Stock subject to an Option may be acquired on the exercise of that Option as determined pursuant to Rule 4.2; |
| *"Approved Scheme"* | means a scheme established by the Company or by any Associated Company and approved by the Board of Inland Revenue under Paragraph 1 of Schedule 9; |
| *"Associated Company"* | means any associated company of the Company within the meaning of Section 416 of the Taxes Act; |
| *"the Auditors"* | means the auditors of the Company for the time being; |
| *"the Commencement Date"* | means the date on which the Company received notice that the Subplan has been approved by the Board of Inland Revenue under Paragraph 1 of Schedule 9 Provided That the Subplan has been approved by the Committee; |
| *"Exercise Period"* | means a period designated by or in accordance with the Rules as the period during which the relevant vested Option may be exercised; |
| *"Grant Date"* | means in relation to an Option the date on which the Option was or is to be granted; |

Plaintiff 143

2

| | |
|---|---|
| *"the Grantor"* | means the grantor of any Option pursuant to Rule 4; |
| *"Market Value"* | means |

on any day when the Stock is not listed on the New York Stock Exchange the market value on the Date of Grant of such Stock determined in accordance with the provisions of Part VIII of the Taxation of Chargeable Gains act 1992 and agreed in advance for the purposes of the Subplan with the Inland Revenue Shares Valuation Division; or

on any day when the Stock is listed on the New York Stock Exchange the closing price of a share of Stock on such exchange on the Grant Date converted into pounds Sterling ;

| | |
|---|---|
| *"Materially Interested Person"* | means a director or employee of any one or more of the Participating Companies who at any relevant time has, or within the relevant preceding twelve (12) months has had, a material interest (as defined in Section 187(3) of the Taxes Act) in the Company or in a company which has control of the Company or which is a member of a consortium which owns the Company, if the Company or any such company is at any relevant time a close company for the purposes of Paragraph 8 of Schedule 9; |
| *"Option Certificate"* | means a certificate recording the terms of grant of an Option in accordance with the Rules; |
| *"Option Holder"* | means any person who holds an Option granted under the Subplan or (where the context admits) his legal personal representative(s); |
| *"Participating Company"* | means the Company and any company of which the Company has control (being control as defined by section 840 of the Taxes Act), but excluding any company which is for the time being specified by the Board as not being a Participating Company; |
| *"the Subplan"* | means part of the Plan for UK based Participants as from time to time constituted by the Rules; |
| *"Qualifying Employee"* | means any person who devotes substantially the whole of their working time to the business of the Company and who is not a Materially Interested Person and who is an employee or full-time director employed by any one or more of the Participating Companies (and for the purposes of this definition a |

Plaintiff 144

director will be regarded as 'full-time' if his terms of employment require him to devote to the duties of his office not less than twenty five (25) hours per week excluding meal breaks);

| | |
|---|---|
| "*the Rules*" | means the rules of the Subplan as from time to time amended; |
| "*Savings-Related Scheme*" | means a savings-related share option scheme as defined in Paragraph 1 of Schedule 9; |
| "*Schedule 9*" | means Schedule 9 to the Taxes Act; |
| "*Subsisting Option*" | means an Option whether vested or not which has not been exercised to the full extent possible under the Rules and which has not lapsed, been cancelled or otherwise terminated; |
| "*Taxes Act*" | means the Income and Corporation Taxes Act 1988; |
| "*Vesting Schedule*" | means the number of and period of time over which an Option shall vest and become capable of exercise in accordance with these Rules. |

1.2.    **Amended Definitions**:  The following definitions in the Plan shall be modified as set forth below in relation to Options granted under this Subplan only and shall be construed as so throughout the Subplan:-

| | |
|---|---|
| "*Option*" | means an option to acquire Stock by purchase or subscription granted (whether by the Company or a third party) pursuant to the Rules; |
| "*Stock*" | means the common stock of the Company which complies with Paragraphs 10 to 14 of Schedule 9. |

1.3    **Interpretation**:  Where the context so admits the singular includes the plural and each gender includes each other gender.

1.4    **Statutory Provisions**:  Any reference to a statutory provision is to be construed as a reference to that provision as for the time being amended or re-enacted.

1.5    **Clause headings**:  Any clause headings shall be ignored in interpretation of these Rules.

2.    LIFE OF THE SUBPLAN

This Subplan shall commence on the Commencement Date.

Plaintiff 145

3.    **INDIVIDUAL LIMITS**

3.1   **Revenue Limit:**  Any Option granted to any Qualifying Employee shall be limited and take effect so that it does not result in the aggregate Market Value of the Stock which he may acquire on the exercise of:

(a)    the Option; and

(b)    any other then Subsisting Options; and

(c)    any other then subsisting options granted under any other share option scheme established by the Company or any Subsidiary (being an Approved Scheme but not a Savings-Related Scheme)

exceeding or further exceeding £30,000.

3.2   **Market Values:**   In determining market values for the purposes of this Rule, the calculation shall be made by reference to the market value of the relevant Stock on the date on which each Option was granted in accordance with the provisions of its respective option scheme.

4.    **GRANT OF OPTIONS**

4.1   **Committee Discretion:**  If in its absolute discretion it thinks fit, the Committee or any delegates then may grant or procure the grant of an Option to a Qualifying Employee over such number of shares of Stock as the Committee may determine Provided That no Option shall be granted unless and until this Subplan becomes an Approved Scheme.

4.2   **Acquisition Price:**  Subject to Rules 8 and 9, the price at which each share of Stock subject to an Option may be acquired on the exercise of that Option shall be not less than its Market Value and subject thereto shall be such sum as the Grantor shall decide and cause to be stated in that respect in the relevant Option Certificate.

4.3   **Performance Condition:**   The grant of any Option may be made upon such performance condition or conditions as to exercise as may from time to time be selected by the Committee or (as appropriate) the Grantor Provided That any such condition(s) must be objective and specified at the Grant Date.

5.    **OPTION CERTIFICATES**

5.1   **Issue:**  All Options shall be granted by a certificate (duly executed by the Grantor as a deed).

5.2   **Content:**  The Option Certificate shall:-

(a)    state the Grant Date of the Option;

Plaintiff 146

6

(b)     state the number of shares of Stock subject to the Option;

(c)     state the Acquisition Price payable for each share of Stock under the Option;

(d)     state the Vesting Schedule of the Option (if any);

(e)     provide that the Option is granted subject to all the provisions of these Rules and in particular the provisions of Rule 11.5;

(f)     where the exercise of an Option granted will be conditional upon the satisfaction of performance criteria, draw attention to such criteria; and

(g)     subject to these conditions, be in such form as the Committee or any delegate may from time to time prescribe.

## 6.     RIGHTS TO EXERCISE OPTIONS

6.1     **General Exercise Rights:**  Subject as otherwise herein provided an Option or (as the case may be) the balance of an Option pursuant to Rule 7.2 ("the Partial Option") may be exercised at any time to the extent that the Option has vested in accordance with the Vesting Schedule.

6.2     **Latest Exercise Date:**  No Option shall be capable of exercise after five o'clock in the afternoon (5.00pm) GMT on the day prior to the tenth anniversary of its Grant Date or after such earlier date as may be specified in that respect in the Option Certificate.

6.3     **Termination of Employment:**  The right to exercise an Option shall terminate on the expiry of the time periods set out below:

(a)     where the holder of an Option dies before exercising the Option whether or not it has vested in accordance with the Vesting Schedule, it may be exercised in full by his personal representatives within twelve (12) months of the date of death;

(b)     where the holder of an Option ceases to be a Qualifying Employee by reason of:-

(i)     disability (evidenced to the satisfaction of the Committee); or

(ii)     retirement at or after the normal or early retirement age under any retirement plan or supplemental retirement agreement maintained by the Company or any subsidiary

then subject to Rule 6.4 and Rules 6.5 to 6.7 the Option to the extent it has vested in accordance with the Vesting Schedule or on such accelerated basis as the Committee may determine may be exercised no later than:-

Plaintiff 147

7

(1)     twelve (12) months after the Option or the last instalment of such Option first becomes capable of exercise; or

(2)     six (6) months after the later of the third anniversary of its Grant Date and the third anniversary of the Option Holder's most recent previous exercise of an option obtained under this or any other Approved Scheme (not being a Savings-Related Scheme) in circumstances in which Paragraphs (a) and (b) of Section 185(3) of the Act applied and which thereby enjoyed relief from income tax; or

(3)     three (3) months after such cessation.

whichever shall allow the longer period and any part of an Option which remains unvested at the expiry of such period shall lapse;

(c)     where the holder of an Option ceases to be a Qualifying Employee for any other reason, Options that had not vested immediately prior to the cessation shall lapse at the time of such cessation. Any Options that had vested immediately prior to the cessation will continue to be exercisable for a period of three (3) months and shall lapse thereupon. If the Option Holder should die within such three (3) month period, the Option will be exercisable (to the extent that it had vested immediately prior to death) for a period of twelve (12) months from the cessation.

6.4     **Change of Control:**

6.4.1   **Effect of Change of Control:**  If there is a Change of Control of the Company each holder of an Option will be made an offer to permit the exercise of each Subsisting Option to the full extent outstanding subject to Rule 6.4.3 and may be given an offer to replace the Subsisting Option to the full extent outstanding with a new option pursuant to Rule 8;

6.4.2   **The Change of Control Notice and Response:**  Upon such a Change of Control, the Company and/or (as appropriate) the Offeror and the Grantor shall forthwith serve on each Option Holder written notice ("the Change of Control Notice") of the Change of Control and therein shall offer to him one or more of the offers specified in Rule 6.4.1 and any holder of a Subsisting Option wishing to accept the same must serve on the Company written acceptance thereof ("the Response") within such period specified in the Change of Control Notice.

6.4.3   **Priority of Change of Control:**  Immediately upon any Change of Control the provisions of Rule 6.4 and the rights of Option Holders thereunder shall apply to the exclusion of any and all other rights to exercise Options under Rules 6.1, 6.3, 6.5 and 6.6 save that an Option shall in no circumstances be capable of exercise more than seven (7) months after the date of the Option Holder's death.

6.5     **Material Interest:**  An Option may not be exercised at any time when the holder is a Materially Interested Person.

Plaintiff 148

6.6    **Performance Conditions:**  An Option may not be exercised until the performance criteria, if any, applying pursuant to Rule 4.3 are satisfied Provided That nothing in this Rule shall prevent the exercise of an Option:-

    (a)      pursuant to Rules 6.3(a), 6.3(b)(i)(ii), 6.3(c), or  6.4; or

    (b)      granted pursuant to Rule 8; or

    (c)      where prior to exercise events cause the Committee and (as the case may be) the Grantor to consider that the satisfaction of different conditions (being no more difficult for the Option Holder to satisfy) prior to exercise of the Option would be a fairer measure of the performance of the Option Holder and acting fairly and reasonably the Committee or the Grantor (as the case may be) varies such condition, and such varied condition has been satisfied.

6.7    **Lapse of Rights:**  Save to the extent then already exercised, an Option shall lapse and cease to be exercisable on the earliest of the following:-

    (a)      at five o'clock in the afternoon (5.00pm) GMT on the day prior to the tenth anniversary of its Grant Date or on such earlier dates as may be specified in that respect in the Option Certificate;

    (b)      at five o'clock in the afternoon (5.00pm) GMT on the expiry date of any Exercise Period;

    (c)      upon the expiry of the time periods specified in Rules 6.3 and 6.4;

    (d)      upon the non acceptance of any of the offers made to the Option Holder under Rule 6.4.1 within the time period specified in that offer;

    (e)      save to the extent permitted pursuant to these Rules immediately upon the Option Holder purporting to transfer, assign or charge his Option or otherwise doing or omitting to do anything as a result of which he ceases to be the legal and beneficial owner of the Option.

## 7.    EXERCISE OF OPTION

7.1    **Notice:**  Subject to Rules 6 and 7.2, an Option (whether granted by the Company or a third party) may be exercised in respect of all or any part of the shares of Stock which are subject to it by delivery of a notice in writing together with payment of or authority for payment of the Acquisition Price to the Secretary of the Company or its duly appointed agent during the relevant Exercise Period or in accordance with Rules 6 and 8.  The Notice exercising the Option shall be given in such form and manner, not inconsistent with these Rules, as the Committee or (as the case may be) the Grantor may determine.  In respect of Options granted otherwise than by the Company any such notice (or remittance enclosed therewith) shall be received by the Company for and on behalf of the Grantor.

Plaintiff 149

7.2 **Partial Exercise:** On any partial exercise the balance shall remain exercisable on the same terms as previously applied to the whole Option and a certificate for the balance shall be issued forthwith. Any partial exercise must be made during the relevant Exercise Period.

7.3 **Allotment:** Subject to the Rules, within thirty (30) days following receipt of a notice constituting a valid exercise of an Option (and complying with the provisions of Rule 7.1) and the appropriate remittance, the Grantor shall allot, issue or transfer or (as the case may be) cause to be allotted, issued or transferred to the Option Holder or (as the case may be) his personal representatives the Stock which is the subject of such notice.

7.4 **Stock Certificates:** As soon as reasonably practicable after such allotment or transfer of Stock under the Subplan, the Company shall issue to such Option Holder or his personal representatives a definitive share certificate in respect of the Stock so allotted or transferred.

7.5 **Ranking of Stock:** Save for any rights determined by reference to a date preceding the date of allotment or transfer, the Stock so issued or transferred shall rank pari passu with the other Stock of the same class in issue at the date of allotment or transfer and shall carry all rights attaching thereto at that date.

## 8. EXCHANGE OF OPTIONS ON A CHANGE OF CONTROL

8.1 **Replacement of Options:** If any company ("the Acquiring Company") obtains Control of the Company, or becomes bound or entitled to acquire Stock in the Company within any of the sets of circumstances specified in Paragraphs 15(1)(a) (b) or (c) of Schedule 9, then, subject to Rule 6.4.2, upon an offer on the basis specified in Rule 6.4.1 being made to Option Holders pursuant to Rule 6.4.2 any Option Holder at any time within the period specified in Paragraph 15(2) of Schedule 9 by agreement with the Acquiring Company and (as appropriate) the Company and the Grantor may release his option ("the Old Option") in consideration of the grant to him of an option ("the New Option") which:-

(a) relates to Stock in a different company (whether the Acquiring Company itself or some other company) which on the assumption that the Acquiring Company were the Grantor would be a company falling within Paragraph 10(b) or (c) of Schedule 9;

(b) is a right to acquire such amount of such Stock as on acquisition of the New Option has an aggregate Market Value equal to the aggregate Market Value of the Stock subject to the Old Option on its release;

(c) has an acquisition price per share of Stock such that the aggregate price payable on complete exercise equals the aggregate Acquisition Price which would have been payable on complete exercise of the Old Option;

(d) for the avoidance of doubt is free from any performance conditions specified in or pursuant to the Rules (those having lapsed pursuant to Rule 6.7); and

Plaintiff 150

(e)     is otherwise equivalent to the Old Option (as defined in Paragraph 15(3) of Schedule 9).

The New Option shall, for all other purposes of this Subplan, be treated as having been acquired at the same time as the Old Option and, following release of the Old Option and the grant of the New Option, for the purposes of applying the Rules thereto:-

(i)     "Company" and "Stock" in relation to the New Options shall be construed as if references to the Company and to the Stock were references to the Acquiring Company and to Stock in the Acquiring Company or (as the case may be) to the other company's Stock to which the New Options relate and to the Stock in the other company;

(ii)    "Committee" shall mean the board of directors of that company or a duly constituted committee thereof.

8.2     **Option Certificates:**  Upon grant of the New Option, a new Option Certificate shall be issued accordingly.

8.3     **Lapse of Options:**  Subject to a release being effected pursuant to Rule 8.1, all Options shall automatically lapse and cease to be exercisable.

8.4     **No Immediate Exercise:**  For the avoidance of doubt, where in accordance with Rule 8.1. Subsisting Options are released and New Options granted, the New Options shall not be exercisable in accordance with Rule 6.4 by virtue of the event on which the New Options were granted.


9.      **VARIATION OF CAPITAL**

9.1     **Adjustment:**  Subject as provided in Rule 9.3, in the event of any capitalisation issue, rights issue, sub-division, consolidation or reduction of share capital or any other variation in capital, the Committee and (as appropriate) the Grantor may make such adjustments as shall be fair and reasonable in all the circumstances to:-

(a)     the number or par value of Stock comprised in any Option; and/or

(b)     the Acquisition Price payable for Stock subject to any Option

Provided Always That the aggregate amount payable on the exercise of an Option in full shall not thereby be increased no adjustment shall cause any of the conditions of the approval of the Subplan under Schedule 9 to be thereby breached.

9.2     **Inland Revenue Approval:**  No adjustment under Rule 9.1 shall take effect without prior confirmation in writing by the Board of the Inland Revenue approving such proposed adjustment.

Plaintiff 151

9.3 **Notice of Adjustment:** As soon as reasonably practicable after making any adjustment under Rule 9.1 the Committee and (as appropriate) the Grantor shall give notice in writing to every Option Holder thereby affected specifying the adjustments made insofar as they affect him and (subject to Rule 9.3) such notice shall be binding upon the Option Holder in the absence of manifest error Provided That where pursuant to Rule 9.1(b) an adjustment is made to the terms of an Option prior to the issue of an Option Certificate pursuant to Rule 5, the certificate shall set out details of the Option as so adjusted and shall be deemed to be sufficient notice of the adjustment for the purpose of this Rule.

## 10. ADMINISTRATION AND ALTERATION

10.1 **Committee Decisions:** The decision of the Committee shall be final and binding in all matters relating to this Subplan and on any dispute or disagreement as to the interpretation of the Subplan or of any rule, regulation or procedure or as to any question or right arising out of or in respect of the Subplan.

10.2 **Amendments:** Subject to Rule 10.3, this Subplan may be amended in any respect by resolution of the Committee provided that no amendment shall take effect which would cause this Subplan to cease to be an Approved Scheme.

10.3 **Inland Revenue Consent:** No amendment to these Rules shall take effect until approved by the Board of the Inland Revenue

10.4 **Circulars:** The Company shall not be obliged to provide Qualifying Employees or Option Holders with copies of any notices, circulars or other documents sent to shareholders of the Company.

## 11. GENERAL

11.1 **Availability of Stock:** The Company shall at all times take account of the need for there to be available sufficient Stock to satisfy the exercise to the full extent still possible of all Subsisting Options taking account of any other obligations of the Company to issue unissued Stock and of the availability of existing unissued Stock.

11.2 **Employment Rights:**

11.2.1 **Effect of Participation:** This Subplan shall not form part of any contract of employment between any Participating Company and any employee of any such company and the rights and obligations of any individual under the terms of his office or employment with the Company or any Participating Company shall not be affected by his participation in the Subplan or any right which he may have to participate therein.

11.2.2 **Effect of Loss of Office:**

Participation in the Subplan shall be on the express condition that:-

Plaintiff 152

(a)    neither it nor cessation of participation shall afford any individual under the terms of his office or employment with the Company or any Participating Company any additional or other rights to compensation or damage; and

(b)    no damages or compensation shall be payable in consequence of the termination of such office or employment or for any other reason whatsoever to compensate him for the loss of any rights he would otherwise have had (actual or prospective) under the Subplan howsoever arising but for such termination; and

(c)    by applying for an Option he shall be deemed irrevocably to have waived any such rights to which he may otherwise have been entitled.

11.3   **Non-Admission:**  No Qualifying Employee shall have any claim against a Participating Company arising out of his not being admitted to participation in the Subplan which (for the avoidance of doubt) is entirely within the discretion of the Committee.

11.4   **Consequence of Lapse:**  No Option Holder shall be entitled to claim compensation from any Participating Company or the Grantor in respect of any sums paid by him pursuant to the Subplan or for any diminution or extinction of his rights or benefits (actual or otherwise) under any Option held by him consequent upon the lapse for any reason of any Option held by him or otherwise in connection with the Subplan and the Company and each Participating Company shall be entirely free to conduct its affairs as it sees fit without regard to any consequences under, upon or in relation to the Subplan or any Option or Option Holder.

11.5   **Transfer, Assignment or Charge:**  All Options granted to Qualifying Employees are personal rights which cannot be transferred, assigned or charged in any circumstances whatsoever save as set out in Rule 8.1 and any purported transfer, assignment or charge (save as aforesaid) shall cause the Option to lapse immediately.

11.6   **Termination:**  The Committee may terminate the Subplan at any time but Options granted prior to such termination shall continue to be valid and exercisable in accordance with the Rules, which shall continue to apply thereto.

11.7   **Notices:**  Any notice or other communication required to be given pursuant to the terms of the Subplan shall be sent:-

(a)    in the case of any Participating Company by personal delivery or by first-class post to such company at its registered office and shall be effective upon receipt;

(b)    in the case of the Grantor by personal delivery or by first class post to the Company at its registered office and shall be effective upon receipt; and

Plaintiff 153

(c)    in any other case, by personal delivery or by delivery or sending the same by first-class post to the addressee's address last known to the Company or to the address of the place of business from which he performs the whole or substantially the whole of his duties of his office or employment (and notice to the personal representatives of a deceased Option Holder shall be effectively given if given personally or if left at or sent by first class post addressed to the Option Holder and delivered or sent by post accordingly) and where such notice or other communication is given by post it shall be deemed to have been received no later than forty-eight (48) hours after it was put into the post properly addressed and stamped.

11.8    **Law:**  The Subplan and all Options shall be governed by and construed in accordance with English law.

## 12    DISAPPLIED PROVISIONS

The following definitions and Sections of the Plan shall not apply to the Subplan

(a)    incentive stock option

(b)    restricted award

(c)    stock appreciation right

(d)    Sections 6.1(e)(i), and 6.2 to 6.6

(e)    Sub-paragraph (f) of the second paragraph of Section 2

(f)    Section 6.1(f)

(g)    Section 8.2 from the words "However, the Committee" to the end of the Section.

Plaintiff 154

14

# EXHIBIT 51

1

# COPY

Volume: 1
Pages:  1 to 50
Exhibits:  1 to 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-11178-NG

ALAN BROWN,                                        )
                    Plaintiff              )
                                                          )
                                                          )
        vs.                                        )
                                                          )
                                                          )
STATE STREET CORPORATION,          )
STATE AND STREET GLOBAL           )
ADVISORS,                                        )
                    Defendants           )

        **DEPOSITION of DAVID A. SPINA**,
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Massachusetts Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108, on
Wednesday, May 31st, 2006, commencing at
10:00 a.m.

* * * *

SHEA COURT REPORTING SERVICES
ONE UNION STREET, SECOND FLOOR
BOSTON, MASSACHUSETTS 02108-2408

6

```
 1   A.   I was involved in the strategic

 2        discussions leading up to having a VSP,

 3        and how it would be sort of formed,

 4        shaped.

 5   Q.   And I take it you were -- I'll use the

 6        term underlings that came up with the

 7        details?

 8   A.   Well, everything.  There was a

 9        policy-making group at the top of a

10        company, inside company executives, who

11        discussed this over a period of time,

12        and among those was the head of human

13        resources and Lou de Ocejo.  When it

14        came time to take the ideas that we

15        were discussing and convert them into

16        something practical and specific, it

17        was really Lou and his team within the

18        human resources department that did the

19        drafting.  But final approval would have

20        been -- well, first in my level, and then

21        presenting to the Board.

22   Q.   Were there discussions that you

23        participated in about whether or not to

24        extend the VSP benefits to State Street
```

9

```
 1        of the plan; and therefore, the time to

 2        implement and announce such a program.

 3   Q.   So what was the decision that was made

 4        as to who the VSP would be extended to?

 5   A.   Well, again, we're talking during,

 6        what I would call, the discussion and

 7        design phase within a management of the

 8        company.  And what the management decided

 9        was that it was better to focus it on the

10        U.S. both because it was quicker and as

11        important.  Since we were trying to cut

12        expenses, we expected or felt that the

13        vast majority of the overstaffing, if I

14        could use that word, was in the U.S.  We

15        hadn't been operating outside of the U.S.

16        that long.  And while there were plenty

17        of people outside of the U.S., those

18        tended to be more rapidly parts of the

19        business that were still growing.  And

20        it was the U.S. where the revenue was

21        declining and not growing.  So I think

22        both on economic grounds and on practical

23        grounds of speed to implement was the

24        basis on which the group and I decided
```

10

```
 1        that it would be better to have a program
 2        designed for U.S. only or eligible for
 3        U.S. only.
 4   Q.   My understanding is that in addition
 5        to the general VSP, there was also an
 6        executive VSP that was available to
 7        executive vice-presidents?
 8   A.   Right.
 9   Q.   Is that correct?
10   A.   Yes.
11   Q.   Were there any discussions in regard
12        to the EVSP as to whether that would be
13        available to worldwide employees?
14   A.   I don't remember those discussions.
15   Q.   Were there any executive vice-presidents
16        who were not considered U.S. employees at
17        the time that the VSP was implemented?
18   A.   Well, I think the question turns on what
19        is a definition of a U.S. employee.
20   Q.   Yes.
21   A.   And that can be different in the eye of
22        the beholder and whatever.
23   Q.   Well, let's cut right to the chase.  Did
24        you have any discussions with anybody
```

24

1     corner received by Tim Harbert.  I

2     take it when you sent the letter to

3     Mr. Weissman, that it didn't have that

4     stamp on it?

5  A.  Correct.

6  Q.  Now getting back to the word commitment,

7     in this letter you use the word

8     commitment repeatedly.  What did you mean

9     by commitment when you told Mr. Weissman

10    that you made oral commitments to Mr.

11    Harbert and Mr. Brown?

12         MR. CALAMARI:  I'll object to

13    the form.

14 A.  Well, I think there was a considerable

15    passage of time between the conversation

16    I had with Alan and Tim, which would have

17    been April, May of '03, --

18 Q.  Right.

19 A.  -- and the writing of this letter, which

20    would have been June 30, '04; so more

21    than a year has gone by.  This happens

22    to be the day that I was retiring.

23 Q.  Yes.

24 A.  And I was purposeful in this letter to

25

```
 1        play a role that approached advocacy,

 2        even without the benefit of a law degree,

 3        or being accepted by the member of the

 4        bar, or something like that, because I

 5        thought this was in the best interest of

 6        the company for the Board to honor what I

 7        felt was the general ideas of the program

 8        that Alan and I had talked about.  So I

 9        was trying to put some spin on the ball

10        by using stronger letters or stronger

11        words with the Board in the letter,

12        because it was the only action I had

13        left that I could really do at that

14        point.

15   Q.   So when you use the word commitment in

16        this letter, what was your understanding

17        of what commitment meant?

18   A.   Well, I was trying to convey an

19        impression to them that while they had

20        the ultimate authority on these things,

21        that I had made -- I don't know what

22        the right word is -- I had made

23        representations to Alan that he would

24        get his needs addressed.
```

26

```
 1    Q.   And had you made those representations?
 2    A.   Well, whatever I said to him in that
 3         meeting back in '03, I said I would go
 4         and do my best to get what I could get.
 5    Q.   And between that meeting in '03 and
 6         this letter in June of '04, had you done
 7         anything in furtherance of that?
 8    A.   Well, unfortunately, shortly after the
 9         conversation in '03, I had quadruple
10         bypass surgery, and was out for quite a
11         while, and had a few other little things
12         going on.  So until the spring of '04 I
13         had done nothing to advance the issues
14         that Alan and Tim and I had discussed.
15    Q.   Getting back to that '03 conversation
16         with Alan, you made representations
17         that you would make efforts, as you've
18         discussed.  On the other side was
19         there anything Alan was expected to do
20         in return for receiving the benefits that
21         you discussed with him?
22              MR. CALAMARI:  I object to the
23         form.
24    A.   I don't really know what Alan was
```

# EXHIBIT 52

Louis de Ocejo
5/23/2006

1

1     **COPY**                    Volume:
                                  Pages: 1 - 102
2                                 Exhibits: 1 -   7

3          UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
4

5     ALAN BROWN,

6                    Plaintiff
                                      C.A.
7     Vs.                          No. 05-11178-NG

8

9     STATE STREET CORPORATION and
      STATE STREET GLOBAL ADVISORS,

10                   Defendants

11

12          Deposition of LOUIS de OCEJO, a witness

13     called on behalf of the Plaintiff, pursuant

14     to the Federal Rules of Civil Procedure,

15     before Rosamond K. Marcy, a Certified

16     Shorthand/Registered Professional Reporter

17     and Notary Public in and for the Commonwealth

18     of Massachusetts, at the Offices of Rodgers,

19     Powers & Schwartz, LLP, 18 Tremont Street,

20     Boston, Massachusetts 02108, commencing at

21     10 A.M. on Tuesday, May 23, 2006.

22

23

24

SHEA COURT REPORTING SERVICES
(617) 227-3097

Louis de Ocejo
5/23/2006

19

| | | |
|---|---|---|
| 1 | A. | I don't know. |
| 2 | Q. | Who made the ultimate decision that the |
| 3 | | VSP would be limited to U.S.-based |
| 4 | | employees? |
| 5 | A. | Senior managers meaning David Spina, |
| 6 | | Ronald Logue, John Powers, and |
| 7 | | subsequently it was presented to the |
| 8 | | Strategy Steering Committee and |
| 9 | | subsequently to the Board. |
| 10 | Q. | Is it fair to say that if Mr. Spina had |
| 11 | | decided to extend the VSP to other |
| 12 | | employees besides U.S.-based employees |
| 13 | | he had the authority to make that |
| 14 | | decision? |
| 15 | A. | No. |
| 16 | Q. | Who had authority to make that decision? |
| 17 | A. | My view has always been that the Board |
| 18 | | was the one that defined the parameters |
| 19 | | of the plan, so an expansion of the plan |
| 20 | | to include others than those that were |
| 21 | | presented to them it would have to seek |
| 22 | | their approval again. |
| 23 | Q. | Do you know whether or not the Board |
| 24 | | actually did approve the plan as opposed |

Louis de Ocejo
5/23/2006

50

```
 1          people.  Certainly in the charter it was

 2          pretty clear that the Compensation

 3          Committee had the authority from the

 4          Board to act and not other people.

 5   Q.     Do you believe it was clear that the

 6          Comp. Committee had the authority to

 7          decide whether or not Mr. Brown should

 8          be extended the benefits of the VSP?

 9   A.     It was clear to me.

10   Q.     Do you think that it was clear to

11          Mr. Brown?

12   A.     I believe it was clear to all executives

13          when it came to their compensation under

14          the terms and conditions of their

15          employment.

16   Q.     Do you think Mr. Brown should have

17          questioned Mr. Spina's authority to make

18          the commitment that Mr. Spina says he

19          did?

20   A.     I don't know.

21   Q.     Mr. Spina says in Exhibit 5 that he made

22          a commitment to Alan Brown.

23                 MR. CALAMARI:  Objection to

24          form.  I don't agree with your
```

# EXHIBIT 53

Ronald E. Logue
May 8, 2006

1

| | |
|---|---|
| 1 | **COPY** |
| 2 | |
| 3 | |

Volume:
Pages:  1 - 99
Exhibits:  1 - 13

1    **COPY**

2

3          UNITED STATES DISTRICT COURT

             DISTRICT OF MASSACHUSETTS

4

5    ALAN BROWN,

6                    Plaintiff

                                        C.A.
7    Vs.                                No. 05-11178-NG

8

9    STATE STREET CORPORATION and
     STATE STREET GLOBAL ADVISORS,

10                   Defendants

11

12        Deposition of RONALD E. LOGUE, a witness

13   called on behalf of the Plaintiff, pursuant

14   to the Federal Rules of Civil Procedure,

15   before Rosamond K. Marcy, a Certified

16   Shorthand/Registered Professional Reporter

17   and Notary Public in and for the Commonwealth

18   of Massachusetts, at the Offices of Rodgers,

19   Powers & Schwartz, LLP, 18 Tremont Street,

20   Boston, Massachusetts 02108, commencing at

21   10 A.M. on Monday, May 8, 2006.

22

23

24

SHEA COURT REPORTING SERVICES
(617) 227-3097

Ronald E. Logue
May 8, 2006

20

```
 1         purposes of the EVSP?
 2   A.    No, I don't think he had the authority.
 3   Q.    Why is that?
 4   A.    I think that's the authority of the
 5         Compensation Committee because that's
 6         changing eligibility which I think is a
 7         fundamental piece of a plan.
 8   Q.    Did the Compensation Committee determine
 9         who would be eligible for the VSP or the
10         EVSP?
11   A.    I don't know.  I assume it was some
12         combination between the Compensation
13         Committee and maybe HR.
14   Q.    And if it was Spina or HR who determined
15         who would be eligible for the EVSP do
16         you believe that Spina would have had
17         authority to decide if Brown would be
18         eligible for the EVSP?
19   A.    No, I do not.  I think the Compensation
20         Committee has that responsibility, the
21         fundamental concept of the plan.
22   Q.    Do you know for a fact whether or not
23         the Compensation Committee determined
24         who would be eligible for the VSP or the
```

Ronald E. Logue
May 8, 2006

37

```
 1   Q.   Your understanding was that Mr. Brown
 2        had a right to some sort of modified VSP
 3        benefits if he was terminated by State
 4        Street without cause, is that right?
 5                  MR. CALAMARI:  Objection as
 6        to form.
 7   A.   No, that wasn't my impression at all.
 8   Q.   What was your impression?
 9   A.   I didn't have one.  My impression was
10        that Mr. Brown didn't have any rights.
11        There was no agreement, there was
12        nothing.
13   Q.   Nothing in writing?
14   A.   I didn't see anything.
15                  [E-mail from Mr. Spina to
16                  Mr. Brown dated 6/15/04
17                  marked Logue Exhibit No. 4
18                  for Identification.]
19   Q.   I show you what we have marked as
20        Exhibit 4.  It's stamped SSC01207.  This
21        is an e-mail from Mr. Spina to
22        Mr. Brown, cc to Mr. Harbert dated
23        6/15/2004.  Have you seen this before?
24   A.   The first time I saw it was last week
```

Ronald E. Logue
May 8, 2006

76

```
 1        early January of 2005?
 2   A.   Yes.
 3   Q.   Did you make any notes of that meeting?
 4   A.   No.
 5   Q.   Do you recall any discussion about the
 6        VSP or EVSP at that meeting?
 7   A.   I think that's probably when Alan first
 8        said to me that he believed he had some
 9        form of VSP.
10   Q.   What did you reply?
11   A.   I said, "I am aware that you had
12        discussions.  Tim had told me that his
13        interpretation was that if we were to
14        terminate either of you without cause
15        that there was some discussion that you
16        had with David Spina."
17   Q.   What did Mr. Brown say?
18   A.   He said, "I think I have the right to
19        accept the VSP."  I forget over what
20        period of time.  I don't remember at the
21        time.  He then said, "I hope it doesn't
22        come to that."
23   Q.   So at least as of early January of 2005
24        you were aware that you and Mr. Brown
```

Ronald E. Logue
May 8, 2006

77

```
 1          had a different understanding as to what
 2          his entitlement was.
 3    A.    Correct.
 4    Q.    Did you do anything to follow up on
 5          that?
 6    A.    I did not.
 7    Q.    How come?
 8    A.    At the time we were in the middle of
 9          interviewing, I'm sure you know, a
10          number of candidates for the job
11          including Mr. Brown and I made no
12          decision at that time as to what I was
13          going to do.
14    Q.    As part of your decision-making process
15          would you have wanted to know whether or
16          not Mr. Brown had this entitlement?
17    A.    This was after the Compensation
18          Committee had met so I'm pretty sure he
19          did not have that entitlement.
20    Q.    Let's run through that again.  You were
21          pretty sure Mr. Brown didn't have the
22          option to elect to receive these
23          benefits.
24    A.    Correct.
```

Ronald E. Logue
May 8, 2006

78

1   Q.   And that is because of what Mr. Harbert

2        told you.

3   A.   Yes.

4   Q.   And also because of what was said at the

5        Compensation Committee meeting in

6        September.

7   A.   Right.

8   Q.   And no vote had been taken at the

9        Compensation Committee meeting

10       concerning Mr. Brown.

11  A.   That's correct.

12  Q.   But you say a decision had been reached

13       concerning his entitlement.

14  A.   I think what the minutes showed is that

15       that is what the consensus of the

16       Committee was, yes.

17  Q.   The minutes don't show that, do they?

18  A.   Not the minutes.  I'm sorry.  The

19       minutes don't show that.  I guess I'm

20       confusing the minutes with the material

21       that was in the book for discussion.

22  Q.   The material that was prepared by

23       somebody in HR in advance of the meeting

24       proposed a modification.

# EXHIBIT 54

1

# COPY

Volume: 1
Pages: 1 to 53
Exhibits: 1 to 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 05-11178-NG

ALAN BROWN,                          )
                    Plaintiff        )
                                     )
        vs.                          )
                                     )
STATE STREET CORPORATION,            )
STATE AND STREET GLOBAL              )
ADVISORS,                            )
                    Defendants       )

DEPOSITION of RICHARD P. SERGEL,
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Rodgers,
Powers & Schwartz, LLP, 18 Tremont
Street, Boston, Massachusetts 02108,
on Friday, May 26, 2006, commencing at
10:00 a.m.

* * * *

SHEA COURT REPORTING SERVICES
ONE UNION STREET, SECOND FLOOR
BOSTON, MASSACHUSETTS 02108-2408

7

```
 1    A.   Yes.

 2    Q.   My understanding is that the VSP was put

 3         into effect around April, May, June of

 4         2003.  Does that sound about right?

 5    A.   It does.

 6    Q.   And what role did the executive

 7         compensation committee play in

 8         determining the terms of the VSP?

 9    A.   We approved the plan.

10    Q.   The entire plan?

11    A.   The VSP, right, and the terms of the

12         plan, yes.

13    Q.   Now, I take it, besides attending

14         meetings of the compensation committee,

15         you also attend meetings of the entire

16         board, correct?

17    A.   Yes.

18    Q.   Do you know whether the terms of the VSP

19         were ever presented to the entire board

20         as opposed to just the compensation

21         committee?

22    A.   I don't recall, but they certainly would

23         have been described in our report to the

24         board if it was not, in fact, voted by
```

12

1       presented to the meeting reflected the

2       outcome to a particular issue, and it

3       had been presented to the meeting in that

4       form, then I would assume it was going

5       to take place as it had been presented.

6  Q.  Will you agree that senior management of

7       the corporation prepared and approved

8       the final version of the VSP as it was

9       presented to the committee?

10  A.  Often our votes delegate back to the

11       officers of the company to execute it as

12       we have -- as it's substantially in the

13       form presented at the meeting.

14  Q.  Is it your understanding that the

15       decision as to who the VSP would be

16       offered to, as to which State Street

17       employees the VSP would be offered to,

18       that that decision was made by senior

19       management as opposed to being made by

20       the board?

21  A.  No.  It was clearly presented to us, and

22       at the point in time it was presented to

23       us as to who was eligible, we wouldn't be

24       at liberty to change that without coming

13

1     back would be my view.

2  Q.  You understand that this case is about

3      whether Mr. Spina made a certain

4      commitment to Mr. Brown concerning

5      the VSP type benefits; is that your

6      understanding, roughly?

7  A.  I understand why I'm here, as a member of

8      the committee.

9          MR. SCHWARTZ:  Let's mark this

10     exhibit.

11          (Exhibit No. 2 marked for
       identification.)

12

13 Q.  I show you what we've marked as Exhibit

14     2.  It's SSC1206.  Have you ever seen

15     this document or any portions of it

16     before?

17 A.  No.

18 Q.  I just want to get back to the VSP

19     for one moment here.  While the VSP was

20     being extended to employees, if there

21     was a question as to whether a particular

22     employee was eligible for the VSP.

23     Did Mr. Spina have authority to decide

24     whether or not that employee was eligible

21

1    Q.    Tell me what he said?

2    A.    Came to us to discuss three individuals,

3          whose name I couldn't recall until my

4          memory was refreshed, which was Tim

5          Harbert.  I think that got bumped from my

6          mind, because Tim ultimately died.  Maybe

7          that's how my brain works.  The other was

8          John Tower, and the last was Alan Brown,

9          so three conversations.  He discussed

10         each.  He told us that he had had

11         discussions with them.  He outlined those

12         with us, and talking about the things

13         that he had talked with them about.

14         And basically told us that he understood

15         he knew that it was the committee's

16         responsibility to decide these things,

17         and he wanted us to know.  And with

18         respect to each individual he gave us

19         the relevant facts with respect to each

20         one.

21   Q.    Do you recall him saying words to

22         the effect that he knew it was the

23         committee's responsibility to make some

24         sort of decisions?

22

1   A.   Yes.

2   Q.   What was it that he said, as best as you

3        remember?

4   A.   It is with respect -- it was in the

5        conversation as he was wrapping up; so

6        I don't know why I don't necessarily want

7        to associate it with Mr. Brown, but it

8        was at the end.  Mr. Brown was third and

9        was the last of the three to be presented

10       in my memory.  And in that discussion he

11       said, These are matters that you have to

12       decide.  You're going to have to think

13       about them, and he outlined each.  In

14       the case of Mr. Brown, he talked about

15       the fact that he was -- the eligibility

16       requirement, and specifically as an issue

17       that's in my memory.

18  Q.   What did he say about the eligibility

19       requirement?

20  A.   That Mr. Brown was not eligible under the

21       terms of the plan as it was written.

22  Q.   And this meeting, I take it, was a

23       couple of weeks before Mr. Spina left the

24       corporation?

```
 1    A.   It's in that window.

 2    Q.   And did you know at the time that he was

 3         leaving at the time of that meeting?

 4    A.   I believe so.  I think that's a yes.

 5    Q.   Now, Mr. Spina was reporting in June of

 6         2004 conversations that he had a year or

 7         so earlier, correct?

 8    A.   It would have been -- it certainly would

 9         have been in that window between when

10         the plan was first announced, right,

11         and certainly when he came in to talk

12         to us.

13    Q.   Did anybody ask Mr. Spina why he had

14         waited a year to communicate this

15         information to the committee?

16    A.   I don't recall.

17    Q.   Did anybody tell Mr. Spina at the meeting

18         that he did not have authority to make

19         any commitments as to these matters?

20    A.   He told us that.

21    Q.   So it's your memory that Mr. Spina said

22         that he knew he did not have authority

23         to make commitments?

24    A.   My memory of the meeting is that David
```

1       came in and said, I am going to talk to

2       you about the three things. This is what

3       I said to them. You will have to take

4       action on these. These would be for you

5       to do.

6   Q.  Let's take a quick look at Exhibit 3,

7       which is Mr. Spina's letter to Mr.

8       Weissman of June 30th. In the first

9       sentence Mr. Spina says, "I reported

10      to the committee that I made oral

11      commitments to several executives during

12      2003 for the purpose of retaining their

13      services through State Street during 2003

14      and beyond." Is that accurate? Did

15      Mr. Spina report to the committee that

16      he made oral commitments to these

17      executives?

18  A.  I've not seen this before you reading to

19      me from the letter that's what it says.

20      Beyond that I'm not going to redescribe

21      my thoughts based on what I read here.

22  Q.  No, no, I am not asking you to interpret

23      this. I am asking you what your memory

24      is what Mr. Spina said at that June 16th

44

1      Mr. Spina did.

2  Q.  Yes.

3  A.  What I do is I'm on the committee, and

4      that's in a different role.

5  Q.  Well, after the committee was informed

6      that Mr. Spina made verbal commitments to

7      Alan Brown, did anybody on the committee

8      say words to the effect that Mr. Spina

9      lacked authority to make commitments?

10           MR. LEE:  I object to form.

11  A.  Well, I think the fact is that it was

12      coming to the committee for us to

13      exercise our authority.  I don't know

14      that we said it out loud or not.  It's

15      implicit by the fact that we were

16      exercising our judgment and our authority

17      as to whether or not we were going to

18      modify the plan.  I believe we did modify

19      the plan at this meeting.

20  Q.  How was the plan modified?  It was

21      modified with regard to someone else,

22      other than Mr. Brown?

23  A.  Almost administrative matter, but,

24      nonetheless, we modified the plan.

```
1    A.   Yes.

2    Q.   How was a consensus reached without a

3         vote being taken?

4    A.   Through discussion.

5    Q.   How is a consensus recorded in the

6         minutes?

7    A.   At least it wasn't recorded in this

8         instance.

9    Q.   How is anybody supposed to know a year

10        or two later what the consensus was that

11        was reached in regard to Mr. Brown?

12             MR. LEE:  I object to form.

13   A.   We record the actions that we take.

14        We did not take an action.  We did not

15        modify the plan.

16   Q.   Now, in Exhibit 6 the committee is told

17        that Mr. Spina made certain commitments

18        to Mr. Brown, correct?

19   A.   On the top of this exhibit.

20   Q.   And you believe that Mr. Spina lacked

21        authority to make those commitments,

22        is that correct?

23             MR. LEE:  I object to form.

24   A.   I believe the modification of the plan
```

# EXHIBIT 55

Linda Hill
5/23/2006

1

1          **COPY**          Volume:
                              Pages:   1 - 29
2                             Exhibits:  1 - 2

3          UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
4

5     ALAN BROWN,

6                    Plaintiff
                                    C.A.
7     Vs.                          No. 05-11178-NG

8

9     STATE STREET CORPORATION and
      STATE STREET GLOBAL ADVISORS,

10                   Defendants

11

12          Deposition of LINDA HILL, a witness

13    called on behalf of the Plaintiff, pursuant

14    to the Federal Rules of Civil Procedure,

15    before Rosamond K. Marcy, a Certified

16    Shorthand/Registered Professional Reporter

17    and Notary Public in and for the Commonwealth

18    of Massachusetts, at the Offices of Rodgers,

19    Powers & Schwartz, LLP, 18 Tremont Street,

20    Boston, Massachusetts 02108, commencing at

21    2:00 P.M. on Tuesday, May 23, 2006.

22

23

24

SHEA COURT REPORTING SERVICES
(617) 227-3097

Linda Hill
5/23/2006

6

1    Q.    What role did the Board play in

2          determining certain parameters of the

3          VSP?

4    A.    The management would have made a

5          recommendation and we as an Executive

6          Compensation Committee would have

7          reviewed that recommendation and we

8          would advise the Board on whether or not

9          we should accept or not accept the

10         parameters as proposed.

11   Q.    Did you know whether the Board actually

12         voted to accept the parameters of the

13         VSP as proposed?

14   A.    I think we probably did the vote as the

15         Compensation Committee but we would

16         always inform the Board of what we were

17         doing and get their input about that.

18   Q.    I have noticed in the minutes of a

19         meeting that there were a number of

20         votes taken in regard to the VSP

21         changing the terms of various equity

22         plans.  Do you recall that at all?

23   A.    I'm not sure what exhibits you are

24         referring to.

Linda Hill
5/23/2006

18

```
 1   Q.   Did he acknowledge that he didn't have
 2        authority?
 3   A.   I don't recall.
 4   Q.   Did anybody say that he did not have
 5        authority at the meeting?
 6   A.   I don't think it needed to be said.  I
 7        think he told us because he knows he
 8        doesn't have authority.
 9   Q.   Whether or not it needed to be said, do
10        you recall anybody saying that he did
11        not have authority?
12   A.   I don't recall.
13   Q.   Did anybody at the meeting suggest that
14        Mr. Brown be told that Mr. Spina lacked
15        authority?
16   A.   No.
17   Q.   After the June 16, 2004 meeting when is
18        the next time that you had any
19        involvement of any kind regarding this
20        matter involving Mr. Brown and
21        Mr. Spina?
22   A.   I believe we would have asked Bob as the
23        head of the Committee to find out more
24        about whatever it was that David was
```

Linda Hill
5/23/2006

26

```
 1          Mr. Spina might have made the
 2          corporation was rejecting?
 3    A.    I don't think it was unfair so I don't
 4          know how to answer your question.  There
 5          was no action.  This was informational.
 6          I don't know why we would have been
 7          informing him.
 8    Q.    You were told the Chief Executive
 9          Officer of the corporation had made
10          verbal commitments to Mr. Brown,
11          correct?
12    A.    We were told that he had this
13          conversation about these matters, yes.
14    Q.    You were told that he made verbal
15          commitments, correct?
16    A.    Yes.
17    Q.    Would it have been reasonable for
18          Mr. Brown to have relied on a commitment
19          made by the CEO of the corporation?
20    A.    I don't know how Mr. Brown thinks but
21          Mr. Brown never asked us about this.
22          This is David reporting this information
23          when he was leaving with the
24          recommendations.  We wanted to find out
```

Linda Hill
5/23/2006

27

1          waht the nature of the conversation was.

2          We then knew.  Someone may have actually

3          reported back to him, I don't know that,

4          but as far as I knew we had the

5          information and that was the end of it.

6                    MR. SCHWARTZ:  Thank you.

7                    [The deposition was

8          concluded.]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 56

1

# COPY

Volume 1, Pages 1-53

Exhibits 1-7

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No.:   05-11178-NG

*********************************

ALAN BROWN,

      Plaintiff

   vs.

STATE STREET CORPORATION and

STATE STREET GLOBAL ADVISORS,

     Defendants

*********************************

DEPOSITION OF:  ROBERT WEISSMAN

Home of Robert Weissman

152 Shelburne Center Road

Shelburne, Massachusetts

Thursday, July 13, 2006

2:00 p.m. - 3:38 p.m.

Reporter:  Kelly M. Bruce

Shea Court Reporting Services

One Union Street

Boston, MA 02108

(617) 227-3097

Robert Weissman
July 13, 2006

32

1    It says, I made oral commitments.  And my

2    conversation with David before the Comp.

3    Committee meeting and his presentation to the

4    Comp. Committee were that he had had these

5    discussions with these individuals, they had

6    talked about commitments, that is, obligations

7    of the company, but I don't know whether or

8    not -- I don't know how to read that.  I don't

9    know -- David knew that he couldn't make -- he

10   couldn't back up a commitment if he made a

11   commitment from the company.  I don't know that

12   he made a commitment.  He told me this is what

13   these various individuals wanted and this is

14   what he had said in he response to that, at

15   least in general terms.  But I guess it's the

16   price of being a nonlawyer.  I don't know how to

17   define "commitment" here.

18        Q.      Well, if Mr. Spina had not told you

19   that he had made commitments, what were you

20   upset about?

21             MR. CALAMARI:  Objection to form.

22             THE WITNESS:  I was upset that he

23        would have the -- well, several levels:

24        One, that he would have any level of

Robert Weissman
July 13, 2006

33

1    discussion about material agreements

2    outside the terms of the VSP without

3    advising me and/or the full committee;

4    two, that there would be any chance that

5    he had suggested to these individuals

6    that he had the authority to make

7    commitments, which he did not.  And so

8    on both of those bases, I was troubled.

9        In the case of Mr. Brown, I had

10   one other concern.  Because as he

11   described his talks with Alan Brown, my

12   first interpretation of what he said was

13   that Alan would be encouraged to leave

14   the company before his 55th birthday,

15   because he could leave the company

16   through a choice of his own and collect

17   the money, so he would be incented to

18   leave.

19       David disabused me of that.  He

20   said that that wasn't what the intent

21   was, it wasn't what he said.  But when I

22   first heard it, I was upset about that

23   as well.

24   Q.    (By Mr. Schwartz)  What was it that

Robert Weissman
July 13, 2006

36

1      A.      Again, I don't recall.

2      Q.      Okay.  Did you do anything as a

3  result of receiving this letter?

4      A.      I don't believe I did.

5  *   Q.      Does Mr. Spina -- do the statements

6  that Mr. Spina made in this June 30th letter

7  contradict anything he had told you or had told

8  the Compensation Committee previously?

9               MR. CALAMARI:  Objection to form.

10              THE WITNESS:  Please read back

11          the question.

12              (* Question read)

13              THE WITNESS:  I don't see

14          anything that makes it apparent that

15          there's a contradiction here.

16      Q.      (By Mr. Schwartz)  Okay.  So after

17  you read this June 30th letter, did you believe

18  that Mr. Spina, whether or not he had authority

19  to do so, had made certain oral commitments to

20  Mr. Brown?

21              MR. CALAMARI:  Objection to form.

22              THE WITNESS:  I don't think at

23          any point in this process I, in my own

24          head, framed the question that way.  It

Robert Weissman
July 13, 2006

37

1    was:  Here is what David is reporting in

2    terms of what he talked about with these

3    individuals, and that the company had

4    some decisions to make as to whether or

5    not they were going to authorize an

6    agreement, a commitment which paralleled

7    those talks or not.  And I think that,

8    as the year progressed, that's what

9    happened, at least with some of the

10   individuals where there was a resolution

11   over the course of that year.

12        Q.    (By Mr. Schwartz)  Okay.  Let me see

13   if I can speed things up a little bit.

14              MR. SCHWARTZ:  Mark this, please.

15              (Exhibit 6, letter, marked)

16              MR. SCHWARTZ:  Do you want to

17   take a break?

18              THE WITNESS:  Yes.  Let me take a

19   break for a couple minutes.

20              (Recess taken)

21              MR. SCHWARTZ:  Back on the

22   record.

23        Q.    (By Mr. Schwartz)  Showing you

24   Exhibit 6, it's a letter to you dated July 12,