UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ALAN BROWN**<br>   Plaintiff<br><br>v.<br><br>**STATE STREET CORPORATION,**<br>**STATE and STREET GLOBAL**<br>**ADVISORS,**<br>   Defendants | )<br>)<br>)<br>)<br>)<br>)   C.A. No. 05-11178-NG<br>)<br>)<br>)<br>) |

**PLAINTIFF'S REPLY MEMORANDUM TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

All parties have moved for summary judgment, asserting in their own motions that there are no contested material facts and, in their oppositions that there are contested material facts that preclude granting their opponent's summary judgment motion. After the bloodletting of the memoranda and counter-memoranda, Alan Brown submits this Reply Memorandum for the purpose of emphasizing a selected few of the many material facts that remain on their feet, still uncontested[1]. Brown suggests that these facts support the allowance of summary judgment as to liability for the plaintiff and bar summary judgment for the defendants.

Defendants' response to Plaintiff's L.R. 56.1 statement of uncontested facts is problematical because, in most instances, the defendants do not recite the facts they claim contest the facts stated by the plaintiff. Instead, the defendants simply declare that they "dispute" the plaintiff's allegation and refer to documents, deposition pages or, in most cases, their own previous responses. As a result, in most instances it is not possible to determine which part of

---

[1] References to facts will be as follows: "Plaintiff's Facts" refers to Plaintiffs' L.R. 56.1 statement; "Defendants' Response" refers to Defendants' response to Plaintiff's L.R. 56.1 statement; "Defendants' Facts" refers to Defendants' L.R. 56.1 statement; "Plaintiff's Response" refers to Plaintiff's response to Plaintiff's L.R. 56.1 statement.

plaintiff's factual assertion the defendants dispute or what, if any, facts they suggest dispute the plaintiff's facts. In this Reply, the plaintiff attempts to determine from the defendants' factual response whether there actually is any evidence in the record that contradicts the specific evidence cited by the plaintiff.

## Facts

Brown suggests that the defendants failed to offer admissible evidence that contradicted the following factual assertions by the plaintiff.

1. **Alan Brown's employment status with State Street was unique. Although he was originally hired as a United Kingdom employee, his responsibilities changed over his career until by 2003 his duties were identical to that of other top SSgA Boston-based executives.**

    a. Brown was originally employed under a United Kingdom employment contract with State Street Global Advisor's ("SSgA") U.K. subsidiary, but his salary was charged back to SSgA's Boston headquarters. (Plaintiff's Facts ¶ 9).

    b. Brown had offices in both London and Boston. (Plaintiff's Facts ¶ 9).

    c. Brown's responsibilities were global to the same extent as the other top SSgA managers in Boston. (Plaintiff's Facts ¶ 8, 9).

    d. In 2003, Brown was an executive vice president of the U.S. State Street Corporation. (Plaintiff's Facts ¶ 6), and was Chief Investment Officer of SSgA, a United States entity, not its U.K. subsidiary. (Plaintiff's Facts ¶ 5).

    e. Brown received some of his compensation in the form of equity awards from State Street as an executive vice president. (Plaintiff's Facts ¶ 7).

2. **No consideration was given to Brown's unique status at the time the Voluntary Separation Plan was originally implemented.**

    a.       The Voluntary Separation Plan ("VSP") and Executive Voluntary Separation Plan ("EVSP") were offered to all of State Street's U.S. employees with one year of service. (Plaintiff's Facts ¶ 12).

    b.       Whether or not Brown should be offered the EVSP was never discussed among the corporation's managers when the plan was implemented. (Plaintiff's Facts ¶ 24).

3.    **After the EVSP package was not offered to Brown, he and Spina discussed whether Brown should receive the equivalent of the EVSP benefits.**

    a.       The unexpectedly large response to the VSP caused serious problems for State Street. The corporation went through what Spina termed "tough times" and experienced what he said was "instability." (Plaintiff's Facts ¶ 34).

    b.       Brown told Spina he was upset about not being offered the EVSP. (Plaintiff's Facts ¶ 24).

    c.       Spina wanted Brown to stay at SSgA through this period of difficulty caused by the VSP. (Plaintiff's Facts ¶ 32). Spina intended to give Brown "motivation to stay with the company." (Plaintiff's Facts ¶ 34).

    c.       In order to induce Brown to remain at State Street, Spina and Brown made "commitments" to one another as follows:

        i.       Spina wanted Brown not to leave SSgA in the immediate future but, rather, to remain at SSgA "through 2003 and beyond." (Plaintiff's Exhibit 18, Spina June 30, 2004 letter).

        ii.      Brown agreed to remain at SSgA through the period of instability caused by the VSP. (Plaintiff's Facts ¶ 39).

    iii.    In return, Spina made a commitment to Brown to "hold available to [him] the same separation package" offered to other employees at that time through the EVSP. (Plaintiff's Exhibit 18, Spina June 30, 2004 letter).

    iv.    These benefits included the following:

        1.    a lump sum severance payment calculated in accordance with a formula stated in the EVSP documentation. (EVSP plan, Defendants' Exhibit 6).

        2.    an annuity pension under a formula used in State Street's Supplemental Executive Retirement Plan (SERP), as modified by the EVSP. The EVSP added five years of service for SERP eligibility. Brown and Spina agreed that this five-year supplement would amortize over the following five years so that after five years it would disappear. (Plaintiff's Exhibit 15, Brown Deposition p. 102, Spina deposition p. 32).

        4.    extended vesting and exercise of stock options in accordance with the EVSP. However, since Brown and Spina understood that Spina lacked authority to modify stock awards, their agreement was limited to stock awards prior to June 30, 2003. (EVSP plan, Defendants' Exhibit 6). The Executive Compensation Committee took the necessary votes to modify these stock and equity awards for the EVSP at its June 18, 2003 meeting. (Plaintiff's Exhibit 13).

4. **Brown and Spina never agreed that their agreement would only be binding if it were reduced to an executed written document. In fact, they both wanted their oral agreement placed on the record in writing only to memorialize it. All of the correspondence between Spina and Brown, and between Spina and the Executive Compensation Committee refers to placing their oral "agreement" or "commitments" "on the record," not to any intention to draft a written document to be executed by the parties.**

   a. Brown wrote to Spina on June 10, 2004, saying, "it is important for both myself and State Street that we should have a written record of this understanding" and that he "would be perfectly happy for this e:mail to stand as a record of our agreement." (Plaintiff's Exhibit 15).

   b. Spina replied to Brown's email thanking him for taking a "first cut at a record" and saying he would discuss the matter with the Executive Compensation Committee "[s]o I will get it on the record." (Plaintiff's Exhibit 16).

   c. After Spina informed the Executive Compensation Committee of his "commitments" to Brown, that Committee told him to "record these commitments in the form of a letter …" (Plaintiff's Exhibit 18, Spina June 30, 2004 letter).

5. **There is no evidence Spina told Brown that their agreement would have to be approved by the Executive Compensation Committee. The only two persons present at the agreement, still living – Spina and Brown – both denied that Spina told Brown anything about ECC approval.**

   a. There is no evidence Spina told Brown about any need for ECC approval. Spina testified that he couldn't recall "one way or the other" whether he had said anything to Brown concerning the Board or the compensation committee. (Spina transcript p. 21-22.) "I don't recall any specific situation where I walked Alan through that," Spina said, referring to ECC approval. (Plaintiff's Supplemental Exhibit 3, Spina deposition p. 44).

    b.    Brown, too, testified that Spina did not talk with him about seeking approval of the compensation committee for any arrangement they made. (Brown transcript p. 104-105). To the contrary, Brown testified, "He gave no indication that there was any other process to go through." (Brown Transcript p. 105).

6. **Spina told Brown that he could not make changes to any stock equity plan. As a result, their agreement did not involve changes to any equity plan other than changes that had already been approved by the Executive Compensation Committee.**

    a.    Spina told Brown he could not authorize future changes to equity plans. (Plaintiff's Facts ¶ 35).

    b.    The "commitments" made by Brown and Spina, as described in Spina's June 30, 2004 letter to the Executive Compensation Committee and Brown's June 10, 2004 email to Spina, did not involve any changes to future options or stock grants. Instead, the agreement was to apply only to awards granted prior to June 30, 2003. (Plaintiff's Exhibit 15).

    c.    The agreement as described by both Brown and Spina did not require changes to any stock awards other than those changes made by the Executive Compensation Committee at its June 2003 meeting, for the entire EVSP. (Plaintiff's Exhibit 13).

7. **State Street's managers decided which employees would be offered the VSP and EVSP. Although the Board of Directors and its Executive Compensation Committee were briefed about these plans, the only votes they took were those necessary to modify benefit and stock plans to implement the VSP and EVSP.**

    a.    The Executive Compensation Committee took certain votes involving the VSP at its June 18, 2003 meeting. The minutes of this meeting (Plaintiff's Exhibit 13) reflect every vote taken by the Committee concerning the VSP. All these votes involved approving changes to stock, equity and retirement plans. No vote was

        taken to determine which employees would be offered the VSP. The "definitions" section of the Committee's vote simply defined a "VSP participant" as "any individual who is eligible to and does elect to participate in the 2003 Program." The Committee further voted "That the officers of the Corporation be and they are and each of them is hereby authorized and directed, in the name and on behalf of the Corporation, to take such actions as such officer or officers deem necessary or appropriate to effectuate the foregoing votes …" (Plaintiff's Exhibit 13 at p. SSC 04647).

    b.    The Executive Compensation Committee never voted as to which Executive Vice Presidents would be offered the EVSP, but, instead, left that determination up to management. (Plaintiff's Exhibit 13).

    c.    The Board of Directors took certain votes concerning the VSP at its June 19, 2003 meeting. (Plaintiff's Exhibit 14). The Board was briefed about the VSP and EVSP. The Board voted only as follows: to amend the State Street Corporation Retirement Plan to accommodate the VSP and to amend the Supplemental Executive Retirement Plan (SERP) to accommodate the VSP. However, unlike the ECC vote, the Board vote specifically excluded any applicability of those votes to the EVSP, the plan for executive vice presidents. (Plaintiff's Exhibit 13 at p. SSC 06099).

8.    **Brown received a copy of Spina's June 30, 2004 letter to the Executive Compensation Committee (Plaintiff's Exhibit 18) in which Spina wrote that he was complying with the Committee's directive that he "record these commitments in the form of a letter to you." There is no evidence that Brown was told that State Street had actually decided to refuse to honor this commitment, until Brown sought to exercise his rights in March 2005.**

**Discussion**

I.  **The above facts support the allowance of the plaintiff's summary judgment motion and bar the allowance of the defendants' motion**.

The above facts, which are supported by evidence from both sides and which State Street fails to contest with counter-evidence, portray a straightforward, logical history of the events at issue. The plaintiff urges the Court to step back from the legal arguments and review this simple series of events, then to do what is fair and just in accordance with the law. The story is a simple one.

Alan Brown was one of the four top managers of State Street Global Advisors. Although he was first hired by State Street's United Kingdom subsidiary, by 2003 his job duties, responsibilities, functions and title related entirely to the worldwide operations of SSgA, based in Boston, to the same extent as SSgA's other three senior managers in Boston. Brown had offices in both Boston and London office and held the titles of Executive Vice President of State Street Corporation, a U.S. entity, not a U.K. entity, and of Chief Investment Officer of SSgA, again the U.S. entity, not the U.K. subsidiary.

State Street's 2003 cost-cutting program, its Voluntary Separation Plan, succeeded beyond expectations when far more employees opted to leave than had been anticipated. This exodus sent State Street into what its chairman, David Spina, testified were "tough times" as a result of losing so many people. This was especially acute at the top level of SSgA, where at least two and possibly three of the four senior managers were leaving. Brown, the fourth senior manager, was upset that State Street had neglected to offer the VSP to him. Spina, justifiably, feared the corporation would lose Brown, who Spina said was "the heart of SSgA's business globally." (Plaintiff's Exhibit 5, Spina deposition p. 17). Spina decided to give Brown

"motivation to stay with the company" and "was prepared to do what I could do to effectuate whatever that would be." (*Id*. p. 18).

Brown proposed a solution, that he agree to remain at SSgA until it recovered from the problems caused by the VSP. In return, the equivalent of the VSP (or in his case, the Executive Voluntary Separation Plan, or "EVSP") benefits be held open for him. Spina agreed to this proposal. Brown was 50 years old at the time. He and Spina agreed this package would be available to Brown for the following five years, with certain conditions they discussed and agreed to. The evidence is uncontested that Spina never told Brown this agreement required approval from the Executive Compensation Committee.

Rather than leaving SSgA in a huff, or pursuing what he believed were legal remedies, or looking for work elsewhere, or paying attention to the frequent calls he received from headhunters, Brown was satisfied to rely on the deal he reached with Spina, who he knew to be an honorable person.

Brown continued working for SSgA, the corporation healed from the VSP trauma and life went on.

As Brown learned that Spina might be leaving, and at the urging of his wife, an English lawyer, Brown wrote to Spina suggesting that they make a written record of their agreement. Spina replied, agreeing they should make such a record. Spina never questioned Brown's assertion that they actually had an agreement. Spina said he would report to the Executive Compensation Committee to "get it on the record." Spina followed up by sending Brown a copy of a letter he wrote to that Committee, stating in the letter that he and Brown had exchanged "commitments" and affirming that the Committee had instructed him to put his "commitment" to Brown on the record by such a letter.

Spina's letter to the Committee leaves no doubt that he and Brown exchanged what Spina termed were "commitments." The contemporaneous correspondence – Brown's and Spina's emails and Spina's letter – leave no doubt that the parties themselves believed they had reached an oral agreement, albeit one that should be memorialized in writing. State Street can avoid this inescapable conclusion only by having the jury find that its CEO and Chairman was outright lying in a written communication to its Board of Directors. In fact, not only does State Street have to base its defense on a finding that Spina lied about making a commitment to Brown, but that he was joined in this fabrication by his successor, Ronald Logue, and by State Street's Human Resources director, Louis deOcejo. They submitted written material to the Committee stating that Spina had made "oral promises" to Brown valued at more than $5 million. Neither Spina, Logue nor deOcejo ever told the ECC that Spina had not exchanged these commitments with Brown.

The Executive Compensation Committee members were upset with Spina for making this deal with Brown. As with States Street's senior managers, the ECC, too, never questioned that Spina had made such an agreement with Brown. Nonetheless, the Committee decided to ignore Spina's "promises" and "commitments" on the theory that he lacked authority to make them. Brown was not told of this decision until he sought to exercise the agreement in March 2005.

Shorn of all the vituperation and legal arguments, these facts portray a straightforward situation in which a senior manager entered into an employment agreement with the corporation's top executive. The manager fulfilled his part of the bargain and the corporation benefited from his continued leadership and efforts. Nonetheless, under new leadership, the corporation seeks to escape its part of the bargain. For all of the various legal reasons cited by

the plaintiff in his summary judgment papers, the corporation should be held to the deal that it entered into, that it failed to renounce and that it received the benefit of.

Alan Brown met his commitments to State Street. This Court should require State Street to do right by the commitments its chairman and chief executive officer agrees he made with Brown.

> Alan Brown, plaintiff
> By his attorneys,
>
> /s/ Harvey A. Schwartz
> HARVEY A. SCHWARTZ
>  BBO. # 448080
> LAURIE A. FRANKL
>  BBO # # 647181
> Rodgers, Powers & Schwartz
> 18 Tremont Street
> Boston, MA 02108
> (617) 742-7010

### Certificate of service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 28, 2006.

> /s/ Harvey A. Schwartz
> Harvey A. Schwartz