UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALAN BROWN           )<br>    Plaintiff         )<br>                      )<br>v.                    )<br>                      )   C.A. No. 05-11178-NG<br>STATE STREET CORPORATION and )<br>STATE STREET GLOBAL ADVISORS )<br>    Defendants        ) | |

**PLAINTIFF'S OPPOSITION TO MOTION TO STRIKE PARAGRAPHS 2, 3 AND 4 OF THE AFFIDAVIT OF ALAN BROWN**

The plaintiff opposes the defendants' motion to strike three paragraphs of the affidavit he submitted in opposition to the defendants' summary judgment motion. The defendants argue that the affidavit directly contradicts Brown's deposition testimony. Because that suggestion is clearly inaccurate, the plaintiff opposes this motion.

**Paragraphs Two and Three of the Affidavit**

The second and third paragraphs of the affidavit state:

2. **The Voluntary Separation Plan** – Prior to the implementation of the VSP, and prior to my conversation with David Spina about the VSP not having been offered to me, I had been involved in numerous discussions about the VSP program and its likely impact on SSgA. As a senior manager of SSgA, I had been provided with detailed information about the VSP so I could communicate with staff about the program. This included the terms of the package plus draft communications to staff in "question and answer" format. It is fair to say that the VSP and its consequences were a topic of constant conversation right throughout the 2nd quarter of 2003 and beyond.

3. As to the Executive Voluntary Separation Plan (the "EVSP"), I had numerous discussions with the other three senior managers of SSgA on the detailed terms of the package offered to them and on whether they were likely to take it. Moreover, at the time when I stayed in Boston I normally stayed with John Snow – who had been offered the EVSP with full documentation – and we had a number of detailed conversations on the terms of the EVSP and the specifics of what it would mean for him and for me, if I had been offered it. I cannot be

> absolutely certain whether I had actually seen and read John Snow's documentation, but all of the terms of the EVSP, as offered to him, were thoroughly discussed between us and understood by me, all before I spoke with David Spina about the EVSP. In fact, it was because both Mr. Spina and I so thoroughly understood the terms of the EVSP that we did not need to discuss those terms in detail in our conversation

Brown's deposition testimony cited by State Street that supposedly contradicts these affidavit statements is on pages 66, 88 and 161 of Brown's deposition. (Attached as Exhibit 1). Only by misconstruing, misinterpreting and misstating that deposition testimony could it be found to be contradictory to the affidavit.

The basis for this lawsuit is that State Street did not offer the Executive Voluntary Separation Plan (EVSP) package to Brown, that he was not given a personalized EVSP proposal containing calculations of the specific benefits he would receive under the program, as other managers were. His deposition testimony was to that effect. On page 66, for example, in response to the question "[d]idn't you have your own copy [of the Executive Voluntary Separation Plan]?" Brown answered, "No … Because I wasn't given one." Again, on page 161 he testified, "I didn't receive this document until after I left." The "document" referred to is the Executive Voluntary Separation Package, marked as an exhibit on p. 160. That is the same document he testified John Snow gave him shortly before the deposition. (Brown deposition p. 66). In short, Brown testified at his deposition that State Street did not give him an EVSP package for himself, in his name, calculated for Alan Brown. He testified he first **received** a copy of Snow's EVSP package shortly before the litigation.

Nonetheless, despite not having a paper copy of the EVSP package in 2003, Brown never testified he was unaware of the details of the plan or of the benefits it offered or of how those benefits were calculated. He was never asked at his deposition one way or the other about his

**knowledge** of the EVSP, only about whether he "got" the package. His affidavit explains how he learned the details of the program, even though it was not offered to him.

Brown says in the affidavit that John Snow was given a specific EVSP package and that the two of them discussed Snow's package in detail during the time of the VSP when Brown stayed at Snow's apartment. Brown says in the affidavit that he might have seen Snow's package[1]. Further, he says in his affidavit that he "had numerous discussions with the other three senior managers of SSgA on the detailed terms of the package offered to them and on whether they were likely to take it." The affidavit does not state that he "had" a VSP proposal of his own, i.e., his "own copy." The relevance of the affidavit is that State Street argued in support of its summary judgment motion that Brown was unaware of the details of the EVSP so he could not have reached an agreement with Spina for those benefits. The affidavit shows that Brown was quite familiar with the provisions of the EVSP, even though State Street never gave him a personal EVSP package and even though he did not obtain a paper copy of the specific package until after the litigation began. There is nothing contradictory between his deposition testimony that he did not have a paper copy of the package offered to senior executives and his affidavit statements that, nonetheless, he was quite familiar with the plan's benefits from discussing them in detail with Snow, and other senior executives, who received the package themselves.

Similarly, State Street argues that Brown's deposition testimony that he reviewed general materials but none specific to himself at the time of the VSP (Brown deposition p. 88) contradicts his affidavit statement that he discussed Snow's EVSP package in 2003. In fact, the

---

[1] Earlier on page 66, Brown testified that Snow gave him a copy of the EVSP plan, but State Street acknowledges that testimony was in reference to Brown's meeting with Snow shortly before the deposition, not in reference to the time of the VSP, in 2003. In response to a question about what Brown and Snow had discussed at that meeting, Brown answered, "Whether we might have time for a drink tonight."

two statements are entirely consistent. Brown says in both statements that he received no material specific to his own situation – meaning with calculations specifically prepared for himself – but only material prepared for other employees[2].

Further, State Street is wrong in its memorandum (at p. 3) when it says that "Brown admitted that he never **saw** specific program documentation on the VSP." (Emphasis added). That is not what he said at his deposition. He was asked (Brown deposition p. 88), "Did you **get** VSP program materials at the time the VSP was offered?" (Emphasis added). He answered, "I reviewed general materials, but none obviously specific to myself, because, along with other senior management at SSgA, we had to be ready to explain these programs both to staff and clients and consultants." In short, although he **got** no material specific to himself, he testified that he **saw** general material detailing the plan's benefits. The affidavit clears up the difference between whether he "got" material and whether he knew the specifics of the EVSP package. What he testified to was that he was never given a specific VSP package for himself, calculating his own benefits under the program. He did not say he never saw material concerning the VSP program for other employees. He certainly did not testify that he never discussed the specifics of the program with other senior managers or that he did not know those specifics. It is odd that State Street could even suggest with a straight face that Brown, as one of the four top managers of SSgA, would not have known how the VSP worked and how it would impact SSgA.

There are no contradictions between paragraphs two and three of Brown's affidavit and his deposition testimony.

---

[2] State Street's citation to Brown's deposition statement that he did not receive a specific letter explaining the VSP until after he left the company is inexplicable. The defendant does not suggest how that statement is contradicted by the affidavit, which makes no reference to that document.

**Paragraph Four of the Affidavit**

The fourth paragraph of Brown's affidavit concerns when he first read the Executive Compensation Committee's charter on the State Street Internet web set. Brown testified at his 2006 deposition that he did not have a copy of State Street's Executive Compensation Committee's charter, but had seen it on the corporation's web site. (Exhibit 2, Brown deposition pp. 74-75). State Street did not ask him when he first saw the charter on the web site. He was not asked if he had seen the charter at the time of his 2003 conversation with Spina. Because he was not asked when he first saw the charter, Brown did not testify as to when that happened. In fact, there is no evidence when the ECC charter was first posted on the web site, or even whether State Street had a web site in 2003. In his affidavit, Brown says that he first read the ECC charter on the web site "in 2005, quite possibly not until after the present litigation had started. I had not seen the ECC's charter at the time I spoke with Mr. Spina in 2003, nor at any time before 2005." (Brown affidavit, ¶ 4). State Street claims this affidavit statement contradicts Brown's deposition testimony.

There is no contradiction between the two statements. Brown said nothing at his deposition about when he first saw the charter on the web site. It was not the duty of Brown's attorney to cross-examine his own client nor was Brown obliged to use the errata sheet to his deposition to add an answer to a question he was not asked. Rather than Brown attempting to "patch up" his testimony with an affidavit, as State Street argues (Memorandum at p. 4), State Street seeks to strike the affidavit in an effort to overcome its own failure to ask a logical follow-up question at Brown's deposition.

The motion to strike various paragraphs of Brown's affidavit should be denied.

Alan Brown, plaintiff
By his attorneys,

<u>/s/ Harvey A. Schwartz</u>
HARVEY A. SCHWARTZ
 BBO. # 448080
LAURIE A. FRANKL
 BBO # # 647181
Rodgers, Powers & Schwartz
18 Tremont Street
Boston, MA 02108
(617) 742-7010

**EXHIBIT 1**
**TO OPPOSITION TO MOTION TO STRIKE AFFIDAVIT PARAGRAPHS**

```
 1                                      Volume:   I
                                        Pages: 190
 2                                      Exhibits: 25

 3            UNITED STATES DISTRICT COURT

 4              DISTRICT OF MASSACHUSETTS

 5

 6
     ALAN BROWN,
 7                    Plaintiff
                                        Docket No.
 8             vs.                      05 CIV 1178(NG)

 9   STATE STREET CORPORATION and
     STATE STREET GLOBAL ADVISORS,
10                    Defendant

11

12

13            VIDEOTAPED DEPOSITION of ALAN BROWN, a
     witness called by and on behalf of the Defendant, taken
14   pursuant to the Federal Rules of Civil Procedure,
     videotaped by Craig Newman of Valed Videography
15   Services, before Cynthia F. Stutz, Certified Shorthand
     Reporter and Notary Public in and for the Commonwealth
16   of Massachusetts, at the offices of Hare & Chaffin, 160
     Federal Street, Boston, Massachusetts, on Monday, April
17   24, 2006, commencing at 10:31 a.m.
```

Case 1:05-cv-11178-NG    Document 72-2    Filed 12/01/2006    Page 2 of 8

Case 1:05-cv-11178-NG    Document 72-2    Filed 12/01/2006    Page 3 of 8

66

```
1     A.   Whether we might have time to meet for a drink
2   tonight.
3     Q.   And did he?
4     A.   Depends how long you keep me here.
5     Q.   And other than that, was that the sum and
6   substance of the entire conversation?
7     A.   It was.
8     Q.   You did not talk about any information that is
9   related to this case?
10    A.   No.
11    Q.   Did you get any documents from either John
12  Marrs or John Snow?
13    A.   From John Marrs, no.  From John Snow, a copy
14  of the EVSP plan.
15    Q.   And you got a copy of the EVSP plan from him
16  why?
17    A.   So that I could refresh my knowledge of its
18  terms.
19    Q.   Didn't you have your own copy?
20    A.   No.
21    Q.   Why not?
22    A.   Because I wasn't given one.
23    Q.   Now, you also said in preparing for the
24  deposition you reviewed documents.  Can you tell me
```

88

```
1      A.   Which was me.
2      Q.   And was there also a provision in the VSP that
3   permitted the company to designate people as ineligible
4   on a so-called discretionary basis?
5      A.   I believe that a couple of individuals within
6   State, the wider State Street were made ineligible, but
7   I'm not aware of anyone in SSgA being made ineligible
8   who otherwise would have been eligible.
9      Q.   Did you get VSP program materials at the time
10  the VSP was offered?
11     A.   I reviewed general materials, but none
12  obviously specific to myself, because, along with other
13  senior management at SSgA, we had to be ready to
14  explain these programs both to staff and clients and
15  consultants.
16     Q.   And you were also part of the process that
17  resulted in the VSP, as I recall?
18     A.   The VSP was not created by people in SSgA, but
19  we had to apply it within SSgA once we decided not to
20  ask for an exemption, yes.
21     Q.   Right.  And you equally -- Strike that.
22          Now, of the underlying plans that the
23  VSP applied to, which were you a member of?  Which plan
24  did you, plans did you participate in?
```

160

1   various equity agreements?
2       A.   Yes.
3                (Brown Exhibit No. 20 marked
4                for identification.)
5       Q.   Let me show you what's Exhibit 20.
6                (Document handed to the witness.)
7       Q.   And it's a document dated May 1, 2003 entitled
8   Executive Voluntary Separation Package.  It's numbers
9   Plaintiff 1 to Plaintiff 28.  Where did you get this
10  document, by the way?
11      A.   It either came from John Serhant or John Snow
12  or both.
13      Q.   Now, let me ask you to go to Plaintiff 2,
14  Page 2, that is.  And you see right under Non-
15  competition Agreement, you see the words?
16      A.   I see the words, You may be required to enter
17  into a non-competition agreement.
18      Q.   Could you finish reading that?
19      A.   That would be specifically limited as to the
20  length and nature of the restricted activity.
21      Q.   You can keep reading.
22      A.   The terms of such an agreement would be
23  communicated to you separately as soon as practical
24  after you submit your EVSP election.  If you're

161

1  required to enter into a non-competition agreement,
2  your election pursuant to the EVSP will not be
3  effective unless you execute such an agreement in
4  addition to the other terms and conditions as set forth
5  in the EVSP materials.
6      Q.   So in theory, if the company were to want to,
7  were to have wanted to, as a condition for your
8  exercising whatever rights you might have had under the
9  VSP or the EVSP, they could have asked you to sit out
10 of work for a period of time?
11     A.   Possibly.  I have no idea of the nature of the
12 agreements that they may have entered into with people.
13 And I didn't receive this document until after I left.
14     Q.   I understand that.  But you have alleged that
15 you were entitled to a VSP arrangement?
16     A.   Uh-hum.
17     Q.   This would be an element of a VSP arrangement
18 if the company were to choose to exercise it?
19     A.   Possibly.
20     Q.   And if the company were to choose to exercise
21 it, it might have prevented you from earning any future
22 income for a period of time?
23     A.   Possibly.
24              MR. CALAMARI:  Tape's out?  Tape's out.

**EXHIBIT 2**
**TO OPPOSITION TO MOTION TO STRIKE AFFIDAVIT PARAGRAPHS**

```
 1                                        Volume:  I
                                          Pages: 190
 2                                        Exhibits: 25

 3             UNITED STATES DISTRICT COURT

 4               DISTRICT OF MASSACHUSETTS

 5


 6
     ALAN BROWN,
 7                      Plaintiff
                                          Docket No.
 8              vs.                       05 CIV 1178(NG)

 9   STATE STREET CORPORATION and
     STATE STREET GLOBAL ADVISORS,
10                      Defendant

11

12

13            VIDEOTAPED DEPOSITION of ALAN BROWN, a
     witness called by and on behalf of the Defendant, taken
14   pursuant to the Federal Rules of Civil Procedure,
     videotaped by Craig Newman of Valed Videography
15   Services, before Cynthia F. Stutz, Certified Shorthand
     Reporter and Notary Public in and for the Commonwealth
16   of Massachusetts, at the offices of Hare & Chaffin, 160
     Federal Street, Boston, Massachusetts, on Monday, April
17   24, 2006, commencing at 10:31 a.m.
```

74

```
 1   arrangements, which would then be discussed with David
 2   Spina or such other COO's of the day.
 3        Q.   And then what would David Spina do with it?
 4        A.   David Spina, in my experience, accepted it
 5   without alteration.
 6        Q.   Would he present it to the executive
 7   compensation committee for approval?
 8        A.   I doubt it.  I don't know.  I'd be surprised
 9   if he showed the bonuses of every member of staff down
10   to the lowest level to David Thick of the compensation
11   committee.
12        Q.   Was there a specific day upon which bonuses
13   were actually paid?
14        A.   Each year there would be a date upon which
15   bonuses would be paid.
16        Q.   And was that a date that followed the
17   executive compensation committee approving the bonuses?
18        A.   Yes.
19        Q.   And so the executive compensation committee
20   did in fact approve the bonuses?
21        A.   Not necessarily at the individual level.  I
22   mean, that would be a daunting task with over 20,000
23   employees.
24        Q.   Would the executive compensation committee
```

75

```
 1   approve the bonuses for the senior level people?
 2        A.   I don't know how far down the organization
 3   they would go, so I couldn't speculate on that.
 4        Q.   Would it go as far down as you?
 5        A.   Again, I don't know.  I know, because it says
 6   so under its remit, that it includes David Spina's
 7   compensation.  I don't know how much further down the
 8   organization it goes.
 9        Q.   Do you have a copy of the executive
10   compensation's remit, as you put it?
11        A.   Only such as is displayed on the Website.
12        Q.   And you have seen that?
13        A.   Yes.
14        Q.   And you know what it says?
15        A.   Yes.
16                  Not wanting to break your flow, could I
17   request a top off of this jug of water?
18                  MR. CALAMARI:  Yeah.  We could even take
19   a break at some point.  I don't know what everybody's
20   preference is on lunch.  I want to cut it quick,
21   because we're low on time because of the late start,
22   but I don't mind taking a break at some point.
23                  MR. SCHWARTZ:  Yeah, let's -- Obviously
24   we'll take a lunch break.  We could shoot for a half
```