UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
ALAN BROWN,                    )
      Plaintiff,               )
                               )
      v.                       ) Civ. Action No. 05cv11178-NG
                               )
STATE STREET CORPORATION,      )
STATE STREET GLOBAL ADVISORS,  )
      Defendant.               )
_____)
```

GERTNER, D.J.

MEMORANDUM AND ORDER RE:
CROSS-MOTIONS FOR SUMMARY JUDGMENT
September 28, 2007

I.    INTRODUCTION

Alan Brown ("Brown") brings this action for retirement benefits against his former employer, State Street Corporation. He raises state common-law claims of breach of contract, promissory estoppel, and breach of covenant of good faith in an at-will employment contract.

Brown's original complaint also raised an ERISA claim, which was the subject of a motion to dismiss that was denied. Brown then amended the complaint so as to drop the ERISA claim, although ERISA pre-emption remains an issue notwithstanding.

Both parties have moved for summary judgment (defendants' docket #48, plaintiff's docket #54).[1] For the reasons below, I **GRANT IN PART** defendants' motion for summary judgment as to Brown's claimed pension and the breach of covenant of good faith,

---

[1] Both have also filed motions to strike (docket ## 62 and 68). Brown moves to strike a statement by one of defendants' employees as hearsay; defendants move to strike an affidavit filed by Brown to supplement and correct his deposition testimony.  Since the evidence at issue in those motions does not affect the analysis in this memorandum, these motions are **MOOT.**

and **DENY IN PART** defendants' motion as to the rest of Brown's claims and benefits.  I also **DENY** plaintiff's motion for summary judgment.

## II.  BACKGROUND

### A.  Facts

From 1995 until 2005, Alan Brown worked for State Street Global Advisors ("SSGA"), the largest institutional asset manager in the world and an entity of State Street Corporation ("SSC"). He was initially hired as Managing Director of SSGA, and received various promotions until he was named Executive Vice President of State Street Corporation in 2000.  In this position, Brown was one of the "G4" - a group of four executives responsible for the overall strategy and direction of SSC.

SSC is based in Boston, Massachusetts.  Brown is a citizen and resident of the United Kingdom; during his entire employment, he was based in the U.K. and maintained a residence in London, though he worked one week per month in the United States and traveled globally.

### 1.  The EVSP Early Retirement Plan

In 2003, to cut costs, SSC offered many of its United States employees an early retirement plan called the Voluntary Separation Plan ("VSP"). In addition, the company offered some of its U.S.-based Executive Vice Presidents a version of the VSP

called the Executive Voluntary Separation Plan ("EVSP").  Under the EVSP, the early retiring employee would collect:

- The retirement pension that the employee was entitled to under SSC's pension plan, the Supplemental Defined Benefit Pension Plan ("SERP"), calculated as though the employee had worked an additional five years at the company and was five years older;

- Ongoing retiree medical coverage;

- A severance benefit equal to 5 weeks of base pay plus 4 weeks of pay per year of completed service as of August 1, 2003, payable in a single lump sum;

- Continued vesting of stock options as though the employee continued to be employed by the company; and

- Outplacement assistance.

Eligible employees had 45 days (until June 27, 2003) to opt for early retirement.

An unexpectedly-large number of employees opted for early retirement under these plans, including two members of the G4 group.  The EVSP was not offered to Brown, however, as he was not a U.S.-based employee.  In fact, Brown did not have a pension plan through SSC; instead, he opted to be paid a cash benefit every year.

### 2.  Brown Seeks His Own Retirement Plan

In June 2003, Brown met twice with David Spina ("Spina"), the Chief Executive Officer of SSC.  Also present at the meetings was the other G4 member not offered the EVSP, Tim Harbert ("Harbert"), the head of SSGA.  At the meetings, Brown expressed disappointment that he and Harbert had not been offered the EVSP,

and said that he was concerned that he was not protected in the event of management turnover. He suggested to Spina that he and Harbert should be made eligible for the EVSP in return for their agreeing to remain at SSGA for an unspecified length of time "through this difficult period" caused by the departure of many employees.

Spina expressed support for Brown's proposal and a desire to make him feel more comfortable about his position at SSGA. At this point Brown's and defendants' accounts of the facts diverge. Brown alleges that he and Spina proceeded to make mutually binding oral commitments. Defendants and Spina allege that the meeting participants merely worked out a proposal that would still have to be finalized, reduced to writing, and approved by SSC's Board of Directors.

Whether an actual commitment or a rough proposal, the terms set out and agreed upon by Brown and Spina in the meeting(s) were as follows: Brown would not exercise any option to resign or opt into early retirement until the end of the transition period caused by the departure of so many employees through the VSP. (A more definite term was not specified.) In return, he would be eligible for the EVSP with some modifications:

- He would have until age 55 to exercise early retirement, as opposed to the 45-day window under the original EVSP;(he was then in his early fifties);

- The original EVSP provided that a departing employee's pension benefit would be calculated as though the

employee had worked 5 additional years; Brown was not entitled to any SSC pension, as he elected to collect an annual cash sum instead; however, he felt that it would be fair to SSC to reflect this cash benefit "in some way," by deducting an undetermined amount from any pension he collected under the EVSP;

- Under the original EVSP, a departing employee's stock options would continue to vest as though the employee had remained with the company; if Brown exercised early retirement, he would be entitled only to stock options that had vested before June 30, 2003, the date of the Spina meeting.

The last modification was felt to be necessary by both Brown and Spina because, as Spina pointed out only the Board of Directors had authority to extend stock options.

Brown and Spina agreed to record their ideas/agreement in writing. However, Spina experienced health problems shortly thereafter. A year passed without further discussion of the matter. On June 10, 2004, Brown sent Spina an email memorializing the terms of their discussion of a year before. Spina replied on June 15, 2004, that Brown's writing was "a 'first cut' at a record," and promised to share it with the Executive Compensation Committee ("ECC") of the Board the next day "[s]o I will get it on the record."

### 3.  Rejection of Brown's Plan by the ECC

The ECC was created by SSC's corporate charter, according to which it has "direct responsibility, as described in this charter, for the director and officer compensation plans,

policies, and programs of the Corporation." Its responsibilities are more specifically defined as:

> The Committee shall annually review, evaluate and advise the Board with respect to an assessment of management's performance and the total compensation of all senior executives (Executive Vice President level and above), including under incentive compensation plans which are subject to Board approval and equity-based plans.
>
> The Committee shall annually review, evaluate and advise the Board with respect to, for the CEO and the senior executives of the corporation, (a) the annual base salary level, (b) the annual incentive opportunity level, (c) the long-term incentive opportunity level, (d) employment agreements, severance arrangements, and change in control agreements/provisions, in each case, as, when and if appropriate, (e) any special or supplemental benefits.
>
> The Committee shall review, evaluate and approve annual incentive plans which are subject to Board approval and equity-based plans and awards made thereunder.

At its June 16, 2004, meeting, the ECC took no action on Brown's benefits, but asked Spina for a more detailed written proposal to consider at its next meeting. Pursuant to this request, Spina sent a letter to the Chair of the ECC on June 30, 2004, outlining the terms that he and Brown had discussed, repeatedly referring to them as the "commitment" he had made to Brown and Harbert. He pointed out that he and Brown had not decided how to calculate Brown's pension, which was left to the ECC's "thought and judgment . . . the definition and application

of additional service will require some development." He concluded the letter by writing "I strongly recommend the Executive Compensation Committee act in accordance with these decisions if and as the circumstances arise that make them relevant." He also asked Boon Ooi, SSC's Senior Vice President for Compensation and U.S. Benefits, to calculate the amount of the benefits that would be due Brown under the modified EVSP. Ooi calculated that Brown would be owed approximately $5.54 million: $1.5 million in vesting stock options, $1.14 million in severance pay, and $2.9 million in pension. However, Ooi noted that the last sum would have to be reduced by an unknown amount to account for cash benefits Brown had collected in lieu of a U.K. pension plan.

On July 1, 2004, Spina resigned as CEO of SSC due to health problems, and was replaced by Ronald Logue. On September 15, 2004, the ECC met again and heard a presentation on the application of the modified EVSP to Brown. The ECC again took no vote, but reached consensus that it was opposed to making Brown eligible for any form of the EVSP. Shortly after that, defendant alleges that Louis de Ocejo, SSC's Vice President for Human Resources, told Brown, "Alan, it will never see the light of day. The committee will never agree to something like this." Brown denies that he ever had such a conversation with do Ocejo. The ECC never took further action on the matter.

In late 2004, Harbert passed away.  Brown was a candidate to replace him as head of SSGA, but ultimately another candidate received the job.  On March 11, 2005, Brown wrote Logue that his position at SSGA had become "untenable" due to his relationship with the new head, and that he was therefore electing early retirement under the EVSP.  SSC's counsel, William Hunt, responded the next day that Brown was not eligible for the EVSP, but that his "voluntary resignation" was accepted and his employment accordingly terminated as of March 18, 2005.  Brown immediately spoke on the phone with SSC counsel Mitchell Shames; Brown alleges that during that phone call he asserted that his letter was an "election letter," not a "resignation letter." Hunt does not recall Brown indicating in any way that he did not want to resign.  SSC held a press conference shortly thereafter to announce Brown's resignation.  On May 17, 2005, Brown accepted employment with another firm.

### B.  __Procedural History__

Brown filed his complaint on June 7, 2005.  The original complaint contained both common-law contract claims and an ERISA claim.  Defendants moved to dismiss the latter on August 16, 2005 (docket # 10), the motion was denied on November 1, 2005. However, Brown filed an amended complaint on May 26, 2006 (docket # 35) which dropped the ERISA claim entirely.  All that remains are the common-law contract claims.

Defendants moved for summary judgment on September 26, 2006 (docket # 48), Brown moved for summary judgment on September 28, 2006 (docket # 54).

**C.  Claims**

Plaintiff's amended complaint raises four counts: (1) breach of contract, arguing that Spina made an enforceable commitment to Brown in the June 2003 meeting(s) that bound SSC; (2) ratification, arguing that even if Spina did not have the authority to bind SSC, the Board of Directors ratified his commitment by failing to repudiate it; (3) detrimental reliance and promissory estoppel, arguing that Brown reasonably relied on promises made by Spina in the June 2003 meeting(s) in failing to pursue potential employment opportunities; and (4) breach of covenant of good faith and fair dealing, arguing that SSC terminated Brown's employment in order to avoid fulfilling its commitment to pay him the disputed benefits.

**III.  STANDARD OF REVIEW**

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Once the moving party demonstrates the "'absence of evidence to support the nonmoving party's case,' the burden of production shifts to the nonmovant." <u>Dow v. United Brotherhood of Carpenters</u>, 1 F.3d 56, 58 (1st Cir. 1993) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). The nonmovant must then "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." <u>McCarthy v. Northwest Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995). The court must:

> 'view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor,' but paying no heed to 'conclusory allegations, improbable inferences, [or] unsupported speculation.' If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

<u>Id.</u> (citations omitted).

## IV. **THE PENSION BENEFIT**

Defendants argue the pension claim is flawed, making it ineligible as *both* an ERISA plan and as a contract -- namely, that its provisions were never fully articulated between Brown and Spina.

It is clear from the record that the terms of Brown's pension benefit were never sufficiently agreed-upon. The original EVSP provided that employees accepting early retirement would receive pension benefits under the SERP as though they were

five years older and had stayed with the company an additional five years; their current SERP benefit would then be subtracted out, so that they were not collecting a double pension.  Brown, however, was never included in the SERP, instead receiving an annual cash benefit in the U.K., but he felt that "they had been making a contribution to me in lieu [of a pension] and they ought to get some benefit from that in relation to a reduced SERP liability" but "we didn't get into any more detail on that." Defs.' Ex. at 144 (#51-2).  Or, as Brown put it in his June 14, 2004, email to Spina, seeking to memorialize the terms of their June 2003 discussion, "[w]e also agreed that we would clarify how the EVSP plan would apply in my circumstances where I have no DB[2] benefits at all from State Street or any former employees." Defs.' Stmt. of Mat. Facts, Ex. 35.  Spina then referred to this undefined term in his subsequent letter to the ECC:

> The application of this promise to Alan's
> situation requires thought and judgment.
> Alan is a U.K. employee . . . The difficulty
> in applying the additional years of service
> for retirement purposes for Alan is that we
> did not offer the VSP to any non-U.S.
> employees and we do not have any similar DB
> type retirement plans in place for Alan.
> Hence, the definition and application of
> additional service will require some
> development.

Defs.' Stmt. of Mat. Facts Ex. 18.

---

[2] The definition of "DB" is unclear from the record.

Brown admits that a term of his pension is missing, but argues that the missing term is not material.  He refers to the calculation done by Boon Ooi, SSC's Senior Vice President, for the ECC, of the expected value of pension benefits due to Brown under the modified EVSP.  Ooi calculated a base value by simply applying the SERP formula, and then noted that an additional "offset" should be subtracted from the result, based somehow on the annual cash payments Brown had been receiving in lieu of a U.K. pension. Defs.' Stmt. of Mat. Facts Ex. 40.  Brown argues that Ooi's ability to do the calculation is conclusive evidence of the definiteness of the terms.  Ooi himself testified at deposition that he did not know of any additional terms, beyond Brown's email, Spina's letter, and the unmodified terms of the EVSP, that he would need to do that calculation. Pl.'s Cross-Stmt. of Facts Ex. 8 at 55.  However, Ooi was only asked to produce a "worst-case scenario" -- the highest amount of benefit Brown could possibly collect -- and so calculated the amount with no cash offset.  If Ooi had been asked to calculate Brown's *actual* pension (as the case before this Court apparently requires), he would have been unable to do so, as it is clear from Brown's own testimony that there had never been a decision at any level as to what that offset should consist of or how it should be calculated. Defs.' Ex. at 144 (#51-2).

This is a classic example of an indefinite term -- one which the parties simply did not go far enough in negotiation to agree upon.  1-2 Murray on Contracts § 38(B ).  For the Court to fill in a value would be to go beyond merely construing the terms of a contract from its context; rather, the Court would have to make the very policy decision that Brown, Spina, and the ECC did not make.

ERISA enforces only actual employee pension plans; it cannot be applied to the terms of a half-completed negotiation. The unenforceability of the pension term, however, does not doom the putative contract.  Where one term of a contract fails, the Court can treat it as divisible from the rest, unless division would fundamentally change the nature of the other terms, or would be unfair.  Farnsworth Contracts Sec. 3.30.  Divisibility may be unfair where it would result in one party's obligation being reduced while the other party is still forced to pay its full agreed-upon price.  <u>Wilhelm Lubrication Co. v. Brattrud</u>, 268 N.W. 634 (Minn. 1936).  Here, Brown has arguably already performed his full obligation under the putative contract -- he stayed at SSC nearly two years.  Therefore, I consider the other provisions of the putative benefit plan separately as contract claims below.

Likewise, I also consider below whether the rest of Brown's putative benefit plan -- without pension -- would nevertheless trigger ERISA pre-emption.  I conclude that they do not.

V.    <u>ERISA PRE-EMPTION</u>

Defendants argue that Brown's remaining state-law claims relate to ERISA-covered benefit plans, and that therefore Brown's state-law claims (Counts I-IV) are pre-empted by ERISA, even if that would leave Brown without remedy.

In enacting ERISA, Congress intended to make the administration of employee benefit plans exclusively a matter of federal law.  <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 46 (1987) (quoting <u>Alessi v. Raybestos-Manhattan, Inc.</u>, 451 U.S. 504, 523 (1981)).  Thus, its provisions "supersede any and all State laws insofar as they . . . relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a).

In his initial complaint, Brown brought an ERISA claim, arguing that the EVSP was a covered benefit plan; defendants argued in their motion to dismiss that the plan was not covered under ERISA.  I denied the motion to dismiss, ruling that the question of whether the EVSP was covered under ERISA was too fact-intensive to be resolved by the record at that stage.  While Brown dropped his ERISA claim in his amended complaint, the parties have swapped arguments, with Brown arguing that the plans in question are not ERISA-covered.  In addition, Brown argues that defendants should be "judicially estopped" from reversing their position.  For the reasons below, both defendants' pre-

emption argument and Brown's judicial estoppel argument should
fail.

### A.    <u>Judicial Estoppel</u>

For judicial estoppel to attach, at least two conditions
must be fulfilled: (1) the party in question must take a position
that is directly inconsistent and mutually exclusive with an
earlier position that it took in a prior legal argument or an
earlier phase of the same proceeding; (2) it must have
successfully persuaded the court to adopt the first position.
<u>Alternative Sys. Concepts, Inc. v. Synopsys, Inc.</u>, 374 F.3d 23,
33 (1st Cir. 2004).  Here, the first element is fulfilled, but
the second is not.  The Court denied defendants' motion to
dismiss, declining to adopt their argument that the benefits in
question here were <u>not</u> covered by ERISA.  That the plaintiff
later decided to dismiss his ERISA claim -- perhaps persuaded by
defendants' arguments, but perhaps also by his own evaluation of
materials obtained through discovery -- and that the Court
granted plaintiff's motion for voluntary dismissal hardly
constitutes "adoption" by the Court.

### B.    <u>Whether Brown's Claimed Benefits Relate to Benefits Covered Under ERISA</u>

Under <u>O'Connor v. Commonwealth Gas Co.</u>, 251 F.3d 262, 267
(1st Cir. 2001), the question of whether a given benefit is a
plan covered under ERISA is a fact-intensive determination.  The
fundamental question is whether the benefit is vulnerable to

abuses of discretion by the employer.  Such vulnerability may
arise where the administration of the benefit relies on
subjective, individualized decisions by the employer, id., or
where the benefit involves "ongoing investments and obligations."
Belanger v. Wyman-Gordon Co., 71 F.3d 451, 454 (1st Cir. 1995).
"[W]here benefit obligations are administered by a mechanical
formula that contemplates no exercise of discretion, the need for
ERISA's protections is diminished."  O'Connor, 251 F.3d at 266-
267.

　　　Brown lays claim to five separate benefits: (1) a severance
payment, (2) a pension, (3) the vesting of previously-awarded
stock options, (4) continuation of employer-sponsored health
insurance, and (5) outplacement services.  Defendants only argue
that (1) and (2) are ERISA-covered because they "relate to"
ERISA-covered plans -- the standard SSC pension and severance
plans that they trigger and/or modify.[3]  Brown, for his part, now
argues that the modified EVSP allegedly promised him by Spina did
not in fact trigger those underlying programs at all, since Spina
promised him only a sum of money equivalent to what he would
collect if he were covered under those programs, and not
participation in those programs themselves.

---

[3] Ordinarily an ongoing retiree health insurance plan would be a covered
employee welfare plan under ERISA, but in this case the insurance plan is
administered and paid for entirely in the U.K. and hence is not covered under
ERISA.

The First Circuit has followed the Supreme Court in holding that a benefit "relates to" an ERISA-covered plan if, in order to calculate the benefit, the court must "refer to" the terms of the ERISA-covered plan, whether or not the money comes from the same fund. Hampers v. W.R. Grace & Co., 202 F.3d 44, 52 (1st Cir. 2000) ("We have consistently held that a cause of action 'relates to' an ERISA plan when a court must evaluate or interpret the terms of the ERISA-regulated plan to determine liability under the state law cause of action").[4] Thus, the question is both whether the severance and pension benefits relate closely enough to pre-existing plans, and also whether those plans are covered under ERISA. I will consider each of these questions for the pension and then for the severance payment.

### 1.   **Severance Payment**

By the terms of Brown and Spina's June 2003 discussion, Brown would receive exactly the same severance payment as any executive exercising early retirement under the EVSP: fifty weeks of base pay plus four weeks per year of employment. This severance benefit was an artifact of the EVSP -- it did not refer to the ordinary SSC severance benefit, which was figured using an

---

[4] See also McMahon v. Digital Equip. Corp., 162 F.3d 28, 38 (1st Cir. 1998); Boston Children's Heart Found., Inc. v. Nadal-Ginard, 73 F.3d 429, 440 (1st Cir. 1996); Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790, 793-94 (1st Cir. 1995); Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994); Degnan v. Publicker Indus., 83 F.3d 27 (1st Cir. 1996).

entirely different formula and was not available to the Executive Vice Presidents who were eligible for the EVSP.

Defendants argue that such a payment is covered under ERISA, relying on the Labor Management Relations Act's definition of "employee welfare benefit plan" as any plan that provides "severance benefits." 29 U.S.C. § 1002(2)(B); 29 C.F.R. § 2510.3-1.  But the Supreme Court has ruled that there is a difference between severance "plans," which require ongoing administration and discretion by the employer, and lump-sum severance "payments"; ERISA covers only severance "plans," and not "payments." <u>Fort Halifax Packing Co. v. Coyne</u>, 482 U.S. 1, 12 (1987); <u>construed in</u> <u>District of Columbia v. Greater Wash. Bd. of Trade</u>, 506 U.S. 125 (1992)). The First Circuit has followed, ruling that a lump-sum severance payment based on a mechanical formula  qualitatively similar to the formula at issue here (one week's salary per year of employment) was not covered because it did not involve sufficient employer administration and discretion.  <u>Rodowicz v. Mass. Mutual Life Ins. Co.</u>, 192 F.3d 162, 171 (1st Cir. 1999) (citing <u>Belanger</u>, 71 F.3d at 454). Hence, the mechanical lump-sum severance payment here is not covered by ERISA.[5]

---

[5] Ordinarily, where a "multi-part" benefit plan has both ERISA and non-ERISA elements, the entire plan is covered under ERISA in order to avoid the administrative confusion of having some parts of a benefit package covered by state law and other parts by federal law. <u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85, 107-08 (1983).  Thus, if the pension benefit at issue in this case had been developed enough to be enforceable, and was ERISA-covered, it would

### 2. **Pension**

As described above, the terms of the pension benefit were never worked out to the point that it could be enforced.  Thus it is not a "plan" at all; there is nothing there for ERISA to cover or enforce.

Accordingly, I conclude that there is no ERISA preemption of the common law claims, to which I now turn.

## VI. **COUNT I:  BREACH OF CONTRACT**

Plaintiff argues that his and Spina's June 2003 conversation satisfied all the elements of an enforceable oral contract, that this contract bound SSC, and that SSC breached the contract in denying Brown the benefits in question.  Defendants argue that no contract existed because (1) the June 2003 conversation was only a negotiation, not a final agreement; (2) the terms agreed-upon in the June 2003 conversation were not definite enough to constitute a contract; and (3) Spina had no authority, either actual or apparent, to bind SSC to the commitments Brown claims were made.  Both of these arguments need to be reviewed through the lens of a summary judgment proceeding -- whether material facts are at issue.

### A. **Spina's Intent**

---

drag the other benefits - severance, medical, etc. - along with it into ERISA coverage.  But the pension benefit was never fleshed out to the point that it could even be considered a "part" of a multi-part plan; therefore, there is nothing on which to hang ERISA coverage.

In order for the June 2003 conversation to have constituted the meeting of the minds necessary for a contract, Spina must have intended his statements as binding commitments.  In determining Spina's intent, we cannot rely on his later assertions of what his intent was; rather, his outward manifestations -- his statements to Brown and others -- are the exclusive evidence of his intent.  Restatement 2d of Contracts, § 19-21.

Spina testified at length in his deposition as to his subjective understanding of the June 2003 conversation,[6] but only one sentence describes what he actually said to Brown at that time with respect to the details of the arrangement: "I said I would go and do my best to get what I could get [for Brown]."

---

[6] Spina asserted repeatedly that he did not subjectively understand or intend the June 2003 conversation to be a binding agreement.

> A: I made a commitment that I was empowered to make by my office, which was to use my office to get him these benefits that he thought were fair, and would make him comfortable.
>
> Q: What did you believe you were empowered to do in that regard?
>
> A: It was to direct HR to put it into details to either ask HR or me to negotiate with Alan to make sure we had the agreement with Alan and Tim, things that we got the spirit of what we were discussing onto paper.  And then to the extent that it involved, you know, options in particular, that was a thing that management, including the CEO, was never able to grant, or do, or agree to without permission of the board.

Defs.' Stmt. of Mat. Facts, Ex. 34 at 26.  Unfortunately, Spina does not assert that he actually said any of this to Brown, only that it was what he subjectively believed his authority was.

Defs.' Stmt. of Mat. Facts, Ex. 34 at 26 ("Spina depo."). Spina conceded, however, that he did not remember whether he'd specifically mentioned to Brown any need to get ECC approval; "I don't recall any specific situation where I walked Alan through that." Pl.'s Cross-Stmt. of Fact Ex. 4 at 44. This testimony certainly could support reasonable inferences either way - either that Spina made it clear to Brown that the discussion did not represent a final commitment, or that he acted as though it did, as if he were the final decisionmaker.

Brown testified as follows about statements allegedly made in June 2003:

> He [Spina] said that he'd considered my proposal, and with the exception of the piece that he couldn't deal with, such as equity plans, he thought that it was a fair one and he was happy with it and I accepted it.

Pl.'s Cross-Stmt. of Facts, Suppl. Ex. 3 at 104. Again, it is unclear whether Spina's statement that he thought Brown's proposal was fair and that he was happy with it reasonably constituted a binding offer or acceptance. Likewise, Brown's statement that he "accepted it" is not a description of what Brown actually said, but rather Brown's after-the-fact assertion that whatever he said constituted an acceptance.

Spina himself repeatedly characterized the June 2003 discussion as a "commitment" when he described it for the ECC in his letter of June 30, 2004.

> I made oral *commitments* to Tim Harbert and
> Alan Brown . . . The *commitment* I made to Tim
> and Alan was as follows.  In exchange for
> their continued *commitment* to remain active
> as leaders of SSGA, State Street Corporation
> would hold available for them the same
> separation package the company was offering
> U.S. employees under what is known as the
> Voluntary Separation Program (VSP) . . . My
> stated *commitment* to them was stated as for
> the period when they were between the ages of
> 50 and 55 . . .[7]

Pl.'s Stmt. of Mat. Facts Ex. 18 (emphasis added).  But elsewhere
in the same letter, Spina made statements to the ECC indicating
that his discussion with Brown was *not* legally binding: "I
strongly recommend the Executive Compensation Committee act in
accordance with these decisions if and as the circumstances arise
that make them relevant." Id.  Taken as a whole, the mixed
messages in Spina's June 30 letter do not resolve the dispute as
to whether he intended his discussion with Brown to be a legally
binding commitment.

Finally, defendants point to the agreement - undisputed to
have occurred between Brown and Spina - that Spina would put the
terms of their discussion into writing.  Defendants argue that
this agreement made any larger agreement on the EVSP conditional

---

[7] Again, Spina testified at deposition as to his subjective
understanding of what he meant by the word "commitment": "I was trying to put
some spin on the ball by using stronger letters or stronger words with the
Board in the letter . . . I was trying to convey an impression to them that,
while they had the ultimate authority on these things, that I had made
representations to Alan that he would get his needs addressed." Defs.' Stmt.
of Mat. Facts, Ex. 34 at 26.  But again, his *ex post* assertion of subjective
intent is not relevant.

on finalization and reduction to written terms.  But, as Brown points out, parties may arrive at an oral contract and then agree to memorialize that contract in writing for practical reasons, without making the contract conditional on the writing.

**B.**    **Whether the Terms were Sufficiently Definite**

As described above, in connection with the pension provisions, in order for an agreement to be legally binding, its terms must be "sufficiently definite or reasonably certain." 1-2 Murray on Contracts § 38(A).  The test of whether an agreement is sufficiently definite is whether the Court would be able to discern its terms well enough to determine whether a breach has occurred and fashion a remedy. Restatement 2d of Contracts § 33(2).  "[W]here the parties have not merely left out a material term [by oversight or accident], but have expressly agreed to reach agreement later through their own decision-making process, the contract is unenforceable." Murray § 38(B).

Defendants argue that at least two material terms were left undecided in the June 2003 conversation.  First, it was not specified how long Brown would commit to remain with the company. Second, as described above, it was not specified how Brown's retirement benefit would be calculated.

The only consideration offered by Brown for inclusion in the EVSP was that he would not respond to other companies' recruitment efforts and would "be there to lead SSGA through this

very difficult time until it was definitely behind us and the firm was stable and cruising ahead again." Pl.'s Stmt. of Mat. Facts in Supp'l of Pl.'s Mot. for S.J. at ¶ 33.  This is not necessarily incurable vagueness.  It is clear from the context that the "difficult time" referred to the period following the exodus of executives, including two of the G4.  In addition, Brown proposed that he have until age 55 to elect the EVSP; since he was in his early 50's at the time of the discussion, it is clear that he was proposing to stay no more than a few years.  A reasonable fact-finder may be able to supply a term of time here if given sufficient evidence of the goings-on at the company.

As described above, however, the terms of Brown's pension benefit cannot be similarly filled in by a fact-finder.

### C.    **Whether Spina had the Authority to Bind SSC**

Brown argues that Spina had both actual and apparent authority to bind SSC to the terms they discussed.  Defendants argue that Spina did not have actual authority, because decisions about executive compensation were the sole authority of the Board and its Executive Compensation Committee.  Further, defendants argue that Brown knew or should have known this from his ten years' experience in the upper echelons of SSC management and from the prior dealings with the company in setting and adjusting his compensation, so that he cannot claim that Spina had apparent authority.

1.    **Spina's Actual Authority**

Defendants allege that the Board and the ECC had sole authority with respect to all executive compensation decisions, based on SSC's corporate charter. The charter itself is not absolutely clear on this, saying only that the ECC

> shall annually review, evaluate and advise
> the Board . . . with respect to, for the CEO
> and the senior executives [Executive Vice
> President and above] of the Corporation, (a)
> the annual base salary level, (b) the annual
> incentive opportunity level, (c) the long-
> term incentive opportunity level, (d)
> employment agreements/provisions, in each as,
> when and if appropriate, and (e) any special
> or supplemental benefits.

Defs.' Ex. 2 (#51-2). The verbs "review, evaluate and advise" do not equate to "have sole authority to determine." However, Brown himself admitted in testimony that he believed that the ECC had sole authority to approve benefit packages. Defs.' Ex. 13 at 80 (#51-2) ("the charter of the executive compensation committee . . . puts something like that [the VSP] squarely in its remit"). Thus, Brown concedes that the creation of a new benefit would be beyond the scope of Spina's authority. But Brown does not argue that Spina created a new benefit. Instead, he argues that the EVSP had already been approved by the ECC, and that all Spina did was extend eligibility to Brown, an act <u>within</u> his authority.

Defendants offer multiple corporation documents, from the corporate charter to minutes of ECC meetings to standard employment agreements, all of which support their assertion that

-25-

the ECC and the Board were the decision-makers on matters of executive compensation.  But none of the evidence in the record resolves the issue raised by Brown, namely whether the ECC's vote to approve the EVSP package authorized Spina to offer that package to whomever he wished.  Further, if Spina did have this authority, it is not clear whether he could make modifications to the EVSP as Brown's situation required.

Therefore, the question of whether Spina had authority to bind SSC to the alleged contract remains a matter of disputed fact.

### 2.  Spina's Apparent Authority

Brown argues that, even if Spina did not have actual authority to bind SSC to the agreement, he had apparent authority.  Under the doctrine of apparent authority,

> where a principal has, by voluntary act,
> placed an agent in such a situation that a
> person of ordinary prudence conversant with
> business usages and the nature of the
> particular business is justified in assuming
> that such agent has authority to perform a
> particular act and deals with the agent upon
> that assumption, the principal is estopped as
> against such third person from denying the
> agent's authority.

3 Am. Jur. 2d Agency § 79.  The third party - in this case, Brown - has a duty to act with reasonable diligence and prudence in determining the extent of the agent's authority. 3 Am. Jur. 2d Agency § 81.  Moreover, if the agent falsely represents himself as having authority where the principal has not clothed him with

any such authority, then the principal is not liable for the agent's obligations unless it later ratifies them (see § VII, _infra_, on the question of whether ratification occurred).

Here, defendants argue that multiple sources of information - the corporate charter, fine print on Brown's prior compensation statements, and experience in the ordinary course of SSC's business - should have alerted Brown to limits on Spina's authority.  Whether Brown actually read and heeded these sources is irrelevant, as the standard is whether "a person of ordinary prudence conversant with business usages and the nature of the particular business" should have known the information they contained. 3 Am. Jur. 2d Agency § 79.

However, once again, Brown's theory is not that Spina had authority to set executive compensation, but rather that he had authority to extend eligibility for the already-approved EVSP package.  None of the documents in the record address this fine point.  Considering that Spina's actual authority remains unclear from the record, it necessarily remains even more unclear whether Brown's perception of Spina's authority was reasonable.

Factual issues remain as to whether Spina intended to form a binding commitment and whether he had actual or apparent authority to bind SSC in a contract.  However, it is clear from the record that no material term was agreed upon for calculation

of Brown's pension.  Therefore, I **GRANT** defendants' motion for
summary judgment as to the pension, but **DENY** it as to the rest of
the benefits sought.  I also **DENY** plaintiff's motion for summary
judgment as to Count I.

## VII. <u>COUNT II: RATIFICATION</u>

A principal may be bound by the promises made by its agent,
even if the agent acted without actual or apparent authority, if
the principal becomes aware of the promise and either expressly
ratifies it or fails to repudiate it.  Brown argues that Spina's
June 30, 2004 letter informed the ECC that Spina had made a
"commitment" to Brown.  If the ECC at that time believed that
such a commitment was beyond the scope of Spina's authority, it
had a duty to inform Brown so, or else its silence would ratify
Spina's promise.

A principal's duty to repudiate an agent's *ultra vires*
promise is triggered when it "had 'knowledge of such facts or
circumstances as would put a reasonable person on inquiry and
which would lead to full discovery.'" <u>Puritan Medical Center,
Inc. v. Edward L. Cashman, Jr.</u>, 413 Mass. 167, 172-173 (1992)
(citing <u>Ingalls Iron Works Co. v. Ingalls</u>, 177 F. Supp. 151, 162
(N.D. Ala. 1959) (directors ratified settlement contract where
they had only constructive knowledge of it); citing <u>Baltimore &
O. R. Co. v. Foar</u>, 84 F.2d 67, 72 (7th Cir. 1936) (directors
ratified contract where, if they did not have actual knowledge of

-28-

the contract, they ought to have known of it)).  The question,
then, is whether Spina's letter and presentation gave the ECC
constructive knowledge that he had gone ahead and made a contract
with Brown.

Given the mixed messages in Spina's June 30, 2004 letter to
the ECC - frequently using the term "commitment" but concluding
by "recommending" that the ECC act on the proposal - a reasonable
fact-finder could go either way as to what the ECC actually knew
or should have known about Spina's assurances to Brown.

I **DENY** both plaintiff's and defendants' motions for summary
judgment as to Count II (except for Brown's claim for a pension
benefit).

VIII.    <u>COUNT III: DETRIMENTAL RELIANCE AND PROMISSORY ESTOPPEL</u>

Though there is significant factual dispute as to whether
Brown reasonably relied on his discussion(s) with Spina and
others, this Count is moot, because it will succeed only if
either Count I or II also succeed.

Ordinarily, promissory estoppel stands in to make a promise
enforceable in the absence of consideration.  Here, the dispute
does not concern consideration; if an agreement was formed, Brown
provided consideration in the form of a promise to remain
employed at the company for a period of time while others were
leaving.  The dispute here is whether there was an agreement at
all, whether the terms of any putative agreement were

sufficiently definite to constitute a contract, whether Spina had the authority to bind SSC, and whether SSC had the constructive knowledge of a promise by an agent required to invoke the doctrine of ratification.  A promissory estoppel argument adds nothing to any of these issues.

If the June 2003 discussion did not amount to something that a reasonable person could take to be a commitment, then there was no promise on which Brown could have reasonably relied, and he must lose on all Counts.  Likewise, if the terms of the June 2003 discussion were not sufficiently definite, then there was also no promise on which Brown could have relied, and again he must lose on all Counts.

If Spina did make Brown a definite promise in June 2003, and if he had the authority (actual or apparent) to do so, then there was a binding contract and Brown can prevail on Count I for breach of contract;[8] promissory estoppel is moot where there is a fully enforceable contract.  If Spina made a definite promise *without* authority, but the promise was then ratified by the ECC's silence, Brown will prevail on Count II; again, promissory estoppel will be moot.  If Spina made a definite promise without authority (actual or apparent), and the ECC did not have the

---

[8] In this case (though not always). apparent authority is the equivalent of reasonable reliance.  Both ask whether it was reasonable for a third party to rely on an agent's promise.  If it was reasonable for Brown to believe that Spina had authority to make a promise, then Brown can win on Count I by an apparent authority theory, and promissory estoppel will be moot.

constructive knowledge of the promise required for ratification, then Brown can have no claims against SSC for a promise made by its agent without its knowledge and outside of the scope of the agent's actual or apparent authority. Brown might be able to argue promissory estoppel against Spina himself, but Spina is not a defendant in this action.

Therefore, there is no need for a ruling on this Count. Brown will either prevail on another Count, or will fail on all of them.

## IX.  COUNT IV: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

Brown claims that SSC terminated him so as to prevent his receiving the benefits owed him pursuant to Spina's alleged promise, in violation of the implied covenant of good faith and fair dealing in his employment contract.

Brown was an at-will employee. Under Massachusetts law, all at-will employment contracts contain "an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Fortune v. National Cash Register Co., 373 Mass. 96, 104 (1977). Thus, a claim for breach of covenant of good faith arises when an employer terminates an employee for the purpose of unjustly preventing the employee from collecting future compensation due for past services. Frankina v. First Nat'l Bank, 801 F. Supp. 875, 883 (D. Mass. 1992). Brown

therefore argues that SSC terminated him in March 2005 so as to prevent him from collecting the benefits he alleges he was due under the EVSP.

If there was no binding contract to include Brown in the EVSP, then this Count must fail, as there would then be no due compensation that Brown was prevented from collecting.

However, even if there was a binding contract to include Brown in the EVSP, his argument here must fail.  The parties dispute whether Brown attempted or was able to make it clear to SSC that his resignation was contingent on his eligibility for benefits, or whether he attempted to stave off his termination. But neither party alleges that Brown was terminated "for cause" as would be necessary to deny benefits under the EVSP; therefore, whatever factors may stand in the way of his collecting benefits, the nature of his termination is not one of them.  Defendants do not argue anywhere that Brown is ineligible for benefits because he was terminated for cause; in fact, they maintain that he resigned voluntarily.  As the record now stands, if Brown did create a binding contract with SSC, then he will collect his benefits, regardless of whose version of the termination is found to be true.  Defendants cannot be guilty of terminating Brown to

avoid paying him benefits when they do not even seek to use the termination to avoid the benefits.[9]

Therefore, I **GRANT** defendants' motion for summary judgment as to Count IV, and **DENY** plaintiff's motion for summary judgment as to Count IV.

**X.    CONCLUSION**

As to the pension benefit Brown seeks, he and Spina never reached terms specific enough for the Court to enforce. Therefore, I **GRANT** defendants' motion for summary judgment as to the pension on all counts.

I **DENY** both parties' motions for summary judgment as to the rest of Count I (breach of contract) and all of Count II (ratification), and **GRANT** defendants' motion for summary judgment as to Count IV (breach of covenant of good faith and fair dealing).  Count III is moot, as it will succeed only if Count I or II also succeeds.

For the reasons set forth above, I **GRANT IN PART** defendants' motion for summary judgment as to Brown's claimed pension and the breach of covenant of good faith, and **DENY IN PART** defendants' motion for summary judgment as to the rest of Brown's claims and benefits.  I also **DENY** plaintiff's motion for summary judgment.

---

[9] Of course, if the Court finds that Brown is entitled to benefits because a binding contract was formed, and defendants *then* turn around and attempt to argue that Brown was terminated for cause, they should be judicially estopped from doing so.  At that point, they would be reversing an argument that they would have already prevailed upon the Court to adopt.

-1-

In order to set a trial date, a status conference will be held on Tuesday, December 18, 2007, at 2:30 p.m., Courtroom 2, 3rd Floor. Document numbers **62 and 68** are **MOOT.**

**SO ORDERED.**

**Date:  September 28, 2007**              /S/ NANCY GERTNER

                                          **NANCY GERTNER, U.S.D.C.**